UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SYLVESTER OWINO and JONATHAN
GOMEZ, on behalf of themselves and all
others similarly situated,

Plaintiffs,

v.

CORECIVIC, INC., a Maryland
corporation,

Defendant.

Case No.: 17-CV-1112 JLS (NLS)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO DISMISS**

(ECF No. 18)

Presently before the Court is Defendant CoreCivic, Inc.'s Motion to Dismiss Complaint, ("MTD," ECF No. 18). Also before the Court is Plaintiffs Sylvester Owino and Jonathan Gomez's Response in Opposition to the Motion, ("Opp'n," ECF No. 22), and Defendant's Reply in Support of, ("Reply," ECF No. 26), the Motion. The Court vacated the hearing on the Motion and took it under submission pursuant to Civil Local Rule 7.1(d)(1). (ECF No. 25.) After the Court vacated the hearing, Plaintiffs filed two Requests for Judicial Notice, ("First RJN," ECF No. 27; "Second RJN," ECF No. 32), to which Defendant filed a Response, ("RJN Response," ECF No. 36). Then, the Court stayed the current proceedings and deferred ruling on Defendant's Motion, (ECF No. 33), for the purpose of addressing a motion to consolidate in a related case, *Gonzalez et al. v.*

*CoreCivic, Inc.*, (No. 17-CV-2573 JLS (NLS)). The Court ruled on the related matter and now **LIFTS** the stay in these proceedings. After considering the Parties' arguments and the law, the Court rules as follows.

## BACKGROUND

Plaintiffs are former civil immigration detainees who were incarcerated at the Otay Mesa Detention Center, which is owned and operated by Defendant. ("Compl.," ECF No. 1, ¶¶ 10–11.) Plaintiffs allege while at Otay Mesa, they and other detainees performed a variety of tasks for Defendant ranging from "scrubb[ing] bathrooms, showers, toilets, and windows" to "provid[ing] barber services to detainees" to "perform[ing] clerical work for CoreCivic." (*Id.* ¶ 14.) In return for those services, detainees were paid $1.00 per day, which Plaintiffs refer to as "Dollar-A-Day Work." (*Id.* ¶ 15.) Detainees could only spend their earnings at Defendant's "company store" or commissary. (*Id.*)

Plaintiffs also allege that Defendant forced Plaintiffs and other detainees "to clean, maintain, scrub, sweep, and mop floors, bathrooms, showers, toilets, and windows for no pay at all." (*Id.* ¶ 16.) Defendant allegedly threatened to punish Plaintiffs and other detainees who refused to work by means of "confinement, physical restraint, substantial and sustained restriction, deprivation, and violation of their liberty, and solitary confinement." (*Id.*)

Plaintiffs seek to certify three subclasses. Two of those subclasses would include all detainees who performed uncompensated work for Defendant, both nationally—the "Nationwide Forced Labor Class"—and in California—the "California Forced Labor Class." (*Id.* ¶ 30.) The third subclass would include all detainees who performed work for Defendant and were paid one dollar per day—the "California Labor Law Class." (*Id.*) Plaintiffs bring twelve claims, which can be divided as follows. First, Plaintiffs allege violations of the federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, *et seq.*, and the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5. (*See* Compl. ¶¶ 40–62.) Next, Plaintiffs allege violations of numerous sections of the California Labor Code. (*See id.* ¶¶ 71–101.) Finally, Plaintiffs bring a negligence claim, (*id.* ¶¶ 102–

19), a claim for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, and an unjust enrichment claim, (*id.* ¶¶ 120–28).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678 (citation omitted).

3

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

## ANALYSIS

The Court's analysis proceeds as follows. First, the Court briefly analyzes the judicial notice requests. Second, the Court discusses Plaintiffs' forced labor claims arising from alleged violations of the federal and California TVPA. These claims coincide with Plaintiffs' putative state and nationwide forced labor classes. Third, the Court addresses Plaintiffs' "Dollar-A-Day" claims arising from alleged violations of the California Labor Code. These claims coincide with Plaintiffs' putative California labor law class. Fourth, the Court analyzes Plaintiffs' derivative claims.

## I.     Request for Judicial Notice

Plaintiffs request the Court judicially notice two documents. First, Plaintiffs submit an opinion from *Chao Chen v. Geo Group, Inc.*, No. 17-cv-5769-RJB, 2017 WL 6034365 (W.D. Wash. Dec. 6, 2017). (First RJN.) Second, Plaintiffs request the Court notice the Tenth Circuit's opinion in *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018). (Second RJN.)

Defendant opposes both Plaintiffs' requests because "it is inappropriate to request that the Court take judicial notice of legal authority." (RJN Response 2[1] (quoting *Stiller v. Costco Wholesale Corp.*, No. 09-cv-2473-GPC-BGS, 2013 WL 4401371, at *1 (S.D. Cal. Aug. 15, 2013)).) The Court agrees with Defendant. It is well established that that courts may consider legal reasoning and conclusions of other federal courts without resort to Rule 201. *See, e.g.*, *Derum v. Saks & Co.*, 95 F. Supp. 3d 1221, 1224 (S.D. Cal. 2015) (citing *McVey v. McVey*, 26 F. Supp. 3d 980, 984–85 (C.D. Cal. 2014)). The opinions attached to Plaintiffs' requests are the legal reasoning and conclusion of other federal courts. While the Court will consider relevant legal authority in arriving at its conclusion, the Court

---

[1] Pin citations refer to the CM/ECF page numbers electronically stamped at the top of each page.

**DENIES** Plaintiffs' Requests for Judicial Notice, (ECF Nos. 27, 32).

## II. Forced Labor Claims

### A. Federal TVPA (First Cause of Action)

Plaintiffs allege Defendant violated the Federal Trafficking Victims Protection Act, 18 U.S.C. § 1589(a).[2] (Compl. ¶ 41.) Section 1595 creates a private cause of action for victims of a violation of the TVPA. 18 U.S.C. § 1595(a). Plaintiffs allege they and putative class members were forced to perform labor and services under force, threats, abuse, and other means. (Compl. ¶ 42.)

Defendant raises several challenges to the TVPA claim. First, Defendant argues that the TVPA does not extend to civil immigration detainees performing routine housekeeping tasks in lawful detention. (MTD 13.) Second, Defendant contends that Plaintiffs fail to plead sufficient facts to state a TVPA claim. (*Id.* at 18.) Third, Defendant argues that Congress amended the TVPA in 2008; therefore, at least some of Plaintiffs' claims are barred because the relevant portions of TVPA cannot be given retroactive effect. (*Id.* at 20.) Fourth, Defendant argues that a portion of Plaintiffs' claim are barred by the statute of limitations. (*Id.*) The Court addresses each argument in turn.

### 1. Whether the TVPA Extends to Civil Immigration Detainees

Defendant advances two arguments why the TVPA does not apply to civil immigration detainees. First, Congress did not intend for the statute to apply to

---

[2] 18 U.S.C. § 1589(a) provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

Defendant's conduct. Second, the Thirteenth Amendment, which provides Congress's authority to create the TVPA, has a "civic duty exception" that Defendant contends exempts its conduct from the TVPA.

a. Statutory Interpretation of 18 U.S.C. § 1589

Defendant argues that Congress's purpose in enacting the TVPA, including section 1589, was to "combat trafficking in persons." (*Id.* at 13 (quoting Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466 (2000)).) The congressional findings all focused on the evils of trafficking in persons. (*Id.*) For example, Congress found:

> As the 21st century begins, the degrading institution of slavery continues throughout the world. Trafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today. At least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year.

(*Id.* at 14 (emphasis omitted) (quoting § 102(b)(1), 114 Stat. at 1466).) Defendant goes on to cite several similar congressional findings—all focused on "[t]rafficking in persons." (*Id.*) From these findings Defendant concludes that Congress's clear intent was to prosecute human traffickers, i.e., those who transport persons "across international borders" and force them to work. (*Id.* at 15.) Because neither the U.S. Immigrations and Customs Enforcement ("ICE") nor Defendant transported Plaintiffs from their homes or across national borders, then Defendant is beyond Congress's intended purpose. (*Id.*) Finally, Defendant cites several cases for the proposition that where literal application of a criminal statute would lead to "extreme or absurd results" then the class of persons subject to the criminal statute should be limited. (*Id.* (citing, e.g., *United States v. Katz*, 271 U.S. 354, 362 (1926)).) From that rule, Defendant contends that applying a forced labor statute to lawfully-detained civil immigration detainees would be both extreme and absurd.

Plaintiffs respond that the plain text of the TVPA, including section 1589, proscribes any kind of forced labor even if that labor does not rise to the level of involuntary servitude as defined prior to enactment of the TVPA. (Opp'n 16 (citing *Nunag–Tanedo v. E. Baton*

6

*Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1144–46 (C.D. Cal. 2011); and *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015)).) According to Plaintiffs, the plain meaning of the TVPA is broad enough to encompass their claims. Plaintiffs also argue that the Complaint does not allege any "trafficking" violations under the TVPA, but rather bring violations of the "forced labor" provision of TVPA, § 1589. (*Id.* at 19.)

In reply, Defendant again reiterates its argument that a court must look beyond the plain language of a statute if a literal application would lead to "extreme of absurd results," (Reply 6–7 (quoting *Katz*, 271 U.S. at 362)), or if "internal evidence of the statute" suggests a "departure from a literal reading" to "effect the legislative purpose," (*id.* at 7 (quoting *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 803–04 (9th Cir. 1989))). Defendant also argues *Nunag-Tanedo* is factually distinguishable. (*See id.*)

Defendant argues its conduct does not fall under § 1589. This requires the Court to undertake statutory construction. "The plain language of a statute is the starting point for its interpretation." *Wilshire Westwood Assocs.*, 881 F.2d at 803 (citing *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)). A court's "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); and *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)).

18 U.S.C. § 1589 provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

The statute's express terms do not limit who constitutes a victim of forced labor. Section 1589 applies to any "person"—there is no limitation on the type or status of said person. Similarly, the target of the statute is broad: section 1589 criminalizes "[w]hoever knowingly provides or obtains the labor or services." Nor does the statute contain any language limiting application to those who traffic in persons or transport persons across national borders.

Had Congress intended to limit § 1589 to trafficking or transnational crime it could have done so; indeed, other sections of the TVPA contain the limiting language Defendant urges the Court read into § 1589. For example, section 1591 prohibits "[s]ex *trafficking* of children or by force, fraud, or coercion" and has an explicit interstate or foreign commerce requirement. 18 U.S.C. § 1591 (emphasis added). Section 1584 criminalizes "[w]hoever knowingly and willfully holds to involuntary servitude . . . any other person for any term, or *brings within the United States* any person so held." 18 U.S.C. § 1584(a) (emphasis added). The lack of similar language in section 1589 reinforces the conclusion that there is no limitation on who constitutes a "person" for purposes of section 1589.

Defendant urges the Court to read Congress's purpose, purportedly evident from TVPA's congressional findings, into the statute. (*See* MTD 13–15.) Yet, courts "have long held that there is a strong presumption that the plain language of [a] statute expresses congressional intent, rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed." *Campbell v. Allied Van Lines Inc.*, 410 F.3d 618, 622 (9th Cir. 2005) (alteration in original) (quoting *United States v. Tobeler*, 311 F.3d

8

1201, 1203 (9th Cir. 2002)). "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (alteration in original) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). If the statutory text is unambiguous, the inquiry ends there. *See id.*

Here, Defendant's arguments do not illustrate ambiguity in the language or exceptional circumstances to depart from the plain language of the statute. The Sixth Circuit addressed an argument similar to Defendant's in *United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015). There, two defendants were convicted for violating section 1589 when they forced a developmentally-disabled young woman and her minor daughter "to clean the apartment, do yardwork, care for [the defendants'] dogs, and run various errands for [the defendants]." *Id.* at 613. The court went on to detail more than two years of inhumane conduct—none of which involved transporting people across borders or trafficking in persons. *See id.* at 613–16. The defendants were convicted at trial and appealed.

