J. MARK WAXMAN  (SBN 58579)
    mwaxman@foley.com
NICHOLAS J. FOX (SBN 279577)
    nfox@foley.com
**FOLEY & LARDNER LLP**
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
T: 858.847.6700 // F:  858.792.6773

EILEEN R. RIDLEY (SBN 151735)
    eridley@foley.com
ALAN R. OUELLETTE (SBN 272745)
    aouellette@foley.com
**FOLEY & LARDNER LLP**
555 California Street, Suite 1700
San Francisco, CA 94104-1520
T:  415.434.4484 // F: 415.434.4507

ROBERT L. TEEL (SBN 127081)
    lawoffice@rlteel.com
**LAW OFFICE OF ROBERT L. TEEL**
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
T: 866. 833.5529 // F:855.609.6911

GEOFFREY M. RAUX (pro hac vice)
    graux@foley.com
**FOLEY & LARDNER LLP**
111 Huntington Avenue
Boston, MA 02199-7610
T: 617.342.4000 // F: 617.342.4001

Attorneys for Plaintiffs SYLVESTER OWINO,
JONATHAN GOMEZ, and the Proposed Class(es)

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CORECIVIC, INC., <br><br> Defendant. | Case No. 3:17-CV-01112-JLS-NLS <br><br> **CLASS ACTION** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| CORECIVIC, INC., <br><br> Counter-Claimant, <br><br> vs. <br><br> SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated, <br><br> Counter-Defendants. | Date:   July 11, 2019 <br> Time:   1:30 p.m. <br> Place:  Courtroom 4D <br><br> Judge:  Hon. Janis L. Sammartino <br> Magistrate:  Hon. Nita L. Stormes <br><br> DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ..................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................... 3

    A.    CORECIVIC IS UNJUSTLY ENRICHED BY THE WORK OF ICE DETAINEES. ................................................................... 3

    B.    CORECIVIC'S COMMON POLICIES AND PRACTICES. ..................... 4

        1.    CoreCivic's Facilities Operate Through The Use Of Standardized Policies & Procedures. ..................................... 4

        2.    CoreCivic Has And Continues To Utilize ICE Detainees To Perform Work That Is Essential To Facility Operations. ..................................................................... 5

        3.    CoreCivic's Policy Of Violating California Labor Law. ................ 7

        4.    CoreCivic's Policy And Practice Of Coercing ICE Detainees To Clean Areas Of The Facility Beyond Their Immediate Living Areas. .................................................. 8

        5.    CoreCivic's Practice Of Withholding Basic Living Necessities In Order To Coerce ICE Detainees To Join The VWP. .................................................................. 10

III.  PLAINTIFFS SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION. ................................................................. 13

    A.    PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(A). ............ 15

        1.    The Numerosity Requirement Is Satisfied. ................................ 15

        2.    Common Questions Of Law And Fact Abound. .......................... 16

        3.    The Claims Of The Class Representatives Are Typical Of The Claims Of The Members Of The Putative Class. ............. 21

        4.    Plaintiffs Will Adequately Protect The Interests Of The Class. ..................................................................... 23

    B.    PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(B)(3). ........ 24

        1.    Common Issues Predominate. .................................................. 24

        2.    Class Treatment Is The Superior Method Of Adjudication. ..................................................................... 24

IV.   CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

## Federal Cases

*Abdullah v. U.S. Sec. Associates, Inc.*,
   731 F.3d 952 (9th Cir. 2013) ....................................................................... 19

*Allen v. Similasan Corp.*,
   306 F.R.D. 635 (S.D. Cal. 2015) ............................................................ 15, 16

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ..................................................................................... 24

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ....................................................................... 22

*Blair v. CBE Grp., Inc.*,
   309 F.R.D. 621 (S.D. Cal. 2015) ................................................................. 15

*Canela v. Costco Wholesale Corp.*,
   No. 13-cv-03598-BLF, 2018 U.S. Dist. LEXIS 88037 (N.D. Cal. May 23,
   2018) .............................................................................................................. 1

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .................................................................. 15, 16

*ESG Capital Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ..................................................................... 18

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982) ..................................................................................... 22

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..................................................................... 23

*Hoffman v. Blattner Energy, Inc.*,
   315 F.R.D. 324 (C.D. Cal. 2016) ................................................................. 19

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014) ..................................................................... 16

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ..................................................................... 25

*LaDuke v. Nelson*,
   762 F.2d 1318 (9th Cir. 1985) ..................................................................... 22

*Leyva v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) ....................................................................... 24

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ....................................................................... 16

*Menocal v. GEO Grp., Inc.*,
   882 F.3d 905 (10th Cir. 2018) ............................................................. 25

*In re Monster Worldwide, Inc. Securities Litig.*,
   251 F.R.D. 132 (S.D.N.Y 2008) .......................................................... 25

*Rannis v. Recchia*,
   380 Fed. Appx. 646 (9th Cir. 2010) ..................................................... 15

*Silva-Arriaga v. Texas Express, Inc.*,
   222 F.R.D. 684 (M.D. Fla. 2004) ......................................................... 25

*Smith v. Univ. of Wash. Law Sch.*,
   2 F. Supp. 2d 1324 (W.D. Wash. 1998) ............................................... 22

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................. 16

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .............................................................. 24

**California Cases**

*Alejo v. City of Alhambra*,
   75 Cal. App. 4th 1180 (1999) ............................................................... 18

*Arias v. Superior Court*,
   46 Cal. 4th 969 (2009) ............................................................................ 1

*Martinez v. Combs*,
   49 Cal. 4th 35 (2010) ..................................................................... 17, 18

*Rose v. Bank of Amer., N.A.*,
   57 Cal. 4th 390 (2013) .......................................................................... 18

**Federal Statutes**

18 U.S.C. § 1589(a) ................................................................................... 21

18 U.S.C. § 1589(c)(2) ............................................................................... 21

Federal Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq.* ..................... *passim*

**California Statutes**

Cal. Labor Code §§ 204, 510, 1194 .......................................................... 17

Cal. Labor Code § 226 ............................................................................... 17

Cal. Labor Code § 226(a) ............................................................................ 7

Cal. Labor Code §§ 226.7, 512 .................................................................. 17

Cal. Labor Code § 432.5 ............................................................................ 17

Cal. Labor Code §§ 1194, 1197, 1197.1 .......................................................... 17

Cal. Penal Code § 236.1 ................................................................................... 19

Cal. Penal Code § 236.1(a) .............................................................................. 19

Cal. Penal Code § 236.1(h)(3) ......................................................................... 19

Cal. Penal Code § 236.1(h)(4) ......................................................................... 20

California's Private Attorney General Act, Cal. Labor Code § 2698 ................ 1

California's Unfair Competition Law, Cal. Business and Professions Code § 17200, *et seq*. .............................................................................................*passim*

California Trafficking Victims Protection Act, Cal. Civil Code § 52.5 ....... 1, 19

**<u>Other Authorities</u>**

Fed. R. Civ. P. Rule 23(a) ..................................................................... 14, 15, 24

Fed. R. Civ. P. Rule 23 ........................................................................ 1, 2, 15

Fed. R. Civ. P. Rule 23(a)(2) .......................................................................... 16

Fed. R. Civ. P. Rule 23(a)(3) .......................................................................... 22

Fed. R. Civ. P. Rule 23(a)(4) .......................................................................... 23

Fed. R. Civ. P. Rule 23(a)'s ............................................................................ 24

