| | |
|---|---|
| J. MARK WAXMAN (SBN 58579)<br>  mwaxman@foley.com<br>NICHOLAS J. FOX (SBN 279577)<br>  nfox@foley.com<br>**FOLEY & LARDNER LLP**<br>3579 Valley Centre Drive, Suite 300<br>San Diego, CA 92130<br>T: 858.847.6700 // F: 858.792.6773<br><br>EILEEN R. RIDLEY (SBN 151735)<br>  eridley@foley.com<br>ALAN R. OUELLETTE (SBN 272745)<br>  aouellette@foley.com<br>**FOLEY & LARDNER LLP**<br>555 California Street, Suite 1700<br>San Francisco, CA 94104-1520<br>T: 415.434.4484 // F: 415.434.4507 | ROBERT L. TEEL (SBN 127081)<br>  lawoffice@rlteel.com<br>**LAW OFFICE OF ROBERT L. TEEL**<br>1425 Broadway, Mail Code: 20-6690<br>Seattle, Washington 98122<br>T: 866. 833.5529 // F:855.609.6911<br><br>GEOFFREY M. RAUX (pro hac vice)<br>  graux@foley.com<br>**FOLEY & LARDNER LLP**<br>111 Huntington Ave.<br>Boston, MA 02199-7610<br>T: 617.342.4000 // F: 617.342.4001 |

Attorneys for Plaintiffs SYLVESTER OWINO, JONATHAN GOMEZ, and the Proposed Class(es)

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>CORECIVIC, INC.,<br><br>　　　　　　　　　Defendant.<br><br>CORECIVIC, INC.,<br><br>　　　　　　　　　Counter-Claimant,<br><br>vs.<br><br>SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　Counter-Defendants. | Case No. 3:17-CV-01112-JLS-NLS<br><br>**CLASS ACTION**<br><br>**DECLARATION OF PLAINTIFF SYLVESTER OWINO IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:　July 11, 2019<br>Time:　1:30 p.m.<br>Place:　Courtroom 4D<br><br>Judge:　Hon. Janis L. Sammartino<br>Magistrate:　Hon. Nita L. Stormes |

Case No. 17-CV-01112-JLS-NLS

I, Sylvester Owino, declare as follows:

1. I am above the age of eighteen (18). I am a named Plaintiff in the above-captioned action. I am familiar with the action, including the facts and claims at issue. The facts stated herein are of my own personal knowledge, and if called upon to do so, I could and would competently testify thereto under oath.

2. I have been detained by Immigration and Customs Enforcement ("I.C.E.") on several occasions, and have spent nine years in I.C.E. custody. Of those nine years, seven of them were spent detained in CoreCivic's detention facilities, including CoreCivic's detention facilities in San Diego, California (which included the San Diego Correctional Facility and its successor the Otay Mesa Detention Center, which I refer to collectively in this Declaration as "OMDC" because my experiences were the same in both facilities). I was housed at OMDC at various times from approximately November 7, 2005, to March 9, 2015. All of my detentions were related to my immigration status and were not related to any criminal charge or conviction.

3. During the intake process for each period of detention at OMDC, I was required to sign numerous documents. The documents were handed to me at a quick pace and without any explanation as to what they were or what they meant, and I was told to "just sign" the numerous forms as they were given to me. In addition, my experience of being detained in OMDC for seven years showed me that numerous detainees had communication issues with OMDC's staff during the intake process. OMDC staff usually spoke only English, although some OMDC staff also spoke Spanish. Because OMDC staff usually only spoke English and possibly Spanish, any new detainee who did not speak either of those languages would likely have difficulty understanding what OMDC staff said to him or her, and would have difficulty understanding the numerous documents he or she was signing during the intake process. I know this from personal experience in going through the intake process several times and in interacting with fellow detainees during my seven years in detention.

4. Although the intake documents were not explained to me in any detail, I do recall generally signing some documents during the intake process based on the titles of documents, such as documents related to questions about my background and history, that any personal belongings I had with me would be kept by OMDC, and OMDC rules and safety guidelines. I was told and I understand that these forms were kept in my detainee file, along with any paperwork, documents, or forms that were related to my detention at OMDC.

