| | |
|---|---|
| J. MARK WAXMAN (SBN 58579)<br>   mwaxman@foley.com<br>NICHOLAS J. FOX (SBN 279577)<br>   nfox@foley.com<br>**FOLEY & LARDNER LLP**<br>3579 Valley Centre Drive, Suite 300<br>San Diego, CA 92130<br>T: 858.847.6700 // F: 858.792.6773 | ROBERT L. TEEL (SBN 127081)<br>   lawoffice@rlteel.com<br>**LAW OFFICE OF ROBERT L. TEEL**<br>1425 Broadway, Mail Code: 20-6690<br>Seattle, Washington 98122<br>T: 866. 833.5529 // F:855.609.6911 |
| EILEEN R. RIDLEY (SBN 151735)<br>   eridley@foley.com<br>ALAN R. OUELLETTE (SBN 272745)<br>   aouellette@foley.com<br>**FOLEY & LARDNER LLP**<br>555 California Street, Suite 1700<br>San Francisco, CA 94104-1520<br>T: 415.434.4484 // F: 415.434.4507 | GEOFFREY M. RAUX (pro hac vice)<br>   graux@foley.com<br>**FOLEY & LARDNER LLP**<br>111 Huntington Ave.<br>Boston, MA 02199-7610<br>T: 617.342.4000 // F: 617.342.4001 |

Attorneys for Plaintiffs SYLVESTER OWINO, JONATHAN GOMEZ, and the Proposed Class(es)

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>vs.<br><br>CORECIVIC, INC.,<br><br>               Defendant.<br><br>CORECIVIC, INC.,<br><br>               Counter-Claimant,<br><br>vs.<br><br>SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>               Counter-Defendants. | Case No. 3:17-CV-01112-JLS-NLS<br><br>**CLASS ACTION**<br><br>**DECLARATION OF PLAINTIFF JONATHAN GOMEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: July 11, 2019<br>Time: 1:30 p.m.<br>Place: Courtroom 4D<br><br>Judge: Hon. Janis L. Sammartino<br>Magistrate: Hon. Nita L. Stormes |

Case No. 17-CV-01112-JLS-NLS

I, Jonathan Gomez, declare as follows:

1. I am above the age of eighteen (18). I am a named Plaintiff in the above-captioned action. I am familiar with the action, including the facts and claims at issue. The facts stated herein are of my own personal knowledge, and if called upon to do so, I could and would competently testify thereto under oath.

2. I was detained by Immigration and Customs Enforcement ("I.C.E."), and spent my period of detention in CoreCivic's detention facilities in San Diego, California (which included the San Diego Correctional Facility and its successor the Otay Mesa Detention Center, which I refer to collectively in this Declaration as "OMDC" because my experiences were the same in both facilities). I was housed at OMDC from approximately June 18, 2012, through September 18, 2013. My detention was related to my immigration status and was not related to any criminal charge or conviction.

3. During the intake process my detention at OMDC, I was required to sign numerous documents. The documents were handed to me at a quick pace and without any explanation as to what they were or what they meant, and I was told to "just sign" the numerous forms as they were given to me. In addition, my experience during my detention showed me that numerous detainees had communication issues with OMDC's staff during the intake process. The intake documents were usually explained in English, although some CoreCivic staff also spoke Spanish. OMDC staff usually spoke only English, although some OMDC staff also spoke Spanish. Because OMDC staff usually only spoke English and possibly Spanish, any new detainee who did not speak either of those languages would likely have difficulty understanding what OMDC staff said to him or her, and would have difficulty understanding the numerous documents he or she was signing during the intake process. I know this from personal experience in going through the intake process and in interacting with fellow detainees during my detention.

///

///

///

-1-   Case No. 17-CV-01112-JLS-NLS

4. Although the intake documents were not explained to me in any detail, I do recall generally signing some documents during the intake process based on the titles of documents, such as documents related to questions about my background and history, that any personal belongings I had with me would be kept by OMDC, and rules and safety guidelines. I was told by OMDC staff that these forms were kept in my detainee file, along with any paperwork, documents, or forms that were related to my detention at OMDC.

5. During my detention at OMDC, I performed work through the "Volunteer Work Program." I signed up for the "Volunteer Work Program," and was eventually told by staff members at OMDC that I was assigned to perform cleaning and janitorial tasks for my living pod. I worked as a cleaner / janitor throughout my detention at OMDC. Before starting work as a clean / janitor, I signed a work agreement. I also received training by OMDC staff as to how to perform my job, including rules and safety guidelines.

