# Exhibit 3

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3     _____

4     SYLVESTER OWINO, on behalf of

5     themselves, and all others similarly

6     situated, et al.,

7                    Plaintiff,

8        vs.              Case No. 3:17-cv-01112-JLS-NLS

9     CORECIVIC, INC., a Maryland

10    corporation,

11

12                   Defendant.

13    _____

14

15         THE DEPOSITION OF JASON ELLIS

16              MARCH 4, 2019

17

18

19

20

21    Reported By:

22    PATRICIA A. NILSEN,

23    RMR, CRR, CRC

24    Job No. 3225918

25    Pages 1 - 270

                                    Page 1

```
1                    The deposition of JASON ELLIS, taken
2          on behalf of the Plaintiffs, pursuant to Notice on
3          MARCH 4, 2019, beginning at approximately 9:11 a.m.
4          in the offices of Alpha Reporting.
5                    This deposition is taken in
6          accordance with the terms and provisions of the
7          Federal Rules of Civil Procedure.  All objections
8          are reserved except as to form.
9                    The signature of the witness is
10         reserved.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 2
```

```
 1                           APPEARANCES
 2
          For the Plaintiffs:
 3                           EILEEN REGINA RIDLEY
                             ALAN R. OUELLETE
 4                           Attorneys at Law
                             FOLEY & LARDNER LLP
 5                           555 California Street, Suite 1700
                             San Francisco, CA 94104
 6                           (415) 434-4484
 7
 8                           eridley@foley.com
 9                           ROBERT L. TEEL (via video conf.)
                             Attorney at Law
10                           1425 Broadway
11                           Mail Code: 20-6690
12                           Seattle, WA 98122
13                           866-833-5529
                             lawoffice@rlteel.com
14
          For the Defendant:
15                           DANIEL P. STRUCK
                             Attorney at Law
16                           STRUCK LOVE BOJANOWSKI & ACEDO, PLC
17                           3100 West Ray Road, Suite 300
18                           Chandler, AZ 85226
                             (480) 420-1620
19                           dstruck@strucklove.com
20
21        Reported By:
22                           PATRICIA A. NILSEN, RMR, CRR, CRC
23                           TN Certified Court Reporter
24
25        Videotaped By: DAVID DRUMEL

                                                Page 3
```

```
 1                          INDEX

 2

 3     WITNESS:                              PAGE

 4

 5           JASON ELLIS

 6   Examination

 7    By Ms. Ridley                              6

 8

 9

10

11                       EXHIBITS

12   NUMBER             DESCRIPTION            PAGE

13   EXHIBIT 65    Notice of deposition         11

14   EXHIBIT 66    Policy 19-100, the resident  195

15                 work program for Otay Mesa

16                 Detention Center

17   EXHIBIT 67    Post orders for food service 197

18   EXHIBIT 68    Document entitled            208

19                 Work/Program Plan Guidelines (ICE)

20   EXHIBIT 69    Document entitled San Diego  228

21                 Correctional Facility

22                 Inmate/Detainee Safety Rules

23   EXHIBIT 70    One-page document entitled   236

24                 Detainee Voluntary Work Program

25                 Agreement

                                        Page 4
```

```
 1                        EXHIBITS
 2    NUMBER              DESCRIPTION              PAGE
 3    EXHIBIT 71     Document entitled CoreCivic    244
 4                   Eloy Detention Center Detainee
 5                   Handbook Supplement
 6    EXHIBIT 72     Document headed Weekend Pod     251
 7                   Utility Porter
 8    EXHIBIT 73     Work/Program Plan Guidelines    265
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 5
```

1    A.        Yes.

2    Q.        And do you know what time frame that was?

3    A.        I'm familiar with one site, which is the

4    Citrus County Detention Center, which is one of my

5    jail/detention centers in the state of Florida.

6    And they held ICE detainees, that I'm aware of, in

7    early 2000 -- late 1990s, early 2000 period.

8    Q.        Okay.  So I want to make sure we have an

9    agreement about some nomenclature, so we both

10   understand what's being discussed.  When we say

11   "ICE detainees," what's your understanding of a

12   person who is an ICE detainee?

13   A.        My understanding of a person that is

14   classified as an ICE detainee is someone that's

15   designated by our partner, ICE, to be housed or

16   detained in one of our facilities, pending a final

17   determination or a decision.

18   Q.        I'm sorry, pending a final ...

19   A.        A final determination to their sentence or

20   final determination of their current

21   classification, pending asylum, etc.  They're not

22   sentenced, or most are not sentenced, that I'm

23   aware of.  Some are, but most of them are just

24   detainees.

25   Q.        So just so I'm clear, when you say "most

                                              Page 20

1    are not sentenced," I take it most of the ICE

2    detainees are being detained by ICE, but they're

3    not been charged with a -- a crime?

4    A.        That's -- that's correct.  That's my

5    understanding.

6    Q.        Okay.  They may be held based on their

7    status, their immigration status, related to being

8    in the United States, correct?

9    A.        That's correct.

10   Q.        Okay.  Whereas when you have -- when you

11   have someone detained by the US Marshals who are

12   charged with a crime, how -- how would you refer to

13   them?

14   A.        I would refer to a US Marshal's

15   detainee -- US Marshal Service detainee as somebody

16   that we house on behalf of the US Marshal Service.

17   And -- and most are detainees, if not all

18   detainees.  They're pending the -- the resolution

19   of their current sentence or current case.

20             I see them as -- I view them as detainees

21   as well.

22   Q.        Okay.  But in -- in that case, if -- if an

23   individual, to your understanding, is a US Marshal

24   detainee, they either have a criminal charge

25   against them or have a -- a sentence; is that

Page 21

```
 1        Q.        Okay.  Who is Bethany Norman?
 2        A.        She is the business manager at the Stewart
 3   County Detention Center.
 4        Q.        And who is Ligier?
 5        A.        Ligier Mallamas is the director of
 6   commissary for the facility support center with
 7   CoreCivic.
 8        Q.        And what did you discuss -- were counsel
 9   present for your discussions with Bethany and
10   Ligier?
11        A.        No.
12        Q.        Okay.  When did you discuss your
13   deposition with Bethany?
14        A.        I didn't necessarily discuss my deposition
15   with Bethany.  I asked her some questions.
16        Q.        In preparation for the --
17        A.        In preparation for the ...
18        Q.        What did you ask?
19        A.        I asked her about detainee work
20   assignments, and how the detainees were paid or
21   compensated for the voluntary work program.
22        Q.        And what did you learn from Bethany on
23   that topic?
24        A.        I learned from Bethany that there are a
25   number of job assignments that we offer detainees
```

Page 39

```
1        at the Stewart County Detention Center, so that

2        they have the ability to volunteer to work.  And I

3        learned that they're -- they're compensated at a

4        minimum of one dollar a day, and that their payment

5        is provided to them in a timely manner after they

6        work; most of the time by the -- the first of the

7        next business day.

8        Q.        The first of the --

9        A.        The first of the next business day.  The

10       following business day after they work.

11       Q.        Okay.  Anything else?

12       A.        That's it.

13       Q.        Okay.  And what did you discuss with

14       Mr. Mallamas?

15       A.        Ms. Mallamas, I discussed -- I discussed

16       the commissary pricing in general.  And I discussed

17       how the company goes about determining the pricing

18       for the commissary items.

19       Q.        And what did you learn in your discussions

20       with Mr. Mallamas?

21                 MR. STRUCK:   "Ms."

22       A.        "Ms. Mallamas."

23       Q.        "Ms."; I'm sorry.

24       A.        Yeah, Ms. Mallamas.

25       Q.        Appreciate it.
```

Page 40

1    A.      I learned that the company -- with the ICE

2    contracts, the company utilizes a 30 percent margin

3    to determine the cost for the items that we offer

4    to the detainees, and that that amount accurately

5    supports the funding that we have to provide, the

6    things that we purchase for the detainee

7    population, the -- the televisions, the exercise

8    equipment, and the services that -- the services

9    that we provide for the commissary.

