# EXHIBIT 2

1           UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3     _____

4     SYLVESTER OWINO, on behalf of

5     themselves, and all others similarly

6     situated, et al.,

7                     Plaintiff,

8        vs.            Case No. 3:17-cv-01112-JLS-NLS

9     CORECIVIC, INC., a Maryland

10     corporation,

11

12                    Defendant.

13     _____

14

15          THE DEPOSITION OF JASON ELLIS

16               MARCH 4, 2019

17

18

19

20

21     Reported By:

22     PATRICIA A. NILSEN,

23     RMR, CRR, CRC

24     Job No. 3225918

25     Pages 1 - 270

                                              Page 1

1                    The deposition of JASON ELLIS, taken

2        on behalf of the Plaintiffs, pursuant to Notice on

3        MARCH 4, 2019, beginning at approximately 9:11 a.m.

4        in the offices of Alpha Reporting.

5                    This deposition is taken in

6        accordance with the terms and provisions of the

7        Federal Rules of Civil Procedure.  All objections

8        are reserved except as to form.

9                    The signature of the witness is

10       reserved.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  2

```
 1                    APPEARANCES
 2

        For the Plaintiffs:
 3                    EILEEN REGINA RIDLEY
                      ALAN R. OUELLETE
 4                    Attorneys at Law
                      FOLEY & LARDNER LLP
 5                    555 California Street, Suite 1700
                      San Francisco, CA 94104
 6                    (415) 434-4484
 7
 8                    eridley@foley.com
 9                    ROBERT L. TEEL (via video conf.)
                      Attorney at Law
10                    1425 Broadway
11                    Mail Code: 20-6690
12                    Seattle, WA 98122
13                    866-833-5529
                      lawoffice@rlteel.com
14
        For the Defendant:
15                    DANIEL P. STRUCK
                      Attorney at Law
16                    STRUCK LOVE BOJANOWSKI & ACEDO, PLC
17                    3100 West Ray Road, Suite 300
18                    Chandler, AZ 85226
                      (480) 420-1620
19                    dstruck@strucklove.com
20
21      Reported By:
22                    PATRICIA A. NILSEN, RMR, CRR, CRC
23                    TN Certified Court Reporter
24
25      Videotaped By: DAVID DRUMEL
```

                                           Page 3

Exhibit 2 Page 37

```
 1                          INDEX

 2

 3    WITNESS:                              PAGE

 4

 5            JASON ELLIS

 6    Examination

 7     By Ms. Ridley                          6

 8

 9

10

11                     EXHIBITS

12    NUMBER              DESCRIPTION           PAGE

13    EXHIBIT 65    Notice of deposition         11

14    EXHIBIT 66    Policy 19-100, the resident  195

15                  work program for Otay Mesa

16                  Detention Center

17    EXHIBIT 67    Post orders for food service 197

18    EXHIBIT 68    Document entitled            208

19                  Work/Program Plan Guidelines (ICE)

20    EXHIBIT 69    Document entitled San Diego  228

21                  Correctional Facility

22                  Inmate/Detainee Safety Rules

23    EXHIBIT 70    One-page document entitled   236

24                  Detainee Voluntary Work Program

25                  Agreement
```

Page 4

```
 1                         EXHIBITS
 2    NUMBER              DESCRIPTION              PAGE
 3    EXHIBIT 71    Document entitled CoreCivic    244
 4                  Eloy Detention Center Detainee
 5                  Handbook Supplement
 6    EXHIBIT 72    Document headed Weekend Pod     251
 7                  Utility Porter
 8    EXHIBIT 73    Work/Program Plan Guidelines    265
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                    VIDEOGRAPHER:  Good morning.  Today
 2       is March 4, 2019.  The time is approximately
 3       9:11 a.m.  The location is One Vantage Way in
 4       Nashville, Tennessee.
 5                    This is Case Number
 6       3:17-CV-01112-JLS-NLS, filed in the United States
 7       District Court for the Southern District of
 8       California, in the case of Owino vs. CoreCivic,
 9       Inc. et al.  The deponent today is Jason Ellis.
10                    Counsel, please identify yourselves
11       for the record at this time.
12                    MS. RIDLEY:  Eileen Ridley,
13       Foley & Lardner, on behalf of the plaintiffs.
14                    MR. STRUCK:  Daniel Struck, on behalf
15       of defendant counterclaimant CoreCivic.
16                    VIDEOGRAPHER:  The deponent may now
17       be sworn in by the court reporter.
18                    JASON ELLIS,
19       having been first duly sworn, was examined
20       and testified as follows:
21                    EXAMINATION
22       BY MS. RIDLEY:
23       Q.      Good morning.
24       A.      Good morning.
25       Q.      My name is Eileen Ridley, as you've heard.
```

