# Exhibit 6

```
 1                UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
 5   SYLVESTER OWINO and JONATHAN    )
     GOMEZ, on behalf of themselves )
 6   and all others similarly       )
     situated,                      )
 7                                  )
             Plaintiffs,            )
 8                                  )
        vs.                         ) Case No. 3:17-CV-01112-
 9                                  ) JLS-NLS
     CORECIVIC, INC.,               )
10                                  )
             Defendants.            )
11   _____/   )
                                    )
12   CORECIVIC, INC.,               )
                                    )
13             Counter-Claimant,    )
                                    )
14        vs.                       )
                                    )
15   SYLVESTER OWINO and JONATHAN    )
     GOMEZ, on behalf of themselves )
16   and all others similarly       )
     situated,                      )
17                                  )
             Counter-Defendants.    )
18   _____/
19
          VIDEO-RECORDED DEPOSITION OF FRED FIGUEROA
20
               San Diego, California
21
          Tuesday, February 19, 2019
22
23   Reported by:
     BARBARA A. BAKER
24   RPR, CSR No. 13033
     Job No. 3225065
25   Pages 1 - 183
```

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
 5   SYLVESTER OWINO and JONATHAN   )
     GOMEZ, on behalf of           )
 6   themselves and all others     )
     similarly situated,           )
 7                                 )
                Plaintiff,         )
 8                                 )
        vs.                        )  Case No. 3:17-CV-01112-
 9                                 )  JLS-NLS
     CORECIVIC, INC.,              )
10                                 )
                Defendants.        )
11   _____/ )
                                   )
12   CORECIVIC, INC.,              )
                                   )
13              Counter-Claimant,  )
                                   )
14      vs.                        )
                                   )
15   SYLVESTER OWINO and JONATHAN  )
     GOMEZ, on behalf of           )
16   themselves and all others     )
     similarly situated,           )
17                                 )
                Counter-Defendants.)
18   _____/
19
20        Video-recorded deposition of FRED FIGUEROA, taken
21   on behalf of Plaintiffs at 3579 Valley Centre Drive,
22   Suite 300, San Diego, California, beginning at 9:31 a.m.
23   and ending at 3:04 p.m. on February 19, 2019, before
24   BARBARA A. BAKER, Certified Shorthand Reporter No.
25   13033.
```

                                                      Page 2

```
 1    APPEARANCES:
 2
 3    For Plaintiffs:
 4            FOLEY & LARDNER LLP
              BY:  J. MARK WAXMAN
 5            Attorney at Law
              3579 Valley Centre Drive
 6            Suite 300
              San Diego, California  92130
 7            858.847.6700
              858.792.6773  Fax
 8            mwaxman@foley.com
 9
10            FOLEY & LARDNER LLP
              BY:  ALAN R. OUELLETTE
11            Attorney at Law
              555 California Street
12            Suite 1700
              San Francisco, California  94104-1520
13            415.434.4484
14            415.434.4507  Fax
              aouellette@foley.com
15
              LAW OFFICE OF ROBERT L. TEEL
16            ROBERT L. TEEL, ESQ.
              1425 Broadway
17            Mail Code 20-6690
              Seattle, Washington  98122
18            866.833.5529
19            855.609.6911  Fax
20            lawoffice@rlteel.com
21            (Appearing via videoconference)
22
23
24
25
```

Page 3

```
1    APPEARANCES:
     (Continued)
2

3    For Defendant CoreCivic, Inc.:
4            STRUCK LOVE BOJANOWSKI & ACEDO, PLC
             BY:  ASHLEE B. HESMAN
5            Attorney at Law
             3100 West Ray Road
6            Suite 300
             Chandler, Arizona   85226
7            480.420.1600
             ahesman@strucklove.com
8

9    The Videographer:
10           JAKE THOMPSON, VERITEXT LEGAL SOLUTIONS
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 4
```

