# Exhibit 7

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3          CASE NO. 3:17-CV-01112-JLS-NLS

4          JUDGE HON. JANIS L. SAMMARTINO

5          MAGISTRATE HON. NITA L. STORMES

6

7                    CLASS ACTION

8    SLYVESTER OWINO AND JONATHAN GOMEZ, ON BEHALF OF

9    THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

10        PLAINTIFFS

11

12        V.

13

14   CORECIVIC, Inc.

15        DEFENDANT

16   ------------------------------------------------

17

18          DEPONENT: TROY G. POLLOCK

19          DATE:     FEBRUARY 26, 2019

20

21

22   REPORTER:

23   KELLEY BOHAN

24   JOB NO. 3225917

25   PAGES 1 - 203

                                        Page 1

```
1                    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, SLYVESTER OWINO,

4    ET AL.:

5          BY:  GEOFFREY RAUX

6          FOLEY & LARDNER, LLP

7          111 HUNTINGTON AVENUE

8          BOSTON, MASSACHUSETTS 02199

9          TELEPHONE NO.  (617) 342-4000

10         FACSIMILE NO.  (617) 342-4001

11         E-MAIL: GRAUX@FOLEY.COM

12

13           - AND  -

14

15         BY:  ROBERT L. TEEL, PRESENT

16              VIA VIDEOCONFERENCE

17         THE LAW OFFICE OF ROBERT L. TEEL

18         207 ANTHES AVENUE, SUITE 201

19         LANGLEY, WASHINGTON 98260

20         TELEPHONE NO.  (866) 833-5529

21         FACSIMILE NO.  (855) 609-6911

22         E-MAIL:  LAWOFFICE@RLTEEL.COM

23

24

25

                                        Page 2
```

```
 1                    APPEARANCES CONTINUED

 2

 3   ON BEHALF OF THE DEFENDANT, CORECIVIC, Inc.:

 4          BY:   DANIEL P. STRUCK

 5          STUCK LOVE BOJANOWSKI & ACEDO, PLC

 6          3100 WEST RAY ROAD, SUITE 300

 7          CHANDLER, ARIZONA 85226

 8          TELEPHONE NO.   (480) 420-1601

 9          FACSIMILE NO.   (480) 420-1696

10          E-MAIL:   DSTRUCK@STRUCKLOVE.COM

11

12   ALSO PRESENT: ELIZABETH HARLOW, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 3
```

```
1                        INDEX

2                                         Page

3    PROCEEDINGS                           7

4    DIRECT EXAMINATION BY MR. RAUX        9

5

6

7

8                       EXHIBITS

9                                          Page

10   Exhibit 49 - NOTICE OF DEPOSITION              9

11   Exhibit 50 - RECEPTION AND ORIENTATION, POLICY 17-100 38

12   Exhibit 51 - SANITATION AND HYGIENE, POLICY 12-100   54

13   Exhibit 52 - RESIDENT RULES AND DISCIPLINE,

14              POLICY 15-100                       69

15   Exhibit 53 - SPECIAL MANAGEMENT RESIDENT,

16              POLICY 10-100                       81

17   Exhibit 54 - INMATE RESIDENT GRIEVANCE PROCEDURE,

18              POLICY 14-5                         95

19   Exhibit 55 - RESIDENT WORK PROGRAM, POLICY 19-100   117

20   Exhibit 56 - FOOD SERVICE OPERATIONS, POLICY 11-1   130

21   Exhibit 57 - POST ORDERS, FOOD SERVICE          140

22   Exhibit 58 - DETAINEE HANDBOOK SUPPLEMENT        144

23   Exhibit 59 - INMATE/DETAINEE COMMITMENT PACKET,

24              MOHAMED A. DIRIE                     159

25

                                           Page 4
```

```
1                      EXHIBITS CONTINUED

2                                                    Page

3   Exhibit 60 - INMATE/DETAINEE COMMITMENT PACKET,

4                NARCISCO B. MARTINEZ                 168

5   Exhibit 61 - INMATE/DETAINEE COMMITMENT PACKET,

6                OSCAR D. DURAN                       173

7   Exhibit 62 - OFFICE OF INSPECTOR GENERAL REPORT;

8                DECEMBER 11, 2017                    185

9   Exhibit 63 - FREEDOM OF INFORMATION ACT REQUEST  191

10  Exhibit 64 - HUMAN TRAFFICKING, POLICY 3-38      200

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 5
```

```
 1                          STIPULATION

 2

 3    The deposition of TROY G. POLLOCK taken at the offices

 4    of Kentuckiana Court Reporters, 175 East Main Street,

 5    Suite 105, Lexington, Kentucky on Tuesday the 26th day

 6    of February, 2019 at approximately 9:11 a.m.  Said

 7    deposition was taken pursuant to the United States

 8    District Rules of Civil Procedure.

 9

10    It is agreed that Kelley Bohan, being a Notary Public

11    and Court Reporter for the State of Kentucky, may swear

12    the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 6
```

