STRUCK LOVE BOJANOWSKI & ACEDO, PLC
Daniel P. Struck, AZ Bar #012377
*(admitted pro hac vice)*
Rachel Love, AZ Bar #019881
*(admitted pro hac vice)*
Nicholas D. Acedo, AZ Bar #021644
*(admitted pro hac vice)*
Ashlee B. Hesman, AZ Bar #028874
*(admitted pro hac vice)*
Jacob B. Lee, AZ Bar #030371
*(admitted pro hac vice)*
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Tel.:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com

LAW OFFICE OF ETHAN H. NELSON
Ethan H. Nelson, CA Bar #262448
4 Park Plaza, Suite 1025
Irvine, California 92614
Tel.: (949) 229-0961
Fax: (949) 861-7122
ethannelsonesq@gmail.com

Attorneys for Defendant/Counter-Claimant
CoreCivic, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated,<br><br>                  Plaintiffs,<br><br>v.<br><br>CoreCivic, Inc., a Maryland corporation,<br><br>                  Defendant. | Case No. 3:17-cv-01112-JLS-NLS<br><br>**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: August 22, 2019<br>Time: 2:00 pm<br>Courtroom: 4D<br>Judge:  Hon. Janis L. Sammartino |

1  CoreCivic, Inc., a Maryland
   corporation,

2
                          Counter-Claimant,

3
   v.

4
   Sylvester Owino and Jonathan Gomez,
5  on behalf of themselves, and all others
   similarly situated,

6
                          Counter-Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................1

I.    Relevant Facts ..........................................................................................1

    A.    CoreCivic's Contractual Relationship with Ice ......................1

    B.    Relevant CoreCivic Facility Policies ....................................3

        1.    Sanitation Policies ......................................................3

        2.    Disciplinary Policies...................................................5

        3.    Clothing, Hygiene, and Commissary Policies............7

        4.    Voluntary Work Program ..........................................10

II.    Plaintiffs' Class Claims ..........................................................................12

LEGAL ARGUMENT .......................................................................................13

I.    The Proposed Basis Necessities Classes Are Not Certifiable
Because They Were Not Alleged in the Complaint ................................13

II.    None of the Putative Classes Should Be Certified ................................14

    A.    Ascertainability .....................................................................14

        1.    The Class Definitions Are Over-Inclusive ...............14

        2.    The Class Definitions Are Too Vague ......................16

        3.    The Class Periods Are Overly Broad ........................16

    B.    Numerosity.............................................................................18

    C.    Typicality and Adequacy ......................................................20

    D.    Commonality and Predominance...........................................24

        1.    Plaintiffs Have Failed to Establish Policies or Practices
Purportedly Common to All Putative Class Members ..............25

        2.    Individual Questions Predominate ...........................29

    E.    Superiority..............................................................................33

CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allen v. Similasan Corp.*
306 F.R.D. 635 (S.D. Cal. 2015)........................................................................18

*Alpert v. U.S. Indus., Inc.*
59 F.R.D. 491 (C.D. Cal. 1973) ........................................................................35

*Amchem Products, Inc. v. Windsor*
521 U.S. 591 (1997) ..........................................................................................25

*Bee, Denning, Inc. v. Capital All. Group*
310 F.R.D. 614 (S.D. Cal. 2015)........................................................................13

*Blackwell v. SkyWest Airlines, Inc.*
245 F.R.D. 453 (S.D. Cal. 2007)........................................................20, 23, 24, 35

*Brown v. Federal Express*
*Co.*, 249 F.R.D. 580 (C.D. Cal. 2008) ..............................................................33

*Campbell v. Vitran Express Inc.*
2016 WL 873009 (C.D. Cal. Nov. 12, 2015)..................................................25, 26

*CGC Holding Co. v. Broad & Cassel*
773 F.3d 1076 (10th Cir. 2014)..........................................................................31

*Colapinto v. Esquire Deposition Services, LLC*
2011 WL 913251 (C.D. Cal. Mar. 8, 2011) ......................................................15

*Comcast Corp. v. Behrend*
569 U.S. 27 (2013) ......................................................................................14, 33

*Costelo v. Chertoff*
258 F.R.D. 600 (C.D. Cal. 2009) ......................................................................13

*D.C. by & through Garter v. Cty. of San Diego*
2018 WL 692252 (S.D. Cal. Feb. 1, 2018) ......................................................35

*David v. Signal Int'l, LLC*
2012 WL 10759668 (E.D. La. Jan. 4, 2012)......................................................30

*Davidson v. O'Reilly Auto Enterprises*, LLC
2017 WL 8292782 (C.D. Cal. Dec. 15, 2017) ..................................................25

*Dioquino v. Sempris, LLC*
2012 WL 6742528 (C.D. Cal. Apr. 9, 2012) ....................................................15

*DL v. Dist. of Columbia*
713 F.3d 120 (D.C. Cir. 2013) ..........................................................................24

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*
431 U.S. 395 (1977) ........................................................................................ 20

*Eisen v. Carlisle & Jacquelin*
417 U.S 156 (1974) ......................................................................................... 34

*Ellis v. Costco Wholesale Corp.*
657 F.3d 970 (9th Cir. 2011) .......................................................................... 25

*Gen Tel. Co. of Sw. v. Falcon*
457 U.S. 147 (1982) ........................................................................................ 20

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) ................................................................... 25, 32

*Hunter v. Okun*
2011 WL 13243583 (N.D. Cal. July 12, 2011) .......................................... 14, 15

*La Mar v. H & B Novelty & Loan Co.*
489 F.2d 461 (9th Cir. 1973) .......................................................................... 20

*Lan Dow v. 3M Co.*
2008 WL 11334593 (C.D. Cal. Nov. 24, 2008) ............................................. 19

*Lee v. Pep Boys-Manny Moe & Jack of Cal.*
2015 WL 9480475 (N.D. Cal. Dec. 23, 2015) ............................................... 20

*Lucas v. Breg, Inc.*
212 F. Supp. 3d 950 (S.D. Cal. 2016) ............................................................ 16

*Menocal v. The Geo Group*
882 F.3d 905 (10th Cir. 2018) ................................................................... 30, 31

*Orantes-Hernandez v. Smith*
541 F. Supp. 351 (C.D. Cal. 1982) ................................................................. 18

*Panwar v. Access Therapies, Inc.*
2015 WL 329013 (S.D. Ind. Jan. 22, 2015) ................................................... 30

*Peralta v. Wonderful Citrus Packing LLC*
2019 WL 95456 (E.D. Cal. Jan. 3, 2019) ....................................................... 25

*Phillips Petroleum Co. v. Shutts*
472 U.S. 797 (1985) ........................................................................................ 34

*Pilgrim v. Luther*
571 F.3d 201 (2d Cir. 2009) ............................................................................. 3

*Poulos v. Caesars World, Inc.*
379 F.3d 654 (9th Cir. 2004) .......................................................................... 31

*Reyes v. Educ. Credit Mgmt. Corp.*
322 F.R.D. 552 (S.D. Cal. 2017) .................................................................... 13

*Ruiz v. XPO Last Mile, Inc.*, 5CV2125 JLS (KSC)
  2016 WL 4515859 (S.D. Cal. Feb. 1, 2016) ........................................................33

*Schwartz v. Upper Deck Co.*
  183 F.R.D. 672 (S.D. Cal. 1999)......................................................................18, 20

*Senne v. Kansas City Royals Baseball Corp.*
  315 F.R.D. 523 (N.D. Cal. 2016)..............................................................................24

*Simer v. Rios*
  661 F.2d 655 (7th Cir. 1981) ....................................................................................16

*Stone v. Advance Am.*
  278 F.R.D. 562 (S.D. Cal. 2011)..............................................................................15

*Talib v. Guerrero*
  2015 WL 7428511 (C.D. Cal. Nov. 20, 2015)........................................................30

*Turcios v. Carma Labs., Inc.*
  296 F.R.D. 638 (C.D. Cal. 2014) .............................................................................18

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011) .........................................................................................passim

*Weigele v. FedEx Ground Package Sys., Inc.*
  267 F.R.D. 614 (S.D. Cal. 2010)........................................................................33, 35

*Wilson v. TE Connectivity Networks*
  2017 WL 1758048 (N.D. Cal. Feb. 9, 2017) ..........................................................34

*Xavier v. Philip Morris USA Inc.*
  787 F. Supp. 2d 1075 (N.D. Cal. 2011) ..................................................................16

*Zinser v. Accufix Research Inst., Inc.*
  253 F.3d 1180 (9th Cir. 2001)..................................................................................34

**Statutes**

8 U.S.C. § 1231(g) ................................................................................................1

8 U.S.C. §§ 1103, 1226, 1231 ..............................................................................1

18 U.S.C. 1589(a)(2) ............................................................................................29

18 U.S.C. § 1589(a) .............................................................................................30

Cal. Bus. & Prof. Code § 17200 ..........................................................................17

Cal. Bus. & Prof. Code § 17208 ..........................................................................17

Cal. Civ. Code § 52.5 ...........................................................................................30

Cal. Civ. Code § 52.5(c) .......................................................................................17

Cal. Code. Civ. Proc. § 335.1 .........................................................................17, 24

Cal. Code Civ. Proc. § 338 .............................................................................17, 24

Cal. Code Civ. Proc. § 338(d) ..............................................................................17

Cal. Code Civ. Proc. § 340 .............................................................................17, 23

Cal. Labor Code §§ 201-203 ................................................................................12

Cal. Labor Code §§ 226.7, 510, 512 ....................................................................32

Cal. Penal Code § 236.1(a) ..................................................................................30

Cal. Penal Code § 236.1(a) ..................................................................................30

Cal. Penal Code § 236.1 .......................................................................................30

**Rules**

Fed. R. Civ. P. 23(b)(3)(A), (B) ...........................................................................33

Fed. R. Civ. P. 23(b)(3)(C) ..................................................................................33

# INTRODUCTION

Class certification requires affirmative proof and strict scrutiny of Rule 23's elements.  Plaintiffs seek to certify five classes—two of them nationwide—but the evidence they provide is so inadequate that they do not meet their burden to certify even one.  Despite claiming more than 120,000 putative class members, they provide declarations of only four.  Despite challenging the policies of 24 facilities, they submit only seven.  They stand behind written policies and purported practices to claim classwide injuries, but they have not shown that those policies or practices even exist.  The class definitions they propose are not ascertainable; the class sizes are not numerous; the Plaintiffs are neither typical nor adequate representatives; the claims do not turn on common questions, much less common questions that predominate; and a class-action device is not the superior method for bringing the highly individualized claims of the thousands of putative class members.  This case is not suitable for class certification.