Like Defendant here, the *Callahan* defendants argued that the TVPA's legislative history was passed to combat international trafficking in human beings and Congress did not intend to criminalize their conduct. *Id.* at 617. The *Callahan* court reasoned that the plain language of the statute was not limited to immigrant victims or sex workers. The court determined that reference to legislative history was unnecessary when the legislature's intent was obvious from the statute's unambiguous language. *Id.* at 617–18 (citations omitted). The court was also unpersuaded by an argument that § 1589 was meant to target those who exploit foreign-born victims because, again, the language of the statue did not include such a restriction. *Id.* at 618. Accordingly, the court held that § 1589 proscribed the defendants' conduct. *Id.* at 620.

The Court finds the *Callahan* court's reasoning and conclusion persuasive. There is no ambiguity in section 1589 and the Court will not read congressional findings into the statute. The next issue is whether the Court should deviate from the plain meaning of the

statute when literal application of the criminal statute would lead to "extreme or absurd results." *Katz*, 271 U.S. at 362. Defendant argues that interpreting the phrase "labor or services of a person" to include lawfully-detained civil immigration detainees required to clean up after themselves is both extreme and absurd. Defendant does not explain its reasoning beyond its assertion that it would be absurd to criminalize Defendant's requirement for lawfully-detained immigration detainees to clean up.[3]

Perhaps Defendant thinks it absurd to criminalize its alleged conduct because the federal government contracts with Defendant to house civil immigration detainees, i.e., Plaintiffs and other putative class members were lawfully detained. Yet, this Court and courts across this nation routinely hear cases involving violations of constitutional rights of incarcerated prisoners at the state and federal level. These prisoners were lawfully imprisoned. Lawful detention, by itself, is not a shield against illegal conduct against those held in detention.

Alternatively, Defendant might argue that the "labor or services" it requires of detainees is miniscule—detainees are only required to clean up their personal and communal areas. Logically, this is a question of degree. If detainees are only forced to

---

[3] Defendant's concern for an "absurd and extreme" application is tempered by two considerations. First, section 1589 only reaches labor or service achieved through force, "serious harm," abuse of legal process, or a scheme intended to cause a person to believe that serious harm would befall that person. *See* § 1589(a)(1)–(4). The term "serious harm" is defined broadly. *See* § 1589(c)(2). As the Ninth Circuit has summarized:

> [S]omeone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm—physical or nonphysical, including psychological, financial, reputation harm—that would compel someone in her circumstances to continue working to avoid that harm.

*United States v. Dann*, 652 F.3d 1160, 1169–70 (9th Cir. 2011). Second, section 1589's scope is narrowed further still by the requirement of scienter. *Id.* at 1170 (citing *United States v. Calimlim*, 538 F.3d 706, 712, 714 (7th Cir. 2008)). "The jury must find that the employer intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *Id.* These two limitations mitigate, at a high level of generality, the concern against "absurd or extreme" application of this criminal statute.

make their beds then such conduct likely does not rise to criminal forced labor. Indeed, ICE has published standards requiring civil immigration detainees to make their beds, amongst other personal housekeeping tasks. *See* U.S. Immigration & Customs Enforcement, Performance-Based National Detention Standards 2011, § 5.8, at 406 (2016 ed.), https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (hereinafter "ICE PBNDS").[4] Conversely, one could imagine forced labor to such an extent and degree as to go well beyond cleaning personal and communal areas. In fact, Plaintiffs allege that Defendant forced them to "clean, maintain, scrub, sweep, and mop floors, bathrooms, showers, toilets, and windows for no pay at all, not only in their living areas ('pods'), but also throughout the other interior and exterior areas of CoreCivic's detention facilities." (Compl. ¶ 16.) The preceding comparison illustrates that Plaintiffs' claims require a fact-intensive inquiry. The Court raises this hypothetical only to illustrate the following conclusion: the Court only finds that applying § 1589 to Defendant's alleged conduct does not lead to *per se* "extreme or absurd" consequences that would warrant deviation from § 1589's plain meaning.

### b. Civic Duty Exception

Defendant advances a second argument why the TVPA does not apply to its conduct: Defendant may avail itself of the Thirteenth Amendment's civic duty exception. (*See* MTD 15–18.) Defendant begins with *United States v. Kozminski*, 487 U.S. 931 (1988), where the Supreme Court examined the phrase "involuntary servitude," found in 18 U.S.C. § 1584. As Defendant explains, *Kozminski* determined that Congress intended § 1584 to carry the same meaning as the Thirteenth Amendment's prohibition against "involuntary servitude." (*Id.* at 16 (citing *Kozminski*, 487 U.S. at 944–45).) The Supreme Court also

---

[4] A court may take judicial notice of publicly available government documents, including those posted on government web sites. *See Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033–34 (C.D. Cal. 2015) (citing, e.g., *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010); and *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08–CV–1166–IEG, 2009 WL 6597891, at *1 (S.D. Cal. Dec. 23, 2009)).

17-CV-1112 JLS (NLS)

recognized a long-standing "civic duty" exception to the Thirteenth Amendment's prohibition on involuntary servitude whereby state or federal governments could compel their citizens, by threat of criminal sanction, to perform certain civic duties. (*Id.* (citing *Kozminski*, 487 U.S. at 943–44).) Thus, Defendant argues that § 1589, which Congress enacted after *Kozminski*, incorporates the civic duty exception and the exception is available to Defendant. (*Id.* at 17 (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988)).)

Defendant then cites *Channer v. Hall*, 112 F.3d 214, 215 (5th Cir. 1997), where the Fifth Circuit applied the civic duty exception to an immigration detainee. There, an immigration detainee was compelled to work in the Food Services Department and "intimidated and threatened with solitary confinement if he failed to work." (MTD 16 (quoting *Channer*, 112 F.3d at 218).) The *Channer* court held that the detainee was not subjected to "involuntary servitude" because the civic duty exception applied and "the federal government [was] entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks." (*Id.* (quoting *Channer*, 112 F.3d at 218–19).) Defendant urges the Court to adopt the civic duty exception to Plaintiffs' situation, which appears to be factually similar to *Channer*.

Congress amended the TVPA post-*Kozminski*, but Defendant argues that the amendment did not alter the civic duty exception's applicability to TVPA. (*See id.* at 17.) Defendant cites several decisions from after the TVPA amendment where federal courts applied the civic duty exception to deny claims brought by immigration detainees. (*Id.* at 17–18 (citing, e.g., *Owuor v. Courville*, No. 11-CV-926, 2013 WL 7877306, at *4 (W.D. La. Aug. 7, 2013)).) Defendant would have the Court find that *Channer*'s logic controls and the civic duty exception applies to Defendant's conduct.

Finally, Defendant cites 28 C.F.R. § 545.23, which permits the federal Bureau of Prisons to require pretrial inmates to perform "housekeeping tasks in the inmate's own cell and in the community living area." (*Id.* at 18.) Defendant cites cases from the Fourth, Seventh, and Eighth Circuits where courts denied claims from pretrial detainees required

to perform "general housekeeping responsibilities" without pay. (*Id.* at 16–17 (quoting *Bijeol v. Nelson*, 579 F.2d 423, 424–25 (7th Cir. 1978) (per curiam); and citing *Hause v. Vaught*, 993 F.2d 1079, 1085 4th Cir. 1993); and *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)).) Defendant argues that construing 18 U.S.C. § 1589 to criminalize housekeeping tasks required by Defendant would also criminalize the same types of housekeeping tasks required of pretrial detainees and authorized by federal regulation. (*Id.*)

Plaintiffs respond that there is no civic duty exception for section 1589. (Opp'n 19.) Plaintiffs argue that Defendant has not cited any authority for reading a civic duty exception into the TVPA or applying the exception to a private, for-profit venture. (*Id.*) Plaintiffs distinguish Defendant's cited cases as all involving *Bivens* claims for violation of the Thirteenth Amendment in federal government-run detention facilities. (*Id.*)

The Court begins with the basic proposition that the Thirteenth Amendment does not prohibit compelled labor in all situations. There are generally three exceptions to involuntary servitude. First, by its own terms, the Amendment excludes involuntary servitude imposed as legal punishment for a crime. *See* U.S. Const. amend. XIII. Second, the Supreme Court has recognized that the prohibition against involuntary servitude "does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties." *Kozminski*, 487 U.S. at 943–44. Third, the Thirteenth Amendment does not apply to "exceptional" cases that were well-established in the common law when the Amendment was passed. *See id.* at 944 (citing *Robertson v. Baldwin*, 165 U.S. 275, 282, 288 (1897)) (explaining the Amendment does not reach the right of parents to custody of minor children or laws preventing sailors from deserting their ships). Defendant only raises the civic duty exception; thus, the Court's first task is to determine whether the exception applies to the TVPA in its entirety or only where TVPA refers to "involuntary servitude." The issue before the *Kozminski* court was the interpretation of the term "involuntary servitude," found in 18 U.S.C. § 1584, which the Supreme Court determined to be co-extensive with the scope of the "involuntary

servitude" found in the Thirteenth Amendment. *Kozminski*, 487 U.S. at 948. Section 1589 does not contain the term "involuntary servitude" and it is conceivable that the civic duty exception might not apply to section 1589. Indeed, Plaintiffs contend that there is no authority to read a civic duty exception into the TVPA. (Opp'n 19.)

Congress has broad power to determine "what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968)). Congress enacted the TVPA pursuant to its power to enforce the Thirteenth Amendment. *See Kozminski*, 487 U.S. at 934. Defendant has not cited any explicit authority applying the civic duty exception to 18 U.S.C. § 1589. The Sixth Circuit has examined whether the "exceptional" case exception to the Thirteenth Amendment applied to § 1589. *See United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014). There, the federal government attempted to prosecute parents for child abuse under section 1589. *Id.* at 623–24. The Sixth Circuit reasoned that the Thirteenth Amendment's exceptional case exception applied to a parent's control over a child's work and concluded that section 1589 could not criminalize a parent's control over a child. *Id.* at 626 (quoting *Kozminski*, 487 U.S. at 944). If the *Toviave* court applied the exceptional case exception to section 1589 then it is logical to apply the civic duty exception to section 1589. The Court reads the civic duty exception as deriving from the Thirteenth Amendment, regardless of whether Congress uses the phrase "involuntary servitude." Thus, the Court accepts Defendant's premise that the civic duty exception applies to section 1589.

Even so, Plaintiffs raise an important issue bound up in the civic duty analysis: may a private entity avail itself of the civic duty exception to alleged involuntary servitude. (*See* Opp'n 19.) Indeed, *Kozminski* summarized the civic duty exception as permitting "the *State or Federal Governments* from compelling their citizens, by threat of criminal

sanction, to perform certain civic duties."[5]  487 U.S. at 943–44 (emphasis added).  Here, Defendant is not the government; it is a private, for-profit corporation.  In *Menocal v. GEO Group, Inc.*, 113 F. Supp. 3d at 1128, the district court encountered a nearly identical factual scenario and putative class action as the case presently before this Court.  There, the plaintiffs were current and former civil immigration detainees held at a private, for-profit immigration detention facility.  Like here, the plaintiffs also alleged that they were forced to clean the facility's pods without compensation under the threat of solitary confinement.  *Id.*  The plaintiffs brought claims under 18 U.S.C. § 1589 and, like here, the defendants argued that the civic duty exception applied to bar the plaintiffs' claims.  *See id.* at 1132.  The *Menocal* court found that "Defendants have cited no authority for reading a civic duty exception into § 1589, or for applying such an exception to a private, for-profit corporation under contract with the government."  *Id.* at 1133.