Fed. R. Civ. P. Rule 23(b) ............................................................................... 14

Fed. R. Civ. P. Rule 23(b)(3) ............................................................. 14, 15, 24, 25

Fed. R. Civ. P. Rule 23(b)(3)'s ....................................................................... 24

Fed. R. Civ. P. Rule 30(b)(6) ...................................................................*passim*

ICE PBNDS, § 4.5, at 327, *available at* https://www.ice.gov/doclib/detention-standards/2011/4-5.pdf ................... 11

ICE PBNDS, § 5.8, at 406, *available at* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf ..................... 8

Inspector General, *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (2007), at 7, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf......................................................................................................... 13

IWC Wage Order No. 5-2001 .......................................................................... 17

# I.    <u>INTRODUCTION</u>

This is a Rule 23 class action on behalf of Immigration and Customs Enforcement ("ICE") detainees that worked at CoreCivic, Inc.'s ("CoreCivic" or "Defendant") detention facilities.  Presently before this Court is Plaintiffs' motion to: (1) certify a California-wide class with respect to Plaintiffs' labor law and derivative state law claims; (2) certify two California-wide classes with respect to Plaintiffs' claim for violations of the California Trafficking Victims Protection Act, Cal. Civil Code § 52.5 (the "California TVPA"), and derivative state law claims; and (3) certify two nationwide classes with respect to Plaintiffs' claim for violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq.* (the "Federal TVPA").

Plaintiffs assert class claims for violations of: (1) the California Labor Code; (2) the California Industrial Welfare Commission's (the "IWC") Wage Order No. 5-2001; (3) the California TVPA; and (4) the Federal TVPA.  [Dkt. 67.]  Plaintiffs also bring derivative claims for violations of California's Unfair Competition Law, Cal. Business and Professions Code § 17200, *et seq*. (the "UCL"), unjust enrichment, and negligence.[1] [*Id*.]  Plaintiffs' claims all arise out of CoreCivic's general policies and practices concerning work by civil immigration detainees that are involuntarily confined at CoreCivic facilities in California and throughout the United States.  Plaintiffs and the putative class members were detained based solely on their immigration status and not because they have been convicted of any crime.  In spite of this, the general operations of CoreCivic's facilities for civil immigration detainees are essentially indistinguishable from those of penal institutions, and the lived experience of civil immigration detainees while they are at CoreCivic is virtually identical to that of criminal prisoners.

---

[1] Plaintiffs' claim for violations of the California's Private Attorney General Act. Cal. Labor Code § 2698 ("PAGA"), is a representative action under California law that does not require certification under Rule 23.  *Arias v. Superior Court*, 46 Cal. 4th 969, 975 (2009); *Canela v. Costco Wholesale Corp.*, No. 13-cv-03598-BLF, 2018 U.S. Dist. LEXIS 88037, at *30-31 (N.D. Cal. May 23, 2018).  To the extent that the Court concludes that class certification is necessary for Plaintiffs' PAGA claim, class certification is appropriate for the same reasons discussed below with respect to the CA Labor Law Class.

As the Court has acknowledged, "Plaintiffs are not convicted criminals and have no obligation to work." [Dkt. 38 at 46:16-18.]  CoreCivic—which reports over one billion dollars in revenue annually—completely disregards the distinction between a civil immigration detainee and a prisoner for the purpose of further increasing its profits. Specifically, CoreCivic capitalizes on its complete dominion over civil immigration detainees by using them as a virtually free labor pool to complete admittedly essential facility operations.  As a matter of policy and practice, CoreCivic obtains the use of this virtually free labor pool by: (1) forcing civil immigration detainees to work under threat of discipline, including the threat that a non-compliant civil immigration detainee will be placed in solitary confinement for periods of time up to 30 days; and (2) coercing civil immigration detainees to work by withholding basic living necessities, which can only be purchased through CoreCivic's commissaries at marked up prices.  These challenged policies and practices violate both the CA TVPA and the Federal TVPA.

Further, civil immigration detainees that work through CoreCivic's so-called "voluntary work program" (the "VWP") are employees of CoreCivic under California labor law.  Nevertheless, CoreCivic has—and continues to— exploit civil immigration detainees in the VWP  in its California facilities through its improper classification of civil immigration detainees as "volunteers."  As a result, civil immigration detainees are not afforded any of the rights and protections California mandates they be provided, and they work as many as eight hour shifts, and sometimes more, for as little as $.75 to $1.00 per day without scheduled rest breaks, meal breaks, or overtime pay.

Plaintiffs' class claims all depend on the resolution of overarching common issues regarding the legality of CoreCivic's challenged policies and practices, which CoreCivic has used to exploit civil immigration detainees for its sole profit for over a decade.  For these reasons, and the reasons discussed in greater detail below, Plaintiffs' proposed classes all satisfy the requirements of Rule 23, and the Court should grant this motion in its entirety.

///

## II.     FACTUAL BACKGROUND

### A.     CoreCivic Is Unjustly Enriched By The Work Of ICE Detainees.

CoreCivic is a corporation that "owns and operates detention facilities around the country." [Dkt. 70 at 11.] CoreCivic's facilities have and continue to house civil immigration detainees that are in the custody of ICE, who are referred to by CoreCivic and in the instant motion as "ICE detainees." [Ex. 3[2] (Ellis Dep. (Vol. 1)) at 81:4-12.] ICE detainees are detained based on their immigration status and have not been charged with a crime. [*Id*. at 20:25-21:5.] This action concerns ICE detainees that worked for CoreCivic while detained at a CoreCivic facility. The proposed classes herein exclude other categories of individuals that have been housed at a CoreCivic facility, such as individuals in the custody of the U.S. Marshall Service or state law enforcement agencies.

At all times relevant to this lawsuit, CoreCivic exploited ICE detainees, who were under CoreCivic's sole control and supervision at all times, by using them as a virtually free labor force to perform "essential" facility operations. [Ex. 5 (Huffman Dep.) at 27:10-17, 31:2-35:15; *see also* Ex. 6 (Figueroa Dep.) at 52:1-54:17; Ex. 7 (Pollock Dep.) at 106:2-14; Ex. 8 (Lacy Dep.) at 71:25-71:12.] As a result, CoreCivic was able to profit from the work of ICE detainees by reducing the number of employees and contractors that it would otherwise have needed to hire and compensate at a prevailing wage with benefits. [Ex. 6 (Figueroa Dep.) at 52:1-54:17; Ex. 7 (Pollock Dep.) at 53:23-54:3, 112:6-12.] Indeed, where there has been a shortage of ICE detainees, CoreCivic has had to use its own employees to perform the exact same work as ICE detainees. [Ex. 5 (Huffman Dep.) at 27:10-17; 31:2-35:15; Ex. 6 (Figueroa Dep.) at 52:1-54:17; Ex. 7 (Pollock Dep.) at 112:6-12.]

Without a virtually free labor force of ICE detainees, CoreCivic would have to hire more employees or have its contractors hire more employees to complete the work of ICE

---

[2] All citations in this brief are to the Declaration of Eileen R. Ridley, submitted concurrently herewith, unless otherwise indicated.

detainees.[3]  [Ex. 3 (Ellis Dep. (Vol. 1)) at 105:12-106:13.]  The Rule 30(b)(6) witnesses for CoreCivic and CoreCivic's contractor for food services, Trinity Services Group, Inc., both confirmed what basic economics dictates: CoreCivic would have incurred additional costs to operate its facilities absent the labor performed by ICE detainees that work for CoreCivic.  [*Id.* at 106:14-107:11; Ex. 5 (Huffman Dep.) at 76:9-80:17.]  CoreCivic's focus on obtaining virtually free labor from ICE detainees is so pervasive and institutionalized that CoreCivic's budgets assume that ICE detainees will comprise part of CoreCivic's labor force.  [Ex. 3 (Ellis Dep. (Vol. I) at 103:19-105:11.]