5. During each period of detention at OMDC, I performed work through the "Volunteer Work Program." I signed up for the "Volunteer Work Program," and was eventually told by staff members at OMDC that I was assigned to the kitchen to work. I worked in the kitchen on and off throughout each period of detention at OMDC, sometimes rotating between other jobs (as discussed below) or being terminated from my job due to disciplinary actions against me (including being placed in more restrictive housing where I was not permitted to work in the kitchen). Before starting work in the kitchen, I signed a work agreement, but similar to the intake process the work agreement was handed to me and I was told to sign without reading the agreement. I also received training by OMDC staff and employees of Trinity as to how to use certain equipment and how to prepare and handle the food. I was also informed of kitchen rules, including rules for health, safety, and hygiene.

6. As part of my job in the kitchen, I was required to work a set shift. My normal shift in the kitchen was from 3:00 a.m. – 12:00 p.m., five days per week with two days off. However, there were many instances where I and other kitchen workers would work more than our shift. For example, sometimes the breakfast shift that I usually worked, who are all male detainees, would be followed by a lunch shift of all female detainees. Due to the size of some equipment or the weight of certain packages or materials, I would be asked by Trinity's staff to help out with any heavy lifting for the lunch shift to begin preparing the next meal. This could easily turn my 9-hour morning shift into a much longer workday in order to assist others in their shifts, including up to 14 working hours in a day. OMDC

1  staff always supervised us while working, and knew about and approved Trinity's request
2  to have me and other detainees work longer hours in the kitchen for this purpose.

3      7.   In addition, when working in the kitchen, the work only had one quick break
4  to eat their meal and no other scheduled rest breaks.  Our usual schedule would be to work
5  from 3:00 a.m. until about 6:30 a.m. to prepare breakfast.  Once breakfast was served, the
6  kitchen crew prepared and ate their meal from 6:30 a.m. – 7:00 a.m. (so this was not really
7  a "break" in the true sense because we still had to prepare our own means).  When the main
8  breakfast service was done, around 7:00 a.m. we would begin cleaning breakfast service
9  items and preparing for lunch service until the end of our shift at 12:00 p.m. without any
10 other scheduled rest break.  And, as noted above, some of us would work beyond the
11 scheduled end of our shift to assist the next shift.

12     8.   Sometimes during my detention at OMDC, I would also work as a chemical
13 porter, where I prepared and provided cleaning chemicals to be used by the pod porters in
14 cleaning after each meal.  Before starting work as a chemical porter, I signed a separate
15 work agreement for that job.  I received basic training for this job, and was provided with
16 very basic protective gear to handle the chemicals.  In some cases, the bottles of chemicals
17 were not labeled.  There was no set shift for my work as a chemical porter, but I would
18 work "until the job was done."  I also had no scheduled rest or meal breaks.  I would have
19 to prepare the cleaning chemicals in advance of meal periods so that the pod cleaners could
20 use them to clean up after meals.  I would also have to prepare more cleaning chemicals if
21 the pod cleaners ran out of cleaning chemicals, for unexpected incidents (such as spills), or
22 when the living pod would go through a "deep clean" because a dignitary or other important
23 person was touring the facility.

24     9.   In addition, I would occasionally work as a general cleaner / janitor, where I
25 would perform a variety of tasks, such as cleaning communal areas of the living pods,
26 interior painting, sweeping and waxing floors, cleaning drains, cleaning up liquid spills,
27 and handing out weekly supplies to detainees.  Before starting work as a cleaner / janitor,
28 I again signed a work agreement for that job.  There was no set shift for my work as a

cleaner / janitor, but I would work "until the job was done." I also had no scheduled rest or meal breaks.

10. While working in each of these jobs, I was paid $1.00 per day for my work. That money was added to my account that I could then spend at the commissary. However, I recall from personal experience and from speaking with other detainees that the payments would not always process to my account or to their account. In order to figure out why I did not get paid for work (or why other detainees did not get paid for work, and I would help them in this regard), I would contact the unit manager or case manager to ask. Usually the unit manager or case manager would tell me that he would look into it. Sometimes the missing payment issue would be fixed, other times it would not be fixed and I did not get paid for that particular day (or the other detainee who I was helping did not get paid).

11. In addition, when I worked longer than my scheduled shift, such as when I stayed several hours longer to help a female lunch crew in the kitchen with heavy lifting, I was still paid only $1.00 for that day's work. I did not receive any additional money for the extra hours worked.

12. Some jobs might receive "bonuses" or "incentives," such as extra food for kitchen workers or even special meals for kitchen workers. In fact, during part of my time at OMDC, OMDC staff would ask me what types of special food the kitchen workers wanted—such as carne asada or ice cream—so that OMDC staff could order it for us. These meals were much better than the line food served to detainees. However, kitchen workers would not receive special meals if an inspector was touring the facility; instead, we would receive the same meal as all other detainees. But if OMDC passed the inspection, OMCD staff would order us special food as a "thanks" for passing the inspection. Other incentives for detainees to do extra work or odd jobs included a "sack lunch," which is similar to brown bag lunch that is specially prepared by the kitchen and that is provided in addition to the regular lunch served on the line. I never personally received any extra pay for extra work but am not sure if other detainees did.