6. My job duties as a cleaner / janitor including painting interior areas of the living pod at OMDC, distributing supplies to detainees, cleaning up the common living area for my particular pod, cleaning up after each meal period and before the nightly count, sweeping and waxing floors, cleaning drains, and cleaning up liquid spills or bodily fluids (such as blood after a fight). I also recall instances of being rousted in the middle of the night to clean the bathrooms, including pouring unknown chemicals down the drain without personal protective equipment and then having to reach down and pull out materials clogging the drain. I also recall having to climb up on ladders to clean the windows in the bathroom or shower areas.

7. There was no set shift for my work as a cleaner / janitor, but I would work "until the job was done," including whatever tasks were assigned to me by OMDC staff. I also had no scheduled rest or meal breaks.

///

///

///

8. While working as a cleaner / janitor, I was paid $1.00 per day for my work. That money was added to my account that I could then spend at the commissary. However, I recall from personal experience and from speaking with other detainees that the payments would not always process to my account or to their account. In order to figure out why I did not get paid for work or why other detainees did not get paid for work, I would contact the unit manager or case manager to ask. Usually the unit manager or case manager would tell me that he would look into it. Sometimes the missing payment issue would be fixed, other times it would not be fixed and I did not get paid for that particular day (or the other detainee who I was helping did not get paid).

9. Sometimes detainee workers might receive "bonuses" or "incentives," such as getting paid an extra $1.00 for cleaning windows (which were on the second floor and could only be reached by a ladder, which did not include safety equipment).

10. During my detention, I never received any "wage statement" or similar document that provided me with information regarding gross wages earned, total hours worked, applicable deductions, net wages earned, the pay period, and the applicable hourly rates in effect and the corresponding number of hours worked during the pay period.

11. As part my job as a cleaner / janitor, I was told by OMDC staff that I could be removed from my job if I missed work without an excuse, if I wasn't working, or if my work was not satisfactory. Although I was never removed from my job, I witnessed other detainee workers who were removed from their jobs for failing to show up, failing to work, or failing to do their job properly.

12. Also as part of my job as a cleaner / janitor, I and other detainee workers were supervised by OMDC staff. OMDC staff directed us what to do, and many times assigned other tasks to us "as needed" in the areas where we were working.

13. Outside of the "Volunteer Work Program," detainees are required to keep their immediate living areas clean, which includes making the bed every day, tidying up loose items, keeping the floors free of debris, and not hanging anything from the beds or lights.

-3-                   Case No. 17-CV-01112-JLS-NLS

14. But there were many instances of when detainees in a living pod would have to work to clean the common areas in the living pod beyond just maintaining their own living area. One instance when this would happen would be whenever a "deep clean" was needed, which was usually when a dignitary was going to tour the living pod. The "deep cleaning" included cleaning common areas and all windows—including those on the second story of the facility without any safety apparatus. All detainees in the living pod had to help out to get the living pod clean, even if it was a detainee's day off from his work schedule and even if a detainee did not work as part of the "Voluntary Work Program." Detainees were not paid for these "deep cleanings"— all detainees had to clean.

15. For larger tasks such as "deep cleans" before a dignitary arrived, the entire pod had to work and clean. Failure to do so by the entire living pod resulted in consequences for the entire pod, such as being on longer lockdown (which resulted in delays in detainees, including myself, contacting family, friends, or our attorneys), commissary requests being delivered late, or loss of other privileges, such as time in the yard.

16. Detainees were also responsible for removing trash from the common areas of the living pods on a daily basis, sweeping and mopping floors, and cleaning toilet bowls, sinks, showers, and furniture. Again, detainees were not paid for these cleaning tasks— they just had to do it.

17. When detainees needed to clean the living pod common areas or perform any other work, regardless of whether it was the detainee's day off or whether the detainee was even working in the "Volunteer Work Program," the detainees were not paid for working to clean the common areas when instructed by OMDC staff. There were times when I had to work and clean the pod despite that it was my day off.

18. In addition, for those detainees who had to clean or work on their days off, those detainees were not paid for the additional day(s) of work—we just had to do it. The weekly pay cap for workers was $1.00 per day and $5.00 per week (or at least that's what we were told). So, for example, if I worked my usual five days as a cleaner / janitor, I

would be paid $5.00 for the week. But if I was required to work or clean on the sixth and/or seventh day, I would receive no extra payment.

19. When I or other detainees were told to do extra work, even if on our day off, we almost always complied even if we didn't want to work. If we failed to follow a "direct order" from OMDC staff ("Go clean the pod"), we could be subject to more random and frequent searches and cell tossing, as I witnessed during my detentions at OMDC when other detainees would have their cells checked much more frequently than others. Failing to follow orders could also result in being removed from the general living pod and placed in more restrictive housing, which could last from several days to several weeks, and which might also result in a loss of job due to a higher security classification. I also witnessed this during my detentions at OMDC where detainees might refuse to clean and the situation escalated to the point of the detainee being relocated to restrictive housing. We were also told that a disciplinary note could be placed in our detainee file, which could negatively impact our case before the judge. Other times, the entire living pod might suffer some consequences for a single detainee's refusal to work, such as being on lockdown longer than usual, or not permitting us to use the TV. As a result of the potential of being placed in more restrictive housing, I and other detainees complied with OMDC staff orders, including orders to clean the pods, to avoid a higher security classification and the resulting loss of job, loss of privileges, and being placed in more restrictive housing.