10            And that every two years, they do a survey

11    of the top 25 items at each of the locations to

12    ensure that we're priced appropriately and fairly,

13    or that each -- each of those 25 items are priced

14    appropriately and fairly.

15    Q.      Did you learn anything else from

16    Ms. Mallamas?

17    A.      To my knowledge, no.

18    Q.      Okay.  How long was your conversation with

19    Ms. Mallamas?

20    A.      My conversation with Ms. Mallamas was

21    probably -- lasted probably three to five minutes.

22    Q.      Okay.  And it was one conversation?

23    A.      It was two conversations.

24    Q.      Were they both three to five minutes, or

25    were they a total of three to five minutes?

Page 41

```
1        number of different policies in preparation for
2        your deposition.  I want to talk about the use of
3        policies by CoreCivic, at least in the safety
4        portion of CoreCivic.
5               I'm going to stick in the safety portion
6        of CoreCivic throughout your deposition.  I'm not
7        really asking questions about either the real
8        estate or the re-entry, all right?
9        A.      I understand.
10       Q.      Okay.  Fair enough.
11              So to your understanding, with regard to
12       the 60 to 65 facilities under the safety portion,
13       to your understanding, each of them has a set of
14       policies, correct?
15       A.      That's correct.
16       Q.      And these are written policies, correct?
17       A.      That's correct.
18       Q.      And with regard to the facilities, is
19       there a certain type of policy that they have?  In
20       other words -- let me try that again.
21              To your knowledge, does CoreCivic have
22       template policies?
23                      MR. STRUCK:  Form.
24       A.      To my knowledge, CoreCivic has policies
25       that are general in scope and are able to be
```

                                                    Page 49

1    modified to contain contractual language and to be

2    modified to be more specific -- more specific to

3    each of the facilities, based on the contract and

4    the customer's requirements.  I would say state

5    laws, etc., federal laws.

6    Q.        Okay.  So I want to talk a little bit

7    about the -- sort of the creation of a policy, the

8    sort of life cycle -- the creation of a policy,

9    okay?

10            So you mentioned that CoreCivic has

11    policies in general, and that those can be modified

12    depending on the facility and the contracts

13    involved, correct?

14    A.        Correct.

15    Q.        Okay.  So do you know who creates the

16    policy in general before they are modified, if at

17    all?

18                 MR. STRUCK:  Object to the form.

19    Currently?  2006?

20                 MS. RIDLEY:  Well, let's say

21    currently, and then I'll ask if there's been any

22    change.

23                 MR. STRUCK:  Okay.

24    A.        Can you repeat the question, please.

25                 MS. RIDLEY:  Can you reread that,

                                              Page 50

```
 1        please.
 2                      (Record read)
 3        A.      CoreCivic has a facility support center,
 4        and they have a policies and procedures department,
 5        and the policies and procedures department has
 6        staff which create the -- the generic policies
 7        prior to modification.
 8        BY MS. RIDLEY:
 9        Q.      And for the 25 and a half years that
10        you've been with CoreCivic, has it always been the
11        case that there was a facility support center, and
12        within that center, a policy/procedure section that
13        deals with the -- the form -- policies before
14        they're modified?
15        A.      That's correct.  Used to be the corporate
16        headquarters nomenclature; now it's the facility
17        support center.  So, yes, the answer is yes.
18        Q.      And when did it become the facility
19        support center?
20        A.      If I recall correctly -- and I'll just
21        give you an estimated time frame:  When I -- when I
22        started as a correctional officer, for several
23        years after that it was the corporate headquarters,
24        and corporate headquarters' name was changed to
25        facility support center approximately 2005, 2006.
```

Page 51

1    Green Hills as well, but I'm not sure if it was.

2    It was definitely in a different location.

3    Q.      Okay.  And it was -- it was named

4    corporate headquarters during the time of the move,

5    and it was only in 2005 or 2006 that it was renamed

6    the facility support center, correct?

7    A.      That's correct.

8    Q.      Okay.  And to your knowledge, what sort of

9    support is the facility support center providing

10   the -- the facilities?

11   A.      To my knowledge, they provide -- there are

12   positions that oversee the -- the facilities and

13   the applicable wardens.  There are a lot of subject

14   matter experts that work at the facility support

15   center; those that are -- there's -- there are

16   attorneys that support the company and the

17   facilities.  There are, as I mentioned earlier,

18   policies and procedure departments.  There are

19   security departments.  There are program

20   departments.  Just -- just other type of subject

21   matter experts which -- partnership development.

22         There are just a number, a large number of

23   departments that -- that it's comprised of.

24   Q.      Okay.  So let me see if I -- I understand.

25         So obviously, for example, policy --

                                              Page 54

```
 1        policies and procedures that facilities would have
 2        would originate with the facility support center,
 3        correct?
 4        A.        Correct.
 5        Q.        Okay.  Contracts with partners:  When you
 6        say "partners," who are you referring to?
 7        A.        When I refer to "partners," I refer to a
 8        number of partners or customers that we currently
 9        partner with.  It could be ICE or Immigration; it
10        could be the US Marshal Service, the Bureau of
11        Prisons; any number of states that we contract
12        with; county entities, the Bureau of Prisons.
13                  Those are -- are some.
14        Q.        Okay.  And to your understanding,
15        CoreCivic has contracts with these clients,
16        correct?
17        A.        Correct.
18        Q.        Okay.  And I take it that the negotiation
19        of those contracts would be done by folks at the
20        facility support center?
21        A.        Correct.
22        Q.        As opposed to folks at specific
23        facilities?
24        A.        Correct.
25        Q.        Okay.  So that -- I'm just picking a
```

Page 55

1    Q.      So as I understand it, the facility

2    support center has a set of sort of original

3    policies and procedures, before they've been

4    modified by any particular facility, correct?

5    A.      Correct.

6    Q.      And do you know, is there a person in

7    charge, at the facility support center, of that?

8    A.      There is a person that is in charge of the

9    policies and procedures department.

10   Q.      And who is that?

11   A.      My understanding, it's Amy Garner.  She's

12   the director of policies and procedures.

13   Q.      And do you know how long she's had that

14   position?

15   A.      I'm not sure how long she's had that

16   position.  I would estimate -- I would estimate 10

17   to 15 years.  I'm not quite sure.

18   Q.      Okay.  And is there a set number of

19   policies and procedures that CoreCivic expects each

20   facility to have?

21            MR. STRUCK:  Form.

22   A.      The -- the number of policies and

23   procedures that each facility has is dependent upon

24   the contract and the partner, the partner's

25   expectations.

Page 59

1          Is there a specific person in each

2     facility that's in charge of policies for that

3     facility?

4               MR. STRUCK:   Form.

5     A.        The facilities that I oversee have quality

6     assurance managers who oversee the quality

7     assurance department at each of -- each of their

8     facilities.   Part of that responsibility is the

9     oversight of the facility's policies.

10    Q.        Okay.  So if -- so you take the -- the --

11    what I'm going to call -- I'm trying to make a

12    distinction between the specific numbered policy

13    from the facility support center and the policy as

14    modified by any particular facility.   Okay?

15          So the policies that originate from the

16    support center, I'm going to -- I'm going to refer

17    to as the standard policy, the template policy.   Is

18    that all right?