Page 6

Exhibit 2 Page 40

```
 1          one dollar a day.
 2                   And with the voluntary work program, each
 3          of the detainees would be adequately trained to
 4          ensure that they understand what they need to do,
 5          and the detainee and the staff would understand
 6          that the work is voluntary, 100 percent voluntary,
 7          and the detainee can stop working or quit at any
 8          time, and that the detainee has to ensure that they
 9          come to work on time; they work the appropriate
10          number of -- of hours which are required -- which
11          does not exceed eight hours in a day, or 40 hours a
12          week -- and if they fail to comply with that
13          schedule, or the agreement that they've made with
14          the CoreCivic supervisor, or if they don't perform
15          the work appropriately, that they could jeopardize
16          losing their opportunity to work.
17          Q.      Are civil immigration detainees in the
18          custody of ICE eligible to work through the
19          voluntary work program?
20          A.      Please repeat that.
21          Q.      Are civil immigration detainees in the
22          custody of ICE eligible to work through the
23          voluntary work program?
24                       MR. STRUCK:  Form.
25          A.      Detainees which are assigned to us, or
```

Page 80

1       given to us by ICE, they're -- they come into our

2       custody from ICE, those detainees are allowed to

3       participate in the voluntary work program.

4       Q.      Okay.  Do you have an understanding of

5       which CoreCivic facilities house ICE detainees?

6                       MR. STRUCK:  Form.

7       A.      I know that the facilities that I

8       supervise, the nine facilities in my division,

9       currently house ICE detainees, and I'm aware of

10      some of the other facilities outside of that

11      division, or division four, which house ICE

12      detainees.

13      Q.      Okay.  Are the facilities that you are

14      aware house ICE detainees, do they also house

15      detainees from the US Marshal Service?

16      A.      There are some facilities that house ICE

17      detainees which do not house US Marshal detainees.

18      Q.      And I take it from that there are also

19      some facilities that house both?

20      A.      Correct.

21      Q.      Okay.  And again, when we say "US Marshal

22      detainees," these are the ones who have criminal

23      charges pending against them, correct, or are

24      sentenced?

25      A.      To my knowledge, yes.

1    Q.      Okay.  If an ICE detainee is working in

2    the voluntary work program, what sort of work might

3    they do?

4    A.      They may work in the units or the pods as

5    housemen, housewomen, cleaning people, as far as

6    sanitation, cleaning, mopping, etc., just making

7    sure that the pods or the units are cleaned.  The

8    common areas, the bathrooms, etc., inside the

9    housing unit.

10            At some facilities, they're able to work

11   in the laundry.  At some facilities, they're able

12   to work in food service.  At some facilities,

13   they're able to assist in the commissary operations

14   and work in commissary.  At some facilities,

15   they're able to clean outside the pods or the

16   units, work in the hallways, clean different

17   sections of the -- of the facility.

18            I'm sure those are not all of the job

19   opportunities, but those are some.

20   Q.      Do they -- can they work in maintenance?

21   A.      They can.  At some facilities, they're

22   able to work in maintenance.

23   Q.      And I'm distinguishing maintenance from

24   cleaning.

25   A.      Yeah.

1    Q.        I take it you would make a distinction

2    between the two?

3    A.        I would -- I do.  I make a distinction

4    between maintenance and -- and cleaning, yes.

5    Q.        Okay.  How do -- how does a detainee, an

6    ICE detainee, volunteer for work assignments?

7    A.        An ICE detainee goes through orientation

8    after they're received at the facility, or the

9    applicable facility, and they're advised of

10   voluntary work opportunities.  And they have the

11   ability to sign up at any point during their stay

12   for a particular job assignment.  So they can

13   verbally tell somebody in their housing unit, or

14   they can submit a written request saying that

15   they're interested in a job.

16   Q.        If they've identified a job, and it's

17   approved, do they sign work agreements?

18   A.        Yes.  They are required to sign a work

19   agreement stating that they are volunteering to

20   work.