```
 1                    I N D E X
 2                                              Page
 3   EXAMINATION BY MR. WAXMAN                    9
 4
 5                  E X H I B I T S
 6
 7   NUMBER              DESCRIPTION            PAGE
 8   Exhibit 15 Otay Mesa Detention Facility, Detainee   36
                Admission and Orientation Handbook,
 9              Revised January 2019
10   Exhibit 16 Approved Work/Program Assignments,       85
                date:  6/30/17
11
     Exhibit 17 CoreCivic, Food Service Operations,      92
12              Facility Effective Date:  6/30/17
13   Exhibit 18 Sanitation and Hygiene, Daily           100
                Housekeeping Plan,
14              Effective Date:  09/01/15
15   Exhibit 19 Classification Plan Guidelines          104
16   Exhibit 20 Resident Work Agreement, Dining Hall    114
                Porter
17
     Exhibit 21 Resident Work Agreement, Buffer         117
18
     Exhibit 22 Resident Work Agreement, Pod Porter     117
19
     Exhibit 23 Resident Work Agreement, Recreation,    117
20              Windows, Barber's Responsibilities
21   Exhibit 24 Resident Work Agreement, Laundry        117
22   Exhibit 25 Executive Meeting Minutes, October 24,  120
                2016
23
     Exhibit 26 OMDC Department Head Meeting Agenda,    124
24              October 27, 2016
25

                                              Page 5
```

```
1                    E X H I B I T S
                      (Continued)
2
3    NUMBER              DESCRIPTION              PAGE
4    Exhibit 27  CCA/Otay Mesa Detention Facility,    132
                 Unit Staff Meeting Record,
5                Date: 11/22/16
6    Exhibit 28  CCA/Otay Mesa Detention Facility,    135
                 Unit Staff Meeting Record,
7                Date: 2/10/17
8    Exhibit 29  Award/Contract, Bates CCOG00006354 -  137
                 CCOG00006435
9
     Exhibit 30  E-mail from Mardysam Madrid to       149
10               Laronda Williams et al.,
                 dated 10/14/16
11
     Exhibit 31  E-mail from Dennis Morris RA to      153
12               Daniel Topasna, dated 10/17/16
13   Exhibit 32  E-mail from Richard Crouch to        156
                 Jarrett Williams, dated 1/24/17
14
     Exhibit 33  E-mail from Rupert Rivera to Fred    157
15               Figueroa, dated 10/27/16
16   Exhibit 34  E-mail from Kimberly Morales to      160
                 Darrick Gillespie, dated 1/19/17
17
     Exhibit 35  E-mail from Daniel Topasna to Billie  161
18               Handsbur, et al., dated 6/16/17
19   Exhibit 36  E-mail from Darrick Gillespie to     162
                 Zandro Blas, et al., dated 9/12/17
20
21             PREVIOUS EXHIBITS REFERENCED
22                 Exhibit      Page
23                    9         173
24
25
                                             Page  6
```

```
1        A    Yes, sir.

2        Q    Maybe you could walk us through what happens

3   from the moment a detainee arrives at the facility until

4   they are in their pod.

5        A    Okay.  Basically, they come in.  If they have    09:41:45

6   property, we go through their property.  They go through

7   a classification process.  Asked several questions.

8            Then they're seen by medical.  And once that

9   entire process is done, they are showered.  Allowed to

10  make a phone call, and then we move them to their         09:42:08

11  housing areas.

12       Q    As part of that, they're issued clothes?

13       A    Yes, they are issued clothes.

14       Q    Is everyone required to wear the clothes that

15  are issued?                                               09:42:22

16       A    Yes.

17       Q    And why is that?

18       A    It's our facility-issued clothes.  They have no

19  personal clothing that they take with them.

20       Q    And why is that?                                09:42:32

21       A    That is for security reasons and our procedure

22  and practices.

23       Q    Are they entitled to retain any personal

24  property?

25       A    No.  Unless it's medical, their glasses.  Some  09:42:52
```

Page 17

1    of them might have a C-PAP machine, and medical may

2    authorize that.

3        Q   And during the time of their residency there,

4    are they ever allowed to have any of their own personal

5    property?                                          09:43:16

6        A   No.

7        Q   So while you are a resident, you would get your

8    clothes, I guess, hygiene material.  And that would be

9    it?

10       A   Yes, sir, that's basically it.             09:43:34

11       Q   And if you wish to get more than that, you

12   would have an ability to buy it through the commissary?

13       A   Yes, sir.

14       Q   Is there a list of purchases by each of the

15   detainees while they are residents at the facility    09:43:54

16   through the commissary?

17       A   Yes.

18       Q   Is that maintained on a computer tape or

19   computer memory of some kind?

20       A   It's kept in the computer and also in their   09:44:05

21   files.

22       Q   Is it maintained for the duration of their

23   residency?

24       A   Yes.

25       Q   Do you know how long it's retained after they  09:44:15

Page 18

```
 1    leave?