1    porters, bathroom porters, the day room area porters,

2    and then the floors in the -- so if you're in an open

3    unit, so you're in an open unit, the entire floor area

4    that they would be required to sweep and mop that area,

5    dusting of all the common areas, cleaning of the

6    microwaves, cleaning of the sinks, sanitizing those

7    areas, sanitizing the bathrooms.

8        Q.   What about the recreation area, is that

9    cleaned?

10       A.   Yes.  And then there are porters that are

11   assigned in that that work out there that has those

12   cleaning duties.

13       Q.   Who does all the cleaning in the various areas

14   within the facility?

15       A.   It depends on the area because there are areas

16   that are restricted to staff only.  In those areas, then

17   the staff clean those areas.

18       Q.   So the detainees don't do any of that?

19       A.   Correct.

20       Q.   And are detainees doing the cleaning in other

21   areas?

22       A.   Yes.

23       Q.   And who cleans the areas that are restricted?

24       A.   The officers do.

25       Q.   Are the cleaning functions in those areas

Page  53

1    different than the cleaning functions performed by the

2    detainees in other areas?

3         A.   No.

4         Q.   Are any outside contractors brought in to do

5    any of the cleaning work?

6         A.   No.

7         Q.   What about general maintenance and upkeep of

8    the facility the painting and things like that?

9         A.   Detainees will paint if it's a non-restricted

10   area.  If it's a restricted area, then staff will paint

11   or contractors.

12              (EXHIBIT 51 MARKED FOR IDENTIFICATION)

13        Q.   I'm handing you what's been marked as Exhibit

14   51 which is the sanitation and hygiene policy, Policy

15   12-100.  Are you familiar with this policy?

16        A.   I am.

17        Q.   In the first section 12-100.1 second sentence

18   states weekly, monthly sanitation inspections will be

19   conducted by designated staff members to ensure a high

20   level of sanitation.  Who conducts these inspections?

21        A.   The unit staff.  The chiefs.

22        Q.   Where in the facility are they conducted?

23        A.   Excuse me?

24        Q.   Where in the facility are they conducted?

25        A.   In all the housing units in all the areas.

                                        Page 54

1    where you walk to get to your area, that's a common

2    area.  The area -- the sink area, the bathroom area, the

3    shower area that's all common areas.

4        Q.   In the cell-style units, everything outside

5    the cell?

6        A.   Everything, correct.

7        Q.   Everything, okay.  There's a reference in the

8    definition it talks about inmate resident and I think it

9    just says there they can be referred to as detainees,

10   prisoners, offenders.  In your time with the company,

11   you've worked in certain facilities they have, those in

12   criminal custody and also those in immigration custody;

13   is that right?

14       A.   Yes.

15       Q.   Is there a distinction between the different

16   types of residents in terms of how the company handles

17   their detention?

18            MR. STRUCK:  Form, foundation.

19       A.   I don't know.  I can only speak to where I

20   worked.