# BACKGROUND

## I.   Relevant Facts.

### A.   CoreCivic's Contractual Relationship with ICE.

By Congressional mandate, ICE is responsible for the detention of aliens who are in the United States pending a decision of removal.  8 U.S.C. §§ 1103, 1226, 1231.  In carrying out that mandate, ICE has the discretion to contract with private entities for detention services if government facilities are otherwise unavailable.  8 U.S.C. § 1231(g).  ICE exercises this authority and contracts with various private entities, including CoreCivic, for the detention of aliens throughout the United States.  For purposes relevant to the National Class allegations, ICE has contracted with CoreCivic to detain ICE detainees at 24 facilities in 11 States.[1]  (Ex. 3, ¶ 4.)

---

[1] Contrary to Plaintiffs' assertion, some of these facilities do house detainees who have been charged and/or convicted of a crime. (Ex. 28 at 20-22, 81, 150.)

Pursuant to those contracts, ICE requires CoreCivic to comply with its Performance Based National Detention Standards ("PBNDS").[2]  (Ex. 28 at 75-76.) The PBNDS requires that "staff and detainees maintain a high standard of facility sanitation and general cleanliness." PBNDS, § 1.2(V)(A)(3), at 21 (2016 ed.), https://www.ice.gov/doclib/detentionstandards/2011/1-2.pdf (Ex. 18).  To that end, the PBNDS instructs that "all detainees are responsible for personal housekeeping," and that they are "required to maintain their immediate living areas in a neat and orderly manner." *Id*., § 5.8(V)(C), at 405-406, https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf.  The PBNDS also requires facilities to operate a Voluntary Work Program ("VWP"). *Id*., §§ 5.8(I), 5.8(V)(A), at 405-406.  The purpose of the VWP is to reduce the negative impact of confinement through "decreased idleness, improved morale and fewer disciplinary incidents."[3] *Id*.

The PBNDS authorizes discipline for detainees who refuse to keep their personal living area clean or who organize work stoppages in the facility.  *Id*., § 3.1 https://www.ice.gov/doclib/detention-standards/2011/3-1.pdf.    Refusing to clean one's assigned living area is a "high moderate" offense, which carries a potential penalty of up to 72 hours of disciplinary segregation, among other sanctions.  *Id*., § 3.1.A(III)(A), (B).  And "[e]ncouraging others to participate in a work stoppage

---

[2] Some facilities follow the National Detention Standards. (Ex. 3, ¶ 7; Ex. 19.) The South Texas Family Residential Center ("STFRC") and T. Don Hutto Residential Center ("TDHRC") must comply with ICE's Family Residential Standards ("FRC"). (*Id*.)

[3] At intake, detainees are provided a copy of ICE's National Detainee Handbook, which elaborates on this personal-housekeeping requirement. *See* https://www.ice.gov/sites/default/files/documents/Document/2017/detainee-handbook.PDF (Ex. 22). Detainees are instructed they must "keep areas that you use clean, including your living area and any general-use areas that you use." *Id*. at 12. They must also: make their bed each day; refrain from hanging sheets, blankets, towels, or anything else from wires, lights, beds, bars, or other objects; remove any fallen hair from the sink; throw trash and used hygiene products into the garbage cans, not onto the floor; and not leave crumbs from food in the housing areas. *Id*. at 14.

or to refuse to work" is a 'high' offense punishable by initiation of criminal proceedings, disciplinary transfer, disciplinary segregation of up to 30 days, loss of privileges, a change in housing, or loss of a job, among other sanctions." *Id*., § 3.1.A(II)(A), (B). Imposing such discipline is necessary to maintain security and order and to ensure the health and safety of detainees. (Ex. 23.) *See also Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (noting that "[w]ork stoppages are deliberate disruptions of the regular order of [a] prison" and "are plainly inconsistent with legitimate objectives of prison organization").

### B.   Relevant CoreCivic Facility Policies.

The bases for Plaintiffs' putative Forced Labor and Basic Necessities Classes are purported CoreCivic policies and/or practices: (1) requiring detainees to clean outside their assigned living areas (i.e., common areas) under threat of disciplinary segregation; and (2) withholding basic necessities to coerce detainees into participating in the VWP. (Dkt. 84-1 at 13-18.) The putative Classes encompass 24 facilities over 14 years. (Dkt. 84 at 2-3; Ex. 3, ¶ 4.) Plaintiffs, however, have provided the Court only a smattering of documents from just 10 of these facilities. (Ex. 27.) Plaintiffs attempt to fill in the gaps with speculation and generalizations about the interpretation and application of CoreCivic's policies.

#### 1.   Sanitation Policies.

CoreCivic does not have a policy or practice of requiring detainees to clean the common areas of their housing units under threat of disciplinary segregation. Plaintiffs cite to a statement in the housekeeping and sanitation policies (Policy 12-100) of six facilities[4] that "all detainees/inmates[/residents][5] assigned to a unit are

---

[4] Plaintiffs attached versions of Policy 12-100 that went into effect at various times during the putative class period at Otay Mesa Detention Center ("OMDC"), Stewart Detention Center ("SDC"), North Georgia Detention Center ("NGDC"), Northeast Ohio Correctional Center ("NEOCC"), La Palma Correctional Center ("LPCC"), and TDHRC. Plaintiffs have not established that the same or similar policies were in effect at all 24 facilities for the entire 14-year period. Plaintiffs also attached only

responsible for maintaining the common living area in a clean and sanitary manner." (Dkt. 84-1 at 13-14.) That policy (12-100), however, does not require detainees to *clean* the common areas of the housing units.[6]

Policy 12-100 requires detainees to *maintain* the common areas, which means they must clean up *after themselves* in the housing unit common areas. (Ex. 4, ¶¶ 6-7; Ex. 5, ¶¶ 5-6; Ex. 9, ¶¶ 7-8; Ex. 10, ¶¶ 5-6; Ex. 16, ¶¶ 6-7; Ex. 17, ¶¶ 7-8.) Specifically, detainees must throw their own trash in the designated containers; pick up their own personal belongings; and not write on the walls. (Ex. 4, ¶¶ 9-14; Ex. 5, ¶¶ 8-13; Ex. 9, ¶¶ 11-16; Ex. 10, ¶¶ 8-13; Ex. 16, ¶¶ 9-14; Ex. 17, ¶¶ 10-15.) They are not required to clean up after *other* detainees. The only detainees who clean the common areas are those who volunteer to participate in the VWP as porters and are paid for their participation. (Ex. 4, ¶ 8; Ex. 5, ¶ 7; Ex. 9, ¶ 12; Ex. 10, ¶ 7; Ex. 16, ¶ 8; Ex. 17, ¶ 9.)

Plaintiffs also misquote Policy 12-100's in stating that "*ICE detainees* 'will be assigned to each area on a permanent basis to perform the daily cleaning routine

---

a single detainee handbook from one California facility for the two-year period that is relevant to the California Classes.

[5] The various versions of Policy 12-100 use the terms "detainees," "inmates," and/or "residents" to refer to the people housed there, depending on the facility and contract. They are collectively referred to herein as "detainees."

[6] Policy 12-100 was written to comply with the PBNDS. (Ex. 4, ¶ 5; Ex. 5, ¶ 4; Ex. 9, ¶ 5; Ex. 10, ¶ 4; Ex. 16, ¶ 5; Ex. 17 ¶ 4.) The personal housekeeping standards in the FRS are similar to those of the PBNDS. FRS, § 1.4(V)(2), https://www.ice.gov/doclib/dro/family-residential/pdf/rs_housekeeping_voluntary_work_program.pdf. Laredo Processing Center ("LPC"), Central Arizona Florence Correctional Complex ("CAFCC"—formerly Florence Correctional Center ("FCC") and Central Arizona Detention Center ("CADC")), NGDC, and SDCF are (or were, at one point) subject to the older National Detention Standards ("NDS"). (Ex. 6, ¶¶ 3-4; Ex. 13, ¶ 16; Ex. 16, ¶ 5; Ex. 17, ¶ 4.) The personal housekeeping standards in the NDS are also similar to those of the PBNDS. The standards are collectively referred to herein as the "PBNDS."

of the common area." (Dkt. 84-1 at 9.) The Policy actually says that "Detainee/inmate workers" are assigned that task, which refers to detainees who participate in the VWP as unit porters.  (Ex. 4, ¶¶ 15-21; Ex. 5, ¶¶ 14-20; Ex. 9, ¶¶ 19-25; Ex. 10, ¶¶ 14-20; Ex. 16, ¶¶ 15-22; Ex. 17, ¶¶ 16-23; Ex. 28 at 153.) Non-VWP participants are only required to keep clean their *own assigned living area*. (Ex. 4, ¶¶ 20-21; Ex. 5, ¶ 17-20; Ex. 9, ¶¶ 23-25; Ex. 10, ¶¶ 18-20; Ex. 16, ¶¶ 19-22; Ex. 17, ¶¶ 20-23; Ex. 18, § 5.8(V)(C); Ex. 28 at 153-154.)

## 2.      Disciplinary Policies.

CoreCivic does not threaten to or actually discipline detainees for failure or refusal to clean. Citing detainee handbooks from five facilities,[7] Plaintiffs suggest that CoreCivic forces detainees to clean common areas under threat of disciplinary segregation because it prohibits and make sanctionable the following acts: 306 (refusal to clean assigned living area), 307 (refusal to obey an order), and 399 (disruptive conduct).  (Dkt. 84-1 at 14.)  This is not what the handbooks say.