Defendant argues that the *Menocal* court's holding is flawed and urges this Court to apply the civic duty exception because Defendant is a "federal actor."  (Reply 9–10.) Defendant cites several cases in support of its proposition.[6]  In *Doe v. United States*, 831

---

[5] Defendant's cited authority all involve incidents of purported involuntary servitude at *government*-run facilities.  *See Channer*, 112 F.3d at 215 (stating that the plaintiff was incarcerated at the Federal Correctional Institution at Oakdale, Louisiana); *see also Mendez v. Haugen*, No. CV 14-4792 ADM/BRT, 2015 WL 5718967, at *1 (D. Minn. Sept. 29, 2015), *aff'd* (8th Cir. Feb. 22, 2016) (plaintiff housed in Federal Medical Center in Rochester, Minnesota); *Owour v. Courville*, No. 11-cv-926, 2013 WL 7877306, at *1 (W.D. La. Aug. 7, 2013) (plaintiff housed at Federal Detention Center in Oakdale, Louisiana); *Hutchinson v. Reese*, No. 07CV181-DCB-MTP, 2008 WL 4857449, at *1 (S.D. Miss. Nov. 7, 2008) (plaintiff housed in the Federal Correctional Complex in Yazoo City, Mississippi).

[6] *Doe v. United States* is the representative of Defendant's other cited precedent.  Corrections Corporation of America, which was CoreCivic's former corporate name, has routinely been deemed a "state actor" for purposes of civil rights complaints.  In *Johnson v. Corrections Corp. of America*, No. 14cv41 LAB (WVG), 2014 WL 2919300, at *2–3 (S.D. Cal. June 26, 2014), the district court construed a *pro se* plaintiff's claim against CCA as a *Bivens* claim and dismissed the claim because it did not allege violations by an individual.  *Guzman-Martinez v. Corrections Corp. of America*, No. CV-11-2390-PHX-NVW, 2012 WL 5907081, at *9–11 (D. Ariz. Nov. 26, 2012), arrived at the same conclusion as *Doe*; the court determined CCA to be acting under color of state law.  *Murray v. Corr. Corp. of America*, No. CV 11-2210-PHX-RCB, 2012 WL 2798759, at *1 (D. Ariz. July 9, 2012), likewise determined that CCA was a state actor.  *See Chuwang v. Corr. Corp. of Am.*, No. CIV.A. L-86-55, 1987 WL 13814, at *1 (S.D. Tex. May 29, 1987) (concluding CCA was federal actor); *see also United States v. Thomas*, 240 F.3d 445, 448 (5th Cir. 2001) (determining guard at CCA was a "public official").

17-CV-1112 JLS (NLS)

F.3d 309, 314 (5th Cir. 2016), the Fifth Circuit was confronted with a 42 U.S.C. § 1983 claim against the Corrections Corporation of America ("CCA"), which was Defendant CoreCivic's corporate predecessor. Section 1983 only reaches conduct of persons operating under color of law, but the court applied a "public function" test to determine whether a private contractor's actions were "fairly attributable to the State." *Id.* at 314 (quoting *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005)). The public function test required the court to determine the "specific conduct of which the plaintiff complains." *Id.* at 316 (citing *Cornish*, 402 F.3d at 550)). The specific conduct at issue in *Doe* was "detaining aliens pending a determination of their immigration status pursuant to ICE specifications." *Id.* The court held that this conduct was a federal function and that CCA was exempt from § 1983 because it were performing a federal function. *Id.*

*Doe v. United States* is exemplary of cases determining whether private conduct is deemed to be fairly attributable to the State and, thus, state action. The Supreme Court has repeatedly held that private actors can be held liable for violations of individual federal rights if the private actions "caus[e] the deprivation of a federal right . . . fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). "As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Id.* (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)). Thus, the state action requirement, which Defendant relies on, derives from the Constitution's guarantee, applied through the Fourteenth Amendment, that a person's civil rights will not be impaired by the state. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974) ("In 1883, this Court in the *Civil Rights Cases*, 109 U.S. 3 (1883), affirmed the essential dichotomy set forth in that Amendment between deprivation by the State,

---

*Agyeman v. Corrections Corp. of America*, 390 F.3d 1101 (9th Cir. 2004), held that a plaintiff could not sustain a *Bivens* claim against CCA because the Supreme Court previously held that private corporations were not subject to *Bivens* claims. *Id.* at 1103 (citing *Corr. Sevs. Corp. v. Malesko*, 534 U.S. 61 (2001)).

17-CV-1112 JLS (NLS)

subject to scrutiny under its provisions, and private conduct, 'however discriminatory or wrongful,' against which the Fourteenth Amendment offers no shield." (citing *Shelley v. Kraemer*, 335 U.S. 1 (1948))).

The Court distinguishes the Fourteenth Amendment's guarantee of individual civil rights against state action from the federal and state governments' power to criminalize conduct. The Fourteenth and Fifth Amendments restrict government action. *See* U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . . .:), amend. XIV ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."). Conversely, Article I, section 8 of the U.S. Constitution and State constitutions give rise to affirmative powers.

The Constitution creates a federal government of enumerated powers. *See* U.S. Const. art. I, § 8; *United States v. Lopez*, 514 U.S. 549, 552 (1995). The Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, grants Congress broad power to enact federal legislation, *United States v. Comstock*, 560 U.S. 126, 133 (2010) (citing *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819)). Thus, even though the Constitution does not explicitly authorize federal crimes, the Necessary and Proper Clause allows Congress to criminalize conduct in furtherance of its enumerated powers. *See Comstock*, 560 U.S. at 136. Moreover, the Clause permits Congress to establish a prison system and ensure that system's "safe and responsible administration." *Id.* at 136–37. Likewise, the state governments, as part of their general police powers, routinely criminalize conduct. *See Torres v. Lynch*, 136 S. Ct. 1619, 1625 (2016) ("State legislatures, exercising their plenary police powers, are not limited to Congress's enumerated powers; and so States have no reason to tie their substantive offenses to those grants of authority." (citing *United States v. Lopez*, 514 U.S. 549, 567 (1995))). Thus, both state and federal governments derive their power to criminalize conduct from specific grants of authority.

The remaining question is whether the civic duty exception falls within the restrictions placed on governments by the Fourteenth and Fifth Amendments or is a power granted to the federal or state governments by their respective constitutions. *Kozminski* characterized the civic duty exception as, "the prohibition against involuntary servitude does not prevent the State or Federal from compelling their citizens, by threat of criminal sanction, to perform certain civic duties." *See* 487 U.S. at 943–44. *Kozminski* cited several examples where the Supreme Court recognized the government's ability to compel certain labor with the threat of criminal sanction. Thus, in *Arver v. United States*, 245 U.S. 366, 388 (1918), the Supreme Court held a selective military draft law to be constitutional pursuant to Congress's power to regulate the national militia, *see* U.S. Const. art. 1, § 8, cl. 15. Or, in *Butler v. Perry*, 240 U.S. 328, 332–33 (1916), the Supreme Court upheld a Florida law requiring citizens to participate in the building and maintenance of public roads because the states possessed the right to require citizens to participate in certain construction at the time the States ratified the Thirteenth Amendment. Thus, the Thirteenth Amendment's civic duty exception derives from the *government's* constitutional authority to criminalize conduct, pursuant to either the federal government's enumerated powers or the state government's police powers.

The foregoing principles distill into the following. First, the state actor inquiry is necessary to determine whether a private person's conduct can be attributed to the government. *See Lugar*, 457 U.S. at 936. When private conduct may be attributed to the state, then that private conduct must adhere to the constitutional limitations placed on state action by the Fourteenth Amendment. *See Evans v. Newton*, 382 U.S. 296, 299 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."). Second, the power to criminalize conduct and the resulting exceptions to the Thirteenth Amendment are distinct from the limitations placed on government. Instead, such power is an affirmative grant of authority from either the United States or State constitutions. *See* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall

17-CV-1112 JLS (NLS)

have power . . . .").  Defendant's only argument supporting its civic duty theory is that it is a "federal actor."  The cases supporting Defendant's argument confirm that CoreCivic (previously Corrections Corporation of America) has been delegated a public function to such an extent that its conduct must adhere to constitutional limitations.  It does not follow that the same finding would also mean Congress or the state legislatures delegated to Defendant their power to criminalize conduct.  Thus, Defendant cannot lay claim to the civic duty exception—Defendant is a private entity, not a government.

Finally, Defendant argues that it would not be logical to allow pretrial inmates to perform housekeeping tasks while criminalizing Defendant's same conduct under § 1589. (*See* MTD 18.)  28 C.F.R. § 545.23(b) exempts pretrial inmates committed to the Federal Bureau of Prisons from forced labor "other than housekeeping tasks in the inmate's own cell."  The Court agrees with Defendant that criminalizing housekeeping tasks in one instance (civil immigration detention) and permitting it in another (pretrial detention) would not be a logical reading of § 1589.  ICE's operations manual, like the Code of Federal Regulations, also requires Plaintiffs to perform personal housekeeping.  *See* ICE PBNDS, at 406.  However, Plaintiffs' Complaint contains factual allegations, which the Court must accept as true, that go beyond the personal housekeeping tasks listed in the ICE manual.  (*See* Comp. ¶ 16 (cleaning floors, bathrooms, and windows not only in Plaintiffs' living areas ("pods") but also throughout the other interior and exterior areas of CoreCivic's detention facilities).)

In sum, the Court finds that no reason proffered by Defendant removes its alleged conduct from 18 U.S.C. § 1589's plain meaning.

### 2. *Whether Plaintiffs Allege Sufficient Facts to State a Claim*

Defendant next argues that Plaintiffs' Complaint fails to allege sufficient facts to state a claim under TVPA.  Defendant contends that Plaintiffs do not provide any factual details as to Defendant's purported force or coercion that compelled Plaintiffs and other detainees to clean their living and community areas.  (MTD 19.)  Thus, Plaintiffs do not identify who threatened them, how they were threatened, or when they were threatened.

(*Id.* (citing Compl. ¶¶ 13, 16, 27, 29).) Nor do Plaintiffs connect any purported threat to any specific demand to work or identify what they were forced to do or when they were forced to do it. (*Id.* (citing *Roman v. Tyco Simplex Grinnell*, 16-CV-3449-T-33AEP, 2017 WL 2427251, at *5 (M.D. Fla. June 5, 2017)).)

Plaintiffs argue that they allege sufficient facts to state a claim for relief by alleging the who, what, when, where, and how of the labor and services the detainees were forced to provide. (Opp'n 15 (citing Compl. ¶¶ 10–11, 13–16, 27–29).)

The Court begins its analysis with the statute; Plaintiffs allege Defendant violated 18 U.S.C. § 1859(a). The first clause of the statute applies to "[w]hoever knowingly provides or obtains the labor or services of a person." 18 U.S.C. § 1589(a). The term "whoever" is broad and does not limit the potential class of persons that fall under section 1589. Here, Plaintiffs allege that Defendant owns and operates the Otay Mesa Detention Center. (Compl. ¶ 11.) The term "labor or services" is not defined by the statute and, therefore, the Court uses the ordinary meaning. *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010) (citing *Smith v. United States*, 508 U.S. 223, 228 (1993); *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992)). "Webster's Third New International Dictionary (1993) defines 'labor' as 'expenditure of physical or mental effort esp. when fatiguing, difficult, or compulsory;' and 'service' is defined as 'the performance of work commanded or paid for by another.'" *Callahan*, 801 F.3d at 620. Plaintiffs allege that they and other detainees cleaned, maintained, scrubbed, swept, and mopped floors, bathrooms, showers, toilets, and windows. (Compl. ¶ 16.) These activities are clearly within the definition of labor or service. The term "person" is not limited by the statute and applies to any persons, i.e. victims of forced labor, subject to the conditions dictated by the statute. *See Callahan*, 801 F.3d at 617. Here, Plaintiffs allege that they were civil detainees at the Otay Mesa Facility and that they were engaged to work by Defendant. (Compl. ¶ 14.)

Section 1589(a) then requires the foregoing labor or services to be obtained through one of four means. Plaintiffs allege three means used by Defendant: (a) force, threats of force, physical restraint, and threats of physical restraint; (b) serious harm and threats of

20

serious harm; and (c) abuse and threatened abuse of law and legal process. (*Id.* ¶ 42.) It is here that Defendant brings to bear its primary argument: Plaintiffs did not allege the means with any factual particularity. Plaintiffs' Complaint alleges the following:

> Defendant forced and coerced Plaintiffs . . . by threatening to punish not only those who refused to work, but also other detainees in the pods with confinement, physical restraint, substantial and sustained restriction, deprivation, and violation of their liberty, and solitary confinement, all with the intent to obtain forced labor or services and as punishment for any refusal to work causing Plaintiffs severe mental pain and suffering.