Driven by profit, and completely disregarding the fact that ICE detainees are not detained under criminal law, CoreCivic has exploited ICE detainees that are involuntarily confined at its facilities for its own enrichment.  As set forth in more detail below, CoreCivic has implemented a policy and practice of: (1) violating numerous provisions of California labor law for ICE detainees that work in California, including by paying ICE detainees at rates between $.75 to $1.50 per day for their work—far below the required minimum wage or the value of their services; (2) forcing ICE detainees to clean CoreCivic facilities under threat of punishment or discipline, including being placed in solitary confinement; and (3) forcing ICE detainees to join the VWP in order to obtain basic living necessities, such as hygienic supplies and clean clothing.

### B.  CoreCivic's Common Policies And Practices.

#### 1.  CoreCivic's Facilities Operate Through The Use Of Standardized Policies & Procedures.

CoreCivic utilized template policies and procedures that are general in scope and are able to be modified based on the "contract and the customer's requirements."  [Ex. 3 (Ellis Dep. (Vol. 1)) at 49:21-50:14.]  ICE is one such "customer" of CoreCivic, and the

---

[3] It makes no difference whether the additional employees would need to be hired by CoreCivic or one of its contractors.  Contractors of CoreCivic are "required to meet [CoreCivic's] standards" such that "the contractor is an extension of [CoreCivic]."  [Ex. 3 (Ellis Dep. (Vol. 1)) at 107:18-108:17; *see also* Ex. 5 (Huffman Dep.) at 81:23-82:15 (confirming that Trinity Services Group, Inc. is the legal agent of CoreCivic when it provides food services and supervises and manages ICE detainee workers).]

facilities that house ICE detainees modified the template policies and procedures to meet any applicable requirements by ICE or the requirements of CoreCivic's contracts with ICE. [*Id.* at 49:21-50:14, 55:5-13.] The template policies were created by CoreCivic's Facility Support Center's "policies and procedures department." [Ex. 3 (Ellis Dep. (Vol. 1) at 50:15-51:17, 54:24-55:4, 59:1-5.] The Facility Support Center functions as CoreCivic's "corporate office" or "headquarters." [Ex. 3 (Ellis Dep. (Vol. 1)) at 51:9-25; Ex. 6 (Figueroa Dep.) at 59:8-12.] CoreCivic's facilities do not have the ability to "opt out" if they do not "want to comply with, abide by, utilize a policy that's in place." [Ex. 3 (Ellis Dep. (Vol. 1)) at 68:1-9.]

CoreCivic's Rule 30(b)(6) witness on the topic of CoreCivic's policies and procedures confirmed that CoreCivic utilized standard policies and procedures for the VWP. [Ex. 3 (Ellis Dep. (Vol. 1)) at 75:18-25; 77:13-17.] CoreCivic's sanitation policy and discipline policy were also "standard policies." [*Id.* at 75:9-14.]

## 2. CoreCivic Has And Continues To Utilize ICE Detainees To Perform Work That Is Essential To Facility Operations.

ICE detainees at CoreCivic's facilities have worked, and continue to work, in CoreCivic's VWP—both in California and throughout CoreCivic's facilities throughout the United States. [Ex. 3 (Ellis Dep. (Vol. 1)) at 80:21-81:3.] While in the VWP, ICE detainees have worked, and continue to work, as "housemen, housewomen, cleaning people," maintenance workers, and workers that carry out CoreCivic's laundry, food service and commissary operations. [*Id.* at 82:1-83:4.] If an ICE detainee is selected by CoreCivic to work, "[t]hey are required to sign a work agreement stating that they are volunteering to work." [*Id.* at 83:16-20.] As a matter of policy and practice, the work agreements typically fix the rate of compensation in the range of $1.00 to $1.50 per day:

[Ex. 9 (Detainee Work Program Agreement); *see also* Ex. 10 (Signed Work Program Agreement).]

    As part of CoreCivic's intake process, ICE detainees are required to sign a litany of intake paperwork when they are first brought to one of its facilities, including (1) demographic questionnaires, (2) acknowledgment that their personal property has been confiscated; (3) acknowledgment of the receipt of standard issue clothing and supplies, (4) acknowledging the receipt of information concerning sexual assault and rape prevention, (5) an attestation that they have completed a "Hazardous Chemical Training Acknowledgment" for the proper handling of chemicals in their "workplace," and (6) an attestation that ███████████████████ from the failure to follow safety regulations while working at CoreCivic.  [Ex. 11 (Detainee File), at CCOG43011-41.] Tellingly, one of the dozens of items that require a signature by the ICE detainee during the intake process—which is completed as soon after an ICE detainee arrives at the facility as possible—is the ICE detainee's waiver of the right to ████████████ and consent to ████████████████

[*Id.* at CCOG43019.]  The timing of this is not surprising: CoreCivic views each ICE detainee—at the point of intake—as another source of virtually free labor and profit.

    During the course of discovery, CoreCivic produced so-called "OMS" reports from its "Offender Management System" that identified every ICE detainee that worked and was paid through the VWP, as well as the daily rate of payment for the ICE detainees.

[Ex. 3 (Ellis Dep. (Vol. 1)) at 99:8-14; *see also* Ex. 4 (Ellis Dep. (Vol. 2)) at 454:4-459:15.]  From January 1, 2006 to the present, approximately 17,319 ICE detainees worked for CoreCivic at one of its California facilities and were paid through the VWP. [Ridley Decl. ¶ 59.]  From December 23, 2008 to the present, approximately 110,826 ICE detainees worked for CoreCivic at one of its facilities outside of California and were paid through the VWP.  [*Id.*]

### 3.   CoreCivic's Policy Of Violating California Labor Law.

ICE detainees worked at three CoreCivic facilities in California between January 1, 2006 and the present—Otay Mesa Detention Center, San Diego Correctional Center, and California City Correctional Facility.[4]  [Ridley Decl. ¶ 59.]  As a matter of policy and practice, the ICE detainees at CoreCivic's California facilities were paid between $.75 and $1.50 per day for their work in nearly every instance.  [Exs. 45-50, 88 (OMS Reports).]  At various points in time, CoreCivic paid "bonuses" or "incentives" for certain types of work, such as work in the kitchen.  [Ex. 3 (Ellis Dep. (Vol. 1)) at 92:7-94:18.]  However, at no point in time did CoreCivic pay wages that remotely approximated the minimum hourly wage mandated by California law.  [Exs. 45-50, 88 (OMS Reports).]  CoreCivic paid ICE detainees these amounts for shifts that lasted up to 8 hours.  [Ex. 3 (Ellis Dep. (Vol. 1)) at 129:23-130:3; Ex. 6 (Figueroa Dep.) at 33:14-34:24.]  CoreCivic also did not provide rest and meal breaks to ICE detainees that worked through the VWP, and ICE detainees carried out their job duties through the VWP without rest or meal breaks.  [Owino Decl. at ¶¶ 7-9; Gomez Decl. at ¶ 7; *see also* Ex. 3 (Ellis Dep. (Vol. 1)) at 129:23-130:15; Ex. 6 (Figueroa Dep.) at 34:2-8.]