13. During each period of my detention at OMDC, I never received any "wage statement" or similar document that provided me with information regarding gross wages earned, total hours worked, applicable deductions, net wages earned, the pay period, and the applicable hourly rates in effect and the corresponding number of hours worked during the pay period.

14. As part my jobs in the kitchen, as chemical porter, and as a general cleaner / janitor, I was told by OMDC staff that I could be removed from those jobs if I missed work without an excuse, if I wasn't working, or if my work was not satisfactory. I witnessed other detainee workers who were removed from their jobs for failing to show up, failing to work, or failing to do their job properly.

15. In addition, I was also removed from jobs as punishment, such as when I got in an argument with an OMDC staff member or refused to follow an order. Such punishment would come in the former of increasing my security classification level and/or placing me in more restrictive housing, which would prohibit me from working certain jobs. I believed and understood that my punishment was to teach other detainees a lesson by making an example out of me so that all detainees kept in line and did what they were told.

16. Also as part my jobs in the kitchen, as chemical porter, and as a general cleaner / janitor, the working crews were supervised by OMDC staff or employees from Trinity. OMDC staff or employees of Trinity directed us what to do, and many times assigned other tasks to us "as needed" in the areas where we were working.

17. Outside of the "Volunteer Work Program," detainees are required to keep their immediate living areas clean, which includes making the bed every day, tidying up loose items, keeping the floors clean, and not hanging anything from the beds or lights.

///
///
///
//

18. But there were many instances of when detainees in a living pod would have to work to clean the common areas in the living pod beyond just maintaining their own living area. As noted above, one instance when this would happen would be whenever a "deep clean" was needed, which was usually when a dignitary was going to tour the living pod. The "deep cleaning" included cleaning common areas and all windows—including those on the second story of the facility without any safety apparatus. All detainees in the living pod were expected to help out to get the living pod clean, even if it was a detainee's day off from his work schedule and even if a detainee did not work as part of the "Voluntary Work Program." Detainees were not paid any compensation for these "deep cleanings"—it was just expected that all detainees would clean. However, for smaller tasks, detainees might be get an "sack lunch" as an incentive to do the work.

19. For larger tasks such as "deep cleans" before a dignitary arrived, the entire pod was expected to work and clean. Failure to do so by the entire living pod resulted in consequences for the entire pod, such as being on longer lockdown (which resulted in delays in detainees, including myself, contacting family, friends, or our attorneys), commissary requests being delivered late, or loss of other privileges, such as time in the yard.

20. Detainees were also responsible for removing trash from the common areas of the living pods on a daily basis, sweeping and mopping floors, and cleaning toilet bowls, sinks, showers, and furniture. Again, detainees were not paid for these cleaning tasks.

21. When detainees needed to clean the living pod common areas or perform any other work, regardless of whether it was the detainee's day off or whether the detainee was even working in the "Volunteer Work Program," the detainees were not paid for working to clean the common areas when instructed by OMDC staff.

22. In addition, for those detainees who had to clean or work on their days off, those detainees were not paid for the additional day(s) of work. The weekly pay cap for workers was $1.00 per day and $5.00 per week (or at least that's what we were told). So, for example, if I worked my usual five days in the kitchen, I would be paid $5.00 for the

1  week.  But if I was required to work or clean on the sixth and/or seventh day, I would
2  receive no extra payment.

3       23.    When I or other detainees were told to do extra work, even if on our day off,
4  we almost always complied even if we didn't want to work.  If we failed to follow a "direct
5  order" from OMDC staff ("Go clean the pod"), we could be subject to more random and
6  frequent searches and cell tossing, as I witnessed during my detentions at OMDC when
7  other detainees would have their cells checked much more frequently than others.  Failing
8  to follow orders could also result in being removed from the general living pod and placed
9  in more restrictive housing, which could last from several days to several weeks, and which
10 might also result in a loss of job due to a higher security classification.  I also witnessed
11 this during my detentions at OMDC where detainees might refuse to clean and the situation
12 escalated to the point of the detainee being relocated to restrictive housing.  As noted above,
13 this type of discipline happened to me several times to make an example out of me and
14 teach other detainees a lesson.  In addition, we were also told that a disciplinary note could
15 be placed in our detainee file, which could negatively impact our case before the judge.
16 Other times, the entire living pod might suffer some consequences for a single detainee's
17 refusal to work, such as being on lockdown longer than usual, or not permitting us to use
18 the TV.