20. Because I and other detainees saw and experienced what happened when we and others failed to comply with orders, we almost always followed orders to clean or perform other work because of the threat of hardship from these various punishments.

21. As noted above, I was paid $1.00 per day for my work, and no more than $5.00 per week. I could spend this money only at the commissary. Although there were different things to purchase at the commissary, I and other detainees would spend our money on basic hygiene products, such as soap, shampoo, and toothpaste, as well as toothbrushes, deodorant, hair brushes, or shaving cream. This is because the weekly supply distribution for each detainee was two small soaps (hotel-sized), one small shampoo (hotel-

-5-         Case No. 17-CV-01112-JLS-NLS

sized), a small tube of toothpaste, and two rolls of toilet paper. These hygiene supplies would not last an entire week, and sometimes the supplies would be late and not re-stocked to be delivered on a weekly basis, so many detainees, including myself, used much of our commissary money to get additional hygiene supplies. And even if we tried to request additional supplies, the supplies might never come, or we would only get supplies after a cell tossing to ensure we were actually out of the supplies we needed.

22. In addition, OMDC has a standard issue of clothing for each detainee, but the standard issue of clothing would get dirty or worn down and would often be of very poor quality. The clothing became quite disgusting and was not replaced with newer, more wearable clothing. We could request to have new clothes, but similar to a request for additional supplies, the request might never be fulfilled, or we would be subjected to additional cell searches. Even if it was fulfilled, the "new" clothes would in fact be old or dirty, likely worn by another current or former detainee. Moreover, even standard issue clothing could simply go missing in the laundry process. To the extent we were allowed, I and other detainees would also purchase clothing items when needed to ensure that we had clean clothes.

23. In addition to hygiene supplies and basic clothing, I and other detainees would use our commissary money to buy larger quantities of shampoo simply for the purposes of cleaning our immediate living areas. OMDC did not provide any cleaning supplies to us for this purpose, but we were still required to have clean living quarters. As a result, I and other detainees would use our own shampoo and soap, and shower towels provided by OMDC, to clean our living areas. I and other detainees found that cleaning the floors and other areas of our living spaces with shampoo that we purchased with our commissary money would result in cleaner living spaces and therefore would result in fewer searches, cell tosses, or disciplinary issues for failing to keep our space clean.

24. I and other detainees had to work so that we would have money to buy some of these basic hygiene supplies and clothing, or otherwise suffer from poor hygiene. I and

other detainees would also purchase pre-paid phone cards to be able to use the telephone system at OMDC to call family and friends.

25. Commissary purchases are drawn from our accounts at OMDC. One way to add money to that account is to have family or friends deposit money, but very few detainees have outside support. The only other way to add money to the account is to work. In order to purchase these supplies, I and other detainees worked so that we could ensure we had enough shower soap, shampoo, and toothpaste for good hygiene.

26. As a Plaintiff in this lawsuit, I understand the general nature of the claims raised and the facts, policies, and procedures that form the basis of those claims. I further understand that, as a Plaintiff and representative of several classes of current and former detainee workers and detainees forced to work, I seek relief in this action on behalf of those classes.

27. I am not antagonistic to other members of the classes in this lawsuit that I seek to represent. On the contrary, the shared and common experiences that all members of the classes have faced, including myself, unite us in challenging the policies and practices at issue in this case. CoreCivic's policies and practices are unlawful, and I seek to obtain relief for all members of these classes who were subject to these unlawful policies and practices.

28. Accordingly, I will fairly and adequately protect the interests of the classes that I seek to represent.

29. I have spent significant time working with my attorneys in this matter, including providing factual information for the complaint and responding to discovery requests from CoreCivic.

30. Given my dedication to challenging these unlawful policies and seeking relief for all of those detainees who were subjected to the same, I will continue to remain heavily involved and invested in this lawsuit as it progresses, and will prosecute the action vigorously on behalf of all classes.

///

1 | I submit this Declaration in support of Plaintiffs' Motion For Class Certification.
2 | I declare under penalty of perjury under the laws of the United States of America
3 | that the foregoing is true and correct. Executed this 12th day of April, 2019, in San
4 | Diego, California.

_____
Jonathan Gomez

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 15, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

*/s/* Eileen R. Ridley
Eileen R. Ridley