19    A.        Yes.

20    Q.        Okay.  So if I'm at a facility and I have

21    the template -- let's call it template policy -- as

22    to maintenance, and I want to make some changes,

23    right, I take it the quality assurance manager

24    would be the person involved in potentially making

25    those changes, correct?

                                              Page  65

1    A.      The quality assurance manager would work

2    with the facility leadership to submit a request to

3    the policies and procedures department at the

4    facility support center.

5    Q.      And then -- and it would be a specific

6    request; in other words, the -- the modification

7    language would be provided to the facility support

8    center, correct?

9    A.      My understanding, if there was a request,

10   there would have to be a reason for the request and

11   a desired language, a modification suggestion,

12   which would go to the facility support center for

13   review and approval -- potential approval.

14   Q.      Okay.  And I take it that for the policy

15   modification to take effect, it would have to be

16   approved by the facility support center, correct?

17   A.      Correct.

18   Q.      Okay.  Is there -- would that be -- the

19   person who is -- who approves it, is that what Amy

20   Gardner (sic) is responsible for?

21   A.  ·   Amy Garner is the director of policies and

22   procedures, but she's not the sole approval or

23   approver.  She would work in -- in coordination or

24   in conjunction with our legal team, our partnership

25   team, and other groups to ensure that -- that the

Page 66

1  modification is appropriate and needs to be

2  approved.

3  Q.       Okay.  So in other words, the modification

4  might go through the legal team to deal with

5  whatever applicable laws there might be; it might

6  go through the partnership --

7  A.       The partnership development team.

8  Q.       Okay, to make sure it complied with any

9  contracts you had.

10         Any -- anybody -- any other team that, to

11  your knowledge, it would go through?

12  A.       There are a number of teams, number of

13  parties that are allowed to weigh in on -- on

14  policy changes or modifications and then subsequent

15  approvals.

16  Q.       Okay.  Can a facility say that they're not

17  going to have a specific policy and procedure?

18              MR. STRUCK:  Form.

19  A.       A facility cannot determine -- and when

20  you say "facility," what do you mean by "facility"?

21  Q.       So like Otay Mesa, or Wilkinson.

22  A.       So when you say "facility," are you

23  referring to the warden?  Are you referring to --

24  there are a number of people that are comprised as

25  a part of a facility.

Page  67

1    Q.       Right.  And when I -- I guess what I'm

2    saying is with regard to the facility, I'm saying

3    if -- for example, if Otay Mesa decides it no

4    longer wants the -- the food service policy,

5    doesn't want to use it at all, can it do that?

6    A.       If a member of the facility does not want

7    to comply with, abide by, utilize a policy that's

8    in place, they don't have the -- the ability to opt

9    out.

10   Q.       Okay.  Fair enough.

11           Are the template policies and procedures,

12   is there like a -- is there a binder of those?

13   Is -- can it be identified, in other words, those

14   core procedures?

15                MR. STRUCK:   Form.

16   A.       Yeah, I'm not sure if there is a binder.

17   I don't know if there -- I'm assuming there's a

18   website where the -- where the templates are -- are

19   stored, and that's the basis for the modifications

20   going forward for each and every one of the

21   contracts.

22   Q.       Okay.  So if you're -- for example, if

23   you're -- if -- if I become a warden of one of the

24   facilities, right, I'm hired to be the warden,

25   right, and I wanted to see what policies and

Page  68

```
 1          Q.        In those -- in that experience in more
 2     than one facility, when you've looked at policies,
 3     were there some common policies that you saw?
 4          A.        As a warden, there were -- when I was a
 5     warden, reflecting back on when I was a warden, I
 6     saw policies that were either exact or very
 7     similar, appeared to be exact or very similar in
 8     nature.
 9          Q.        Okay.  To your understanding, is one of
10     the standard policies a sanitation policy?
11          A.        Correct.
12          Q.        And how -- how about a discipline policy?
13          A.        There is a disciplinary policy in
14     CoreCivic.
15          Q.        Are you familiar with the -- the phrase
16     "voluntary work program"?
17          A.        I am familiar with that phrase.
18          Q.        Okay.  Are you aware of standard policies
19     related to the voluntary work program?
20          A.        I am aware of the performance-based
21     national detention standards that governs our ICE
22     facilities, our ICE contracts, and the voluntary
23     work program standards, and I'm aware of the -- the
24     applicable policies with CoreCivic to support the
25     partner standard.
```

Page 75

```
1     Q.        So -- and the partner here is ICE?

2     A.        Correct.

3     Q.        I just want to --

4     A.        I'm with you.

5     Q.        I want to be careful.

6               So I take it ICE has certain standards, to

7     your understanding, for a voluntary work program,

8     correct?

9     A.        Correct.

10    Q.        And CoreCivic has policies and procedures

11    regarding the voluntary work program, correct?

12    A.        Correct.  As a -- as a direct result of

13    the performance-based national detention standards.

14    Q.        And the performance-based national --

15    A.        Detention standards.

16    Q.        -- detention -- who issues that?

17    A.        ICE.

18    Q.        And to your knowledge, are -- has any

19    facility modified the voluntary work program

20    policies and procedures that CoreCivic has

21    developed?

22              MR. STRUCK:  Form.

23    A.        I'm sorry.  To my knowledge, has any of

24    the facilities modified any of the voluntary work

25    policies that's been designated for them?
```

Page 76

```
 1        Q.        No.

 2        A.        Or their site at -- can you repeat the

 3   question?

 4        Q.        Yeah, let me see if I can rearrange this

 5   here.

 6                  So as I understand your testimony, ICE has

 7   certain standards and policies regarding the

 8   voluntary work program that's referenced in the

 9   performance-based --

10        A.        National detention standards.

11        Q.        Is that correct?

12        A.        That's correct.

13        Q.        Okay.  As a result of that, CoreCivic, in

14   its facility support center, has developed some

15   standard voluntary work program policies and

16   procedures to comply with ICE's policies?

17        A.        Correct.

18        Q.        Okay.  Next question is:  To your

19   knowledge, do you know of any facilities who have

20   modified those standard policies and procedures

21   issued by CoreCivic?

22                  MR. STRUCK:  Form.

23        A.        I don't -- I don't recall any facilities

24   that have modified the voluntary work program

25   policy or standard.  They -- they wouldn't have the
```

                                                    Page 77

1    one dollar a day.

2              And with the voluntary work program, each

3    of the detainees would be adequately trained to

4    ensure that they understand what they need to do,

5    and the detainee and the staff would understand

6    that the work is voluntary, 100 percent voluntary,

7    and the detainee can stop working or quit at any

8    time, and that the detainee has to ensure that they

9    come to work on time; they work the appropriate

10   number of -- of hours which are required -- which

11   does not exceed eight hours in a day, or 40 hours a

12   week -- and if they fail to comply with that

13   schedule, or the agreement that they've made with

14   the CoreCivic supervisor, or if they don't perform

15   the work appropriately, that they could jeopardize

16   losing their opportunity to work.

17   Q.        Are civil immigration detainees in the

18   custody of ICE eligible to work through the

19   voluntary work program?

20   A.        Please repeat that.

21   Q.        Are civil immigration detainees in the

22   custody of ICE eligible to work through the

23   voluntary work program?

24            MR. STRUCK:   Form.

25   A.        Detainees which are assigned to us, or

Page 80

1    given to us by ICE, they're -- they come into our

2    custody from ICE, those detainees are allowed to

3    participate in the voluntary work program.

4    Q.        Okay.  Do you have an understanding of

5    which CoreCivic facilities house ICE detainees?