21             MR. STRUCK:  Just wanted to note for

22   the record that Robert Teel is appearing via

23   Veritext in the deposition.

24             MS. RIDLEY:  Fair enough.

25   Q.        The wording of the work agreement, where

                                              Page 83

```
 1        they would have access, or do have access to that.
 2        Q.        Okay.  Is there a department at the
 3        facility support center that would be likely to
 4        have that access?
 5        A.        There's a -- there's a business department
 6        at the FSC that have business managers that oversee
 7        the facility.  I believe they would have access to
 8        that information.
 9        Q.        If I'm an ICE detainee who's in the
10        voluntary work program, so I -- well, strike that.
11        If I'm an ICE detainee, and I'm in the
12        voluntary work program, is it the case that I will
13        pay -- be paid at least a dollar a day for the work
14        that I'm doing?
15        A.        Yes.
16        Q.        Okay.  Is there any ICE detainee in the
17        voluntary work program that receives zero dollars
18        for that work?
19        A.        For the voluntary work program?
20        Q.        Yes.
21        A.        No.  They shouldn't.  Policy does not
22        allow for that.
23        Q.        Okay.
24        A.        And the standards.
25        Q.        Okay.  What is -- to your understanding,
```

Page 91

```
1          what is the most an ICE detainee in the voluntary

2          work program would earn for their work, per day?

3                     MR. STRUCK:  Form and foundation.

4          A.        I'm not sure, because I -- I don't have

5          direct knowledge of all the facilities that house

6          ICE detainees.

7          Q.        Okay.  Are you aware of any facility that

8          pays a dollar and a half a day?

9          A.        It's my understanding that the Otay Mesa

10         facility currently has jobs for detainees that

11         pay -- or did pay -- $1.50 a day.

12         Q.        And do you know which jobs those were?

13         A.        I don't.

14                   I -- let me back up.  I believe they are

15         to work the kitchen, kitchen workers, if I'm not

16         mistaken.

17         Q.        Other than kitchen workers, do you know if

18         any other workers get paid $1.50 a day?

19         A.        At Otay Mesa?

20         Q.        Yes.

21         A.        I'm -- I'm not aware -- I'm not aware of

22         any.

23         Q.        Do you know of any other CoreCivic

24         facility that pays ICE detainees in the voluntary

25         work program $1.50 a day?
```

Page 92

1    A.       I believe the Stewart County Detention

2    Center pays $1.50 a day, or more, to detainees

3    working in certain jobs.

4    Q.       Which jobs are those?

5    A.       I believe, at a minimum, it's food

6    service.

7    Q.       Other than food service, do you know any

8    other jobs?

9    A.       I'm not sure.  I don't know.

10    Q.       When you say "or more," are you aware of

11    any facility that -- strike that.

12             When you say "pay more," do you know of

13    any amount over $1.50 that is paid to an ICE

14    detainee in the voluntary work program per day?

15    A.       Over $1.50?

16    Q.       Yeah.

17    A.       Stewart is -- I believe is -- approximates

18    $4 a day, or -- or did at one time.

19    Q.       Okay.  And was that for specific work?

20    A.       I believe that was for food service.

21    Q.       Okay.  Do you know of any other facility

22    at CoreCivic that pays more than $1.50 a day for

23    work performed in the voluntary work program by ICE

24    detainees?

25    A.       Other than Stewart?

Page 93

```
 1        Q.        Right.
 2        A.        I'm not sure of any others.
 3        Q.        Okay.  Are you aware of any CoreCivic
 4    facility that provides bonuses to ICE detainees
 5    performing voluntary work, or performing work in
 6    the voluntary work program?
 7                     MR. STRUCK:  Form.
 8        A.        It's my understanding that there were
 9    extra incentives or bonuses that were provided
10    by -- at the Otay Mesa facility in the past.
11        Q.        Other than Otay Mesa, are you aware of any
12    other facility that has done that?
13        A.        I believe Stewart has done that, but I'm
14    not sure.
15        Q.        Okay.  Other than Otay Mesa and Stewart,
16    any other facility that has provided bonuses?
17        A.        To my knowledge, I'm not aware of any
18    others.
19        Q.        Okay.  Do you have an understanding of
20    what bonuses were provided by Otay Mesa to ICE
21    detainees performing work in the voluntary work
22    program?
23        A.        It's my understanding that in the form of
24    a bonus, some detainees were provided with extra
25    popcorn, with gift cards or phone cards -- not gift
```

Page 94

1    A.       That's -- that's CoreCivic's system to --

2    to track detainees, inmates, etc., and to -- to

3    keep up with the moneys they have and, you know,

4    their -- their charges, their history, etc.

5    Q.       Okay.  Other than going to the kiosk to

6    access my account, would I ever be given a written

7    statement of the money I've earned over a period of

8    time through the voluntary work program?

9    A.       It's possible they'd be given a -- a

10   written receipt of the money that they've earned.