 2        A    We have a retention policy.  And I want to say

 3    it's anywhere from three to five years we have to retain

 4    those records.

 5        Q    And they're all digitally retained?              09:44:27

 6        A    Or hard copied.

 7        Q    When the detainees leave the facility, where do

 8    they go?

 9            MS. HESMAN:   Foundation.

10            THE WITNESS:   It depends.  They might be          09:44:47

11    deported.  They might be street released.  And

12    basically, that is it.

13    BY MR. WAXMAN:

14        Q    Would they ever go to a prison or a jail?

15        A    They could be transferred to another facility.    09:45:10

16    Yes, sir, they could.

17        Q    Are you able to tell me the reasons why they

18    might be deported or street released or to another

19    facility?

20            MS. HESMAN:   Foundation.                          09:45:21

21            THE WITNESS:   The decision that ICE makes.

22    BY MR. WAXMAN:

23        Q    CoreCivic plays no role in that?

24        A    No, sir.

25    ///
```

Page 19

1      Q    Is there a minimum?

2      A    I would assume minimum of two.  But the maximum

3    is four.

4      Q    Why would you assume two?

5      A    Just it would take two detainees to do          10:02:33

6    everything that they're doing outside, at least a

7    minimum of two.

8      Q    What does an administrative porter do?

9      A    They clean the various offices both for ICE and

10   for CoreCivic, the courts, for everybody.              10:02:48

11     Q    Do they work in crews?

12     A    There's a morning crew, and then we have an

13   evening crew.

14     Q    You mentioned set hours.

15          Is that done weekly?  Monthly?  How does that    10:03:07

16   work?

17     A    For which?

18     Q    Does it vary?

19     A    Well, for the -- it depends on -- the kitchen

20   is 24/7.  The administrative crew is Monday through    10:03:17

21   Friday.

22     Q    And the outside?

23     A    The outside is Monday through Friday.

24     Q    Monday through Friday are fixed hours every

25   day?                                                   10:03:38

                                                    Page 33

```
1        A    Yes.  7:30 to 3:00 for the outside crew.

2        Q    And is there a lunch break in the middle?

3        A    Yes.

4        Q    What about other breaks?  Are there any others?

5        A    When the officer takes his break, yes, there      10:03:56

6    may be a break for them, too.

7        Q    But no regularly scheduled break?

8        A    Just the lunch break.

9        Q    And the administrative porter staff, what are

10   their hours?                                               10:04:11

11       A    For the day crew, 7:30 to 3:00.  And then the

12   evening crew is pretty much 11:00 to maybe 3:00 o'clock

13   in the morning.

14       Q    And what do they do?

15       A    They clean up mainly the corridors in the main    10:04:34

16   hallway, the staff restrooms down on the first floor,

17   the lobby.

18       Q    Do they report to any one individual in

19   particular?

20       A    There is a detention officer that carries that    10:04:56

21   crew, yes.

22       Q    So one detention officer in the morning, one on

23   the night shift?

24       A    Yes.

25       Q    And the kitchen workers, you said 24/7.           10:05:10
```

Page 34

```
 1        Q    Are there other areas of the facilities where

 2   there's been a shortage of detainee workers?

 3            MS. HESMAN:  Form.  Foundation.

 4            THE WITNESS:  Yes.  It seems like every area of

 5   the facility.  I know we lost a lot of the detail      10:28:33

 6   workers, the administrative workers, and the outside

 7   detail workers, too.

 8   BY MR. WAXMAN:

 9        Q    And when that happens, who does their work?

10        A    Staff will do their work or even whatever is   10:28:48

11   left on the crew.

12        Q    When you say staff, you mean the detention

13   officers?

14        A    The detention officers, yes.

15        Q    I'm sorry.  And so that would be for outside   10:29:00

16   workers, kitchen workers, to name two groups?

17        A    Yes.

18        Q    Is your staff unionized?

19        A    No.

20        Q    'And in terms of, I guess, detention officers,  10:29:28

21   how many are in the facility?

22        A    My complement is 261 detention officers.

23        Q    Are those slots, or are those actual people?

24        A    No.  That's the total number I can have as my

25   complement.                                             10:29:52
```

Page 52

```
1        Q    So that would be --

2        A    We have --

3        Q    I'm sorry.

4        A    We have approximately 359 -- or 259, I mean.

5   I'm sorry.                                        10:30:05

6        Q    So you're budgeted, if you will, for 261.  And

7   you actually have 259?