21       Q.   From your personal experience?

22       A.   If you can ask me specifically about the place

23   I've worked, I can answer that.

24       Q.   Sure.  About the places -- that's what I'm

25   asking about your personal experience, places you

                                          Page 56

```
 1    worked, is there a difference in terms of how the

 2    company handles the detention of these different

 3    inmates?

 4          MR. STRUCK:  Form, foundation.

 5      A.   So the prior places to coming to the detention

 6    center have all been inmates, state inmates, convicted

 7    felons, so I mean, what -- I guess I need a little bit

 8    more what you're asking?

 9      Q.   Is there a difference in approach in terms of

10    how you're handling their detention or is it similar to

11    what's done at Stewart?

12          MR. STRUCK:  Form and foundation.

13      A.   My job at each one of these places has been to

14    provide a safe and secure environment and met the basic

15    needs, life safety needs of whether they're inmates or

16    detainees so they're treated the same.

17      Q.   And are the daily experiences of the different

18    detainees or inmates, are they similar or different?

19          MR. STRUCK:  Form.

20      Q.   In your experience?

21          MR. STRUCK:  Form and foundation.

22      A.   It depends on, again, what facilities it is.

23    Some facilities have different programs that they

24    require educational things, vocational things, depending

25    on which facility you have.
```

Page 57

1      Q.   And I'm asking about the different facilities

2  you've been.  Are they generally similar or no?

3      A.   Each of them --

4           MR. STRUCK:  Form and foundation.

5      A.   They're generally similar.

6      Q.   Okay.  So in 12-100-4 this is the procedure

7  section on the same page.  It references common living

8  areas and says that all inmates/residents assigned to a

9  unit are responsible for maintaining the common living

10  area in a clean and sanitary manner.  So is everybody in

11  the unit that's housed there equally responsible for

12  keeping the common areas clean?

13      A.   Yes.

14      Q.   There's a reference in subparagraph four.  The

15  inmate resident workers will be assigned to each area on

16  a regular basis to perform the daily cleaning routine of

17  the common area.  How are these workers selected?

18      A.   They volunteer.  They submit a request to

19  their unit managers stating that they would like to have

20  a job.  Some of them will just say they'd like to have a

21  job.  Some of them will be specific and say I would like

22  to have a job as this.  And then that goes through the

23  process to make sure that they don't have any

24  disqualifying issues to keep them from getting that job

25  and then they're hired for the job.  And then they go

Page 58

1    than on your scheduled laundry day?

2        A.   I don't know.

3        Q.   Section I 5 here, it talks about some cleaning

4    that's done in the laundry area.  Do you know who does

5    that cleaning?

6        A.   Laundry workers.

7        Q.   And are those detainees?

8        A.   Yes.

9        Q.   And are they paid for that work?

10       A.   Yes.

11       Q.   Do you know how much?

12       A.   No.

13       Q.   Section J sanitation of mattresses and

14    pillows.  Who does the cleaning of that work or of those

15    items?

16       A.   I'm not sure.

17       Q.   Okay.  Do you know if that's paid work?

18       A.   Yes.

19       Q.   Okay.  Let's talk a little bit now about

20    disciplinary policy and procedures at Stewart.  Is

21    discipline an important aspect of the facilities

22    operations?

23       A.   Rules are.

24       Q.   Okay.  Why is that?

25       A.   Well, every institution or every organization

Page 66

1   has to have rules to go by in order to maintain a safe

2   and secure environment for the detainees and staff and

3   the public.

4        Q.   Is there a concern with respect to the

5   behavior of the detainees?

6        A.   What do you mean by concern?

7             MR. STRUCK:  Object to the form.

8        Q.   Is that a problem that is anticipated?

9             MR. STRUCK:  Form, foundation.

10       A.   I'm still -- I still don't understand.  I

11  mean, by nature, what we're doing, we're a detention

12  facility that nobody wants to be in.  So does that

13  heighten our alertness?  Yes.  Nobody wants to be there.

14       Q.   And because they don't want to be there, that

15  raises a concern, why?

16            MR. STRUCK:  Form and foundation.

17       A.   So if a person does not want to be somewhere,

18  usually they don't always act appropriately.