First, CoreCivic did not create the offense codes or potential sanctions; rather, they are required by the PBNDS.  (Ex. 4, ¶ 22; Ex. 6, ¶ 4; Ex. 7, ¶ 4; Ex. 13, ¶ 16; Ex. 17, ¶ 24; Ex. 18, § 3.1.A.)  Second, by their plain language, none of them impose any discipline for failure to clean a common area; 306 prohibits only the refusal to clean a detainee's "assigned living area," which Plaintiffs concede CoreCivic may do and falls outside the scope of their claims.  (*See* Dkt. 84-1 at 13 ["CoreCivic also compelled ICE detainees to clean areas of CoreCivic facilities *beyond their immediate living area* under threat of discipline."], emphasis added.) Third, Plaintiffs fail to demonstrate that these codes and sanctions were used to force detainees to work outside their assigned living areas, and indeed they were

---

[7] Plaintiffs attached versions of handbooks that went into effect at various times during the putative class period at OMDC, FCC, LPC, Eloy Detention Center ("EDC"), and Houston Processing Center ("HPC"). They have not established that the same handbooks were in use at all 24 facilities for the entire 14-year period.

not.  (Ex. 2, ¶¶ 23-27; Ex. 4, ¶¶ 22-38; Ex. 6, ¶¶ 4-15; Ex. 7, ¶¶ 4-11; Ex. 13, ¶¶ 16-27; Ex. 17, ¶¶ 24-36.)[8]

Nor have Plaintiffs demonstrated that CoreCivic applied its disciplinary policy "in an excessively penal manner" or in a way that forces detainees to clean outside their assigned living areas.  CoreCivic enforces rules and regulations for the safety and security of the facility, staff, detainees, and the public. (Ex. 29, 57:9-16, 67:25-68:11.)  Detention facilities house people who do not want to be there—some of whom are members of violent gangs and/or come to the facility straight from prison—and therefore such people may act inappropriately. (Ex. 29, 66:19-67:24, 86:9-15.)  Disciplinary segregation, however, is only given as a sanction for refusal to obey an order or disruptive conduct in extreme circumstances, and never for simply refusing an order to clean.  (Ex. 2, ¶¶ 25-28; Ex. 4, ¶¶ 32-33, 37-38; Ex. 6, ¶¶ 14-15; Ex. 7, ¶¶ 15-18; Ex. 11, ¶¶ 88, 90; Ex. 13, ¶¶ 26-27; Ex. 17, ¶¶ 35-36.) Typical sanctions for refusal to clean assigned living area, refusal to obey an order, or disruptive conduct include verbal reprimand or loss of privileges.  (Ex. 2, ¶ 24; Ex. 4, ¶¶ 26-27, 32-33; Ex. 6, ¶¶ 9-10; Ex. 7, ¶¶ 14-16; Ex. 11, ¶ 88; Ex. 13, ¶¶ 20-22; Ex. 17, ¶¶ 28-29.)

Plaintiffs submit disciplinary actions by several detainees, but only three of them were even tangentially related to a refusal to clean an assigned living area (which, again, does not implicate any of Plaintiffs' claims).  (Ex. 4, ¶¶ 29-31; Ex. 11, ¶¶ 45-90.) One detainee (already in segregation) refused an order to submit to

---

[8] Plaintiffs' citation to three facilities' post orders and the testimony of Jason Ellis regarding discipline that could arise in the context of the VWP have nothing to do with their argument that CoreCivic uses the threat of disciplinary segregation to force detainees to clean common areas. Even if they were relevant, none of this evidence suggests, let alone demonstrates, that segregation may be imposed on a detainee who fails to come to work on time, report for a shift, or perform satisfactorily. (Ex. 2, ¶¶ 23-24; Ex. 4, ¶ 23, 34-35; Ex. 6, ¶ 5, 10, 12-13; Ex. 7, ¶ 9, 21-25; Ex. 13, ¶¶ 16, 23, 25; Ex. 17, ¶¶ 25, 31, 34; Ex. 18, § 3.1.A(3)(B); Ex. 28, 157:5-12, 157:25-158:9, 259:8-260:7; Ex. 29, 116:11-117:12, 124:8-17.)

leg restraints to be removed from his cell so that staff could remove trash that had accumulated, and then physically resisted officers' attempts to remove the handcuffs after they were done; he was given disciplinary segregation due to his lengthy disciplinary history.  (Ex. 11, ¶¶ 75-76.)  Another detainee refused to make his bed and remove the paper covering his cell light and air vents; he was also given disciplinary segregation due to his lengthy disciplinary history.  (Ex. 11, ¶¶ 81-83.)  A third detainee refused to take the paper off his cell light and refused several orders to clean his cell after throwing toilet paper all over it; he was given disciplinary segregation due to repeated refusals to obey orders.  (Ex. 4, ¶ 30.)

Others submissions include disciplinary reports for defecating in the shower; defecating on the cell floor; and urinating and throwing food through the food port of a cell door ("unsanitary and disorderly housing conditions").  (Ex. 11, ¶¶ 54-58, 61-62.)  That detainee was subjected to disciplinary sanctions for "failure to follow ... orders" because he refused to submit to restraints prior to movement from the cell and defecated in his cell and then refused an order to flush the feces.  (Ex. 11, ¶¶ 65-66, 69-70, 73-74.)  Plaintiffs have not cited any instances in which a detainee was disciplined for disruptive conduct.  Nor have Plaintiffs demonstrated that disciplinary segregation was inappropriate in the cited situations, or that it was used to force detainees to clean outside of their assigned living areas.

### 3.      Clothing, Hygiene, and Commissary Policies.

CoreCivic does not deny detainees clothing and basic living necessities[9] in order to coerce them into participating in the VWP.  The PBNDS requires that detainees receive 1 bar of soap, 1 comb, 1 tube of toothpaste, 1 toothbrush, 1 bottle of shampoo, and 1 container of skin lotion; that razors and feminine hygiene products be made available as needed; and that these items be replenished as

---

[9] Plaintiffs do not define "basic living necessities" with specificity, but include stamps, envelopes, phone time/cards, deodorant, floss, lip balm, shaving cream, and hair brushes.

needed, including through the use of an empty container exchange system.  (Ex. 18, § 4.5(V)(D).)  The PBNDS also requires that detainees receive 2 uniforms (shirts and pants or jumpsuits), 2 pair of socks, 2 pair of underwear, 2 bras (as applicable), and 1 pair of footwear.  (Ex. 18, § 4.5(V)(B).)  Finally, the PBNDS provides that detainees may not retain their own personal clothing, and that personal hygiene items are only permitted from outside sources if the facility does not have a commissary.  (Ex. 18, § 4.5(V)(B) and (D).)

CoreCivic provides detainees all of these items and in these amounts (and often more).  (Ex. 1, ¶ 4; Ex. 2, ¶ 28; Ex. 4, ¶3 9; Ex. 6, ¶ 16; Ex. 7, ¶ 26; Ex. 13, ¶ 28.)  If detainees run out of a hygiene item, or if an item of clothing becomes worn out, all they have to do is ask, and more will be provided; a one-for-one exchange is not always necessary. (Ex. 1, ¶¶ 5-7; Ex. 2, ¶¶ 30-31, 33; Ex. 4, ¶¶ 40-41; Ex. 6, ¶¶ 17-18; Ex. 7, ¶¶ 27, 29; Ex. 13, ¶¶ 29–30.)[10]  Laundry services are available at least twice a week, and often daily.  (Ex. 1, ¶¶8–9; Ex. 2, ¶32; Ex. 4, ¶42; Ex. 6, ¶19; Ex. 7, ¶28; Ex. 13, ¶31.)  CoreCivic also provides detainees three meals per day approved by a registered dietician to ensure sufficient calories, nutrients, and variety.  (Ex. 1, ¶ 10; Ex. 4, ¶ 45; Ex. 7, ¶ 33; Ex. 13, ¶ 32.)

In addition to the food, hygiene items, and clothing it provides, CoreCivic makes commissaries available to detainees.  (Ex. 1, ¶ 11; Ex. 2, ¶ 29; Ex. 4, ¶ 43; Ex. 6, ¶ 20; Ex. 7, ¶ 30; Ex. 13, ¶ 33.)  The commissaries are intended to give detainees options; the items are not required to survive.  (Ex. 1, ¶¶ 12-13; Ex. 2,

---

[10] Plaintiffs claim a "shake down" is required for detainees to get more hygiene items based on the testimony of Warden Figueroa. He did not, however, state that a "shake down" is required, or routinely done. As demonstrated in the attached declarations, including the Declaration of OMDC's Business Manager, R. Crouch, it is not. Moreover, the DHS Office of Inspector General's 2017 report is irrelevant, as the statement at issue was made about one of two facilities, one of which was not a CoreCivic facility. Thus, it is unclear whether that unverified statement can even be attributed to a CoreCivic facility.

¶ 29; Ex. 4, ¶ 44; Ex. 6, ¶ 21; Ex. 7, ¶¶ 31-32; Ex. 13, ¶¶ 34-35.)   Detainees purchase items from the commissary with funds from their trust accounts, whether they intend to participate in the VWP or not.  (Ex. 1, ¶ 14.)  Any money detainees have in their possession when they arrive at the facility, that they receive from family and friends, and that they receive from the VWP is deposited into their account.  (Ex. 1, ¶¶ 15-18.)

Although Plaintiffs claim that they were required to participate in the VWP in order to purchase hygiene and clothing items, Owino and Gomez received considerable money from outside sources.  (Ex. 24, 25.)  For example, Owino started his February 2015 detention at SDCF with $2,461.75 deposited in his account, and did not receive any job pay deposits during his two-week detention. (Ex. 24 at 2464; Ex. 1, ¶ 15.)  Owino made several large purchases consisting primarily of snacks, as well as Dove soap, cocoa and shea lotion, and Lady Speed Stick deodorant.  (Dkt. 114-15.)  He left SDCF with $2,332.40 in cash.  (Ex. 24 at 2464.)