(*Id.* ¶ 16.) Taking the factual allegations as true, the Complaint reveals that Defendant had a policy of forcing detainees to perform labor or services and if the detainees refused then they or other detainees would be placed in solitary confinement.

The remaining question is whether allegations of solitary confinement within a detention facility are sufficient to state a claim under TVPA. Plaintiffs argue that solitary confinement has long been recognized as an additional punishment above and beyond day-to-day incarceration. (Opp'n 21 (citing, e.g., *In re Medley*, 134 U.S. 160 (1890)).) The Court finds this authority persuasive. It has long been recognized that "solitary confinement bears 'a further terror and peculiar mark of infamy.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (quoting *Medley*, 134 U.S. at 170). At the very least, solitary confinement constitutes serious harm, which Congress defined to include psychological harm. 18 U.S.C. § 1589(c)(2). Here, solitary confinement, or the threat of solitary confinement, sufficiently alleges the means to achieve forced labor.

The case Defendant cites, *Roman v. Tyco Simplex Grinnell*, is distinguishable. There, a pro se plaintiff alleged the following: "While working for Tyco Simplex Grinnell, I was harassed, eggs, mucus, Grease or tar thrown on company van. Placed in unfair and unsafe work Conditions. Causing me high blood pressure. All because an oral Contract was breached. I seek 7 million dollars in compensation and punitive damages For the wrong done to me." *Roman*, 2017 WL 2427251, at *1. Based on those limited factual allegations, the district court dismissed a § 1859 claim, asking "The count does state

Roman was "harassed" and "threatened" but does not clarify who threatened him, how he was threatened, and for what purpose. Was Roman threatened because he refused to work or because he complained about the alleged breach of oral contract? Was he threatened with violence, with being fired, or with something else?" *Id.* at *5. Here, Plaintiffs allege a specific punishment (solitary confinement) carried out or threatened to be carried out as a direct consequence for refusing to perform labor. The conduct occurred while Plaintiffs were under the exclusive control of Defendant. Such allegations are sufficient here.

In sum, the Court finds that Plaintiffs have sufficiently stated a claim for a TVPA violation.

### 3. Whether the 2008 TVPA Amendments Apply Retroactively

Defendant argues that Plaintiffs do not have a private cause of action prior to Congress's 2008 TVPA amendments. (MTD 20.) Congress amended the TVPA to extend the civil remedy provision, 18 U.S.C. § 1595, to allow victims to recover against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPA]." (*Id.* (quoting Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (2008)).) Defendant contends that Congress did not give the amendment retroactive effect and, therefore, any liability under the "financial benefit" prong of § 1595 can only attach to conduct after December 23, 2008—the effective date of the amendment. (*Id.* (citing *Griffin v. Alamo*, 14-CV-4065, 2016 WL 7391046, at *3 (W.D. Ark. Dec. 21, 2016)).) Defendant concludes that Plaintiffs only bring a TVPA claim under the "financial benefit" prong and therefore Plaintiffs claims before December 23, 2008 must fail.

Plaintiffs respond that at the time Congress enacted the 2008 amendments their TVPA claims were unexpired under the four-year statute of limitations. (Opp'n 24.) As part of the 2008 amendments, Congress replaced the four-year limitations period and enacted a ten-year statute of limitations. 122 Stat. at 5067. Plaintiffs argue that the applicable rule should be that unexpired claims at the time of enactment do not give rise to an impermissible retroactive effect. (*Id.* (citing, e.g., *Landgaf v. USI Film Products*, 511

U.S. 244 (1994); *Stogner v. California*, 539 U.S. 607, 611, 631 (2003)).) According to Plaintiffs, if their claims were alive under the prior limitations period (four years) then those claims would remain valid through the newly enacted ten-year statute of limitations. (Opp'n 24.) Plaintiffs also point out that they also bring a claim under 18 U.S.C. § 1593 for mandatory restitution, which has no "financial benefit" requirement. (Opp'n 23 n.7 (citing Compl. ¶¶ 1, 12, 18, 44, 50; and subpart d of the Prayer for Relief).)

The Fourth Circuit addressed this issue in *Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014). There, a plaintiff alleged the defendants violated sections 1589 and 1590 by knowingly obtaining her labor through "means of threats," "holding her in a position of involuntary servitude," and "confiscating her passport." *Id.* at 143. At the time the alleged violations took place, the TVPA had a four-year statute of limitations. *Id.* at 143–44; *see Oluoch v. Orina*, 101 F. Supp. 3d 325, 329 (S.D.N.Y. 2015) ("When first enacted, the TVPRA did not contain a statute of limitations. Thus, claims brought under the TVPRA were subject to the default four-year statute of limitations applying to civil causes of action created by Congress." (citation omitted) (citing 28 U.S.C. § 1658)). Then, Congress amended the TVPA to provide a ten-year statute of limitations. The plaintiff argued, as our Plaintiffs do here, that the ten-year limitations period applied to her TVPA claims. *Id.* at 144. The *Cruz* court applied the *Landgraf* framework to determine whether the amended ten-year statute of limitations applied retroactively. *Landgraf* requires a three-step analysis to determine retroactive application. First, a court must determine "whether Congress has expressly prescribed the statute's proper reach." *Cruz*, 773 F.3d at 144 (citing *Landgraf*, 511 U.S. at 280). If Congress prescribed the reach, the inquiry ends. *Id.* If not, a court must decide whether the statute would operate retroactively, "i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* (quoting *Landgraf*, 511 U.S. at 280). "Finally, if the statute does have a retroactive effect, it will not apply 'absent clear congressional intent favoring such a result.'" *Id.* (quoting *Landgraf*, 511 U.S. at 280).

The *Cruz* court first determined that Congress did not expressly indicate the 2008 TVPA's proper temporal scope. *Id.* Then, the court reasoned that applying the new ten-year statute of limitations to unexpired claims would *not* "attach[] new legal consequences to events completed before its enactment." *Id.* at 145 (alteration in original) (quoting *Landgraf*, 511 U.S. at 270). The court explained that, "in the criminal context, there is a consensus that extending a limitations period *before* prosecution is time-barred does not run afoul of the Ex Post Facto Clause of the Constitution." *Id.* (citing, e.g., *United States v. Jeffries*, 405 F.3d 682, 685 (8th Cir. 2005)). Under this reasoning, the *Cruz* court held that applying the ten-year limitations period to claims that were unexpired at the time of its enactment did not give rise to impermissible retroactive effect under *Landgraf*. *Id.*

*Cruz* would appear to strongly support Plaintiffs' argument. Like *Cruz*, Plaintiffs argue the statute of limitations had not run prior to the 2008 amendments; therefore, there is no new legal consequence for Defendant. However, the case at bar has a critical distinction. *Cruz* only considered the retroactive application of the TVPA statute of limitations. Here, as Defendant points out, the 2008 amendment also created Plaintiffs' cause of action against Defendant. Plaintiffs' Complaint rests on TVPA's "financial benefit" cause of action to the TVPA. *See* 18 U.S.C. § 1595(a); (Compl. ¶ 43.) Congress created this cause of action as part of the 2008 amendments. 122 Stat. at 5067. Thus, the Court must determine whether the "financial benefit" provision applies retroactively.

The first *Landgraf* step is to determine whether Congress expressly mandated the statute's "proper reach." 511 U.S. at 280. As the *Cruz* court recognized, Congress did not identify the 2008 TVPA amendment's proper temporal scope. At the second step in the analysis, our path diverges from *Cruz*. In 2008, Congress created a new cause of action—the financial benefit prong of § 1595(a)—which Plaintiffs utilize. The new cause of action "increase[s] a party's liability for past conduct." *Landgraf*, 511 U.S. at 280. Before the 2008 amendments, Defendant was not liable because the "financial benefit" element cause of action did not exist. After the amendments, Defendant is potentially liable. Because Defendant is liable after the amendment, but not liable before, the 2008 amendments create

new legal consequences. Therefore, the 2008 amendments do not apply retroactively barring Congress's clear intent to do so. The amendments do not contain any clear intent to apply retroactively. *See Cruz*, 773 F.3d at 144.

Accordingly, the Court finds that Plaintiffs may only bring claims under the "financial benefit" prong for violations of the TVPA after the amendments' effective date.[7]

### 4. Whether TVPA's Statute of Limitations Bar Plaintiffs' Claims

Defendant argues that a ten-year statute of limitations governs TVPA claims and Plaintiffs filed their Complaint May 31, 2017. (MTD 20 (citing Compl.).) Thus, Plaintiffs cannot bring any TVPA claims for conduct occurring before May 31, 2007. (*Id.* at 21.) Plaintiffs respond that dismissal on the basis of statute of limitations is only proper if Defendant shows some obvious bar to securing relief on the face of the Complaint. (Opp'n 23 (citing *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).) Plaintiffs argue that a factual question exists whether equitable tolling would apply to their claims. Defendant rejoins that Plaintiffs have shown no factual basis for equitable tolling. (Reply 13.)

The Court agrees with Plaintiffs. "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *ASARCO, LLC*, 765 F.3d 999, 1004 (9th Cir. 2014) (quoting *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam)). Defendant points out that Plaintiffs do not state a factual basis for equitable tolling. The Complaint suggests otherwise. Plaintiffs were held in a civil immigration detention facility and it is plausible that equitable tolling could apply because Plaintiffs were physically

---

[7] Plaintiffs also argue that they seek mandatory restitution under 18 U.S.C. § 1593, which has no "financial benefit" requirement and, thus, no retroactivity issue. (Opp'n 23 n.7.) Plaintiffs' argument fails because § 1593's mandatory restitution provision is a remedy that applies "*only* to cases in which a defendant has been convicted of an offense under the Trafficking Act." *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1164 (9th Cir. 2010) (citing 18 U.S.C. § 1593(a)). Section 1593 requires a predicate "offense under this chapter." Even assuming a civil remedy can supply the predicate offense, the above discussion confirms that Plaintiffs' TVPA cause of action against Defendant was not available until December 23, 2008.

detained at Defendant's facility. At the very least, there is a factual dispute concerning Defendant's affirmative defense. *See Scott*, 746 F.2d at 1377 (citing C. Wright & A. Miller, *Federal Practice and Procedure*, § 1277, at 328–30). Therefore, the Court declines to impose a statute of limitations bar at this stage in the proceedings.

*5. Conclusion*

In sum, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss Plaintiffs' first cause of action. The Court **DISMISSES WITH PREJUDICE** Plaintiffs' claims to the extent those claims rely on § 1595(a)'s "financial benefit" element and arose prior to December 23, 2008.

### B. California TVPA (Second Cause of Action)

Plaintiffs bring a cause of action under the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5, which provides a state civil remedy for victims of human trafficking, (Compl. ¶ 53). Defendant argues that, like the federal TVPA, the California legislature did not intend for the California human trafficking statute to prohibit Defendant from requiring lawfully-held immigration detainees to perform housekeeping tasks. (MTD 21.) In support of this contention, Defendant references the legislative intent as only intending to reach "trafficking of a person for forced labor or services." (*Id.* (quoting 2005 Cal. Legis. Serv. Ch. 240 (A.B. 22)).) Defendant also briefly mentions its preemption argument, which it raises below with regard to Plaintiffs' minimum wage claims. *See infra* section III.A. Defendant argues that immigrant detention is a federal function and the California law has no authority to govern the conditions of detention. (MTD 21.) Next, Defendant points out that California Penal Code § 2700 requires prisoners in the custody of the California Department of Corrections and Rehabilitation to perform work. From that premise, Defendant argues the California would not have criminalized conduct in one statute, the California TVPA, that it authorized in a different statute, California Penal Code § 2700. (Reply 13.) Finally, Defendant argues that Plaintiffs' Complaint fails to allege sufficient facts to state a claim. (MTD 22 (citing *Loftus v. Long Beach Veterans Hosp.*, 214 F. Supp. 3d 908, 916 (C.D. Cal. 2016)).)