Further, between January 1, 2006 and the present, CoreCivic admitted that it did not provide ICE detainees with an itemized statement in writing showing the categories of information set forth in California Labor Code § 226(a), including (1) gross wages earned, (2) total hours worked, (3) any applicable deductions, (4) net wages earned, (5)

---

[4] Otay Mesa Detention Center is the only CoreCivic facility in California that currently houses ICE detainees.  [Ex. 3 (Ellis Dep. (Vol. 1)) at 130:19-131:1.]

the pay period, and (6) the applicable hourly rates in effect and the corresponding number of hours worked during the pay period.  [Ex. 44 (CoreCivic's RFA Response).]

### 4. CoreCivic's Policy And Practice Of Coercing ICE Detainees To Clean Areas Of The Facility Beyond Their Immediate Living Areas.

In addition to work through the VWP, CoreCivic also compelled ICE detainees to clean areas of CoreCivic facilities beyond their immediate living area under threat of discipline in direct violation of the Federal TVPA and State TVPA.  Under ICE's Performance-Based National Detention Standards 2011 ("ICE PBNDS"), ICE detainees are responsible for personal housekeeping and are required to maintain their immediate living areas in a neat and orderly manner by (1) making their beds daily, (2) stacking loose papers, (3) keeping the floor free of debris and dividers free of clutter, and (4) refraining from hanging or draping clothing, pictures, keepsakes, or other objects from beds, overhead light fixtures or other furniture.  *See* ICE PBNDS, § 5.8, at 406, *available at* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf.  Outside of these categories, ICE detainees cannot be compelled to work.  [*Id.*]  As the Court acknowledged, "Plaintiffs are not convicted criminals and have no obligation to work (other than the basic housekeeping tasks outlined in the PBNDS manual)."  [Dkt. 38 at 46:16-18.]

In spite of the clear requirements of the ICE PBNDS, CoreCivic's policies and practices went far beyond requiring ICE detainees to clean their immediate living areas.  CoreCivic also required all ICE detainees to clean common living areas in the facility.  [*See, e.g.,* Ex. 12 (OMDC Sanitation Policy), Ex. 13 (Stewart Sanitation Policy), Ex. 14 (San Diego Sanitation Policy), Ex. 15 (North Georgia Sanitation Policy); *see also* Ex. 11 (Detainee File), at CCOG43019 (███████████████████████████████████████ ████████████████████████████████████████████████████████████) (emphasis added); Ex. 7 (Pollock Dep.) at 58:6-13.]  Specifically, CoreCivic's written sanitation policy provided that ████████████████████████████████

█████████████████████████████████████████ [*Id.*[5]]  Under this policy, ICE detainees ████████████████████████████████████████████████ ████████████████████████████████ [*See, e.g.,* Ex. 12 (OMDC Sanitation Policy), at 1.]  The policy mandated that ████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████ [*Id.*]  ICE detainees were responsible for removing trash from the common areas on a daily basis, sweeping and mopping floors, cleaning toilet bowls, sinks, showers, and furniture, and completing ██████████████████████████████████████████████████ ████████████████ [*Id.* at 1-2; Declarations Ortiz Decl. at ¶ 5; Nunez Decl. at ¶ 6.]

CoreCivic obtained compliance with this policy by threatening ICE detainees with discipline.  Under CoreCivic's disciplinary policy, ICE detainees could be (and, in fact were) subject to discipline, including being placed in solitary confinement or "disciplinary segregation,"[6] for (1) failing to ██████████████████████ (2) failing to ████████████████████████████████ and (3) engaging in █████████████████ █████████████████████████████████████████ of the facility.  [*See, e.g.,* Ex. 21 (2018 OMDC Handbook) at 44-45[7].]

CoreCivic's Rule 30(b)(6) witness confirmed that "any of the types of discipline is possible" when ICE detainees perform work at CoreCivic's facilities—even when an ICE detainee is working through the VWP.  [Ex. 3 (Ellis Dep. (Vol. 1)), at 157:5-23; *see also* Ex. 27 (OMDC Post Order), at 1 (███████████████████████████████████████ █████████████████████████████████████████████████████

---

[5] *See also* Ex. *4 (Ellis Dep. (Vol. II)) at 281:23-293:21, Ex. 16 (NE Ohio Sanitation Policy) at CCOG31605-7, Ex. 17 (T. Don Hutto Sanitation Policy) at CCOG76351-56, Ex. 18 (Stewart Sanitation Policy) at CCOG8881-84, Ex. 19 (San Diego Sanitation Policy) at CCOG00030664-68, Ex. 20 (La Palma Sanitation Policy) at CCOG32688-91.
[6] "Disciplinary segregation" refers to the punishment of isolating a detainee from the general population in a single cell.  [Ex. 8 (Lacy Dep.) at 67:5-21.]
[7] *See also* Ex. 22 (2012 Florence Handbook), at 29-30; Ex. 23 (2007 San Diego Handbook), at 28-30; Ex. 24 (2016 Laredo Handbook), at 49-51; Ex. 25 (2013 Eloy Handbook), at 17-18; Ex. 26 (2013 Houston Processing Handbook), at 17-18.

███████████████████████████) (emphasis added); *see also* Ex. 28 (Laredo Post Order), at 1 (same); Ex. 29 (Stewart Post Order), at 1 (same).] The threat of punishment was conveyed to ICE detainees at intake through CoreCivic's admission handbooks and orientation process. ICE detainees were constantly reminded of the risks of disobeying an order through CoreCivic's enforcement of its disciplinary policy in an excessively penal manner. [Ortiz Decl. at ¶ 4; Nunez Decl. at ¶ 4.] In fact, as one of CoreCivic's wardens acknowledged, CoreCivic not only took a penal approach when it came to detainee punishment, the general operations of its civil immigration detention centers were essentially indistinguishable from those of penal institutions. [Ex. 7 (Pollock Dep.) at 56:15-58:5, 66:19-67:18, 170:15-172:18.]

Consistent with CoreCivic's disciplinary policy, the handful of disciplinary logs produced by CoreCivic in discovery demonstrate numerous instances in which CoreCivic punished ICE detainees for failing to comply with CoreCivic's sanitation policy or allegedly failing to follow an order.[8] CoreCivic routinely punished ICE detainees by placing them in "disciplinary segregation" for as many as 30 days fo████████████ ██████████████████ and when it determined that an ICE detainee did not comply with an order by a CoreCivic staff member or officer. [*See,* Ex. 30 (Disciplinary Log) at 246, 278, 327, 366, 391, 427, 449, 451, 484, 492, 504, 516, 519, 522.[9]]

### 5. CoreCivic's Practice Of Withholding Basic Living Necessities In Order To Coerce ICE Detainees To Join The VWP.

In addition to the threat of discipline, CoreCivic secured the use of a virtually free labor force by withholding basic living necessities from ICE detainees unless they worked. ICE detainees were coerced into participating in the VWP because it is the only way that the vast majority of them could obtain basic hygiene items and clean clothing. [Ex. 11 (Detainee File) (██████████████████████████████████████████

---

[8] CoreCivic's failure to produce all of its disciplinary logs will be the subject of future meet and confer correspondence and, if necessary, another joint discovery motion.
[9] *See also* Ex. 31 (Disciplinary Log) at 198, 652, 2341; Ex. 32 (Disciplinary Log) at 864, 1042; Ex. 33 (Disciplinary Log) at 69, 392, 412.