19      24.    Because I and other detainees observed what happened when others failed to
20 comply with orders, we almost always followed orders to clean or perform other work so
21 as to avoid any punishment.

22      25.    As noted above, I was paid $1.00 per day for my work, and no more than
23 $5.00 per week.  I could spend this money at the commissary.  Although there were
24 different things to purchase at the commissary, I and other detainees would spend our
25 money on basic hygiene products, such as soap, shampoo, and toothpaste, as well as
26 toothbrushes, deodorant, hair brushes, or shaving cream.  This is because the weekly supply
27 distribution for each detainee was two small soaps (hotel-sized), one small shampoo (hotel-
28 sized), a small tube of toothpaste, and two rolls of toilet paper.  These hygiene supplies

would not last an entire week, and sometimes the supplies would be late and not re-stocked to be delivered on a weekly basis, so many detainees, including myself, used much of our commissary money to get additional hygiene supplies. And even if we tried to request additional supplies, the supplies might never come, or we would only get supplies after a cell tossing to ensure we were actually out of the supplies we needed.

26. In addition, OMDC has a standard issue of clothing for each detainee, but the standard issue of clothing would get dirty or worn down and would often be of very poor quality. The clothing became quite disgusting and was not replaced with newer, more wearable clothing. We could request to have new clothes, but similar to a request for additional supplies, the request might never be fulfilled, or we would be subjected to additional cell searches. Even if it was fulfilled, the "new" clothes would in fact be old or dirty, likely worn by another current or former detainee. Moreover, even standard issue clothing could simply go missing in the laundry process. However, kitchen workers did receive better / newer clothing an incentive for working in the kitchen.

27. In addition to hygiene supplies, I and other detainees would use our commissary money to buy larger quantities of shampoo simply for the purposes of cleaning our immediate living areas. OMDC did not provide any cleaning supplies to us for this purpose, but we were still required to have clean living quarters. As a result, I and other detainees would use our own shampoo and soap, and the shower towels provided to us be OMDC, to clean our living areas. I and other detainees found that cleaning the floors and other areas of our living spaces with shampoo that we purchased with our commissary money would result in cleaner living spaces and therefore would result in fewer searches, cell tosses, or disciplinary issues for failing to keep our space clean.

28. I and other detainees had to work so that we would have money to buy some of these basic hygiene supplies, as well as pre-paid phone cards to be able to use the telephone system at OMDC to call family and friends.

///

///

29. Commissary purchases are drawn from our accounts at OMDC. One way to add money to that account is to have family or friends deposit money, but very few detainees have outside support. The other way to add money to the account is to work. In order to purchase these supplies, I and other detainees worked so that we could ensure we had enough shower soap, shampoo, and toothpaste for good hygiene, our own cleaning supplies for our cells, and phone cards to call our families.

30. As a Plaintiff in this lawsuit, I understand the general nature of the claims raised and the facts, policies, and procedures that form the basis of those claims. I further understand that, as a Plaintiff and representative of several classes of current and former detainee workers and detainees forced to work, I seek relief in this action on behalf of those classes.

31. I am not antagonistic to other members of the classes in this lawsuit that I seek to represent. On the contrary, the shared and common experiences that all members of the classes have faced, including myself, unite us in challenging the policies and practices at issue in this case. CoreCivic's policies and practices are unlawful, and I seek to obtain relief for all members of these classes who were subject to these unlawful policies and practices.

32. Accordingly, I will fairly and adequately protect the interests of the classes that I seek to represent.

33. I have spent significant time working with my attorneys in this matter, including providing factual information for the complaint and responding to discovery requests from CoreCivic.

34. Given my dedication to challenging these unlawful policies and seeking relief for all of those detainees who were subjected to the same, I will continue to remain heavily involved and invested in this lawsuit as it progresses, and will prosecute the action vigorously on behalf of all classes.

///

///

1  I submit this Declaration in support of Plaintiffs' Motion For Class Certification.

2  I declare under penalty of perjury under the laws of the United States of America
3  that the foregoing is true and correct. Executed this 13th day of April, 2019, in San
4  Diego, California.

_____
Sylvester Owino

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 15, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

*/s/* Eileen R. Ridley
Eileen R. Ridley