6                    MR. STRUCK:  Form.

7    A.        I know that the facilities that I

8    supervise, the nine facilities in my division,

9    currently house ICE detainees, and I'm aware of

10   some of the other facilities outside of that

11   division, or division four, which house ICE

12   detainees.

13   Q.        Okay.  Are the facilities that you are

14   aware house ICE detainees, do they also house

15   detainees from the US Marshal Service?

16   A.        There are some facilities that house ICE

17   detainees which do not house US Marshal detainees.

18   Q.        And I take it from that there are also

19   some facilities that house both?

20   A.        Correct.

21   Q.        Okay.  And again, when we say "US Marshal

22   detainees," these are the ones who have criminal

23   charges pending against them, correct, or are

24   sentenced?

25   A.        To my knowledge, yes.

Page 81

```
1    Q.        Okay.  If an ICE detainee is working in

2    the voluntary work program, what sort of work might

3    they do?

4    A.        They may work in the units or the pods as

5    housemen, housewomen, cleaning people, as far as

6    sanitation, cleaning, mopping, etc., just making

7    sure that the pods or the units are cleaned.  The

8    common areas, the bathrooms, etc., inside the

9    housing unit.

10            At some facilities, they're able to work

11   in the laundry.  At some facilities, they're able

12   to work in food service.  At some facilities,

13   they're able to assist in the commissary operations

14   and work in commissary.  At some facilities,

15   they're able to clean outside the pods or the

16   units, work in the hallways, clean different

17   sections of the -- of the facility.

18            I'm sure those are not all of the job

19   opportunities, but those are some.

20   Q.        Do they -- can they work in maintenance?

21   A.        They can.  At some facilities, they're

22   able to work in maintenance.

23   Q.        And I'm distinguishing maintenance from

24   cleaning.

25   A.        Yeah.
```

Page 82

1    Q.       I take it you would make a distinction

2    between the two?

3    A.       I would -- I do.  I make a distinction

4    between maintenance and -- and cleaning, yes.

5    Q.       Okay.  How do -- how does a detainee, an

6    ICE detainee, volunteer for work assignments?

7    A.       An ICE detainee goes through orientation

8    after they're received at the facility, or the

9    applicable facility, and they're advised of

10    voluntary work opportunities.  And they have the

11    ability to sign up at any point during their stay

12    for a particular job assignment.  So they can

13    verbally tell somebody in their housing unit, or

14    they can submit a written request saying that

15    they're interested in a job.

16    Q.       If they've identified a job, and it's

17    approved, do they sign work agreements?

18    A.       Yes.  They are required to sign a work

19    agreement stating that they are volunteering to

20    work.

21              MR. STRUCK:  Just wanted to note for

22    the record that Robert Teel is appearing via

23    Veritext in the deposition.

24              MS. RIDLEY:  Fair enough.

25    Q.       The wording of the work agreement, where

                                         Page 83

1    what is the most an ICE detainee in the voluntary

2    work program would earn for their work, per day?

3              MR. STRUCK:   Form and foundation.

4    A.       I'm not sure, because I -- I don't have

5    direct knowledge of all the facilities that house

6    ICE detainees.

7    Q.       Okay.  Are you aware of any facility that

8    pays a dollar and a half a day?

9    A.       It's my understanding that the Otay Mesa

10   facility currently has jobs for detainees that

11   pay -- or did pay -- $1.50 a day.

12   Q.       And do you know which jobs those were?

13   A.       I don't.

14            I -- let me back up.  I believe they are

15   to work the kitchen, kitchen workers, if I'm not

16   mistaken.

17   Q.       Other than kitchen workers, do you know if

18   any other workers get paid $1.50 a day?

19   A.       At Otay Mesa?

20   Q.       Yes.

21   A.       I'm -- I'm not aware -- I'm not aware of

22   any.

23   Q.       Do you know of any other CoreCivic

24   facility that pays ICE detainees in the voluntary

25   work program $1.50 a day?

                                        Page 92

| | |
|---|---|
| 1 | A.        I believe the Stewart County Detention |
| 2 | Center pays $1.50 a day, or more, to detainees |
| 3 | working in certain jobs. |
| 4 | Q.        Which jobs are those? |
| 5 | A.        I believe, at a minimum, it's food |
| 6 | service. |
| 7 | Q.        Other than food service, do you know any |
| 8 | other jobs? |
| 9 | A.        I'm not sure.  I don't know. |
| 10 | Q.        When you say "or more," are you aware of |
| 11 | any facility that -- strike that. |
| 12 |           When you say "pay more," do you know of |
| 13 | any amount over $1.50 that is paid to an ICE |
| 14 | detainee in the voluntary work program per day? |
| 15 | A.        Over $1.50? |
| 16 | Q.        Yeah. |
| 17 | A.        Stewart is -- I believe is -- approximates |
| 18 | $4 a day, or -- or did at one time. |
| 19 | Q.        Okay.  And was that for specific work? |
| 20 | A.        I believe that was for food service. |
| 21 | Q.        Okay.  Do you know of any other facility |
| 22 | at CoreCivic that pays more than $1.50 a day for |
| 23 | work performed in the voluntary work program by ICE |
| 24 | detainees? |
| 25 | A.        Other than Stewart? |

Page 93

1    Q.       Right.

2    A.       I'm not sure of any others.

3    Q.       Okay.  Are you aware of any CoreCivic

4    facility that provides bonuses to ICE detainees

5    performing voluntary work, or performing work in

6    the voluntary work program?

7                   MR. STRUCK:   Form.

8    A.       It's my understanding that there were

9    extra incentives or bonuses that were provided

10   by -- at the Otay Mesa facility in the past.

11   Q.       Other than Otay Mesa, are you aware of any

12   other facility that has done that?

13   A.       I believe Stewart has done that, but I'm

14   not sure.

15   Q.       Okay.  Other than Otay Mesa and Stewart,

16   any other facility that has provided bonuses?

17   A.       To my knowledge, I'm not aware of any

18   others.

19   Q.       Okay.  Do you have an understanding of

20   what bonuses were provided by Otay Mesa to ICE

21   detainees performing work in the voluntary work

22   program?

23   A.       It's my understanding that in the form of

24   a bonus, some detainees were provided with extra

25   popcorn, with gift cards or phone cards -- not gift

                                          Page 94

1      Q.       And would they purchase that through the

2      commissary?

3      A.       Yes.

4      Q.       Okay.  So if someone was getting a bonus

5      by way of minutes on a phone card, that would go

6      into their general account, I take it?

7      A.       I don't know if the money would be

8      deposited into their account and it would result in

9      them then being issued a phone card, or if the

10     phone card has a certain amount of money on it, and

11     it's just provided to the detainee and it's not put

12     on their books.

13              But they can utilize a phone card or a

14     phone card number, so I'm not sure if it's

15     actually -- the money is actually deposited to

16     their account or if it's separate from that.

17     Q.       Would a detainee hold the -- the phone

18     card on their person while in the facility?

19     A.       I'm not sure if they would or not.  I'm

20     not sure if -- if they're given a number, or

21     they're actually -- they're given an actual phone

22     card.

23     Q.       Okay.  All right.

24              When an ICE detainee is performing work in

25     the voluntary work program, are they given any

Page 98

1    statements of the amount of money that they've

2    earned?

3                MR. STRUCK:   Form.

4    A.        Each detainee should have access to their

5    account.  Whether they work or not, they should be

6    able to access their account to see how much money

7    they have in their account.

8    Q.        And if -- if I were a detainee and I had

9    an account, how would I do that?

10   A.        In most facilities that I'm aware of,

11   there is an OMS or a CORES account, and I believe

12   the CORES account stands for correctional offender

13   and resident electronic system, or so, or offender

14   management system.