11   Q.       When you say "it's possible," is that a --

12   the regular course?

13   A.       I don't know if that's a requirement.

14   Q.       Okay.

15   A.       If they have -- if they have access to it,

16   I'm not sure that we would require us to print a

17   paper copy.

18   Q.       You haven't seen that as a standard

19   practice, I take it?

20   A.       I don't recall that as a standard

21   practice.

22   Q.       Okay.  Who -- who pays the ICE detainees

23   who are in the voluntary work program?

24            MR. STRUCK:  Form.

25   A.       CoreCivic is responsible for providing

Page 100

1      them with the earned revenue as a result of the

2      voluntary work program.

3      Q.      Okay.  If I'm an ICE detainee at a

4      facility, and I've been participating in the

5      voluntary work program, the money's been put in my

6      account, and for whatever reason I'm leaving the

7      facility, what happens to the money in that

8      account?

9      A.      The detainees are requested to provide a

10     future address so that we can send them or the

11     facilities can forward them moneys.  Typically when

12     a detainee leaves, they are provided with

13     everything, all the money in their account,

14     everything that they're -- they've earned.

15             If for some reason not everything has been

16     posted to their account, if they -- as an example,

17     if they were to leave tomorrow morning and they

18     worked today, if the business office knows that

19     they're leaving tomorrow morning, they would do

20     everything that they could to put that money on

21     their -- their account so that they would leave

22     with everything that they've earned and all the

23     money that they have.

24             If for some reason that didn't occur, we

25     ask the detainees to provide a future address so we

Exhibit 2 Page 50

1      don't think that they would have the ability to go

2      and cash a check; it would be far too difficult.

3      So it's my understanding that they would have cash.

4      Q.      On the day they leave?

5      A.      Yes.  That's my understanding.

6      Q.      Okay.  Why -- why are ICE detainees in the

7      voluntary work program paid anything?

8      A.      In my opinion -- well, first of all, it's

9      because it's required by our partner, ICE; it's a

10     requirement.  They -- they determine that they are

11     to receive a minimum of one dollar a day to work.

12             So if nothing else, for no other reason,

13     it's because it's a requirement of -- of ICE, the

14     partner.

15     Q.      Okay.  Have you ever -- are you familiar

16     with the budgets for facilities?  Each facility has

17     a budget, correct?

18     A.      Correct.

19     Q.      To your understanding, does each facility

20     budget assume a certain amount of work that's being

21     performed by people in the voluntary work program?

22     A.      It's my understanding that we have a

23     budget, and the budget is based on history, whether

24     it's 6 months or 12 months.  And the -- the budget

25     going forward in most cases would take into

Page 103

1      consideration the -- the six-month history, the

2      three-month history, the 12-month history, and that

3      money would be budgeted for each of the facilities

4      in the future.

5              That -- that's just a starting point.   And

6      to your point about the voluntary work program, one

7      year you may have -- you may have 500 hours' worth

8      of detainee work, and the next year it could be

9      2,500 or it could be zero.   So the facilities are

10     able to contract and expand, based on what the

11     detainees are volunteering to do.

12             And we're allowed, each facility is

13     allowed to accommodate in any of those situations

14     or any of those -- any of those circumstances,

15     whether we get no voluntary work or there's an

16     abundance of voluntary work, because a lot of

17     detainees are wanting to earn extra income.

18     Q.      Okay.  You agree with your prior

19     testimony, though, you've never known any facility

20     to have zero people working in the voluntary work

21     program, correct?

22     A.      I don't recall any facility having

23     never -- never having a detainee volunteer to work

24     in the ICE -- with the ICE contract.

25     Q.      Okay.  And to your knowledge, facilities,

Page 104

1    when they do their budgeting, they look to their

2    historical experience about who's in the voluntary

3    work program as part of that budget, correct?

4             MR. STRUCK:   Form.

5    A.     I think all of the expenditures are

6    captured, and going forward, everything is taken

7    into consideration.

8    Q.     Including the historical numbers of

9    voluntary work participants?

10    A.     It's my understanding that that would be

11    captured in the history of the budget.

12    Q.     Right.  If -- if no one volunteered to

13    work for food services, who would do the work?

14             MR. STRUCK:   Form.   Foundation.

15    A.     In my opinion -- we contract with a

16    subcontractor to assist our staff with operating

17    the food service departments and facilities.  If --

18    and I have no idea what we would do, because it

19    could vary; it could vary from us hiring more

20    contract staff or requiring our contract staffing

21    to increase, to ensure that -- that the food

22    service operation or -- or whatever is run

23    effectively.