8        A    Yes.

9        Q    And what's their range of compensation?

10       MS. HESMAN:  Form.                           10:30:17

11       THE WITNESS:  What do you mean, "their range of

12   compensation"?

13   BY MR. WAXMAN:

14       Q    What do they get paid?

15       A    33.84 an hour.                          10:30:22

16       Q    Does that include benefits?

17       A    No.

18       Q    So what would the benefits be?

19       A    No.  That includes everything, yes.  Benefits.

20   Everything.                                      10:30:40

21       Q    So that's an all-in number?

22       A    Yes.

23       Q    Are there people, other than detention

24   officers, who perform some of the administrative work?

25       MS. HESMAN:  Form.                           10:30:57

                                                    Page 53
```

```
1              THE WITNESS:  Administrative clerks.

2    BY MR. WAXMAN:

3         Q    How many of those are in the facility?

4         A    I have nine, if memory serves me correctly.

5         Q    And what do they get paid?              10:31:09

6         A    Fifteen and some change.

7         Q    Again, that's an all-in number?

8         A    Yes, sir.

9         Q    Does compensation for those folks go up by a

10   cost of living every year?                         10:31:33

11        A    It depends.  We are a wage-an-hour facility.

12        Q    What does that mean?

13        A    The federal government, if they get a raise,

14   then the staff will get a raise.

15        Q    So it's pegged to changes in federal       10:31:47

16   compensation system?

17        A    Yes.

18        Q    If Congress says, for example, it goes up

19   1.9 percent, all of the -- all of the folks working in

20   the facility would also go up 1.9 percent?          10:32:00

21        A    Yes.

22        Q    I know that because my son just told me that.

23             MR. WAXMAN:  I'll tell you.  Why don't we take

24   a ten-minute break, if that's okay.

25             THE WITNESS:  Okay.                        10:32:12

                                           Page 54
```

1      Q    So there's a work detail individual who sits at

2   or is responsible for every table?

3      A    Yes.

4      Q    I guess when you say that, the head of the

5   line, is that so that they will be ready to clean it up?   10:47:40

6      A    They'll be ready to clean once they eat, while

7   the others are eating.  And as they're getting up,

8   they'll go and start cleaning those tables for the next

9   pod that is coming in.

10     Q    And once you leave the dining area, as I          10:47:58

11  understand it from the bottom of this page, you can't

12  take any food with you?

13     A    That's correct.

14     Q    So is the only way that you can get food

15  between meals is by buying it through the commissary?     10:48:08

16     A    Yes.

17     Q    And in terms of the food that's available

18  through the commissary, is it same as you would eat at

19  the dining hall, or is it something different?

20     A    That's different.                                 10:48:23

21     Q    How so?

22     A    They're more snacks, chips, breakfast cereal

23  bars; that kind of stuff.

24     Q    So in order to get food from the commissary,

25  you need to have a bank account?                          10:48:41

Page 57

```
 1        A    Yes.

 2        Q    If you don't have a bank account, not available

 3   to you?

 4        A    Correct.

 5        Q    And the only way you get a bank account is by      10:48:47

 6   either working or having somebody outside the facility

 7   fill the account for you?

 8        A    Yes, sir; that's correct.

 9        Q    So if you don't have someone outside the

10   facility and you don't work, then you wouldn't have any    10:49:05

11   money to get commissary items?

12        A    Correct.

13        Q    Do you know what portion of the detainees have

14   outside resources to contribute to funds?

15        A    No, I don't.                                      10:49:20

16        Q    Do most of the -- maybe withdraw that.

17             Can you give us some estimate of the number of

18   detainees who come into the facility and have funds on

19   them that go into a bank account?

20        A    No.  I'd be guessing if I told you.              10:49:35

21        Q    So you could go look at the bank account

22   records, though, and that would tell you who had money

23   coming in?

24        A    Yes.

25        Q    And how often some third party funded their      10:49:49
```

Page 58

```
 1    account?

 2        A    Yes.

 3        Q    And there's a limit on how much they can fund

 4    in the account?

 5        A    That, I don't recall.  I know -- I can tell you      10:49:58

 6    about Tallahatchie, but I can't tell you about this

 7    facility.

 8        Q    Okay.  How are the prices set for commissary

 9    items?

10            MS. HESMAN:  Form.  Foundation.                        10:50:19

11            THE WITNESS:  The prices are set by our

12    corporate office, FSC, facility support center.