19       Q.   The inmate -- or the detainees, sorry, at

20  Stewart are not in criminal custody, correct?

21            MR. STRUCK:  Foundation.

22       A.   Currently, no.  Some of them do have criminal

23  backgrounds and have come straight to us from prison

24  after they have done their prison time.

25       Q.   What's the objective for the disciplinary

                                              Page  67

1    then inside their institutional file, it's maintained in

2    records.

3        Q.   And does the facility keep a separate copy of

4    these records at all?

5        A.   What do you mean keep?  We maintain the

6    records.

7        Q.   Yes.  You maintain them outside of the

8    detainee's file?

9        A.   I don't know.

10       Q.   Okay.  I'm looking at page 7986, which is --

11   it talks about notice to detainees of prohibited acts.

12   How are you detainees made aware of prohibited acts and

13   the consequences for them?

14       MR. STRUCK:   Form.

15       A.   So they're provided the handbook which states

16   all the rules in there and the consequence for breaking

17   those rules.

18       Q.   During your time at Stewart, were all the

19   detainees, in your experience, adequately informed of

20   the rules and consequences for those?

21       A.   To my knowledge.

22       Q.   Staying in section M here, take a moment to

23   look it over if you need, but paragraphs 3 through 7

24   essentially concern assistance to detainees either with

25   disabilities or language barriers, things of that sort.

Page 80

1        A.    Yes.

2        Q.    Has the Voluntary Work Program been in place

3   at Stewart for your entire time there?

4        A.    Yes.

5        Q.    What's the objective of the program?

6        A.    To maintain the sanitation of the facility to

7   operate the basic -- how do I want to say that -- the

8   basic needs parts of it of providing food three meals a

9   day for the detainees and laundry services for the

10  detainees, to give the detainees something to do because

11  we do not have any educational programs in the detention

12  center, so we really don't have anything for them to do

13  other than recreation, so to provide them something to

14  do and to give them a little bit of spending money.

15       Q.    Okay.  What jobs are available to detainees at

16  Stewart?

17       A.    I'm not sure of every job that we have listed.

18  There's a list of every job.  I can give you a

19  generalization.

20       Q.    Sure.

21       A.    So sanitation workers throughout the facility

22  in the different areas, the living units, the common

23  areas, such as the recreation area, the chapel, the

24  hallways in the main building, laundry workers, as I

25  mentioned earlier.  The kitchen, the dining room,

                                              Page 106

```
 1        A.    The kitchen workers, I believe, are the only
 2   ones that can get the $4 an hour because we were having
 3   a hard time staffing, getting detainees to work in the
 4   kitchen, to keep the detainees.  So to entice them,
 5   I know the pay was up to $4 an hour.
 6        Q.    What happens if you don't have enough
 7   detainees to fill a particular role?
 8             MR. STRUCK:  Form.
 9        A.    A role in what?
10        Q.    So kitchen, for example, even if the $4 is not
11   enough, what would you do in that circumstances?
12        A.    Then staff would do it.
13        Q.    Okay.  Are detainees ever compensated by means
14   other than money?
15        A.    Yes.
16        Q.    In what ways?
17        A.    In such as bonuses, we would give them bonuses
18   if they -- like painting, we talked earlier about
19   painting, we got volunteers to paint so that was outside
20   of their normal job duties.  Then we would pay them in
21   the form of phone card time, so anywhere between $5 and
22   $20 depending on how long they worked.
23        Q.    What about privileges, are detainees ever
24   given additional privileges for their work?
25        A.    No.
```

Page 112

1    Q.   What's the next page?

2    A.   This is the investigation.

3    Q.   45468, sorry.

4    A.   This is the investigation report.

5    Q.   Who does this?

6    A.   The supervisor that does the investigation.

7    Q.   In your view, is this sufficient detail for an

8    investigation report?

9    A.   Well, again, this one was pretty cut and dry.

10   There's not a lot to investigate, either he had his area

11   clean or he didn't have his area clean.  It's the most

12   simple basic thing.  It's a very low category of 400,

13   you know, could the staff member have be a little more

14   informative?  Yes.

15   Q.   All right.  So next page 45469, what is this

16   showing?

17   A.   This is where the unit staff member had the

18   hearing.