Gomez started his June 2012 detention at SDCF with only $0.80 in his account, but promptly received several Western Union deposits for $20, $40, $29.05, $40, and $32 within the first month.  (Ex. 25 at 2465; Ex. 1, ¶¶ 16-17.) Gomez continued to receive outside deposits and did not start receiving job pay deposits until September 2012.  (Ex. 25 at 2465-66.)  Gomez spent $1,970.92 during the approximately 15 months he was at SDCF, mostly on snacks, but also on Irish Spring and Dove soap, dandruff shampoo, cocoa butter lotion, and sensitive toothpaste. (Dkt. 114-12.)

Detainee MAH, who submitted a request on September 1, 2017 asking for a job to get "money to buy basic needs," started his detention at OMDC in June 2017 with $200 in his account.  (Dkt. 114-4 at 304; Ex. 26 at 56567.)  He began receiving job pay deposits two weeks later, and received deposits off and on in July and August 2017.  (Ex. 26 at 56567-69.)  By August 31, 2017, his balance was

down to $2.19 due to several large commissary purchases, including one for $69.84. (Ex. 26 at 56567-69.) Detainee MAH's purchases were primarily snacks, as well as Suave and Elementz shampoo, Irish Spring and Dove soap, coconut lime lotion, a sweatshirt, and a pair of jersey shorts. (Dkt. 114-13.) These are not the spending habits of detainees who were coerced into participating in the VWP in order to purchase "basic living necessities."

CoreCivic operates its commissaries solely for the benefit of the inmate and detainee population at each facility. (Ex. 8, ¶ 4.) It does not, as Plaintiffs allege without support, sell "basic living necessities to ICE detainees at inflated prices" to increase its profits. (Dkt. 84-1 at 18.) Rather, every two years, CoreCivic conducts a market-based pricing analysis to ensure that the prices of the items sold in its commissaries are comparable to those of local convenience stores. (Ex. 8, ¶¶ 5-12.) The use of revenue from commissary sales is strictly controlled, and is limited to replenishing commissary inventory; paying the operating expenses of the commissary; and benefitting the inmate/detainee population at each facility through the purchase of recreational materials; books; movies; hobby/craft materials; etc. (Ex. 8, ¶¶ 13-17.) CoreCivic does not profit from commissary sales. (Ex. 8, ¶ 4.)

### 4.   Voluntary Work Program.

CoreCivic is contractually required to provide a VWP for detainees at its ICE detention facilities. PBNDS, § 5.8(I). Not only does it give detainees the opportunity to earn money while reducing the negative impact of detention through "decreased idleness, improved morale and fewer disciplinary incidents," PBNDS, § 5.8(II), but it gives detainees the opportunity to be active, break up their day, leave their unit, and gain skills and training (Ex. 3, ¶ 10). At CoreCivic facilities, the VWP is administered in conformance with the PBNDS. (Ex. 21; Ex. 28 at 77-79.) CoreCivic cannot unilaterally modify those standards. (*Id.* at 77-78.)

Detainees are informed about the VWP at their orientation. (Ex. 28 at 83.) If a detainee wants to participate in the VWP, they must sign up for an available job

with their unit manager or case manager.  (Ex. 17, ¶ 38.)  They can do this at any time.  (Ellis at 83.)  If selected, they must sign a work agreement that informs them they are not permitted to work more than eight (8) hours a day or more than forty (40) hours a week.  (Ex. 28 at 83, 85, 115-116, 129.)  The work agreement complies with the PBNDS and is approved by ICE.  (*Id*. at 84-85.)  For most jobs, detainees are given an allowance of at least $1 per day (*id*. at 91.), which, again, complies with the PBNDS, § 5.8(V)(K).  Detainees can also receive extra incentives or bonuses.  (Ex. 28 at 94.)  Allowances earned are deposited into the detainee's account, which they can view in the housing units and use to purchase commissary.  (*Id*. at 98-100, 366-367.)  If there is a balance at the time a detainee is released, it is given to them in cash or by check.  (*Id*. at 101-102.)

At OMDC,[11] detainees can sign up for many different jobs.  (Ex. 20, 18-100CC.)  For example, unit porters perform daily cleaning three times each day, spending no more than one hour each time.  (Ex. 17, ¶ 19; Ex. 30 at 28.)  Kitchen workers usually work five days a week, working a four to six hour shift.  (Ex. 17, ¶ 39; Ex. 30 at 35.)  Kitchen workers get a meal break and have rest breaks.  (Ex. 17, ¶ 39; Ex. 31 at 115.)  Administrative porters work five days a week, from 7:30 a.m. to 3:00 p.m., or 11:00 p.m. to 3:00 a.m., and outside workers work five days a week, from 7:30 a.m. to 3:00 p.m.  (Ex. 30 at 33-34.)  Administrative porters and outside workers get a lunch break and have rest breaks. (Ex. 17, ¶ 40; Ex. 30 at 33-34.)  Laundry, commissary, and intake porters work, on average, two to four hours a day, but no more than 6 hours a day.  (Ex. 17, ¶ 42.)  They typically have breaks every two hours, including a 30-minute lunch break if they are working during their scheduled lunch.  (*Id*.)

---

[11] OMDC is currently CoreCivic's only ICE detention facility in California. (Ex. 3, ¶ 5.) The California City Correctional Facility ("CCCF") closed in November 28, 2013, and all ICE detainees were transferred to other facilities. (*Id*.) The San Diego Correctional Facility ("SDCF") closed in October 2015, and all ICE detainees were transferred to OMDC. (*Id*.)

Detainees in the VWP are expected to report for work on time and perform all tasks diligently and conscientiously. (Ex. 21, 19-100.4(M).) A detainee can be removed from the program for failing to show up, unsatisfactory performance, or disruptive behavior. (Ex. 17, ¶ 34; Ex. 21, 19-100.4(L).) Detainees are not placed in disciplinary segregation or given any other disciplinary sanction simply for refusing to participate in the VWP, or volunteering for the VWP and then refusing to report to work or complete their assigned task. (*Id*.) Detainee participation in the VWP is strictly voluntary. (*Id*.)

## II.    Plaintiffs' Class Claims.

As detailed in CoreCivic's Motion to Dismiss, Plaintiffs raised 12 claims in their original Complaint. (Dkt. 1; Dkt. 18-1 at 10-11.) Their amended Complaint added a thirteenth claim, and sought to certify three classes: a Nationwide Forced Labor Class, a California Forced Labor Class, and a California Labor Law Class. (Dkt. 67.) The Motion for Class Certification seeks to certify five Classes: CA Labor Law Class; CA Forced Labor Class; CA Basic Necessities Class; National Forced Labor Class; and National Basic Necessities Class. (Dkt. 84.)

The CA Labor Law Class is pursuing claims under the California Labor Code, Wage Order 5-2001, and California's Unfair Competition Law ("UCL"), and for negligence and unjust enrichment. (*Id*. at 2.) However, Plaintiffs exclude Count Nine (Failure to Pay Compensation Upon Termination/Waiting Time Penalties, Cal. Labor Code §§ 201-203) from the list of claims that this Class is pursuing. [12] (Dkt. 84-1 at 22.). The CA Forced Labor Class and CA Basic Necessities Class are pursuing claims under California's Trafficking Victims Protection Act ("California TVPA"), California's UCL, and for negligence and unjust enrichment. (Dkt. 84 at 2-3.) And the National Forced Labor Class and

---

[12] Plaintiffs also exclude their Private Attorney General Act claim from any class definition. (Dkt. 84-1 at 6 n.1.)

National Basic Necessities Class are pursuing claims under the federal Trafficking Victims Protection Act ("TVPA").  (*Id*. at 3.)

## LEGAL ARGUMENT[13]

### I.    The Proposed Basic Necessities Classes Are Not Certifiable Because They Were Not Alleged in the Complaint.

In their Complaint, Plaintiffs sought to certify only three Classes: a Nationwide Forced Labor Class, a California Forced Labor Class, and a California Labor Law Class.  (Dkt. 67, ¶ 30.)  Their Motion for Class Certification, however, seeks to certify two additional Classes—a California Basic Necessities Class and a National Basic Necessities Class—in support of their TVPA and California TVPA claims.  (Dkt. 84 at 2-3; Dkt. 84-1 at 19.)   The theory underlying these new proposed Classes is that CoreCivic withholds basic necessities ("clean clothing and personal hygiene items") to coerce detainees into working in the VWP so that they can earn money to purchase them at the commissary.  (Dkt. 84-1 at 15-18.)

The Court cannot certify the Basic Necessities Classes because it "is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it."  *Reyes v. Educ. Credit Mgmt. Corp.*, 322 F.R.D. 552, 559 (S.D. Cal. 2017) (quoting *Costelo v. Chertoff*, 258 F.R.D. 600, 605 (C.D. Cal. 2009)); *accord Bee, Denning, Inc. v. Capital All. Group*, 310 F.R.D. 614, 621 (S.D. Cal. 2015). The Complaint does not include these Basic Necessities Classes, and there are no factual allegations to support them.  Nowhere does the Complaint allege that CoreCivic withholds basic necessities.  (Dkt. 67.)  Indeed, the words "basic necessities" are not even mentioned. (*Id*.)  Rather, Plaintiffs' allegations of forced labor focused on threats of disciplinary segregation.  (Dkt. 67, ¶¶ 13, 20.)  Although a Court is not precluded from considering a new class "that is *narrower* than the class definition originally proposed," *Bee, Denning*, 310 F.R.D.

---

[13] CoreCivic has contemporaneously filed a Motion for Judgment on the Pleadings, objecting to the Court's personal jurisdiction over the National Class claims.

at 621, Plaintiffs' Basic Necessities Classes involve an *entirely different* theory of liability, based on factual allegations that simply do not exist in the Complaint.