Plaintiffs argue that the plain meaning of California Penal Code § 236.1(a) governs their claims. (Opp'n 26.) They further contend that section 236.1 does not contain any limiting language that might restrict application of the statute to only those defendants who traffic in persons. (*Id.*) Relevant to their argument, section 236.1(g) states that the "Legislature finds that the definition of human trafficking in this section is equivalent to the federal definition of a severe form of trafficking found in Section 7102(9) of Title 22 of the United States Code."[8] Cal. Penal Code § 236.1(g). Plaintiffs contend that this definition is merely a declaration of legislative finding and does not control sections 236.1(a) and (b). (Opp'n 26.) Next, Plaintiffs argue that they are not prisoners nor in the custody of the California Department of Corrections and Rehabilitations and therefore any comparison to prisoners in state custody is misleading. (*Id.* at 27.) Finally, Plaintiffs contend that they have alleged sufficient facts to state a claim. (*Id.* at 27–28 (citing Compl. ¶¶ 10–11, 13–16, 27–29).)

California Civil Code § 52.5 states that "[a] victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action." California Penal Code section 236.1 provides, in relevant part, that "[a] person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking." Cal. Penal Code § 236.1(a). "As summarized in the official standard jury instructions for criminal cases, the elements of this offense are (1) the defendant either deprived another person of personal liberty or violated that other person's personal liberty; and (2) when the defendant did so, he or she intended to obtain forced labor or services

---

[8] 22 U.S.C. § 7102(9) provides:

The term "severe forms of trafficking in persons" means—
(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or
(B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

from that person." *People v. Halim*, 14 Cal. App. 5th 632, 643 (Ct. App. 2017) (citing CALCRIM No. 1243), *reh'g denied* (Sept. 12, 2017), *review denied* (Nov. 29, 2017). The statute further defines "[d]eprivation or violation of the personal liberty of another" as

> substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.

Cal. Penal Code § 236.1(h)(3).

As before, the Court begins with the plain meaning of the statute. *See Mt. Hawley Ins. Co. v. Lopez*, 215 Cal. App. 4th 1385, 1397 (2013); *see also Klein v. United States*, 50 Cal. 4th 68, 77 (2010) ("We look first to the words of the statute, 'because the statutory language is generally the most reliable indicator of legislative intent.'" (quoting *Hassan v. Mercy Am. River Hosp.*, 31 Cal. 4th 709, 715 (2003))). The California TVPA differs from 18 U.S.C. § 1859 because the former includes an explicit reference to the federal definition of human trafficking, found in 22 U.S.C. § 7102(9). *See* Cal. Penal Code § 236.1(a), (g). However, the definition of human trafficking is not an element of the substantive offense; instead, it defines the result of the crime. As *People v. Halim* and the California jury instruction illustrate, the only two elements necessary to prove a § 236.1 crime are: (1) the defendant either deprived another person of personal liberty or violated that other person's personal liberty; and (2) when the defendant did so, he or she intended to obtain forced labor or services from that person. As in the federal TVPA, there is no language that limits the "person" to someone who was trafficked, nor is trafficking an element of the offense.

Defendant argues that the California legislature would not criminalize conduct in one statute, Cal. Penal Code § 236.1, only to explicitly authorize the same conduct in a different statute, Cal. Penal Code § 2700. (Reply 13.) Defendant's point is well taken; however, the Court distinguishes between the targets of each statute. California Penal Code § 2700 regulates the conduct of prisoners who are expressly exempt from the Thirteenth

Amendment's prohibition on involuntary servitude. California Penal Code § 236.1 regulates conduct of private parties who are not exempt from the Thirteenth Amendment's prohibition of involuntary servitude. The Court finds that the California TVPA is available to Plaintiffs.[9]

Moreover, the Court finds Plaintiffs state a claim under the California TVPA. Plaintiffs allege that Defendant threatened to place non-compliant detainees in solitary confinement if they refused to perform certain labor. As previously discussed, solitary confinement, even for those in confinement and whose liberty is already deprived, constitutes deprivation of personal liberty. Plaintiffs also allege that the solitary confinement was a punishment for refusing to perform work, which demonstrates Defendant's intent to obtain labor or services from Plaintiffs. Thus, the Court finds that Plaintiffs state a claim under the California TVPA.

Though neither party raises the issue, retroactivity is also relevant here. California Civil Code § 3 states that Civil Code provisions are not retroactive "unless expressly so declared." Both sections 52.5 and 236.1 were enacted January 1, 2006 and neither statute expressly declared to have retroactive effect. *Headley v. Church of Scientology Int'l*, No. CV 09-3986 DSF (MANx), 2009 WL 10671565, at *4 (C.D. Cal. Aug. 12, 2009). Therefore, Plaintiffs' claim cannot state a claim for events that occurred prior to January 1, 2006.

Therefore, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion as to Plaintiffs' second cause of action and **DISMISSES WITH PREJUDICE** Plaintiffs' California TVPA claim to the extent that it arose prior to January 1, 2006.

---

[9] Defendant advances a preemption argument, stating "detention of immigrants is exclusively a federal function; California has no authority to govern the conditions of their detention." Defendant does not elaborate on how preemption applies specifically to the California TVPA beyond that statement. Defendant cites two statutes—the Immigration and Nationality Act and the Immigration Reform and Control Act—for its preemption argument. (*See* MTD 22–25.) The Court addresses Defendant's preemption argument in detail below, but the holding there applies equally here. The Court finds that federal law does not preempt California labor law from regulating Plaintiffs' detention conditions; thus, Defendant has not demonstrated why the California TVPA may not also regulate detention conditions.

# III. Voluntary Labor Claims (Fourth through Tenth Causes of Action)

In these causes of action, Plaintiffs allege the following violations of the California Labor Code: failure to pay minimum wages; failure to pay overtime wages; failure to provide mandated meal periods; failure to provide mandated rest periods; failure to furnish timely and accurate wage statements; failure to pay compensation upon termination/waiting time penalties; imposition of unlawful terms and conditions of employment. (*See* Compl. ¶¶ 71–101.) Before turning to the merits of Plaintiffs' labor claims, the Court must address a threshold issue raised by Defendant: whether federal law preempts California law to the extent the latter seeks to regulate civil immigration detainees.

## A. Preemption

Defendant raises a threshold objection to Plaintiffs' fourth through tenth causes of action: preemption. (MTD 22.) Article VI, clause 2 of the United States Constitution—the Supremacy Clause—commands that the laws of the United States "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. "[T]he Supremacy Clause invalidates all state laws that conflict or interfere with an Act of Congress." *Rose v. Ark. State Police*, 479 U.S. 1, 3 (1986). Federal law may invalidate, or preempt, state law in three ways: express, field, and conflict preemption. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008). When federal laws regulate conduct in an area in which state law has historic police powers there is a strong presumption against preemption. *Id.* Accordingly, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Conversely, the presumption against preemption does not apply "when [a] States regulates in an area where there has been a history of significant federal presence." *Silvas*, 514 F.3d at 1004 (alteration in original) (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). Defendant argues both field and conflict preemption bar application of California's labor laws to Plaintiffs' claims.

### 1. Field Preemption

Defendant argues that the federal government has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Accordingly, Congress has enacted two statutes relevant here. The Immigration and Nationality Act ("INA") vests responsibility for detaining aliens with the U.S. Attorney General. (MTD 23 (citing, e.g., 8 U.S.C. §§ 1103, 1226, 1231).) The Immigration Reform and Control Act ("IRCA") lays out a "comprehensive scheme prohibiting the employment of illegal aliens in the United States." (*Id.* (quoting *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 147 (2002)).) Defendant argues that these two statutes reflect a congressional mandate to regulate the detention of unlawful immigrants—including employment and labor practices at detention facilities. (*Id.*) Thus, Defendant would have the Court find the INA and IRCA preempt California's labor laws and those state laws cannot regulate Defendant's conduct towards Plaintiffs. (*Id.* at 24.)

Plaintiffs counter that California labor laws do not intrude on INA and IRCA's regulatory field. (Opp'n 34.) Plaintiffs cite *Arizona v. United States* where the Supreme Court held that Congress regulated the field of alien registration, but the Court allowed other provisions of the Arizona law intact. (*Id.* (citing *Arizona*, 567 U.S. at 400–15).) Accordingly, Plaintiffs argue that California's labor laws do not intrude upon INA's field of alien registration. (*Id.*)

Field preemption occurs "where: (1) the 'regulatory framework is so pervasive' that there is no room for state regulation, or (2) where the 'federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) (alteration in original) (quoting *Arizona*, 567 U.S. at 399). *Arizona v. United States* is the Supreme Court's most recent pronouncement on preemption and immigration.

In *Arizona*, the Supreme Court examined four provisions of an Arizona law: (1) Section 3 created a misdemeanor for failing to comply with federal alien-registration requirements; (2) Section 5 created a misdemeanor for an unauthorized alien to seek or

engage in work in Arizona; (3) Section 6 authorized law enforcement officers to arrest a person without a warrant if the officer had probable cause to believe the person had committed a public offense to make that person removable from the United States; and (4) Section 2(B) required officers who conducted a stop, detention, or arrest to verify a person's immigration status. 567 U.S. at 393–94. The Supreme Court applied the field preemption doctrine to Section 3 because that section regulated conduct in the field of alien registration. The Supreme Court held that "[t]he framework enacted by Congress leads to the conclusion here . . . that the Federal Government has occupied the field of alien registration." *Id.* at 401 (citing, e.g., *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419, n.11 (2003)). The Court reasoned "[i]f § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, 'diminish[ing] the [Federal Government]'s control over enforcement' and 'detract[ing] from the "integrated scheme of regulation" created by Congress.'" *Id.* at 402. (alterations in original) (quoting *Wis. Dep't of Indus. v. Gould Inc.,* 475 U.S. 282, 288–89 (1986)). Accordingly, the *Arizona* court struck down Section 3 of the state law.

Here, Defendant argues that the INA preempts any state regulation in the field of immigration detention. (MTD 23 (citing *Medina v. O'Neill*, 589 F. Supp. 1028, 1038 (S.D. Tex. 1984)).) At a high level of generality, Defendant's proposition has support in both the statute and case law. For example, 8 U.S.C. §§ 1226 & 1231 authorize the U.S. Attorney General to take into custody and detain an alien who is to be removed from the United States. Additionally, in *Arizona*, the Supreme Court struck down the provision authorizing a state officer to arrest an alien without a warrant because the "federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." 567 U.S. at 407. The Supreme Court characterized the relevant field as "alien registration," *id.* at 403, and Arizona's statute regulated conduct precisely in the alien registration field.

Yet, the high court defined the relevant field narrowly. None of the statutory sections cited by Defendant discuss the detention of aliens. The *Arizona* court was concerned when a state framework of sanctions creates a conflict with the plan Congress

put in place. *Id.* (citing *Wis. Dep't*, 475 U.S. at 286 ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity.")). Thus, while Congress authorized the Attorney General to detain unlawful aliens there is no clear congressional framework for regulating detainee conditions, once unlawful aliens are detained in the first instance. There is no clear congressional intent to occupy the field of detention conditions. Without a clear congressional intent, "the historic police powers of the States" are not to be superseded. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Carrying Defendant's theory to its logical conclusion, if this Court were to find that Congress preempted California law in the entire field of civil immigration detention then California could not enforce state and local ordinances, including building codes, sanitation requirements, and other licensing strictures. In fact, ICE's operations manual[10] explicitly requires contract detention facilities to follow applicable federal, state, and local law with regard to safety and sanitation law, fire safety codes, garbage and hazardous waste disposal, drinking and wastewater compliance, and food service. *See* ICE PBNDS, at 19–21, 228. The Court finds that the INA does not regulate the entire field of detention conditions within an immigration detention facility.