██████████████████████); Ex. 4 (Ellis Dep. (Vol. 2)) at 445:23-446:4, 446:12-18; Ortiz Decl. at ¶ 6; Nunez Decl. at ¶ 6.]  CoreCivic is required to "ensure[] that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels and personal hygiene items."  ICE PBNDS, § 4.5, at 327, *available at* https://www.ice.gov/doclib/detention-standards/2011/4-5.pdf.  For personal hygiene items, CoreCivic is required to "replenish supplies as needed."  *Id.* at 328.  With respect to clothing, the ICE PBNDS provides that "[e]ach detainee shall have sufficient clean clothing that is properly fitted; [*sic*] climatically suitable, durable and presentable."  *Id.* at 327.  In violation of this requirement, CoreCivic withholds clean clothing and personal hygiene items from ICE detainees such that the only way an ICE detainee can obtain these basic necessities in to obtain them from CoreCivic's commissary.  As a result, there was nothing "voluntary" about an ICE detainee's participation in the VWP where the VWP represented the sole means of earning money to purchase basic living necessities that could only be obtained through the commissary.

While at a CoreCivic facility, ICE detainees are prohibited from having any of their own personal property.  [Ex. 6 (Figueroa Dep.) at 18:3-6.]  When an ICE detainee arrived at CoreCivic, they were provided with their standard issue clothing and some basic hygiene materials.  [*Id.* at 18:7-10.]  After that, they had the ability to purchase additional clothing and hygiene materials through the commissary.  [*Id.* at 18:11-13.]  In order to make a purchase at the commissary, ICE detainees had to have an account at CoreCivic.  [*Id.* at 57:24-58:4.]  The only way for an ICE detainee to fund the commissary account is to work through the VWP or have someone outside the facility transfer money into it.  [*Id.* at 58:5-12.]

The amount of standard issue clothing provided by CoreCivic is not sufficient for ICE detainees to wear clean clothing between laundry cycles.  [Ortiz Decl. at ¶ 7; Nunez Decl. at ¶ 8.]  If an ICE detainee wants to have clean clothing to wear, they need to buy additional clothing from the commissary.  [*Id.*; *see also* Ex. 34 (Commissary Purchase

Log of Jonathan Gomez) at CCOG45309-27 (showing the purchase of shoes); Ex. 35 (Detainee MH Commissary Purchase Log) at CCOG00056592-601 (showing the purchase of shorts, sweatshirt); Ex. 36 (JVB Commissary Purchase Log) at CCOG00057056-59 (showing the purchase of shoes).]  As to hygiene items, ICE detainees are only provided with toothpaste, shampoo, and soap.  [Ex. 6 (Figueroa Dep.) at 85:4-5.]  Because of this, ICE detainees must purchase items such as toothbrushes, deodorant, hair brushes, and shaving cream from the commissary with the $1.00 to $1.50 that they typically earn per day by working through the VWP.  [Nunez Decl. at ¶ 9; Ex. 34 (Commissary Purchase Log of Jonathan Gomez) at CCOG00045309-27 (showing the purchase of deodorant, lotion, floss, toothbrush, postage stamps, envelopes); Ex. 37 (Commissary Purchase Log of Sylvester Owino) at CCOG00045345-47 (showing the purchase of deodorant, shaving cream, lip balm, phone time, stamps).[10]]

With respect to toothpaste, shampoo and soap, one of CoreCivic's wardens testified that new toothpaste, shampoo and soap are issued on a set schedule, but can be replenished earlier if "I shake your cell down, and I see you don't have it."  [Ex. 6 (Figueroa Dep.) at 85:8-15.]  Given the threat of a cell "shake down" to obtain something as basic as toothpaste, ICE detainees also work through the VWP in order to purchase basic living necessities that CoreCivic claims to replenish.  [Ex. 34 (Commissary Purchase Log of Jonathan Gomez) at CCOG00045309-27 (showing the purchase of shampoo, toothpaste, soap); Ex. 37 (Commissary Purchase Log of Sylvester Owino at CCOG00045345-47 (showing the purchase of soap).[11]]

_____

[10] *See also* Ex. 38 (Detainee JA Commissary Purchase Log) at CCOG00074453-54 (showing the purchase of toothbrush, deodorant, hairbrush, lotion, postage stamps, phone time); Ex. 35 (Detainee MH Commissary Purchase Log) at CCOG00056592-601 (showing the purchase of deodorant, toothbrush, shaving cream, lip balm, postage stamps, envelopes); Ex. 39 (Detainee AP Commissary Purchase Log) at CCOG00054219-20 (showing the purchase of lip balm, deodorant, phone time, envelopes); Ex. 40 (Detainee SC Commissary Purchase Log) at CCOG00054050-51 (showing the purchase of deodorant, phone time).

[11] *See also* Ex. 41 (Detainee KF Commissary Purchase Log) at CCOG00074650-54 (showing the purchase of shampoo, soap, toothpaste); Ex. 42 (Detainee JF Commissary Purchase Log) at CCOG00074564-66 (showing the purchase of toothpaste, soap); Ex. 38

Further, as reported by the U.S. Department of Homeland Security's Office of Inspector General, ICE detainees at CoreCivic's facilities "complained that some of the basic hygienic supplies, such as toilet paper, shampoo, soap, lotion, and toothpaste, were not provided promptly or at all when detainees ran out of them" and that "when they used up their initial supply of certain personal care items, such as toothpaste, they were advised to purchase more at the facility commissary, contrary to the PBNDS, which specify that personal hygiene items should be replenished as needed."  U.S. Dep't of Homeland Security, Office of Inspector General, *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (2007), at 7, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

CoreCivic "utilizes a 30 percent margin to determine the cost for the items that [CoreCivic] offer[s] to the detainees" through the commissary, including basic living necessities.  [Ex. 3 (Ellis Dep. (Vol. 1)) at 40:19-41:14; Ex. 4 (Ellis Dep. (Vol. 2)) at 373:7-10.]  CoreCivic adopted the 30 percent margin in order ██████████████ ██████  [Ex. 43 (Commissary Checking Account Policy) at CCOG2503.]  This margin reflects yet another way in which CoreCivic has profited from work performed by ICE detainees.  In addition to benefitting from a virtually free labor pool, CoreCivic sold basic living necessities to ICE detainees at inflated prices.

## III.   PLAINTIFFS SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION.

Plaintiffs' claims all arise out of CoreCivic's uniform policies or practices concerning work by civil immigration detainees that are involuntarily confined at CoreCivic facilities.  By way of this motion, Plaintiffs seek to certify the following five classes:

- For Plaintiffs' claims for violations of the California Labor Code, violations of the IWC's Wage Order No. 5-2001, violations of the UCL, unjust enrichment and

---

(Detainee JA Commissary Purchase Log) at CCOG00074453-54 (showing the purchase toothpaste, shampoo, soap ); Ex. 40 (Detainee SC Commissary Purchase Log) at CCOG00054050-51 (showing the purchase toothpaste, shampoo, soap).

negligence, Plaintiffs seek to certify the following class: All ICE detainees who (i) were detained at a CoreCivic facility located in California between May 31, 2013 and the present, and (ii) worked through CoreCivic's VWP during their period of detention in California (the "**CA Labor Law Class**").