15             It's -- it's their ability to go to access

16   a kiosk.  Most of those are located in their -- in

17   their specific housing pods or housing units, and

18   they're able to -- to query or to see how much

19   money is in their account.

20   Q.        In the kiosk?

21   A.        In the -- yes, in the kiosk, or via the

22   kiosk.

23   Q.        What's an OMS?

24   A.        Offender management system.

25   Q.        Okay.

                                        Page  99

```
1    A.      That's -- that's CoreCivic's system to --
2    to track detainees, inmates, etc., and to -- to
3    keep up with the moneys they have and, you know,
4    their -- their charges, their history, etc.
5    Q.      Okay.  Other than going to the kiosk to
6    access my account, would I ever be given a written
7    statement of the money I've earned over a period of
8    time through the voluntary work program?
9    A.      It's possible they'd be given a -- a
10   written receipt of the money that they've earned.
11   Q.      When you say "it's possible," is that a --
12   the regular course?
13   A.      I don't know if that's a requirement.
14   Q.      Okay.
15   A.      If they have -- if they have access to it,
16   I'm not sure that we would require us to print a
17   paper copy.
18   Q.      You haven't seen that as a standard
19   practice, I take it?
20   A.      I don't recall that as a standard
21   practice.
22   Q.      Okay.  Who -- who pays the ICE detainees
23   who are in the voluntary work program?
24           MR. STRUCK:  Form.
25   A.      CoreCivic is responsible for providing
```

Page 100

1     them with the earned revenue as a result of the

2     voluntary work program.

3     Q.        Okay.  If I'm an ICE detainee at a

4     facility, and I've been participating in the

5     voluntary work program, the money's been put in my

6     account, and for whatever reason I'm leaving the

7     facility, what happens to the money in that

8     account?

9     A.        The detainees are requested to provide a

10    future address so that we can send them or the

11    facilities can forward them moneys.  Typically when

12    a detainee leaves, they are provided with

13    everything, all the money in their account,

14    everything that they're -- they've earned.

15              If for some reason not everything has been

16    posted to their account, if they -- as an example,

17    if they were to leave tomorrow morning and they

18    worked today, if the business office knows that

19    they're leaving tomorrow morning, they would do

20    everything that they could to put that money on

21    their -- their account so that they would leave

22    with everything that they've earned and all the

23    money that they have.

24              If for some reason that didn't occur, we

25    ask the detainees to provide a future address so we

Page 101

```
1    don't think that they would have the ability to go
2    and cash a check; it would be far too difficult.
3    So it's my understanding that they would have cash.
4    Q.      On the day they leave?
5    A.      Yes.  That's my understanding.
6    Q.      Okay.  Why -- why are ICE detainees in the
7    voluntary work program paid anything?
8    A.      In my opinion -- well, first of all, it's
9    because it's required by our partner, ICE; it's a
10   requirement.  They -- they determine that they are
11   to receive a minimum of one dollar a day to work.
12           So if nothing else, for no other reason,
13   it's because it's a requirement of -- of ICE, the
14   partner.
15   Q.      Okay.  Have you ever -- are you familiar
16   with the budgets for facilities?  Each facility has
17   a budget, correct?
18   A.      Correct.
19   Q.      To your understanding, does each facility
20   budget assume a certain amount of work that's being
21   performed by people in the voluntary work program?
22   A.      It's my understanding that we have a
23   budget, and the budget is based on history, whether
24   it's 6 months or 12 months.  And the -- the budget
25   going forward in most cases would take into
```

Page 103

1    consideration the -- the six-month history, the

2    three-month history, the 12-month history, and that

3    money would be budgeted for each of the facilities

4    in the future.

5         That -- that's just a starting point.  And

6    to your point about the voluntary work program, one

7    year you may have -- you may have 500 hours' worth

8    of detainee work, and the next year it could be

9    2,500 or it could be zero.  So the facilities are

10   able to contract and expand, based on what the

11   detainees are volunteering to do.

12        And we're allowed, each facility is

13   allowed to accommodate in any of those situations

14   or any of those -- any of those circumstances,

15   whether we get no voluntary work or there's an

16   abundance of voluntary work, because a lot of

17   detainees are wanting to earn extra income.

18   Q.       Okay.  You agree with your prior

19   testimony, though, you've never known any facility

20   to have zero people working in the voluntary work

21   program, correct?

22   A.       I don't recall any facility having

23   never -- never having a detainee volunteer to work

24   in the ICE -- with the ICE contract.

25   Q.       Okay.  And to your knowledge, facilities,

Page 104

1    when they do their budgeting, they look to their

2    historical experience about who's in the voluntary

3    work program as part of that budget, correct?

4                MR. STRUCK:  Form.

5    A.      I think all of the expenditures are

6    captured, and going forward, everything is taken

7    into consideration.

8    Q.      Including the historical numbers of

9    voluntary work participants?

10   A.      It's my understanding that that would be

11   captured in the history of the budget.

12   Q.      Right.  If -- if no one volunteered to

13   work for food services, who would do the work?

14                MR. STRUCK:  Form.  Foundation.

15   A.      In my opinion -- we contract with a

16   subcontractor to assist our staff with operating

17   the food service departments and facilities.  If --

18   and I have no idea what we would do, because it

19   could vary; it could vary from us hiring more

20   contract staff or requiring our contract staffing

21   to increase, to ensure that -- that the food

22   service operation or -- or whatever is run

23   effectively.

24                We could hire more staff to do that.  I

25   mean, there's -- there's a -- we could contract

                                          Page 105

1      with a -- a third party or another party to

2      subsidize that.

3          Q.      And I take it that same logic would be

4      true with regard to other categories of work that

5      was being performed by voluntary work participants?

6                  MR. STRUCK:   Form.

7          A.      Yeah, I -- I think food services is a

8      little bit different.  As far as cleaning, as far

9      as the cleaning duties, as far as the laundry

10     duties, I don't know if we would have to increase

11     to a great degree the staffing.  We may have to

12     reallocate.  But it -- it may be a little bit

13     different with -- in other departments.

14         Q.      Okay.  Are you aware of any staff person

15     getting paid a dollar a day?

16         A.      I'm not aware of any staff person getting

17     paid a dollar a day.

18         Q.      Are you aware of any third-party vendor

19     getting paid a dollar a day for their work at any

20     facility?

21         A.      I'm unaware of a third party getting paid

22     a dollar a day.

23         Q.      Staff is paid more than a dollar a day,

24     correct?

25         A.      To my knowledge, yes.

Page 106

```
1      Q.        Third-party vendors, also paid more than a
2   dollar a day?
3                MR. STRUCK:   Foundation.
4      A.        To my knowledge.   To my knowledge, yes.
5      Q.        Staff paid hourly?
6      A.        Some staff are paid hourly, and some of
7   them are paid annually.
8      Q.        I'm sorry --
9      A.        By salary.   Annually by salary.
10     Q.        Annually?
11     A.        Yes.
12     Q.        Okay.   For participants in the voluntary
13  work program --
14     A.        I'm sorry?
15     Q.        -- for -- I hadn't finished.
16                For participants --
17     A.        I didn't hear the word you said, though.
18     Q.        For participants in the voluntary work
19  program --
20     A.        Okay.
21     Q.        -- if they're doing a job that requires
22  training to do the job, who provides the training?
23                MR. STRUCK:   Form.
24     A.        The warden and his -- his or her staff
25  ensure that the people in the applicable area, the
```