24             We could hire more staff to do that.  I

25    mean, there's -- there's a -- we could contract

Veritext Legal Solutions
866 299-5127

Exhibit 2 Page 53

1     with a -- a third party or another party to

2     subsidize that.

3     Q.        And I take it that same logic would be

4     true with regard to other categories of work that

5     was being performed by voluntary work participants?

6               MR. STRUCK:   Form.

7     A.        Yeah, I -- I think food services is a

8     little bit different.  As far as cleaning, as far

9     as the cleaning duties, as far as the laundry

10    duties, I don't know if we would have to increase

11    to a great degree the staffing.  We may have to

12    reallocate.  But it -- it may be a little bit

13    different with -- in other departments.

14    Q.        Okay.  Are you aware of any staff person

15    getting paid a dollar a day?

16    A.        I'm not aware of any staff person getting

17    paid a dollar a day.

18    Q.        Are you aware of any third-party vendor

19    getting paid a dollar a day for their work at any

20    facility?

21    A.        I'm unaware of a third party getting paid

22    a dollar a day.

23    Q.        Staff is paid more than a dollar a day,

24    correct?

25    A.        To my knowledge, yes.

Veritext Legal Solutions
866 299-5127

Exhibit 2 Page 54

1    Q.        Third-party vendors, also paid more than a

2    dollar a day?

3                   MR. STRUCK:   Foundation.

4    A.        To my knowledge.   To my knowledge, yes.

5    Q.        Staff paid hourly?

6    A.        Some staff are paid hourly, and some of

7    them are paid annually.

8    Q.        I'm sorry --

9    A.        By salary.   Annually by salary.

10   Q.        Annually?

11   A.        Yes.

12   Q.        Okay.   For participants in the voluntary

13   work program --

14   A.        I'm sorry?

15   Q.        -- for -- I hadn't finished.

16             For participants --

17   A.        I didn't hear the word you said, though.

18   Q.        For participants in the voluntary work

19   program --

20   A.        Okay.

21   Q.        -- if they're doing a job that requires

22   training to do the job, who provides the training?

23                   MR. STRUCK:   Form.

24   A.        The warden and his -- his or her staff

25   ensure that the people in the applicable area, the

Page 107

1       staff in the particular area, are providing that
2       training.  It -- it could vary, by department
3       and -- and by person or supervisor.
4       Q.      Okay.
5       A.      But it has to be a staff member providing
6       that training.
7       Q.      Okay.
8       A.      Or a contractor.
9       Q.      Okay.  Or a contractor to the facility?
10      A.      Or a contractor to the facility.
11      Q.      And would the facility supervise that
12      training the contractor gives?
13                      MR. STRUCK:  Form.
14      A.      The contractor is required to meet our
15      standards.  So the contractor is an extension of
16      us.  So the training would be done in compliance
17      with our expectations, CoreCivic's expectations.
18      Q.      Understood.
19              If the work that's being performed by an
20      ICE detainee in the voluntary work program required
21      tools, you know, for cleaning -- you know, cleaning
22      supplies; for food, implements to make the food;
23      for maintenance, tools to do the maintenance, etc.,
24      where would those materials come from?
25                      MR. STRUCK:  Form.

                                        Page 108

1      A.      That's correct.

2      Q.      Okay.  And I'm not expected to buy those

3      boots, correct?

4      A.      That's correct.

5      Q.      Okay.  And in the food service, you know,

6      if I'm using an oven or a -- you know, a grill, or

7      using food, all of those tools are supplied by

8      CoreCivic, correct?

9      A.      That's correct.

10     Q.      Okay.  Same thing with maintenance:  Maybe

11     I need to use a ladder or a screwdriver or a

12     hammer.  All of those tools are supplied by the

13     CoreCivic facility, correct?

14                     MR. STRUCK:  Form.

15     A.      And you give some examples, such as a

16     ladder and other equipment similar to that, they

17     would be provided; the detainees don't have to

18     purchase those to facilitate their work duties.

19     Q.      Okay.  Fair enough.

20             Now, we talked little bit about how much

21     ICE detainees are paid, and -- and you made

22     reference to the performance standards, right?

23     Those are the ICE standards?

24     A.      Correct.

25     Q.      Okay.  Do the ICE standards limit how much

                                          Page 114

1        CoreCivic could pay the ICE detainee in the

2        voluntary work program?

3        A.      To my knowledge, no.  There's no

4        limitation of what can be paid.

5                    MR. STRUCK:  Late objection to form.

6        A.      Paid per hour, or paid in total?

7        Q.      Either.

8        A.      No.  To my knowledge, there's no -- no

9        requirement.