13    BY MR. WAXMAN:

14        Q    And do you know how they're set?

15        A    No.                                                   10:50:32

16        Q    Are there hygiene items you can buy from the

17    commissary area?

18        A    Yes.

19        Q    What would those be?

20        A    Deodorant sticks, bars of soap, shampoo,             10:50:42

21    toothpaste.

22        Q    Do you know what a bar of soap costs?

23        A    No, I don't.

24        Q    I assume there's a price list?

25        A    Yes.                                                  10:50:57
```

Page 59

```
1            Where else did I see?  Where it says Socks,
2     they can actually have their own socks.  But we also
3     issue socks.
4        Q    Uh-huh.  Households items.  Are those issued or
5     have to be bought?                              11:26:06
6        A    Those are bought.
7        Q    Religious items?
8        A    Those are bought.
9        Q    Just put a fine point on it.  If I come in
10    wearing a wedding band, do I get to keep it, or is it    11:26:23
11    also stored?
12       A    No, sir.  You get to keep it.
13       Q    I take it the religious items, that's true with
14    all of those?
15       A    Yes.                                    11:26:34
16       Q    The electrical audio, those I have to buy?
17       A    We do issue radios to indigent inmates.
18       Q    But if you're not indigent --
19       A    You can buy them.
20       Q    -- with respect to audio, if you want them, you    11:26:47
21    buy them?
22       A    Yes, sir.
23       Q    Same thing is true with recreational?
24       A    Yes.
25       Q    The hygiene items, other than the last line,    11:26:57
```

Page 84

```
 1    hygiene products and commissary, all of those furnished,

 2    or do I have to buy those?

 3        A    You can buy those.

 4        Q    Do I get them if I don't buy them?

 5        A.   No.  You get toothpaste, shampoo, soap.        11:27:10

 6        Q    That's it?

 7        A    Yes.

 8        Q    And if I run out of one of those things?

 9        A    Then you just ask the officer.

10        Q    Automatically, or is --                         11:27:25

11        A    Yes.

12        Q    -- every Monday or?

13        A    It's twice a week.  But if I know you don't

14    have it, and I shake your cell down, and I see you don't

15    have it, then you're going to get it.                    11:27:36

16        Q    We are done with that exhibit.  Give that to

17    the court reporter.  Put that aside.

18            MR. WAXMAN:  I have put in front of you what

19    we've now marked as Exhibit 16.

20            (Exhibit 16 marked)                              11:29:04

21    BY MR. WAXMAN:

22        Q    Can you tell us what is on this document?

23        A    This is basically the custody category and the

24    various jobs that are available.

25        Q    Available to detainees as work?                 11:29:26
```

Page 85

1    BY MR. WAXMAN:

2        Q    And what is a C7?

3        A    It's a disciplinary charge, un-excused absence.

4        Q    And would this recommendation come up to you

5    for approval, or is it someone else?                14:03:24

6        A    No.  It's someone else that -- the unit manager

7    can make that decision.

8            MS. HESMAN:  Is now a good time for a quick

9    break?

10           MR. WAXMAN:  You bet.  Sure.                14:03:40

11           MS. HESMAN:  Thanks.

12           THE VIDEOGRAPHER:  The time is 2:03 p.m.  We

13   are off the record, ending media number four.

14           (Recess)

15           THE VIDEOGRAPHER:  The time is 2:08 p.m.  We    14:08:34

16   are now back on the record, beginning media number five.

17   BY MR. WAXMAN:

18       Q    Just to take a step back with respect to the

19   work program.  I just want to confirm that CoreCivic

20   decides how much each of the detainees will get paid for  14:08:55

21   the work they do.

22           MS. HESMAN:  Form.

23           THE WITNESS:  No, we don't.

24   BY MR. WAXMAN:

25       Q    Okay.  Who decides that?                   14:09:01

Page 151

```
 1        A    It's in the standards what we pay.

 2        Q    The $1.50 is in the standards?

 3        A    No.  The dollar, the minimum of a dollar.

 4        Q    But that's a minimum; right?

 5        A    Yes.                              14:09:13

 6        Q    So has anyone ever told you you couldn't pay

 7   more?

 8        A    No.

 9        Q    And you decided how much they would actually

10   get over the minimum?                      14:09:21

11        A    Yes.

12        Q    And you decide what their hours are?

13        A    Well, the department does, yes.

14        Q    Okay.  So you decide what training they will

15   receive?                                   14:09:34

16        A    Yes.

17        Q    And you do performance reviews?

18        A    Yes.

19        Q    And performance can lead to a bonus?

20        A    Yes.                             14:09:45

21        Q    Poor performance can lead to termination?

22        A    Correct.

23        Q    And in terms of those who might volunteer to

24   work, you decide who actually gets to work?