19   Q.   Where can you tell from this that a hearing

20   was conducted?

21   A.   So if you look in the middle section, it is

22   the finding of disciplinary committee that you committed

23   a prohibited act of 4-13.

24   Q.   I'm with you?

25   A.   And committee findings are based on the

Page 170

1  following, based on the description of the incident and

2  detainee's statement and was sanctioned to loss of

3  privileges, loss of commissary October 7th to October

4  21st.

5      Q.   So I'm asking you how do we know a hearing was

6  conducted in this case?

7      A.   Because this form is filed out and supervisor

8  signed it.

9      Q.   So when these forms are filed out, they're

10 filled out in response to a hearing?

11     A.   Correct.

12     Q.   Okay.  Is this finding adequately supported?

13     A.   Yes.

14     Q.   By the documentation review?

15     MR. STRUCK:  Form.

16     A.   Yes, the officer's statement is that he did

17 not clean his area, that he was told to clean his area

18 and he failed to do so.

19     Q.   Right.  And he stated he did clean his area

20 and it was clean?

21     A.   Right.

22     Q.   That's all we have at least that I'm seeing

23 here, so my question was: Is that sufficient?

24     A.   It is sufficient.

25     Q.   Why is that sort of?

Page 171

1      A.   Why is that sufficient?

2      Q.   Yeah.

3      MR. STRUCK: Form.

4      A.   And I can't remember the exact ruling, but the

5  Supreme Court ruled that in a correctional setting, you

6  only need some evidence to convict an inmate or detainee

7  on an internal disciplinary hearing.  Some evidence is

8  the officer's statement.  The officer witnessed it, the

9  officer's statement is enough to convict.

10     Q.   So that's the approach that would be used?

11     A.   That's correct.

12     Q.   Would you have had expected, in a case like

13  this, there to be some sort of photo evidence if

14  presented?

15     A.   No.

16     Q.   Would you expect any testimony from other

17  witnesses?

18     A.   No.

19     Q.   Okay.  Turn to 45488.  This a detainee

20  Voluntary Work Program agreement.  My question is:  Is

21  there a separate document that tells the specific rate

22  of pay that a detainee would have for his job?

23     A.   I'm not sure.

24     Q.   Okay.

25     MR. STRUCK:  I'm sorry, other than this

Page 172

```
1                    CERTIFICATE OF REPORTER
2              COMMONWEALTH OF KENTUCKY AT LARGE
3
4     I do hereby certify that the witness in the foregoing
5     transcript was taken on the date, and at the time and
6     place set out on the Title page here of by me after
7     first being duly sworn to testify the truth, the whole
8     truth, and nothing but the truth; and that the said
9     matter was recorded stenographically and mechanically by
10    me and then reduced to type written form under my
11    direction, and constitutes a true record of the
12    transcript as taken, all to the best of my skill and
13    ability. I certify that I am not a relative or employee
14    of either counsel, and that I am in no way interested
15    financially, directly or indirectly, in this action.
16
17
18
19
20
21    _____
22              KELLEY BOHAN,
23         COURT REPORTER / NOTARY
24    MY COMMISSION EXPIRES ON: 05/19/2020
25         SUBMITTED ON: 03/01/2019

                                        Page 203
```

Kentucky Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

RULE 30.05: Submission to witness; changes;

signing.  Any party to an action may make written

request before the officer taking a deposition therein

that it be submitted to the witness.  In such event,

and when the testimony is fully transcribed the

deposition shall be submitted to the witness

for examination and shall be read to or by

him. Any changes in form or substance which

the witness desires to make shall be entered

upon the deposition by the officer with a

statement of the reasons given by the witness

for making them. The deposition shall then be

signed by the witness,unless the witness is

ill or cannot be found or refuses to sign. If

the deposition is not signed by the witness,

the officer shall sign it and state on the

record the fact of the illness or absence of

the witness or the fact of the refusal to sign

together with the reason, if any, given therefor;

Exhibit 7 - Page 174

and the deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 32.04 the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit 7 - Page 175

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit 7 - Page 176