## II.   None of the Putative Classes Should Be Certified.

"A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Allegations and speculation are not enough; a plaintiff must satisfy Rule 23 "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  And with any proof that is provided, a court must conduct a "rigorous analysis" to ensure that each of Rule 23 prerequisites have been satisfied.  *Wal-Mart*, 564 U.S. at 350.  Plaintiffs have failed to meet their burden.  None of the putative classes should be certified.

### A.   Ascertainability.

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Hunter v. Okun*, 2011 WL 13243583, at \*2 (N.D. Cal. July 12, 2011) (internal quotation marks and citation omitted).  "Thus, an implied prerequisite to certification is that the class must be sufficiently definite." *Id*.  "A class definition should be precise, objective, and presently ascertainable." *Id*.  "While the identity of the class members need not be known at the time of certification, the class definition must be definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Id*.  "In addition, a class must be defined such that anyone within it would have standing." *Id*.

### 1.   The Class Definitions Are Over-Inclusive.

The <u>CA Labor Law Class</u>, <u>CA Basic Necessities Class</u>, and <u>National Basic Necessities Class</u> are over-inclusive—and therefore not ascertainable—because they include putative class members who have no claim.  The CA Labor Law Class

is defined to include all detainees who "worked through CoreCivic's voluntary work program ... during their period of detention." (Dkt. 84 at 2.) That definition, however, necessarily includes detainees who never worked enough daily or weekly hours to entitle them to a rest period, a meal period, or overtime wages. To determine if a detainee qualifies, the Court must resolve whether each detainee worked the requisite number of hours. Similarly, the National and CA Basic Necessities Classes are defined to include all detainees who "worked through CoreCivic's VWP ... and ... purchased basic living necessities through CoreCivic's commissary during their period of detention." (*Id.* at 2-3.) That definition necessarily includes detainees who were never deprived basic necessities and simply wanted to have more (or different items) on hand. To determine if a detainee qualifies, the Court must resolve whether they joined the VWP and purchased the commissary because they were in fact deprived of a basic necessity.

The over-inclusivity of these definitions is enough to deny certification of these Classes. *See Dioquino v. Sempris, LLC*, 2012 WL 6742528, at *5 (C.D. Cal. Apr. 9, 2012) (citing *Stone v. Advance Am.*, 278 F.R.D. 562, 569 (S.D. Cal. 2011)) ("As to the Sempris, Debit Card, and California classes, Plaintiff fails to define a certifiable class because Plaintiff's overbroad class definitions sweep harmed and unharmed members into the same group. ... Therefore, the Court could deny certification of the Sempris, Debit Card, and California classes solely on lack of ascertainability."); *Colapinto v. Esquire Deposition Services, LLC*, 2011 WL 913251, at *4 (C.D. Cal. Mar. 8, 2011) ("Here, Plaintiffs fail to define an ascertainable class because Plaintiffs' proposed class definition includes members who are unharmed. .... This alone is sufficient to warrant denial of Plaintiffs' Motion for Class Certification."); *Hunter*, 2011 WL 13243583, at *3 (denying class certification where definition was over-inclusive because it included class members who could not bring a claim).

### 2.    The Class Definitions Are Too Vague.

The definitions for the <u>CA Forced Labor Class</u>, <u>CA Basic Necessities Class</u>, <u>National Forced Labor Class</u>, and <u>National Basic Necessities Class</u> are not sufficiently definite to readily ascertain who qualifies because they turn on subjective criteria.  "In order for a proposed class to satisfy the ascertainability requirement, membership must be determinable from objective, rather than subjective, criteria."  *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).  Thus, courts "have recognized the difficulty of identifying class members whose membership in the class depends on each individual's state of mind.'"  *Id.*  (quoting *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981)).  "If a class definition includes a requirement that cannot be proven directly, and that depends instead upon each putative class member's feelings and beliefs, then there is no reliable way to ascertain class membership."  *Id.*; *see also Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 973 (S.D. Cal. 2016) ("[A] class is not ascertainable where a court must investigate the merits of individual claims to determine class membership, or if membership depends upon subjective factors such as a prospective member's state of mind.").

The National and CA Forced Labor Classes include only those detainees who worked "under threat of discipline."  (Dkt. 84 at 2-3.)  What constitutes a "threat" or "discipline," however, are both subjective inquiries with no boundaries.  The National and CA Basic Necessities Classes include only those detainees who purchased "basic living necessities" from the commissary.  (*Id.*)  But whether a detainee believed his or her commissary purchase involved a basic living necessity is also entirely subjective.  To answer that question, the Court must look at each transaction and determine whether it was actually a basic living necessity.  The Court should not certify these indefinite Class definitions.

### 3.    The Class periods are overly broad.

The <u>CA Labor Law Class</u> definition includes a class period of May 31, 2013,

to the present.  (Dkt. 84 at 2.)  This is too long.  Plaintiffs filed their original Complaint on May 31, 2017.  (Dkt. 1.)  The limitations periods for the claims this Class is pursuing are as follows:

| | |
|---|---|
| Labor Code – Wage Provisions §§ 204, 226.7, 432.5, 510, 512, 1194, 1197 | 3 years Cal. Code Civ. Proc. § 338 |
| Labor Code – Penalty Provisions §§ 201–203, 226, 1197.1 | 1 year Cal. Code Civ. Proc. § 340 |
| Labor Code – Wage Order WO 5-2001 | 1 year Cal. Code Civ. Proc. § 340 |
| Unjust Enrichment | 3 years Cal. Code Civ. Proc. § 338(d) |
| Negligence (Personal Injury) | 2 years Cal. Code. Civ. Proc. § 335.1 |
| Unfair Competition Law Cal. Bus. & Prof. Code § 17200 | 4 years Cal. Bus. & Prof. Code § 17208 |

Plaintiffs apparently rely on the four-year statute of limitations for their claim under California's UCL to extend the class period back to May 31, 2013, but they admit that their UCL claim (as well as their claims for unjust enrichment and negligence) are solely derivative of their Labor Code claims.  (Dkt. 84-1 at 6:13-15 & at 23:22-23.)  Thus, the most the class period can go back is three years, from May 31, 2014 to the present.  And even then, the class period for members seeking penalties under the Labor Code can only go back one year, from May 31, 2016 to the present.

The class periods for the <u>CA Forced Labor Class</u> and <u>CA Basic Necessities Class</u>, from January 1, 2006 to the present, are similarly overbroad.  (Dkt. 84 at 2-3.)  Although California enacted the California TVPA on January 1, 2006 (Dkt. 38 at 29), it has a seven-year statute of limitations, *see* Cal. Civ. Code § 52.5(c).  Thus,

the class period cannot reach back before May 31, 2010.  Although Plaintiffs may argue that some detainees are entitled to tolling (a case-by-case, individual determination), they have not established that all detainees are entitled to such tolling that would allow them to expand the class period to the dates they request.  Thus, each Class, as defined, is not ascertainable because it improperly includes detainees that have no viable claim.

### B.  Numerosity.

In determining numerosity, "[t]he central question is whether Plaintiffs have sufficiently identified and demonstrated the existence of the numbers of persons for whom they speak."  *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680-81 (S.D. Cal. 1999).  Although Plaintiffs ask this Court to apply common sense to find the putative Classes sufficiently numerous, (Dkt. 84-1 at 20, citing *Allen v. Similasan Corp.*, 306 F.R.D. 635, 644 (S.D. Cal. 2015), "[a] higher level of proof than mere common sense impression or extrapolation from cursory allegations is required."  *Schwartz*, 183 F.R.D. at 681.  "Mere speculation as to satisfaction of this numerosity requirement does not satisfy Rule 23(a)(1)."[14]  *Id*.

<u>CA Labor Law Class</u>:  Plaintiffs contend that there are "at least 8,346 putative class members" in this Class.  (Dkt. 84-1 at 20.)  That number presumably represents the number of ICE detainees who participated in the VWP in a California facility between May 31, 2013 and the present.  (Dkt. 84 at 2.)  But they provide no evidence to support it.  (*See* Dkt. 85, ¶ 59.)  The OMS reports they cite identify

---

[14] Although *Allen* quotes *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 645 (C.D. Cal. 2014), for the proposition that the numerosity requirement is satisfied "where the exact size of the class is unknown but general knowledge and common sense indicate that it is large," 306 F.R.D. at 644, *Turcios* quoted *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982).  *Orantes-Hernandez*'s approach to class certification cannot be squared with the Supreme Court's subsequent decision in *Wal-Mart*, which requires a party seeking class certification to "affirmatively demonstrate his compliance with the Rule." 564 U.S. at 350-51.

only 55 detainees who received an account deposit for "Job Pay."  (Dkt. 85-46, 85-47, 85-48, 85-49, 85-50, 85-51, 85-89.)  More importantly, Plaintiffs fail to identify the number of detainees who were eligible for, but did not receive, a rest period, meal period, or overtime wages.  In other words, they provide no evidence that a single putative class member worked at least 3½ or 5 hours in a day and did not receive a rest or meal break, or worked more than 8 hours in a day or 40 hours in a week to even be eligible for overtime wages.  *See Lan Dow v. 3M Co.*, 2008 WL 11334593, at *5-6 (C.D. Cal. Nov. 24, 2008) ("The evidence certainly establishes that 3M employs a sufficient number of employees to meet the numerosity requirement; however the evidence does not establish that the numerosity requirement has been met as to the four classes of employees Plaintiff seeks to certify.").  Thus, the number of putative class members who can bring claims for violations of those corresponding Labor Code provisions is unknown.

CA Basic Necessities Class:  Plaintiffs contend that there are "approximately 17,319 ICE detainees that worked through CoreCivic's VWP in California between January 1, 2006 and the present."  (Dkt. 84-1 at 20; Dkt. 85, ¶ 59.)  But of that number, Plaintiffs do not identify how many detainees actually joined the VWP and purchased from the commissary because they were in fact deprived of a basic necessity.  Only *those* detainees may have a viable claim under the California TVPA and can be included in the Class.  A list of which detainees simply purchased commissary items (even "basic living necessities," Dkt. 84-1 at 21) does not bear that out.