The Court next considers whether the IRCA provides the congressional intent to preempt the field of employment and labor practices in immigration detention facilities. Prior to IRCA's enactment, the Supreme Court noted that the "States possess[ed] broad authority under their police powers to regulate the employment relationship to protect workers within the State." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 588 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 356 (1976), *overruled in part by* 8 U.S.C. § 1324a(h)(2)). Again prior to IRCA, the Supreme Court had reasoned that "'prohibit[ing] the knowing employment . . . of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of [the State's] police

---

[10] The ICE PBNDS is a federal agency publication and cannot provide congressional intent, but it at least provides evidence that ICE does not read Congress's intent as to control the entire field of conditions within immigration facilities.

power' and that the Federal Government had 'at best' expressed 'a peripheral concern with [the] employment of illegal entrants' at that point in time." *Id.* (alterations in original) (quoting *De Canas*, 424 U.S. at 356, 360). Before IRCA, the Court declined to hold that federal immigration law preempted a state law assessing civil fines for the employment of unauthorized aliens. *See id.* Under this reasoning, a state law regulating the employment and labor of immigration detainees would most certainly withstand a preemption challenge.

However, in 1986 Congress enacted IRCA and made it "unlawful for a person or other entity . . . to hire, or recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U.S.C. § 1324(a)(1)(A). As the Supreme Court has stated, "IRCA 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.'" *Hoffman Plastic Compounds*, 535 U.S. at 147 (alteration in original) (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 & n.8 (1991)). Yet, Defendant does not cite any cases for the proposition that IRCA preempts the entire field of immigration employment such that a state cannot applying its worker protection and employment regulations to unauthorized aliens. *See Salas v. Sierra Chemical Co.*, 59 Cal. 4th 407, 423 (2014) (holding that "federal regulation imposed by the Immigration Reform and Control Act of 1986 is not so pervasive as to leave no room for any state law on the same subject").

The Court finds that Congress has not preempted state law in the field of immigration detainee labor and employment. *See Washington v. Geo Group, Inc.*, 283 F. Supp. 3d 967, 977 (W.D. Wash. 2017) (finding same).

### 2. *Conflict Preemption*

Defendant also argues that Plaintiffs' minimum wage (fourth cause of action) and overtime wage (fifth cause of action) are preempted because those California laws conflict with federal law. (MTD 24.)

Conflict preemption applies in two situations—when it is impossible to comply with both state and federal law, or when the state law poses an obstacle to accomplishing and executing Congress' purposes and objectives. *Bank of Am. v. City & Cnty. of San*

34

*Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (citing *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002); and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Like field preemption, the touchstone of the conflict preemption inquiry is congressional intent. *Puente Ariz.*, 821 F.3d at 1104 (citing *Wyeth*, 555 U.S. at 565).

Defendant states that 8 U.S.C. § 1555(d) authorizes ICE to pay "allowance (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." (MTD 24 (quoting 8 U.S.C. § 1555(d)).) Defendant argues that Congress set the allowance rate not in excess of $1 per day in the 1978 Department of Justice Appropriation Act. (*Id.* (citing Pub. L. No. 95-86, 91 Stat. 419, 426 (1977); and *Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990)).) Thus, Defendant argues that California's minimum wage and overtime wages—both of which require well over $1 per day—conflict with the rate fixed by Congress. (*Id.* at 25 (citing Cal. Labor Code §§ 510(a), 1197).)

Plaintiffs point out that the $1 per day requirement was laid out in an appropriations bill. (*See* Opp'n 35–36.) Plaintiffs argue that Congress did not preempt state labor law through a $1 per day appropriation. (*Id.* at 36.) Further, Plaintiffs posit that there is nothing in the appropriations bill that makes it impossible for Defendant to comply with California's labor laws, including payment of the minimum wage. (*Id.*) Defendant responds by reiterating its position that the 1978 appropriations bill controls the wages Defendant can lawfully pay Plaintiffs. (Reply 15.)

The conflict preemption argument depends entirely on the 1978 Department of Justice appropriations bill. *See* 91 Stat. at 426 ("For expenses not otherwise provided for, . . . including . . . payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under the immigration laws, for work performed."). Plaintiffs argue "[t]here is nothing in that appropriations bill that makes it impossible for Defendant to comply with California's labor laws." (Opp'n 36.) This position is untenable. Plaintiffs provide no authority that Defendant is able to ignore congressional mandates imposed on

ICE and imposed on Defendant by contracting with ICE. It cannot be true that Defendant must follow both California's minimum wage law (requiring well over $1 per day) and the 1978 Appropriations Act (requiring no more than $1 a day) at the same time. The operative question is whether the appropriations bill still controls to this day.

The limited case law on this question is clearly split. In 1992, the Federal Circuit determined the Fair Labor Standards Act ("FLSA") did not apply to INS detainees and cited with approval the 1978 Department of Justice appropriations bill. *See Guevara v. I.N.S.*, 954 F.2d 733, 1992 WL 1029, at *2 (Fed. Cir. 1992) (per curiam) (unpublished decision). More recently, the district court for the District of Washington encountered the same fact pattern presently before this Court: civil immigration detainees sued a private, for-profit immigration detention corporation alleging that the defendant failed to meet the Washington state minimum wage law. *See Chao Chen v. Geo Group, Inc.*, 287 F. Supp. 3d 1158, 2017 WL 6034365, at *1 (W.D. Wash. Dec. 6, 2017). The *Chao Chen* court pointed out that while 8 U.S.C. § 1555(d) is still in effect, Congress has not specified any rate for detainee work since fiscal year 1979, despite knowing how to set a specific rate. *Id.* at *4 (citing Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2497 (2015)).

This is a close question. The Court begins with the general proposition, repeatedly expressed by the Supreme Court, that "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth*, 555 U.S. at 565 (alterations in original) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Regulating labor and wages is a historic police power belonging to the States. *See Salas*, 59 Cal. 4th at 422 (citing *De Canas*, 424 U.S. at 356). Thus, this Court will only find conflict preemption when Congress provides a clear and manifest purpose. Congress appropriated funds for the federal fiscal year ending September 30, 1978, including funds not to exceed $1 per day for aliens held in custody.

Congress did not include similar language in subsequent years, nor did it codify the $1 per day limitation in the United States Code. This Court does not foreclose the possibility that Congress intended for the $1 per day ceiling to bind future parties, but does not find a clear and manifest purpose on these facts is not warranted. Therefore, the Court declines to apply conflict preemption.[11]

Finally, Defendant does not raise the obstacle preemption element of conflict preemption. *See Hines*, 312 U.S. at 67. Moreover, given the lack of clear congressional intent as to the "Dollar-A-Day" program, the Court finds the obstacle analysis to be coextensive with the conflict preemption analysis.

### B. Whether Plaintiffs Are Employees for Purposes of California Law

Plaintiffs' fourth cause of action seeks to recover minimum wages; their fifth cause of action is for recovery of overtime compensation. (*See* Compl. ¶¶ 71–79.) California Labor Code § 1194 provides the civil remedy for unpaid minimum wages or overtime compensation. *See* Cal. Labor Code § 1194(a).

Defendant offers three reasons why Plaintiffs are not employees under California law. First, the Labor Code defines "employee" differently within the code itself, depending on the chapter, part, article, or section. (*See* MTD 26.) In some sections the legislature expressly included aliens in the definition of employee. (*Id.* (citing Cal. Labor Code §§ 350, 2501(c), 3351).) Because the legislature did not define alien in the section relied on by Plaintiffs, many of who are aliens, in their Complaint, they are not employees. (*Id.*) Second, Defendant argues that IRCA "makes it unlawful to knowingly hire or continue to employ an unauthorized alien." (*Id.* (quoting *Hilber v. Int'l Lining Tech.*, No. C 12-3 LB, 2012 WL 3542421, at *1 (N.D. Cal. July 24, 2012)).) Thus, according to Defendant it would be absurd to confer employee status on Plaintiffs when IRCA prevents hiring aliens.

---

[11] Additionally, the ICE manual provides that "[t]he compensation is *at least* $1.00 (USD) per day." ICE PBNDS, at 407 (emphasis added). Thus, assuming ICE's manual were to preempt state law, *see Chao Chen*, 2017 WL 6034365, at *5 (finding Voluntary Work Program does not preempt Washington minimum wage law), the ICE manual prescribes a floor, not a ceiling for daily wage.

Third, Defendant cites several Ninth Circuit cases where courts have found that prison inmates are not employees for purposes of the FLSA. (*Id.* at 27 (citing, e.g., *Burleson v. State of Cal.*, 83 F.3d 311, 313 (9th Cir. 1996)).) Defendant also directs the Court to *Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 395 (5th Cir. 1990), where the Fifth Circuit held that immigration detainees, who performed various tasks for $1 a day, were not employees under the FLSA. Defendant invites the Court to find the FLSA cases analogous to situation at bar.

Before addressing Plaintiffs' rebuttal arguments, the Court addresses the threshold issue of whether Plaintiffs can qualify as employees before considering the idiosyncrasies of the immigration detention situation. The threshold question is not the immigration status of Plaintiffs, whether IRCA prohibits Defendant from employing them, or whether immigration detainees are similar to prisoners. The threshold inquiry is much simpler: are Plaintiffs employees under California Labor Code § 1194. If the answer is in the affirmative, only then does the Court need to consider whether Plaintiffs' status as aliens or immigration detainees necessitates an exception to the definition of employee. If the answer is in the negative, the inquiry ends.

### 1. *Whether Defendant Employs Plaintiffs Pursuant to* Martinez v. Combs

As Plaintiffs point out, the California Supreme Court addressed the definition of an employee who brings an action under California Labor Code § 1194 in *Martinez v. Combs*, 49 Cal. 4th 35 (2010). (Opp'n 39.) The California Supreme Court noted that generally "employees" may recover unpaid minimum and overtime wages under the terms of the applicable wage order issued by the Industrial Welfare Commission ("IWC") and California courts generally defer to the IWC's definition of employee. *See id.* at 60–61. After discussing the history of the IWC's definition and the common law definition, the *Martinez* court went on to hold that "[t]o employ, then under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship. *Id.* at 64. The court then emphasized that the

IWC's definition of the term "employ" was in "no sense" based on federal law. *Id.* at 66. While the IWC has expressly incorporated elements of the FLSA into select wage orders, the California Supreme Court concluded that there was no reason to substitute the FLSA's "economic reality" test for definitions in wage orders regularly adopted by the IWC. *Id.* at 67.

Defendant argues that Plaintiffs' reliance on *Martinez* is misplaced. (Reply 16.) Defendant reads *Martinez* as inapplicable to state prison inmates and therefore similar logic should extend to federal immigration detainees whose labor, wages, and conditions are completely controlled by ICE[12] regulations. (*Id.* at 16 n.5 (citing Cal. Code Reg. tit. 15, § 3041.2, which sets wages for inmate wages at $0.08 to $0.13 per hour).)

The Court disagrees with Defendant and applies *Martinez*. Plaintiffs' Complaint alleges that Defendant offered $1 per day to participate in a Voluntary Work Program. (Compl. ¶¶ 15, 17.) Plaintiffs list a variety of tasks actually completed by detainees including, but not limited to scrubbing bathrooms, sweeping, mopping, and waxing floors, and preparing and serving detainee meals. (*Id.* ¶ 16.) These allegations sufficiently support a conclusion that Defendant controlled the hours, wages, and working conditions of detainees in their Otay Mesa facility. ICE's 2011 PBNDS reinforces such a finding. The PBNDS states that "[d]etainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly." ICE, PBNDS, at 407. It also provides that "[t]he compensation is at least $1.00 (USD) per day." *Id.* Finally, the manual requires that "[a]ll detention facilities shall comply with all applicable health and safety regulations standards." *Id.* at 408. Assuming Defendant adheres to ICE's policies, and there is no reason offered in the record

―――――――――――――

[12] Defendant refers to the regulations as "INS regulations." (Reply 16.) The Immigration and Naturalization Service, or INS, was abolished in 2003, *see* Pub. L No. 107-296, § 471, 116 Stat. 2135, 2205 (2002), and its duties were divided into ICE, Customs and Border Patrol, and U.S. Citizenship and Immigration Services. The Court assumes that Defendant meant to refer to ICE regulations, but Defendant does not cite which specific regulations control housekeeping chores or voluntary work programs. Because the 2011 ICE PBNDS discusses both housekeeping chores and the voluntary work program and applies to "Contract Detention Facilities," *see* ICE PBNDS, at 405, the Court again assumes Defendant refers to that manual.

to think otherwise, then the logical conclusion is that, at a minimum, Defendant controls the wages, hours, and working conditions of Plaintiffs and putative class members. As such, Defendant employed Plaintiffs and putative class members for purposes of California Labor Code § 1194.