- For Plaintiffs' claims for violations of the CA TVPA, violations of the UCL, unjust enrichment and negligence, Plaintiffs seek to certify the following class: All ICE detainees who (i) were detained at a CoreCivic facility located in California between January 1, 2006 and the present, (ii) cleaned areas of the facilities above and beyond the personal housekeeping tasks enumerated in the ICE PBNDS, and (iii) performed such work under threat of discipline irrespective of whether the work was paid or unpaid (the "**CA Forced Labor Class**").

- For Plaintiffs' claims for violations of the CA TVPA, violations of the UCL, unjust enrichment and negligence, Plaintiffs seek to certify the following class: All ICE detainees who (i) were detained at a CoreCivic facility located in California between January 1, 2006 and the present, (ii) worked through CoreCivic's VWP, and (iii) purchased basic living necessities through CoreCivic's commissary during their period of detention in California (the "**CA Basic Necessities Class**").

- For Plaintiffs' claims for violations of the Federal TVPA, Plaintiffs seek to certify the following class: All ICE detainees who (i) were detained at a CoreCivic facility between December 23, 2008 and the present, (ii) cleaned areas of the facilities above and beyond the personal housekeeping tasks enumerated in the ICE PBNDS, and (iii) performed such work under threat of discipline irrespective of whether the work was paid or unpaid. (the "**National Forced Labor Class**").

- For Plaintiffs' claim for violations of the Federal TVPA, Plaintiffs seek to certify the following class: All ICE detainees who (i) were detained at a CoreCivic facility between December 23, 2008 and the present, (ii) worked through CoreCivic's VWP, and (iii) purchased basic living necessities through CoreCivic's commissary during their period of detention. (the "**National Basic Necessities Class**").

A class may be certified if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a plaintiff needs to show that one of the three described scenarios in Rule 23(b) is satisfied. Here, Plaintiffs seek certification of the proposed class pursuant to Rule 23(b)(3), which requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual

members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court need not engage in "an in-depth examination of the underlying merits" of the case at this stage in the litigation, and need merely analyze the merits to the extent necessary to determine the propriety of class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011). "In determining whether class certification is appropriate under Rule 23, courts 'may consider all material evidence submitted by the parties… and need not address the ultimate admissibility of evidence proffered by the parties.'" *Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 627 (S.D. Cal. 2015) (citation omitted).

### A. Plaintiffs Meet The Requirements Of Rule 23(a).

#### 1. The Numerosity Requirement Is Satisfied.

"[A] proposed class must be 'so numerous that joinder of all members is impracticable.'" *Rannis v. Recchia*, 380 Fed. Appx. 646, 650 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). While "[t]he numerosity requirement is not tied to any fixed numerical threshold[,]… [i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Id.* at 651. Also, "where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Allen v. Similasan Corp.*, 306 F.R.D. 635, 644 (S.D. Cal. 2015). The numerosity requirement is satisfied for each proposed class. As an initial matter, the CA Labor Law Class has at least 8,346 putative class members. [Exs. 45-50, 88 (OMS Reports).] While the exact size of the other four proposed classes are not currently known, general knowledge and common sense indicate that they are large enough to satisfy the numerosity requirement of Rule 23(a). *Allen*, 306 F.R.D. at 644. The CA Basic Necessities Class is comprised of most, if not all, of the approximately 17,319 ICE detainees that worked through CoreCivic's VWP in California between January 1, 2006 and the present. [Ridley Decl. ¶ 59.] Similarly, the National Basic Necessities Class is comprised of the majority, if not all, of the approximately 123,815 ICE detainees that worked in CoreCivic's California and non-California facilities

between December 23, 2008 and the present.  [*Id.*]  CoreCivic's facilities maintain a list of commissary purchases by each of the ICE detainees in hardcopy and digital format, and CoreCivic can run reports that show purchases made by ICE detainees during their period of confinement at a CoreCivic facility and the balance of their commissary accounts.  [Ex. 6 (Figueroa Dep.) at 18:14-19:6; Ex. 4 (Ellis Dep. (Vol. 2)) at 411:6-412:6.]  Therefore, the identity of the ICE detainees that worked through the VWP and purchased basic living necessities from CoreCivic's commissary is readily ascertainable.

The CA Forced Labor Class and the National Forced Labor Class arise out of CoreCivic's policy and practice of requiring "***all***" ICE detainees at its facilities to perform cleaning work outside of the ICE detainees' immediate living areas under threat of discipline.  [*See supra* Part II.B.4.]  Therefore, the remaining four proposed classes will necessarily include several thousands of former and current ICE detainees, and the requirement of numerosity is satisfied.

## 2.   Common Questions Of Law And Fact Abound.

The commonality requirement of Rule 23(a)(2) requires that "class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'"  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  "All questions of fact and law need not be common" to satisfy the commonality requirement.  *Ellis*, 657 F.3d at 981 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).  Rather, the "common questions may center on 'shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies.'"  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Hanlon*, 150 F.3d at 1019); *Dukes*, 564 U.S. at 359  ("[E]ven a single common question will do.").  In other words, the inquiry is whether resolution of a common issue will "drive the resolution of the litigation."  *Jimenez*, 765 F.3d at 1165.  Here, Plaintiffs' claims all hinge on common contentions that are capable of classwide resolution.

**CA Labor Law Class**: Plaintiffs' claims on behalf of the CA Labor Law Class for violations of the California Labor Code, violations of the IWC's Wage Order No. 5-2001, violations of the UCL, unjust enrichment and negligence all turn on a common legal question: whether ICE detainees that worked through the VWP at CoreCivic's facilities in California are employees of CoreCivic under California law and entitled to the protections for employees set forth in the California Labor Code and the IRC's Wage Order No. 5-2001. The resolution of this central issue for the CA Labor Law Class will be dispositive of the claims of the proposed class.

As CoreCivic admits, it did not consider or treat ICE detainees that worked through the VWP in California as employees of CoreCivic as a matter of uniform policy and practice. [Dkt. 18 at 17; Dkt. 70 at 26.] As a result of this uniform policy and practice, CoreCivic did not comply with California labor law that required CoreCivic to:

- Pay ICE detainees the minimum wage mandated by California Labor Code §§1194, 1197, 1197.1 and IWC Wage Order No. 5-2001;
- Pay ICE detainees the overtime wages mandated by California Labor Code §§ 204, 510, 1194 and IWC Wage Order 5-2001;
- Provide the meal and rest periods mandated by California Labor Code §§ 226.7, 512 and IWC Wage Order 5-2001 to ICE detainees;
- Provide the wage statements mandated by California Labor Code § 226 to ICE detainees; and
- Not impose unlawful terms and conditions on CoreCivic's employment of ICE detainees as proscribed by California Labor Code § 432.5.

[*See supra* at Part II.B.3.]