Page 107

```
 1          staff in the particular area, are providing that
 2          training.  It -- it could vary, by department
 3          and -- and by person or supervisor.
 4          Q.       Okay.
 5          A.       But it has to be a staff member providing
 6          that training.
 7          Q.       Okay.
 8          A.       Or a contractor.
 9          Q.       Okay.  Or a contractor to the facility?
10          A.       Or a contractor to the facility.
11          Q.       And would the facility supervise that
12          training the contractor gives?
13                        MR. STRUCK:  Form.
14          A.       The contractor is required to meet our
15          standards.  So the contractor is an extension of
16          us.  So the training would be done in compliance
17          with our expectations, CoreCivic's expectations.
18          Q.       Understood.
19                   If the work that's being performed by an
20          ICE detainee in the voluntary work program required
21          tools, you know, for cleaning -- you know, cleaning
22          supplies; for food, implements to make the food;
23          for maintenance, tools to do the maintenance, etc.,
24          where would those materials come from?
25                        MR. STRUCK:  Form.
```

Page 108

1    A.        Where would they originate?

2    Q.        Yeah.

3    A.        I assume somewhere outside the facility,

4    wherever they made the -- the equipment.  I -- I

5    don't --

6    Q.        I don't mean the creation of the tools.

7    A.        Right.

8    Q.        But if I were an ICE detainee in the

9    voluntary work program, say in the food service

10   area, and I needed a blender, who would give me the

11   blender?

12             MR. STRUCK:  Form.

13   A.        Somebody in the department would provide

14   them access to the equipment.

15   Q.        Somebody at the Core --

16   A.        A staff member or a contractor in the

17   applicable department would provide them access to

18   the tool or the equipment.

19   Q.        Okay.  So the CoreCivic facility would

20   provide them with the equipment to do that work?

21   A.        A staff member or contractor of the

22   facility would -- would provide them with access to

23   the tool.

24   Q.        What about cleaning now?  Buckets, rags,

25   brushes, brooms?  Who would provide that to the

Page 109

1    voluntary -- the ICE detainee doing the voluntary

2    work?

3                    MR. STRUCK:  Form.

4    A.        I think in most cases it would be the

5    same; it would be a staff member or a -- a

6    contractor.  It -- it's possible that another

7    detainee, at the end of their shift, his or her

8    shift, could provide that directly to another

9    detainee after -- after they've been trained.

10            So I -- I'm not saying that the staff

11   member, each and every time, would disseminate that

12   tool.

13   Q.        Okay.  Who owns the tool?

14                   MR. STRUCK:  Form.

15   A.        It's -- it's hard to say.  Sometimes

16   CoreCivic owns all the property, and some of our

17   facilities, the customer or the partner owns that

18   property.  The state, the federal government,

19   county government, they could own the property.  So

20   it all depends.

21   Q.        So for example, if I had cleaning

22   supplies, right, that's not something the ICE

23   detainee would have with them, correct?

24                   MR. STRUCK:  Form.

25   A.        Please be more specific.

                                        Page 110

```
1        Q.       Sure.  Let's say I'm an ICE detainee and
2    I'm doing work in the common areas, right, and I am
3    doing cleaning; toilets, etc., right?  So I need
4    all the various supplies.  You know, the soap,
5    sponges, whatever is needed to clean.  I don't
6    personally bring that, correct?  I don't own it and
7    bring it?
8        A.       You don't own it and bring it, no.
9        Q.       That's provided --
10       A.       You don't own it.  I can't say -- you
11   can -- you can bring it or relocate it, but you
12   don't own it.
13       Q.       Right.  And it's provided to me by the
14   facility, correct?
15       A.       That's correct.
16       Q.       In other words, I don't have to buy it to
17   use it?
18       A.       That's correct.
19       Q.       Okay.  Same thing for the food service?
20   Like if I'm working in food service, I don't have
21   to buy the food, correct?
22                MR. STRUCK:  Form.
23       A.       You don't have to purchase or buy the food
24   that's provided to you as a meal.
25       Q.       Right.  And if I'm performing work in the
```

Page 111

1    food services, either making the meal, using tools

2    to make the meal, using, you know, ingredients to

3    make the meal, I don't have to bring any of those,

4    correct?

5                    MR. STRUCK:   Form.

6    A.        I'm sorry.  You don't have to bring any of

7    the food or the tools or equipment?

8    Q.        To make the food.

9    A.        Bring from where, from --

10   Q.        From anywhere.

11   A.        Well, you could -- you could be located in

12   the kitchen, and you could be assigned a tool, and

13   you may have to go to a different portion of -- so

14   technically, you could -- you could bring that or

15   relocate that equipment or that tool from inside

16   one department or one area.

17   Q.        I'm thinking more globally.  I'm not

18   talking about transit within the facility.  I'm

19   just saying, in order to do my job in the food

20   services area, right, I might need certain tools:

21   Knives, forks, bowls, right?  Ovens?

22   A.        You might need certain tools or equipment,

23   correct.

24   Q.        I, as the detainee, am not bringing those

25   tools, correct?

                                        Page 112

```
1        A.        You're not bringing them from -- to my
2    knowledge you're not bringing them from your
3    unit --
4        Q.        Right?
5        A.        -- unless you've been assigned that
6    equipment.
7                  And -- and I will tell you, as an
8    example -- I'm not trying to be difficult.
9                  As an example, some kitchen workers, or
10   some workers that work in the voluntary work
11   program, are provided with rubber boots,
12   slip-resistant boots.  So they can be assigned
13   those boots, and they can be assigned some other
14   type of clothing or equipment that's special to
15   their job assignment, and technically, we assign
16   those to them; and as long as they're -- they
17   participate in that -- that work program, or that
18   work detail, they're responsible for keeping up
19   with that.
20                 So that's -- that's the example.  That's
21   why I asked that question.
22       Q.        That's fine, and -- and that's a great
23   example.
24                 And those boots are provided to the
25   workers by the CoreCivic facility, correct?
```

Page 113

```
1    A.       That's correct.
2    Q.       Okay.  And I'm not expected to buy those
3    boots, correct?
4    A.       That's correct.
5    Q.       Okay.  And in the food service, you know,
6    if I'm using an oven or a -- you know, a grill, or
7    using food, all of those tools are supplied by
8    CoreCivic, correct?
9    A.       That's correct.
10   Q.       Okay.  Same thing with maintenance:  Maybe
11   I need to use a ladder or a screwdriver or a
12   hammer.  All of those tools are supplied by the
13   CoreCivic facility, correct?
14                  MR. STRUCK:  Form.
15   A.       And you give some examples, such as a
16   ladder and other equipment similar to that, they
17   would be provided; the detainees don't have to
18   purchase those to facilitate their work duties.
19   Q.       Okay.  Fair enough.
20               Now, we talked little bit about how much
21   ICE detainees are paid, and -- and you made
22   reference to the performance standards, right?
23   Those are the ICE standards?
24   A.       Correct.
25   Q.       Okay.  Do the ICE standards limit how much
```

Page  114

```
 1        CoreCivic could pay the ICE detainee in the
 2        voluntary work program?
 3        A.      To my knowledge, no.  There's no
 4        limitation of what can be paid.
 5                    MR. STRUCK:  Late objection to form.
 6        A.      Paid per hour, or paid in total?
 7        Q.      Either.
 8        A.      No.  To my knowledge, there's no -- no
 9        requirement.
10        Q.      Does CoreCivic decide what job assignment
11        an ICE detainee will work?
12                    MR. STRUCK:  Form.
13        A.      CoreCivic decides what job opportunities
14        are available for those that want to participate in
15        the voluntary work assignment, with ICE's approval.
16        Q.      So let's say -- let's say a facility
17        wants -- has available folks to work in maintenance
18        and food services, right?  And let's say they
19        had -- that facility had a few ICE detainees who
20        wanted to participate.  Is it the facility,
21        CoreCivic facility, that determines which of those
22        detainees would do which of the work?
23                    MR. STRUCK:  Form.
24        A.      The detainees apply for certain job
25        details.  So it -- it begins with them, their
```