10       Q.      Does CoreCivic decide what job assignment

11       an ICE detainee will work?

12                   MR. STRUCK:  Form.

13       A.      CoreCivic decides what job opportunities

14       are available for those that want to participate in

15       the voluntary work assignment, with ICE's approval.

16       Q.      So let's say -- let's say a facility

17       wants -- has available folks to work in maintenance

18       and food services, right?  And let's say they

19       had -- that facility had a few ICE detainees who

20       wanted to participate.  Is it the facility,

21       CoreCivic facility, that determines which of those

22       detainees would do which of the work?

23                   MR. STRUCK:  Form.

24       A.      The detainees apply for certain job

25       details.  So it -- it begins with them, their

Page 115

Exhibit 2 Page 58

```
 1        A.        Please repeat the question.

 2        Q.        Sure.  To your knowledge, does any

 3     facility, any CoreCivic facility that has ICE

 4     detainees, do any of them have use of -- of

 5     volunteers outside the voluntary work program?

 6                  MR. STRUCK:  Form.

 7        A.        To my knowledge, no.  And people -- and

 8     just to be specific, I mean, we can't keep a

 9     detainee -- if the detainee wants to go and clean

10     something, or wants to do something on their own, I

11     mean, I -- I can't say that we're going to stop

12     people or stop detainees from doing that.

13                  So it's certainly possible, without our

14     approval or our initiation, that there are

15     people -- there are detainees that take it upon

16     themselves that operate outside the voluntary work

17     program.

18        Q.        Okay.  How about people from the public

19     who are not detainees, and they wish to volunteer

20     at the facilities.  Have you ever heard of such a

21     thing?

22        A.        We -- we do have volunteers, people from

23     the outside that are not staff, that are allowed,

24     if they meet the expectations or the requirements,

25     they're allowed to volunteer and work inside the
```

Page 120

```
 1          facilities.
 2          Q.        And -- and what sort of work would they
 3          do?
 4          A.        They can -- religious work, Narcotics
 5          Anonymous, Alcoholics Anonymous, just -- substance
 6          abuse programs and -- and other type programs,
 7          maybe GED testing in -- in some -- in some areas.
 8          But mainly religious, in my opinion; religious
 9          support.
10          Q.        And to your knowledge, are any of those
11          volunteers paid anything by CoreCivic?
12          A.        To my knowledge, and I -- I don't know if
13          they're paid, but to my knowledge, they are not
14          paid.  That's my understanding, that -- or they
15          wouldn't be volunteers.
16          Q.        Does CoreCivic have the ability to
17          terminate an ICE detainee from the voluntary work
18          program?
19                    MR. STRUCK:  Form.
20          A.        Yeah, we -- we discussed earlier that I'm
21          aware of a couple of circumstances when -- when
22          a -- a detainee can -- can no longer be allowed to
23          work.  If he's not performing the job
24          satisfactorily, or if the detainee is unwilling to
25          show up, meet the schedule, do what's being done.
```

Page 121

1               Who would decide how those slots would be

2        filled and who would fill them?

3        A.      It's my understanding the -- the

4        supervisory staff, between the contractor and

5        CoreCivic staff, would make that determination,

6        based on what the detainees are volunteering for

7        and what their certain abilities are.

8        Q.      And -- and if they said they were

9        interested in either, would it ultimately come down

10       to CoreCivic staff and any contractor, if they were

11       involved?

12       A.      Yes.

13               MR. STRUCK:  Form and foundation.

14       Q.      You mentioned earlier on, when we were

15       talking about your own experience about shifts,

16       right, and -- well, let me ask you this:  When --

17       if there is an ICE detainee who is doing work in

18       the voluntary work program and has an eight-hour

19       shift, okay -- because you said it wouldn't be more

20       than eight hours, correct?

21       A.      Wouldn't be more than eight hours a day,

22       correct.

23       Q.      Right.  And there are some ICE detainees

24       in the voluntary work program who work an

25       eight-hour shift, correct?

                                        Page 129

1       A.      Who work an eight-hour shift?

2       Q.      Yes.

3       A.      Correct.

4       Q.      Okay.  Are there any breaks given to the

5       voluntary workers, if they have an eight-hour

6       shift, during that eight hours?

7                       MR. STRUCK:  Form.

8       A.      I'm not sure if there are -- there are

9       breaks or not.  Whatever the requirements and --

10      and whatever the -- not only the agreement, but

11      whatever -- I mean, it could be a -- it could be a

12      state law issue.  I -- I'm not sure if it would be

13      the same across the board, but I'm sure there would

14      be breaks, some breaks at least.  I don't know the

15      length of those breaks or -- or the duration.