25        A    When you say --                  14:09:59
```

                                           Page 152

```
 1        Q    Just because I volunteer doesn't mean I get the

 2   job I want?

 3        A    Correct.

 4        Q    It doesn't necessarily mean I get to work at

 5   all?                                              14:10:10

 6        A    Correct.

 7        Q    And at all times I'm working, I'm supervised?

 8        A    Yes.

 9        Q    It might be direct supervision or even

10   intermittent?                                     14:10:23

11        A    Correct.

12        Q    But everybody is supervised?

13        A    Correct.

14        Q    For the entire time they are working?

15        A    Yes.                                    14:10:30

16        Q    And for anyone who works, the work they do is

17   documented?

18        A    Yes.

19        Q    Okay.

20             MR. WAXMAN:  If you would take a look at  14:10:44

21   Exhibit 31.

22             (Exhibit 31 marked)

23   BY MR. WAXMAN:

24        Q    What is that?

25        A    It's an e-mail from Warden Morris to Topasno.  14:10:56
```

Page 153

```
1                          DECLARATION

2

3

4            I hereby declare I am the deponent in the

5    within matter; that I have read the foregoing deposition

6    and know the contents thereof.  And I declare that the

7    same is true of my knowledge except as to the matters

8    which are therein stated upon my information or belief.

9    And as to those matters, I believe it to be true.

10           I declare under the penalties of perjury of

11   the State of California that the foregoing is true and

12   correct.

13           Executed on the _____ day of

14   _____, 2019, at _____,

15   California.

16

17

18                   _____

19                         FRED FIGUEROA

20

21

22

23

24

25

                                             Page 182
```

```
1                            CERTIFICATE
2           I, the undersigned, a Certified Shorthand
3    Reporter of the State of California, do hereby
4    certify:
            That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that any witnesses in the foregoing proceedings,
7    prior to testifying, were administered an oath; that
8    a record of the proceedings was made by me using
9    machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is a
11   true record of the testimony given.
12          Further, that if the foregoing pertains to the
13   original transcript of a deposition in a Federal Case,
14   before completion of the proceedings, review of the
15   transcript [] was [] was not requested.
16          I further certify I am neither financially
17   interested in the action nor a relative or employee of
18   any attorney or any of the parties.
19          IN WITNESS WHEREOF, I have this date subscribed
20   my name.
21   Dated:  February 22, 2019
22
23
24        Barbara A. Baker
25        BARBARA A. BAKER, RPR, CSR No. 13033

                                         Page 183
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit 6 - Page 152

```
                    VERITEXT LEGAL SOLUTIONS
          COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

     Veritext Legal Solutions represents that the
     foregoing transcript is a true, correct and complete
     transcript of the colloquies, questions and answers
     as submitted by the court reporter. Veritext Legal
     Solutions further represents that the attached
     exhibits, if any, are true, correct and complete
     documents as submitted by the court reporter and/or
     attorneys in relation to this deposition and that
     the documents were processed in accordance with
     our litigation support and production standards.

     Veritext Legal Solutions is committed to maintaining
     the confidentiality of client and witness information,
     in accordance with the regulations promulgated under
     the Health Insurance Portability and Accountability
     Act (HIPAA), as amended with respect to protected
     health information and the Gramm-Leach-Bliley Act, as
     amended, with respect to Personally Identifiable
     Information (PII). Physical transcripts and exhibits
     are managed under strict facility and personnel access
     controls. Electronic files of documents are stored
     in encrypted form and are transmitted in an encrypted
     fashion to authenticated parties who are permitted to
     access the material. Our data is hosted in a Tier 4
     SSAE 16 certified facility.

     Veritext Legal Solutions complies with all federal and
     State regulations with respect to the provision of
     court reporting services, and maintains its neutrality
     and independence regardless of relationship or the
     financial outcome of any litigation. Veritext requires
     adherence to the foregoing professional and ethical
     standards from all of its subcontractors in their
     independent contractor agreements.

     Inquiries about Veritext Legal Solutions'
     confidentiality and security policies and practices
     should be directed to Veritext's Client Services
     Associates indicated on the cover of this document or
     at www.veritext.com.
```

Exhibit 6 - Page 153