National Basic Necessities Class:  Plaintiffs contend that there are "approximately 123,815 ICE detainees that worked in CoreCivic's California and non-California facilities between December 26, 2008 and the present."  (Dkt. 84-1 at 20-21.)  But like the CA Basic Necessities Class, Plaintiffs do not identify how many detainees actually joined the VWP and purchased from the commissary because they were in fact deprived of a basic necessity.

<u>CA Forced Labor Class</u> and <u>National Forced Labor Class</u>:   Plaintiffs speculate—without any supporting evidence—that there are "several thousands of former and current ICE detainees" who were forced to clean outside their immediate living areas under threat of discipline. (Dkt. 84-1 at 21.) Such speculation clearly does not satisfy the numerosity requirement. *Schwartz*, 183 F.R.D. at 681.

## C.   Typicality and Adequacy.

"The typicality requirement ensures that 'the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Lee v. Pep Boys-Manny Moe & Jack of Cal.*, 2015 WL 9480475, at *8 (N.D. Cal. Dec. 23, 2015) (quoting *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)).   "[A] plaintiff who has no cause of action against the defendant cannot 'fairly and adequately protect the interests' of those who do have such causes of action." *Id.* (quoting *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973)).   In other words, a "class representative must be part of the class." *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977); *accord Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 463 (S.D. Cal. 2007).

<u>Plaintiff Owino</u>:   Owino avows that: (1) "throughout each period of detention" at either SDCF or OMDC, he worked in the kitchen "on and off," normally worked a 9-hour shift with only one meal break, and sometimes worked "up to 14 working hours in a day" (Dkt. 84-3, ¶¶ 5-7); (2) "[s]ometimes during [his] detention" he would work as a chemical porter and did not have "scheduled rest or meal breaks" (*id.*, ¶ 8); (3) he would "occasionally" work as a general cleaner/janitor with "no scheduled rest or meal breaks" (*id.*, ¶ 9); (4) "there were many instances" when he was required to clean common areas without pay (*id.*, ¶¶ 18-24); and (5) he made purchases at the commissary (*id.*, ¶¶ 25-27).

Although Owino avows that he was detained at SDCF and OMDC "at various times from approximately November 7, 2005, to March 9, 2015" (*id.*, ¶ 2), he does not avow that any of these allegations occurred during the alleged class periods. Without affirmative evidence establishing *when* these allegations occurred, he has not established a viable cause of action.  For instance, his ambiguous avowals make it just as likely that he worked a 14-hour day sometime before May 31, 2013 (CA Labor Law Class),[15] or that he was forced to clean a common area sometime before December 23, 2008 (National Forced Labor Class and National Basic Necessities Class).  He has not established that he is typical of the Classes that he seeks to represent.

Paragraph 23 of his Declaration is also murky.  Instead of concisely avowing that *he* was ordered to clean a common area and was either threatened with or actually placed in "solitary confinement" if he refused—which is the basis for his TVPA and California TVPA claims (Dkt. 84-1 at 7, 9, 14, 25-27)—he dances around that allegation.  He avows generally that "detainees" were "expected to help" clean common areas "whenever a 'deep clean' was needed" or "before a dignitary arrived," and then avows:

> 23.   When I or other detainees were told to do extra work, even if on our day off, we *almost* always complied even if we didn't want to work. If we failed to follow a "direct order" from OMDC staff ("Go clean the pod"), we could be subject to *more random and frequent searches and cell tossing*, as I *witnessed* during my detentions at OMDC when *other* detainees would have their cells checked much more frequently than others. Failing to follow orders *could* also result in being removed from the general living pod and *placed in more restrictive housing*, which could last from several days to several weeks, and which *might* also result in a loss of job due to a higher security classification. I also *witnessed* this during my detentions at OMDC where detainees might refuse to clean and the situation escalated to the point of the detainee being relocated to restrictive housing. As noted

---

[15] Other than during his shifts as a kitchen worker, he does not avow how long he worked per day as a chemical porter or general cleaner/janitor. (Dkt. 84-3, ¶¶ 8-9.)

above, this type of discipline happened to me several times to make an example out of me and teach other detainees a lesson. In addition, we were also told that a disciplinary note could be placed in our detainee file, which could negatively impact our case before the judge. Other times, the entire living pod might suffer some consequences for a single detainee's refusal to work, such as *being on lockdown longer than usual, or not permitting us to use the TV.*

24.    Because I and other detainees *observed* what happened when *others* failed to comply with orders, we *almost* always followed orders to clean or perform other work so as to avoid any punishment.

(Dkt. 84-3, ¶¶ 23-24, emphasis added.) Owino does not define "restrictive housing," nor does he explain the circumstances when "the situation escalated to the point of the detainee being relocated to restrictive housing." For example, was he inciting a facility-wide work stoppage, which places the safety and security of staff and other detainees at risk and is subject to discipline? He does not explain.

His avowals purportedly supporting the claims of the Basic Necessities Classes are similarly ambiguous and deficient. He readily admits at the outset that he voluntarily signed up for the VWP and performed various jobs. (Dkt. 84-3, ¶¶ 5-9.) He also admits that he was provided hygiene supplies, but then complains that the supplies "would not last an entire week, and sometimes the supplies would be late and not re-stocked to be delivered on a weekly basis." (*Id.*, ¶ 25.) He further complains that the clothing issued to detainees would "get dirty or worn down and would often be of very poor quality" but "not replaced with newer, more wearable clothing," and that, although they could request to have new clothes, those requests "might never be fulfilled" or they would be given clothes that were "old or dirty." (*Id.*, ¶ 26.) These avowals are significantly different than the arguments in Plaintiffs' Motion: that CoreCivic intentionally withholds basic living necessities to coerce detainees to join the VWP. And although Owino avows that he would purchase "some" "basic hygiene supplies" to "ensure" he "had enough" and "had to work" so that he would have money to do so, he also admits that he used his money

to purchase phone cards to call his family and friends. (*Id.*, ¶¶ 25, 28-29.)

Owino also avows that "very few detainees have outside support" and thus the only way to add money to their commissary account is to work in the VWP. (Dkt. 84-3, ¶ 29.)  Although this may be true of other putative class members, it is not true of Owino.  As discussed above, money was regularly deposited into Owino's account by people from the outside, so much so that he did not even need to work to purchase commissary items.

Finally, because Owino left OMDC on March 9, 2015 (Dkt. 84-3, ¶ 2), he is time barred from seeking penalties under California's Labor Code or pursuing claims pursuant to WO 5-2001 or for negligence because these claims have 1- or 2-year statutes of limitations, *see* Cal. Code Civ. Proc. §§ 340, 335.1, and he filed the Complaint in May 2017.  Thus, he is not typical of the class.  *Blackwell*, 245 F.R.D. at 462-63.

Plaintiff Gomez:  Like Owino, Gomez avows only that he was housed at SDCF and OMDC "from approximately June 18, 2012, through September 18, 2013.  (Dkt. 84-4, ¶ 2.)  He does not avow when any of his allegations occurred and thus has failed to establish that he has a valid claim as a member of the CA Labor Law Class.  For instance, his ambiguous avowals make it just as likely that he was allegedly denied rest or meal periods sometime before May 31, 2013.  He also does not allege that he worked enough hours in a day or week to be entitled to a rest or meal period or overtime wages.  (*Id.*, ¶ 7.)  Therefore, he has not established that he is typical of that Class.  Gomez's avowals purportedly supporting membership of the National and CA Forced Labor Basic Necessities Classes are as vague and deficient as Owino's.  (*Id.*, ¶¶ 13-20, 21-25.)  In fact, Gomez does not even allege that he was placed in restrictive housing or otherwise disciplined for refusing to work.  (*Id.*, ¶¶ 19-20.)  Moreover, like Owino, Gomez received outside monetary support and did not need to work to purchase basic hygiene supplies.

Finally, because Gomez left OMDC on September 18, 2013 (Dkt. 84-4, ¶ 2), he is time barred from pursuing any claims under California's Labor Code or WO 5-2001, or for unjust enrichment or negligence, *id*. §§ 335.1, 338(d), because these claims have 1-, 2-, or 3-year statutes of limitations, *see* Cal. Code Civ. Proc. §§ 338, 340, 335.1, 338(d), and he filed the Complaint in May 2017. Thus, he is not typical of this Class. *Blackwell*, 245 F.R.D. at 462-63.

In addition, neither Plaintiff is typical of, or can adequately represent, the National Classes. Both were detained only at SDCF or OMDC, both California facilities. They do not contend that they were ever detained at any other facility. Without knowledge of the policies or practices—and how they were implemented at non-California facilities—they cannot say that they suffered the same or similar injury as putative class members at those facilities. *See Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 569 (N.D. Cal. 2016) (finding class representatives who had never engaged in activities in other states could not represent class members from those states.). They also have no incentive to pursue a class action on behalf of detainees in facilities they never stepped foot in. Because there are no class representatives that are or were detained at those non-California facilities, the Nationwide Classes should not be certified.

### D.   Commonality and Predominance.

The Supreme Court in *Wal-Mart* heightened the necessary commonality showing, and "changed the landscape" for certifying class actions. *DL v. Dist. of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013). An assertion that putative class members "have all suffered a violation of the same provision of law" does not support a finding of commonality. *Wal-Mart*, 564 U.S. at 350. Thus, it is not enough to simply phrase as a common question, "Is that an unlawful [] practice?" *Id*. at 349. Moreover, a common question must be such that its answer can "resolve an issue that is central to the validity of each of the" class members' claims "in one stroke." *Id*. at 350. Dissimilarities within a proposed class potentially impede the

generation of common answers. *Id.*

Rule 23's predominance requirement is "far more demanding" than commonality. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("[T]he presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)."). Where common questions do not present a "significant aspect of the case" that "can be resolved for all members of the class in a single adjudication" certification is not appropriate. *Hanlon*, 150 F.3d at 1022. "Courts determine whether individual issues predominate over common issues by examining the elements of the plaintiffs' claims and the defenses raised by the defendant, as well as the evidence that relates to those elements." *Id.*

### 1. Plaintiffs Have Failed to Establish Policies or Practices Purportedly Common to All Putative Class Members.

As a threshold matter, to certify a claim based on a policy or practice, a plaintiff must present "significant proof" that a policy or practice in fact exists *and* that the entire class was subjected to it. *Wal-Mart*, 564 U.S. at 353; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011). For claims involving a general policy, a plaintiff must also provide evidence showing that the policy was implemented as they say it was. *See*, *e.g.*, *Peralta v. Wonderful Citrus Packing LLC*, 2019 WL 95456, at *4 (E.D. Cal. Jan. 3, 2019); *Davidson v. O'Reilly Auto Enterprises*, LLC, 2017 WL 8292782, at *4 (C.D. Cal. Dec. 15, 2017); *Campbell v. Vitran Express Inc.*, 2016 WL 873009, at *3 (C.D. Cal. Nov. 12, 2015).