Defendant's argument that *Martinez* does not apply to Plaintiffs is not persuasive. To arrive at its conclusion, Defendant compares Plaintiffs to state prison inmates, who are excluded from the IWC's scope. (*See* Reply 16.) Yet, the California Penal Code expressly exempts inmates from the Labor Code's minimum wage requirements. *See* Cal. Penal Code § 2811. Indeed, the Thirteenth Amendment's prohibition on involuntary servitude does not apply to convicted criminals. The only authority Defendant cites for treating civil immigration detainees the same as inmates are ICE regulations. (Reply 16.) Yet, the ICE regulations only set a floor, not a ceiling. ICE PBNDS, at 405 ("The compensation is *at least* 1.00 (USD) per day." (emphasis added)). The Court finds such guidance insufficient, especially compared to the clear statement in Penal Code § 2811, to exempt Plaintiffs from *Martinez.*

### 2. *Whether the Labor Code Expressly Includes Immigration Detainees*

The Court turns to the Defendant's arguments why the Labor Code should not apply to Plaintiffs, even if Defendant employs detainees. Defendant first argues that the Labor Code defines "employee" deliberately based on the respective chapter, part, article, or section. (MTD 26.) In some Labor Code sections the legislature expressly included aliens in the definition of employee. (*Id.* (citing Cal. Labor Code §§ 350, 2501(c), 3351).) But, the legislature did not include alien detainees in the definition of employee in the statutes in Plaintiffs' Complaint and, thus, Defendant urges the Court not to read "immigrant detainee" into the Labor Code. (*Id.*)

Plaintiffs counter that Labor Code § 1171.5 expresses a clear intent by the California Legislature to accord all individuals "regardless of immigration status" the protections, rights, and remedies under state law. Cal. Labor Code § 1171.5(a). Plaintiffs cite *Incalza v. Fendi North America, Inc.*, 479 F.3d 1005, 1009 (9th Cir. 2007), as recognizing that

40

illegal aliens, like other California employees, cannot be terminated in violation of an express or implied agreement without good cause. (Opp'n 38.) Plaintiffs argue *Incalza* is exemplary of a multitude of decisions, both state and federal, finding that illegal aliens are protected under the California Labor Code. (*Id.* at 38 & n.11 (collecting cases).)

Defendant responds that Plaintiffs are not employees so Labor Code § 1171.5 does not apply to them. (Reply 16.) Defendant emphasizes that the relevant inquiry is not Plaintiffs' immigration status, but rather their detention status. (*Id.* at 15–16.)

Plaintiffs bring causes of action under Labor Code § 1194. *Martinez* describes the applicable test to determine whether a person is engaged in employment for purposes of section 1194. The Court found that Plaintiffs meet the *Martinez* definition and are therefore engaged in employment and able to bring claims under § 1194. The Court agrees with Defendant that Plaintiffs do not answer the thrust of Defendant's argument: that the Labor Code does not define employee as an alien held in a detention center. Yet, the inverse is also true, Defendant has not demonstrated that the Labor Code, or any case law, specifically exempts alien detainees from the Labor Code. Defendant invites comparison to *Gerard v. Mitchell Systems*, No. CV 14-4999 DSF (SHX), 2016 WL 4479987, at *8 (C.D. Cal. Aug. 22, 2016), where the district court determined that cosmetology students required to perform housekeeping chores without pay did not fall under the applicable IWC wage order. Defendant argues that the federal ICE regulations are similar to the cosmetology regulations that displaced the IWC wage order. *Gerard* relied on a California Court of Appeal decision that explicitly held cosmetology students did not fall under the IWC. *See* 2016 WL 4479987, at *7–8 (citing *Hutchison v. Clark*, 67 Cal. App. 2d 155, 160–61 (Ct. App. 1944)). Defendant does not cite, nor can the Court find, a similar case holding that alien detainees do not fall under the IWC's sweep. Without any similar precedent, the Court declines to create an exception for civil immigration detainees removing them from IWC's purview.

### 3. Whether IRCA Prohibits Defendant from Employing Plaintiffs

Defendant next argues that Plaintiffs' legal theory creates an absurdity because of

17-CV-1112 JLS (NLS)

IRCA. IRCA "makes it unlawful to knowingly hire or continue to employ an unauthorized alien." (MTD 26 (quoting *Hilber*, 2012 WL 3542421, at *1).) Thus, if civil immigration detainees are unauthorized aliens then Defendant could not knowingly hire or continue to employ those unauthorized aliens. (*See id.* at 26–27.)

Plaintiffs respond that the California Supreme Court has held that statutory labor provisions are available to all workers "regardless of immigration status." (Opp'n 37 (quoting *Salas*, 59 Cal. 4th at 426).) According to Plaintiffs, federal law does not preempt, (*id.* at 38 (citing *Salas*, 59 Cal. 4th at 421–24)), the California Legislature's clear intent to provide unauthorized aliens all protections, rights, and remedies under state law, (*id.* (citing, e.g., Cal. Gov. Code § 7285)).

The Court agrees with Defendant's general principal that IRCA prohibits employers from employing unauthorized aliens and if any detainees were unauthorized aliens then Defendant would be prohibited from employing unauthorized aliens. Civil immigration detention facilities house persons as their immigration status is adjudicated. Logic would suggest at least some of Plaintiffs' putative class would fall under IRCA—creating a legal Gordian knot for Defendant. Two considerations allow the Court to cut the proverbial knot. First, the Court has no information or allegation concerning Plaintiffs' immigration status. (*See* Compl. ¶¶ 27–29.) The Motion before the Court is not class certification, but rather whether these particular Plaintiffs state a claim. Thus, Defendant's argument, while potentially relevant in future motions, is not dispositive here. Second, as Plaintiffs point out, California law provides a remedy for unauthorized aliens. *See* Cal. Labor Code §§ 1171.5, 1194; *Salas*, 59 Cal. 4th at 426. The relevant inquiry is not whether Defendant violated IRCA, but whether Plaintiffs can recover under California law for past wrongs. Thus, the Court finds IRCA does not control the issue of whether Plaintiffs are employees under California law.

### 4. Whether Immigration Detainees Are Analogous to Prisoners

The Court turns to the subset of persons perhaps most similarly situated to immigration detainees: state prison inmates. Defendant argues that courts have repeatedly

17-CV-1112 JLS (NLS)

held prison inmates are not employees for purposes of the FLSA, (MTD 27 (citing, e.g., *Burleson*, 83 F.3d at 313; and *Hale v. Arizona*, 993 F.2d 1387, 1389 (9th Cir.) (en banc), *cert. denied*, 510 U.S. 946 (1993))), the Americans with Disabilities Act, (*id.* (citing *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 906–08 (9th Cir. 2013)), and the Toxic Substances Control Act and Clean Air Act, (*id.* (citing *Coupar v. U.S. Dep't of Labor*, 105 F.3d 1263, 1265 (9th Cir. 1997))). Defendant also points the Court to *Alvarado Guevara v. I.N.S.*, 902 F.2d at 395, where the Fifth Circuit held that immigrant detainees who performed housekeeping tasks were not employees under the FLSA, (MTD 27).

Plaintiffs' counter that the California Supreme Court has rejected the application of the common law definition of employer as well as the FLSA's "economic reality" test. (Opp'n 39 (citing *Martinez*, 49 Cal. 4th at 64).) Plaintiffs also argue that even if the Court applied the FLSA economic reality test then they still qualify as employees. (*See id.* 39–40.) Plaintiffs point to the *Hale* court's statement, quoted with approval in *Burleson*, that the Ninth Circuit does "not believe that prisoners are categorically excluded from the FLSA." (*Id.* at 39 (quoting *Burleson*, 83 F.3d at 313).) Thus, Plaintiffs argue that if the Court were to apply the economic reality test, articulated in *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), then civil immigration detainees would be situated differently than state prisoners. (*See* Opp'n 40.) Plaintiffs state the single determinative factor under the economic reality test is whether immigration detainees have a legal obligation to work. (*Id.* (citing *Hale*, 993 F.2d at 1395).) Thus, Plaintiffs contend that they, unlike prisoners, are under no obligation to work. (*See id.* at 40–41.) Applying the remaining *Bonnette* factors, Plaintiffs contend that Defendant controls the hours, wages, and hiring and firing of detainee workers and, therefore, Plaintiffs qualify as employees under the economic reality test. (*Id.* at 41.)

In response, Defendant reiterates that Plaintiffs fail to address *Alvarado Guevara* and *Menocal*. (Reply 17.) *Alvarado Guevara* determined that civil immigration detainees were not employees for purposes of the FLSA. (*Id.* (citing *Alvarado Guevara*, 902 F.2d at 395).) Moreover, Defendant points to a case cited by Plaintiffs, *Menocal*, which reasoned

17-CV-1112 JLS (NLS)

that immigration detainees were similar to prisoners and concluded that immigration detainees were not employees for purposes of Colorado's minimum wage law. (*Id.* (citing *Menocal*, 113 F. Supp. 3d at 1129).)

Defendant cites several cases where courts found prison inmates were not employees for purposes of various federal statutes, like the Americans with Disabilities Act and the Clean Air Act. These cases share a common precedent and common analysis framework: *Hale v. Arizona*, 993 F.2d 1387. Defendant's diverse array of cases relying on *Hale* also relies on FLSA's economic reality test employed in *Hale*. For example, *Castle v. Eurofresh, Inc.*, 731 F.3d at 906–08, explicitly relied on *Hale* to hold that an inmate was not an employee. *See id.* at 908 ("We are equally unpersuaded by [the plaintiff's] other attempts to distinguish this case from *Hale* and *Coupar*."). Thus, Defendant's primary argument boils down to the following proposition: courts regularly find that prison inmates not employees under FLSA and the Court should apply this reasoning to immigration detainees under California's Labor Code.

The defect in Defendant's argument is that California's employment definition is explicitly different from FLSA's economic reality test. *See Martinez*, 49 Cal. 4th at 66–67. The California Supreme Court cannot be much clearer when it said "[i]n no sense is the IWC's definition of the term 'employ' based on federal law." *Id.* at 66. Moreover, the *Martinez* court reiterated that it had "previously cautioned against 'confounding federal and state labor law.'" *Id.* at 68 (quoting *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 798 (1999)). And, while the IWC's wage orders are at times patterned after federal regulations, the wage orders sometimes provide greater protection than is provided under federal law. *Ramirez*, 20 Cal. 4th at 795 (collecting cases). Defendant's analysis does not bridge the gap between California's Labor Code and the FLSA. Put differently, *Martinez* explicitly distinguishes the California IWC definition of "to employ" from FLSA's economic reality test. Moreover, Defendant does not offer a convincing reason to apply a test disavowed by the California Supreme Court.

Even if the Court were to apply the economic reality test it is not clear that Plaintiffs

do not qualify as employees. *Hale* held that inmates were not employees of the prison because they "worked for programs structured by the prison pursuant to the state's requirement that prisoners work at hard labor, the economic reality is that their labor belonged to the institution." 993 F.2d at 1395. *Hale* distinguished prisoners from employees in the free market because "[c]onvicted criminal do not have the right to freely sell their labor and are not protected by the Thirteenth Amendment against involuntary servitude." *Id.* at 1394 (citing *Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir.), *cert. denied*, 375 U.S. 915 (1963)).

Here, California Penal Code § 2700 mandates that "every able-bodied prisoner imprisoned in any state prison" are required to carry out "as many hours of faithful labor in each day" as prescribed by the Director of Corrections. Like the *Hale* court's reasoning, California inmates cannot freely sell their labor and are exempted from the Thirteenth Amendment's prohibition on involuntary servitude. Defendant has not directed the Court to any similar statute for civil immigration detainees—other than ICE's regulations. (*See* Reply 16.) Yet, the ICE regulation clearly states, "Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." ICE PBNDS, at 405. The ICE regulations are voluntary, not mandatory (excepting certain housekeeping tasks). Plaintiffs are not convicted criminals and are accorded the protections of the Thirteenth Amendment. *See supra* section II.A.1.b (discussing Thirteenth Amendment's civic duty exception).