CoreCivic instead classified the ICE detainees as "volunteers" even though CoreCivic exercised control over the wages, hours and working conditions of the ICE detainees. *See Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010) (holding that "[t]o employ" means, *inter alia*, "to exercise control over the wages, hours or working conditions."). Here, CoreCivic's Rule 30(b)(6) representative on the topic of CoreCivic's VWP confirmed that CoreCivic: (1) controls the wages paid to ICE detainees, (2) is "responsible" for paying ICE detainees that work through the VWP, (3) concedes that there is no limitation on what ICE detainees can be paid by CoreCivic under the ICE

PBNDS or otherwise, (4) controls the hours and shifts worked by ICE detainees, (5) determines an ICE detainee's suitability for a job, (6) determines which job an ICE detainee will work, (7) evaluates the work performance of the ICE detainees, (8) determines whether an ICE detainee is complying with the work agreements with CoreCivic, (9) controls the training provided to ICE detainees, (10) provides the tools necessary for ICE detainees to complete their job assignments, (11) determines whether bonuses or other incentives will be paid, (12) supervises ICE detainees for the entire duration of their shifts, and (13) controls the decision of, and reserves the ability to, terminate an ICE detainee from a job assignment or the VWP.  [Ex. 3 (Ellis Dep. (Vol. 1)), at 100:22-101:2, 107:12-116:22, 121:16-122:5, 124:25-125:19; *see also* Ex. 6 (Figueroa Dep.) at 151:18-153:18.]  Thus, Plaintiffs and the putative class members were not volunteers, and the resolution of this issue can be adjudicated on a class-wide basis. In addition to satisfying the test for employment under *Martinez*, all of these factors distinguish ICE detainees that work through the VWP from CoreCivic's civilian volunteers.  As CoreCivic's Rule 30(b)(6) representative confirmed, true volunteers, in contrast to ICE detainees, would not be paid—"or they wouldn't be volunteers."  [Ex. 3 (Ellis Dep. (Vol. 1)), at 120:18-121:15.]

Plaintiffs' claims for violations of the California Labor Code and violations of the IWC's Wage Order No. 5-2001 all hinge on the common legal issue of whether CoreCivic's classification of ICE detainees that worked through the VWP as "volunteers" was correct or whether the ICE detainees were employees of CoreCivic under California law.  Plaintiffs' derivative state law claims for violations of the UCL, unjust enrichment, and negligence also depend on the resolution of the same issue.  *Rose v. Bank of Amer., N.A.*, 57 Cal. 4th 390, 396 (2013) (holding that the UCL "borrows violations of other laws and treats them as unlawful practices that the [UCL] makes *independently* actionable") (emphasis in original); *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038-39 (9th Cir. 2016) (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)); *Alejo v. City of Alhambra*, 75 Cal. App. 4th 1180, 1184-85 (1999).  In addition,

claims alleging violations of California labor law and the UCL are appropriate for class action treatment when they challenge a common policy.  *See, e.g.*, *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 962-63 (9th Cir. 2013); *Hoffman v. Blattner Energy, Inc.*, 315 F.R.D. 324, 345-46 (C.D. Cal. 2016).

**CA Forced Labor Class & CA Basic Necessities Class**:  Plaintiffs' claims on behalf of the CA Forced Labor Class and CA Basic Necessities Class for violations of the CA TVPA, violations of the UCL, unjust enrichment and negligence all depend on the resolution of overarching legal issues:

- Whether CoreCivic's policy and practice of requiring ICE detainees in its California facilities to clean areas of the facility above and beyond the personal housekeeping tasks enumerated in the ICE PBNDS under threat of discipline constitutes "human trafficking" within the meaning of California Penal Code § 236.1(a).
- Whether CoreCivic's practice of withholding basic living necessities from ICE detainees such that the only way they can obtain them is by working through CoreCivic's VWP so that they can afford to purchase them from CoreCivic's commissary constitutes "human trafficking" within the meaning of California Penal Code § 236.1(a).

Plaintiffs bring their claims on behalf of the CA Forced Labor Class and the CA Basic Necessities Class under California Civil Code § 52.5, which states that "[a] victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action."  Cal. Civ. Code § 52.5.  California Penal Code § 236.1, in turn, defines "human trafficking" as the deprivation or violation of "the personal liberty of another with the intent to obtain forced labor or services."  Cal. Penal Code § 236.1(a).  The statute further defines "[d]eprivation or violation of the personal liberty of another" as "substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out."  Cal. Penal Code § 236.1(h)(3).

As set forth above, CoreCivic implemented a policy and practice of requiring ICE

detainees to clean areas of the facilities outside of the personal housekeeping tasks enumerated in the ICE PBNDS under threat of discipline, including solitary confinement, and actually punished ICE detainees for "unsanitary and disorderly housing conditions" by forcing them into solitary confinement for non-compliance.  [*See supra* at Part II.B.4.] As the Court previously recognized, "solitary confinement, even for those in confinement and whose liberty is already deprived, constitutes deprivation of personal liberty."  [Dkt. 38 at 29:5-12.]  Further, CoreCivic's policy and practice of withholding basic living necessities from ICE detainees in order to coerce them into joining the VWP or face significant hardship, as described in Part II.B.5, *supra*, similarly constitutes "duress" within the meaning of Cal. Penal Code § 236.1(h)(4) because it had the intended effect of forcing ICE detainees to work for as little as \$.75 to \$1.00 per day in order to purchase items such as toothpaste, shampoo, and soap from CoreCivic's commissary.[12]  [*See supra* at Part II.B.5.]  CoreCivic sold these basic living necessities to ICE detainees at marked up prices in order to ███████████████████████ [*Id.*]

Because Plaintiffs' claim for violations of the CA TVPA, and derivative claims for violations of the UCL, unjust enrichment and negligence, depend on the common question of whether CoreCivic's generally applicable policies and practices violate the CA TVPA, commonality is satisfied for both the CA Forced Labor Class and the CA Basic Necessities Class.

**National Forced Labor Class & National Basic Necessities Class**: As with the CA Forced Labor Class and the CA Basic Necessities Class, Plaintiffs' claims on behalf of the National Forced Labor Class and National Basic Necessities Class for violations of the Federal TVPA depend on the resolution of common issues arising from the same policies and practices described above, which were implemented at CoreCivic's facilities throughout the United States.  [*See supra* at Part II.B.4-5.]  The Federal TVPA provides

---

[12] "Duress," under the CA TVPA, includes "a direct or implied threat of force, violence, danger, **hardship**, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed." Cal. Penal Code § 236.1(h)(4) (emphasis added).

that:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)."

18 U.S.C. § 1589(a). CoreCivic's policy and practice of forcing ICE detainees to clean areas of the facility above and beyond the personal housekeeping tasks enumerated in the ICE PBNDS under threat of discipline, including solitary confinement, plainly violates the Federal TVPA. As the Court has previously ruled, "[a]t the very least, solitary confinement constitutes serious harm, which Congress defined to include psychological harm." [Dkt. 38 at 21:18-20 (citing 18 U.S.C. § 1589(c)(2).] Similarly, CoreCivic's practice of withholding basic living necessities in order to coerce ICE detainees to work through the VWP in order to earn money to purchase items such as soap, shampoo and toothpaste violates from CoreCivic's commissary constitutes "serious harm" that would cause a reasonable person in the same circumstances to perform labor or services. 18 U.S.C. § 1589(c)(2). Accordingly, for all members of the National Forced Labor Class and National Basic Necessities Class, the resolution of the Federal TVPA claim depends on whether the challenged policies and practices constitute a violation of the Federal TVPA's prohibition on obtaining labor or services by means of force or serious harm, threats of force or serious harm, or by means of any scheme, plan, or pattern intended to cause a person to believe that serious harm would result if that person did not perform such labor or services within the meaning of the Federal TVPA. Because Plaintiffs claim for violations of the Federal TVPA hinge on the legality of CoreCivic's uniform policy and practices, commonality is satisfied here.