Page 115

```
1    willingness to work a particular job.  So that --
2    that's where it initiates.  And then CoreCivic,
3    after they volunteer, would make determinations if
4    they're able to perform those specific job details.
5    Q.       Okay.  And if an ICE detainee said, "I'm
6    willing to work either in the food service or
7    maintenance," would it be CoreCivic to determine
8    which one that -- the detainee would actually do
9    the work at?
10                   MR. STRUCK:   Form.
11   A.       It would be in conjunction with -- with
12   the detainee and medical and -- and other people to
13   ensure that they're capable of -- of working in
14   those particular areas.
15   Q.       You mentioned medical.  Would medical be
16   involved in order to determine whether or not the
17   ICE detainee could actually do the work?
18   A.       Medical would be involved for food service
19   details.
20   Q.       Okay.
21   A.       And maybe some other details, but I know
22   of food service.
23   Q.       Okay.  If any job within the voluntary
24   work program required safety equipment -- you know,
25   goggles, gloves -- who would supply that?
```

                                              Page 116

1    A.       CoreCivic would ensure that -- that those

2    safety equipment -- the safety equipment was

3    provided to the detainee.

4    Q.        Okay.  Does CoreCivic have the ability to

5    remove an ICE detainee from a job assignment?

6              MR. STRUCK:  Form.

7    A.       CoreCivic has the ability to remove a

8    detainee from a voluntary work assignment if they

9    don't meet the agreements that -- the agreement

10   between them and us and the detainee.

11             A couple of examples:  If they don't come

12   to work on time, and they are not performing their

13   work satisfactory.  So those -- those are a couple

14   of -- of reasons that -- that CoreCivic could

15   remove a detainee from a work assignment.

16   Q.        Are ICE -- sorry, I keep taking them on or

17   off, but -- I can see far and not near.

18   A.        That's okay.

19   Q.        Are ICE detainees in the voluntary work

20   program -- strike that.

21             Does CoreCivic ever provide evaluations to

22   the ICE detainees who are in the voluntary work

23   program?

24             MR. STRUCK:  Form.

25   A.        I don't know if they provide formal

Page  117

1    evaluations.  Each detainee is informally evaluated

2    on the -- the work that they perform each -- each

3    hour, each day, to ensure that they're -- they're

4    meeting the needs, their -- their practices are

5    safety -- their practices are safe, and -- and

6    they're complying with the agreement.

7    Q.      If -- if an ICE detainee is in the

8    voluntary work program and is not performing up to

9    snuff for whatever work they're doing, how would

10   they know that they're not meeting those

11   obligations?

12   A.      They should be told that they're not

13   meeting those obligations.  And in my opinion,

14   there should be an opportunity, as long as the

15   detainee is willing, to make the -- the necessary

16   corrections to perform the work appropriately, so

17   that -- that detail manager or that staff member

18   working with -- with the detainee should let them

19   know.

20   Q.      Okay.  Is there a process to have that

21   sort of interaction happen?

22   A.      I don't know if there -- there's a

23   process.  It's a part of the agreement that they

24   will comply with the work requirements, so I think,

25   day in and day out, I think that they -- the staff

Page 118

```
1      A.          Please repeat the question.

2      Q.          Sure.  To your knowledge, does any

3      facility, any CoreCivic facility that has ICE

4      detainees, do any of them have use of -- of

5      volunteers outside the voluntary work program?

6                  MR. STRUCK:  Form.

7      A.          To my knowledge, no.  And people -- and

8      just to be specific, I mean, we can't keep a

9      detainee -- if the detainee wants to go and clean

10     something, or wants to do something on their own, I

11     mean, I -- I can't say that we're going to stop

12     people or stop detainees from doing that.

13                 So it's certainly possible, without our

14     approval or our initiation, that there are

15     people -- there are detainees that take it upon

16     themselves that operate outside the voluntary work

17     program.

18     Q.          Okay.  How about people from the public

19     who are not detainees, and they wish to volunteer

20     at the facilities.  Have you ever heard of such a

21     thing?

22     A.          We -- we do have volunteers, people from

23     the outside that are not staff, that are allowed,

24     if they meet the expectations or the requirements,

25     they're allowed to volunteer and work inside the
```

Page 120

```
 1      facilities.

 2      Q.       And -- and what sort of work would they

 3      do?

 4      A.       They can -- religious work, Narcotics

 5      Anonymous, Alcoholics Anonymous, just -- substance

 6      abuse programs and -- and other type programs,

 7      maybe GED testing in -- in some -- in some areas.

 8      But mainly religious, in my opinion; religious

 9      support.

10      Q.       And to your knowledge, are any of those

11      volunteers paid anything by CoreCivic?

12      A.       To my knowledge, and I -- I don't know if

13      they're paid, but to my knowledge, they are not

14      paid.  That's my understanding, that -- or they

15      wouldn't be volunteers.

16      Q.       Does CoreCivic have the ability to

17      terminate an ICE detainee from the voluntary work

18      program?

19              MR. STRUCK:  Form.

20      A.       Yeah, we -- we discussed earlier that I'm

21      aware of a couple of circumstances when -- when

22      a -- a detainee can -- can no longer be allowed to

23      work.  If he's not performing the job

24      satisfactorily, or if the detainee is unwilling to

25      show up, meet the schedule, do what's being done.
```

Page 121

```
 1              You know, if they're late to work every
 2       day, you know, then -- then we would need to
 3       potentially take action to remove that person, if
 4       they're not -- if they're not providing that work
 5       in accordance with what we need.
 6       Q.       And is there a process to do that?  In
 7       other words, how is that effectuated?
 8       A.       Yeah, I don't know -- I don't know that
 9       there's a formal process, and there may be; but
10       the -- I would believe that the supervisor would
11       tell the detainee, after multiple or several or --
12       or once, if it's very impactful, one situation
13       where the detainee was not complying with orders
14       and not -- not meeting the -- the work agreement,
15       voluntary work agreement, that they would let them
16       know that they're -- they're not going to be
17       utilized to work anymore, and they would be taken
18       out of that opportunity, and -- and they wouldn't
19       work anymore after that, if something changed.
20       Q.       I'm sorry.  Would there be a note in any
21       of the detainee's records about being terminated?
22       A.       I believe, if there is a -- a note, and I
23       know -- a record of the work detail is provided
24       and -- and placed in their -- their folder, so it's
25       my understanding that their willingness to work, if
```

Page 122

1           I think ICE possesses that.

2           Q.       You said "criminal record."  Now, you said

3      most of the ICE detainees are not -- they're not

4      under criminal charge; they're -- they have a

5      status with regard to immigration, correct?

6           A.       Yeah.  I said -- going back to what I

7      said, I said "if applicable."

8           Q.       I see.

9           A.       If they have an applicable -- if

10     applicable, they have a criminal record.

11          Q.       Okay.  And then there's a separate

12     detainee file that CoreCivic maintains?

13          A.       That's correct.

14          Q.       And typically what's in that?

15          A.       It -- that file would -- it would -- it

16     would have what they've been provided.  It would

17     have any disciplinary history that they would --

18     would have.  Work -- voluntary work program

19     information, the amount of money that they made,

20     some of the receipts, maybe, if they do -- if they

21     do exist, if there's receipts of their work.

22               Just everything that's determined

23     important while that detainee is there has to be

24     placed in their file.