16      Q.      Okay.

17                      MR. STRUCK:  Belated objection.

18      Foundation.

19      Q.      Let me ask you this:  How many -- to your

20      knowledge, how many California facilities does

21      CoreCivic have that has ICE detainees in them?

22      A.      I'm aware of one facility currently that

23      CoreCivic has in the state of California that

24      houses ICE detainees.

25      Q.      And that is the Otay Mesa?

Exhibit 2 Page 62

1     A.      That's correct.

2     Q.      Okay.  Do you know whether or not any ICE

3     detainees on the voluntary work program at Otay

4     Mesa, whether any of them work an eight-hour shift?

5             MR. STRUCK:  Form and foundation.

6     A.      I don't.

7     Q.      And I take it, then, you also don't know

8     whether or not they get any breaks in an eight-hour

9     shift, if they work one?

10            MR. STRUCK:  Form.  Foundation.

11    A.      I don't.

12    Q.      Are there any incentives to work in one

13    job assignment as opposed to another?  For example,

14    kitchen versus being a laundry or --

15            MR. STRUCK:  Form.

16    A.      We talked earlier about the pay

17    differential, so I'm aware of -- of that increase

18    in pay.  I don't know if it's an incentive, per se,

19    because the detainee determines whether or not they

20    want to work, and preferably -- they volunteer to

21    work in a certain area.

22    Q.      Have you ever heard of any CoreCivic

23    facility trying to incentivize detainee workers in

24    the voluntary work program to focus in on a

25    particular area?  For example, let's say they

Page 131

Exhibit 2 Page 63

```
1        A.        Yes.

2        Q.        Okay.

3                      MR. STRUCK:  Form.

4                      MS. RIDLEY:  Sorry?

5                      MR. STRUCK:  I just object to the

6        form.

7                      MS. RIDLEY:  Okay.

8        A.        At a different location.

9                      MR. STRUCK:  Yeah.

10       BY MS. RIDLEY:

11       Q.        So the San Diego Correctional Facility

12       was -- the actual facility was moved, correct?

13       A.        The --

14       Q.        Not saying the buildings, obviously.

15       A.        Right.  We relocated from the San Diego

16       Correctional Facility to the Otay Mesa Detention

17       Center.  We relocated the detainees.

18       Q.        Okay.  When --

19       A.        And operated that facility as opposed to

20       the San Diego Correctional Facility.

21       Q.        Right.  Okay.  And when did that take

22       place?

23       A.        I'm not sure.  I was involved in the --

24       the relocation --

25       Q.        I'm sorry, I just want to be clear:  You
```

Page 229

1          were involved?

2          A.       I was involved in the --

3          Q.       Okay.

4          A.       -- in the transition.

5          Q.       Okay.

6          A.       I was.

7                   I believe it was 2015, towards the end

8          of 2015.

9          Q.       Okay.  And so were all of the detainees

10         that you had at the San Diego Correctional Facility

11         moved to Otay Mesa at that time?

12                      MR. STRUCK:  Form.

13         A.       Those which were currently incarcerated at

14         the San Diego Correctional Facility -- I'm not

15         going to say all of them were, but they were either

16         released during that time to other places or

17         transferred to the Otay Mesa Detention Center.

18         Q.       Okay.  Do you know if the policies and

19         procedures that were being used at the San Diego

20         Correctional Facility were then adopted when the

21         move took place in 2015 at Otay Mesa?

22                      MR. STRUCK:  Form.

23         A.       I'm not sure if each of the policies was

24         adopted.  And this doesn't have a -- a date on it,

25         so I'm not sure how old this -- this form is.  We

Page 230

```
 1          I declare under penalty of perjury
 2     under the laws that the foregoing is
 3     true and correct.
 4
 5          Executed on ____April 5____, 20_19_,
 6     at __Nashville,__ _____TN_____.
 7
 8
 9
10     ___4·5·19___         _____Jam 7. Ev____
11     DATE                            WITNESS
12
13
14     Sworn to and Subscribed before me,
15
16     this___5___day of___April___, 2018.
17
18     _Diane S_____
19     Notary Public          My commission expires:
20
21                            ___7-9-22_____
22
23
24
25
```

Page 269

## INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below. If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line.