<u>National Forced Labor Class</u>:  Plaintiffs contend that all members of this Class are subject to the same sanitation and disciplinary policies that, together, force detainees to clean common areas under threat of disciplinary segregation. But as discussed *supra*, Background Section I.B.1-2, those policies require only that detainees clean their assigned living areas, which is not part of their claim. Only detainees in the VWP program are required to clean the common areas, and

disciplinary segregation is only authorized if a detainee refuses to clean their personal living area. (*Id.*) Even if a detainee refuses to clean their personal living area (or clean up *their own* messes in a common area), they will not be disciplined with segregation. (*Id.*)

Plaintiffs' attempts to manipulate the policies to say otherwise are unavailing. The only evidence they have to support their claim that detainees are actually forced to clean common areas under threat of disciplinary segregation are the declarations of four detainees.[16] Two of those detainees avowed only that they witnessed, observed, or were told by other detainees of a segregation threat. (Dkt. 84-4, ¶ 19; Dkt. 84-6, ¶ 4.) All four are vague and/or conclusory. (Dkt. 84-3, ¶¶ 23-24; Dkt. 84-5, ¶ 4.) Nevertheless, despite months of class discovery and access to all putative class members, Plaintiffs have mustered avowals from only *two* other detainees to support their claim. The allegations of four detainees is not "significant proof" that more than 120,000 detainees were subject to their claimed policy.

That National Forced Labor Class fails for another reason. The putative Class includes all CoreCivic ICE detention facilities across the Country. But of the 24 nationwide facilities, Plaintiffs provide no evidence specific to 14 of those facilities. (Ex. 27; Ex. 33, ¶ 11.) And for the 10 facilities that they do provide something, it is spotty at best. (*Id.*; *see also* footnotes 4, 7, supra.) In fact, the only detainee declarants are from SDCF/OMDC. Plaintiffs presumably will rely on their contention that "CoreCivic's facilities operate through the use of standardized policies and procedures" (Dkt. 84-1 at 9), but the documents they do attach show that they are not identical. The only consistency across those facilities are the declarations provided by CoreCivic that avow that not one facility has a policy or practice of forcing detainees to clean common areas. Because Plaintiffs have not

---

[16] As discussed above, none of the disciplinary orders they attach support their assertion that detainees are placed in disciplinary segregation for refusing an order to clean or refusing to clean a common area.

established a common policy or practice among all 24 facilities, there is no glue binding the National Forced Labor Class together.

California Forced Labor Class:  This Class suffers from the same lack of proof as the National Forced Labor Class: the California facilities do not have a policy or practice of forcing detainees to clean common areas under threat of disciplinary segregation.  The allegations of four detainees is not "significant proof" that "several thousands" (Dkt. 84-1 at 21) of detainees in California facilities were subject to their claimed policy.[17]

National Basic Necessities Class:  Plaintiffs contend that CoreCivic has a "practice" of withholding "clean clothing and personal hygiene items" to coerce ICE detainees to join the VWP.  (Dkt. 84-1 at 15-18.)  Their claim that CoreCivic (knowingly) withholds basic living necessities (to procure detainee labor) at every one of its 24 facilities in the Country is supported only by: (1) the declarations of four California-facility detainees (including Plaintiffs), who conclusively state that OMDC did not promptly replenish items and so they worked in the VWP so they could purchase them from commissary (Dkt. 84-3, ¶¶ 25-28; Dkt. 84-4, ¶¶ 21-24; Dkt. 84-5, ¶¶ 6-8; Dkt. 84-6, ¶¶ 6-8); (2) receipts showing that four OMDC detainees purchased clothes or hygiene products at commissary (Dkt. 84-1 at 16-18); and (3) a statement in a 2017 report by the Office of Inspector General, that "[m]ultiple detainees at the Hudson County Jail [a non-CoreCivic facility] and Stewart Detention Center [a CoreCivic facility in Georgia] … complained that some of the basic hygiene supplies … were not provided promptly or at all when detainees                 ran                 out                 of                 them,"      *see* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf    , at 7.

---

[17] Plaintiffs did not submit any disciplinary records of California-facility detainees showing they were placed in disciplinary segregation for refusing to clean.

This evidence falls woefully short of establishing a nationwide practice of withholding basic living necessities to coerce detainees to join the VWP. First, Plaintiffs provide no evidence of this purported policy at any non-California facility. A report that an unknown number of detainees at the Stewart Detention Center in Georgia "complained" that "some" supplies were not promptly provided "or" at all, does not establish a *practice* of withholding supplies at that facility, much less at *every* non-California facility. And they provide no evidence that any putative class member outside of California actually participated in the VWP so that they could purchase basic living necessities that were not replenished or provided. Second, the declarations of four detainees do not establish a nationwide practice to which more than 120,000 detainees (Dkt. 84 at 3) were allegedly subjected to. Commissary receipts showing purchases of clothes or hygiene products also do not establish either that the four detainees purchased those items with VWP earnings or that they participated in the VWP to purchase those items *because they were otherwise withheld by CoreCivic staff.*

California Basic Necessities Class: This Class suffers from the same lack of proof as the National Basic Necessities Class: the California facilities do not have a practice of withholding basic living necessities to coerce detainees into participating in the VWP. The declarations and commissary receipts of four detainees is not "significant proof" that more than 17,000 detainees in the California facilities were subject to Plaintiffs' purported practice.

California Labor Law Class: Plaintiffs contend that CoreCivic has a policy of not paying overtime wages and refusing to provide rest and meal breaks, in violation of California's labor laws. (Dkt. 84-1 at 7.) But they do not provide any evidence to support any such policies. In fact, they cannot dispute that CoreCivic has a policy *prohibiting* detainees from working more than eight hours in a day or forty hours in a week. (*Id*. at 10.) Owino avows that his "normal shift" in the kitchen was 9 hours and that there were "many instances" where he worked back-

to-back shifts ("up to 14 working hours").  (Dkt. 84-3, ¶ 6.)  Aside from the fact that his overtime avowal is contradicted by CoreCivic policy (and the fact that kitchen workers only work 5 ½ or 6 hour shifts, Ex. 17, ¶ 39), Plaintiffs provide no other evidence that any other putative class member worked more than 8 hours in a day or 40 hours in a week and was even eligible for overtime pay.  Owino and Gomez also conclusively avow (contrary to the record) that they did not get scheduled meal or rest breaks when working as porters.  (Dkt. 84-3, ¶¶ 8-9; Dkt. 84-4, ¶ 7.)  But neither avows to how many hours he actually worked during those shifts.  Thus, they fail to show that they were even eligible for a meal or rest break.  Nonetheless, like Owino's overtime avowal, these avowals are not "significant proof" that the more than 8,000 putative class members at OMDC were subject to a practice of denying meal or rest periods.

### 2.    Individual Questions Predominate.

National and CA Forced Labor Classes:  These Classes bring claims under the TVPA and California TVPA.  Plaintiffs argue that, whether CoreCivic's purported policies and practices of forcing or coercing detainees to clean common areas (a) "constitute a violation of the Federal TVPA's prohibition on obtaining labor or services by means of force or serious harm," and (b) "constitute[] 'human trafficking' within the meaning of" the California TVPA, are common questions (respectively).  (Dkt. 84-1 at 24, 26.)  But these purported questions violate *Wal-Mart*'s admonition that a common question cannot simply be whether all putative class members have "suffered a violation of the same provision of law."  564 U.S. at 350.

Furthermore, resolving whether each putative class member was in fact a victim of a TVPA or California TVPA violation requires the resolution of many individualized inquiries that are particular to each class member.  Inquiries will include: whether the detainee cleaned a common area *because* they were (1) threatened with serious harm, i.e., "by means of" serious harm, *see* 18 U.S.C.

1589(a)(2), or (2) forced to clean, i.e., it was "accomplished through" force, *see* Cal. Civ. Code § 52.5; Cal. Penal Code § 236.1(a), -(h)(3).   Or did they clean voluntarily?   The driving question for each class members' claim is, *why* did you work?   Answering this question will require delving into each class member's subjective state of mind.   *See David v. Signal Int'l, LLC*, 2012 WL 10759668, at *21 (E.D. La. Jan. 4, 2012) (refusing to certify a TVPA class because: "The question in a forced labor case is … whether Defendants' coercive conduct was such that it could overcome the will of the victim so as to make him render his labor *involuntary*.  The Court is persuaded that this question cannot be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof."); *see also Panwar v. Access Therapies, Inc.*, 2015 WL 329013, at *6 (S.D. Ind. Jan. 22, 2015).

For the California TVPA claim, each member must also establish that the deprivation of personal liberty was "substantial *and* sustained," *see* Cal. Penal Code § 236.1(h)(3) (emphasis added).  Both statutes also require a specific mens rea to prove a violation (knowingly or intentionally).   18 U.S.C. § 1589(a); Cal. Penal Code § 236.1(a).   Thus, each detainee will have to prove that the particular employee who allegedly made a threat did so to obtain the detainee's labor.  *Talib v. Guerrero*, 2015 WL 7428511, at *11 (C.D. Cal. Nov. 20, 2015).