Defendant is correct that Plaintiffs do not directly address the holding in *Alvarado Guevara*, 902 F.2d at 395, (Reply 17). Like here, *Alvarado Guevara* involved an alien detention facility that offered detainees the opportunity to participate in a voluntary work program for $1 per day. 902 F.2d at 395. The Fifth Circuit held that the detainees were not employees under the FLSA. *Id.* In doing so, the court relied largely on one factor: that the FLSA's intent was to protect the "standard of living" and "general well-being" of the worker in the American industry. *Id.* (quoting *Alexander v. Sara, Inc.*, 559 F. Supp. 42 (M.D. La.), *aff'd.* 721 F.2d 149 (5th Cir. 1983)). Because detainees were removed from

the American economy, they were not employees under FLSA.

While the factual situation between this case and *Alvarado Guevara* is similar, *Alvarado Guevara*'s reasoning presupposes that the immigration detention facility exerts nearly the same level of control over a detainee as a prison does over a prisoner. The question of control is important. At common law, the employment relationship between an employer and independent contractor tested the amount of control the employer exerted over an independent contractor. *See Vanskike v. Peters*, 974 F.2d 806, 810 (7th Cir. 1992) (citing *Bonnette*, 704 F.2d at 1470). In the prison employment inquiry, a court approaches the question of control from the other direction: is there too much control over the purported employee. *See id.* ("[T]here is obviously enough control over the prisoner; the problematic point is that there is *too much* control to classify the relationship as one of employment."). Thus, when *Hale* discussed the economic reality of a prisoner's situation the overriding factor was that the relationship between prison and prisoner was "penological, no pecuniary." 993 F.2d at 1395.

Here, it is not clear that Defendant exerts the same level of control over Plaintiffs as a prison does over a prisoner. As discussed, Plaintiffs are not convicted criminals and have no obligation to work (other than the basic housekeeping tasks outlined in the PBNDS manual). Consider the following hypothetical, based on the facts and allegations before the Court. If all civil immigration detainees at Defendant's Otay Mesa facility refused to participate in the Voluntary Work Program then Defendant could not force detainees to perform labor and services at the facility, beyond basic housekeeping tasks. Moreover, the ICE regulations require the facility administrator to "ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness." ICE PBNDS, at 21. If detainees are unavailable for sanitation and cleanliness it is conceivable that Defendant would hire persons to perform the tasks previously performed by detainees: cooking meals for detainees, cutting detainees' hair, and launder detainees' clothing. (*See* Compl. ¶ 14.) By comparison, a prison can control their inmates and require them, under the Thirteenth Amendment and California law, to perform those tasks for well under

minimum wage. Such a hypothetical illustrates that the level of control over detainees does not rise to the same level described in *Hale* and *Vanskike*.

But, the foregoing economic reality discussion is, ultimately, <u>not</u> the applicable test to Plaintiffs' situation.[13] Instead, the IWC wage orders, which the California Supreme Court defers to, controls. *See Martinez*, 49 Cal. 4th at 66–67. Accordingly, the Court finds Defendant's analogy to prison employment cases does not address the critical issue in this case—whether Plaintiffs meet the definition of employee under *Martinez*.

### C. Whether IWC's Wage Orders Apply to Plaintiffs

Defendant states that Plaintiffs' fourth, fifth, sixth, and seventh causes of action all rely, in part, on IWC Wage Orders ("WO") 5-2001 and 15-2001. (MTD 28.) Defendant argues reliance on both orders are misplaced.

#### 1. Wage Order 5-2001

WO 5-2001 applies to the Public Housekeeping Industry and defines the industry to include "any industry, business, or establishment which provides meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the Commission." (*Id.* (quoting Cal. Code Regs. tit. 8, § 11050(2)(P) (2017)).) The Wage Order then provides an exemplary list of businesses that do not include corrections or detention facilities. (*Id.* (citing Cal. Code Regs. tit. 8, § 11050(2)(P)(1)–(7)).) Defendant concludes that the illustrative list is not remotely similar to the detention of immigration detainees and urges the Court not to apply this Wage Order. In response, Plaintiffs point out that the IWC's occupations are the same as in their Complaint, e.g., janitorial services, landscaping,

---

[13] Defendant also argues that an employment relationship cannot be found under the common law test because detention for the purposes of deportation does not support a reasonable belief that an employer-employee relationship existed. (Reply 16–17 (citing *Bonnette*, 704 F.2d at 1470; and *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 404 (Cal. 1989)).) The Court acknowledges but does not make a finding as to the common law employment relationship. It does so because *Martinez* makes clear that the IWC's employment test is available for those persons, like Plaintiffs, who seek remedy under California Labor Code § 1194.

catering, boarding, and cleaning of facilities. (Opp'n 43.)

WO 5-2001's plain language answers this issue. Defendant operates a immigration detention facility. In that capacity, Plaintiffs allege that they perform tasks concerning meals, housing, and maintenance. (*See* Compl. ¶ 14.) The wage order applies to any industry or business which provides meals, housing, or maintenance services even when the services is operated incidental to the business's other operations in an establishment not covered by an industry order of the IWC. § 11050(2)(P). Meals, housing, or maintenance clearly are not Defendant's primary business purpose, but those services are provided incidental to its role in housing detainees.

Defendant argues that it is not "remotely similar" to the examples listed in the wage order. (MTD 28.) The Court is not convinced the examples are so far afield as Defendant contends. For example, the wage order cites "[p]rivate schools, colleges, or universities, and similar establishments which provide board or lodging in addition to educational facilities." § 11050(2)(P)(5). It also offers as examples "[h]ospitals, sanitariums, rest homes, child nurseries, child care institutions, homes for the aged, and similar establishments offering board or lodging in addition to medical, surgical, nursing, convalescent, aged, or child care." § 11050(2)(P)(4). These two examples call to mind an institution where people remain for long periods of time for a purpose (education or healthcare) while receiving meals and lodging that are incidental to that purpose. While the purpose of the institution may differ—education vs. nursing home vs. detention facility—each institution provides essential services for those under their charge. Finally, as Defendant admits, the wage order list is not exhaustive.

The Court declines to dismiss Plaintiffs' Complaint to the extent it relies on Wage Order 5-2001.

### 2. *Wage Order 15-2001*

Defendant also argues that WO 15-2001 should not apply because the wage order only covers "all persons employed in household occupations." (MTD 28 (citing Cal. Code Regs. tit. 8, § 11050(1)).) "Household Occupations" is further defined as:

> [A]ll services related to the care of persons or maintenance of a private household or its premises by an employee of a private householder. Said occupations shall include, but not be limited to, the following: butlers, chauffeurs, companions, cooks, day workers, gardeners, graduate nurses, grooms, house cleaners, housekeepers, maids, practical nurses, tutors, valets, and other similar occupations.

(*Id.* at 28–29 (citing Cal. Code Regs. tit. 8, § 11050(2)(I)).)  Defendant argues that it is not a private household, but rather a detention facility.  Plaintiffs do not address Defendant's argument.

The Court agrees with Defendant.  It is true that Plaintiffs' allegations include some of these types of occupations like housekeepers, gardeners, and cooks.  (*See* Compl. ¶ 14.)  However, WO 15-2001 does not include all cooks, gardeners, and housekeepers; it only includes those services related to a "private household or its premises."  § 11050(2)(I).  Plaintiffs raise no argument why a private household includes a civil immigration detention facility.  The Court finds that Wage Order 15-2001 does not support Plaintiffs' claims.  Accordingly, the Court **GRANTS IN PART** Defendant's Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims in the fourth through seventh causes of action to the extent they rely on Wage Order 15-2001.

## IV.    Derivative Claims (Third, Eleventh, and Twelfth Causes of Action)

Defendant argues that Plaintiffs remaining causes of action must fail to the extent Plaintiffs' substantive claims are dismissed.  (MTD 29.)  In addition, Defendant argues Plaintiffs' unjust enrichment merits special attention and fails regardless of whether Plaintiffs' substantive claims succeed or fail.  (*See id.*)

### A. Unjust Enrichment (Twelfth Cause of Action)

Defendant posits that Plaintiffs' unjust enrichment claim must fail because unjust enrichment is an equitable remedy and an equitable theory of recovery is barred if an adequate remedy exists at law against the same person.  (MTD 29 (citing *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996)).)  Defendant explains that courts typically find unjust enrichment to be unavailable when a plaintiff's other claims prove that adequate

remedies exist. (*Id.* (citing, e.g., *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO (Ex), 2016 WL 7486600, at *13 (C.D. Cal. Sept. 27, 2016)).) Thus, Defendant argues that Plaintiffs' statutory causes of action under the TVPA and the California Labor Code all seek redress for the same injuries as Plaintiffs' unjust enrichment claim. Defendant urges the Court to limit Plaintiffs' unjust enrichment claim accordingly.

Plaintiffs counter that Federal Rules of Civil Procedure 8(a)(3) and 8(d)(2) allow them to plead alternative forms of relief. (Opp'n 31.) Furthermore, Plaintiffs point the Court to *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015), where the Ninth Circuit determined that a unjust enrichment claim should not be dismissed as duplicative of a plaintiff's other claims according to Rule 8(d)(2). (Opp'n 31.)

The issue here falls squarely under *Astiana*. In California, there is no "standalone cause of action for 'unjust enrichment.'" *Astiana*, 783 F.3d at 762 (citing *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (Ct. App. 2010); and *Jogani v. Superior Court*, 165 Cal. App. 4th 901, 911 (Ct. App. 2008)). California state courts are split on whether California law recognizes a cause of action for unjust enrichment. *See McMillan v. Lowe's Home Ctrs., LLC*, No. 15-CV-695-KJM-SMS, 2016 WL 232319, at *6 (E.D. Cal. Jan. 20, 2016) (citing *Paskenta Band of Nomlaki Indians v. Crosby*, No. 15-00538, 2015 WL 4879650, at *6 (E.D. Cal. Aug. 14, 2015)). However, *Astiana* interpreted California law to recognize that an unjust enrichment claim may be construed as an action in quasi-contract. 783 F.3d at 762. The *Astiana* court went on to hold that where a plaintiff states a claim for relief under a quasi-contract cause of action that cause should not be dismissed as "duplicative or superfluous" to the plaintiff's other claims. *Id.* (citing Fed. R. Civ. P. 8(d)(2)).

"To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038–39 (9th Cir. 2016) (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (Ct. App. 2000)). Here, Plaintiffs allegations sufficiently state a claim for unjust enrichment or quasi-contract. Defendant

received the value of Plaintiffs' labor and allegedly did not adequately compensate Plaintiffs. The Court **DENIES IN PART** Defendant's Motion as to Plaintiffs' twelfth cause of action; however, the Court qualifies its holding as follows. *Astiana* and Federal Rule of Civil Procedure 8(d)(2) allow Plaintiffs to plead alternative causes of action, but the Court understands that Plaintiffs cannot recover twice for the same injury. *Gen. Tel. Co. of the Nw., Inc. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 333 (1980) (citation omitted) ("It also goes without saying that the courts can and should preclude double recovery by an individual.").

### B. Remaining Derivative Claims (Third and Eleventh Causes of Action)

Defendant argues that Plaintiffs' derivative causes of action—California Unfair Competition Law and Negligence—should be dismissed as they rely entirely on violations of the federal and California TVPA and California Labor Code. (MTD 29.) Because Plaintiffs claims survive this Motion, the Court will not dismiss Plaintiffs' derivative claims. Thus, the Court **DENIES IN PART** Defendant's Motion as to Plaintiffs' third and eleventh causes of action.

## CONCLUSION

In light of the following, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss, (ECF No. 18). Additionally, the Court **LIFTS** the stay on these proceedings.

**IT IS SO ORDERED.**

Dated: May 14, 2018

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

17-CV-1112 JLS (NLS)