### 3.   The Claims Of The Class Representatives Are Typical Of The Claims Of The Members Of The Putative Class.

Under Rule 23(a)(3), a party seeking class certification must show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." To establish typicality, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982). Factual differences among class members do not defeat typicality in a case dealing with a uniform policy or practice, provided that "the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001); *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985); *Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998).

As applied here, Plaintiffs own claims are typical of the classes that they seek to represent. Like the putative class members, Plaintiffs were also subject to CoreCivic's uniform policies and practices described above. [*See supra* Part II.B.] Plaintiffs were both ICE detainees that were involuntarily confined at CoreCivic's San Diego Correctional Center and Otay Mesa Detention Center in California based on their immigration status and not based on any criminal conviction. [Owino Decl. at ¶ 2; Gomez Decl. at ¶ 2.] During their period of detention, Plaintiffs were forced to join the VWP by CoreCivic in order to have money to obtain basic living necessities, such as shampoo, toothpaste, soap, clean clothing, phone time with family members, and postage, including postage for filings in connection with pending immigration proceedings. [Owino Decl. at ¶¶ 5, 10, 25-28; Gomez Decl. at ¶¶ 5, 8, 21-24.] Plaintiffs were also forced to work—both through the VWP and for no pay at all outside of the VWP—under threat of discipline, including the threat that non-compliant ICE detainees would be transferred to solitary confinement for up to 30 days for refusing to clean the facilities' common areas and areas of the facility outside of their immediate living areas. [Owino Decl. at ¶¶ 23-24; Gomez Decl. at ¶¶ 19-20.] For work performed through the VWP, CoreCivic did not pay Plaintiffs minimum wage and instead paid them $1.00 for their work. [Owino Decl. at ¶¶ 7-10; Gomez Decl. at ¶¶ 7, 8.] CoreCivic also did not pay

Plaintiffs overtime wages when they worked more than 8 hour shifts or provide Plaintiffs with meal and rest periods during their shifts.  [Owino Decl. at ¶¶ 7-11; Gomez Decl. at ¶ 7]  Plaintiffs also did not provide Plaintiffs with wage statements at any point in time— let alone wage statements that showed Plaintiffs' gross wages earned, total hours worked, applicable deductions, net wages earned, the pay period, the applicable hourly rates in effect, and the corresponding number of hours worked during the pay period.  [Owino Decl. at ¶ 13; Gomez Decl. at ¶ 10.]

In sum, like the other members of the proposed class, Plaintiffs' claims all depend on the resolution of the legality of CoreCivic's challenged policies and practices.

### 4.  <u>Plaintiffs Will Adequately Protect The Interests Of The Class.</u>

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  The adequacy inquiry turns on whether (1) the "named plaintiffs and their counsel have any conflicts of interest with other class members," and (2) "the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020.  First, Plaintiffs each seek relief on behalf of the class as a whole and have no interest antagonistic to other class members.  [Owino Decl. at ¶31; Gomez Decl. at ¶ 27..]  Thus, they will fairly and adequately protect the interests of the class they seek to represent.  [Owino Decl. at ¶32; Gomez Decl. at ¶ 28.]  Their mutual goal is to declare CoreCivic's challenged policies and practices unlawful, and to obtain relief for themselves and similarly situated former and current ICE detainees.  [Owino Decl. at ¶ 31; Gomez Decl. at ¶ 27.]  Plaintiffs have already dedicated a significant amount of time working with their counsel and responding to voluminous written discovery requests by CoreCivic.  [Owino Decl. at ¶33; Gomez Decl. at ¶ 29.]  Plaintiffs will continue to remain heavily involved and invested as this matter progresses and will prosecute the action vigorously on behalf of the proposed classes.  [Owino Decl. at ¶34; Gomez Decl. at ¶ 30.]

Second, as set forth in Plaintiffs' counsel's declaration, Plaintiffs' counsel does not have any conflicts with other class members and will prosecute the action vigorously on

behalf of both the named and absent class members.  [Ridley Decl., ¶¶ 2-16; Teel Decl., ¶ 4.]  Plaintiffs' counsel are well qualified, have significant experience in prosecuting complex litigation cases, and have previously been certified as class counsel in a class action involving claims against a prison technology company on behalf of detainees/prisoners.  [Ridley Decl., ¶¶ 2-16; Teel Decl., ¶¶ 9-25.]  As a result, Rule 23(a)'s adequacy requirement is satisfied.

### B. Plaintiffs Meet The Requirements Of Rule 23(b)(3).

#### 1. Common Issues Predominate.

Rule 23(b)(3) states that a class may be maintained if the requirements of Rule 23(a) are fulfilled and if "the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The existence of individualized issues does not on its own demonstrate that individualized questions predominate over common ones.  *See Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013).

Here, the claims of Plaintiffs and the putative class members all center on the legality or illegality of CoreCivic's generally applicable policies and practices.  As a result, the claims of Plaintiffs and the putative class members will be adjudicated based on the resolution of the following common issues.  As set forth in Part III.A.2., *supra*, Plaintiffs and the putative class members, as ICE detainees that were involuntarily confined at CoreCivic's facilities, were all subject to the same policies and practices. Because the claims of the class members "will prevail or fail in unison" based on the adjudication of the legality or illegality of the challenged policies and practices, Rule 23(b)(3)'s requirement that common issues predominate is satisfied.  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013).

#### 2. Class Treatment Is The Superior Method Of Adjudication.

The superiority inquiry focuses "on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be

adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks omitted).  Courts recognize that Rule 23(b)(3) class actions are superior when it allows for the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

As past or current ICE detainees, many of the putative class members have a limited understanding of the law, limited English skills, and limited resources to devote to pursuing recovery.  These considerations strongly "weigh in favor of class certification." *Menocal*, 882 F.3d at 915 (citing 2 William B. Rubenstein, Newberg on Class Actions § 4:65 (5th ed., Dec. 2017 update); *see also Silva-Arriaga v. Texas Express, Inc.*, 222 F.R.D. 684, 691 (M.D. Fla. 2004).  Many former ICE detainees also fear retaliation given their uncertain immigration status or ongoing immigration proceedings, which makes them less likely to pursue a claim against CoreCivic even if they had available resources. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir. 2017).  Finally, the class members are geographically dispersed given the number of CoreCivic facilities throughout the United States, which also favors class treatment over other methods of adjudication. *In re Monster Worldwide, Inc. Securities Litig.*, 251 F.R.D. 132, 139 (S.D.N.Y 2008).  Thus, all of the requirements for class certification for Plaintiffs' five proposed classes are satisfied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion for Class Certification in its entirety as to the five proposed classes and appoint Foley & Lardner LLP and the Law Office of Robert L. Teel as class counsel.

DATED:  April 15, 2019

**FOLEY & LARDNER LLP**
J. Mark Waxman
Eileen R. Ridley
Geoffrey M. Raux
Nicholas J. Fox
Alan R. Ouellette


/s/ Eileen R. Ridley
Eileen R. Ridley
Attorneys for Plaintiffs SYLVESTER OWINO,
JONATHAN GOMEZ, and the Proposed
Class(es)

**LAW OFFICE OF ROBERT L. TEEL**
Robert L. Teel
  lawoffice@rlteel.com
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Telephone:  (866) 833-5529
Facsimile:  (855) 609-6911

Attorneys for Plaintiffs SYLVESTER OWINO,
JONATHAN GOMEZ, and the Proposed
Class(es)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 15, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

*/s/*_____
Eileen R. Ridley