25          Q.       For some work performed by detainees in

                                              Page  124

```
1        the voluntary work program, I take it there are
2        shifts?
3        A.        Correct.
4        Q.        Not all work, but just some of the work?
5        A.        Correct.
6        Q.        What's typically the type of work that
7        would be in shifts?
8        A.        One example of a work that would be in
9        shifts would be food service.
10       Q.        And who determines the shift?
11       A.        Either CoreCivic staff or the contract, or
12       contractor's staff, would determine that.
13       Q.        And who determines which shift the ICE
14       detainee will work?
15                 MR. STRUCK:  Form.
16       A.        I'm -- I'm not sure, because it could --
17       it could vary from facility to facility.  But it
18       would either be a staff member, a CoreCivic staff
19       member, or a contractor.
20       Q.        Would there ever be a contractor working
21       with ICE detainees in the voluntary work program
22       that would not also have a CoreCivic supervisor
23       present?
24       A.        I'm sorry, repeat that, please?
25       Q.        Yeah, it was convoluted.
```

Page 125

1          Who would decide how those slots would be

2     filled and who would fill them?

3     A.      It's my understanding the -- the

4     supervisory staff, between the contractor and

5     CoreCivic staff, would make that determination,

6     based on what the detainees are volunteering for

7     and what their certain abilities are.

8     Q.      And -- and if they said they were

9     interested in either, would it ultimately come down

10    to CoreCivic staff and any contractor, if they were

11    involved?

12    A.      Yes.

13             MR. STRUCK:   Form and foundation.

14    Q.      You mentioned earlier on, when we were

15    talking about your own experience about shifts,

16    right, and -- well, let me ask you this:  When --

17    if there is an ICE detainee who is doing work in

18    the voluntary work program and has an eight-hour

19    shift, okay -- because you said it wouldn't be more

20    than eight hours, correct?

21    A.      Wouldn't be more than eight hours a day,

22    correct.

23    Q.      Right.  And there are some ICE detainees

24    in the voluntary work program who work an

25    eight-hour shift, correct?

Veritext Legal Solutions
866 299-5127

Exhibit 3 - Page 62

```
 1        A.        Who work an eight-hour shift?

 2        Q.        Yes.

 3        A.        Correct.

 4        Q.        Okay.  Are there any breaks given to the

 5        voluntary workers, if they have an eight-hour

 6        shift, during that eight hours?

 7                        MR. STRUCK:  Form.

 8        A.        I'm not sure if there are -- there are

 9        breaks or not.  Whatever the requirements and --

10        and whatever the -- not only the agreement, but

11        whatever -- I mean, it could be a -- it could be a

12        state law issue.  I -- I'm not sure if it would be

13        the same across the board, but I'm sure there would

14        be breaks, some breaks at least.  I don't know the

15        length of those breaks or -- or the duration.

16        Q.        Okay.

17                        MR. STRUCK:  Belated objection.

18        Foundation.

19        Q.        Let me ask you this:  How many -- to your

20        knowledge, how many California facilities does

21        CoreCivic have that has ICE detainees in them?

22        A.        I'm aware of one facility currently that

23        CoreCivic has in the state of California that

24        houses ICE detainees.

25        Q.        And that is the Otay Mesa?
```

Page 130

1      A.        That's correct.

2      Q.        Okay.  Do you know whether or not any ICE

3      detainees on the voluntary work program at Otay

4      Mesa, whether any of them work an eight-hour shift?

5                MR. STRUCK:  Form and foundation.

6      A.        I don't.

7      Q.        And I take it, then, you also don't know

8      whether or not they get any breaks in an eight-hour

9      shift, if they work one?

10               MR. STRUCK:  Form.  Foundation.

11     A.        I don't.

12     Q.        Are there any incentives to work in one

13     job assignment as opposed to another?  For example,

14     kitchen versus being a laundry or --

15               MR. STRUCK:  Form.

16     A.        We talked earlier about the pay

17     differential, so I'm aware of -- of that increase

18     in pay.  I don't know if it's an incentive, per se,

19     because the detainee determines whether or not they

20     want to work, and preferably -- they volunteer to

21     work in a certain area.

22     Q.        Have you ever heard of any CoreCivic

23     facility trying to incentivize detainee workers in

24     the voluntary work program to focus in on a

25     particular area?  For example, let's say they

                                        Page 131

1   A.        Paid workers could be responsible for

2   cleaning outside of their cells in the common

3   areas.  Staff could clean.  I've seen both do -- do

4   that.

5   Q.        What are the types of discipline that

6   might arise in the course of working in the

7   voluntary working -- work program?  Excuse me.

8                  MR. STRUCK:  Form.

9   A.        What type of discipline?

10  Q.        Yeah.

11  A.        Any of the -- any of the -- the types of

12  discipline is possible in any particular area.

13  Q.        Does that include going into restrictive

14  housing?

15  A.        Certain offenses can lead to being placed

16  into restrictive housing.

17  Q.        Is not timely reporting for a shift an

18  infraction or otherwise something that could be

19  subject to discipline for a detainee in the

20  voluntary work program?

21  A.        Is it subject to discipline?

22  Q.        Yes.

23  A.        It is subject to discipline.

24                  MR. STRUCK:  Form.  Foundation.

25  Q.        How about not reporting for a shift at

Page  157

```
 1          I declare under penalty of perjury
 2     under the laws that the foregoing is
 3     true and correct.
 4
 5          Executed on _____ , 20___,
 6     at _____, _____.
 7
 8
 9
10     _____      _____
11     DATE                            WITNESS
12
13
14     Sworn to and Subscribed before me,
15
16     this_____day of_____, 2018.
17
18     _____
19     Notary Public           My commission expires:
20
21                             _____
22
23
24
25
                                        Page 269
```

```
1              COURT REPORTER'S CERTIFICATE

2

   STATE OF TENNESSEE:

3

                    I, PATRICIA A. NILSEN, Licensed

4       Reporter for the State of Tennessee, CERTIFY:

5                    1. The foregoing deposition was

6       taken before me at the time and place stated in the

7       foregoing styled cause with the appearances as

8       noted;

9                    2. Being a Court Reporter, I then

10      reported the deposition in Stenotype to the best of

11      my skill and ability, and the foregoing pages

        contain a full, true and correct transcript of my

12      said Stenotype notes then and there taken;

13                   3. I am not in the employ of and am

14      not related to any of the parties or their counsel,

        and I have no interest in the matter involved.

15

16                   WITNESS MY SIGNATURE, this,

        the 15th day of March, 2019.

17

18

19

20

21      _____

22      PATRICIA A. NILSEN, RMR, CRR, CRC

23      TN Licensed Court Reporter

24      LCR Number: 717

25      Expiration: 6/30/2020

                                          Page 270
```

Tennessee Rules of Civil Procedure

Depositions Upon Oral Examination

Rule 30


Rule 30.05: Submission to Witness; Changes;
Signing.


When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless such examination and reading are waived by
the witness and by the parties. Any changes in form
or substance which the witness desires to make
shall be entered upon the deposition by the officer
with a statement of the reasons given by the
witness for making them. The deposition shall then
be signed by the witness, unless the parties by
stipulation waive the signing or the witness is ill
or cannot be found or refuses to sign. If the
deposition is not signed by the witness within 30
days of its submission, the officer shall sign it
and state on the record the fact of the waiver or
of the illness or absence of the witness or the
fact of the refusal to sign together with the
reason, if any, given therefor; and the deposition

Exhibit 3 - Page 68

may then be used as fully as though signed unless
on a motion to suppress under Rule 32.04(4) the
court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FORINFORMATIONAL  PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit 3 - Page 69

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 3 - Page 70