### ERRATA SHEET

| Page | Line | | |
|------|------|--|--|
| 19 | 19 | Change: | off of the other contracts |
| | | Reason: | grammatical enhancement |
| 35 | 13 | Change: | yes, it was |
| | | Reason: | grammatical enhancement |
| 42 | 10 | Change: | Ms. Norman provided detainee wage information (email) for the jobs at the Stewart Detention Center. |
| | | Reason: | I didn't recall this during my testimony. |
| 44 | 18 | Change: | I reviewed the recent depositions of Fred Figueroa and Troy Pollock |
| | | Reason: | I didn't recall this during my testimony. |

Exhibit 2 Page 67

| Page | Line | | |
|------|------|---|---|
| 51 | 16 | Change: | (nomenclature) |
| | | Reason: | grammatical enhancement |
| 97 | 24 | Change: | change "had" to "have" |
| | | Reason: | grammatical enhancement |
| 117 | 10 | Change: | between CoreCivic and the detainee. |
| | | Reason: | the change provides a better explanation. Remove "them and us". |
| 122 | 19 | Change: | replace "if" with "unless" |
| | | Reason: | incorrect wording |
| 128 | 18 | Change: | replace "Uh-huh" with "correct" |
| | | Reason: | response is more discernable |
| 130 | 15 | Change: | replace "length" with "Frequency" |
| | | Reason: | appropriate response |
| 136 | 25 | Change: | remove "That's right" and replace with "the applicable facility staff member complies with the payment obligation". |
| | | Reason: | appropriate response |
| | | Change: | |

✓ ⊗  Subject to the above changes, I certify that the transcript is true and correct.

_____  No changes have been made. I certify that the transcript is true and correct.

_____  *Jan Eus* _____        4.4.19
**Signature**                              **Date**

Exhibit 2 Page 68

| Page | Line | |
|------|------|--|
| 146 | 23 | Change: replace "sentence" with "asylum or case review" |
| | | Reason: Correction |
| 148 | 2 | Change: Teresa Smith |
| | | Reason: confirmed her last name |
| 151 | 15 | Change: replace "it's" with "he is" |
| | | Reason: Correction |
| 185 | 13 | Change: replace "Uh-huh" with "Yes" |
| | | Reason: more accurate response |
| 329 | 5 | Change: replace "Uh-huh" with "Yes" |
| | | Reason: more accurate response |
| 381 | 4 | Change: replace "Uh-huh" with "Yes" |
| | | Reason: more accurate response |
| | | Change: _____ |
| | | Reason: _____ |
| ___ | ___ | Change: _____ |

✓ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made. I certify that the transcript is true and correct.

_____ Jan Ewi _____     4·4·19
**Signature**                    **Date**

Exhibit 2 Page 69

```
 1              COURT REPORTER'S CERTIFICATE

 2

    STATE OF TENNESSEE:

 3

                 I, PATRICIA A. NILSEN, Licensed

 4       Reporter for the State of Tennessee, CERTIFY:

 5                 1. The foregoing deposition was

 6       taken before me at the time and place stated in the

 7       foregoing styled cause with the appearances as

 8       noted;

 9                 2. Being a Court Reporter, I then

10       reported the deposition in Stenotype to the best of

11       my skill and ability, and the foregoing pages

         contain a full, true and correct transcript of my

12       said Stenotype notes then and there taken;

13                 3. I am not in the employ of and am

14       not related to any of the parties or their counsel,

         and I have no interest in the matter involved.

15

16                 WITNESS MY SIGNATURE, this,

         the 15th day of March, 2019.

17

18

19

20

21       _____

22       PATRICIA A. NILSEN, RMR, CRR, CRC

23       TN Licensed Court Reporter

24       LCR Number: 717

25       Expiration: 6/30/2020
```

                                          Page 270

Tennessee Rules of Civil Procedure

Depositions Upon Oral Examination

Rule 30

Rule 30.05: Submission to Witness; Changes;
Signing.

When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless such examination and reading are waived by
the witness and by the parties. Any changes in form
or substance which the witness desires to make
shall be entered upon the deposition by the officer
with a statement of the reasons given by the
witness for making them. The deposition shall then
be signed by the witness, unless the parties by
stipulation waive the signing or the witness is ill
or cannot be found or refuses to sign. If the
deposition is not signed by the witness within 30
days of its submission, the officer shall sign it
and state on the record the fact of the waiver or
of the illness or absence of the witness or the
fact of the refusal to sign together with the
reason, if any, given therefor; and the deposition

Exhibit 2 Page 71

may then be used as fully as though signed unless
on a motion to suppress under Rule 32.04(4) the
court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit 2 Page 72

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit 2 Page 73