Although Plaintiffs do not mention it—likely because it is distinguishable— the Tenth Circuit recently certified a similar TVPA class based on circumstantial proof of classwide causation.  In *Menocal v. The Geo Group*, 882 F.3d 905, 918-21 (10th Cir. 2018), the court held that individual inquiries about why each detainee worked was not necessary because it could infer that all detainees felt compelled to work based on the Geo Group's Sanitation Program and policy at the particular facility.  No such inference can be made in this case, and Plaintiffs do not suggest

1   that one can.[18]

2      The Geo Group's Sanitation Program required every detainee to clean

3   common areas; Geo staff generated a daily list of detainees from each housing unit

4   who were assigned to clean the common areas. *Id*. at 910-11, 919-20. If a detainee

5   refused to participate, they were subject to disciplinary segregation. *Id*. Every

6   detainee received a handbook notifying them of their obligation to participate in the

7   Sanitation Program and the sanction for refusing to participate. *Id*. CoreCivic has

8   no such program, nor do its policies require detainees to clean common areas or

9   subject them to discipline if they refuse to clean a common area. Moreover,

10  Plaintiffs provide no evidence that detainees receive copies of the policies.

11  Although they have submitted detainee handbooks from six (out of the 24) ICE

12  detention facilities, those handbooks do not inform detainees that they are required

13  to clean common areas with a potential sanction of disciplinary segregation if they

14  refuse. Thus, no classwide inference can be made in this case. Individual inquiries

15  must be made.[19]

16      <u>National and CA Basic Necessities Class</u>:  These Classes also bring claims

17  under the TVPA and California TVPA and argue that the same questions they pose

18  for the Forced Labor Classes qualify as common questions for the Basic Necessities

19  Classes (substituting in CoreCivic's purported practice of withholding basic living

20  necessities to coerce detainees to participate in the VWP). (Dkt. 84-1 at 24, 26.)

21  They do not (and do not predominate) for all of the reasons stated above. In fact,

22  _____

23  [18] Plaintiffs are foreclosed from attempting to rely on *Menocal* in their Reply Brief.
24  If they believed it applied, they should have raised it in their Motion and allowed
    CoreCivic to respond to their arguments.

25  [19] *Menocal* also relied heavily on unique Tenth Circuit jurisprudence regarding
26  classwide-causation evidence. *See* 882 F.3d at 918-20 (applying *CGC Holding Co.
    v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014)). The Ninth Circuit, however,
27  has not taken the same permissive approach. *See Poulos v. Caesars World, Inc.*,
28  379 F.3d 654, 668 (9th Cir. 2004).

individual questions predominate more so for these Classes.  For instance, for each detainee's claim, the following questions will need to be resolved: (1) whether CoreCivic withheld from him a basic living necessity; (2) whether he participated in the VWP because CoreCivic withheld a basic living necessity, i.e., was he coerced into participating; (3) whether he needed to work to earn money to purchase the withheld basic living necessity or, e.g., did he have sufficient funds in his account from outside sources; (4) whether he actually used the money earned to purchase the withheld basic living necessity; and (5) whether the withheld but purchased item actually was a basic living necessity.  These questions cannot be resolved on a classwide basis.

CA Labor Law Claim:   Plaintiffs contend that there is a single common question that will resolve all nine of their labor law claims: whether detainees who participate in the VWP are CoreCivic's employees under California law.  (Dkt. 84-1 at 22.)   CoreCivic disputes that they are, but does not dispute that this is a common question.  But it is not a "significant aspect of the case."  *Hanlon*, 150 F.3d at 1022.  There are many other individual questions needed to fully resolve the putative class member's claims.  For example, as the Court has already alluded to, a detainee's status (as an authorized or unauthorized alien) is potentially relevant in deciding whether he can be considered an employee under California law.  (Dkt. 38 at 42.)   The putative Labor Law Class includes unauthorized aliens.  (Ex. 32.) Status aside, to recover on their overtime wage, meal period, and rest period claims, each detainee must prove that he worked more than 8 hours in a day or 40 hours in a week (for overtime), more than 5 hours in a day (for a meal period), or 3 ½ hours in a day (for a rest period).  *See* Cal. Labor Code §§ 226.7, 510, 512; Wage Order 5-2001.  For meal periods, it will also have to be determined whether the detainee worked a 6 hour shift and agreed to waive his meal period.  *Id*.  And for all qualifying shifts, it will have to be determined whether the detainee actually received a meal and/or rest period.  These are all individualized inquiries.  *See*

*Brown v. Federal Express Co.*, 249 F.R.D. 580, 586-87 (C.D. Cal. 2008).

For those detainees who might establish that they are entitled to damages, there are still more individual determinations that must be made. In addition to determining the amount of each class member's damages—which Plaintiffs have not proposed how this can be done on a classwide basis—any damages must be offset by CoreCivic's counterclaim for unjust enrichment. (Dkt. 70 at 30-34.) That offset includes the cost of providing each detainee housing, food, clothing, and other costs and expenses associated with their detention. Those costs and expenses are unique to each detainee and the duration of their detention. *See Comcast*, 569 U.S. at 34 ("Questions of individual damage calculations will inevitably overwhelm questions common to the class."); *Ruiz v. XPO Last Mile, Inc.*, 5CV2125 JLS (KSC), 2016 WL 4515859, at \*11 (S.D. Cal. Feb. 1, 2016) ("If Plaintiff proves liability, the damages owed to each class member for missed meal and rest breaks will necessarily be a more individualized inquiry, as Defendant suggests.").

### E.     Superiority.

Plaintiffs fail to meaningfully address, much less meet their burden of establishing through evidence, that class treatment is the "superior" method for resolving all claims efficiently and economically under the four factors articulated in Rule 23(b)(3)(A)-(D). *Weigele v. FedEx Ground Package Sys., Inc.*, 267 F.R.D. 614, 623 (S.D. Cal. 2010). The similar lawsuits outside of California that concern these issues not only shows that other putative class members have an interest in controlling their own separate actions, but also that "litigation concerning the controversy [has] already begun by class members."[20] Fed. R. Civ. P. 23(b)(3)(A), (B). The putative National classes have no meaningful ties to California, and Plaintiffs provide no reason why this forum is superior. Fed. R. Civ. P. 23(b)(3)(C).

---

[20] *See, e.g.*, *Barrientos v. CoreCivic, Inc.*, No. 4:18-cv-00070-CDL (M.D. Ga. 2018); *Martha Gonzalez v. CoreCivic., Inc.*, No. 1:18-cv-00169 (W.D. Tex. 2018) *Carlos Gonzalez v. CoreCivic, Inc.*, No. 3:17-cv-02573-JLS-NLS (S.D. Cal. 2017).

The most detrimental factor to Plaintiffs is the "manageability" factor, which "encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S 156, 164 (1974).  Indeed, the manageability of individual issues is just as important as the existence of common questions in determining whether a class action is a superior device.  "[I]f 'the complexities of class action treatment outweigh the benefits of considering common issues in one trial,' and 'each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not superior.'"  *Wilson v. TE Connectivity Networks*, 2017 WL 1758048, at *6 (N.D. Cal. Feb. 9, 2017) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001)).

Here, Plaintiffs offer no explanation of how they plan to manage *five* classes, which they claim will include more than 120,000 people who are scattered across a multitude of countries.  This lack of a management plan threatens class members' due process rights. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (due process rights of class members in monetary damages suits include receiving notice, participating in the litigation, and the choice to opt out).

Moreover, Plaintiffs fail to provide any proposal of how the jury will be able to sort out all the individualized determinations necessary for each putative class member.  For instance, differences in the number of hours that individual class members worked per day or per week would determine liability for overtime.  Differences in the number of continuous hours each class member allegedly worked each day would also determine liability for meal and rest periods.  The TVPA claims will similarly require jurors to assess each class members' subjective beliefs of threat or coercion. As discussed above, each of these issues turn on individualized facts that would require the Court to engage in thousands of mini-trials before it could even find liability.

The complications from damages calculations in this case also weigh heavily against class certification.  Although damage calculations by themselves cannot defeat class certification, individualized damage calculations can affect the efficacy and judicial economy of trial management and weigh against a finding of superiority.  *See Blackwell*, 245 F.R.D. at 467 (S.D. Cal. 2007) ("[C]lass action[s] are improper where an individual class member would be required to try 'numerous and substantial issues to establish his or her right to recovery individually, after liability to the class is established.'") (internal quotations omitted).

In addition to determining the compensation each putative class member is owed for the number of hours he or she worked, the jury would also have to calculate the offset by CoreCivic's right to recover damages for unjust enrichment. Plaintiffs have not addressed how the jury will be able to sort out all these issues that determine liability and damages for each class member's claim.  *Weigele*, 267 F.R.D. at 624-25.  Class certification on these complicated and individualized issues would not promote efficiency or judicial economy, and therefore is not a superior method of resolving the controversies.  *See D.C. by & through Garter v. Cty. of San Diego*, 2018 WL 692252, at *4 (S.D. Cal. Feb. 1, 2018) ("As such, a series of individual lawsuits are just as efficient as a class action where damages would need to be determined on an individualized basis."); *Alpert v. U.S. Indus., Inc.*, 59 F.R.D. 491, 499 (C.D. Cal. 1973) (noting that the presence of counterclaims can defeat superiority).

## CONCLUSION

The Court should deny Plaintiffs' Motion for Class Certification.

1      Dated:  July 11, 2019

2

3                              By s/ Nicholas D. Acedo
                                  Daniel P. Struck
4                                 dstruck@strucklove.com
                                  Rachel Love
5                                 rlove@strucklove.com
                                  Nicholas D. Acedo
6                                 nacedo@strucklove.com
                                  Ashlee B. Hesman
7                                 ahesman@strucklove.com
                                  Jacob B. Lee
8                                 jlee@strucklove.com
                                  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
9
                                  Ethan H. Nelson
10                                LAW OFFICE OF ETHAN H. NELSON
                                  ethannelsonesq@gmail.com
11
                                  Attorneys for Defendant/Counter-Claimant
12                                CoreCivic, Inc.

13     3574033.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28