**EXHIBIT 12**

**EXHIBIT 12**

1  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   Daniel P. Struck, AZ Bar #012377
2  *(admitted pro hac vice)*
   Rachel Love, AZ Bar #019881
3  *(admitted pro hac vice)*
   Nicholas D. Acedo, AZ Bar #021644
4  *(admitted pro hac vice)*
   Ashlee B. Hesman, AZ Bar #028874
5  *(admitted pro hac vice)*
   Jacob B. Lee, AZ Bar #030371
6  *(admitted pro hac vice)*
   3100 West Ray Road, Suite 300
7  Chandler, Arizona  85226
   Tel.:  (480) 420-1600
8  Fax:  (480) 420-1695
   dstruck@strucklove.com
9  rlove@strucklove.com
   nacedo@strucklove.com
10 ahesman@strucklove.com
   jlee@strucklove.com
11
   LAW OFFICE OF ETHAN H. NELSON
12 Ethan H. Nelson, CA Bar #262448
   4 Park Plaza, Suite 1025
13 Irvine, California 92614
   Tel.: (949) 229-0961
14 Fax: (949) 861-7122
   ethannelsonesq@gmail.com
15
   Attorneys for Defendant/Counter-Claimant
16 CoreCivic, Inc.

17              **UNITED STATES DISTRICT COURT**

18             **SOUTHERN DISTRICT OF CALIFORNIA**

19 Sylvester Owino and Jonathan Gomez,     NO. 3:17-cv-01112-JLS-NLS
   on behalf of themselves, and all others
20 similarly situated,                     **DECLARATION OF T. PEAKS, II
                                           IN SUPPORT OF DEFENDANT'S**
21            Plaintiffs,                  **MEMORANDUM IN OPPOSITION
                                           TO PLAINTIFFS' MOTION FOR**
22 v.                                      **CLASS CERTIFICATION**

23 CoreCivic, Inc., a Maryland
   corporation,
24
              Defendant.
25

26

27

28

   Declaration of T. Peaks, II.                          17cv01112-JLS-NLS

**EXHIBIT 12**
**Page 0367**

1    CoreCivic, Inc., a Maryland
     corporation,
2
                         Counter-Claimant,
3
     v.
4
     Sylvester Owino and Jonathan Gomez,
5    on behalf of themselves, and all others
     similarly situated,
6
                         Counter-Defendants.
7

8

9        I, T. Peaks, II, make the following Declaration:

10       1.    I am over the age of 18 years and competent to testify to the matters

11   set forth in this Declaration.

12       2.    I make this Declaration in support of CoreCivic's Memorandum in

13   Opposition to Plaintiffs' Motion for Class Certification based on my own personal

14   knowledge and my review of the relevant documents as maintained by CoreCivic in

15   the usual course of business.

16       3.    I am employed by CoreCivic as the Headquarters & Facility Support

17   Center in Tennessee at Director of Payroll, a position I have held since July 2018.

18   My previous position was Payroll Manager, which I held from October 2010 until

19   June 2018.

20       4.    My duties as Director of Payroll include management of all aspects of

21   payroll and payroll processing.

22       5.    At the end of June 30, 2017, CoreCivic employed approximately

23   13,120 employees, of which 418 were employed at its corporate offices and 12,702

24   were employed at 46 correctional and detention facilities and 28 residential reentry

25   facilities that it owned, controlled, or leased across the United States.

26       6.    Of these employees, CoreCivic employed approximately 459

27   employees at facilities that it owned, controlled, or leased in California.

28       I declare under penalty of perjury that the foregoing is true and correct to the

Declaration of T. Peaks, II                2                17cv01112-JLS-NLS

EXHIBIT 12
Page 0368

1  best of my knowledge.

2

3        EXECUTED this <u>11</u> day of July, 2019 at Brentwood, Tennessee.

4

5

6                          T. Peaks, II

7

8  3599861.1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of T. Peaks, II          3          17cv01112-JLS-NLS

**EXHIBIT 12**
**Page 0369**

**EXHIBIT 13**

**EXHIBIT 13**

1   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    Daniel P. Struck, AZ Bar #012377
2   *(admitted pro hac vice)*
    Rachel Love, AZ Bar #019881
3   *(admitted pro hac vice)*
    Nicholas D. Acedo, AZ Bar #021644
4   *(admitted pro hac vice)*
    Ashlee B. Hesman, AZ Bar #028874
5   *(admitted pro hac vice)*
    Jacob B. Lee, AZ Bar #030371
6   *(admitted pro hac vice)*
    3100 West Ray Road, Suite 300
7   Chandler, Arizona  85226
    Tel.:  (480) 420-1600
8   Fax:  (480) 420-1695
    dstruck@strucklove.com
9   rlove@strucklove.com
    nacedo@strucklove.com
10  ahesman@strucklove.com
    jlee@strucklove.com
11
    LAW OFFICE OF ETHAN H. NELSON
12  Ethan H. Nelson, CA Bar #262448
    4 Park Plaza, Suite 1025
13  Irvine, California 92614
    Tel: (949) 229-0961
14  Fax: (949) 861-7122
    ethannelsonesq@gmail.com
15
    Attorneys for Defendant/Counter-Claimant
16  CoreCivic, Inc.

17              **UNITED STATES DISTRICT COURT**

18            **SOUTHERN DISTRICT OF CALIFORNIA**

19  Sylvester Owino and Jonathan Gomez,        NO. 3:17-cv-01112-JLS-NLS
    on behalf of themselves, and all others
20  similarly situated,                        **DECLARATION OF ORLANDO
                                               PEREZ IN SUPPORT OF
21              Plaintiffs,                     DEFENDANT'S MEMORANDUM
                                               IN OPPOSITION TO PLAINTIFFS'
22  v.                                         MOTION FOR CLASS
                                               CERTIFICATION**
23  CoreCivic, Inc., a Maryland
    corporation,
24
                Defendant.
25

26

27

28

    Declaration of Orlando Perez                        17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0370**

CoreCivic, Inc., a Maryland
corporation,

             Counter-Claimant,

v.

Sylvester Owino and Jonathan Gomez,
on behalf of themselves, and all others
similarly situated,

             Counter-Defendants.

I, Orlando Perez, make the following Declaration:

1.  I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I make this Declaration in support of CoreCivic's Memorandum in Opposition to Plaintiffs' Motion for Class Certification based on my own personal knowledge and my review of the relevant documents as maintained by CoreCivic in the usual course of business.

2.  I have been in corrections for over 42 years. I have been employed by CoreCivic since December 2003, when I started as an Assistant Warden at CoreCivic's Willacy County State Jail, located Raymondville, Texas. Prior to starting at Willacy County State Jail, I spent 27 years with the Texas Department of Criminal Justice, where I held positions ranging from Correctional Officer to Senior Warden II.

3.  I am currently the Warden of CoreCivic's Laredo Processing Center ("LPC"), located in Laredo, Texas, a position I have held since July 2016. As Warden, I am responsible for managing the operational functions of the facility, providing guidance and leadership to facility staff, and maintaining standards of compliance for internal and external stakeholders, including contracting agencies.

**Housekeeping**

4.  LPC uses dormitory-style housing units with bunk beds. Each detainee's assigned living area consists of a bunk and a locker that fits under the bottom bunk.

Declaration of Orlando Perez          2          17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0371**

5.  Detainees are provided instruction during orientation and in the detainee handbook as to their responsibilities with regard to cleanliness of their housing units. (*See* Doc. 85-25.)

6.  Detainees are expected to keep their assigned living area and beds clean and presentable at all times.

7.  The dormitories are cleaned four times daily, once after each meal and once at 9:00 p.m., but only by detainees enrolled in the Voluntary Work Program ("VWP"). Each cleaning takes approximately one hour or less, for a total of no more than three to five hours each day.

8.  Only detainees who are participating in the VWP are assigned to clean the common areas in the housing units. Such detainees are paid $1 per day for the participation. No other detainees are assigned jobs in the common areas.

9.  Detainees who volunteer to participate in the VWP and are assigned as housing unit porters clean the floors, surfaces, microwaves, showers, sinks, toilets, walls, windows, dayrooms, and rec areas and take out the trash in the common areas. Detainees who choose not to participate in the VWP are not assigned or asked to do these tasks.

10.  All detainees are expected to clean up their own messes in the common areas. For example, if a detainee spills a drink on the floor, or if something in the microwave bubbles over, they are expected to clean up the mess, rather than leaving it for someone else to clean up later. If a detainee walks away from a mess they made, however, they will not be disciplined for it. Rather, it will be cleaned by the assigned VWP unit porter.

11.  The only detainees who have ever been expected to clean up messes other than those they made themselves are either the assigned VWP unit porters or, before the VWP program, the detainees living in the unit who agreed to help clean the common areas.

Declaration of Orlando Perez                    3                    17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0372**

12.     Similarly, detainees are expected to throw their trash in the designated trash containers rather than leaving it on the floor or anywhere else in the common areas. Detainees are also expected to keep their assigned living areas free of trash, loose papers, and other debris.

13.     The only detainees who have ever been expected to pick up trash that was not their own are either the assigned VWP unit porters or, before the VWP program, the detainees living in the unit who agreed to help clean the common areas.

14.     Detainees are also expected to keep their personal belongings in their lockers, and to pick up their own personal belongings from the common area.

15.     The only detainees who have ever been expected to pick up personal belongings that were not their own are either the assigned VWP unit porters or, before the VWP program, the detainees living in the unit who agreed to help clean the common areas.

### Discipline

16.     The detainee handbook provides a list of prohibited acts and sanctions, divided into categories based on the severity of the prohibited acts. Among the "high moderate" offenses are 306 (refusal to clean assigned living area), 307 (refusal to obey a staff member/officer's order), and 399 (conduct that disrupts or interferes with the security or orderly running of the facility). These categories and offense codes are required by ICE and ICE's National Detention Standards ("NDS").

17.     Possible sanctions for these offenses include disciplinary segregation, loss of privileges (commissary, recreation, etc.), loss of job, restriction to housing unit, and a reprimand or warning. These potential sanctions are taken from the NDS, as well.

18.     When a staff member observes a violation of facility rules or policy, they report the violation to their supervisor, who decides whether to issue a formal

disciplinary report. If the supervisor decides to proceed with the disciplinary report, the staff member who observed the violation writes the report, and the Shift Supervisor orders an investigation.

19.     The disciplinary report and the investigation report are submitted to the Unit Disciplinary Committee ("UDC"). The UDC decides whether a violation occurred and, if so, the appropriate sanction to be imposed under the circumstances, including whether the detainee is a repeat offender and the severity of the offense.

20.     Disciplinary segregation is typically reserved for the most severe offenses that impact the safety and security of the institution, such as assaults or possession of contraband/weapons. Before a detainee may be placed in segregation as a disciplinary sanction, the placement must be approved by me and then by the ICE Senior Deportation Detention Officer ("SDDO"). The SDDO is one of several ICE representatives who provide oversight at LPC through regular facility visits and meetings with me and other facility administrative staff.

21.     In my three years as Warden of LPC, I recall only two or three instances in which a detainee was placed in segregation as a disciplinary sanction, and those all involved assaults.

22.     In my three years as Warden of LPC, no detainee has ever been placed in disciplinary segregation for refusal to clean their assigned living area, and no detainee ever would be. At most, such a detainee would be sanctioned with loss of privileges such as commissary or recreation, but even that is rare.

23.     Nor has a detainee ever been placed in disciplinary segregation or given any other disciplinary sanction for refusing to participate in the VWP, volunteering for the VWP and then refusing to report to their assigned work location, or volunteering for the VWP and then refusing to complete their assigned task. Facility supervisors are trained and instructed that participation in the VWP is strictly voluntary.

Declaration of Orlando Perez                    5                    17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0374**

24.     Detainees who volunteer to participate in the VWP and work outside their unit are called out and escorted from their housing units to their work areas according to a set schedule. This is done to ensure that detainees do not work more than they are permitted to work by policy (i.e., no more than eight hours per day and no more than 40 hours per week), and to ensure that they are paid for the days they work.

25.     After a detainee refuses to work two or three times, the Unit Manager will ask the detainee if they want to continue in the VWP. If a detainee says they do not want to work, they may be offered another available position. If they do not want to work in that position either, they may be dropped from the program. They are never given a disciplinary report or sanction for not participating.

26.     Because LPC is a secure detention facility, it is important for detainees to obey staff orders to maintain the safe and orderly operation of the facility. Nevertheless, disciplinary segregation is not given as a sanction for refusal to obey an order except under extreme circumstances. Sanctions for refusal to obey an order typically include loss of privileges (commissary, recreation, etc.) or restriction to housing unit.[1] A detainee would not be given disciplinary segregation for refusing an order to clean their assigned living area.

27.     Disciplinary sanctions for conduct that disrupts or interferes with the security or orderly running of the facility are rare. When they are given, it is usually related to count procedures (failure to stand for count, not being in the detainee's designated area during count, etc.). Sanctions typically include loss of privileges (commissary, recreation, etc.) or restriction to housing unit, but not segregation.

---

[1] Disciplinary segregation is a form of separation from the general population in which detainees are confined for a period of time in a segregation cell. While in segregation, a detainee's property and privileges are restricted. Restriction to housing unit requires a detainee to remain in their housing unit for a period of time, but does not restrict them from any in-unit activities or privileges.

Declaration of Orlando Perez                 6                 17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0375**

**Commissary/Basic Necessities**

28.     When new detainees arrive at LPC, they are provided the following clothing and hygiene items consistent with the requirements of the NDS:

    a.  2 uniforms (shirts and pants);

    b.  1 pair of shoes;

    c.  2 t-shirts;

    d.  2 pair of underwear;

    e.  2 bras (as needed);

    f.  2 pair of socks;

    g.  1 bar of soap;

    h.  1 tube of toothpaste;

    i.  1 toothbrush;

    j.  1 bottle of shampoo;

    k.  1 comb;

    l.  1 brush;

    m. 1 packet of lotion; and

    n.  1 sanitary napkin (as applicable).

Razors are available upon request. Photographs that accurately depict the types of hygiene and clothing items that are provided to new detainees are attached as Attachments A and B, respectively.

29.     Detainees are informed during orientation that if they run out of a hygiene item, or if an item of clothing gets worn out, all they have to do is ask for a new one, and it will be provided to them. This is also covered in the detainee handbook and during regular town hall meetings. (*See, e.g.,* Doc. 85-25 at CCOG00019523.)

30.     Detainees are not required to turn in an empty container to get new hygiene items. All they need to do is ask for a new one, and it will be provided to them.

Declaration of Orlando Perez    7    17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0376**

31.   Laundry is done every day. Each detainee is provided a mesh laundry bag with their initial clothing issue. A laundry officer comes through every housing unit every day to pick up laundry bags. All laundry is returned to the detainees that same day. Additionally, staff makes regular rounds to inspect clothing, and will replace worn out clothing upon request.

32.   Detainees are provided three meals per day that are approved by a registered dietician to ensure they provide sufficient calories and nutrients, and that they provide sufficient variety.

33.   LPC also makes a commissary available to detainees, from which they can purchase certain food, hygiene items, clothing, and other items. The commissary inventory is approved by CoreCivic's Facility Support Center.

34.   The hygiene and clothing items available from the commissary are different than those provided for free to all detainees in that they generally provide detainees additional options in terms of brands, scents, colors, sizes, styles, etc.

35.   Because LPC provides detainees with meals and basic clothing and hygiene items, the commissary is intended to provide detainees options. It is not necessary for a detainee to purchase food, clothing, or hygiene items from the commissary.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 10th day of July, 2019 at Laredo, Texas.

Orlando Perez

3597799.1

Declaration of Orlando Perez                8                17cv01112-JLS-NLS

**EXHIBIT 13**
**Page 0377**

# ATTACHMENT A

# ATTACHMENT A

**EXHIBIT 13**
**Page 0378**



CCOG00103854

**EXHIBIT 13**
**Page 0379**

# ATTACHMENT B

# ATTACHMENT B

**EXHIBIT 13**
**Page 0380**



CCOG00103855

**EXHIBIT 13**
**Page 0381**

**EXHIBIT 14**

**EXHIBIT 14**

STRUCK LOVE BOJANOWSKI & ACEDO, PLC
Daniel P. Struck, AZ Bar #012377
*(admitted pro hac vice)*
Rachel Love, AZ Bar #019881
*(admitted pro hac vice)*
Nicholas D. Acedo, AZ Bar #021644
*(admitted pro hac vice)*
Ashlee B. Hesman, AZ Bar #028874
*(admitted pro hac vice)*
Jacob B. Lee, AZ Bar #030371
*(admitted pro hac vice)*
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Tel.:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com

LAW OFFICE OF ETHAN H. NELSON
Ethan H. Nelson, CA Bar #262448
4 Park Plaza, Suite 1025
Irvine, California 92614
Tel.: (949) 229-0961
Fax: (949) 861-7122
ethannelsonesq@gmail.com

Attorneys for Defendant/Counter-Claimant
CoreCivic, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated, | NO. 3:17-cv-01112-JLS-NLS |
| Plaintiffs, | **DECLARATION OF J. RODRIGUEZ, JR. IN SUPPORT OF DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| CoreCivic, Inc., a Maryland corporation, | |
| Defendant. | |

Declaration of J. Rodriguez                                                    17cv01112-JLS-NLS

**EXHIBIT 14**
**Page 0382**

CoreCivic, Inc., a Maryland
corporation,

                Counter-Claimant,

v.

Sylvester Owino and Jonathan Gomez,
on behalf of themselves, and all others
similarly situated,

                Counter-Defendants.

I, J. Rodriguez, Jr. make the following Declaration:

1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I make this Declaration in support of CoreCivic's Memorandum in Opposition to Plaintiffs' Motion for Class Certification based on my own personal knowledge and my review of the relevant documents as maintained by CoreCivic in the usual course of business.

2.     I have been in corrections for over 23 years. I first began my employment with CoreCivic since 1996, when I started as a Correctional Officer at CoreCivic's Central Arizona Detention Center, located in Florence, Arizona. I worked for other private corrections and law enforcement entities in Texas from 2004 to 2009, and returned to CoreCivic in 2011 as the Chief of Security at CoreCivic's Northeast Ohio Correctional Center, located in Youngstown, Ohio.

3.     I am currently an Assistant Facility Administrator at CoreCivic's South Texas Family Residential Center ("STFRC"), located in Dilley, Texas, a position I have held since January 2016. As an Assistant Facility Administrator, I help ensure that the facility follows appropriate policies and procedures, including the facility's safety and sanitation procedures. I may also act in the capacity of the Facility Administrator if he is absent.

4.     As the name implies, STFRC houses families in ICE custody. STFRC is monitored by ICE's Juvenile and Family Residential Unit, and is subject to ICE's Family Residential Standards ("FRS").

Declaration of J. Rodriguez          2          17cv01112-JLS-NLS

**EXHIBIT 14**
**Page 0383**

5.      More specifically, STFRC houses mothers and their children. The facility is not built like a jail or prison, but consists of modular buildings arranged into five "neighborhoods." Each neighborhood has four complexes of 120 beds each, a soccer field, a basketball court, and playground equipment. Residents are allowed open movement within the facility.

6.      Within each complex are suites of 12 beds (six bunk beds). Each suite has a shared living area with couches, a table and chairs, a television, and a phone.

7.      Each complex has a microwave, and a refrigerator stocked with juice, milk, fruit, and snacks. Residents can access the snacks in their complex at any time. The refrigerator is re-stocked periodically throughout the day.

8.      Each complex also has a building with shared restroom facilities, including showers, as well as a phone room with additional phones.

9.      Each complex also has a shared laundry room with eight to ten washer/ dryer combination machines. Laundry detergent dispensers are built into each machine, and provide detergent at the push of a button for free.

10.      STFRC has two dining halls—the main dining hall and the annex. The annex is used for overflow as needed. The dining halls provide a buffet-style meal service. Residents are served the main course, and can serve themselves at a salad bar, condiments bar, and beans and rice bar. Residents can go back for more food if they want to.

11.      STFRC receives approximately 100 new residents each day. The average length of stay is approximately 11 days.

12.      Each suite typically houses up to three families. Residents are classified and housed according to the age and gender of the children in the family.

13.      Each new resident receives the following hygiene items consistent with the FRS:

        a.  1 toothbrush;

        b.  1 tube of toothpaste;

Declaration of J. Rodriguez                3                17cv01112-JLS-NLS

**EXHIBIT 14**
**Page 0384**

c.  1 bottle of shampoo;

d.  1 bottle of soap;

e.  1 comb;

f.  1 stick of deodorant; and

g.  1 container of lotion.

Diapers, wipes, and feminine hygiene products are available as needed.

14.    If residents run out of a hygiene item, they only need to ask staff for more. There is no need to exchange empty containers for new items. Each shower has a built-in soap dispenser that provides soap at the touch of a button free of charge.

15.    Residents are allowed to wear their own clothing at STFRC, and may keep up to 10 sets of clothing with them in their housing unit. If a detainee arrives at STFRC with an insufficient amount of clothing, the facility provides them a minimum of six sets of new clothing free of charge in the proper size, consisting of shirts, pants, socks, and underwear, as well as one pair of shoes. Children under 12 may also receive up to three sets of pajamas at their mother's request.

16.    Residents may keep their facility-issued clothing when they leave. If they choose not to, the clothing is washed and donated.

17.    STFRC also makes a commissary available to residents that operates like a convenience store, from which they can purchase certain food, hygiene, and other items. The commissary inventory is compiled by CoreCivic's Facility Support Center and approved by ICE.

18.    The hygiene items available from the commissary are different than those provided for free to all residents in that they generally provide residents additional options in terms of brands, scents, colors, sizes, etc.

19.    Residents are expected to clean their immediate living area—i.e., their bunk and the bunks of their children, and the immediate area around each—each morning and as needed. Essentially, residents are required to make their beds and

Declaration of J. Rodriguez                    4                    17cv01112-JLS-NLS

**EXHIBIT 14**
**Page 0385**

1  pick up their belongings. An outside janitorial contractor cleans the common areas
2  of the suites and the facility in general each day, seven days a week.

3      20.    STFRC also operates a Voluntary Work Program ("VWP") pursuant to
4  the FRS. The VWP is available only to residents 18 years of age or older, and pays
5  $3 per day. Parents who choose to participate in the VWP can take their children to
6  supervised daycare run by facility staff for up for four hours a day while they
7  complete their assignments.

8      21.    Participation is strictly voluntary, and very few residents participate.
9  At any given time, only about 70–80 residents out of a facility capacity of 2,400
10  residents participate in the VWP.

11      22.    Available assignments consist primarily of general cleaning, such as
12  picking up trash or sweeping. It is generally not necessary to use chemicals to
13  complete VWP assignments, except perhaps to clean windows.

14      23.    The STFRC laundry is staffed by facility staff. The kitchen is staffed
15  by an outside vendor.

16      24.    School is provided for minor residents, who receive a minimum of five
17  hours each day—one hour each in science, social studies, math, language arts, and
18  physical education. School is strongly encouraged, but is not required.

19      I declare under penalty of perjury that the foregoing is true and correct to the
20  best of my knowledge.

21      EXECUTED this 11th day of July, 2019 at Dilley, Texas.

22

23

24      J. Rodriguez, Jr.

25  3599861.1

26

27

28

Declaration of J. Rodriguez                    5                    17cv01112-JLS-NLS

EXHIBIT 14
Page 0386

**EXHIBIT 15**

**EXHIBIT 15**

1   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    Daniel P. Struck, AZ Bar #012377
2   *(admitted pro hac vice)*
    Rachel Love, AZ Bar #019881
3   *(admitted pro hac vice)*
    Nicholas D. Acedo, AZ Bar #021644
4   *(admitted pro hac vice)*
    Ashlee B. Hesman, AZ Bar #028874
5   *(admitted pro hac vice)*
    Jacob B. Lee, AZ Bar #030371
6   *(admitted pro hac vice)*
    3100 West Ray Road, Suite 300
7   Chandler, Arizona 85226
    Tel.: (480) 420-1600
8   Fax: (480) 420-1695
    dstruck@strucklove.com
9   rlove@strucklove.com
    nacedo@strucklove.com
10  ahesman@strucklove.com
    jlee@strucklove.com
11
    LAW OFFICE OF ETHAN H. NELSON
12  Ethan H. Nelson, CA Bar #262448
    4 Park Plaza, Suite 1025
13  Irvine, California 92614
    Tel.: (949) 229-0961
14  Fax: (949) 861-7122
    ethannelsonesq@gmail.com
15
    Attorneys for Defendant/Counter-Claimant
16  CoreCivic, Inc.

17                  **UNITED STATES DISTRICT COURT**

18                **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 19  Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated, | NO. 3:17-cv-01112-JLS-NLS |
| 20 | **DECLARATION OF S. SIMMONS IN SUPPORT OF DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| 21              Plaintiffs, | |
| 22  v. | |
| 23  CoreCivic, Inc., a Maryland corporation, | |
| 24 | |
| 25              Defendant. | |

26

27

28

Declaration of S. Simmons                                17cv01112-JLS-NLS

**EXHIBIT 15**
**Page 0387**

1  CoreCivic, Inc., a Maryland
   corporation,
2
                        Counter-Claimant,
3
4  v.

5  Sylvester Owino and Jonathan Gomez,
   on behalf of themselves, and all others
6  similarly situated,

7                       Counter-Defendants.

8      I, S. Simmons, make the following Declaration:

9      1.    I am over the age of 18 years and competent to testify to the matters

10 set forth in this Declaration.

11     2.    I make this Declaration in support of CoreCivic's Memorandum in

12 Opposition to Plaintiffs' Motion for Class Certification based on my own personal

13 knowledge and my review of the relevant documents as maintained by CoreCivic in

14 the usual course of business.

15     3.    I am employed by CoreCivic at its Headquarters & Facility Support

16 Center in Tennessee as Managing Director of Accounting, a position I have held

17 since 2013.

18     4.    As Managing Director of Accounting, my duties include financial

19 reporting, including Forms 10-K and 10-Q filed with the Securities and Exchange

20 Commission ("SEC"), and supplemental financial information.

21     5.    I have knowledge of CoreCivic's Form 10-Q for the quarter ending on

22 June 30, 2017 (attached as "Attachment A"), filed with the SEC, and its

23 Supplemental Financial Information for the quarter ending on June 30, 2017

24 (attached as "Attachment B").

25     6.    As of June 30, 2017, CoreCivic owned or controlled 46 correctional

26 and detention facilities, owned or controlled 28 residential reentry centers, and

27 managed an additional 10 correctional and detention facilities owned by its

28

Declaration of S. Simmons                    2                    17cv01112-JLS-NLS

**EXHIBIT 15**
**Page 0388**

government partners, with a total design capacity of approximately 87,400 beds in 20 states. (Att. A, at pg. 6.)

7.    Of these facilities, CoreCivic operated only one detention facility in California, Otay Mesa Detention Center, with 1,482 beds; and two residential reentry facilities, CAI-Boston Avenue (State of California), with 120 beds and CAI Ocean View (primarily Federal Bureau of Prisons), with 483 beds.  (Att. B, at pg. 13.)

8.    Of these facilities, CoreCivic leased, but did not operate, eight facilities: four in Pennsylvania, three in California, and one in Oklahoma. Only one of those facilities, the California City Correctional Center, was leased to the California Department of Corrections and Rehabilitation ("CDCR").  (Att. B, at pg. 17.)

9.    CoreCivic owned and/or operated two correctional facilities outside California that incarcerated CDCR inmates: La Palma Correctional Center in Arizona; and Tallahatchie County Correctional Facility in Mississippi.  (Att. B, at pgs. 13–14.)

10.    For the six months ending June 30, 2017, CoreCivic generated approximately 7.79 percent of its total revenue from its business with the State of California. (Att. B, at pgs. 8, 12.)

11.    CoreCivic's business affiliations with the State of California was only a small part of its nationwide business revenue. (*Id.*)

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 11 day of July, 2019 at Brentwood, Tennessee.

S. Simmons

Declaration of S. Simmons                              3                              17cv01112-JLS-NLS

**EXHIBIT 15**
**Page 0389**

# ATTACHMENT A

# ATTACHMENT A

EXHIBIT 15
Page 0390

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C.  20549**

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED:  JUNE 30, 2017**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**

**COMMISSION FILE NUMBER: 001-16109**

# CORECIVIC, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **MARYLAND** | **62-1763875** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**10 BURTON HILLS BLVD., NASHVILLE, TENNESSEE  37215**
**(Address and zip code of principal executive offices)**

**(615) 263-3000**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

Indicate the number of shares outstanding of each class of Common Stock as of August 2, 2017:

Shares of Common Stock, $0.01 par value per share: 118,179,086 shares outstanding.

**EXHIBIT 15**
**Page 0391**

**CORECIVIC, INC.**

**FORM 10-Q**

**FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2017**

**INDEX**

|  |  | PAGE |
|---|---|---|
| **PART 1 – FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 1 |
| a) | Consolidated Balance Sheets (Unaudited) as of June 30, 2017 and December 31, 2016 | 1 |
| b) | Consolidated Statements of Operations (Unaudited) for the three and six months ended June 30, 2017 and 2016 | 2 |
| c) | Consolidated Statements of Cash Flows (Unaudited) for the six months ended June 30, 2017 and 2016 | 3 |
| d) | Consolidated Statement of Stockholders' Equity (Unaudited) for the six months ended June 30, 2017 | 4 |
| e) | Consolidated Statement of Stockholders' Equity (Unaudited) for the six months ended June 30, 2016 | 5 |
| f) | Notes to Consolidated Financial Statements (Unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 40 |
| Item 4. | Controls and Procedures | 41 |
| **PART II – OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 42 |
| Item 1A. | Risk Factors | 42 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 42 |
| Item 3. | Defaults Upon Senior Securities | 42 |
| Item 4. | Mine Safety Disclosures | 43 |
| Item 5. | Other Information | 43 |
| Item 6. | Exhibits | 43 |
| **SIGNATURES** | | 44 |

**EXHIBIT 15**
**Page 0392**

# PART I – FINANCIAL INFORMATION

**ITEM 1. – FINANCIAL STATEMENTS.**

**CORECIVIC, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
(UNAUDITED AND AMOUNTS IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

| ASSETS | June 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 46,584 | $ | 37,711 |
| Accounts receivable, net of allowance of $666 and $1,580, respectively | | 206,848 | | 229,885 |
| Prepaid expenses and other current assets | | 25,620 | | 31,228 |
| Total current assets | | 279,052 | | 298,824 |
| Property and equipment, net of accumulated depreciation of $1,413,136 and $1,352,323, respectively | | 2,806,078 | | 2,837,657 |
| Goodwill | | 40,402 | | 38,386 |
| Non-current deferred tax assets | | 11,537 | | 13,735 |
| Other assets | | 87,247 | | 83,002 |
| Total assets | $ | 3,224,316 | $ | 3,271,604 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Accounts payable and accrued expenses | $ | 243,975 | $ | 260,107 |
| Income taxes payable | | 853 | | 2,086 |
| Current portion of long-term debt | | 10,000 | | 10,000 |
| Total current liabilities | | 254,828 | | 272,193 |
| Long-term debt, net | | 1,407,196 | | 1,435,169 |
| Deferred revenue | | 46,574 | | 53,437 |
| Other liabilities | | 52,374 | | 51,842 |
| Total liabilities | | 1,760,972 | | 1,812,641 |
| Commitments and contingencies | | | | |
| Preferred stock – $0.01 par value; 50,000 shares authorized; none issued and outstanding at June 30, 2017 and December 31, 2016, respectively | | — | | — |
| Common stock – $0.01 par value; 300,000 shares authorized; 118,179 and 117,554 shares issued and outstanding at June 30, 2017 and December 31, 2016, respectively | | 1,182 | | 1,176 |
| Additional paid-in capital | | 1,789,337 | | 1,780,350 |
| Accumulated deficit | | (327,175) | | (322,563) |
| Total stockholders' equity | | 1,463,344 | | 1,458,963 |
| Total liabilities and stockholders' equity | $ | 3,224,316 | $ | 3,271,604 |

The accompanying notes are an integral part of these consolidated financial statements.

1

**EXHIBIT 15**
**Page 0393**

**CORECIVIC, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(UNAUDITED AND AMOUNTS IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| REVENUES | $ 436,393 | $ 463,331 | $ 882,077 | $ 910,716 |
| EXPENSES: | | | | |
| Operating | 307,897 | 316,446 | 623,200 | 630,364 |
| General and administrative | 26,417 | 27,364 | 51,243 | 53,844 |
| Depreciation and amortization | 36,800 | 42,345 | 73,057 | 84,404 |
| Asset impairments | — | — | 259 | — |
| | 371,114 | 386,155 | 747,759 | 768,612 |
| OPERATING INCOME | 65,279 | 77,176 | 134,318 | 142,104 |
| OTHER (INCOME) EXPENSE: | | | | |
| Interest expense, net | 16,622 | 16,796 | 33,112 | 34,340 |
| Other (income) expense | (60) | 132 | (43) | 49 |
| | 16,562 | 16,928 | 33,069 | 34,389 |
| INCOME BEFORE INCOME TAXES | 48,717 | 60,248 | 101,249 | 107,715 |
| Income tax expense | (3,242) | (2,665) | (5,727) | (3,825) |
| NET INCOME | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| BASIC EARNINGS PER SHARE | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.89 |
| DILUTED EARNINGS PER SHARE | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.88 |
| DIVIDENDS DECLARED PER SHARE | $ 0.42 | $ 0.54 | $ 0.84 | $ 1.08 |

The accompanying notes are an integral part of these consolidated financial statements.

2

**EXHIBIT 15**
**Page 0394**

CORECIVIC, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED AND AMOUNTS IN THOUSANDS)

|  | For the Six Months Ended June 30, | |
|  | 2017 | 2016 |
| --- | --- | --- |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income | $ 95,522 | $ 103,890 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 73,057 | 84,404 |
| Asset impairments | 259 | — |
| Amortization of debt issuance costs and other non-cash interest | 1,566 | 1,577 |
| Deferred income taxes | 2,198 | 2,050 |
| Non-cash revenue and other income | (10,740) | (2,204) |
| Income tax benefit of equity compensation | — | (25) |
| Non-cash equity compensation | 8,145 | 7,873 |
| Other expenses and non-cash items | 1,964 | 2,192 |
| Changes in assets and liabilities, net: | | |
| Accounts receivable, prepaid expenses and other assets | 27,952 | 22,079 |
| Accounts payable, accrued expenses and other liabilities | (15,907) | (7,754) |
| Income taxes payable | (1,233) | (756) |
| Net cash provided by operating activities | 182,783 | 213,326 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Expenditures for facility development and expansions | (13,862) | (18,725) |
| Expenditures for other capital improvements | (20,929) | (20,695) |
| Acquisitions, net of cash acquired | (14,077) | (43,618) |
| Decrease in restricted cash | — | 240 |
| Proceeds from sale of assets | 100 | 8,192 |
| Decrease in other assets | 4,893 | 833 |
| Payments received on direct financing lease and notes receivable | 684 | 1,231 |
| Net cash used in investing activities | (43,191) | (72,542) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from issuance of debt and borrowings from credit facility | 120,500 | 201,000 |
| Scheduled principal repayments | (5,000) | (2,500) |
| Other principal repayments of debt | (144,500) | (196,000) |
| Payment of debt issuance and other refinancing and related costs | (65) | (68) |
| Payment of lease obligations | (1,149) | (6,702) |
| Contingent consideration for acquisition of businesses | — | (1,073) |
| Dividends paid | (101,064) | (128,550) |
| Income tax benefit of equity compensation | — | 25 |
| Purchase and retirement of common stock | (5,818) | (3,947) |
| Decrease in restricted cash for dividends | — | 550 |
| Proceeds from exercise of stock options | 6,377 | 2,033 |
| Net cash used in financing activities | (130,719) | (135,232) |
| **NET INCREASE IN CASH AND CASH EQUIVALENTS** | 8,873 | 5,552 |
| **CASH AND CASH EQUIVALENTS, beginning of period** | 37,711 | 65,291 |
| **CASH AND CASH EQUIVALENTS, end of period** | $ 46,584 | $ 70,843 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | |
| Cash paid during the period for: | | |
| Interest (net of amounts capitalized of $0 and $164 in 2017 and 2016, respectively) | $ 28,786 | $ 28,655 |
| Income taxes paid (refunded), net | $ 2,295 | $ (10,520) |

The accompanying notes are an integral part of these consolidated financial statements.

3

**EXHIBIT 15**
**Page 0395**

**CORECIVIC, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**
**FOR THE SIX MONTHS ENDED JUNE 30, 2017**
(UNAUDITED AND AMOUNTS IN THOUSANDS)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Par Value | | | |
| Balance as of December 31, 2016 | 117,554 | $ 1,176 | $ 1,780,350 | $ (322,563) | $ 1,458,963 |
| Net income | — | — | — | 95,522 | 95,522 |
| Retirement of common stock | (175) | (2) | (5,816) | — | (5,818) |
| Dividends declared on common stock ($0.84 per share) | — | — | — | (100,134) | (100,134) |
| Restricted stock compensation, net of forfeitures | — | — | 8,145 | — | 8,145 |
| Restricted stock grants | 507 | 5 | (5) | — | — |
| Stock options exercised | 293 | 3 | 6,663 | — | 6,666 |
| Balance as of June 30, 2017 | 118,179 | $ 1,182 | $ 1,789,337 | $ (327,175) | $ 1,463,344 |

The accompanying notes are an integral part of these consolidated financial statements.

4

**EXHIBIT 15**
**Page 0396**

**CORECIVIC, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**
**FOR THE SIX MONTHS ENDED JUNE 30, 2016**
(UNAUDITED AND AMOUNTS IN THOUSANDS)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Par Value | | | |
| Balance as of December 31, 2015 | 117,232 | $ 1,172 | $ 1,762,394 | $ (300,818) | $ 1,462,748 |
| Net income | — | — | — | 103,890 | 103,890 |
| Retirement of common stock | (134) | (1) | (3,946) | — | (3,947) |
| Dividends declared on common stock ($1.08 per share) | — | — | — | (127,998) | (127,998) |
| Restricted stock compensation, net of forfeitures | (1) | — | 7,720 | 57 | 7,777 |
| Income tax benefit of equity compensation | — | — | 25 | — | 25 |
| Stock option compensation expense, net of forfeitures | — | — | 96 | — | 96 |
| Restricted stock grants | 310 | 3 | — | — | 3 |
| Stock options exercised | 113 | 1 | 2,032 | — | 2,033 |
| Balance as of June 30, 2016 | 117,520 | $ 1,175 | $ 1,768,321 | $ (324,869) | $ 1,444,627 |

The accompanying notes are an integral part of these consolidated financial statements.

5

**EXHIBIT 15**
**Page 0397**

CORECIVIC, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)

JUNE 30, 2017

1.   ORGANIZATION AND OPERATIONS

CoreCivic, Inc. (together with its subsidiaries, the "Company" or "CoreCivic") is one of the nation's largest owners of partnership correctional, detention, and residential reentry facilities and one of the largest prison operators in the United States. Through three business offerings, CoreCivic Safety, CoreCivic Properties, and CoreCivic Community, the Company provides a broad range of solutions to government partners that serve the public good through high-quality corrections and detention management, innovative and cost-saving government real estate solutions, and a growing network of residential reentry centers to help address America's recidivism crisis. As of June 30, 2017, CoreCivic owned or controlled 46 correctional and detention facilities, owned or controlled 28 residential reentry centers, and managed an additional 10 correctional and detention facilities owned by its government partners, with a total design capacity of approximately 87,400 beds in 20 states.

In addition to providing fundamental residential services, CoreCivic's facilities offer a variety of rehabilitation and educational programs, including basic education, faith-based services, life skills and employment training, and substance abuse treatment. These services are intended to help reduce recidivism and to prepare offenders for their successful reentry into society upon their release. CoreCivic also provides or makes available to offenders certain health care (including medical, dental, and mental health services), food services, and work and recreational programs.

CoreCivic began operating as a real estate investment trust ("REIT") effective January 1, 2013. The Company provides correctional services and conducts other business activities through taxable REIT subsidiaries ("TRSs"). A TRS is a subsidiary of a REIT that is subject to applicable corporate income tax and certain qualification requirements. The Company's use of TRSs enables CoreCivic to comply with REIT qualification requirements while providing correctional services at facilities it owns and at facilities owned by its government partners and to engage in certain other business operations. A TRS is not subject to the distribution requirements applicable to REITs so it may retain income generated by its operations for reinvestment.

2.   BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The accompanying unaudited interim consolidated financial statements have been prepared by the Company and, in the opinion of management, reflect all normal recurring adjustments necessary for a fair presentation of results for the unaudited interim periods presented. Certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. generally accepted accounting principles have been condensed or omitted. The results of operations for the interim period are not necessarily indicative of the results to be obtained for the full fiscal year. Reference is made to the audited financial statements of CoreCivic included in its Annual Report on Form 10-K as of and for the year ended December 31, 2016 filed with the Securities and Exchange Commission (the "SEC") on February 23, 2017 (File No. 001-16109) (the "2016 Form 10-K") with respect to certain significant accounting and financial reporting policies as well as other pertinent information of the Company.

Recent Accounting Pronouncements

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, "Revenue from Contracts with Customers", which establishes a single, comprehensive revenue recognition standard for all contracts with customers. For public reporting entities such as CoreCivic, ASU 2014-09 was originally effective for interim and annual periods beginning after December 15, 2016 and early adoption of the ASU was not permitted. In July 2015, the FASB agreed to defer the effective date of the ASU for public reporting entities by one year, or to interim and annual periods beginning after December 15, 2017. Early adoption is now allowed as of the original effective date for public companies. In summary, the core principle of ASU 2014-09 is to recognize revenue when promised goods or services are transferred to customers in an amount that reflects the consideration that is expected to be received for those goods or services. Companies are allowed to select between two transition methods: (1) a full retrospective transition method with the application of the new guidance to each prior reporting period presented, or (2) a modified retrospective transition method that recognizes the cumulative effect on prior periods at the date of adoption together with additional footnote disclosures. CoreCivic is currently planning to adopt the standard when effective in its fiscal year 2018 and expects to utilize the modified retrospective transition method upon adoption of the ASU. CoreCivic has begun its analysis of the various contracts and revenue streams in order to determine the potential impact the ASU might have on the Company's results of operations or financial position and its related financial statement disclosure.

6

EXHIBIT 15
Page 0398

In February 2016, the FASB issued ASU 2016-02, "Leases (ASC 842)", which requires lessees to put most leases on their balance sheets but recognize expenses on their income statements in a manner similar to current accounting requirements. ASU 2016-02 also eliminates current real estate-specific provisions for all entities. For lessors, the ASU modifies the classification criteria and the accounting for sales-type and direct financing leases. For public reporting entities such as CoreCivic, guidance in ASU 2016-02 is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, and early adoption of the ASU is permitted. Entities are required to use a modified retrospective approach for leases that exist or are entered into after the beginning of the earliest comparative period in the financial statements. CoreCivic is currently planning to adopt the ASU when effective in its fiscal year 2019. CoreCivic does not currently expect that the new standard will have a material impact on its financial statements.

In March 2016, the FASB issued ASU 2016-09, "Improvements to Employee Share-Based Payment Accounting", that changes certain aspects of accounting for share-based payments to employees. ASU 2016-09 requires all income tax effects of awards to be recognized in the income statement when the awards vest or are settled. The new ASU also allows an employer to repurchase more of an employee's shares for tax withholding purposes without triggering liability accounting, and to make a policy election to account for forfeitures. Companies are required to elect whether to account for forfeitures of share-based payments by (1) recognizing forfeitures of awards as they occur, or (2) estimating the number of awards expected to be forfeited and adjusting the estimate when it is likely to change, as previously required. For public reporting entities such as CoreCivic, guidance in ASU 2016-09 is effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years, and early adoption of the ASU is permitted. All of the guidance in the ASU must be adopted in the same period. CoreCivic adopted the ASU in the first quarter of 2017, opting to estimate the number of awards expected to be forfeited and adjusting the estimate when it is likely to change, as was previously required. The amendments in ASU 2016-09 were applied prospectively and the Company's financial statements for prior periods were not adjusted. Adoption of the ASU resulted in a $1.0 million income tax benefit recognized by the Company in the first six months of 2017. The new standard will continue to have an impact on the Company's financial statements whenever the vested value of the awards differs from the grant-date fair value of such awards.

In January 2017, the FASB issued ASU 2017-01, "Business Combinations (Topic 805): Clarifying the Definition of a Business", that provides guidance to assist entities with evaluating when a set of transferred assets and activities ("set") is a business. Under the new guidance, an entity first determines whether substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets. If this threshold is met, the set is not a business. If the threshold is not met, the entity then evaluates whether the set meets the requirement that a business include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. The new ASU provides a more robust framework to use in determining when a set of assets and activities is a business. For public reporting entities such as CoreCivic, guidance in ASU 2017-01 is effective for fiscal years beginning after December 15, 2017, and interim periods within those years, and is to be applied prospectively to any transactions occurring within the period of adoption. Early adoption of the ASU is allowed for transactions that occur before the issuance date or effective date of the ASU, only when the transaction has not been reported in financial statements that have been issued or made available for issuance. CoreCivic adopted ASU 2017-01 in the first quarter of 2017.

In January 2017, the FASB issued ASU 2017-04, "Intangibles–Goodwill and Other (Topic 350): Simplifying the Test of Goodwill Impairment", that eliminates the requirement to calculate the implied fair value of goodwill by performing a hypothetical application of the acquisition method as of the date of the impairment test to measure a goodwill impairment charge. This requirement is the second step in the annual two-step quantitative impairment test that is currently required under Accounting Standards Codification ("ASC") 350, "Intangibles-Goodwill and Other". Instead, entities will recognize an impairment charge based on the first step of the quantitative impairment test currently required, which is the measurement of the excess of a reporting unit's carrying amount over its fair value. Entities will still have the option to perform a qualitative assessment to determine if the quantitative impairment test is necessary. For public reporting entities such as CoreCivic, guidance in ASU 2017-04 is effective for fiscal years beginning after December 15, 2019, and interim periods within those years. Early adoption of the ASU is allowed for interim or annual goodwill impairment tests performed on testing dates on or after January 1, 2017. CoreCivic is reviewing the ASU to determine the potential impact it might have on the Company's results of operations or financial position and its related financial statement disclosure.

7

EXHIBIT 15
Page 0399

**Fair Value of Financial Instruments**

To meet the reporting requirements of ASC 825, "Financial Instruments", regarding fair value of financial instruments, CoreCivic calculates the estimated fair value of financial instruments using market interest rates, quoted market prices of similar instruments, or discounted cash flow techniques with observable Level 1 inputs for publicly traded debt and Level 2 inputs for all other financial instruments, as defined in ASC 820, "Fair Value Measurement". At June 30, 2017 and December 31, 2016, there were no material differences between the carrying amounts and the estimated fair values of CoreCivic's financial instruments, other than as follows (in thousands):

| | June 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Note receivable from Agecroft Prison Management, LTD | $ 3,078 | $ 4,738 | $ 2,920 | $ 4,647 |
| Debt | $ (1,426,000) | $ (1,456,250) | $ (1,455,000) | $ (1,459,625) |

**Revenue Recognition – Multiple-Element Arrangement**

In September 2014, CoreCivic agreed under an expansion of an existing inter-governmental service agreement ("IGSA") between the city of Eloy, Arizona and U.S. Immigration and Customs Enforcement ("ICE") to provide residential space and services at the South Texas Family Residential Center. The IGSA was further amended in October 2016. The IGSA qualifies as a multiple-element arrangement under the guidance in ASC 605, "Revenue Recognition". CoreCivic determined that there were five distinct elements related to the amended IGSA with ICE. In the three months ended June 30, 2017 and 2016, CoreCivic recognized $42.5 million and $70.8 million, respectively, in revenue associated with the amended IGSA while $85.1 million and $141.5 million in revenue was recognized in the six months ended June 30, 2017 and 2016, respectively. The unrecognized balance of the fixed monthly payments is reported in deferred revenue. The current portion of deferred revenue is reflected within accounts payable and accrued expenses while the long-term portion is reflected in deferred revenue in the accompanying consolidated balance sheets. As of June 30, 2017 and December 31, 2016, total deferred revenue associated with this agreement amounted to $60.2 million and $67.0 million, respectively.

3.    **GOODWILL**

ASC 350, "Intangibles-Goodwill and Other", establishes accounting and reporting requirements for goodwill and other intangible assets. Goodwill was $40.4 million and $38.4 million as of June 30, 2017 and December 31, 2016, respectively. This goodwill was established in connection with multiple business combination transactions.

Under the provisions of ASC 350, CoreCivic performs a qualitative assessment that may allow it to skip the annual two-step impairment test. Under ASC 350, a company has the option to first assess qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If, after assessing the totality of events or circumstances, an entity determines it is not more likely than not that the fair value of a reporting unit is less than its carrying amount, then performing the two-step impairment test is unnecessary. If the two-step impairment test is required, CoreCivic determines the fair value of a reporting unit using a collaboration of various common valuation techniques, including market multiples and discounted cash flows. These impairment tests are required to be performed at least annually. CoreCivic performs its impairment tests during the fourth quarter, in connection with its annual budgeting process. CoreCivic performs these impairment tests at least annually and whenever circumstances indicate the carrying value of goodwill may not be recoverable.

In March 2017, the Texas Department of Criminal Justice ("TDCJ") notified CoreCivic that, in light of the current economic climate, as well as the fiscal constraints and budget outlook for the next biennium, the TDCJ would not be awarding the contract for the Bartlett State Jail. The TDCJ had previously solicited proposals for the rebid of the Bartlett facility, along with three other facilities that CoreCivic currently manages for the state of Texas. The managed-only contracts at the four facilities were scheduled to expire in August 2017. However, in collaboration with the TDCJ, the decision was made to close the Bartlett facility on June 24, 2017. In anticipation of the termination of the contract and closing of the Bartlett facility, CoreCivic recorded an asset impairment of $0.3 million during the first quarter of 2017 for the write-off of goodwill associated with the facility.

**EXHIBIT 15**
**Page 0400**

4.    **REAL ESTATE TRANSACTIONS**

**Acquisitions**

On January 1, 2017, CoreCivic acquired the Arapahoe Community Treatment Center, a 135-bed residential reentry center in Englewood, Colorado, for $5.5 million in cash, excluding transaction-related expenses. The acquisition included a contract with Arapahoe County whereby CoreCivic will provide residential reentry services for up to 135 residents.

On February 10, 2017, CoreCivic acquired the Stockton Female Community Corrections Facility, a 100-bed residential reentry center in Stockton, California, in a real estate-only transaction for $1.6 million, excluding transaction-related expenses. The 100-bed Stockton facility is leased to a third-party operator pursuant to a lease agreement that extends through April 2021 and includes one five-year lease extension option. The lessee separately contracts with the California Department of Corrections and Rehabilitation ("CDCR") to provide rehabilitative and reentry services to female residents at the leased facility.

On June 1, 2017, CoreCivic acquired the real estate operated by Center Point, Inc. ("Center Point"), a California-based non-profit organization, for $7.0 million in cash, excluding transaction-related expenses. CoreCivic consolidated a portion of Center Point's operations into the Company's preexisting residential reentry center portfolio and assumed ownership and operations of the Oklahoma City Transitional Center, a 200-bed residential reentry center in Oklahoma City, Oklahoma.

In allocating the purchase price of these three acquisitions, CoreCivic recorded $10.8 million of net tangible assets, $1.0 million of identifiable intangible assets, and $2.3 million of goodwill. CoreCivic acquired the facilities as strategic investments that further expand the Company's network of residential reentry centers.

Subsequent to quarter-end, CoreCivic acquired New Beginnings Treatment Center, Inc. ("NBTC"), an Arizona-based community corrections company, along with the real estate used in the operation of NBTC's business from an affiliate of NBTC, for an aggregate purchase price of $6.4 million. In connection with the acquisition, CoreCivic assumed a contract with the Federal Bureau of Prisons ("BOP") to provide reentry services to male and female adults at the Oracle Transitional Center containing 92 beds located in Tucson, Arizona.

**Idle Facilities**

On April 30, 2017, the contract with the BOP at the Company's 1,422-bed Eden Detention Center expired and was not renewed. CoreCivic idled the Eden facility following the transfer of the offender population, and has begun to market the facility. The Company can provide no assurance that it will be successful in securing a replacement contract. CoreCivic performed an impairment analysis of the Eden facility, which had a net carrying value of $40.5 million as of June 30, 2017, and concluded that this asset has a recoverable value in excess of the carrying value.

As of June 30, 2017, CoreCivic had eight idled correctional facilities, including the Eden facility, that are currently available and being actively marketed to potential customers. The following table summarizes each of the idled facilities and their respective carrying values, excluding equipment and other assets that could generally be transferred and used at other facilities CoreCivic owns without significant cost (dollars in thousands):

| Facility | Design Capacity | Date Idled | Net Carrying Values June 30, 2017 | Net Carrying Values December 31, 2016 |
|---|---|---|---|---|
| Prairie Correctional Facility | 1,600 | 2010 | $ 16,585 | $ 17,071 |
| Huerfano County Correctional Center | 752 | 2010 | 17,201 | 17,542 |
| Diamondback Correctional Facility | 2,160 | 2010 | 40,948 | 41,539 |
| Southeast Kentucky Correctional Facility | 656 | 2012 | 22,287 | 22,618 |
| Marion Adjustment Center | 826 | 2013 | 11,982 | 12,135 |
| Lee Adjustment Center | 816 | 2015 | 10,243 | 10,342 |
| Kit Carson Correctional Center | 1,488 | 2016 | 57,948 | 58,819 |
| Eden Detention Center | 1,422 | 2017 | 40,473 | 41,269 |
| | 9,720 | | $ 217,667 | $ 221,335 |

CoreCivic also has two idled non-core facilities containing 440 beds with an aggregate net book value of $3.9 million. CoreCivic incurred approximately $2.5 million and $2.0 million in operating expenses at the idled facilities for the three months ended June 30, 2017 and 2016, respectively. CoreCivic incurred approximately $5.4 million and $4.1 million in operating expenses at the idled facilities for the six months ended June 30, 2017 and 2016, respectively.

CoreCivic considers the cancellation of a contract as an indicator of impairment and tested each of the idled facilities for impairment when it was notified by the respective customers that they would no longer be utilizing such facility. CoreCivic

9

**EXHIBIT 15**
**Page 0401**

updates the impairment analyses on an annual basis for each of the idled facilities and evaluates on a quarterly basis market developments for the potential utilization of each of these facilities in order to identify events that may cause CoreCivic to reconsider its most recent assumptions. As a result of CoreCivic's analyses, CoreCivic determined each of the idled facilities to have recoverable values in excess of the corresponding carrying values.

As a result of declines in federal populations at the Company's 910-bed Torrance County Detention Facility and 1,129-bed Cibola County Corrections Center, during the third quarter of 2017 CoreCivic expects to obtain customer consent to consolidate offender populations into its Cibola facility in order to take advantage of efficiencies gained by consolidating populations into one facility. CoreCivic has begun to market the Torrance facility, which had a net carrying value of $37.3 million at June 30, 2017, to other potential customers.

5.    **DEBT**

Debt outstanding as of June 30, 2017 and December 31, 2016 consists of the following (in thousands):

|  | June 30, 2017 | December 31, 2016 |
|---|---|---|
| $900.0 Million Revolving Credit Facility, principal due at maturity in July 2020; interest payable periodically at variable interest rates. The weighted average rate at June 30, 2017 and December 31, 2016 was 2.6% and 2.2%, respectively. | $    411,000 | $    435,000 |
| Term Loan, scheduled principal payments through maturity in July 2020; interest payable periodically at variable interest rates. The rate at June 30, 2017 and December 31, 2016 was 2.7% and 2.3%, respectively. Unamortized debt issuance costs amounted to $0.4 million at both June 30, 2017 and December 31, 2016. | 90,000 | 95,000 |
| 4.625% Senior Notes, principal due at maturity in May 2023; interest payable semi-annually in May and November at 4.625%. Unamortized debt issuance costs amounted to $3.6 million and $3.9 million at June 30, 2017 and December 31, 2016, respectively. | 350,000 | 350,000 |
| 4.125% Senior Notes, principal due at maturity in April 2020; interest payable semi-annually in April and October at 4.125%. Unamortized debt issuance costs amounted to $2.3 million and $2.7 million at June 30, 2017 and December 31, 2016, respectively. | 325,000 | 325,000 |
| 5.0% Senior Notes, principal due at maturity in October 2022; interest payable semi-annually in April and October at 5.0%. Unamortized debt issuance costs amounted to $2.5 million and $2.8 million at June 30, 2017 and December 31, 2016, respectively. | 250,000 | 250,000 |
| Total debt | 1,426,000 | 1,455,000 |
| Unamortized debt issuance costs | (8,804) | (9,831) |
| Current portion of long-term debt | (10,000) | (10,000) |
| Long-term debt, net | $    1,407,196 | $    1,435,169 |

*Revolving Credit Facility.* During July 2015, CoreCivic entered into an amended and restated $900.0 million senior secured revolving credit facility (the "$900.0 Million Revolving Credit Facility"). The $900.0 Million Revolving Credit Facility has an aggregate principal capacity of $900.0 million and a maturity of July 2020. The $900.0 Million Revolving Credit Facility also has an "accordion" feature that provides for uncommitted incremental extensions of credit in the form of increases in the revolving commitments or incremental term loans in an aggregate principal amount up to an additional $350.0 million as requested by CoreCivic, subject to bank approval. At CoreCivic's option, interest on outstanding borrowings under the $900.0 Million Revolving Credit Facility is based on either a base rate plus a margin ranging from 0.00% to 0.75% or at LIBOR plus a margin ranging from 1.00% to 1.75% based on CoreCivic's then-current leverage ratio. The $900.0 Million Revolving Credit Facility includes a $30.0 million sublimit for swing line loans that enables CoreCivic to borrow at the base rate from the Administrative Agent without advance notice.

**EXHIBIT 15**
**Page 0402**

Based on CoreCivic's current leverage ratio, loans under the $900.0 Million Revolving Credit Facility bear interest at the base rate plus a margin of 0.50% or at LIBOR plus a margin of 1.50%, and a commitment fee equal to 0.35% of the unfunded balance. The $900.0 Million Revolving Credit Facility also has a $50.0 million sublimit for the issuance of standby letters of credit. As of June 30, 2017, CoreCivic had $411.0 million in borrowings outstanding under the $900.0 Million Revolving Credit Facility as well as $7.5 million in letters of credit outstanding resulting in $481.5 million available under the $900.0 Million Revolving Credit Facility.

The $900.0 Million Revolving Credit Facility is secured by a pledge of all of the capital stock of CoreCivic's domestic subsidiaries, 65% of the capital stock of CoreCivic's foreign subsidiaries, all of CoreCivic's accounts receivable, and all of CoreCivic's deposit accounts. The $900.0 Million Revolving Credit Facility requires CoreCivic to meet certain financial covenants, including, without limitation, a maximum total leverage ratio, a maximum secured leverage ratio, and a minimum fixed charge coverage ratio. As of June 30, 2017, CoreCivic was in compliance with all such covenants. In addition, the $900.0 Million Revolving Credit Facility contains certain covenants that, among other things, limit the incurrence of additional indebtedness, payment of dividends and other customary restricted payments, transactions with affiliates, asset sales, mergers and consolidations, liquidations, prepayments and modifications of other indebtedness, liens and other encumbrances and other matters customarily restricted in such agreements. In addition, the $900.0 Million Revolving Credit Facility is subject to certain cross-default provisions with terms of CoreCivic's other indebtedness, and is subject to acceleration upon the occurrence of a change of control.

*Incremental Term Loan.* On October 6, 2015, CoreCivic obtained $100.0 million under an Incremental Term Loan ("Term Loan") under the "accordion" feature of the $900.0 Million Revolving Credit Facility. Interest rates under the Term Loan are the same as the interest rates under the $900.0 Million Revolving Credit Facility. The Term Loan also has the same collateral requirements, financial and certain other covenants, and cross-default provisions as the $900.0 Million Revolving Credit Facility. The Term Loan, which is pre-payable, also has a maturity concurrent with the $900.0 Million Revolving Credit Facility due July 2020, with scheduled quarterly principal payments in years 2016 through 2020. As of June 30, 2017, the outstanding balance of the Term Loan was $90.0 million.

*Senior Notes.* Interest on the $325.0 million aggregate principal amount of CoreCivic's 4.125% senior notes issued in April 2013 (the "4.125% Senior Notes") accrues at the stated rate and is payable in April and October of each year. The 4.125% Senior Notes are scheduled to mature on April 1, 2020. Interest on the $350.0 million aggregate principal amount of CoreCivic's 4.625% senior notes issued in April 2013 (the "4.625% Senior Notes") accrues at the stated rate and is payable in May and November of each year. The 4.625% Senior Notes are scheduled to mature on May 1, 2023. Interest on the $250.0 million aggregate principal amount of CoreCivic's 5.0% senior notes issued in September 2015 (the "5.0% Senior Notes") accrues at the stated rate and is payable in April and October of each year. The 5.0% Senior Notes are scheduled to mature on October 15, 2022.

The 4.125% Senior Notes, the 4.625% Senior Notes, and the 5.0% Senior Notes, collectively referred to herein as the "Senior Notes", are senior unsecured obligations of the Company and are guaranteed by all of the Company's subsidiaries that guarantee the $900.0 Million Revolving Credit Facility. CoreCivic may redeem all or part of the Senior Notes at any time prior to three months before their respective maturity date at a "make-whole" redemption price, plus accrued and unpaid interest thereon to, but not including, the redemption date. Thereafter, the Senior Notes are redeemable at CoreCivic's option, in whole or in part, at a redemption price equal to 100% of the aggregate principal amount of the notes to be redeemed plus accrued and unpaid interest thereon to, but not including, the redemption date.

CoreCivic may also seek to issue additional debt or equity securities from time to time when the Company determines that market conditions and the opportunity to utilize the proceeds from the issuance of such securities are favorable.

*Debt Maturities.* Scheduled principal payments as of June 30, 2017 for the remainder of 2017, the next four years, and thereafter were as follows (in thousands):

| | |
|---|---:|
| 2017 (remainder) | $    5,000 |
| 2018 | 10,000 |
| 2019 | 15,000 |
| 2020 | 796,000 |
| 2021 | — |
| Thereafter | 600,000 |
| Total debt | $   1,426,000 |

11

EXHIBIT 15
Page 0403

**6.    STOCKHOLDERS' EQUITY**

**Dividends on Common Stock**

During 2016 and the first six months of 2017, CoreCivic's Board of Directors declared the following quarterly dividends on its common stock:

| Declaration Date | Record Date | Payable Date | | Per Share |
|---|---|---|---|---|
| February 19, 2016 | April 1, 2016 | April 15, 2016 | $ | 0.54 |
| May 12, 2016 | July 1, 2016 | July 15, 2016 | $ | 0.54 |
| August 11, 2016 | October 3, 2016 | October 17, 2016 | $ | 0.54 |
| December 8, 2016 | January 3, 2017 | January 13, 2017 | $ | 0.42 |
| February 17, 2017 | April 3, 2017 | April 17, 2017 | $ | 0.42 |
| May 11, 2017 | July 3, 2017 | July 17, 2017 | $ | 0.42 |

Future dividends will depend on CoreCivic's distribution requirements as a REIT, future earnings, capital requirements, financial condition, opportunities for alternative uses of capital, and on such other factors as the Board of Directors of CoreCivic may consider relevant.

**Stock Options**

In the first six months of 2017 and during 2016, CoreCivic elected not to issue stock options to its non-employee directors, officers, and executive officers as it had in years prior to 2013 and instead elected to issue all of its equity compensation in the form of restricted common stock units ("RSUs"), as described hereafter. However, CoreCivic continued to recognize stock option expense during the vesting period of stock options awarded in prior years. All outstanding stock options were fully vested as of December 31, 2016. As of June 30, 2017, options to purchase 1.0 million shares of common stock were outstanding with a weighted average exercise price of $19.90.

**Restricted Stock Units**

During the first six months of 2017, CoreCivic issued approximately 554,000 shares of RSUs to certain of its employees and non-employee directors, with an aggregate value of $18.1 million, including 487,000 RSUs to employees and non-employee directors whose compensation is charged to general and administrative expense and 67,000 RSUs to employees whose compensation is charged to operating expense. During 2016, CoreCivic issued approximately 635,000 shares of RSUs to certain of its employees and non-employee directors, with an aggregate value of $18.5 million, including 562,000 RSUs to employees and non-employee directors whose compensation is charged to general and administrative expense and 73,000 RSUs to employees whose compensation is charged to operating expense.

CoreCivic established performance-based vesting conditions on the RSUs awarded to its officers and executive officers in years 2015 through 2017. Unless earlier vested under the terms of the agreements, performance-based RSUs issued to officers and executive officers in those years are subject to vesting over a three-year period based upon the satisfaction of certain annual performance criteria, and no more than one-third of the RSUs may vest in any one performance period. Time-based RSUs issued to other employees in 2016 and 2017, unless earlier vested under the terms of the agreements, generally vest equally on the first, second, and third anniversary of the award. Time-based RSUs issued to other employees in 2015, unless earlier vested under the terms of the agreements, "cliff" vest on the third anniversary of the award. RSUs issued to non-employee directors vest one year from the date of award.

During the three months ended June 30, 2017, CoreCivic expensed $4.1 million, net of forfeitures, relating to RSUs ($0.5 million of which was recorded in operating expenses and $3.6 million of which was recorded in general and administrative expenses). During the three months ended June 30, 2016, CoreCivic expensed $4.1 million, net of forfeitures, relating to restricted common stock and RSUs ($0.5 million of which was recorded in operating expenses and $3.6 million of which was recorded in general and administrative expenses).

During the six months ended June 30, 2017, CoreCivic expensed $8.1 million, net of forfeitures, relating to RSUs ($1.0 million of which was recorded in operating expenses and $7.1 million of which was recorded in general and administrative expenses). During the six months ended June 30, 2016, CoreCivic expensed $7.8 million, net of forfeitures, relating to restricted common stock and RSUs ($1.0 million of which was recorded in operating expenses and $6.8 million of which was recorded in general and administrative expenses). As of June 30, 2017, approximately 1.1 million RSUs remained outstanding and subject to vesting.

**EXHIBIT 15**
**Page 0404**

**7.    EARNINGS PER SHARE**

Basic earnings per share is computed by dividing net income by the weighted average number of common shares outstanding during the year.  Diluted earnings per share reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the entity.  For CoreCivic, diluted earnings per share is computed by dividing net income by the weighted average number of common shares after considering the additional dilution related to restricted share grants and stock options.

A reconciliation of the numerator and denominator of the basic earnings per share computation to the numerator and denominator of the diluted earnings per share computation is as follows (in thousands, except per share data):

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| **NUMERATOR** | | | | |
| **Basic:** | | | | |
| Net income | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| **Diluted:** | | | | |
| Net income | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| **DENOMINATOR** | | | | |
| **Basic:** | | | | |
| Weighted average common shares outstanding | 118,164 | 117,401 | 117,974 | 117,318 |
| **Diluted:** | | | | |
| Weighted average common shares outstanding | 118,164 | 117,401 | 117,974 | 117,318 |
| Effect of dilutive securities: | | | | |
| Stock options | 377 | 514 | 398 | 473 |
| Restricted stock-based awards | 44 | 94 | 51 | 98 |
| Weighted average shares and assumed conversions | 118,585 | 118,009 | 118,423 | 117,889 |
| **BASIC EARNINGS PER SHARE** | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.89 |
| **DILUTED EARNINGS PER SHARE** | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.88 |

There were no stock options excluded from the computation of diluted earnings per share for the three and six months ended June 30, 2017 and 2016.

13

**EXHIBIT 15**
**Page 0405**

8.   **COMMITMENTS AND CONTINGENCIES**

**Legal Proceedings**

The nature of CoreCivic's business results in claims and litigation alleging that it is liable for damages arising from the conduct of its employees, offenders or others.  The nature of such claims includes, but is not limited to, claims arising from employee or offender misconduct, medical malpractice, employment matters, property loss, contractual claims, including claims regarding compliance with contract performance requirements, and personal injury or other damages resulting from contact with CoreCivic's facilities, personnel or offenders, including damages arising from an offender's escape or from a disturbance at a facility.  CoreCivic maintains insurance to cover many of these claims, which may mitigate the risk that any single claim would have a material effect on CoreCivic's consolidated financial position, results of operations, or cash flows, provided the claim is one for which coverage is available.  The combination of self-insured retentions and deductible amounts means that, in the aggregate, CoreCivic is subject to substantial self-insurance risk.

CoreCivic records litigation reserves related to certain matters for which it is probable that a loss has been incurred and the range of such loss can be estimated.  Based upon management's review of the potential claims and outstanding litigation and based upon management's experience and history of estimating losses, and taking into consideration CoreCivic's self-insured retention amounts, management believes a loss in excess of amounts already recognized would not be material to CoreCivic's financial statements.  In the opinion of management, there are no pending legal proceedings that would have a material effect on CoreCivic's consolidated financial position, results of operations, or cash flows.  Any receivable for insurance recoveries is recorded separately from the corresponding litigation reserve, and only if recovery is determined to be probable.  Adversarial proceedings and litigation are, however, subject to inherent uncertainties, and unfavorable decisions and rulings resulting from legal proceedings could occur which would have a material adverse impact on CoreCivic's consolidated financial position, results of operations, or cash flows for the period in which such decisions or rulings occur, or future periods.  Expenses associated with legal proceedings may also fluctuate from quarter to quarter based on changes in CoreCivic's assumptions, new developments, or by the effectiveness of CoreCivic's litigation and settlement strategies.

9.   **INCOME TAXES**

As discussed in Note 1, the Company began operating in compliance with REIT requirements for federal income tax purposes effective January 1, 2013.  As a REIT, the Company must distribute at least 90 percent of its taxable income (including dividends paid to it by its TRSs) and will not pay federal income taxes on the amount distributed to its stockholders.  In addition, the Company must meet a number of other organizational and operational requirements.  It is management's intention to adhere to these requirements and maintain the Company's REIT status. Most states where CoreCivic holds investments in real estate conform to the federal rules recognizing REITs. Certain subsidiaries have made an election with the Company to be treated as TRSs in conjunction with the Company's REIT election; the TRS elections permit CoreCivic to engage in certain business activities in which the REIT may not engage directly. A TRS is subject to federal and state income taxes on the income from these activities and therefore, CoreCivic includes a provision for taxes in its consolidated financial statements.

Income taxes are accounted for under the provisions of ASC 740, "Income Taxes". ASC 740 generally requires CoreCivic to record deferred income taxes for the tax effect of differences between book and tax bases of its assets and liabilities. Deferred income taxes reflect the available net operating losses and the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in the statement of operations in the period that includes the enactment date.  Realization of the future tax benefits related to deferred tax assets is dependent on many factors, including CoreCivic's past earnings history, expected future earnings, the character and jurisdiction of such earnings, unsettled circumstances that, if unfavorably resolved, would adversely affect utilization of its deferred tax assets, carryback and carryforward periods, and tax strategies that could potentially enhance the likelihood of realization of a deferred tax asset.

CoreCivic recorded an income tax expense of $3.2 million and $2.7 million for the three months ended June 30, 2017 and 2016, respectively.  CoreCivic recorded an income tax expense of $5.7 million and $3.8 million for the six months ended June 30, 2017 and 2016, respectively.  As a REIT, CoreCivic is entitled to a deduction for dividends paid, resulting in a substantial reduction in the amount of federal income tax expense it recognizes.  Substantially all of CoreCivic's income tax expense is incurred based on the earnings generated by its TRSs.  CoreCivic's overall effective tax rate is estimated based on its current projection of taxable income primarily generated in its TRSs. The Company's consolidated effective tax rate could fluctuate in the future based on changes in estimates of taxable income, the relative amounts of taxable income generated by the TRSs and the REIT, the implementation of additional tax planning strategies, changes in federal or state tax rates or laws affecting tax credits available to the Company, changes in other tax laws, changes in estimates related to uncertain tax positions, or changes

14

**EXHIBIT 15**
**Page 0406**

in state apportionment factors, as well as changes in the valuation allowance applied to the Company's deferred tax assets that are based primarily on the amount of state net operating losses and tax credits that could expire unused.

**Income Tax Contingencies**

ASC 740 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The guidance prescribed in ASC 740 establishes a recognition threshold of more likely than not that a tax position will be sustained upon examination. The measurement attribute requires that a tax position be measured at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement.

CoreCivic had no liabilities recorded for uncertain tax positions as of June 30, 2017. CoreCivic recognizes interest and penalties related to unrecognized tax positions in income tax expense. CoreCivic does not currently anticipate that the total amount of unrecognized tax positions will significantly change in the next twelve months.

**10.   SEGMENT REPORTING**

As of June 30, 2017, CoreCivic owned and managed 66 facilities, and managed 10 facilities it did not own. In addition, CoreCivic owned eight facilities that it leased to third-party operators. Management views CoreCivic's operating results in one operating segment. However, the Company has chosen to report financial performance segregated for (1) owned and managed facilities and (2) managed-only facilities as the Company believes this information is useful to users of the financial statements. Owned and managed facilities include the operating results of those facilities placed into service that were owned or controlled via a long-term lease and managed by CoreCivic. Managed-only facilities include the operating results of those facilities owned by a third party and managed by CoreCivic. The operating performance of the owned and managed and the managed-only facilities can be measured based on their net operating income. CoreCivic defines facility net operating income as a facility's operating income or loss from operations before interest, taxes, asset impairments, depreciation, and amortization.

15

**EXHIBIT 15**
**Page 0407**

The revenue and net operating income for the owned and managed and the managed-only facilities and a reconciliation to CoreCivic's operating income is as follows for the three and six months ended June 30, 2017 and 2016 (in thousands):

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Revenue: | | | | |
| Owned and managed | $ 374,849 | $ 401,931 | $ 759,552 | $ 790,552 |
| Managed-only | 50,871 | 51,346 | 101,432 | 101,176 |
| Total management revenue | 425,720 | 453,277 | 860,984 | 891,728 |
| Operating expenses: | | | | |
| Owned and managed | 254,611 | 266,249 | 516,883 | 529,672 |
| Managed-only | 46,017 | 44,218 | 92,742 | 89,309 |
| Total operating expenses | 300,628 | 310,467 | 609,625 | 618,981 |
| Facility net operating income: | | | | |
| Owned and managed | 120,238 | 135,682 | 242,669 | 260,880 |
| Managed-only | 4,854 | 7,128 | 8,690 | 11,867 |
| Total facility net operating income | 125,092 | 142,810 | 251,359 | 272,747 |
| Other revenue (expense): | | | | |
| Rental and other revenue | 10,673 | 10,054 | 21,093 | 18,988 |
| Other operating expense | (7,269) | (5,979) | (13,575) | (11,383) |
| General and administrative | (26,417) | (27,364) | (51,243) | (53,844) |
| Depreciation and amortization | (36,800) | (42,345) | (73,057) | (84,404) |
| Asset impairments | — | — | (259) | — |
| Operating income | $ 65,279 | $ 77,176 | $ 134,318 | $ 142,104 |

The following table summarizes capital expenditures including accrued amounts for the three and six months ended June 30, 2017 and 2016 (amounts in thousands):

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Capital expenditures: | | | | |
| Owned and managed | $ 18,089 | $ 59,453 | $ 34,929 | $ 70,731 |
| Managed-only | 1,034 | 686 | 1,814 | 1,341 |
| Corporate and other | 3,510 | 11,215 | 7,096 | 12,209 |
| Total capital expenditures | $ 22,633 | $ 71,354 | $ 43,839 | $ 84,281 |

The total assets are as follows (in thousands):

| | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Assets: | | |
| Owned and managed | $ 2,798,003 | $ 2,841,799 |
| Managed-only | 59,282 | 62,292 |
| Corporate and other | 367,031 | 367,513 |
| Total assets | $ 3,224,316 | $ 3,271,604 |

11.  CONDENSED CONSOLIDATING FINANCIAL STATEMENTS OF THE COMPANY AND SUBSIDIARIES

The following condensed consolidating financial statements of CoreCivic and subsidiaries have been prepared pursuant to Rule 3-10 of Regulation S-X.  These condensed consolidating financial statements have been prepared from the Company's financial information on the same basis of accounting as the consolidated financial statements.

16

EXHIBIT 15
Page 0408

**CONDENSED CONSOLIDATING BALANCE SHEET**
**As of June 30, 2017**
(in thousands)

| ASSETS | Parent | | Combined Subsidiary Guarantors | | Consolidating Adjustments and Other | | Total Consolidated Amounts | |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 16,078 | $ | 30,506 | $ | — | $ | 46,584 |
| Accounts receivable, net of allowance | | 189,181 | | 309,411 | | (291,744) | | 206,848 |
| Prepaid expenses and other current assets | | 2,445 | | 29,385 | | (6,210) | | 25,620 |
| Total current assets | | 207,704 | | 369,302 | | (297,954) | | 279,052 |
| Property and equipment, net | | 2,477,862 | | 328,216 | | — | | 2,806,078 |
| Goodwill | | 25,506 | | 14,896 | | — | | 40,402 |
| Non-current deferred tax assets | | — | | 12,096 | | (559) | | 11,537 |
| Other assets | | 382,649 | | 64,038 | | (359,440) | | 87,247 |
| Total assets | $ | 3,093,721 | $ | 788,548 | $ | (657,953) | $ | 3,224,316 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | | | | |
| Accounts payable and accrued expenses | $ | 209,271 | $ | 332,658 | $ | (297,954) | $ | 243,975 |
| Income taxes payable | | 1,370 | | (517) | | — | | 853 |
| Current portion of long-term debt | | 10,000 | | — | | — | | 10,000 |
| Total current liabilities | | 220,641 | | 332,141 | | (297,954) | | 254,828 |
| Long-term debt, net | | 1,408,102 | | 114,094 | | (115,000) | | 1,407,196 |
| Non-current deferred tax liabilities | | 559 | | — | | (559) | | — |
| Deferred revenue | | — | | 46,574 | | — | | 46,574 |
| Other liabilities | | 1,075 | | 51,299 | | — | | 52,374 |
| Total liabilities | | 1,630,377 | | 544,108 | | (413,513) | | 1,760,972 |
| Total stockholders' equity | | 1,463,344 | | 244,440 | | (244,440) | | 1,463,344 |
| Total liabilities and stockholders' equity | $ | 3,093,721 | $ | 788,548 | $ | (657,953) | $ | 3,224,316 |

17

**EXHIBIT 15**
**Page 0409**

**CONDENSED CONSOLIDATING BALANCE SHEET**
**As of December 31, 2016**
(in thousands)

| ASSETS | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments and Other | Total Consolidated Amounts |
|---|---|---|---|---|
| Cash and cash equivalents | $ 11,378 | $ 26,333 | $ — | $ 37,711 |
| Accounts receivable, net of allowance | 237,495 | 270,952 | (278,562) | 229,885 |
| Prepaid expenses and other current assets | 7,582 | 30,123 | (6,477) | 31,228 |
| Total current assets | 256,455 | 327,408 | (285,039) | 298,824 |
| Property and equipment, net | 2,493,025 | 344,632 | — | 2,837,657 |
| Goodwill | 23,231 | 15,155 | — | 38,386 |
| Non-current deferred tax assets | — | 14,056 | (321) | 13,735 |
| Other assets | 339,391 | 57,873 | (314,262) | 83,002 |
| Total assets | $ 3,112,102 | $ 759,124 | $ (599,622) | $ 3,271,604 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | |
| Accounts payable and accrued expenses | $ 203,074 | $ 342,072 | $ (285,039) | $ 260,107 |
| Income taxes payable | 1,850 | 236 | — | 2,086 |
| Current portion of long-term debt | 10,000 | — | — | 10,000 |
| Total current liabilities | 214,924 | 342,308 | (285,039) | 272,193 |
| Long-term debt, net | 1,436,186 | 113,983 | (115,000) | 1,435,169 |
| Non-current deferred tax liabilities | 321 | — | (321) | — |
| Deferred revenue | — | 53,437 | — | 53,437 |
| Other liabilities | 1,708 | 50,134 | — | 51,842 |
| Total liabilities | 1,653,139 | 559,862 | (400,360) | 1,812,641 |
| | | | | |
| Total stockholders' equity | 1,458,963 | 199,262 | (199,262) | 1,458,963 |
| Total liabilities and stockholders' equity | $ 3,112,102 | $ 759,124 | $ (599,622) | $ 3,271,604 |

18

**EXHIBIT 15**
**Page 0410**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the three months ended June 30, 2017**
(in thousands)

| | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments and Other | Total Consolidated Amounts |
|---|---:|---:|---:|---:|
| REVENUES | $ 287,900 | $ 361,548 | $ (213,055) | $ 436,393 |
| EXPENSES: | | | | |
| Operating | 221,293 | 299,659 | (213,055) | 307,897 |
| General and administrative | 8,471 | 17,946 | — | 26,417 |
| Depreciation and amortization | 21,711 | 15,089 | — | 36,800 |
| | 251,475 | 332,694 | (213,055) | 371,114 |
| OPERATING INCOME | 36,425 | 28,854 | — | 65,279 |
| OTHER (INCOME) EXPENSE: | | | | |
| Interest expense, net | 13,737 | 2,885 | — | 16,622 |
| Other (income) expense | (123) | 52 | 11 | (60) |
| | 13,614 | 2,937 | 11 | 16,562 |
| INCOME BEFORE INCOME TAXES | 22,811 | 25,917 | (11) | 48,717 |
| Income tax expense | (450) | (2,792) | — | (3,242) |
| INCOME BEFORE EQUITY IN SUBSIDIARIES | 22,361 | 23,125 | (11) | 45,475 |
| Income from equity in subsidiaries | 23,114 | — | (23,114) | — |
| NET INCOME | $ 45,475 | $ 23,125 | $ (23,125) | $ 45,475 |

19

**EXHIBIT 15**
**Page 0411**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the three months ended June 30, 2016**
(in thousands)

| | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments and Other | Total Consolidated Amounts |
|---|---|---|---|---|
| REVENUES | $ 293,314 | $ 386,740 | $ (216,723) | $ 463,331 |
| EXPENSES: | | | | |
| Operating | 224,689 | 308,480 | (216,723) | 316,446 |
| General and administrative | 8,832 | 18,532 | — | 27,364 |
| Depreciation and amortization | 21,055 | 21,290 | — | 42,345 |
| | 254,576 | 348,302 | (216,723) | 386,155 |
| OPERATING INCOME | 38,738 | 38,438 | — | 77,176 |
| OTHER (INCOME) EXPENSE: | | | | |
| Interest expense, net | 12,868 | 3,928 | — | 16,796 |
| Other (income) expense | 289 | (153) | (4) | 132 |
| | 13,157 | 3,775 | (4) | 16,928 |
| INCOME BEFORE INCOME TAXES | 25,581 | 34,663 | 4 | 60,248 |
| Income tax expense | (515) | (2,150) | — | (2,665) |
| INCOME BEFORE EQUITY IN SUBSIDIARIES | 25,066 | 32,513 | 4 | 57,583 |
| Income from equity in subsidiaries | 32,517 | — | (32,517) | — |
| NET INCOME | $ 57,583 | $ 32,513 | $ (32,513) | $ 57,583 |

20

**EXHIBIT 15**
**Page 0412**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the six months ended June 30, 2017**
(in thousands)

| | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments and Other | Total Consolidated Amounts |
|---|---|---|---|---|
| REVENUES | $    587,415 | $    726,298 | $    (431,636) | $    882,077 |
| EXPENSES: | | | | |
| Operating | 447,930 | 606,906 | (431,636) | 623,200 |
| General and administrative | 16,807 | 34,436 | — | 51,243 |
| Depreciation and amortization | 43,059 | 29,998 | — | 73,057 |
| Asset impairments | — | 259 | — | 259 |
| | 507,796 | 671,599 | (431,636) | 747,759 |
| OPERATING INCOME | 79,619 | 54,699 | | 134,318 |
| OTHER (INCOME) EXPENSE: | | | | |
| Interest expense, net | 27,173 | 5,939 | — | 33,112 |
| Other (income) expense | (152) | 88 | 21 | (43) |
| | 27,021 | 6,027 | 21 | 33,069 |
| INCOME BEFORE INCOME TAXES | 52,598 | 48,672 | (21) | 101,249 |
| Income tax expense | (1,170) | (4,557) | — | (5,727) |
| INCOME BEFORE EQUITY IN SUBSIDIARIES | 51,428 | 44,115 | (21) | 95,522 |
| Income from equity in subsidiaries | 44,094 | — | (44,094) | — |
| NET INCOME | $    95,522 | $    44,115 | $    (44,115) | $    95,522 |

21

**EXHIBIT 15**
**Page 0413**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the six months ended June 30, 2016**
(in thousands)

| | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments and Other | Total Consolidated Amounts |
|---|---|---|---|---|
| REVENUES | $ 578,038 | $ 764,217 | $ (431,539) | $ 910,716 |
| EXPENSES: | | | | |
| Operating | 446,753 | 615,150 | (431,539) | 630,364 |
| General and administrative | 18,026 | 35,818 | — | 53,844 |
| Depreciation and amortization | 41,946 | 42,458 | — | 84,404 |
| | 506,725 | 693,426 | (431,539) | 768,612 |
| OPERATING INCOME | 71,313 | 70,791 | — | 142,104 |
| OTHER (INCOME) EXPENSE: | | | | |
| Interest expense, net | 25,870 | 8,470 | — | 34,340 |
| Other (income) expense | 401 | (344) | (8) | 49 |
| | 26,271 | 8,126 | (8) | 34,389 |
| INCOME BEFORE INCOME TAXES | 45,042 | 62,665 | 8 | 107,715 |
| Income tax expense | (881) | (2,944) | — | (3,825) |
| INCOME BEFORE EQUITY IN SUBSIDIARIES | 44,161 | 59,721 | 8 | 103,890 |
| Income from equity in subsidiaries | 59,729 | — | (59,729) | — |
| NET INCOME | $ 103,890 | $ 59,721 | $ (59,721) | $ 103,890 |

22

**EXHIBIT 15**
**Page 0414**

**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**For the six months ended June 30, 2017**
(in thousands)

|  | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments And Other | Total Consolidated Amounts |
|---|---|---|---|---|
| Net cash provided by operating activities | $ 168,002 | $ 14,781 | $ — | $ 182,783 |
| Net cash used in investing activities | (32,647) | (10,544) | — | (43,191) |
| Net cash used in financing activities | (130,655) | (64) | — | (130,719) |
| Net increase in cash and cash equivalents | 4,700 | 4,173 | — | 8,873 |
| CASH AND CASH EQUIVALENTS, beginning of period | 11,378 | 26,333 | — | 37,711 |
| CASH AND CASH EQUIVALENTS, end of period | $ 16,078 | $ 30,506 | $ — | $ 46,584 |

**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**For the six months ended June 30, 2016**
(in thousands)

|  | Parent | Combined Subsidiary Guarantors | Consolidating Adjustments And Other | Total Consolidated Amounts |
|---|---|---|---|---|
| Net cash provided by operating activities | $ 158,035 | $ 55,291 | $ — | $ 213,326 |
| Net cash used in investing activities | (20,643) | (51,899) | — | (72,542) |
| Net cash used in financing activities | (132,417) | (2,815) | — | (135,232) |
| Net increase in cash and cash equivalents | 4,975 | 577 | — | 5,552 |
| CASH AND CASH EQUIVALENTS, beginning of period | 15,666 | 49,625 | — | 65,291 |
| CASH AND CASH EQUIVALENTS, end of period | $ 20,641 | $ 50,202 | $ — | $ 70,843 |

23

**EXHIBIT 15**
**Page 0415**

**ITEM 2.      MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

The following discussion should be read in conjunction with the financial statements and notes thereto appearing elsewhere in this report.

This quarterly report on Form 10-Q contains statements as to our beliefs and expectations of the outcome of future events that are forward-looking statements as defined within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  All statements other than statements of current or historical fact contained herein, including statements regarding our future financial position, business strategy, budgets, projected costs and plans, and objectives of management for future operations, are forward-looking statements.  The words "anticipate," "believe," "continue," "estimate," "expect," "intend," "could," "may," "plan," "projects," "will," and similar expressions, as they relate to us, are intended to identify forward-looking statements.  These forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from the statements made.  These include, but are not limited to, the risks and uncertainties associated with:

- general economic and market conditions, including the impact governmental budgets can have on our contract renewals and renegotiations, per diem rates, and occupancy;

- fluctuations in our operating results because of, among other things, changes in occupancy levels, competition, increases in costs of operations, fluctuations in interest rates, and risks of operations;

- changes in the privatization of the corrections and detention industry and the public acceptance of our services;

- our ability to obtain and maintain correctional, detention, and reentry facility management contracts because of reasons including, but not limited to, sufficient governmental appropriations, contract compliance, effects of inmate disturbances, and the timing of the opening of new facilities and the commencement of new management contracts as well as our ability to utilize current available beds and new capacity as development and expansion projects are completed;

- increases in costs to develop or expand correctional, detention, and reentry facilities that exceed original estimates, or the inability to complete such projects on schedule as a result of various factors, many of which are beyond our control, such as weather, labor conditions, and material shortages, resulting in increased construction costs;

- changes in government policy regarding the utilization of the private sector for corrections and detention capacity and our services;

- changes in government policy and in legislation and regulation of corrections and detention contractors that affect our business, including, but not limited to, California's utilization of out-of-state contracted correctional capacity and the continued utilization of the South Texas Family Residential Center by U.S. Immigration and Customs Enforcement, or ICE, under terms of the current contract, and the impact of any changes to immigration reform and sentencing laws (Our company does not, under longstanding policy, lobby for or against policies or legislation that would determine the basis for, or duration of, an individual's incarceration or detention.);

- our ability to successfully integrate operations of our acquisitions and realize projected returns resulting therefrom;

- our ability to meet and maintain qualification for taxation as a real estate investment trust, or REIT; and

- the availability of debt and equity financing on terms that are favorable to us.

Any or all of our forward-looking statements in this quarterly report may turn out to be inaccurate. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy, and financial needs.  Our statements can be affected by inaccurate assumptions we might make or by known or unknown risks, uncertainties and assumptions, including the risks, uncertainties, and assumptions described in "Item 1A Risk Factors" disclosed in Part II hereafter, as well as in our Annual Report on Form 10-K as of and for the year ended December 31, 2016 filed with the Securities and Exchange Commission, or the SEC, on February 23, 2017 (the "2016 Form 10-K") and in other reports we file with the SEC from time to time.  Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof.  We undertake no obligation to publicly revise these forward-looking statements to reflect events or circumstances occurring after the date hereof or to reflect the occurrence of unanticipated events. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained in this report and in the 2016 Form 10-K.

EXHIBIT 15
Page 0416

**OVERVIEW**

**The Company**

We are a diversified government solutions company with the scale and experience needed to solve tough government challenges in cost-effective ways.  Through three business offerings, CoreCivic Safety, CoreCivic Properties, and CoreCivic Community, we provide a broad range of solutions to government partners that serve the public good through high-quality corrections and detention management, innovative and cost-saving government real estate solutions, and a growing network of residential reentry centers to help address America's recidivism crisis.  We have been a flexible and dependable partner for government for more than 30 years.  Our employees are driven by a deep sense of service, high standards of professionalism and a responsibility to help government better the public good.

Structured as a REIT, we are one of the nation's largest owners of partnership correctional, detention, and residential reentry facilities and one of the largest prison operators in the United States.  As of June 30, 2017, we owned or controlled 46 correctional and detention facilities, owned or controlled 28 residential reentry centers, and managed an additional 10 correctional and detention facilities owned by our government partners, with a total design capacity of approximately 87,400 beds in 20 states.  In addition to providing fundamental residential services, our facilities offer a variety of rehabilitation and educational programs, including basic education, faith-based services, life skills and employment training, and substance abuse treatment.  These services are intended to help reduce recidivism and to prepare offenders for their successful reentry into society upon their release.  We also provide or make available to offenders certain health care (including medical, dental, and mental health services), food services, and work and recreational programs.

We are a Maryland corporation formed in 1983.  Our principal executive offices are located at 10 Burton Hills Boulevard, Nashville, Tennessee, 37215, and our telephone number at that location is (615) 263-3000.  Our website address is www.corecivic.com.  We make our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, definitive proxy statements, and amendments to those reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, available on our website, free of charge, as soon as reasonably practicable after these reports are filed with or furnished to the SEC.  Information contained on our website is not part of this report.

We began operating as a REIT effective January 1, 2013.  We provide correctional services and conduct other business activities through taxable REIT subsidiaries, or TRSs.  A TRS is a subsidiary of a REIT that is subject to applicable corporate income tax and certain qualification requirements.  Our use of TRSs enables us to comply with REIT qualification requirements while providing correctional services at facilities we own and at facilities owned by our government partners and to engage in certain other business operations.  A TRS is not subject to the distribution requirements applicable to REITs so it may retain income generated by its operations for reinvestment.

As a REIT, we generally are not subject to federal income taxes on our REIT taxable income and gains that we distribute to our stockholders, including the income derived from providing prison bed capacity and dividends we earn from our TRSs. However, our TRSs will be required to pay income taxes on their earnings at regular corporate income tax rates.

As a REIT, we generally are required to distribute annually to our stockholders at least 90% of our REIT taxable income (determined without regard to the dividends paid deduction and excluding net capital gains). Our REIT taxable income will not typically include income earned by our TRSs except to the extent our TRSs pay dividends to the REIT.

**CRITICAL ACCOUNTING POLICIES**

The consolidated financial statements in this report are prepared in conformity with U.S. generally accepted accounting principles.  As such, we are required to make certain estimates, judgments, and assumptions that we believe are reasonable based upon the information available.  These estimates and assumptions affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. A summary of our significant accounting policies is described in our 2016 Form 10-K.  The significant accounting policies and estimates which we believe are the most critical to aid in fully understanding and evaluating our reported financial results include the following:

25

**EXHIBIT 15**
**Page 0417**

*Asset impairments.*  The primary risk we face for asset impairment charges, excluding goodwill, is associated with correctional facilities we own.  As of June 30, 2017, we had $2.8 billion in property and equipment, including $217.7 million in long-lived assets, excluding equipment, at eight idled correctional facilities.  The impairment analyses we performed for each of these facilities excluded the net book value of equipment, as a substantial portion of the equipment is easily transferrable to other company-owned facilities without significant cost.  The carrying values of the eight idled facilities as of June 30, 2017 were as follows (in thousands):

| | |
|---|---|
| Prairie Correctional Facility | $ 16,585 |
| Huerfano County Correctional Center | 17,201 |
| Diamondback Correctional Facility | 40,948 |
| Southeast Kentucky Correctional Facility | 22,287 |
| Marion Adjustment Center | 11,982 |
| Lee Adjustment Center | 10,243 |
| Kit Carson Correctional Center | 57,948 |
| Eden Detention Center | 40,473 |
| | $ 217,667 |

We also have two idled non-core facilities containing 440 beds with an aggregate net book value of $3.9 million.  We incurred operating expenses at the idled facilities of approximately $2.5 million and $2.0 million for the three months ended June 30, 2017 and 2016, respectively.  We incurred operating expenses of approximately $5.4 million and $4.1 million at the idled facilities for the six months ended June 30, 2017 and 2016, respectively.

We evaluate the recoverability of the carrying values of our long-lived assets, other than goodwill, when events suggest that an impairment may have occurred.  Such events primarily include, but are not limited to, the termination of a management contract or a significant decrease in inmate populations within a correctional facility we own or manage.  Accordingly, we tested each of the idled facilities for impairment when we were notified by the respective customers that they would no longer be utilizing such facility.

We re-perform the impairment analyses on an annual basis for each of the idle facilities and evaluate on a quarterly basis market developments for the potential utilization of each of these facilities in order to identify events that may cause us to reconsider our most recent assumptions.  Such events could include negotiations with a prospective customer for the utilization of an idle facility at terms significantly less favorable than those used in our most recent impairment analysis, or changes in legislation surrounding a particular facility that could impact our ability to care for certain types of inmates at such facility, or a demolition or substantial renovation of a facility.  Further, a substantial increase in the number of available beds at other facilities we own could lead to a deterioration in market conditions and cash flows that we might be able to obtain under a new management contract at our idle facilities. We have historically secured contracts with customers at existing facilities that were already operational, allowing us to move the existing population to other idle facilities. Although they are not frequently received, an unsolicited offer to purchase any of our idle facilities at amounts that are less than the carrying value could also cause us to reconsider the assumptions used in our most recent impairment analysis.

Our impairment evaluations also take into consideration our historical experience in securing new management contracts to utilize facilities that had been previously idled for substantial periods of time.  Such previously idled facilities are currently being operated under contracts that continue to generate cash flows resulting in the recoverability of the net book value of the previously idled facilities by material amounts.  Due to a variety of factors, the lead time to negotiate contracts with our federal and state partners to utilize idle bed capacity is generally lengthy and has historically resulted in periods of idleness similar to the ones we are currently experiencing at our idle facilities.  As a result of our analyses, we determined each of the idled facilities to have recoverable values in excess of the corresponding carrying values.  However, we can provide no assurance that we will be able to secure agreements to utilize our idle facilities, or that we will not incur impairment charges in the future.

By their nature, these estimates contain uncertainties with respect to the extent and timing of the respective cash flows due to potential delays or material changes to historical terms and conditions in contracts with prospective customers that could impact the estimate of cash flows.  Notwithstanding our customers' fluctuating demand for prison beds which led to our decision to idle certain facilities, we believe the long-term trends favor an increase in the utilization of our correctional facilities and management services.  This belief is based on our experience in operating in difficult economic environments and in working with governmental agencies faced with significant budgetary challenges, which is a primary contributing factor to the lack of appropriated funding since 2009 to build new bed capacity by the federal and state governments with which we partner.

On April 30, 2017, the contract with the Federal Bureau of Prisons, or BOP, at our 1,422-bed Eden Detention Center expired and was not renewed.  We idled the Eden facility following the transfer of the offender population, and have begun to market the facility. We can provide no assurance that we will be successful in securing a replacement contract.  We performed an impairment analysis of the

EXHIBIT 15
Page 0418

Eden facility, which had a net carrying value of $40.5 million as of June 30, 2017, and concluded that this asset has a recoverable value in excess of the carrying value.

As a result of declines in federal populations at our 910-bed Torrance County Detention Facility and 1,129-bed Cibola County Corrections Center, during the third quarter of 2017 we expect to obtain customer consent to consolidate offender populations into our Cibola facility in order to take advantage of efficiencies gained by consolidating populations into one facility.  We have begun to market the Torrance facility, which had a net carrying value of $37.3 million at June 30, 2017, to other potential customers.

*Revenue Recognition – Multiple-Element Arrangement.*  In September 2014, we agreed under an expansion of an existing inter-governmental service agreement, or IGSA, between the city of Eloy, Arizona and ICE to provide residential space and services at our South Texas Family Residential Center.  The amended IGSA qualifies as a multiple-element arrangement under the guidance in Accounting Standards Codification, or ASC, 605, "Revenue Recognition".  We evaluate each deliverable in an arrangement to determine whether it represents a separate unit of accounting. A deliverable constitutes a separate unit of accounting when it has standalone value to the customer.  ASC 605 requires revenue to be allocated to each unit of accounting based on a selling price hierarchy.  The selling price for a deliverable is based on its vendor specific objective evidence, or VSOE, of selling price, if available, third-party evidence, or TPE, if VSOE of selling price is not available, or estimated selling price, or ESP, if neither VSOE of selling price nor TPE is available.  We establish VSOE of selling price using the price charged for a deliverable when sold separately.  We establish TPE of selling price by evaluating similar products or services in standalone sales to similarly situated customers.  We establish ESP based on management judgment considering internal factors such as margin objectives, pricing practices and controls, and market conditions.  In arrangements with multiple elements, we allocate the transaction price to the individual units of accounting at inception of the arrangement based on their relative selling price. The allocation of revenue to each element requires considerable judgment and estimations which could change in the future.  In October 2016, we entered into an amended IGSA that extended the term of the contract through September 2021.  As a result of this amendment, the deferred revenue associated with the multiple elements will be recognized over future periods based on the delivery of future services.  If the IGSA were to be further amended or terminated before the expiration of the five-year term, we would determine the allocation of any deferred revenues to the separate units of accounting to be recognized immediately for services previously provided and, if amended, over future periods based on the delivery of future services.

*Self-funded insurance reserves.*  As of June 30, 2017, we had $31.4 million in accrued liabilities for employee health, workers' compensation, and automobile insurance claims.  We are significantly self-insured for employee health, workers' compensation, and automobile liability insurance claims.  As such, our insurance expense is largely dependent on claims experience and our ability to control our claims.  We have consistently accrued the estimated liability for employee health insurance claims based on our history of claims experience and the estimated time lag between the incident date and the date we pay the claims.  We have accrued the estimated liability for workers' compensation claims based on an actuarial valuation of the outstanding liabilities, discounted to the net present value of the outstanding liabilities, using a combination of actuarial methods used to project ultimate losses, and our automobile insurance claims based on estimated development factors on claims incurred. The liability for employee health, workers' compensation, and automobile insurance includes estimates for both claims incurred and for claims incurred but not reported.  These estimates could change in the future. It is possible that future cash flows and results of operations could be materially affected by changes in our assumptions, new developments, or by the effectiveness of our strategies.

*Legal reserves.*  As of June 30, 2017, we had $6.4 million in accrued liabilities related to certain legal proceedings in which we are involved.  We have accrued our best estimate of the probable costs for the resolution of these claims based on a range of potential outcomes.  In addition, we are subject to current and potential future legal proceedings for which little or no accrual has been reflected because our current assessment of the potential exposure is nominal.  These estimates have been developed in consultation with our General Counsel's office and, as appropriate, outside counsel handling these matters, and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies.  It is possible that future cash flows and results of operations could be materially affected by changes in our assumptions, new developments, or by the effectiveness of our litigation and settlement strategies.

27

EXHIBIT 15
Page 0419

## RESULTS OF OPERATIONS

Our results of operations are impacted by the number of facilities we owned and managed, the number of facilities we managed but did not own, the number of facilities we leased to other operators, and the facilities we owned that were not in operation.  The following table sets forth the changes in the number of facilities operated for the periods presented:

| | Effective Date | Owned and Managed | Managed Only | Leased | Total |
|---|---|---|---|---|---|
| Facilities as of December 31, 2015 | | 60 | 11 | 6 | 77 |
| Acquisition of seven community corrections facilities in Colorado | April 2016 | 7 | — | — | 7 |
| Lease of the North Fork Correctional Facility | May 2016 | (1) | — | 1 | — |
| Acquisition of the Long Beach Community Corrections Center in California | June 2016 | — | — | 1 | 1 |
| Facilities as of December 31, 2016 | | 66 | 11 | 8 | 85 |
| Acquisition of the Arapahoe Community Treatment Center in Colorado | January 2017 | 1 | — | — | 1 |
| Expiration of the contract at the D.C. Correctional Treatment Facility in the District of Columbia | January 2017 | (1) | — | — | (1) |
| Acquisition of the Stockton Female Community Corrections Facility in California | February 2017 | — | — | 1 | 1 |
| Acquisition of the Oklahoma City Transitional Center in Oklahoma | June 2017 | 1 | — | — | 1 |
| Combination of two existing facilities in Arizona into one complex | June 2017 | (1) | — | — | (1) |
| Expiration of the contract at the Bartlett State Jail | June 2017 | — | (1) | — | (1) |
| Termination of the lease at the Bridgeport Pre-Parole Transfer Facility | June 2017 | — | — | (1) | (1) |
| **Facilities as of June 30, 2017** | | **66** | **10** | **8** | **84** |

**Three and Six Months Ended June 30, 2017 Compared to the Three and Six Months Ended June 30, 2016**

Net income was $45.5 million, or $0.38 per diluted share, for the three months ended June 30, 2017, compared with net income of $57.6 million, or $0.49 per diluted share, for the three months ended June 30, 2016.  During the six months ended June 30, 2017, we generated net income of $95.5 million, or $0.81 per diluted share, compared with net income of $103.9 million, or $0.88 per diluted share, for the six months ended June 30, 2016.

28

**EXHIBIT 15**
**Page 0420**

*Facility Operations*

A key performance indicator we use to measure the revenue and expenses associated with the operation of the facilities we own or manage is expressed in terms of a compensated man-day, which represents the revenue we generate and expenses we incur for one offender for one calendar day. Revenue and expenses per compensated man-day are computed by dividing facility revenue and expenses by the total number of compensated man-days during the period. A compensated man-day represents a calendar day for which we are paid for the occupancy of an offender. We believe the measurement is useful because we are compensated for operating and managing facilities at an offender per-diem rate based upon actual or minimum guaranteed occupancy levels. We also measure our ability to contain costs on a per-compensated man-day basis, which is largely dependent upon the number of offenders we accommodate. Further, per compensated man-day measurements are also used to estimate our potential profitability based on certain occupancy levels relative to design capacity. Revenue and expenses per compensated man-day for all of the facilities placed into service that we owned or managed, exclusive of those held for lease, were as follows for the three and six months ended June 30, 2017 and 2016:

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2017** | 2016 | **2017** | 2016 |
| Revenue per compensated man-day | $ **71.80** | $ 75.28 | $ **71.89** | $ 75.29 |
| Operating expenses per compensated man-day: | | | | |
| Fixed expense | **37.10** | 38.37 | **37.55** | 39.11 |
| Variable expense | **14.56** | 15.40 | **14.30** | 15.41 |
| Total | **51.66** | 53.77 | **51.85** | 54.52 |
| Operating income per compensated man-day | $ **20.14** | $ 21.51 | $ **20.04** | $ 20.77 |
| Operating margin | **28.1**% | 28.6% | **27.9**% | 27.6% |
| Average compensated occupancy | **79.0**% | 79.3% | **80.0**% | 77.2% |
| Average available beds | **82,447** | 83,399 | **82,711** | 84,297 |
| Average compensated population | **65,160** | 66,169 | **66,170** | 65,077 |

Fixed expenses per compensated man-day for the three and six months ended June 30, 2017 include depreciation expense of $4.1 million and $8.2 million, respectively, and interest expense of $1.6 million and $3.3 million, respectively, in order to more properly reflect the cash flows associated with the lease at the South Texas Family Residential Center. Fixed expenses per compensated man-day for the three and six months ended June 30, 2016 include depreciation expense of $10.6 million and $21.2 million, respectively, and interest expense of $2.7 million and $5.6 million, respectively, associated with the lease at the South Texas Family Residential Center.

*Revenue*

Total revenue consists of revenue we generate in the operation and management of correctional, detention, and residential reentry facilities, as well as rental revenue generated from facilities we lease to third-party operators, and from our inmate transportation subsidiary. The following table reflects the components of revenue for the three and six months ended June 30, 2017 and 2016 (in millions):

| | For the Three Months Ended June 30, | | | |
|---|---|---|---|---|
| | **2017** | 2016 | $ Change | % Change |
| Management revenue: | | | | |
| Federal | $ **205.6** | $ 242.6 | $ (37.0) | (15.3%) |
| State | **182.3** | 174.6 | 7.7 | 4.4% |
| Local | **21.1** | 20.4 | 0.7 | 3.4% |
| Other | **16.7** | 15.6 | 1.1 | 7.1% |
| Total management revenue | **425.7** | 453.2 | (27.5) | (6.1%) |
| Rental and other revenue | **10.7** | 10.1 | 0.6 | 5.9% |
| Total revenue | $ **436.4** | $ 463.3 | $ (26.9) | (5.8%) |

29

EXHIBIT 15
Page 0421

| | For the Six Months Ended June 30, | | | |
| | 2017 | 2016 | $ Change | % Change |
|---|---|---|---|---|
| Management revenue: | | | | |
| Federal | $ 422.3 | $ 478.3 | $ (56.0) | (11.7%) |
| State | 364.1 | 345.8 | 18.3 | 5.3% |
| Local | 41.7 | 36.7 | 5.0 | 13.6% |
| Other | 32.9 | 30.9 | 2.0 | 6.5% |
| Total management revenue | 861.0 | 891.7 | (30.7) | (3.4%) |
| Rental and other revenue | 21.1 | 19.0 | 2.1 | 11.1% |
| Total revenue | $ 882.1 | $ 910.7 | $ (28.6) | (3.1%) |

The $27.5 million, or 6.1%, decrease in total management revenue for the three months ended June 30, 2017 as compared with the same period in 2016 resulted from a decrease in revenue of approximately $20.6 million driven by a decrease of 4.6% in average revenue per compensated man-day. The decrease in management revenue was also a result of a decrease in revenue of approximately $6.9 million caused by a decrease in the average daily compensated population for the three months ended June 30, 2017 as compared with the same period in 2016. The $30.7 million, or 3.4%, decrease in total management revenue for the six months ended June 30, 2017 as compared with the same period in 2016 resulted from a decrease in revenue of approximately $40.0 million driven by a decrease of 4.5% in average revenue per compensated man-day. This decrease in revenue was partially offset by an increase in revenue of approximately $9.3 million caused by an increase in the average daily compensated population for the six months ended June 30, 2017 as compared with the same period in 2016, net of the revenue generated by one fewer day of operations due to leap year in 2016. The decrease in average revenue per compensated man-day during the three- and six-month periods ended June 30, 2017 was primarily a result of the amended IGSA associated with the South Texas Family Residential Center, which became effective in the fourth quarter of 2016, as further described hereafter. The decrease in average revenue per compensated man-day was partially offset by the effect of per diem increases at several of our other facilities.

Average daily compensated population decreased 1,009, or 1.5%, to 65,160 during the three months ended June 30, 2017 compared to 66,169 during the three months ended June 30, 2016, while average daily compensated population for the six months ended June 30, 2017 increased 1,093 from the comparable period in 2016. There were several notable factors that affected the average daily compensated population when comparing both periods in 2017 to those in 2016. Average compensated population during the three- and six-month periods ended June 30, 2017 was positively affected by the activation in the third quarter of 2016 of the new contract to care for up to an additional 1,000 inmates at our newly expanded Red Rock Correctional Center, as further described hereafter, and the full activation of the newly constructed Trousdale Turner Correctional Center during 2016. While we began housing state of Tennessee inmates at the facility in January 2016, occupancy at the facility increased throughout the year. During the six-month period ended June 30, 2017, an increase in populations at certain other facilities, primarily from ICE, also positively affected average compensated population. Average compensated population in both the three- and six-month periods in 2017 was negatively affected by the decline in California inmates held in our out-of-state facilities, the expiration of our contract with the District of Columbia, or the District, at the D.C. Correctional Treatment Facility in the first quarter of 2017, and the expiration of our contract with the BOP at our Eden Detention Center on April 30, 2017, all as further described hereafter. The expiration of our contract with the BOP at our Cibola County Corrections Center in October 2016 also negatively affected average daily compensated population in 2017. While we signed a new contract in October 2016 to provide detention space and services at our Cibola facility to ICE for up to 1,116 detainees, the transition period from the BOP contract to the ICE contract resulted in a reduction in average compensated population at the facility during the first six months of 2017 when compared to the same period in the prior year.

Business from our federal customers, including primarily the BOP, the United States Marshals Service, or USMS, and ICE, continues to be a significant component of our business. Our federal customers generated approximately 47% and 52% of our total revenue for the three months ended June 30, 2017 and 2016, respectively, decreasing $37.0 million, or 15.3%. Our federal customers generated approximately 48% and 53% of our total revenue for the six months ended June 30, 2017 and 2016, respectively, decreasing $56.0 million, or 11.7%. The decrease in federal revenues in both periods primarily resulted from the amended IGSA associated with the South Texas Family Residential Center, which became effective in the fourth quarter of 2016, the expiration of our contract with the BOP at our Eden Detention Center on April 30, 2017 and, in the six-month period, the expiration of our contract with the BOP at our Cibola County Corrections Center in October 2016. The decrease in federal revenues in the six-month period was partially offset by the combined effect of per diem increases for several of our federal contracts and a net increase in federal populations at certain other facilities, primarily from ICE.

State revenues from contracts at correctional, detention, and residential reentry facilities that we operate increased 4.4% from the second quarter of 2016 to the second quarter of 2017 and 5.3% from the first six months of 2016 to the comparable period in 2017. The increase in state revenues in both periods was primarily a result of the full activation of the newly constructed Trousdale Turner

EXHIBIT 15
Page 0422

Correctional Center during 2016 and the activation of the expansion at our Red Rock Correctional Center in the third quarter of 2016.  The increase in state revenues in both periods was partially offset by a decline in California inmates held in our out-of-state facilities and the expiration of our contract with the District at the D.C. Correctional Treatment Facility in the first quarter of 2017.  The $5.0 million, or 13.6%, increase in revenue from local authorities from the first six months of 2016 to the comparable period in 2017 was primarily a result of the acquisition of Correctional Management, Inc., or CMI, in the second quarter of 2016 and the acquisition of the Arapahoe Community Treatment Center, or ACTC, in the first quarter of 2017, both as further described hereafter.

Several of our state partners are projecting improvements in their budgets which has helped us secure recent per diem increases at certain facilities.  Further, several of our existing state partners, as well as state partners with which we do not currently do business, are experiencing growth in inmate populations and overcrowded conditions.  Although we can provide no assurance that we will enter into any new contracts, we believe we are well positioned to provide them with needed bed capacity, as well as the programming and reentry services they are seeking.

We believe the long-term growth opportunities of our business remain attractive as governments consider their emergent needs, as well as the efficiency, savings, and offender programming opportunities we can provide along with flexible solutions to match our partners' needs.  Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide.

*Operating Expenses*

Operating expenses totaled $307.9 million and $316.4 million for the three months ended June 30, 2017 and 2016, respectively, while operating expenses for the six months ended June 30, 2017 and 2016 totaled $623.2 million and $630.4 million, respectively.  Operating expenses consist of those expenses incurred in the operation and management of correctional, detention, and residential reentry facilities, as well as at facilities we lease to third-party operators, and for our inmate transportation subsidiary.

Expenses incurred in connection with the operation and management of correctional, detention, and residential reentry facilities decreased $9.8 million, or 3.2%, during the second quarter of 2017 compared with the same period in 2016.  Operating expenses decreased $9.4 million, or 1.5%, during the six months ended June 30, 2017 compared with the same period in 2016.  There were several notable factors that affected operating expenses when comparing the current year periods with those of the prior year.  The amended IGSA associated with the South Texas Family Residential Center, which lowered the cost structure effective in the fourth quarter of 2016, the expiration of our contract with the District at the D.C. Correctional Treatment Facility in the first quarter of 2017, and the expiration of our contract with the BOP at our Eden Detention Center in the second quarter of 2017 all resulted in a decrease in operating expenses in both the three- and six-month periods.  The decrease in operating expenses was partially offset primarily by the additional expenses resulting from the full activation of the newly constructed Trousdale Turner Correctional Center during 2016 and the activation of the expansion at our Red Rock Correctional Center in the third quarter of 2016. Additional offsetting factors during the six-month period included the one fewer day of operations due to leap year in 2016 and the acquisitions of CMI in the second quarter of 2016 and ACTC in the first quarter of 2017.

Total expenses per compensated man-day decreased to $51.66 during the three months ended June 30, 2017 from $53.77 during the three months ended June 30, 2016, and decreased to $51.85 during the six months ended June 30, 2017 from $54.52 during the same period in the prior year.  Fixed expenses per compensated man-day for the three months ended June 30, 2017 and 2016 include depreciation expense of $4.1 million and $10.6 million, respectively, and interest expense of $1.6 million and $2.7 million, respectively, in order to more properly reflect the cash flows associated with the lease at the South Texas Family Residential Center.  Fixed expenses per compensated man-day for the six months ended June 30, 2017 and 2016 include depreciation expense of $8.2 million and $21.2 million, respectively, and interest expense of $3.3 million and $5.6 million, respectively, associated with the lease at the South Texas Family Residential Center.  Fixed expenses and variable expenses per compensated man-day decreased from both periods from 2016 to 2017 primarily as a result of the amended IGSA which lowered the cost structure associated with the South Texas Family Residential Center effective in the fourth quarter of 2016, as further described hereafter.

As the economy has improved and the nation's unemployment rate has declined, we have experienced wage pressures in certain markets across the country, and have provided wage increases to remain competitive.  However, these pressures have not yet had a material impact on our margins, as salaries expense per compensated man-day increased 2.5% over the prior year quarter and 2.4% over the prior year six-month period, excluding the impact of the aforementioned contract modification at the South Texas Family Residential Center.  We continually monitor compensation levels very closely along with overall economic conditions and will set wage levels necessary to help ensure the long-term success of our business.  Salaries and benefits represent the most significant component of our operating expenses, representing 60% for the first six months of 2017 and 59% of our total operating expenses during 2016.

31

**EXHIBIT 15**
**Page 0423**

*Facility Management Contracts*

We typically enter into facility contracts to provide prison bed capacity and management services to governmental entities for terms typically ranging from three to five years, with additional renewal periods at the option of the contracting governmental agency. Accordingly, a substantial portion of our facility contracts are scheduled to expire each year, notwithstanding contractual renewal options that a government agency may exercise. Although we generally expect these customers to exercise renewal options or negotiate new contracts with us, one or more of these contracts may not be renewed by the corresponding governmental agency.

During the third quarter of 2016, the Texas Department of Criminal Justice, or TDCJ, solicited proposals for the rebid of four facilities we managed for the state of Texas. The managed-only contracts for these four facilities are scheduled to expire in August 2017. The four facilities have a total capacity of 5,129 beds and generated $2.3 million in facility net operating income during 2016. The four facilities generated $0.3 million and $1.2 million in facility net operating income during the six months ended June 30, 2017 and 2016, respectively.

On March 31, 2017, the TDCJ notified us that, in light of the current economic climate as well as the fiscal constraints and budget outlook for the TDCJ for the next biennium, the TDCJ would not be awarding the contract for the Bartlett State Jail, one of the facilities included in the rebid process mentioned in the preceding paragraph. During the first quarter of 2017, we wrote-off $0.3 million of goodwill associated with this managed-only facility. In collaboration with the TDCJ, the decision was made to close the Bartlett facility on June 24, 2017. During the third quarter of 2017, the TDCJ notified us that it selected other operators for the management of the three remaining managed-only facilities subject to the rebid. Accordingly, we expect to transfer operations of these facilities to the other operators during the third quarter of 2017. We expect to write-off approximately $1.0 million of assets associated with these facilities during the third quarter of 2017.

Based on information available at this filing, notwithstanding the contracts at facilities described above, we believe we will renew all other material contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

The operation of the facilities we own carries a higher degree of risk associated with a facility contract than the operation of the facilities we manage but do not own because we incur significant capital expenditures to construct, renovate or acquire facilities we own. Additionally, correctional and detention facilities have limited or no alternative use. Therefore, if a contract is terminated on a facility we own, we continue to incur certain operating expenses, such as real estate taxes, utilities, and insurance, which we would not incur if a management contract were terminated for a managed-only facility. As a result, revenue per compensated man-day is typically higher for facilities we own and manage than for managed-only facilities. Because we incur higher expenses, such as repairs and maintenance, real estate taxes, and insurance, on the facilities we own and manage, our cost structure for facilities we own and manage is also higher than the cost structure for the managed-only facilities. The following tables display the revenue and expenses per compensated man-day for the facilities placed into service that we own and manage and for the facilities we manage but do not own, which we believe is useful to our financial statement users:

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| **Owned and Managed Facilities:** | | | | |
| Revenue per compensated man-day | $ 78.74 | $ 83.43 | $ 78.83 | $ 83.58 |
| Operating expenses per compensated man-day: | | | | |
| Fixed expense | 39.48 | 41.52 | 39.89 | 42.32 |
| Variable expense | 15.21 | 16.50 | 14.94 | 16.51 |
| Total | 54.69 | 58.02 | 54.83 | 58.83 |
| Operating income per compensated man-day | $ 24.05 | $ 25.41 | $ 24.00 | $ 24.75 |
| Operating margin | 30.5% | 30.5% | 30.4% | 29.6% |
| Average compensated occupancy | 76.2% | 76.2% | 77.3% | 73.8% |
| Average available beds | 68,630 | 69,501 | 68,854 | 70,399 |
| Average compensated population | 52,313 | 52,938 | 53,232 | 51,971 |

32

EXHIBIT 15
Page 0424

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| **Managed Only Facilities:** | | | | |
| Revenue per compensated man-day | $ **43.51** | $ 42.65 | $ **43.32** | $ 42.42 |
| Operating expenses per compensated man-day: | | | | |
|    Fixed expense | **27.42** | 25.75 | **27.92** | 26.41 |
|    Variable expense | **11.94** | 10.97 | **11.69** | 11.03 |
|      Total | **39.36** | 36.72 | **39.61** | 37.44 |
| Operating income per compensated man-day | $ **4.15** | $ 5.93 | $ **3.71** | $ 4.98 |
| Operating margin | **9.5%** | 13.9% | **8.6%** | 11.7% |
| Average compensated occupancy | **93.0%** | 95.2% | **93.4%** | 94.3% |
| Average available beds | **13,817** | 13,898 | **13,857** | 13,898 |
| Average compensated population | **12,847** | 13,231 | **12,938** | 13,106 |

*Owned and Managed Facilities*

Facility net operating income, or the operating income or loss from operations before interest, taxes, asset impairments, depreciation and amortization, at our owned and managed facilities decreased by $15.5 million, from $135.7 million during the three months ended June 30, 2016 to $120.2 million during the three months ended June 30, 2017, a decrease of 11.4%. Facility net operating income at our owned and managed facilities decreased by $18.2 million, from $260.9 million during the six months ended June 30, 2016 to $242.7 million during the six months ended June 30, 2017, a decrease of 7.0%. Facility net operating income at our owned and managed facilities in both periods of 2017 was unfavorably impacted by the amended IGSA associated with the South Texas Family Residential Center, which became effective in the fourth quarter of 2016, as further described hereafter. The aggregate depreciation and interest expense associated with the lease at the South Texas Family Residential Center for the three months ended June 30, 2017 and 2016 totaling $5.7 million and $13.3 million, respectively, and for the six months ended June 30, 2017 and 2016 totaling $11.5 million and $26.8 million, respectively, are not included in these facility net operating income amounts, but are included in the per compensated man-day statistics.

In September 2014, we announced that we agreed to an expansion of an IGSA between the city of Eloy, Arizona and ICE to care for up to 2,400 individuals at the South Texas Family Residential Center, a facility we lease in Dilley, Texas. The services provided under the original amended IGSA commenced in the fourth quarter of 2014 and had an original term of up to four years.

In October 2016, we entered into an amended IGSA that provides for a new, lower fixed monthly payment that commenced in November 2016, and extended the term of the contract through September 2021. The agreement can be further extended by bi-lateral modification. However, ICE can also terminate the agreement for convenience or non-appropriation of funds, without penalty, by providing us with at least a 60-day notice. Concurrent with the amendment to the IGSA entered into in October 2016, we modified our lease agreement with the third-party lessor of the facility to reflect a reduced monthly lease expense effective in November 2016, with a new term concurrent with the amended IGSA. In the event we cancel the lease with the third-party lessor prior to its expiration as a result of the termination of the IGSA by ICE for convenience, and if we are unable to reach an agreement for the continued use of the facility within 90 days from the termination date, we are required to pay a termination fee based on the termination date, currently equal to $10.0 million and declining to zero by October 2020.

During the three months ended June 30, 2017 and 2016, we recognized $42.6 million and $70.9 million, respectively, in total revenue associated with the South Texas Family Residential Center. During the six months ended June 30, 2017 and 2016, we recognized $85.2 million and $141.7 million, respectively, in total revenue associated with the South Texas Family Residential Center. The original IGSA with ICE had a favorable impact on the revenue and net operating income of our owned and managed facilities during 2016, with more favorable operating margin percentages than those of our average owned and managed facilities. Under terms of the amended IGSA entered into in October 2016, the revenues generated at the South Texas Family Residential Center declined and operating margin percentages at the facility became more comparable to those of our average owned and managed facilities, resulting in a material reduction to our facility net operating income in 2017.

Numerous lawsuits, to which we are not a party, have challenged the government's policy of detaining migrant families. Any court decision or government action that impacts our existing contract for the South Texas Family Residential Center could materially affect our cash flows, financial condition, and results of operations.

33

**EXHIBIT 15**
**Page 0425**

In December 2015, we announced that we were awarded a new contract from the Arizona Department of Corrections, or ADOC, to care for up to an additional 1,000 medium-security inmates at our Red Rock facility, bringing the contracted bed capacity to 2,000 inmates. The new management contract contains an initial term of ten years, with two five-year renewal options upon mutual agreement and provides for an occupancy guarantee of 90% of the contracted beds. The government partner included the occupancy guarantee in its request for proposal in order to guarantee its access to the beds. In connection with the new award, we expanded our Red Rock facility to a design capacity of 2,024 beds and added additional space for inmate reentry programming. We began receiving inmates under the new contract during the third quarter of 2016. The new contract generated $5.9 million and $11.4 million of incremental revenue during the three and six months ended June 30, 2017, respectively, when compared to the same periods in the prior year.

During the first quarter of 2015, the adult inmate population held in state of California institutions first met a Federal court order to reduce inmate populations below 137.5% of its capacity. Inmate populations in the state continued to decline below the court ordered capacity limit which has resulted in declining inmate populations in the out-of-state program at facilities we own and operate. As of June 30, 2017, the adult inmate population held in state of California institutions remained in compliance with the Federal court order at approximately 135.5% of capacity, or approximately 115,000 inmates, which did not include the California inmates held in our out-of-state facilities. During the three months ended June 30, 2017 and 2016, we cared for an average daily population of approximately 4,300 and 4,900 California inmates, respectively, in facilities outside the state as a partial solution to the State's overcrowding. This decline in population, along with the revenue impact in the six-month period of one fewer day of operations due to leap year in 2016, resulted in a decrease in revenue of $2.8 million and $6.0 million, respectively, from the three and six months ended June 30, 2016 to the comparable periods in 2017.

Approximately 6% of our total revenue for both the six months ended June 30, 2017 and 2016 was generated from the California Department of Corrections and Rehabilitation, or CDCR, in facilities housing inmates outside the state of California.

In June 2017, the Governor of California signed a budget for fiscal 2017-2018. The budget contemplates that implementation of initiatives to reduce prison populations will allow the CDCR to remove all inmates from one of our two remaining out-of-state facilities in fiscal 2017-2018. Additionally, as a result of such prison population reduction initiatives, the CDCR anticipates reducing inmate populations from our other out-of-state facility in calendar year 2018. Although the budget acknowledges that estimates of population reductions are preliminary and subject to considerable uncertainty, we can provide no assurance that we would be able to replace the cash flows associated with our contract with the CDCR, if CDCR inmates are removed from our Tallahatchie and La Palma facilities. An elimination of the use of our out-of-state solutions by the state of California would have a significant adverse impact on our financial position, results of operations, and cash flows.

On April 11, 2017, we announced that we contracted with the state of Ohio to care for up to an additional 996 offenders at our 2,016-bed Northeast Ohio Correctional Center. The initial term of the contract continues through June 2032 with unlimited renewal options, subject to appropriations and mutual agreement. We expect to begin receiving offender populations at the Northeast Ohio facility from the state of Ohio in the third quarter of 2017, with full contract utilization expected by the end of the first quarter of 2018. On June 30, 2017, we cared for approximately 650 detainees from the USMS and approximately 200 detainees from ICE at our Northeast Ohio facility.

Our contract with the District at the D.C. Correctional Treatment Facility expired in the first quarter of 2017. The District assumed operation of the facility in January 2017. We incurred a facility operating loss of $0.5 million during the first quarter of 2017. We incurred facility net operating losses at the facility of $0.1 million and $0.5 million during the three and six months ended June 30, 2016, respectively. Our investment in the direct financing lease with the District also expired in the first quarter of 2017. Upon expiration of the lease, ownership of the facility automatically reverted to the District.

On April 8, 2016, we closed on the acquisition of 100% of the stock of CMI along with the real estate used in the operation of CMI's business from two entities affiliated with CMI. CMI, a privately held community corrections company that operates seven community corrections facilities, including six owned and one leased, with approximately 600 beds in Colorado, specializes in community correctional services, drug and alcohol treatment services, and residential reentry services. We provide these services through multiple contracts with three counties in Colorado, as well as the Colorado Department of Corrections, a pre-existing partner of ours. On January 1, 2017, we also acquired ACTC, a 135-bed residential reentry center in Englewood, Colorado, which we integrated along with the operations of our existing Colorado residential reentry centers. We acquired these eight facilities as strategic investments that further expand the network of reentry assets we own and the services we provide. Total revenue generated from the acquisition of CMI during the three months ended June 30, 2016 totaled $3.3 million. Total revenue generated from the acquisitions of both CMI and ACTC during the three and six months ended June 30, 2017 totaled $3.9 million and $7.7 million, respectively.

34

**EXHIBIT 15**
**Page 0426**

On April 30, 2017, our contract with the BOP at our Eden Detention Center expired and was not renewed. During the three and six months ended June 30, 2017, we generated facility net operating income of $0.5 million and $1.9 million, respectively, at this facility and $9.1 million for the full year ended December 31, 2016.

As a result of declines in federal populations at our 910-bed Torrance County Detention Facility and 1,129-bed Cibola County Corrections Center, during the third quarter of 2017 we expect to obtain customer consent to consolidate offender populations into our Cibola facility in order to take advantage of efficiencies gained by consolidating populations into one facility. During both the three and six months ended June 30, 2017, we incurred facility net operating losses of $0.8 million at the Torrance facility and $4.0 million for the full year ended December 31, 2016.

*Managed-Only Facilities*

Total revenue at our managed-only facilities decreased $0.4 million, from $51.3 million during the second quarter of 2016 to $50.9 million during the second quarter of 2017, and increased $0.2 million, from $101.2 million during the six months ended June 30, 2016 to $101.4 million during the six months ended June 30, 2017. When compared with the same periods in the prior year, revenue per compensated man-day increased to $43.51 from $42.65, or 2.0%, for the three months ended June 30, 2017, and increased to $43.32 from $42.42, or 2.1%, for the six months ended June 30, 2017. Operating expenses per compensated man-day increased to $39.36 from $36.72 for the three months ended June 30, 2017, and increased to $39.61 from $37.44 for the six months ended June 30, 2017, when compared with the same periods in the prior year. Facility net operating income at our managed-only facilities decreased $2.2 million, from $7.1 million during the three months ended June 30, 2016 to $4.9 million during the three months ended June 30, 2017, and decreased $3.2 million, from $11.9 million during the six months ended June 30, 2016 to $8.7 million during the six months ended June 30, 2017. During the three and six months ended June 30, 2017, managed-only facilities generated 3.9% and 3.5%, respectively, of our total facility net operating income compared with 5.0% and 4.4% during the three and six months ended June 30, 2016, respectively. We expect the managed-only business to remain competitive and we will only pursue opportunities for managed-only business where we are sufficiently compensated for the risk associated with this competitive business. Further, we may terminate existing contracts from time to time when we are unable to achieve per diem increases that offset increasing expenses and enable us to maintain safe, effective operations.

As previously described herein, during June 2017, the TDCJ closed the Bartlett State Jail which we managed and selected other operators for three other facilities we managed that were subject of a competitive procurement. These four facilities generated total revenue and net operating income of $23.8 million and $0.3 million, respectively, for the six months ended June 30, 2017, and total revenue and net operating income of $49.9 million and $2.3 million, respectively, for the year ended December 31, 2016.

*Other Facility Related Activity*

In May 2016, we entered into a lease with the Oklahoma Department of Corrections, or ODOC, for our previously idled 2,400-bed North Fork Correctional Facility. The lease agreement commenced on July 1, 2016, and includes a five-year base term with unlimited two-year renewal options. However, the lease agreement permitted the ODOC to utilize the facility for certain activation activities and, therefore, revenue recognition began upon execution of the lease. The average annual rent to be recognized during the five-year base term is $7.3 million, including annual rent in the fifth year of $12.0 million. After the five-year base term, the annual rent will be equal to the rent due during the prior lease year, adjusted for increases in the Consumer Price Index. We are responsible for repairs and maintenance, property taxes and property insurance, while all other aspects and costs of facility operations are the responsibility of the ODOC.

On June 10, 2016, we acquired a residential reentry center in Long Beach, California from a privately held owner. The 112-bed facility is leased to a third-party operator under a triple net lease agreement that extends through June 2020 and includes one five-year lease extension option. In addition, on February 10, 2017, we acquired the Stockton Female Community Corrections Facility, a 100-bed residential reentry center in Stockton, California. The 100-bed facility is leased to a third-party operator under a triple net lease agreement that extends through April 2021 and includes one five-year lease extension option. Both third-party operators separately contract with the CDCR to provide rehabilitative and reentry services to residents at the leased facilities. We acquired the facilities in the real estate–only transactions as strategic investments that further expand our network of residential reentry centers.

*General and administrative expenses*

For the three months ended June 30, 2017 and 2016, general and administrative expenses totaled $26.4 million and $27.4 million, respectively, while general and administrative expenses totaled $51.2 million and $53.8 million, respectively, during the six months ended June 30, 2017 and 2016. General and administrative expenses consist primarily of corporate management salaries and benefits, professional fees and other administrative expenses. We currently expect general and administrative expenses to continue to be lower when compared to prior year periods as a result of a cost reduction plan we implemented at the end of the third quarter of 2016 as part of a restructuring of our corporate operations.

35

EXHIBIT 15
Page 0427

*Depreciation and amortization*

For the three months ended June 30, 2017 and 2016, depreciation and amortization expense totaled $36.8 million and $42.3 million, respectively, while depreciation and amortization expense totaled $73.1 million and $84.4 million, respectively, during the six months ended June 30, 2017 and 2016.  Our lease agreement with the third-party lessor associated with the 2,400-bed South Texas Family Residential Center resulted in our being deemed the owner of the constructed assets for accounting purposes, in accordance with ASC 840-40-55, formerly Emerging Issues Task Force No. 97-10, "The Effect of Lessee Involvement in Asset Construction".  Accordingly, our balance sheet reflects the costs attributable to the building assets constructed by the third-party lessor, which, beginning in the second quarter of 2015, began depreciating over the remainder of the four-year term of the original lease.  Depreciation expense for the constructed assets at this facility was $4.1 million and $10.6 million during the three months ended June 30, 2017 and 2016, respectively, and $8.2 million and $21.2 million during the six months ended June 30, 2017 and 2016, respectively.  As previously described herein, we modified our lease agreement with the third-party lessor of the facility in October 2016, which resulted in a reduced monthly lease rate effective in November 2016 and extended the term of the contract.  As a result of the lease modification, depreciation expense for the constructed assets at the South Texas Family Residential Center is expected to decline in 2017 to approximately $16.6 million from $38.7 million in 2016.

*Interest expense, net*

Interest expense is reported net of interest income and capitalized interest for the three and six months ended June 30, 2017 and 2016.  Gross interest expense, net of capitalized interest, was $16.9 million and $17.3 million, respectively, for the three months ended June 30, 2017 and 2016, and was $33.6 million and $35.0 million, respectively, for the six months ended June 30, 2017 and 2016.  Gross interest expense is based on outstanding borrowings under our $900.0 million revolving credit facility, or revolving credit facility, our outstanding Incremental Term Loan, or Term Loan, and our outstanding senior notes, as well as the amortization of loan costs and unused facility fees.  We also incur interest expense associated with the lease of the South Texas Family Residential Center, in accordance with ASC 840-40-55.  Interest expense associated with the lease of this facility was $1.6 million and $2.7 million during the three months ended June 30, 2017 and 2016, respectively, and $3.3 million and $5.6 million during the six months ended June 30, 2017 and 2016, respectively.  As previously described herein, we modified our lease agreement with the third-party lessor of the facility in October 2016, which resulted in a reduced monthly lease rate effective in November 2016 and extended the term of the contract.  As a result of the lease modification, interest expense associated with the lease of the South Texas Family Residential Center is expected to decline in 2017 to approximately $6.4 million from $10.0 million in 2016.  The decrease in interest expense in both periods that primarily resulted from the reduction in expense associated with the lease of the South Texas Family Residential Center was partially offset by an increase in the London Interbank Offered Rate, or LIBOR.

We have benefited from relatively low interest rates on our revolving credit facility, which is largely based on LIBOR.  It is possible that LIBOR could increase in the future. Based on our leverage ratio, loans under our revolving credit facility during 2016 and the first half of 2017 were at the base rate plus a margin of 0.50% or at LIBOR plus a margin of 1.50%, and a commitment fee equal to 0.35% of the unfunded balance.  Interest rates under the Term Loan are the same as the interest rates under our revolving credit facility.

Gross interest income was $0.3 million and $0.5 million for the three months ended June 30, 2017 and 2016, respectively, and $0.5 million and $0.7 million for the six months ended June 30, 2017 and 2016, respectively.  Gross interest income is earned on notes receivable, investments, and cash and cash equivalents.  There was no interest capitalized during the three and six months ended June 30, 2017.  Capitalized interest was $0.1 million and $0.2 million during the three and six months ended June 30, 2016, respectively.  Capitalized interest in 2016 was primarily associated with the expansion project at our Red Rock Correctional Center.

*Income tax expense*

During the three months ended June 30, 2017 and 2016, our financial statements reflected an income tax expense of $3.2 million and $2.7 million, respectively.  During the six months ended June 30, 2017 and 2016, our financial statements reflected an income tax expense of $5.7 million and $3.8 million, respectively.  Our effective tax rate was 5.7% and 3.6% during the six months ended June 30, 2017 and 2016, respectively.  As a REIT, we are entitled to a deduction for dividends paid, resulting in a substantial reduction in the amount of federal income tax expense we recognize.  Substantially all of our income tax expense is incurred based on the earnings generated by our TRSs.  Our overall effective tax rate is estimated based on the current projection of taxable income primarily generated in our TRSs.  Our consolidated effective tax rate could fluctuate in the future based on changes in estimates of taxable income, the relative amounts of taxable income generated by the TRSs and the REIT, the implementation of additional tax planning strategies, changes in federal or state tax rates or laws affecting tax credits available to us, changes in other tax laws, changes in estimates related to uncertain tax positions, or changes in state apportionment factors, as well as changes in the valuation allowance applied to our deferred tax assets that are based primarily on the amount of state net operating losses and tax credits that could expire unused.

36

**EXHIBIT 15**
**Page 0428**

## LIQUIDITY AND CAPITAL RESOURCES

Our principal capital requirements are for working capital, stockholder distributions, capital expenditures, and debt service payments. Capital requirements may also include cash expenditures associated with our outstanding commitments and contingencies, as further discussed in the notes to our financial statements and as further described in our 2016 Form 10-K. Additionally, we may incur capital expenditures to expand the design capacity of certain of our facilities (in order to retain management contracts) and to increase our inmate bed capacity for anticipated demand from current and future customers. We may acquire additional correctional facilities and residential reentry centers, as well as other real estate assets used to provide mission critical governmental services primarily in the criminal justice sector, that we believe have favorable investment returns and increase value to our stockholders. We will also consider opportunities for growth, including, but not limited to, potential acquisitions of businesses within our lines of business and those that provide complementary services, provided we believe such opportunities will broaden our market share and/or increase the services we can provide to our customers.

To qualify and be taxed as a REIT, we generally are required to distribute annually to our stockholders at least 90% of our REIT taxable income (determined without regard to the dividends paid deduction and excluding net capital gains). Our REIT taxable income will not typically include income earned by our TRSs except to the extent our TRSs pay dividends to the REIT. Our Board of Directors declared a quarterly dividend of $0.42 for the first and second quarters of 2017 totaling $50.0 million in the first quarter and $50.1 million in the second quarter. The amount, timing and frequency of future distributions will be at the sole discretion of our Board of Directors and will be declared based upon various factors, many of which are beyond our control, including our financial condition and operating cash flows, the amount required to maintain qualification and taxation as a REIT and reduce any income and excise taxes that we otherwise would be required to pay, limitations on distributions in our existing and future debt instruments, limitations on our ability to fund distributions using cash generated through our TRSs, alternative growth opportunities that require capital deployment, and other factors that our Board of Directors may deem relevant.

As of June 30, 2017, our liquidity was provided by cash on hand of $46.6 million, and $481.5 million available under our revolving credit facility. During the six months ended June 30, 2017 and 2016, we generated $182.8 million and $213.3 million, respectively, in cash through operating activities, and as of June 30, 2017, we had net working capital of $24.2 million. We currently expect to be able to meet our cash expenditure requirements for the next year utilizing these resources. We have no debt maturities until April 2020.

Our cash flow is subject to the receipt of sufficient funding of and timely payment by contracting governmental entities. If the appropriate governmental agency does not receive sufficient appropriations to cover its contractual obligations, it may terminate our contract or delay or reduce payment to us. Delays in payment from our major customers or the termination of contracts from our major customers could have an adverse effect on our cash flow, financial condition and, consequently, dividend distributions to our shareholders.

### *Debt and equity*

As of June 30, 2017, we had $350.0 million principal amount of unsecured notes outstanding with a fixed stated interest rate of 4.625%, $325.0 million principal amount of unsecured notes outstanding with a fixed stated interest rate of 4.125%, and $250.0 million principal amount of unsecured notes outstanding with a fixed stated interest rate of 5.0%. In addition, we had $90.0 million outstanding under our Term Loan with a variable interest rate of 2.7%, and $411.0 million outstanding under our revolving credit facility with a variable weighted average interest rate of 2.6%. As of June 30, 2017, our total weighted average effective interest rate was 4.1%, while our total weighted average maturity was 4.1 years. We may also seek to issue debt or equity securities from time to time when we determine that market conditions and the opportunity to utilize the proceeds from the issuance of such securities are favorable.

On February 26, 2016, we entered into an ATM Equity Offering Sales Agreement, or ATM Agreement, with multiple sales agents. Pursuant to the ATM Agreement, we may offer and sell to or through the sales agents from time to time, shares of our common stock, par value $0.01 per share, having an aggregate gross sales price of up to $200.0 million. Sales, if any, of our shares of common stock will be made primarily in "at-the-market" offerings, as defined in Rule 415 under the Securities Act of 1933, as amended. The shares of common stock will be offered and sold pursuant to our registration statement on Form S-3 filed with the SEC on May 15, 2015, and a related prospectus supplement dated February 26, 2016. We intend to use the net proceeds from any sale of shares of our common stock to repay borrowings under our revolving credit facility (including the Term Loan under the "accordion" feature of the revolving credit facility) and for general corporate purposes, including to fund future acquisitions and development projects. There were no shares of our common stock sold under the ATM Agreement during the six months ended June 30, 2017.

On August 19, 2016, Moody's downgraded our senior unsecured debt rating to "Ba1" from "Baa3". Also on August 19, 2016, S&P Global Ratings, or S&P, lowered our corporate credit and senior unsecured debt ratings to "BB" from "BB+". Additionally, S&P lowered our revolving credit facility rating to "BBB-" from "BBB". Both Moody's and S&P lowered our ratings as a result of the Department of Justice, or DOJ, announcing its plans on August 18, 2016 to reduce the BOP's utilization of privately operated prisons.

**EXHIBIT 15**
**Page 0429**

On February 21, 2017, the U.S. Attorney General rescinded the memorandum issued on August 18, 2016 by the Deputy Attorney General of the DOJ.  On February 7, 2012, Fitch Ratings assigned a rating of "BBB-" to our revolving credit facility and "BB+" ratings to our unsecured debt and corporate credit.

### *Facility acquisitions, development, and capital expenditures*

On January 1, 2017, we acquired ACTC, a 135-bed residential reentry center in Englewood, Colorado, and on February 10, 2017, we acquired the Stockton Female Community Corrections Facility, a 100-bed residential reentry center in Stockton, California, in a real estate-only transaction.  In addition, on June 1, 2017, we acquired the real estate operated by Center Point, Inc., or Center Point, a California-based non-profit organization.  We consolidated a portion of Center Point's operations into our preexisting residential reentry center portfolio and assumed ownership and operations of the Oklahoma City Transitional Center, a 200-bed residential reentry center in Oklahoma City, Oklahoma.  We acquired the facilities for a combined total of $14.1 million in cash, excluding transaction-related expenses, and funded the transactions utilizing available cash on hand.  We acquired the facilities as strategic investments that further expand our network of residential reentry centers.

The demand for prison capacity in the short-term has been affected by the budget challenges many of our government partners currently face.  At the same time, these challenges impede our customers' ability to construct new prison beds of their own or update older facilities, which we believe could result in further need for private sector capacity solutions in the long-term.  We expect to continue to pursue investment opportunities in residential reentry centers and are in various stages of due diligence to complete additional transactions like the real estate acquisitions of seven residential reentry centers in Pennsylvania, California, and Colorado over the past two years, and business combination transactions like the acquisitions of Avalon Correctional Services, Inc. in the fourth quarter of 2015, CMI in the second quarter of 2016, and Center Point in the second quarter of 2017.  The transactions that have not yet closed are subject to various customary closing conditions, and we can provide no assurance that any such transactions will ultimately be completed.  We are also pursuing investment opportunities in other real estate assets used to provide mission critical governmental services primarily in the criminal justice sector as well as other businesses that provide complementary services that further diversify our cash flows.  In the long-term, however, we would like to see meaningful utilization of our available capacity and better visibility from our customers before we add any additional prison capacity on a speculative basis.

### Operating Activities

Our net cash provided by operating activities for the six months ended June 30, 2017 was $182.8 million, compared with $213.3 million for the same period in the prior year. Cash provided by operating activities represents the year to date net income plus depreciation and amortization, changes in various components of working capital, and various non-cash charges.  The decrease in cash provided by operating activities was primarily due to the reduction in net income and negative fluctuations in working capital balances during the six months ended June 30, 2017 when compared to the same period in the prior year and routine timing differences in the collection of accounts receivables and in the payment of accounts payables, accrued salaries and wages, and other liabilities.

### Investing Activities

Our cash flow used in investing activities was $43.2 million for the six months ended June 30, 2017 and was primarily attributable to capital expenditures during the six-month period of $34.8 million, including expenditures for facility development and expansions of $13.9 million and $20.9 million for facility maintenance and information technology capital expenditures. Our cash flow used in investing activities also included $14.1 million attributable to the acquisitions of the two residential reentry centers in the first quarter of 2017 and the acquisition of Center Point in the second quarter of 2017. Our cash flow used in investing activities was $72.5 million for the six months ended June 30, 2016 and was primarily attributable to capital expenditures during the six-month period of $39.4 million, including expenditures for facility development and expansions of $18.7 million primarily related to the expansion project at our Red Rock Correctional Center, and $20.7 million for facility maintenance and information technology capital expenditures.  Our cash flow used in investing activities also included $43.6 million attributable to the acquisitions of CMI and a residential reentry facility in California during the second quarter of 2016. Partially offsetting these cash outflows, we received proceeds of $8.2 million primarily related to the sale of undeveloped land.

### Financing Activities

Cash flow used in financing activities was $130.7 million for the six months ended June 30, 2017 and was primarily attributable to dividend payments of $101.1 million and $5.8 million for the purchase and retirement of common stock that was issued in connection with equity-based compensation.  In addition, cash flow used in financing activities included $24.0 million of net repayments under our revolving credit facility and $5.0 million of scheduled principal repayments under our Term Loan.  These payments were partially offset by $6.4 million associated with exercising stock options.

38

EXHIBIT 15
Page 0430

Cash flow used in financing activities was $135.2 million for the six months ended June 30, 2016 and was primarily attributable to dividend payments of $128.6 million and $3.9 million for the purchase and retirement of common stock that was issued in connection with equity-based compensation.  In addition, cash flow used in financing activities included $6.7 million of cash payments associated with the financing components of the lease related to the South Texas Family Residential Center and $2.5 million of scheduled principal repayments under our Term Loan.  These payments were partially offset by $5.0 million of net proceeds under our revolving credit facility.

**Funds from Operations**

Funds From Operations, or FFO, is a widely accepted supplemental non-GAAP measure utilized to evaluate the operating performance of real estate companies. The National Association of Real Estate Investment Trusts, or NAREIT, defines FFO as net income computed in accordance with generally accepted accounting principles, excluding gains or losses from sales of property and extraordinary items, plus depreciation and amortization of real estate and impairment of depreciable real estate and after adjustments for unconsolidated partnerships and joint ventures calculated to reflect funds from operations on the same basis.

We believe FFO is an important supplemental measure of our operating performance and believe it is frequently used by securities analysts, investors and other interested parties in the evaluation of REITs, many of which present FFO when reporting results.

We also present Normalized FFO as an additional supplemental measure as we believe it is more reflective of our core operating performance. We may make adjustments to FFO from time to time for certain other income and expenses that we consider non-recurring, infrequent or unusual, even though such items may require cash settlement, because such items do not reflect a necessary component of our ongoing operations.  Even though expenses associated with mergers and acquisitions, or M&A, may be recurring, the magnitude and timing fluctuate based on the timing and scope of M&A activity, and therefore, such expenses, which are not a necessary component of our ongoing operations, may not be comparable from period to period.  Normalized FFO excludes the effects of such items.

FFO and Normalized FFO are supplemental non-GAAP financial measures of real estate companies' operating performances, which do not represent cash generated from operating activities in accordance with GAAP and therefore should not be considered an alternative for net income or as a measure of liquidity. Our method of calculating FFO and Normalized FFO may be different from methods used by other REITs and, accordingly, may not be comparable to such other REITs.

Our reconciliation of net income to FFO and Normalized FFO for the three and six months ended June 30, 2017 and 2016 is as follows (in thousands):

| FUNDS FROM OPERATIONS: | For the Three Months Ended June 30, | |
|---|---|---|
| | 2017 | 2016 |
| Net income | $ 45,475 | $ 57,583 |
| Depreciation of real estate assets | 23,956 | 23,388 |
| Funds From Operations | 69,431 | 80,971 |
| Expenses associated with mergers and acquisitions | 301 | 317 |
| Normalized Funds From Operations | $ 69,732 | $ 81,288 |

| FUNDS FROM OPERATIONS: | For the Six Months Ended June 30, | |
|---|---|---|
| | 2017 | 2016 |
| Net income | $ 95,522 | $ 103,890 |
| Depreciation of real estate assets | 47,655 | 46,725 |
| Funds From Operations | 143,177 | 150,615 |
| Expenses associated with mergers and acquisitions | 431 | 1,460 |
| Goodwill and other impairments | 259 | — |
| Normalized Funds From Operations | $ 143,867 | $ 152,075 |

39

**EXHIBIT 15**
**Page 0431**

**Contractual Obligations**

The following schedule summarizes our contractual cash obligations by the indicated period as of June 30, 2017 (in thousands):

| | 2017 (remainder) | 2018 | 2019 | 2020 | 2021 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | Payments Due By Year Ended December 31, | | | | |
| Long-term debt | $ 5,000 | $ 10,000 | $ 15,000 | $ 796,000 | $ — | $ 600,000 | $1,426,000 |
| Interest on senior notes | 21,047 | 42,094 | 42,094 | 35,390 | 28,688 | 36,781 | 206,094 |
| Contractual facility developments and other commitments | 4,350 | — | — | — | — | — | 4,350 |
| South Texas Family Residential Center | 25,613 | 50,808 | 50,808 | 50,947 | 38,976 | — | 217,152 |
| Operating leases | 341 | 605 | 615 | 563 | 574 | 290 | 2,988 |
| Total contractual cash obligations | $ 56,351 | $ 103,507 | $ 108,517 | $ 882,900 | $ 68,238 | $ 637,071 | $1,856,584 |

The cash obligations in the table above do not include future cash obligations for variable interest expense associated with our Term Loan or the balance on our outstanding revolving credit facility as projections would be based on future outstanding balances as well as future variable interest rates, and we are unable to make reliable estimates of either. Further, the cash obligations in the table above also do not include future cash obligations for uncertain tax positions as we are unable to make reliable estimates of the timing of such payments, if any, to the taxing authorities. The contractual facility developments included in the table above represent development projects for which we have already entered into a contract with a customer that obligates us to complete the development project. Certain of our other ongoing construction projects are not currently under contract and thus are not included as a contractual obligation above as we may generally suspend or terminate such projects without substantial penalty. With respect to the South Texas Family Residential Center, the cash obligations included in the table above reflect the full contractual obligations of the lease of the site, excluding contingent payments, even though the lease agreement provides us with the ability to terminate if ICE terminates the amended IGSA, as previously described herein.

We had $7.5 million of letters of credit outstanding at June 30, 2017 primarily to support our requirement to repay fees and claims under our self-insured workers' compensation plan in the event we do not repay the fees and claims due in accordance with the terms of the plan. The letters of credit are renewable annually. We did not have any draws under any outstanding letters of credit during the six months ended June 30, 2017 or 2016.

**INFLATION**

Many of our contracts include provisions for inflationary indexing, which mitigates an adverse impact of inflation on net income. However, a substantial increase in personnel costs, workers' compensation or food and medical expenses could have an adverse impact on our results of operations in the future to the extent that these expenses increase at a faster pace than the per diem or fixed rates we receive for our management services. We outsource our food service operations to a third party. The contract with our outsourced food service vendor contains certain protections against increases in food costs.

**SEASONALITY AND QUARTERLY RESULTS**

Our business is subject to seasonal fluctuations. Because we are generally compensated for operating and managing facilities at an inmate per diem rate, our financial results are impacted by the number of calendar days in a fiscal quarter. Our fiscal year follows the calendar year and therefore, our daily profits for the third and fourth quarters include two more days than the first quarter (except in leap years) and one more day than the second quarter. Further, salaries and benefits represent the most significant component of operating expenses. Significant portions of the Company's unemployment taxes are recognized during the first quarter, when base wage rates reset for unemployment tax purposes. Finally, quarterly results are affected by government funding initiatives, the timing of the opening of new facilities, or the commencement of new management contracts and related start-up expenses which may mitigate or exacerbate the impact of other seasonal influences. Because of these seasonality factors, results for any quarter are not necessarily indicative of the results that may be achieved for the full fiscal year.

**ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Our primary market risk exposure is to changes in U.S. interest rates. We are exposed to market risk related to our revolving credit facility and Term Loan because the interest rates on our revolving credit facility and Term Loan are subject to fluctuations in the market. If the interest rate for our outstanding indebtedness under the revolving credit facility and Term Loan was 100 basis points

40

**EXHIBIT 15**
**Page 0432**

higher or lower during the three and six months ended June 30, 2017, our interest expense, net of amounts capitalized, would have been increased or decreased by $1.4 million and $2.7 million, respectively.

As of June 30, 2017, we had outstanding $325.0 million of senior notes due 2020 with a fixed interest rate of 4.125%, $350.0 million of senior notes due 2023 with a fixed interest rate of 4.625%, and $250.0 million of senior notes due 2022 with a fixed interest rate of 5.0%. Because the interest rates with respect to these instruments are fixed, a hypothetical 100 basis point increase or decrease in market interest rates would not have a material impact on our financial statements.

We may, from time to time, invest our cash in a variety of short-term financial instruments. These instruments generally consist of highly liquid investments with original maturities at the date of purchase of three months or less. While these investments are subject to interest rate risk and will decline in value if market interest rates increase, a hypothetical 100 basis point increase or decrease in market interest rates would not materially affect the value of these instruments.

**ITEM 4.        CONTROLS AND PROCEDURES.**

An evaluation was performed under the supervision and with the participation of our senior management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act as of the end of the period covered by this quarterly report. Based on that evaluation, our officers, including our Chief Executive Officer and Chief Financial Officer, concluded that as of the end of the period covered by this quarterly report our disclosure controls and procedures are effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and information required to be disclosed in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. There have been no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**EXHIBIT 15**
**Page 0433**

## PART II – OTHER INFORMATION

**ITEM 1.     LEGAL PROCEEDINGS.**

In a memorandum to the BOP dated August 18, 2016, the DOJ directed that, as each contract with privately operated prisons reaches the end of its term, the BOP should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the BOP's inmate population.  In addition to the decline in the BOP's inmate population, the DOJ memorandum cites purported operational, programming, and cost efficiency factors as reasons for the DOJ directive.  On February 21, 2017, the newly appointed Attorney General issued a memorandum rescinding the DOJ's prior directive stating the memorandum changed long-standing policy and practice and impaired the BOP's ability to meet the future needs of the federal correctional system.

Following the release of the August 18, 2016 DOJ memorandum, a purported securities class action lawsuit was filed against us and certain of our current and former officers in the United States District Court for the Middle District of Tennessee, captioned *Grae v. Corrections Corporation of America et al.*, Case No. 3:16-cv-02267.  The lawsuit is brought on behalf of a putative class of shareholders who purchased or acquired our securities between February 27, 2012 and August 17, 2016.  In general, the lawsuit alleges that, during this timeframe, our public statements were false and/or misleading regarding the purported operational, programming, and cost efficiency factors cited in the DOJ memorandum and, as a result, our stock price was artificially inflated.  The lawsuit alleges that the publication of the DOJ memorandum on August 18, 2016 revealed the alleged fraud, causing the per share price of our stock to decline, thereby causing harm to the putative class of shareholders.  We believe the lawsuit is entirely without merit and intend to vigorously defend against it.  In addition, we maintain insurance, with certain self-insured retention amounts, to cover the alleged claims which mitigates the risk such litigation would have a material adverse effect on our financial condition, results of operations, or cash flows.

See the information reported in Note 8 to the financial statements included in Part I, which information is incorporated hereunder by this reference.

**ITEM 1A.     RISK FACTORS.**

Except as set forth below, there have been no material changes in our Item 1A, "Risk Factors" as previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016.

*Failure to comply with facility contracts or with unique and increased governmental regulation could result in material penalties or non-renewal or termination of noncompliant contracts or our other contracts to provide or manage correctional detention, and residential reentry facilities.*  On June 13, 2017, the US Court of Appeals for the District of Columbia Circuit, or the Court, struck down large portions of a late 2016 Order, or the Order, from the Federal Communications Commission, or FCC, which regulates telecommunications. The Order had set numerous rate caps on interstate and intrastate calling services, or ICS, and applied directly to ICS providers who offer their services pursuant to contracts with correctional facilities, including those that we manage. The Court found that the FCC lacked authority to regulate intrastate ICS rates.  The Court also found that the FCC had neglected critical factors in calculating interstate rate caps, remanding the interstate rate proceeding back to the FCC for reconsideration.  As a result of the Court's decision, an earlier FCC order setting interstate rate caps remains in effect.

Because it is unclear what, if any, further rate capping action the FCC may take as regards interstate ICS rates, the financial impact cannot be anticipated at this time.  The impact to our revenue is limited as a significant amount of commissions paid by our ICS providers are passed along to our customers or are reserved and used for the benefit of inmates in our care.

In previous notices, the FCC sought comment on various topics including the development of international ICS rate caps; the potential regulation of rates associated with technology based ICS alternatives, such as videoconferencing; and whether additional reforms are necessary for effective regulation of revenue sharing agreements.  All of these reforms, if pursued, could impact revenue to correctional facility operators, both public and private, but the most recent decision by the Court appears to limit FCC jurisdiction in some of these areas.  For this reason, it remains unclear whether the FCC will undertake further regulatory activity in these fields.

**ITEM 2.     UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**

None.

**ITEM 3.     DEFAULTS UPON SENIOR SECURITIES.**

None.

**EXHIBIT 15**
**Page 0434**

**ITEM 4.       MINE SAFETY DISCLOSURES.**

None.

**ITEM 5.       OTHER INFORMATION.**

None.

**ITEM 6.       EXHIBITS.**

| Exhibit Number | Description of Exhibits |
| --- | --- |
| 31.1* | Certification of the Company's Chief Executive Officer pursuant to Securities and Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of the Company's Chief Financial Officer pursuant to Securities and Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of the Company's Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of the Company's Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase |

\*     Filed herewith.

\*\*    Furnished herewith.

**EXHIBIT 15**
**Page 0435**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CORECIVIC, INC.**

Date:  August 8, 2017

/s/ Damon T. Hininger
Damon T. Hininger
President and Chief Executive Officer

/s/ David M. Garfinkle
David M. Garfinkle
Executive Vice President, Chief Financial Officer, and Principal
Accounting Officer

44

EXHIBIT 15
Page 0436

Exhibit 31.1

**CERTIFICATION**

I, Damon T. Hininger, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of CoreCivic, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2017

/s/ Damon T. Hininger
Damon T. Hininger
President and Chief Executive Officer

**EXHIBIT 15**
**Page 0437**

Exhibit 31.2

## CERTIFICATION

I, David M. Garfinkle, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of CoreCivic, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2017

/s/ David M. Garfinkle
David M. Garfinkle
Executive Vice President, Chief Financial Officer, and Principal Accounting Officer

**EXHIBIT 15**
**Page 0438**

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of CoreCivic, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Damon T. Hininger, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

/s/ Damon T. Hininger
Damon T. Hininger
President and Chief Executive Officer
August 8, 2017

**EXHIBIT 15**
**Page 0439**

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of CoreCivic, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David M. Garfinkle, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

/s/ David M. Garfinkle
David M. Garfinkle
Executive Vice President, Chief Financial Officer, and Principal Accounting Officer
August 8, 2017

**EXHIBIT 15**
**Page 0440**

EXHIBIT 15
Page 0441

# ATTACHMENT B

# ATTACHMENT B

EXHIBIT 15
Page 0442



**Supplemental Financial Information**
**For the Quarter Ended June 30, 2017**

The Company's supplemental financial information and other data presented herein speaks only as of the date or period indicated (or as of the date posted, as the case may be), and the Company does not undertake any obligation, and disclaims any duty, to update any of this information.  The Company's future financial performance is subject to various risks and uncertainties that could cause actual results to differ materially from expectations. The factors that could affect the Company's future financial results are discussed more fully in our reports filed with the SEC. Readers are advised to refer to these reports for additional information concerning the Company.  Readers are also advised that the Company's historical performance may not be indicative of future results.  In addition, the information contained herein does not constitute an offer to sell or a solicitation to buy any of the Company's securities.

**EXHIBIT 15**
**Page 0443**

# CoreCivic, Inc.

**Supplemental Financial Information**
**For the Quarter Ended June 30, 2017**

## TABLE OF CONTENTS

Financial Highlights & 2017 Guidance Summary — 1

Consolidated Balance Sheets — 2

Consolidated Statements of Operations — 3

Reconciliation of Basic to Diluted Earnings Per Share — 4

Calculation of Adjusted Diluted Earnings Per Share — 5

Funds From Operations — 6

Selected Financial Information — 7

Segregated Data — 9

Analysis of Outstanding Debt — 10

Selected Operating Ratios — 11

Partner Information — 12

Facility Portfolio — 13

Research Coverage / Credit Ratings — 19

Damon T. Hininger, President and Chief Executive Officer
David M. Garfinkle, Chief Financial Officer
10 Burton Hills Boulevard
Nashville, TN 37215
Tel.: (615) 263-3000  Fax:  (615) 263-3010

**EXHIBIT 15**
**Page 0444**

## FINANCIAL HIGHLIGHTS

(Unaudited and amounts in thousands, except per share amounts)

|  | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| **Adjusted Diluted EPS** | $ 0.39 | $ 0.49 | $ 0.81 | $ 0.89 |
| **Normalized FFO Per Share** | $ 0.59 | $ 0.69 | $ 1.21 | $ 1.29 |
| **AFFO Per Share** | $ 0.56 | $ 0.65 | $ 1.18 | $ 1.26 |
| **Debt Leverage** | 3.6x | 3.3x | 3.5x | 3.5x |
| **Fixed Charge Coverage Ratio** | 5.7x | 7.0x | 5.8x | 6.6x |

## GUIDANCE SUMMARY

(Unaudited and amounts in thousands, except per share amounts)

|  | Q3 2017 | | Full Year 2017 | |
|---|---|---|---|---|
|  | Low-End | High-End | Low-End | High-End |
| Net income | $ 37,500 | $ 39,600 | $ 177,200 | $ 182,200 |
| Expenses associated with mergers and acquisitions | 400 | 400 | 1,500 | 1,500 |
| Asset impairments | 1,000 | 1,000 | 1,300 | 1,300 |
| Adjusted net income | $ 38,900 | $ 41,000 | $ 180,000 | $ 185,000 |
| Net income | $ 37,500 | $ 39,600 | $ 177,200 | $ 182,200 |
| Depreciation of real estate assets | 23,300 | 23,300 | 93,500 | 94,000 |
| Funds From Operations | $ 60,800 | $ 62,900 | $ 270,700 | $ 276,200 |
| Expenses associated with mergers and acquisitions | 400 | 400 | 1,500 | 1,500 |
| Asset impairments | 1,000 | 1,000 | 1,300 | 1,300 |
| Normalized Funds From Operations | $ 62,200 | $ 64,300 | $ 273,500 | $ 279,000 |
| Maintenance capital expenditures on real estate assets | (7,500) | (7,500) | (26,000) | (27,000) |
| Stock-based compensation and non-cash interest | 5,500 | 5,000 | 19,500 | 19,500 |
| Other non-cash revenue and expenses | (500) | (500) | (3,500) | (3,500) |
| Adjusted Funds from Operations | $ 59,700 | $ 61,300 | $ 263,500 | $ 268,000 |
| Diluted EPS | $ 0.32 | $ 0.33 | $ 1.50 | $ 1.54 |
| Adjusted EPS | $ 0.33 | $ 0.35 | $ 1.52 | $ 1.56 |
| FFO per diluted share | $ 0.51 | $ 0.53 | $ 2.28 | $ 2.33 |
| Normalized FFO per diluted share | $ 0.52 | $ 0.54 | $ 2.31 | $ 2.35 |
| Adjusted Funds from Operations per diluted share | $ 0.50 | $ 0.52 | $ 2.22 | $ 2.26 |
| Net income | $ 37,500 | $ 39,600 | $ 177,200 | $ 182,200 |
| Interest expense, net | 17,500 | 17,000 | 68,000 | 67,000 |
| Depreciation and amortization | 36,500 | 36,500 | 146,500 | 146,500 |
| Income tax expense | 3,000 | 2,500 | 11,500 | 11,000 |
| EBITDA | $ 94,500 | $ 95,600 | $ 403,200 | $ 406,700 |
| Expenses associated with mergers and acquisitions | 400 | 400 | 1,500 | 1,500 |
| Depreciation expense associated with STFRC lease | (4,100) | (4,100) | (16,600) | (16,600) |
| Interest expense associated with STFRC lease | (1,600) | (1,600) | (6,400) | (6,400) |
| Asset impairments | 1,000 | 1,000 | 1,300 | 1,300 |
| Adjusted EBITDA | $ 90,200 | $ 91,300 | $ 383,000 | $ 386,500 |
| **Capital Expenditures** | | | | |
| Prison construction & land acquisitions | | | $ 10,000 | $ 13,000 |
| Maintenance on real estate assets | | | 26,000 | 27,000 |
| Information technology and other assets | | | 31,000 | 35,000 |
| Total capital expenditures | | | $ 67,000 | $ 75,000 |

**EXHIBIT 15**
**Page 0445**

**CONSOLIDATED BALANCE SHEETS**

2 of 19

(Unaudited and amounts in thousands, except per share amounts)

| ASSETS | June 30, 2017 | March 31, 2017 | December 31, 2016 | September 30, 2016 | June 30, 2016 |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ 46,584 | $ 43,164 | $ 37,711 | $ 42,731 | $ 70,843 |
| Accounts receivable, net of allowance | 206,848 | 213,027 | 229,885 | 222,420 | 221,427 |
| Prepaid expenses and other current assets | 25,620 | 25,391 | 31,228 | 32,742 | 32,995 |
| Total current assets | 279,052 | 281,582 | 298,824 | 297,893 | 325,265 |
| | | | | | |
| Property and equipment, net | 2,806,078 | 2,822,805 | 2,837,657 | 2,850,219 | 2,870,150 |
| | | | | | |
| Restricted cash | | | | | |
| Goodwill | 40,402 | 38,127 | 38,386 | 38,386 | 38,415 |
| Non-current deferred tax assets | 11,537 | 11,868 | 13,735 | 11,973 | 7,774 |
| Other assets | 87,247 | 86,236 | 83,002 | 87,041 | 86,146 |
| Total assets | $ 3,224,316 | $ 3,240,618 | $ 3,271,604 | $ 3,285,512 | $ 3,327,750 |
| | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Accounts payable and accrued expenses | $ 243,975 | $ 240,586 | $ 260,107 | $ 329,446 | $ 332,859 |
| Income taxes payable | 853 | 2,601 | 2,086 | 1,627 | 1,139 |
| Current portion of long-term debt | 10,000 | 10,000 | 10,000 | 8,750 | 7,500 |
| Total current liabilities | 254,828 | 253,187 | 272,193 | 339,823 | 341,498 |
| | | | | | |
| Long-term debt, net | 1,407,196 | 1,421,182 | 1,435,169 | 1,420,155 | 1,448,142 |
| Deferred revenue | 46,574 | 50,006 | 53,437 | 36,257 | 45,608 |
| Other liabilities | 52,374 | 53,082 | 51,842 | 45,084 | 47,875 |
| Total liabilities | 1,760,972 | 1,777,457 | 1,812,641 | 1,841,319 | 1,883,123 |
| | | | | | |
| Commitments and contingencies | | | | | |
| | | | | | |
| Common stock - $0.01 par value | 1,182 | 1,181 | 1,176 | 1,176 | 1,175 |
| Additional paid-in capital | 1,789,337 | 1,784,532 | 1,780,350 | 1,776,504 | 1,768,321 |
| Accumulated deficit | (327,175) | (322,552) | (322,563) | (333,487) | (324,869) |
| Total stockholders' equity | 1,463,344 | 1,463,161 | 1,458,963 | 1,444,193 | 1,444,627 |
| | | | | | |
| Total liabilities and stockholders' equity | $ 3,224,316 | $ 3,240,618 | $ 3,271,604 | $ 3,285,512 | $ 3,327,750 |

**EXHIBIT 15**
**Page 0446**

### CONSOLIDATED STATEMENTS OF OPERATIONS

(Unaudited and amounts in thousands, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| **REVENUE:** | | | | |
| Owned & controlled properties | $ 384,874 | $ 411,451 | $ 779,470 | $ 808,329 |
| Managed only and other | 51,519 | 51,880 | 102,607 | 102,387 |
| Total revenue | 436,393 | 463,331 | 882,077 | 910,716 |
| **EXPENSES:** | | | | |
| Operating: | | | | |
| Owned & controlled properties | 257,766 | 268,569 | 522,636 | 533,555 |
| Managed only and other | 50,131 | 47,877 | 100,564 | 96,809 |
| Total operating expenses | 307,897 | 316,446 | 623,200 | 630,364 |
| General and administrative | 26,417 | 27,364 | 51,243 | 53,844 |
| Depreciation and amortization | 36,800 | 42,345 | 73,057 | 84,404 |
| Asset impairments | - | - | 259 | - |
| | 371,114 | 386,155 | 747,759 | 768,612 |
| **OPERATING INCOME** | 65,279 | 77,176 | 134,318 | 142,104 |
| **OTHER (INCOME) EXPENSE:** | | | | |
| Interest expense, net | 16,622 | 16,796 | 33,112 | 34,340 |
| Other (income) expense | (60) | 132 | (43) | 49 |
| | 16,562 | 16,928 | 33,069 | 34,389 |
| **INCOME BEFORE INCOME TAXES** | 48,717 | 60,248 | 101,249 | 107,715 |
| Income tax expense | (3,242) | (2,665) | (5,727) | (3,825) |
| **NET INCOME** | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| **BASIC EARNINGS PER SHARE** | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.89 |
| **DILUTED EARNINGS PER SHARE** | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.88 |

**EXHIBIT 15**
**Page 0447**

**RECONCILIATION OF BASIC TO DILUTED EARNINGS PER SHARE**
(Unaudited and amounts in thousands, except per share amounts)

4 of 19

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Basic: | | | | |
| Net income | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| Diluted: | | | | |
| Net income | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| Basic: | | | | |
| Weighted average common shares outstanding | 118,164 | 117,497 | 117,974 | 117,414 |
| Unvested restricted common stock | - | (96) | - | (96) |
| Weighted average common shares outstanding-basic | 118,164 | 117,401 | 117,974 | 117,318 |
| Diluted: | | | | |
| Weighted average common shares outstanding-basic | 118,164 | 117,401 | 117,974 | 117,318 |
| Effect of dilutive securities: | | | | |
| Stock options | 377 | 514 | 398 | 473 |
| Restricted stock-based awards | 44 | 94 | 51 | 98 |
| Weighted average shares and assumed conversions-diluted | 118,585 | 118,009 | 118,423 | 117,889 |
| Basic earnings per share | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.89 |
| Diluted earnings per share | $ 0.38 | $ 0.49 | $ 0.81 | $ 0.88 |

**EXHIBIT 15**
**Page 0448**

### CALCULATION OF ADJUSTED DILUTED EARNINGS PER SHARE

(Unaudited and amounts in thousands, except per share amounts)

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2017 | | 2016 |
| Net Income | $ | 45,475 | $ | 57,583 | $ | 95,522 | $ | 103,890 |
| Special items: | | | | | | | | |
|   Expenses associated with mergers and acquisitions | | 301 | | 317 | | 431 | | 1,460 |
|   Asset impairments | | - | | - | | 259 | | - |
| Diluted adjusted net income | $ | 45,776 | $ | 57,900 | $ | 96,212 | $ | 105,350 |
| | | | | | | | | |
| Weighted average common shares outstanding - basic | | 118,164 | | 117,401 | | 117,974 | | 117,318 |
| Effect of dilutive securities: | | | | | | | | |
|   Stock options | | 377 | | 514 | | 398 | | 473 |
|   Restricted stock-based compensation | | 44 | | 94 | | 51 | | 98 |
| Weighted average shares and assumed conversions - diluted | | 118,585 | | 118,009 | | 118,423 | | 117,889 |
| | | | | | | | | |
| **Adjusted Diluted Earnings Per Share** | $ | 0.39 | $ | 0.49 | $ | 0.81 | $ | 0.89 |

**EXHIBIT 15**
**Page 0449**

## FUNDS FROM OPERATIONS

(Unaudited and amounts in thousands, except per share amounts)

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2017 | | 2016 | |
| **FUNDS FROM OPERATIONS:** | | | | | | | | |
| Net income | $ | 45,475 | $ | 57,583 | $ | 95,522 | $ | 103,890 |
| Depreciation of real estate assets | | 23,956 | | 23,388 | | 47,655 | | 46,725 |
| Funds From Operations | $ | 69,431 | $ | 80,971 | $ | 143,177 | $ | 150,615 |
| | | | | | | | | |
| Expenses associated with mergers and acquisitions | | 301 | | 317 | | 431 | | 1,460 |
| Goodwill and other impairments | | - | | - | | 259 | | - |
| Normalized Funds From Operations | $ | 69,732 | $ | 81,288 | $ | 143,867 | $ | 152,075 |
| | | | | | | | | |
| Maintenance capital expenditures on real estate assets | | (6,609) | | (8,499) | | (10,353) | | (11,850) |
| Stock-based compensation | | 4,059 | | 4,092 | | 8,145 | | 7,873 |
| Amortization of debt costs | | 783 | | 785 | | 1,566 | | 1,577 |
| Other non-cash revenue and expenses | | (1,510) | | (1,228) | | (3,020) | | (1,244) |
| Adjusted Funds From Operations | $ | 66,455 | $ | 76,438 | $ | 140,205 | $ | 148,431 |
| | | | | | | | | |
| **FUNDS FROM OPERATIONS PER SHARE:** | | | | | | | | |
| Basic | $ | 0.59 | $ | 0.69 | $ | 1.21 | $ | 1.28 |
| Diluted | $ | 0.59 | $ | 0.69 | $ | 1.21 | $ | 1.28 |
| | | | | | | | | |
| **NORMALIZED FUNDS FROM OPERATIONS PER SHARE:** | | | | | | | | |
| Basic | $ | 0.59 | $ | 0.69 | $ | 1.22 | $ | 1.30 |
| Diluted | $ | 0.59 | $ | 0.69 | $ | 1.21 | $ | 1.29 |
| | | | | | | | | |
| **ADJUSTED FUNDS FROM OPERATIONS PER SHARE:** | | | | | | | | |
| Basic | $ | 0.56 | $ | 0.65 | $ | 1.19 | $ | 1.27 |
| Diluted | $ | 0.56 | $ | 0.65 | $ | 1.18 | $ | 1.26 |

FFO and AFFO are widely accepted non-GAAP supplemental measures of REIT performance following the standards established by the National Association of Real Estate Investment Trusts (NAREIT). The Company believes that FFO and AFFO are important operating measures that supplement discussion and analysis of the Company's results of operations and are used to review and assess operating performance of the Company and its correctional facilities and their management teams. NAREIT defines FFO as net income computed in accordance with generally accepted accounting principles, excluding gains (or losses) from sales of property and extraordinary items, plus depreciation and amortization of real estate and impairment of depreciable real estate. Because the historical cost accounting convention used for real estate assets requires depreciation (except on land), this accounting presentation assumes that the value of real estate assets diminishes at a level rate over time. Because of the unique structure, design and use of the Company's correctional facilities, management believes that assessing performance of the Company's correctional facilities without the impact of depreciation or amortization is useful. The Company may make adjustments to FFO from time to time for certain other income and expenses that it considers non-recurring, infrequent or unusual, even though such items may require cash settlement, because such items do not reflect a necessary component of the ongoing operations of the Company. Even though expenses associated with mergers and acquisitions (M&A) may be recurring, the magnitude and timing fluctuate based on the timing and scope of M&A activity, and therefore, such expenses, which are not a necessary component of the ongoing operations of the Company, may not be comparable from period to period. Normalized FFO excludes the effects of such items. The Company calculates AFFO by adding to Normalized FFO non-cash expenses such as the amortization of deferred financing costs and stock-based compensation, and by subtracting from Normalized FFO recurring real estate expenditures that are capitalized and then amortized, but which are necessary to maintain a REIT's properties and its revenue stream. Some of these capital expenditures contain a discretionary element with respect to when they are incurred, while others may be more urgent. Therefore, these capital expenditures may fluctuate from quarter to quarter, depending on the nature of the expenditures required, seasonal factors such as weather, and budgetary conditions. Other companies may calculate FFO, Normalized FFO, and AFFO differently than the Company does, or adjust for other items, and therefore comparability may be limited. FFO, Normalized FFO, and AFFO and their corresponding per share measures are not measures of performance under GAAP, and should not be considered as an alternative to cash flows from operating activities, a measure of liquidity or an alternative to net income as indicators of the Company's operating performance or any other measure of performance derived in accordance with GAAP. This data should be read in conjunction with the Company's consolidated financial statements and related notes included in its filings with the Securities and Exchange Commission.

**EXHIBIT 15**
**Page 0450**

## SELECTED FINANCIAL INFORMATION
(Unaudited and amounts in thousands, except per share amounts)

| | June 30, 2017 | March 31, 2017 | December 31, 2016 | September 30, 2016 | June 30, 2016 |
|---|---|---|---|---|---|
| **BALANCE SHEET:** | | | | | |
| Property and equipment | $ 4,219,214 | $ 4,201,029 | $ 4,189,980 | $ 4,169,671 | $ 4,147,056 |
| Accumulated depreciation and amortization | (1,413,136) | (1,378,224) | (1,352,323) | (1,319,452) | (1,276,906) |
| Property and equipment, net | $ 2,806,078 | $ 2,822,805 | $ 2,837,657 | $ 2,850,219 | $ 2,870,150 |
| Total assets | $ 3,224,316 | $ 3,240,618 | $ 3,271,604 | $ 3,285,512 | $ 3,327,750 |
| Maintenance & technology capital expenditures for the quarter ended | $ 12,522 | $ 8,175 | $ 18,868 | $ 12,055 | $ 14,368 |
| Prison construction & land acquisition capital expenditures for the quarter ended | $ 2,863 | $ 6,359 | $ 8,383 | $ 10,812 | $ 15,220 |
| Total debt | $ 1,426,000 | $ 1,440,500 | $ 1,455,000 | $ 1,439,250 | $ 1,466,500 |
| Equity book value | $ 1,463,344 | $ 1,463,161 | $ 1,458,963 | $ 1,444,193 | $ 1,444,627 |
| **LIQUIDITY:** | | | | | |
| Cash and cash equivalents | $ 46,584 | $ 43,164 | $ 37,711 | $ 42,731 | $ 70,843 |
| Availability under revolving credit facility | $ 481,537 | $ 467,900 | $ 455,900 | $ 471,734 | $ 445,734 |
| **CAPITALIZATION:** | | | | | |
| Common shares outstanding | 118,179 | 118,140 | 117,554 | 117,551 | 117,520 |
| Common share price at end of period | $ 27.58 | $ 31.42 | $ 24.46 | $ 13.87 | $ 35.02 |
| Market value of common equity at end of period | $ 3,259,377 | $ 3,711,959 | $ 2,875,371 | $ 1,630,432 | $ 4,115,550 |
| Total equity market capitalization | $ 3,259,377 | $ 3,711,959 | $ 2,875,371 | $ 1,630,432 | $ 4,115,550 |
| Total market capitalization (market value of equity plus debt) | $ 4,685,377 | $ 5,152,459 | $ 4,330,371 | $ 3,069,682 | $ 5,582,050 |
| Regular Dividends | $ 50,098 | $ 50,036 | $ 49,765 | $ 63,958 | $ 64,048 |
| Dividends per common share | $ 0.42 | $ 0.42 | $ 0.42 | $ 0.54 | $ 0.54 |
| Annualized dividend yield | 6.1% | 5.3% | 6.9% | 15.6% | 6.2% |
| **EBITDA** | $ 102,139 | $ 105,279 | $ 119,391 | $ 116,823 | $ 119,389 |
| **ADJUSTED EBITDA** | $ 96,707 | $ 99,937 | $ 110,651 | $ 105,737 | $ 106,419 |
| **NORMALIZED FUNDS FROM OPERATIONS** | $ 69,732 | $ 74,135 | $ 84,642 | $ 80,929 | $ 81,288 |
| Basic normalized funds from operations per share | $ 0.59 | $ 0.63 | $ 0.72 | $ 0.69 | $ 0.69 |
| Diluted normalized funds from operations per share | $ 0.59 | $ 0.63 | $ 0.72 | $ 0.69 | $ 0.69 |
| **FFO PAYOUT RATIO** | 71.2% | 66.7% | 58.3% | 78.3% | 78.3% |
| **ADJUSTED FUNDS FROM OPERATIONS** | $ 66,455 | $ 73,750 | $ 76,322 | $ 79,619 | $ 76,438 |
| Basic adjusted funds from operations per share | $ 0.56 | $ 0.63 | $ 0.65 | $ 0.68 | $ 0.65 |
| Diluted adjusted funds from operations per share | $ 0.56 | $ 0.62 | $ 0.65 | $ 0.68 | $ 0.65 |
| **AFFO PAYOUT RATIO** | 75.0% | 67.7% | 64.6% | 79.4% | 83.1% |

**EXHIBIT 15**

**SELECTED FINANCIAL INFORMATION**

(Unaudited and amounts in thousands, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Number of days per period | 91 | 91 | 181 | 182 |
| **ALL FACILITIES:** | | | | |
| Average available beds | 82,447 | 83,399 | 82,711 | 84,297 |
| Average compensated occupancy | 79.0% | 79.3% | 80.0% | 77.2% |
| Total compensated man-days | 5,929,565 | 6,021,345 | 11,976,804 | 11,843,951 |
| Revenue per compensated man-day | $ 71.80 | $ 75.28 | $ 71.89 | $ 75.29 |
| Operating expenses per compensated man-day: | | | | |
| Fixed expense (1) | 37.10 | 38.37 | 37.55 | 39.11 |
| Variable expense | 14.56 | 15.40 | 14.30 | 15.41 |
| Total | 51.66 | 53.77 | 51.85 | 54.52 |
| Operating income per compensated man-day | $ 20.14 | $ 21.51 | $ 20.04 | $ 20.77 |
| Operating margin | 28.1% | 28.6% | 27.9% | 27.6% |
| **DEPRECIATION AND AMORTIZATION:** | | | | |
| Depreciation expense on real estate | 23,956 | 23,388 | 47,655 | 46,725 |
| Depreciation expense associated with STFRC rent payment | 4,102 | 10,590 | 8,159 | 21,180 |
| Other depreciation expense | 8,452 | 8,119 | 16,672 | 16,055 |
| Amortization of intangibles | 290 | 248 | 571 | 444 |
| Depreciation and amortization | $ 36,800 | $ 42,345 | $ 73,057 | $ 84,404 |
| **NET OPERATING INCOME:** | | | | |
| Revenue | | | | |
| Owned & controlled properties | $ 384,874 | $ 411,451 | $ 779,470 | $ 808,329 |
| Managed only and other | 51,519 | 51,880 | 102,607 | 102,387 |
| Total revenues | 436,393 | 463,331 | 882,077 | 910,716 |
| Operating Expenses | | | | |
| Owned & controlled properties | 257,766 | 268,569 | 522,636 | 533,555 |
| Managed only and other | 50,131 | 47,877 | 100,564 | 96,809 |
| Total operating expenses | 307,897 | 316,446 | 623,200 | 630,364 |
| Facility Net Operating Income | | | | |
| Owned & controlled properties | 127,108 | 142,882 | 256,834 | 274,774 |
| Managed only and other | 1,388 | 4,003 | 2,043 | 5,578 |
| Total net operating income | $ 128,496 | $ 146,885 | $ 258,877 | $ 280,352 |

(1) Fixed expense and the corresponding fixed expense per compensated man-day for the three and six months ended June 30, 2017  include depreciation expense of $4.1 million and $8.2 million, respectively, and interest expense of $1.6 million and $3.3 million, respectively, associated with the South Texas Family Residential Center (STFRC) lease payments.  Fixed expense and the corresponding fixed expense per compensated man-day for the three and six months ended June 30, 2016 include depreciation expense of $10.6 million and $21.2 million, respectively, and interest expense of $2.7 million and $5.6 million associated with the STFRC lease payments. These amounts are also deducted from our calculation of Adjusted EBITDA, because we believe this presentation is more reflective of the cash flows associated with the facility's operations, and therefore cash available to service our debt and pay dividends to our shareholders.

**EXHIBIT 15**
**Page 0452**

**SEGREGATED DATA**

(Unaudited and amounts in thousands, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| **OWNED AND MANAGED FACILITIES:** | | | | |
| Corrections revenue | $ 374,849 | $ 401,931 | $ 759,552 | $ 790,552 |
| Operating expenses: | | | | |
| Fixed expense (1) | 187,954 | 200,039 | 384,388 | 400,260 |
| Variable expense | 72,390 | 79,497 | 143,959 | 156,168 |
| Total | 260,344 | 279,536 | 528,347 | 556,428 |
| Facility net operating income | $ 114,505 | $ 122,395 | $ 231,205 | $ 234,124 |
| Average available beds | 68,630 | 69,501 | 68,854 | 70,399 |
| Average compensated occupancy | 76.2% | 76.2% | 77.3% | 73.8% |
| Total compensated man-days | 4,760,487 | 4,817,344 | 9,635,082 | 9,458,726 |
| Revenue per compensated man-day | $ 78.74 | $ 83.43 | $ 78.83 | $ 83.58 |
| Operating expenses per compensated man-day: | | | | |
| Fixed (1) | 39.48 | 41.52 | 39.89 | 42.32 |
| Variable | 15.21 | 16.50 | 14.94 | 16.51 |
| Total | 54.69 | 58.02 | 54.83 | 58.83 |
| Operating income per compensated man-day | $ 24.05 | $ 25.41 | $ 24.00 | $ 24.75 |
| Operating margin | 30.5% | 30.5% | 30.4% | 29.6% |
| **MANAGED ONLY FACILITIES:** | | | | |
| Corrections revenue | $ 50,871 | $ 51,346 | $ 101,432 | $ 101,176 |
| Operating expenses: | | | | |
| Fixed expense | 32,055 | 31,008 | 65,373 | 63,004 |
| Variable expense | 13,962 | 13,210 | 27,369 | 26,305 |
| Total | 46,017 | 44,218 | 92,742 | 89,309 |
| Facility net operating income | $ 4,854 | $ 7,128 | $ 8,690 | $ 11,867 |
| Average available beds | 13,817 | 13,898 | 13,857 | 13,898 |
| Average compensated occupancy | 93.0% | 95.2% | 93.4% | 94.3% |
| Total compensated man-days | 1,169,078 | 1,204,001 | 2,341,722 | 2,385,225 |
| Revenue per compensated man-day | $ 43.51 | $ 42.65 | $ 43.32 | $ 42.42 |
| Operating expenses per compensated man-day: | | | | |
| Fixed expense | 27.42 | 25.75 | 27.92 | 26.41 |
| Variable expense | 11.94 | 10.97 | 11.69 | 11.03 |
| Total | 39.36 | 36.72 | 39.61 | 37.44 |
| Operating income per compensated man-day | $ 4.15 | $ 5.93 | $ 3.71 | $ 4.98 |
| Operating margin | 9.5% | 13.9% | 8.6% | 11.7% |

(1) Fixed expense and the corresponding fixed expense per compensated man-day for the three and six months ended June 30, 2017 include depreciation expense of $4.1 million and $8.2 million, respectively, and interest expense of $1.6 million and $3.3 million, respectively, associated with the South Texas Family Residential Center (STFRC) lease payments. Fixed expense and the corresponding fixed expense per compensated man-day for the three and six months ended June 30, 2016 include depreciation expense of $10.6 million and $21.2 million, respectively, and interest expense of $2.7 million and $5.6 million associated with the STFRC lease payments. These amounts are also deducted from our calculation of Adjusted EBITDA, because we believe this presentation is more reflective of the cash flows associated with the facility's operations, and therefore cash available to service our debt and pay dividends to our shareholders.

**EXHIBIT 15**
**Page 0453**

**ANALYSIS OF OUTSTANDING DEBT**
(Unaudited and amounts in thousands)

| | Outstanding Balance 12/31/2016 | Outstanding Balance 6/30/2017 | Stated Interest Rate | Effective Interest Rate [1] | Maturity Date | Callable/ Redeemable |
|---|---|---|---|---|---|---|
| **Fixed Rate:** | | | | | | |
| $350 Million Senior Notes | $ 350,000 | $ 350,000 | 4.625% | 4.80% | May 2023 | Prior to February 1, 2023, redeemable at a "make-whole" redemption price, plus accrued and unpaid interest; thereafter the notes are redeemable at 100% of the aggregate principal amount plus accrued and unpaid interest. |
| $325 Million Senior Notes | 325,000 | 325,000 | 4.125% | 4.38% | April 2020 | Prior to January 1, 2020, redeemable at a "make-whole" redemption price, plus accrued and unpaid interest; thereafter the notes are redeemable at 100% of the aggregate principal amount plus accrued and unpaid interest. |
| $250 Million Senior Notes | 250,000 | 250,000 | 5.0% | 5.19% | October 2022 | Prior to July 15, 2022, redeemable at a "make-whole" redemption price, plus accrued and unpaid interest; thereafter the notes are redeemable at 100% of the aggregate principal amount plus accrued and unpaid interest. |
| Total Fixed Rate Debt | 925,000 | 925,000 | | | | |
| **Floating Rate:** | | | | | | |
| Revolving Credit Facility | 435,000 | 411,000 | 2.96% | 3.21% [2] | July 2020 | |
| Term Loan | 95,000 | 90,000 | 2.59% | 2.72% | July 2020 | |
| Total Floating Rate Debt | 530,000 | 501,000 | | | | |
| Grand Total Debt | $ 1,455,000 | $ 1,426,000 | 3.93% | 4.14% | 4.06 [3] | |

[1] Includes amortization of debt issuance costs.

[2] The Company has $7.5 million of letters of credit outstanding under a sub-facility reducing the available capacity under the $900.0 million revolving credit facility to $481.5 million as of June 30, 2017.  Based on the Company's current leverage ratio, the revolving credit facility bears interest at LIBOR plus a margin of 1.50%.

[3] Represents the weighted average debt maturity in years.

*Debt Maturity Schedule at June 30, 2017:*

| Year | Total Debt Maturing | % of Debt Maturing | % of Debt Maturing |
|---|---|---|---|
| **2017** | $ 5,000 | 0.35% | 0.35% |
| **2018** | 10,000 | 0.70% | 1.05% |
| **2019** | 15,000 | 1.05% | 2.10% |
| **2020** | 796,000 | 55.82% | 57.92% |
| **2021** | - | 0.00% | 57.92% |
| **Thereafter** | 600,000 | 42.08% | 100.00% |
| | $ 1,426,000 | 100.00% | |



Debt Maturity

**EXHIBIT 15**
**Page 0454**

**SELECTED OPERATING RATIOS**

(Unaudited and amounts in thousands, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| **COVERAGE RATIOS:** | | | | |
| Interest coverage ratio (Adjusted EBITDA/Interest incurred) (x) | 6.7x | 7.6x | 6.8x | 7.2x |
| Fixed charge coverage ratio (Adjusted EBITDA/(Interest incurred + Scheduled prin pmts)) (x) | 5.7x | 7.0x | 5.8x | 6.6x |
| Senior debt coverage ratio ((Senior debt - cash)/Annualized Adjusted EBITDA) (x) | 3.6x | 3.3x | 3.5x | 3.5x |
| Total debt coverage ratio ((Total debt - cash)/Annualized Adjusted EBITDA) (x) | 3.6x | 3.3x | 3.5x | 3.5x |
| Accounts receivable turnover (Annualized revenues/Accounts receivable) (x) | 8.4x | 8.4x | 8.5x | 8.2x |
| **DEBT/EQUITY RATIOS:** | | | | |
| Total debt/Total market capitalization | 30.4% | 26.3% | 30.4% | 26.3% |
| Total debt/Equity market capitalization | 43.8% | 35.6% | 43.8% | 35.6% |
| Total debt/Book equity capitalization | 97.4% | 101.5% | 97.4% | 101.5% |
| Total debt/Gross book value of real estate assets | 33.8% | 35.4% | 33.8% | 35.4% |
| **RETURN ON INVESTMENT RATIOS:** | | | | |
| Annualized return on operating real estate investments | | | | |
| (Annualized Adjusted EBITDA/Average operating real estate investments (undepreciated book value)*) | 9.2% | 10.3% | 9.4% | 9.8% |
| Annualized return on total assets | | | | |
| (Annualized Adjusted EBITDA/Average total assets (undepreciated book value)*) | 8.4% | 9.3% | 8.5% | 8.8% |
| **OVERHEAD RATIOS:** | | | | |
| Annualized general & administrative expenses (excl. non-recurring costs)/Average total assets (undepreciated book value)* | 2.3% | 2.4% | 2.2% | 2.3% |
| General & administrative expenses (excluding non-recurring costs)/Total revenues | 6.0% | 5.8% | 5.8% | 5.8% |
| **INTEREST EXPENSE, NET:** | | | | |
| Interest income | $ (327) | $ (549) | $ (539) | $ (659) |
| Interest incurred | 14,535 | 13,967 | 28,780 | 28,010 |
| Interest expense associated with STFRC lease | 1,631 | 2,697 | 3,305 | 5,576 |
| Amortization of debt costs | 783 | 785 | 1,566 | 1,577 |
| Capitalized interest | - | (104) | - | (164) |
| Interest expense, net | $ 16,622 | $ 16,796 | $ 33,112 | $ 34,340 |
| **EBITDA CALCULATION:** | | | | |
| Net income | $ 45,475 | $ 57,583 | $ 95,522 | $ 103,890 |
| Interest expense, net | 16,622 | 16,796 | 33,112 | 34,340 |
| Depreciation and amortization | 36,800 | 42,345 | 73,057 | 84,404 |
| Income tax expense | 3,242 | 2,665 | 5,727 | 3,825 |
| EBITDA | 102,139 | 119,389 | 207,418 | 226,459 |
| Expenses associated with mergers and acquisitions | 301 | 317 | 431 | 1,460 |
| Depreciation expense associated with STFRC lease | (4,102) | (10,590) | (8,159) | (21,180) |
| Interest expense associated with STFRC lease | (1,631) | (2,697) | (3,305) | (5,576) |
| Asset impairments | - | - | 259 | - |
| ADJUSTED EBITDA | $ 96,707 | $ 106,419 | $ 196,644 | $ 201,163 |

*Calculated as a simple average (beginning of period plus end of period divided by 2)

**EXHIBIT 15**
**Page 0455**

**PARTNER INFORMATION**
(Unaudited)

### CONTRACT RETENTION

| | 2012 | 2013 | 2014 | 2015 | 2016 | YTD 2017 | TOTAL |
|---|---|---|---|---|---|---|---|
| **OWNED AND CONTROLLED:** | | | | | | | |
| # of Contracts up for Renewal | 22 | 28 | 22 | 29 | 42 | 13 | 156 |
| # of Contracts Retained | 21 | 25 | 22 | 26 | 39 | 12 | 145 |
| Retention Rate | 95.5% | 89.3% | 100.0% | 89.7% | 92.9% | 92.3% | 92.9% |
| **MANAGED ONLY:** | | | | | | | |
| # of Contracts up for Renewal | 7 | 13 | 7 | 10 | 4 | 3 | 44 |
| # of Contracts Retained | 6 | 11 | 4 | 10 | 4 | 2 | 37 |
| Retention Rate | 85.7% | 84.6% | 57.1% | 100.0% | 100.0% | 66.7% | 84.1% |
| **TOTAL RETENTION RATE** | 93.1% | 87.8% | 89.7% | 92.3% | 93.5% | 87.5% | 91.0% |

### TOP TEN PARTNERS
**Percentage of Revenue for the Six Months Ended June 30, 2017**
(Revenue Percentages and Amounts are Inclusive of all Contracts with Respective Partners)



- United States Immigration and Customs Enforcement - $225,405
- United States Marshals - $133,507
- Tennessee - $73,157
- California (1) - $68,707
- Bureau of Prisons - $63,016
- Georgia - $53,756
- Oklahoma - $34,719
- Texas - $33,564
- Colorado - $31,311
- Arizona - $22,655
- Other

(1) Revenues of $51.6 million, or 6% of total revenue, were earned under a contract in facilities housing out-of-state inmates.

**EXHIBIT 15**
**Page 0456**

**FACILITY PORTFOLIO**

| Facility Name | Year Constructed/Acquired (A) | Primary Customer | Design Capacity (B) | Security Level | Facility Type (C) | Term | Remaining Renewal Options (D) | Compensated Occupancy % for the Quarter ended 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| **Owned and Managed Facilities:** | | | | | | | | |
| Central Arizona Florence Correctional Complex (E) Florence, Arizona | 1994, 1998, 1999, 2004 | USMS | 4,128 | Multi | Detention | Sep-18 | (2) 5 year | 90.13% |
| Eloy Detention Center Eloy, Arizona | 1995, 1996 | ICE | 1,500 | Medium | Detention | Indefinite | - | 87.81% |
| La Palma Correctional Center Eloy, Arizona | 2008 | State of California | 3,060 | Medium | Correctional | Jun-19 | Indefinite | 98.41% |
| Red Rock Correctional Center (F) Eloy, Arizona | 2006, 2016 | State of Arizona | 2,024 | Medium | Correctional | Jan-24 | (2) 5 year | 94.45% |
| Saguaro Correctional Facility Eloy, Arizona | 2007 | State of Hawaii | 1,896 | Medium | Correctional | Jun-19 | (2) 1 year | 88.77% |
| CAI Boston Avenue San Diego, California | 2013 | State of California | 120 | - | Community Corrections | Jun-18 | (3) 1 year | 92.44% |
| CAI Ocean View San Diego, California | 2013 | BOP | 483 | - | Community Corrections | May-18 | (3) 1 year | 100.22% |
| Leo Chesney Correctional Center Live Oak, California | 1989 | - | 240 | - | - | - | - | 0.00% |
| Otay Mesa Detention Center San Diego, California | 2015 | ICE | 1,482 | Minimum/ Medium | Detention | Jun-17 | (2) 3 year | 90.58% |
| Arapahoe Community Treatment Center Englewood, Colorado | 2017 | Arapahoe County | 135 | - | Community Corrections | Jun-18 | - | 84.18% |
| Bent County Correctional Facility Las Animas, Colorado | 1992, 1997, 2008 | State of Colorado | 1,420 | Medium | Correctional | Jun-18 | - | 97.72% |
| Boulder Community Treatment Center Boulder, Colorado | 2016 | Boulder County | 69 | - | Community Corrections | Dec-17 | (1) 1 year | 88.84% |
| Centennial Community Transition Center Englewood, Colorado | 2016 | Arapahoe County | 107 | - | Community Corrections | Jun-18 | - | 95.30% |
| Columbine Facility Denver, Colorado | 2016 | Denver County | 60 | - | Community Corrections | Jun-17 | - | 93.44% |
| Crowley County Correctional Facility Olney Springs, Colorado | 2003, 2004 | State of Colorado | 1,794 | Medium | Correctional | Jun-18 | - | 95.45% |
| Dahlia Facility Denver, Colorado | 2016 | Denver County | 120 | - | Community Corrections | Jun-17 | - | 91.85% |
| Fox Facility and Training Center Denver, Colorado | 2016 | Denver County | 90 | - | Community Corrections | Jun-17 | - | 81.92% |
| Huerfano County Correctional Center Walsenburg, Colorado | 1997 | - | 752 | Medium | Correctional | - | - | 0.00% |

**EXHIBIT 15**
**Page 0457**

**FACILITY PORTFOLIO**

| Facility Name | Year Constructed/Acquired (A) | Primary Customer | Design Capacity (B) | Security Level | Facility Type (C) | Term | Remaining Renewal Options (D) | Compensated Occupancy % for the Quarter ended 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Kit Carson Correctional Center<br>Burlington, Colorado | 1998, 2008 | - | 1,488 | Medium | Correctional | - | - | 0.00% |
| Longmont Community Treatment Center<br>Longmont, Colorado | 2016 | Boulder County | 69 | - | Community Corrections | Dec-17 | (1) 1 year | 91.58% |
| Ulster Facility<br>Denver, Colorado | 2016 | Denver County | 90 | - | Community Corrections | Jun-17 | - | 81.82% |
| Coffee Correctional Facility (G)<br>Nicholls, Georgia | 1998, 1999, 2010 | State of Georgia | 2,312 | Medium | Correctional | Jun-17 | (17) 1 year | 113.53% |
| Jenkins Correctional Center (G)<br>Millen, Georgia | 2012 | State of Georgia | 1,124 | Medium | Correctional | Jun-17 | (18) 1 year | 101.94% |
| McRae Correctional Facility<br>McRae, Georgia | 2000, 2002, 2012 | BOP | 1,978 | Medium | Correctional | Nov-18 | (2) 2 year | 82.56% |
| Stewart Detention Center<br>Lumpkin, Georgia | 2004 | ICE | 1,752 | Medium | Detention | Indefinite | - | 107.85% |
| Wheeler Correctional Facility (G)<br>Alamo, Georgia | 1998, 1999, 2010 | State of Georgia | 2,312 | Medium | Correctional | Jun-17 | (17) 1 year | 115.25% |
| Leavenworth Detention Center<br>Leavenworth, Kansas | 1992, 2000, 2004, 2008 | USMS | 1,033 | Maximum | Detention | Dec-21 | (1) 5 year | 61.98% |
| Lee Adjustment Center<br>Beattyville, Kentucky | 1998 | - | 816 | Minimum/Medium | Correctional | - | - | 0.00% |
| Marion Adjustment Center<br>St. Mary, Kentucky | 1998 | - | 826 | Minimum/Medium | Correctional | - | - | 0.00% |
| Southeast Kentucky Correctional Facility (H)<br>Wheelwright, Kentucky | 1998 | - | 656 | Minimum/Medium | Correctional | - | - | 0.00% |
| Prairie Correctional Facility<br>Appleton, Minnesota | 1991 | - | 1,600 | Medium | Correctional | - | - | 0.00% |
| Adams County Correctional Center<br>Adams County, Mississippi | 2008 | BOP | 2,232 | Medium | Correctional | Jul-19 | - | 96.17% |
| Tallahatchie County Correctional Facility (I)<br>Tutwiler, Mississippi | 2000, 2007, 2008 | State of California | 2,672 | Medium | Correctional | Jun-19 | Indefinite | 49.18% |
| Crossroads Correctional Center (J)<br>Shelby, Montana | 1999 | State of Montana | 664 | Multi | Correctional | Jun-17 | (1) 2 year | 104.54% |
| Nevada Southern Detention Center<br>Pahrump, Nevada | 2010 | Office of the Federal Detention Trustee | 1,072 | Medium | Detention | Sep-20 | (2) 5 year | 72.16% |
| Elizabeth Detention Center<br>Elizabeth, New Jersey | 1963 | ICE | 300 | Minimum | Detention | Aug-17 | (4) 1 year | 97.31% |
| Cibola County Corrections Center<br>Milan, New Mexico | 1994, 1999 | ICE | 1,129 | Medium | Detention | Oct-21 | Indefinite | 75.02% |
| Northwest New Mexico Correctional Center<br>Grants, New Mexico | 1989, 2000 | State of New Mexico | 596 | Multi | Correctional | Jun-20 | - | 113.87% |
| Torrance County Detention Facility<br>Estancia, New Mexico | 1990, 1997 | USMS | 910 | Multi | Detention | Indefinite | - | 55.26% |

**EXHIBIT 15**
**Page 0458**

**FACILITY PORTFOLIO**

| Facility Name | Year Constructed/Acquired (A) | Primary Customer | Design Capacity (B) | Security Level | Facility Type (C) | Term | Remaining Renewal Options (D) | Compensated Occupancy % for the Quarter ended 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Lake Erie Correctional Institution (K) Conneaut, Ohio | 2011 | State of Ohio | 1,798 | Medium | Correctional | Jun-32 | Indefinite | 98.52% |
| Northeast Ohio Correctional Center Youngstown, Ohio | 1997 | USMS | 2,016 | Medium | Correctional | Dec-18 | - | 38.28% |
| Carver Transitional Center Oklahoma City, Oklahoma | 2015 | State of Oklahoma | 494 | - | Community Corrections | Sep-17 | (1) 9 month | 54.50% |
| Cimarron Correctional Facility (L) Cushing, Oklahoma | 1997, 2008 | State of Oklahoma | 1,692 | Medium | Correctional | Jun-18 | (1) 1 year | 94.99% |
| Davis Correctional Facility (L) Holdenville, Oklahoma | 1996, 2008 | State of Oklahoma | 1,670 | Medium | Correctional | Jun-18 | (1) 1 year | 97.04% |
| Diamondback Correctional Facility Watonga, Oklahoma | 1998, 2000 | - | 2,160 | Medium | Correctional | - | - | 0.00% |
| Oklahoma City Transitional Center Oklahoma City, Oklahoma | 2017 | State of Oklahoma | 200 | - | Community Corrections | Sep-17 | (1) 9 month | 90.27% |
| Tulsa Transitional Center Tulsa, Oklahoma | 2015 | State of Oklahoma | 390 | - | Community Corrections | Sep-17 | (1) 9 month | 59.70% |
| Turley Residential Center Tulsa, Oklahoma | 2015 | State of Oklahoma | 289 | - | Community Corrections | Sep-17 | (1) 9 month and (1) 1 year | 54.56% |
| Shelby Training Center Memphis, Tennessee | 1986, 1995 | - | 200 | - | - | - | - | 0.00% |
| Trousdale Turner Correctional Center Hartsville, Tennessee | 2015 | State of Tennessee | 2,552 | Multi | Correctional | Jan-21 | - | 94.83% |
| West Tennessee Detention Facility Mason, Tennessee | 1990, 1996 | USMS | 600 | Multi | Detention | Sep-17 | (6) 2 year | 62.20% |
| Whiteville Correctional Facility (M) Whiteville, Tennessee | 1998 | State of Tennessee | 1,536 | Medium | Correctional | Jun-16 | - | 97.38% |
| Austin Residential Reentry Center Del Valle, Texas | 2015 | BOP | 116 | - | Community Corrections | Aug-17 | - | 75.20% |
| Austin Transitional Center Del Valle, Texas | 2015 | State of Texas | 460 | - | Community Corrections | Aug-18 | (2) 1 year | 84.90% |
| Corpus Christi Transitional Center Corpus Christi, Texas | 2015 | State of Texas | 160 | - | Community Corrections | Aug-19 | - | 91.90% |
| Dallas Transitional Center Hutchins, Texas | 2015 | State of Texas | 300 | - | Community Corrections | Aug-18 | (2) 1 year | 94.12% |
| Eden Detention Center Eden, Texas | 1995 | - | 1,422 | Medium | Correctional | - | - | 28.28% |
| El Paso Multi-Use Facility El Paso, Texas | 2015 | State of Texas | 360 | - | Community Corrections | Aug-18 | (2) 1 year | 79.12% |

**EXHIBIT 15**
**Page 0459**

**FACILITY PORTFOLIO**

| Facility Name | Year Constructed/Acquired (A) | Primary Customer | Design Capacity (B) | Security Level | Facility Type (C) | Term | Remaining Renewal Options (D) | Compensated Occupancy % for the Quarter ended 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| El Paso Transitional Center El Paso, Texas | 2015 | State of Texas | 224 | - | Community Corrections | Aug-18 | (2) 1 year | 82.62% |
| Fort Worth Transitional Center Fort Worth, Texas | 2015 | State of Texas | 248 | - | Community Corrections | Aug-18 | (2) 1 year | 73.82% |
| Houston Processing Center Houston, Texas | 1984, 2005 | ICE | 1,000 | Medium | Detention | Apr-18 | (5) 2 month | 89.10% |
| Laredo Processing Center Laredo, Texas | 1985, 1990 | ICE | 258 | Minimum/ Medium | Detention | Jun-18 | - | 112.51% |
| South Texas Family Residential Center Dilley, Texas | 2014 | ICE | 2,400 | - | Residential | Sep-21 | - | 100.00% |
| T. Don Hutto Residential Center Taylor, Texas | 1997 | ICE | 512 | Medium | Detention | Jan-20 | Indefinite | 93.63% |
| Webb County Detention Center Laredo, Texas | 1998 | USMS | 480 | Medium | Detention | Nov-17 | - | 49.76% |
| Cheyenne Transitional Center Cheyenne, Wyoming | 2015 | State of Wyoming | 116 | - | Community Corrections | Jun-18 | Indefinite | 77.88% |
| Total design capacity for Owned and Managed Facilities (66 Owned and Managed Facilities) | | | 68,764 | | | | | 76.2% |
| **Managed Only Facilities:** | | | | | | | | |
| Citrus County Detention Facility Lecanto, Florida | 1992, 2007 | Citrus County, FL | 760 | Multi | Detention | Sep-20 | Indefinite | 76.22% |
| Lake City Correctional Facility Lake City, Florida | 1997, 2005 | State of Florida | 893 | Medium | Correctional | Jun-18 | Indefinite | 98.62% |
| Marion County Jail Indianapolis, Indiana | 1997, 2005 | Marion County, IN | 1,030 | Multi | Detention | Dec-27 | - | 116.05% |
| Hardeman County Correctional Facility Whiteville, Tennessee | 1997 | State of Tennessee | 2,016 | Medium | Correctional | May-18 | - | 97.67% |
| Metro-Davidson County Detention Facility Nashville, Tennessee | 1992, 1995, 2011 | Davidson County, TN | 1,348 | Multi | Detention | Jan-20 | - | 76.82% |
| Silverdale Facilities Chattanooga, Tennessee | 1985, 1997, 1998, 2005, 2008 | Hamilton County, TN | 1,046 | Multi | Detention | Aug-17 | - | 92.29% |
| South Central Correctional Center Clifton, Tennessee | 1992, 1994, 1995, 2005 | State of Tennessee | 1,676 | Medium | Correctional | Jun-18 | - | 96.63% |
| Bradshaw State Jail (N) Henderson, Texas | 1995 | State of Texas | 1,980 | Minimum/ Medium | Correctional | Aug-17 | - | 96.68% |
| Lindsey State Jail (N) Jacksboro, Texas | 1995 | State of Texas | 1,031 | Minimum/ Medium | Correctional | Aug-17 | - | 93.69% |
| Willacy State Jail (N) Raymondville, Texas | 1995 | State of Texas | 1,069 | Minimum/ Medium | Correctional | Aug-17 | - | 98.76% |
| Total design capacity for Managed Only Facilities (10 Managed Only Facilities) | | | 12,849 | | | | | 93.0% |
| Total design capacity for All Owned and Managed and Managed Only Facilities as of June 30, 2017 | | | 81,613 | | | | | 79.0% |

**EXHIBIT 15**
**Page 0460**

**FACILITY PORTFOLIO**

| Facility Name | Year Constructed/Acquired (A) | Primary Customer | Design Capacity (B) | Security Level | Facility Type (C) | Term | Remaining Renewal Options (D) | Compensated Occupancy % for the Quarter ended 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| **Leased Facilities:** | | | | | | | | |
| California City Correctional Center California City, California | 1999 | CDCR | 2,560 | Medium | Correctional | Nov-20 | Indefinite | 100.00% |
| Long Beach Community Corrections Center Long Beach, California | 2016 | Community Education Centers | 112 | - | Community Corrections | Jun-20 | (1) 5 year | 100.00% |
| Stockton Female Community Corrections Facility Stockton, California | 2017 | WestCare California, Inc. | 100 | | Community Corrections | Apr-21 | (1) 5 year | 100.00% |
| North Fork Correctional Facility Sayre, Oklahoma | 1998, 2007 | State of Oklahoma | 2,400 | Medium | Correctional | Jul-21 | Indefinite | 100.00% |
| Broad Street Residential Reentry Center Philadelphia, Pennsylvania | 2015 | Community Education Centers | 150 | - | Community Corrections | Jul-19 | (4) 5 year | 100.00% |
| Chester Residential Reentry Center Chester, Pennsylvania | 2015 | Community Education Centers | 135 | - | Community Corrections | Jul-19 | (4) 5 year | 100.00% |
| Roth Hall  Residential Reentry Center Philadelphia, Pennsylvania | 2015 | Community Education Centers | 160 | - | Community Corrections | Jul-19 | (4) 5 year | 100.00% |
| Walker Hall Residential Reentry Center Philadelphia, Pennsylvania | 2015 | Community Education Centers | 160 | - | Community Corrections | Jul-19 | (4) 5 year | 100.00% |
| Total design capacity for Leased Facilities (8 Facilities) | | | 5,777 | | | | | 100.0% |
| **Total Portfolio (84 Facilities)** | | | 87,390 | | | | | 80.4% |
| **Less Idle Facilities: (10 Facilities)** | | | (10,160) | | | | | 0.0% |
| **Total Portfolio, Excluding Idle Facilities** | | | 77,230 | | | | | 90.3% |

**EXHIBIT 15**
**Page 0461**

**FACILITY PORTFOLIO**

| Facility Name | Year Constructed/Acquired (A) | Primary Customer | Design Capacity (B) | Security Level | Facility Type (C) | Term | Remaining Renewal Options (D) | Compensated Occupancy % for the Quarter ended 6/30/17 |
|---|---|---|---|---|---|---|---|---|

(A)  The year constructed/acquired represents the initial date of acquisition or completion of construction of the facility, as well as significant additions to the facility that occurred at a later date.

(B)  Design capacity measures the number of beds, and accordingly, the number of offenders each facility is designed to accommodate.  Facilities housing detainees on a short-term basis may exceed the original intended design capacity due to the lower level of services required by detainees in custody for a brief period.  From time to time, we may evaluate the design capacity of our facilities  based on the customers using the facilities, and the ability to reconfigure space with minimal capital outlays.  We believe design capacity is an appropriate measure for evaluating our operations, because the  revenue generated by each facility is based on a per diem or monthly rate per offender cared for at the facility paid by the corresponding contracting governmental entity.

(C)  We manage numerous facilities that have more than a single function (i.e., housing both long-term sentenced adult prisoners and pre-trial detainees).  The primary functional categories into which facility types are identified was determined by the relative size of offender populations in a particular facility on June 30, 2017.  If, for example, a 1,000-bed facility housed 900 adult offenders with sentences in excess of one year and 100 pre-trial detainees, the primary functional category to which it would be assigned would be that of correction facilities and not detention facilities.  It should be understood that the primary functional category to which multi-user facilities are assigned may change from time to time.

(D)  Remaining renewal options represents the number of renewal options, if applicable, and the remaining term of each option renewal.

(E)  For operational efficiency and reporting purposes, during the second quarter of 2017, we combined our Central Arizona Detention Center and our Florence Correctional Center, two adjacent facilities, into one complex.

(F)  Pursuant to the terms of a contract awarded by the state of Arizona in September 2012, the state of Arizona has an option to purchase the Red Rock facility at any time during the term of the contract, including extension options, based on an amortization schedule starting with the fair market value and decreasing evenly to zero over the twenty year term.

(G)  The facility is subject to a purchase option held by the Georgia Department of Corrections, or GDOC, which grants the GDOC the right to purchase the facility for the lesser of the facility's depreciated book value, as defined, or fair market value at any time during the term of the contract between us and the GDOC.

(H)  The facility is subject to a deed of conveyance with the city of Wheelwright, KY which includes provisions that would allow assumption of ownership by the city of Wheelwright under the following occurrences: (1) we cease to operate the facility for more than two years, (2) our failure to maintain at least one employee for a period of sixty consecutive days, or (3) a conversion to a maximum security facility based upon classification by the Kentucky Corrections Cabinet.  We have entered into an agreement with the city of Wheelwright that extends the reversion through July 31, 2018, in exchange for $20,000 per month or until we resume operations, as defined in the agreement.

(I)  The facility is subject to a purchase option held by the Tallahatchie County Correctional Authority which grants Tallahatchie County Correctional Authority the right to purchase the facility at any time during the contract at a price generally equal to the cost of the premises less an allowance for amortization originally over a 20 year period.  The amortization period was extended through 2050 in connection with an expansion completed during the fourth quarter of 2007.

(J)  The State of Montana has an option to purchase the facility generally at any time during the term of the contract with us at fair market value less the sum of a pre-determined portion of per-diem payments made to us by the state of Montana.

(K) The state of Ohio has the irrevocable right to repurchase the facility before we may resell the facility to a third party, or if we become insolvent or are unable to meet our obligations under the management contract with the state of Ohio, at a price generally equal to the fair market value, as defined in the Real Estate Purchase Agreement.

(L) The facility is subject to a purchase option held by the Oklahoma Department of Corrections, or ODC, which grants the ODC the right to purchase the facility at its fair market value at any time.

(M) The state of Tennessee has the option to purchase the facility in the event of our bankruptcy, or upon an operational or financial breach, as defined, at a price equal to the book value, as defined.

(N) During the third quarter of 2017, the Texas Department of Criminal Justice notified us that it selected other operators for the management of these facilities upon expiration of the contracts.  Accordingly, we expect to transfer operations of these facilities to the other operators during the third quarter of 2017.

**EXHIBIT 15**
**Page 0462**

**RESEARCH / ANALYST COVERAGE**

Equity Research Coverage:

| | | |
|---|---|---|
| Canaccord Genuity | Michael Kodesch | (212) 389-8095 |
| Deutsche Bank Securities | Kevin McVeigh | (212) 250-9679 |
| SunTrust Robinson Humphrey | Tobey Sommer | (404) 926-5009 |
| Wells Fargo Securities | Robert LaQuaglia | (617) 603-4263 |

Debt Research Coverage:

| | | |
|---|---|---|
| Wells Fargo Securities | Kevin McClure | (704) 410-3252 |

Rating Agency Coverage:

| | | |
|---|---|---|
| Moody's Investors Service | Chris Pappas | (212) 553-1836 |
| Standard & Poor's | Jerry Phelan | (312) 233-7031 |
| Fitch Ratings | Steven Marks | (212) 908-9161 |

Credit Ratings:

| | Fitch | Standard & Poor's | Moody's |
|---|---|---|---|
| Corporate Credit Rating | BB + | BB | Not rated |
| Senior Unsecured Debt | BB + | BB | Ba1 |
| Senior Bank Credit Facility | BBB - | BBB- | Not Rated |

Any opinions, estimates and/or forecasts regarding the Company's performance made by the analysts and/or rating agencies listed above are theirs alone and do not necessarily represent the opinions, forecasts or predictions of the Company or its management. The Company does not by its reference above imply its endorsement of or concurrence with such information, conclusions or recommendations and the Company has not undertaken to verify any of the information provided by such analysts or agencies.

**EXHIBIT 15**
**Page 0463**

**EXHIBIT 16**

**EXHIBIT 16**

1  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   Daniel P. Struck, AZ Bar #012377
2  *(admitted pro hac vice)*
   Rachel Love, AZ Bar #019881
3  *(admitted pro hac vice)*
   Nicholas D. Acedo, AZ Bar #021644
4  *(admitted pro hac vice)*
   Ashlee B. Hesman, AZ Bar #028874
5  *(admitted pro hac vice)*
   Jacob B. Lee, AZ Bar #030371
6  *(admitted pro hac vice)*
   3100 West Ray Road, Suite 300
7  Chandler, Arizona  85226
   Tel.:  (480) 420-1600
8  Fax:  (480) 420-1695
   dstruck@strucklove.com
9  rlove@strucklove.com
   nacedo@strucklove.com
10 ahesman@strucklove.com
   jlee@strucklove.com
11
   LAW OFFICE OF ETHAN H. NELSON
12 Ethan H. Nelson, CA Bar #262448
   4 Park Plaza, Suite 1025
13 Irvine, California 92614
   Tel.: (949) 229-0961
14 Fax: (949) 861-7122
   ethannelsonesq@gmail.com
15
   Attorneys for Defendant/Counter-Claimant
16 CoreCivic, Inc.

17              **UNITED STATES DISTRICT COURT**

18            **SOUTHERN DISTRICT OF CALIFORNIA**

19 Sylvester Owino and Jonathan Gomez,       NO. 3:17-cv-01112-JLS-NLS
   on behalf of themselves, and all others
20 similarly situated,                        **DECLARATION OF STACEY
                                              STONE IN SUPPORT OF
21              Plaintiffs,                    DEFENDANT'S MEMORANDUM
                                              IN OPPOSITION TO PLAINTIFFS'
22 v.                                          MOTION FOR CLASS
                                              CERTIFICATION**
23 CoreCivic, Inc., a Maryland
   corporation,
24
                Defendant.
25

26

27

28

   Declaration of Stacey Stone                17cv01112-JLS-NLS

**EXHIBIT 16**
**Page 0464**

CoreCivic, Inc., a Maryland
corporation,

                 Counter-Claimant,

v.

Sylvester Owino and Jonathan Gomez,
on behalf of themselves, and all others
similarly situated,

                 Counter-Defendants.

     I, Stacey Stone, make the following Declaration:

     1.    I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I make this Declaration in support of CoreCivic's Memorandum in Opposition to Plaintiffs' Motion for Class Certification based on my own personal knowledge and my review of the relevant documents as maintained by CoreCivic in the usual course of business.

     2.    I have been in corrections for over 23 years. I have been employed by CoreCivic since March 2005, when I started as the Chief of Security at CoreCivic's McRae Correctional Facility, located in McRae, Georgia. Prior to starting at McRae Correctional Facility, I spent nine years with the Georgia Department of Corrections.

     3.    I served as the Warden of CoreCivic's North Georgia Detention Center ("NGDC"), located in Gainesville, Georgia, from January 2009 to November 2012.[1] I then served as the Warden of CoreCivic's Stewart Detention Center, located in Lumpkin, Georgia, from November 2012 to March 2013, when I became Warden of McRae Correctional Facility.

     4.    I am currently a Managing Director of Operations for CoreCivic, a position I have held since June 1, 2018. As a Managing Director, I provide oversight for eight prisons housing state inmates and two full service jails.

_____

[1] NGDC has not housed ICE detainees since December 2013.

Declaration of Stacey Stone        2        17cv01112-JLS-NLS

EXHIBIT 16
Page 0465

**Housekeeping**

5.    I am familiar with the procedures outlined in Policy 12-100, Daily Housekeeping Plan. This policy, like all policies intended to ensure compliance with ICE's Performance-Based National Detention Standards ("PBNDS") [2] at NGDC, was approved by ICE as required by the contract with ICE to house immigration detainees at NGDC.

6.    Policy 12-100 requires all detainees to maintain the common living area in a clean and sanitary manner. The common living area was defined as any area in the housing unit outside the detainee's assigned living area that was used by all detainees in that unit. This included the dayroom, sinks, toilets, and showers.

7.    This policy only required detainees to clean up after themselves in the common living areas. For example, if a detainee spilled a drink on the floor, or if something they were cooking in the microwave bubbled over, they were expected to clean up the mess, rather than leaving it for the assigned porters to clean up later.

8.    This policy did not, however, require detainees to clean up after other detainees in common living areas. The only detainees who cleaned up messes other than those they made themselves were those detainees who volunteered to participate in the Voluntary Work Program ("VWP") and were assigned as unit porters. VWP unit porters were paid $1 per day for their participation. No other detainees were assigned jobs or required to work in or clean up the common living areas.

9.    Policy 12-100 states that "Trash will not be thrown anywhere except in the trash containers provided in each unit." This statement refers to each detainee's responsibility to clean up after themselves. Detainees were required to throw their trash in the designated trash containers, not on the floor or anywhere else in the

---

[2] NGDC followed the National Detention Standards until the PBNDS were developed.

Declaration of Stacey Stone                    3                    17cv01112-JLS-NLS

**EXHIBIT 16**
**Page 0466**

common areas. Detainees were also required to keep their assigned living areas free of trash.

10.     The only detainees who were required to pick up trash that was not their own were those who volunteered to participate in the VWP and were assigned as unit porters. Similarly, the only detainees who were required to empty the trash containers in the unit were those who volunteered to participate in the VWP and were assigned as unit porters.

11.     Policy 12-100 states that "Towels, blankets, clothing or any personal belongings will not be left in the common area." This statement also refers to each detainee's responsibility clean up after themselves. Detainees were required to keep their personal belongings in their assigned living areas, and to pick up their own personal belongings from the common living areas. Clothing and other personal items left in the common living areas were subject to confiscation by staff.

12.     The only detainees who were required to pick up personal belongings that were not their own were those who volunteered to participate in the VWP and were assigned as unit porters.

13.     Policy 12-100 states that "The walls in the common areas will be kept free of writing." This prohibited detainees from writing on the walls. If a detainee wrote on a wall, they were expected to clean off the writing. The same went for their assigned living areas, each of which was inspected prior to a new detainee moving in.

14.     The only detainees who were required to clean someone else's writing off the walls were those who volunteered to participate in the VWP and were assigned as unit porters.

15.     Policy 12-100 states that "Detainee/inmate workers will be assigned to each area on a permanent basis to perform the daily cleaning routine of the common area." This statement refers to detainees who volunteered to participate in the VWP

Declaration of Stacey Stone                    4                    17cv01112-JLS-NLS

**EXHIBIT 16**
**Page 0467**

and were assigned as unit porters. Detainees who chose not to participate in the VWP were not expected to assist in the daily cleaning of the common area.

16.    The daily cleaning routine performed by VWP unit porters, as stated in Policy 12-100, included removing the trash; sweeping and wet mopping the floors (at least once daily and as needed during the day); cleaning and scrubbing the toilets, sinks, and showers; wiping off furniture; and other tasks as assigned by unit staff to maintain clean and sanitary conditions in the unit.

17.    These tasks were performed only by detainees who volunteered to participate in the VWP and were assigned as unit porters. Detainees who chose not to participate in the VWP were not required to complete these tasks.

18.    Each housing unit at NGDC had two to three unit porters assigned to it. The unit porters performed the daily cleaning routine two to three times per day. Each porter typically spent no more than two to four hours total performing these tasks each day.

19.    Policy 12-100 states that "All detainees/inmates are responsible for maintaining their assigned living area in a clean and sanitary manner." In a dorm setting, the assigned living area included a detainee's bed and the immediate area around it. In a cell setting, the assigned living area included a detainee's cell.

20.    Detainees were not required to clean beyond their assigned living areas. Within their assigned living areas, however, detainees were expected to keep trash and combustible materials such as boxes, newspapers, magazines, and other papers from accumulating; keep their personal belongings in a neat and orderly manner; keep their window sills (if they had them) free of any material; keep the walls (if they had them) free of writing; not tape anything to their walls (if they had them) or furnishings (such as beds); and not drape or hang clothing, bedding, or towels on their beds.

21.    Policy 12-100 states that "All detainees will be required to perform a daily cleaning routine of their cells." The daily cleaning routine performed by all

Declaration of Stacey Stone                    5                    17cv01112-JLS-NLS

EXHIBIT 16
Page 0468

detainees housed in cells, as stated in Policy 12-100, included removing the trash; sweeping the floors; making their beds; wiping down the windows; and other tasks as assigned by unit staff to maintain clean and sanitary conditions in the cells.

22.    Unit staff provided detainees the equipment and supplies necessary to complete these tasks each day. If a detainee needed to clean their cell at a time other than the regularly scheduled cleaning time, they could ask unit staff for equipment and supplies, and staff would provide them to them.

### Discipline

23.    Prohibited acts and sanctions were divided into categories based on the severity of the prohibited acts. Among the "high moderate" offenses were 306 (refusal to clean assigned living area), 307 (refusal to obey a staff member/officer's order), and 399 (conduct that disrupts or interferes with the security or orderly running of the facility). These categories and offense codes were based on the NDS.

24.    Disciplinary violations ranged from 100-series ("greatest" offenses) to 400-series ("low moderate" offenses). 300-series offenses were considered lower-level offenses for which the disciplinary process is handled in-unit. Sanctions for these types of offenses typically included loss of privileges (commissary, recreation, etc.), loss of job, or a reprimand or warning.

25.    Disciplinary segregation was typically reserved for the most severe offenses that impacted the safety and security of the institution, such as assaults or possession of contraband/weapons.

26.    In my nearly four years as Warden of NGDC, I do not recall any detainee ever being placed in disciplinary segregation for refusal to clean their assigned living area. At most, such a detainee would have been sanctioned with loss of privileges such as commissary or recreation, but even that was rare.

/ / /

/ / /

Declaration of Stacey Stone                6                17cv01112-JLS-NLS

**EXHIBIT 16**
**Page 0469**

1       I declare under penalty of perjury under the laws of the United States of

2  America and the State of Tennessee that the foregoing is true and correct to the best

3  of my knowledge.

4       EXECUTED this _10th_ day of July, 2019 at Nashville, Tennessee.

5

6

7                           Stacey Stone

8  3596455.1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Stacey Stone            7            17cv01112-JLS-NLS

EXHIBIT 16
Page 0470

**EXHIBIT 17**

**EXHIBIT 17**

1  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   Daniel P. Struck, AZ Bar #012377
2  *(admitted pro hac vice)*
   Rachel Love, AZ Bar #019881
3  *(admitted pro hac vice)*
   Nicholas D. Acedo, AZ Bar #021644
4  *(admitted pro hac vice)*
   Ashlee B. Hesman, AZ Bar #028874
5  *(admitted pro hac vice)*
   Jacob B. Lee, AZ Bar #030371
6  *(admitted pro hac vice)*
   3100 West Ray Road, Suite 300
7  Chandler, Arizona  85226
   Tel.:  (480) 420-1600
8  Fax:  (480) 420-1695
   dstruck@strucklove.com
9  rlove@strucklove.com
   nacedo@strucklove.com
10 ahesman@strucklove.com
   jlee@strucklove.com
11
   LAW OFFICE OF ETHAN H. NELSON
12 Ethan H. Nelson, CA Bar #262448
   4 Park Plaza, Suite 1025
13 Irvine, California 92614
   Tel.: (949) 229-0961
14 Fax: (949) 861-7122
   ethannelsonesq@gmail.com
15
   Attorneys for Defendant/Counter-Claimant
16 CoreCivic, Inc.

17              **UNITED STATES DISTRICT COURT**

18            **SOUTHERN DISTRICT OF CALIFORNIA**

19 Sylvester Owino and Jonathan Gomez,        NO. 3:17-cv-01112-JLS-NLS
   on behalf of themselves, and all others
20 similarly situated,                         **DECLARATION OF D. TOPASNA
                                               IN SUPPORT OF DEFENDANT'S**
21              Plaintiffs,                     **MEMORANDUM IN OPPOSITION
                                               TO PLAINTIFFS' MOTION FOR**
22 v.                                          **CLASS CERTIFICATION**

23 CoreCivic, Inc., a Maryland
   corporation,
24
               Defendant.
25

26

27

28

   Declaration of D. Topasna                              17cv01112-JLS-NLS

**EXHIBIT 17**
**Page 0471**

CoreCivic, Inc., a Maryland
corporation,

               Counter-Claimant,

v.

Sylvester Owino and Jonathan Gomez,
on behalf of themselves, and all others
similarly situated,

               Counter-Defendants.

I, D. Topasna, make the following Declaration:

1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I make this Declaration in support of CoreCivic's Memorandum in Opposition to Plaintiffs' Motion for Class Certification based on my own personal knowledge and my review of the relevant documents as maintained by CoreCivic in the usual course of business.

2.     I have been in corrections for over 19 years. I have been employed by CoreCivic since April 2000, when I started as a Detention Officer at CoreCivic's San Diego Correctional Facility ("SDCF"), located in San Diego, California. In 2009, I became the Chief of Security at SDCF. I remained in that position until 2014, when I became the Chief of Unit Management at SDCF. I remained in that position until the facility closed in 2015, at which time I moved to CoreCivic's Otay Mesa Detention Center ("OMDC"), also located in San Diego, California, as the Chief of Unit Management. I currently oversee state-mandated firearms training at OMDC, and have done so since 2017.

3.     In my position as Chief of Unit Management at SDCF and OMDC, I oversaw the provision of unit management services at the facility, and ensured that unit staff followed applicable policies, procedures, rules, regulations, and standards. This included, but was not limited to, policies and procedures regarding the facility's Voluntary Work Program ("VWP").

**EXHIBIT 17**
**Page 0472**

**Housekeeping**

4.     I am very familiar with the VWP as it was/is implemented at both SDCF and OMDC. I am also familiar with the procedures outlined in Policy 12-100, Daily Housekeeping Plan. This policy was in effect at SDCF and is in effect at OMDC. Except as otherwise specified, my statements in this Declaration regarding implementation of the procedures outlined in the policy apply to both facilities. Policy 12-100, like all policies intended to ensure compliance with ICE's Performance-Based National Detention Standards ("PBNDS"),[1] was approved by ICE as required by the contract between CoreCivic and ICE to house immigration detainees at SDCF/OMDC.

5.     Detainees are provided instruction as to their responsibilities with regard to cleanliness of their housing units.

6.     Specifically, detainees are instructed that they are expected to keep their assigned living areas clean, and that they are expected to clean up after themselves in the common areas. Detainees receive these instructions during intake and orientation in the handbooks they are provided and from Case Managers. Detainees also receive occasional reminders during monthly town hall meetings.

7.     Policy 12-100 requires all detainees to maintain the common living area in a clean and sanitary manner. The common living area is defined as any area in the housing unit outside the detainee's assigned living area that was used by all detainees in that unit. At SDCF, all housing units were comprised of two-person cells. At OMDC, some housing units are comprised of two-person cells, while others are comprised of open bay dormitories in which each bay holds four bunk beds and houses eight detainees. In either type of housing unit, the common living area includes the dayroom and showers. In dormitory units, the common living area

---

[1] SDCF followed the National Detention Standards until the PBNDS were developed.

also includes the sinks and toilets. In cell-based units, each individual cell has its own sink and toilet.

8.   This policy only requires detainees to clean up after themselves in the common areas. For example, if a detainee spills a drink on the floor, or if something they are cooking in the microwave bubbles over, they are expected to clean up the mess, rather than leaving it for the assigned porters to clean up later.

9.   This policy does not, however, require detainees to clean up after other detainees in common living areas. The only detainees who clean up messes other than those they made themselves are those detainees who volunteer to participate in the VWP and are assigned as unit porters.  VWP unit porters are paid $1 per day for their participation.  No other detainees are assigned jobs or required to work in or clean up the common living areas.

10.   Policy 12-100 states that "Trash will not be thrown anywhere except in the trash containers provided in each unit." This statement refers to each detainee's responsibility to clean up after themselves. Detainees are required to throw their trash in the designated trash containers, not on the floor or anywhere else in the common living areas. Detainees are also required to keep their assigned living areas free of trash.

11.   The only detainees who are required to pick up trash that is not their own are those who volunteer to participate in the VWP and are assigned as unit porters.  Similarly, the only detainees who are required to empty the trash containers in the unit are those who volunteer to participate in the VWP and are assigned as unit porters.

12.   Policy 12-100 states that "Towels, blankets, clothing or any personal belongings will not be left in the common area."  This statement also refers to each detainee's responsibility clean up after themselves.  Detainees are required to keep their personal belongings in their assigned living areas, and to pick up their own

personal belongings from the common living areas.   Clothing and other personal items left in the common areas are subject to confiscation by staff.

13.    The only detainees who are required to pick up personal belongings that are not their own are those who volunteer to participate in the VWP and are assigned as unit porters.

14.    Policy 12-100 states that "The walls in the common areas will be kept free of writing." This statement prohibits detainees from writing on the walls. If a detainee writes on a wall, they are expected to clean off the writing. The same goes for their assigned living areas.

15.    The only detainees who are required to clean someone else's writing off the walls are those who volunteer to participate in the VWP and are assigned as unit porters.

16.    Policy 12-100 states that "Detainee/inmate workers will be assigned to each area on a permanent basis to perform the daily cleaning routine of the common area."   This statement refers to detainees who volunteer to participate in the VWP and are assigned as unit porters.   Detainees who choose not to participate in the VWP are not expected to assist in the daily cleaning of the common area.

17.    The daily cleaning routine performed by VWP unit porters, as stated in Policy 12-100, includes removing the trash; sweeping and wet mopping the floors (at least once daily and as needed during the day); cleaning and scrubbing the toilets, sinks, and showers (as applicable); wiping off furniture; and other tasks as assigned by unit staff to maintain clean and sanitary conditions in the unit.

18.    These tasks are performed only by detainees who volunteer to participate in the VWP and are assigned as unit porters.   Detainees who choose not to participate in the VWP are not required to complete these tasks.

19.    Each housing unit has approximately 30 detainees who are assigned as unit porters.   Because policy prohibits detainees from working more than 40 hours per week and requires them to have at least two days off, only about 20 detainees

**EXHIBIT 17**
**Page 0475**

are assigned to clean their unit on any particular day.  The unit porters perform the daily cleaning routine three times each day—after breakfast, lunch, and dinner. Each porter typically spends no more than one hour each time, for a total of three to four hours each day at most.

20.    Policy 12-100 states that "All detainees/inmates are responsible for maintaining their assigned living area in a clean and sanitary manner." In a dormitory unit, the assigned living area includes a detainee's bed and the immediate area around it, as well as the detainee's foot locker, which fits under the bed.  In a cell-based unit, the assigned living area includes a detainee's cell.

21.    Detainees are not required to clean beyond their assigned living areas. Within their assigned living areas, however, detainees are expected to keep trash and combustible materials such as boxes, newspapers, magazines, and other papers from accumulating; keep their personal belongings in a neat and orderly manner; keep their window sills (if they had them) free of any material; keep the walls (if they had them) free of writing; not tape anything to their walls (if they had them) or furnishings (such as beds); and not drape or hang clothing, bedding, or towels on their beds.

22.    Policy 12-100 states that "All detainees will be required to perform a daily cleaning routine of their cells." The daily cleaning routine performed by all detainees in their own assigned living areas, as stated in Policy 12-100, includes removing the trash; sweeping the floors; making their beds; wiping down the windows (if they had them); and other tasks as assigned by unit staff to maintain clean and sanitary conditions in the cells and dorms.

23.    Unit staff provide detainees the equipment and supplies necessary to complete these tasks each day. Mops, brooms, and squeegees are available in the unit cleaning closet for detainee use. If a detainee needs cleaning chemicals, all they need to do is ask one of the unit staff members, and they will be allowed to check out a bottle of cleaning in exchange for the identification badge.

Declaration of D. Topasna                    6                    17cv01112-JLS-NLS

EXHIBIT 17
Page 0476

1

### Discipline

2      24.      The detainee handbook provides a list of prohibited acts and sanctions,

3  divided into categories based on the severity of the prohibited acts. Among the

4  "high moderate" offenses are 306 (refusal to clean assigned living area), 307

5  (refusal to obey a staff member/officer's order), and 399 (conduct that disrupts or

6  interferes with the security or orderly running of the facility). These categories and

7  offense codes are required by ICE and the PBNDS.

8      25.      Possible sanctions for these offenses include disciplinary segregation,

9  loss of privileges (commissary, recreation, etc.), loss of job, restriction to housing

10  unit, and a reprimand or warning. These potential sanctions are required by ICE and

11  the PBNDS, as well.

12      26.      When a staff member observes a violation of facility rules or policy,

13  they write a disciplinary report. The disciplinary report goes to the detainee, the

14  Disciplinary Hearing Officer ("DHO"), and the Unit Disciplinary Committee

15  ("UDC").

16      27.      A Senior Detention Officer not involved in issuing the disciplinary

17  report then conducts an investigation and provides a written report to the detainee,

18  the DHO, and the UDC. The UDC, in conjunction with the DHO, then holds a

19  hearing at which they decide (1) whether a violation occurred, and (2) the

20  appropriate sanction to imposed, taking into consideration such factors as the

21  severity of the offense, the circumstances surrounding the offense, and the

22  detainee's disciplinary history.

23      28.      Disciplinary segregation is typically reserved for the most severe

24  offenses that impact the safety and security of the institution, such as assaults or

25  possession of contraband/weapons (i.e., 100- or 200-level offenses).

26      29.      Disciplinary segregation is never given for refusal to clean the

27  assigned living area. The typical sanctions for such an offense is a verbal

28  reprimand.

Declaration of D. Topasna                    7                    17cv01112-JLS-NLS

**EXHIBIT 17**
**Page 0477**

30.     If a detainee is found guilty of refusing to clean their assigned living area three times in a 90-day period, however, they could be written up for a 220 offense, which is a "high" offense for being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days. At that point, the detainee may be given disciplinary segregation as a sanction in order to correct the repeated failure to comply with facility rules.

31.     No detainee has ever been placed in disciplinary segregation or given any other disciplinary sanction for refusing to participate in the VWP, volunteering for the VWP and then refusing to report to their assigned work location, or volunteering for the VWP and then refusing to complete their assigned task. Participation in the VWP is strictly voluntary.

32.     When a detainee who volunteers to participate in the VWP is assigned to work outside their unit, they are called from their unit to report to their assignment. OMDC uses a corridor management system in which officers are in the corridors to ensure that all detainees released from Point A arrive at Point B. Detainees who are assigned to outside work crews, such as landscaping crews, are escorted from their housing units to their work assignment. At SDCF, all detainees who volunteered to participate in the VWP and were assigned to work outside their unit were escorted from their housing units to their work assignments.

33.     These procedures are followed to ensure that detainees do not work more than they are permitted to work by policy (i.e., no more than eight hours per day and no more than 40 hours per week), and to ensure that they are paid for the days they work.

34.     If a detainee refuses to work when called out, they will not be disciplined. After a detainee refuses to work two or three times, they may be removed from their position, but they are never given a disciplinary report or sanction for not participating.

**EXHIBIT 17**
**Page 0478**

35.    Because the facility is a secure detention facility, it is important for detainees to obey staff orders to maintain the safety and security of the facility, staff, and other detainees. Nevertheless, disciplinary segregation is not given as a sanction for refusal to obey an order except under extreme circumstances, such as refusing an order to stop fighting with another detainee, or refusing an order during an emergency. A detainee would not be given disciplinary segregation simply for refusing an order to clean their assigned living area.

36.    Disciplinary sanctions for conduct that disrupts or interferes with the security or orderly running of the facility are generally given for misbehavior related to count procedures (failure to stand for count, not being in the detainee's designated area during count, etc.). Sanctions typically include loss of privileges, such as commissary or recreation, but not segregation.

**Voluntary Work Program**

37.    Detainees are informed about the VWP at their orientation.

38.    If a detainee wants to participate in the VWP, they must sign up for an available job with their unit manager or case manager.

39.    Kitchen workers typically work four-to-six hour shifts (either breakfast, lunch, or dinner), five days a week.  The breakfast shift is from 3:00 a.m. to 8:30 a.m.  The lunch shift is from 9:00 a.m. to 3:00 p.m.  The dinner shift is from 3:30 p.m. to 9:00 p.m.  Kitchen workers get a meal break and have multiple rest periods.

40.    Administrative porters work two shifts: day shift and night shift.  The day shift typically works no more than four hours.  The night shift typically works no more than six hours.  Administrative porters get a meal break and/or multiple rest periods.

41.    Outside workers typically work no more than six hours a day.  They get a meal break and have multiple rest periods.

**EXHIBIT 17**
**Page 0479**

1      42.    Laundry, commissary, and intake porters work, on average, two to four

2    hours a day, but no more than six hours a day.   They typically have rest periods

3    every two hours, including a 30-minute meal break if they are working during their

4    scheduled meal periods.

5        I declare under penalty of perjury that the foregoing is true and correct to the

6    best of my knowledge.

7        EXECUTED this _11_ day of July, 2019 at San Diego, California.

8

9

10          D. Topasna

11

12

3598675.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of D. Topasna               10            17cv01112-JLS-NLS

**EXHIBIT 17**
**Page 0480**

**EXHIBIT 18**

**EXHIBIT 18**

# 1.2 Environmental Health and Safety

## I. Purpose and Scope

This detention standard protects detainees, staff, volunteers and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices and control of hazardous substances and equipment.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Facility cleanliness and sanitation shall be maintained at the highest level.

2. Compliance with all applicable federal, state and local safety and sanitation laws shall be ensured by documented internal and external inspections, and by corrective action when indicated.

3. Compliance with all applicable fire safety codes and fire safety performance requirements for facility furnishings shall be ensured.

4. Flammable, poisonous, toxic and caustic materials shall be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements and other practices, including periodic fire drills, shall ensure the safety of detainees, staff and visitors.

6. Staff shall be knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and with training at least annually.

7. The facility shall have a written plan for immediate release of detainees from locked areas, and provisions for a back-up system.

8. A sufficient number of properly positioned emergency exits, clear from obstruction, shall be distinctly and permanently marked.

9. Plans shall include procedures for assisting detainees with special needs during an emergency or evacuation.

10. Preventive maintenance and regular inspections shall be performed to ensure timely emergency repairs or replacement and to prevent dangerous and life-threatening situations.

11. Potential disease transfer shall be minimized through proper sanitization of barbering equipment and supplies.

12. Pests and vermin shall be controlled and eliminated.

13. Safe, potable water shall be available throughout the facility.

14. Emergency lighting and life-sustaining equipment shall be maintained and periodically tested.

15. Disposal of garbage and hazardous waste shall be in compliance with applicable government

**EXHIBIT 18**
**Page 0481**

regulations.

16. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Environmental Health and Safety" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, 1C-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

Occupational Safety and Health Administration

(OSHA) Regulations.

NFPA Standards.

U.S. Public Health Service Report on Carcinogens.

## V. Expected Practices

### A. Environmental Health and Safety

#### 1. General Environmental Health

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

a. American Correctional Association;

b. Occupational Safety and Health Administration;

c. Environmental Protection Agency;

d. Food and Drug Administration;

e. National Fire Protection Association's Life Safety Code; and

f. National Center for Disease Control and Prevention.

The facility administrator designee for environmental health is responsible for developing and implementing policies, procedures and guidelines for the environmental health program that are intended to identify and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The facility administrator designee shall:

a. conduct special safety investigations and comprehensive surveys of environmental health conditions; and

b. provide advisory, consultative, inspection and training services regarding environmental health conditions.

For the medical clinic, the health services administrator or equivalent is responsible for:

a. implementing a program that assists in

**EXHIBIT 18**
**Page 0482**

maintaining a high level of environmental sanitation; and

b. providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the environmental health designee.

## 2. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety, in accordance with these detention standards and applicable law. Standard "7.3 Staff Training" further addresses employee training-related issues. Standard "5.8 Voluntary Work Program" addresses detainee training issues for workers. Detainees shall receive safety instruction as necessary for living area-related assignments, such as working with cleaning products to clean general use areas.

Detainee living area safety shall be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. For example, when there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and that has no bed rail, accommodations shall be made to ensure safety. (Because of the potential safety risk they pose, bed rails are not common in detention settings except for medical housing units.) In locations where ladders are unavailable, alternate accommodations, such as the use of bottom bunks or the addition of a ladder or step, shall be made for detainees on a case-by-case basis. Detainees who have medical or physical problems that may be aggravated by sleeping on a top bunk shall be referred to the medical unit for consideration of a lower bunk permit.

## 3. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

a. All horizontal surfaces shall be dampdusted daily

with an approved germicidal solution used according to the manufacturer's directions.

b. Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c. Furniture and fixtures shall be cleaned daily.

d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e. A clean mop head shall be used each time the floors are mopped.

f. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.

g. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.

h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

## 4. Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects and other vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary. Doors to the outside should be tight fitting and door sweeps should be installed to prevent the entry of vermin from outside.

## 5. Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the testing and safety certification shall be maintained on site.

## 6. Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil,

**EXHIBIT 18**
**Page 0483**

water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation.

Power generators are to be inspected weekly and load-tested quarterly at a minimum, or in accordance with the manufacturer's recommendations and instruction manual. Technicians shall check starting battery voltage, generator voltage and amperage output at a minimum, and shall perform all other necessary checks as well.

Other emergency equipment and systems shall be tested quarterly, and all necessary follow-up repairs or replacement shall be performed as soon as feasible.

## 7. Garbage and Refuse

a. Garbage and refuse includes all trash, rubbish and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

b. Garbage and refuse shall be collected and removed from common areas at least daily to maintain sanitary conditions and to avoid creating health hazards.

c. Facilities shall comply with all federal, state and local environmental regulations and requirements governing methods for handling and disposing of refuse.

## B. Hazardous Materials

Every facility shall establish a system for storing, issuing, using and maintaining inventories of and accountability for hazardous materials. The facility program shall be supervised by an individual trained in accordance with OSHA standards. The effectiveness of any such system depends not only on written policies, procedures and precautions, but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions

and using safety equipment properly.

A list of common flammable, toxic and caustic substances is included at the end of this detention standard as "Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances."

## 1. Personal Responsibility

Every individual who uses a hazardous substance must:

a. be trained in accordance with OSHA standards;

b. be knowledgeable about and follow all prescribed precautions;

c. wear personal protective equipment when indicated; and

d. promptly report hazards or spills to the designated authority.

## 2. Protective Equipment

a. Protective eye, face, and other appropriate equipment (such as footwear, gloves, gowns, and/or aprons) is required where there is a reasonable probability of injury preventable by such equipment. Areas of the facility where such injuries can occur shall be conspicuously marked with eye-hazard warning signs.

b. Eyewash stations that meet OSHA standards shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

## 3. Inventories

Every area shall maintain a current inventory of the hazardous substances (e.g., flammable, toxic or caustic) used and stored there. Inventory records shall be maintained separately for each substance. Entries for each shall be logged on a separate card (or equivalent), and filed alphabetically by substance. The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities and quantities on hand.

## 4. Material Safety Data Sheet Files

EXHIBIT 18
Page 0484

a. Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDS) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of these locations. Designated staff from each department or area shall provide a copy of each file to the maintenance supervisor.

b. MSDS are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage and disposal; prohibited interactions; etc.

c. Staff and detainees shall have ready and continuous access to the MSDS for the substances with which they are working. Staff and detainees who do not read English shall not be authorized to work with these materials.

d. Because changes in MSDS occur often and without notice, staff must:

   1) review the latest issuance from the manufacturers of the relevant substances;

   2) update the MSDS files as necessary; and

   3) forward any changes to the maintenance supervisor, so that the copy is kept current.

## 5. Master Index

The maintenance supervisor or facility administrator designee shall compile:

a. a master index of all hazardous substances in the facility and their locations;

b. a master file of MSDS; and

c. a comprehensive, up-to-date list of emergency phone numbers (e.g., fire department, poison control center, etc.).

The maintenance supervisor shall maintain this information in the safety office (or equivalent) and ensure that a copy is sent to the local fire department.

## 6. General Guidelines Regarding Hazardous Substances

a. Issuance
Flammable, caustic and toxic substances (hazardous substances) shall be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

b. Amounts
Hazardous substances shall be issued in single-day increments (the amount needed for one day's work).

c. Supervision
Qualified staff shall closely monitor detainees working with hazardous substances.

d. Accountability
Inventory records for a hazardous substance must be kept current before, during and after each use.

## 7. Flammable and Combustible Liquids

a. As required by the Federal Hazardous Substances Labeling Act, any liquid or aerosol labeled "flammable" or "combustible" must be stored and used as prescribed on the label.

b. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must meet National Electrical Code requirements in hazardous locations.

c. Every hazardous material storage room shall:

   1) be of fire-resistant construction and properly secured;

   2) have self-closing fire doors at each opening;

   3) be constructed with either a four-inch sill or a four-inch depressed floor; and

   4) have a ventilation system (mechanical or gravity flow), which provides at least six air changes per hour, within 12 inches of the floor.

d. Every storage cabinet shall:

**EXHIBIT 18**
**Page 0485**

1) be constructed according to the applicable code and securely locked at all times;

2) be clear of open passageways, stairways and other emergency exit areas;

3) be conspicuously labeled: "Flammable—Keep Fire Away"; and

4) contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

e.  Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

f.  Any portable container that is not the original shipping container must be designated as an approved safety canister, and must be listed or labeled by a nationally recognized testing laboratory. Each container shall bear a legible label that identifies its contents.

g.  Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

h.  The MSDS shall govern use of particular flammable or combustible liquids.

i.  Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing from or transferring these liquids.

j.  Drawing from or transferring any of these liquids into containers indoors is prohibited except:

1) through a closed piping system;

2) from a safety can;

3) by a device drawing through the top; or

4) by gravity, through an approved self-closing system.

An approved grounding and bonding system must be used when liquids are dispensed from drums.

k.  Without exception, cleaning liquids must have a flash point at or above 100º F (e.g., Stoddard solvents, kerosene). Cleaning operations must be in an approved parts-cleaner or dip tank, fitted with a fusible link lid with a 160 degree F melting-temperature link.

l.  Staff shall follow MSDS directions:

1) when disposing of excess flammable or combustible liquids; or

2) after a chemical spill.

## 8. Toxic and Caustic Substances

a.  All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b.  Only authorized staff shall draw/dispense these substances, in accordance with the applicable MSDS.

c.  Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container within the storage area.

d.  MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

## 9. Poisonous Substances

Poisonous substances or chemicals (e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, etc.) pose a very high (Class I) caustic hazard due to their toxicity.

Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems).

a.  If ingested, methyl alcohol can cause permanent blindness or death.

b.  Staff must directly supervise the use of any product containing methyl alcohol. Products that

**EXHIBIT 18**
**Page 0486**

contain methyl alcohol in highly diluted amounts (e.g., shoe dye) may be issued to detainees, but only in the smallest workable quantities.

c. Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

### 10. Other Toxic Substances

a. Permanent antifreeze containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

b. Typewriter cleaner containing carbon tetrachloride or trichlorochane shall be dispensed in small quantities and used under direct staff supervision.

c. Cleaning fluids containing carbon tetrachloride or tetrachloride or trichlorochane shall be strictly controlled.

d. Glues of every type may contain hazardous chemicals. Toxic glues must be stored in a locked location, for use only by authorized staff. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling.

e. The use of dyes and cements for leather requires close supervision. Nonflammable types shall be used whenever possible.

f. Ethyl alcohol, isopropyl alcohol and other antiseptic products shall be stored and used only in the medical department and only under close supervision. To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

g. Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoroacetate) are prohibited. The maintenance supervisor is responsible for purchasing, storing (in a locked area) and dispensing all pesticides used in the facility.

h. The maintenance supervisor or other staff members responsible for herbicides must hold a current state

license as a certified private applicator. Persons applying herbicides must wear proper clothing and protective gear.

i. Lyes may be used only in dye solutions and only under the direct supervision of staff.

### 11. Labeling of Chemicals, Solvents and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

a. identifying the nature of potentially hazardous materials adopted for use;

b. overseeing the use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer materials;

c. instructing staff in the meaning of the classification code and the MSDS, including the safe handling procedures for each material;

d. working with staff to ensure that containers are properly labeled; and

e. correctly labeling all smaller containers to correspond to the manufacturer-affixed labels on larger shipping containers.

### 12. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

a. Class I: Industrial Solvents
Industrial solvents and chemicals used as paint thinners, degreasers and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

b. Class II: Restricted Materials
Beryllium and its alloys and compounds, and

**EXHIBIT 18**
**Page 0487**

silver solder containing cadmium, pose a danger to workers, for whom special precautions must be taken.

c. Class III: Recognized Carcinogens
OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

1) no asbestos fibers shall be released into the air during handling and use; and

2) the asbestos consists of firmly bound fibers contained in a product such as a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

d. Class IV: Suspected Carcinogenic, Teratogenic and Mutagenic Materials
Chemical agents, substances, mixtures and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act. The maintenance supervisor shall ensure that the facility has copies of the report and that there is compliance with the provisions of the latest edition.

## C. Fire Prevention and Control

### 1. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

a. OSHA;

b. the American Correctional Association "mandatory" Expected Practices [Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state and/or local fire safety codes, and that of the authority having jurisdiction over document compliance. A fire alarm and automatic detection system are required (or else there must be a plan

for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction. If the authority approves any variance, exceptions or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.];

c. local and national fire safety codes; and

d. applicable standards of the American Society for Testing and Materials, American National Standards Institute and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations and renovations, shall comply with:

a. the latest revision or update of the International Council Codes;

b. the Uniform Building Code; or

c. the Standard Building Code, in accordance with 40 U.S.C. § 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, construction shall comply with the latest edition of the National Fire Protection Association (NFPA)'s 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to those of the local building code.

### 2. Inspections

a. A qualified departmental staff member shall conduct weekly fire and safety inspections.

b. Facility maintenance (safety) staff shall conduct monthly inspections.

c. Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations.

**EXHIBIT 18**
**Page 0488**

The maintenance supervisor shall maintain inspection reports and records of corrective action in the safety office. Fire safety deficiencies shall be promptly addressed.

### 3. Fire Prevention, Control and Evacuation Plan

Every facility shall develop a written fire prevention, control and evacuation plan that includes the following:

a.  control of ignition sources;

b.  control of combustible and flammable fuel load sources;

c.  provisions for occupant protection from fire and smoke;

d.  inspection, testing and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

e.  monthly fire inspections;

f.  installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

g.  accessible, current floor plans (including all buildings and rooms); prominently posted evacuation maps/plans; and exit signs and directional arrows for traffic flow, with a copy of each revision filed with the local fire department; and

h.  exit diagrams that shall be conspicuously posted throughout the facility.

### 4. Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

a.  Fire drills in housing units, medical clinics and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

b.  Detainees shall be evacuated during fire drills,

except:

   1)  in areas where security would be jeopardized;

   2)  in medical areas where patient health could be jeopardized; or

   3)  in individual cases when the evacuation of patients or detainees is logistically not feasible.

       Staff shall simulate drills in areas where detainees are not evacuated.

c.  Emergency-key drills shall be included in each fire drill, and timed. Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However, when conducting fire drills, emphasis shall be placed on safe and orderly evacuation rather than speed.

### 5. Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

a.  instructions in English, Spanish and the next most prevalent language at the facility;

b.  "You are here" markers on exit maps; and

c.  emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting shall be in accordance with applicable fire safety regulations of the jurisdiction.

## D. Medical Operation

The medical department will develop and implement an exposure control plan for the medical clinic that addresses the management of potentially sharp objects (sharps), standard and transmission-based precautions, post-exposure prophylaxis and management, bloodborne pathogens and other potentially infectious materials, disposal of medical and hazardous waste, and cleaning and disinfection.

**EXHIBIT 18**
**Page 0489**

Only sharps and medical waste generated within the medical department or by medical staff shall be managed in accordance with the medical department's exposure control plan.

## 1. Needles and Other Sharp Objects

A mandatory, uniform procedure shall be established for the safe handling and disposal of used needles and other sharps to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as the hepatitis B virus (HBV) and human immunodeficiency virus (HIV). Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges and lancets.

Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles. A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

## 2. Standard Precautions (includes "Universal Precautions")

Staff shall frequently wash their hands and take additional routine precautions to prevent contact with blood or other body fluids.

a.  Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

b.  Gloves shall be changed after contact with each detainee.

c.  Masks and protective eyewear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids.

d.  Gowns and/or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

e.  Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids. Hands shall be washed immediately after gloves are removed.

f.  All health-care workers shall take precautions to prevent injuries caused by needles, scalpels and other sharp instruments or devices during procedures, especially at the following times: when cleaning used instruments, during disposal of used needles and when handling sharp instruments after procedures. Instruments and drugs shall be maintained in a secure and sanitary condition.

g.  To prevent needle-stick injuries, needles shall not be recapped, purposely bent or broken, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades and other sharp items shall be placed in puncture-resistant containers for disposal.

h.  Large-bore reusable needles shall be placed in a puncture-resistant container for transport to the reprocessing area.

i.  To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is foreseeable.

j.  Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

k.  Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the fetus of perinatal transmission of HIV.

**EXHIBIT 18**
**Page 0490**

l.  Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected. Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of the isolation category of "blood and body fluid precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens.

Staff shall encourage detainees to wash their hands frequently and to take additional routine precautions to prevent contact with blood or other body fluids.

### 3. Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV, and referred to his/her usual source of health care. If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

### 4. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### 5. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

a.  Disposal Containers

1)  Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (e.g., a "Winfield Sharps Container").

2)  Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

3)  Use containers with a two-gallon capacity (approximate).

4)  Under no circumstances shall an item be removed from the Winfield Sharps Container (Sharps Container).

b.  Location
Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Sharps Containers shall never sit on the floor.

c.  Disposal
When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal. The Sharps Container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the Sharps Container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, when possible, for disposal with the hospitals' own infectious waste.

### 6. Environmental Health in Medical Operations

While many of the following considerations,

**EXHIBIT 18**
**Page 0491**

precautions and specific procedures apply to situations that typically arise in medical operations, in many cases they have general application to all facility operations.

a.  General Housekeeping

Environmental cleanliness shall reduce, control and prevent nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

1) the cleaning equipment, cleansers, disinfectants and detergents to be used;

2) the methods of cleaning; and

3) the frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility, noting the condition of floors, walls, windows, horizontal surfaces and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk. Floors, walls, beds, tables and other surfaces that usually come in contact with intact skin require low-level disinfection

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur. Additionally, short-stay units are cleaned when a detainee is discharged. Cleaning of walls, blinds or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

1)  General Cleaning

a) All horizontal surfaces shall be damp dusted daily with an approved germicidal solution.

b) Windows, window frames and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

c) Furniture and fixtures shall be cleaned daily.

d) Floors shall be mopped daily and when soiled using the double bucket mopping technique. The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped.

e) Waste containers shall be lined with plastic bags and the liner shall be changed daily. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

f) Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

2)  Isolation Cleaning

a) An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

b) After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

c) Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled. Items used in cleaning a contaminated isolation room shall never be taken into another area.

d) Linens shall be carefully removed from the

**EXHIBIT 18**
**Page 0492**

bed and double-bagged for transport.

e) All waste materials shall be double-bagged and disposed of as contaminated waste.

3) Terminal Cleaning

a) Every item in the room must be cleaned with an approved hospital germicidal solution.

b) When applicable, linen shall be stripped from the bed, with care taken not to shake the linen. Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

c) When applicable, all reusable receptacles (e.g., drainage bottles, urinals, bedpans, water pitchers) shall be emptied and rinsed with germicidal solutions.

d) All equipment that is not to be discarded (e.g., IV poles, respirators, suction machines) shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

e) When applicable, mattresses and pillows covered with durable plastic covers shall be washed thoroughly with the approved germicidal solution.

f) When applicable, beds shall be washed thoroughly, using a small brush soaked in germicidal solution to gain access to small holes and crevices, to areas between the springs and to the casters.

g) All furniture shall be washed with a germicidal detergent solution. Use a small brush if necessary. Outside and underside as well as legs and casters must also be washed.

h) Wastebaskets shall be thoroughly washed with a germicidal solution after trash and liner have been removed.

i) Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution. The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

j) Walls and ceilings need not be washed entirely, but areas that are soiled shall be washed with germicidal solution.

4) Choice of Disinfecting Materials
Hospital-grade disinfectant detergent formulations registered by the Environmental Protection Agency (EPA) may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is as imperative as any antimicrobial effect of the cleaning agent used.

Cost, safety and acceptance by staff shall be the criteria for selecting any such registered agent. The manufacturer's instructions for use shall be followed exactly.

b. Blood and Body Fluid Clean-up
Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV. A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources, or may be compiled by Health Services Department (HSD) staff or the designated health care provider.

1) Compiling a Cleanup Kit

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear zip-lock bag:

a) gloves, rubber or vinyl, household-type (2 pair);

b) clean absorbent rags (4);

c) absorbent paper towels (15);

EXHIBIT 18
Page 0493

d) disposable bag marked "contaminated" size 23"x10"x39", minimum thickness 1.5 mils.;

e) Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.; and

f) Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25% sodium hypochlorite).

2) Selection of Disinfectants
Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B. Chlorine in solution inactivates viruses quickly and efficiently, but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles. Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, these compounds may be used for cleaning and removal of proteinaceous materials from surfaces. However, when using such a compound to clean a surface, it shall be necessary to follow with the use of chlorine solution for final disinfection.

Most blood or fluids shall be removed from the surface during routine medical cleaning procedures before application of the disinfectant; in such cases, use of sodium hypochlorite solution shall be sufficient.

3) Selection of Gloves
Household or industrial rubber gloves are recommended for use rather than surgical rubber gloves, as surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

4) Assignment of Cleaning Duties to Detainees in Medical Facilities
Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors and walls and to remove trash, but are not permitted to clean medical equipment.

5) Instructions for Use of Clean-Up Kit

a) Open the bag and remove the supplies.

b) Put on one pair of gloves.

c) Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant," or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25% sodium hypochlorite (common household bleach) with 10 parts water.

d) Open the large clear plastic bag and the large bag marked "contaminated." Place them next to each other.

e) Use paper towels to absorb as much of the spilled fluid as possible; then place soiled paper towels in the large clear plastic bag.

f) Pour the solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.

g) Use the rags to clean the area, and place rags in the large clear plastic bag.

h) Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

i) Remove gloves carefully and place them in the plastic bag marked "Contaminated."

**EXHIBIT 18**
**Page 0494**

j) Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

k) Properly dispose of the "Contaminated" trash bag in a contaminated-waste receptacle.

l) Properly dispose of the second pair of gloves in the contaminated-waste receptacle.

m) Wash your hands.

n) Prepare a new clean-up kit.

NOTE: Do not place linen or non-disposable articles in the "Contaminated" trash bag.

c. Hazardous and Infectious Waste Disposal
Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

1) Definitions
Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps; laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste. Such waste includes bandages, dressings, casts, catheters and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

2) Collection and Storage
Infectious waste must be separated from the general waste stream and clearly labeled as infectious, adhering to the following practices:

a) Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

b) The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

c) Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

3) Treatment and Disposal
Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash. Compacting of untreated infectious waste is prohibited. The waste disposal contractor must meet all state and local requirements for transportation and disposal.

## E. Barber Operations

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs and clippers. Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, it is preferable that barbering operations be located in a room that is not used for any other purpose. The room must have sufficient light, and be supplied with hot and cold running water. The floors, walls and ceilings shall be smooth, nonabsorbent and easily cleaned.

2. Each barbershop shall have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

3. After each detainee visit, all hair care tools that

EXHIBIT 18
Page 0495

came in contact with the detainee shall be cleaned and effectively disinfected. Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees. Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle

immediately after use. The common use of brushes, neck dusters, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to any detainee when the skin of the detainee's face, neck or scalp is inflamed, or when there is scaling, pus or other skin eruptions, unless service of such detainee is performed in accordance with the specific authorization of the chief medical officer. No person who is infested with head lice shall be served.

**EXHIBIT 18**
**Page 0496**

# Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances

## Class I Liquids

Gasoline

Benzene (Petroleum ether)

Acetine

Hexane

Lacquer

Lacquer thinner

Denatured alcohol

Ethyl alcohol

Xylene (Xylol)

Contact cement (flammable)

Toudi (Toluene)

Methyl ethyl ether

Methyl ethyl ketone

Naphtha Y, M and P

## Class II Liquids

Diesel fuel

Motor fuel

Kerosene

Cleaning solvents

Mineral spirits

Agitene

## Class III Liquids

Paint (oil base)

Linseed oil

Mineral oil

Neat's-foot oil

Sunray conditioner

Guardian fluid

## Toxic Substances

Ammonia

Chlorine

Antifreeze

Duplicating fluid

Methyl alcohol

Defoliants

Herbicides

Pesticides

## Caustic Substances

Lye

Muriatic acid

Caustic soda

Sulfuric acid

Tannic acid

EXHIBIT 18
Page 0497

# 3.1 Disciplinary System

## I. Purpose and Scope

This detention standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. Each facility shall have graduated severity scales of prohibited acts and disciplinary consequences.

3. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

4. Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible.

5. Staff who have reason to suspect that a detainee has engaged in a prohibited act or who witness a prohibited act that cannot or should not be resolved informally, shall prepare a clear, concise and complete Incident Report.

6. Each Incident Report shall be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

7. A serious incident that may constitute a criminal act shall be referred to the proper investigative agency as appropriate, and administrative investigations shall be suspended pending the outcome of that referral.

8. At each step of the disciplinary and appeal process, the detainee shall be advised in writing of his/her rights in a language he/she understands, and translation or interpretation services shall be provided as needed.

9. When a detainee has a diagnosed mental illness or mental disability, or demonstrates symptoms of mental illness or mental disability, a mental health professional, preferably the treating clinician, shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing, any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior, and information about any known mitigating factors in regard to the behavior.

10. A Unit Disciplinary Committee (UDC) shall further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

11. An Institution Disciplinary Panel (IDP) shall

EXHIBIT 18
Page 0498

conduct formal hearings on Incident Reports referred from investigations or UDCs and may impose higher level sanctions for "greatest" and "high" level prohibited acts.

12. Detainees before the IDP shall be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

13. Actions of the IDP shall be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

14. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

15. All steps of the disciplinary process shall be performed within the required time limits.

16. At all steps of the disciplinary process, accurate and complete records shall be maintained. The detainee shall receive copies of all reports, exhibits and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety, security and orderly conduct of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

17. If a detainee is found not guilty at any stage of the disciplinary process, the incident records shall not be placed or retained in the detainee's file, even if these records are retained elsewhere for statistical or historical purposes.

18. Detainees shall be allowed to appeal disciplinary decisions through a formal grievance system. No staff member shall harass, discipline, punish or otherwise retaliate against any detainee for filing a complaint or grievance.

19. Detainees shall be afforded rights including, but not limited to, the following: the right to protection from abuse; the right to freedom from discrimination; the right to pursue a grievance; the right to correspond with persons or organizations; and the right to due process.

20. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Disciplinary Policy" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

**EXHIBIT 18**
**Page 0499**

# V. Expected Practices

## A. Guidelines

1. Detainees with limited English proficiency (LEP) shall receive translation or interpretation services, and detainees with disabilities shall receive appropriate accommodations  in order to meaningfully participate in the investigative, disciplinary, and appeal process.

2. Each facility holding ICE/ERO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures and documentation procedures. Written disciplinary policy and procedures shall clearly define detainee rights and responsibilities. The policy, procedures and rules shall be reviewed annually at a minimum.

3. Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, gender, sexual orientation, disability or political beliefs.

4. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

5. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services, to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of indoor or outdoor recreation, unless such activity would create a documented unsafe condition within the facility. Any sanction imposed shall be approved by the facility administrator and reviewed by the Field Office Director.

6. When a detainee has a diagnosed mental illness or mental disability, or demonstrates symptoms of mental illness or mental disability, a mental health professional, preferably the treating clinician, shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing, any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior, and information about any known mitigating factors in regard to the behavior.

7. The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent. For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong." Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his/her "wrongful" actions.

8. If a detainee has a mental disability or mental illness  but is competent, the disciplinary process shall consider whether the detainee's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.  A mental health professional should also be consulted as to whether certain types of sanctions, (e.g., placement in disciplinary segregation, loss of visits, or loss of phone calls) may be inappropriate because they would interfere with supports that are a part of the detainee's treatment or recovery plan.

9. A person who cannot assist in his/her own defense because he/she lacks the ability to understand the nature of the disciplinary proceedings, as determined by a medical authority, shall be considered incompetent. Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her

**EXHIBIT 18**
**Page 0500**

own defense. If the detainee's mental status does not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his/her own defense, and note such finding on the Incident Report.

## B. Notice to Detainees

The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings. Detainees shall have the following rights and shall receive notice of them in the handbook:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment;

2. The right of freedom from discrimination based on race, religion, national origin, gender, sexual orientation, physical or mental ability, or political beliefs;

3. The right to pursue a grievance in accordance with procedures provided in the detainee handbook, without fear of retaliation;

4. The right to pursue a grievance in accordance with standard "6.2 Grievance System" and procedures provided in the detainee handbook.

5. The right to correspond with persons or organizations, consistent with safety, security and the orderly operation of the facility; and

6. The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and other languages spoken by significant segments of the population with limited English proficiency. Copies to be provided and posted are as follows:

1. Disciplinary Severity Scale;

2. Prohibited Acts; and

3. Sanctions.

## C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*Prohibited acts are divided into four categories: "greatest," "high," "moderate" and "low moderate." The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act (see "Appendix 3.1.A: Offense Categories").*

### 1. Greatest Offenses

*The IDP shall impose and execute at least one sanction in the 1 through 5 range. Additional sanctions may be imposed and either executed or suspended, at the discretion of the panel.*

### 2. High Offenses

*The IDP shall impose and execute at least one sanction in the 1 through 12 range. Additional sanctions (1 through 12) may be imposed or may be suspended at the discretion of the panel.*

### 3. High Moderate Offenses

*The IDP shall impose at least one sanction in the 1 through 13 range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the 7 through 13 range, but may suspend any or all, once imposed.*

### 4. Low Moderate Offenses

*The IDP shall impose at least one sanction in the 1 through 9 range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the 3 through 9 range, but may suspend any or all, once imposed.*

## D. Incident Report

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall immediately prepare and submit an Incident Report. All Incident Reports must state facts clearly, precisely and concisely, omitting no details that may prove significant. Reports also shall identify the officer(s), the detainee(s) and all witnesses to the incident.

Minor transgressions shall be settled informally and by mutual consent whenever possible.  If, however, the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and submit it to the appropriate supervisor before the end of the assigned shift.

ICE/ERO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, in the event of destruction of government property, the report shall cite, briefly, "Code 218—Destroying Government Property," specify the exact manner in which the detainee is alleged to have violated the cited rule or standard, and include all relevant facts such as time, dates and places.)*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report. The reporting officer shall also list all staff, contract officers, and/or detainee witnesses to the incident and the disposition of any physical evidence (e.g., weapons, property, etc.) relating to the incident. The reporting officer shall sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

## E. Investigations

All facilities shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer must have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, as either witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness and sign them.

The investigating officer shall:

1. Commence the investigation within 24 hours of receipt of the Incident Report.

2. Advise the detainee of his/her right to remain silent at every stage of the disciplinary process, and ensure that he/she has a complete listing of detainee rights.

3. Complete the investigation within 72 hours of receipt of the Incident Report, barring exceptional circumstances.

4. Provide the detainee a copy of the Incident Report and notice of charges immediately after the conclusion of the investigation..

5. Terminate the administrative investigation, if the incident is under investigation on different grounds (i.e., the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it shall not pursue the matter.

    Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of custody. Contraband shall be reported to the appropriate law enforcement authority for action and possible seizure and prosecution. See "Preservation of Evidence" in standard "2.10 Searches of Detainees."

6. Advise the detainee in writing of his/her due process rights before the UDC, or before the IDP if the case is being referred directly to the IDP, as provided in this standard.

7. Record personal observances and other potentially material information.

**EXHIBIT 18**
**Page 0502**

8. Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

9. Forward to the UDC or directly to the IDP all reports relevant to the disciplinary hearing—..

## F. Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions. They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall comprise up to three members, at least one of whom is a supervisor. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall conduct hearings and, to the best extent possible, shall informally resolve cases involving high moderate or low moderate charges in accordance with the list of charges and related sanctions noted as "Appendix 3.1.A: Offense Categories." Unresolved cases and cases involving serious charges are forwarded to the institution disciplinary panel, and may be referred to the IDP without a hearing.

The UDC shall have authority to:

1. conduct hearings and resolve incidents involving high moderate or low moderate charges;

2. consider written reports, statements and physical evidence;

3. hear pleadings on the part of the detainee;

4. make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

5. impose minor sanctions in accordance with the table of prohibited acts and associated sanctions later in this document; minor sanctions are those listed sanctions other than initiation of criminal proceedings, recommended disciplinary transfer, disciplinary segregation, or monetary restitution.

The detainee in UDC proceedings shall have the right to due process, which includes the rights to:

1. remain silent at any stage of the disciplinary process;

2. have a UDC hearing within 24 hours after the conclusion of the investigation, unless the detainee:

   a. waives the notification period and requests an immediate hearing, or

   b. requests more time to gather evidence or otherwise prepare a defense;

3. attend the entire hearing (excluding committee deliberations), or waive the right to appear.

   If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;

4. Present statements and evidence, including witness testimony on his/her own behalf; and

5. Appeal the committee's determination through the detainee grievance process.

The UDC shall:

1. verify that the detainee has been advised of and afforded his/her due process rights, as provided above in this standard;

2. refer to the IDP any incident involving a serious violation that may result in the following sanctions: initiation of criminal proceedings, recommended disciplinary transfer, disciplinary

EXHIBIT 18
Page 0503

segregation, or monetary restitution. This includes all code violations in the "greatest" and "high" categories (100s and 200s), and must include code violations in the "high moderate" category (300s) in order for any of the sanctions listed above to be imposed;

3. serve the detainee with:

   a. a copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or

   b. written notification of charges and hearing before the IDP; and

4. if the detainee's case is being referred to the IDP, advise the detainee, in writing, of his/her due process rights as provided in this standard.

## G. Staff Representation for the IDP

The facility administrator shall upon the detainee's request, assign a staff representative to help prepare a defense prior to the commencement of the IDP. This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, or who are without means of collecting and presenting essential evidence. Detainees shall also have the option of receiving assistance from another detainee of their selection rather than a staff representative, subject to approval from the facility administrator.

1. *A staff representative must be a full-time employee.*

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his/her staff representative, barring those identified in paragraph 2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee may:*

   a. *select a different representative;*

   b. *wait for the unavailable staff member to become available (within a reasonable period); or*

   c. *proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including evidence of any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as requested by the detainee or as otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (which is pre-established by the IDP).*

EXHIBIT 18
Page 0504

11. *In the event that a detainee cannot effectively present his/her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.*

## H. Institution Disciplinary Panel (IDP)

All facilities that house ICE/ERO detainees shall have a higher level disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a three-person panel appointed by the facility administrator, or a one-person disciplinary hearing officer, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident.

The IDP may receive incident reports following a referral from the UDC or directly from the investigative officer following the conclusion of the investigation.

The IDP shall have authority to:

1. conduct hearings on all charges and allegations referred by the UDC or sent directly from the investigating officer;

2. call witnesses to testify;

3. consider written reports, statements, physical evidence and oral testimony;

4. hear pleadings by detainee and staff representative;

5. make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

6. impose sanctions as listed and authorized in each category.

The detainee in IDP proceedings shall have the right to due process, which includes the rights to:

1. remain silent at any stage of the disciplinary process;

2. have an IDP hearing within 48 hours after the conclusion of the investigation or the conclusion of the UDC hearing, unless the detainee:

   a. waives the notification period and requests an immediate hearing, or

   b. requests more time to gather evidence or otherwise prepare a defense;

3. attend the entire hearing (excluding committee deliberations), or waive the right to appear.

   If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses;

4. present statements and evidence, including witness testimony, on his/her behalf;

5. have a staff representative; and

6. appeal the committee's determination through the detainee grievance process.

The IDP shall:

1. verify that the detainee has been advised of and afforded his/her due process rights, as provided above in this standard;

2. remind the detainee of his/her right to a staff representative, provide one if requested and verify that a staff representative has been assigned when a representative is requested;

3. advise the detainee of his/her right to waive the

**EXHIBIT 18**
**Page 0505**

hearing and admit having committed the offense;

4. conduct the hearing within 48 hours after the conclusion of the investigation or the conclusion of the UDC hearing, unless the detainee requests more time to gather evidence or otherwise prepare a defense. In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and, unless the detainee has requested the delay, approved by the facility administrator. If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency;

5. prepare a written record of any hearing. This record must show that the detainee was advised of his/her rights. It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation;

6. forward the entire record to the facility administrator, who may (a) concur, (b) terminate the proceedings or (c) impose more severe or more lenient sanctions; and

7. serve the detainee with written notification of the decision, which must contain the reason for the decision.

## I. Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall include in the hearing record the factual basis for finding the information reliable.

## J. Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

Circumstances justifying the postponement or

continuance of a hearing might include, but are not limited to: defense preparation, physical or mental illness, security, escape, disciplinary transfer or pending criminal prosecution.

An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.

## K. Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

2. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances, such as violations of offenses 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A.

3. While a detainee may be charged with multiple prohibited acts and may receive multiple sanctions for one incident, sanctions arising from a single incident shall run concurrently.

4. Time served in segregation pending the outcome of the proceedings shall be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

5. The detainee's good behavior subsequent to the rule violation or prohibited act should be given consideration when determining the appropriate penalty.

6. The disciplinary report and accompanying documents are not placed in the file of a detainee

**EXHIBIT 18**
**Page 0506**

who is found not guilty. The facility, however, may retain the material in its own files for Institution statistical or historical purposes.

## L. Documents

All documents relevant to the incident, subsequent investigation and hearing(s) shall be completed and distributed in accordance with facility procedures.

### 1. Incident Report/Notice of Charges

The officer shall prepare an Incident Report and submit it to the supervisor immediately after the incident takes place. If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the Chief of Security.

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the Chief of Security or the IDP, as appropriate.*

### 2. Investigation Report

*The original shall be submitted to the UDC.*

*The detainee does not receive a copy.*

### 3. UDC Report of Findings and Action

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file (guilty finding only).*

### 4. Notice of IDP Hearing

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file.*

### 5. Detainee Rights at IDP Hearing

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the facility detention file.*

### 6. IDP Report

*The original shall be included in the detainee detention file.*

*A copy shall be provided to the detainee.*

## M. Criminal Prosecution

Facilities, in coordination with the Field Office Director, shall work with prosecutors and other law enforcement officials to ensure that detainees who engage in serious criminal activity, including violence against staff and other detainees, face criminal prosecution when appropriate.

**EXHIBIT 18**
**Page 0507**

# Appendix 3.1.A: Offense Categories

## I. "Greatest" Offense Category

### A. Prohibited Acts

| | |
|---|---|
| 100 | Killing |
| 101 | Assaulting any person (includes sexual assault) |
| 102 | Escape from escort; escape from a secure facility |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity [e.g., a riot or an escape]; otherwise the charge is classified as Code 222, 223 or 322)) |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition |
| 105 | Rioting |
| 106 | Inciting others to riot |
| 107 | Hostage-taking |
| 108 | Assaulting a staff member or any law enforcement officer |
| 109 | Threatening a staff member or any law enforcement office with bodily harm |
| *198 | Interfering with a staff member in the performance of duties (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable) |
| *199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable) |

### B. Sanctions

1. Initiate criminal proceedings
2. Disciplinary transfer (recommend)
3. Disciplinary segregation (up to 60 days)
4. Make monetary restitution, if funds are available
5. Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

## II. "High" Offense Category

### A. Prohibited Acts

| | |
|---|---|
| 200 | Escape from unescorted activities open or secure facility, proceeding without violence |
| 201 | Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person, except when part of an approved recreational or athletic activity |
| 202 | Possession or introduction of an unauthorized tool |
| 203 | Loss, misplacement or damage of any restricted tool |
| 204 | Threatening another with bodily harm |
| 205 | Extortion, blackmail, protection and demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm or avoiding a threat of being informed against |
| 206 | Engaging in sexual acts |
| 207 | Making sexual proposals or threats |
| 208 | Wearing a disguise or mask |
| 209 | Tampering with or blocking any lock device |
| 210 | Adulterating of food or drink |
| 211 | Possessing, introducing, or using narcotics, narcotic paraphernalia or drugs not prescribed for the individual by the medical |

**EXHIBIT 18**
**Page 0508**

staff

212   Possessing an officer's or staff member's clothing

213   Engaging in or inciting a group demonstration

214   Encouraging others to participate in a work stoppage or to refuse to work

215   Refusing to provide a urine sample or otherwise cooperate in a drug test

216   Introducing alcohol into the facility

217   Giving or offering an official or staff member a bribe or anything of value

218   Giving money to, or receiving money from, any person for an illegal or prohibited purpose (e.g., introducing/conveying contraband)

219   Destroying, altering, or damaging property (government or another person's) worth more than $100

220   Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days

222   Possessing or introducing an incendiary device (e.g., matches, lighter, etc.)

223   Engaging in any act that could endanger person(s) and/or property

*298   Interfering with a staff member in the performance of duties (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

*299   Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

**B. Sanctions**

1.   Initiate criminal proceedings

2.   Disciplinary transfer (recommend)

3.   Disciplinary segregation (up to 30 days)

4.   Make monetary restitution, if funds are available

5.   Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

6.   Change housing

7.   Remove from program and/or group activity

8.   Loss of job

9.   Impound and store detainee's personal property

10.   Confiscate contraband

11.   Restrict to housing unit

12.   Warning

## III. "High Moderate" Offense Category

### A. Prohibited Acts

300   Indecent exposure

301   Stealing (theft)

302   Misusing authorized medication

303   Loss, misplacement or damage of a less restricted tool

304   Lending property or other item of value for profit/increased return

305   Possessing item(s) not authorized for receipt or retention and not issued through regular channels

306   Refusing to clean assigned living area

307   Refusing to obey the order of a staff member or officer (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting; continuing to fight Code 201—Fighting; refusing to provide a urine sample, Code 215—Refusing to provide a urine sample or otherwise

**EXHIBIT 18**
**Page 0509**

cooperate in a drug test).

308    Insolence toward a staff member

309    Lying or providing false statement to staff

310    Counterfeiting, forging or other unauthorized reproduction of money proceedings or other official document or item (e.g., security document, identification card, etc.); may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction (e.g., counterfeiting release papers to effect escape—Code 102 or 200).

311    Participating in an unauthorized meeting or gathering

312    Being in an unauthorized area

313    Failing to stand count

314    Interfering with count

315    Making, possessing, or using intoxicant(s)

316    Refusing a breathalyzer test or other test of alcohol consumption

317    Gambling

318    Preparing or conducting a gambling pool

319    Possessing gambling paraphernalia

320    Unauthorized contact with the public

321    Giving money or another item of value to, or accepting money or another item of value from, anyone, including another detainee, without staff authorization

322    Destroying, altering, or damaging property (government or another person's) worth equal to or less than $100

323    Signing, preparing, circulating, or soliciting support for group petitions that threaten the security or orderly operation of the facility.

*398    Interfering with a staff member in the performance of duties (offense must be of high moderate severity; this charge to be used only when no other charge in this category is applicable)

*399    Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity; this charge is to be used only when no other charge in this category is applicable)

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

### B. Sanctions

1. Initiate criminal proceedings

2. Disciplinary transfer (recommend)

3. Disciplinary segregation (up to 72 hours)

4. Make monetary restitution, if funds are available

5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

6. Change housing

7. Remove from program and/or group activity

8. Loss of job

9. Impound and store detainee's personal property

10.    Confiscate contraband

11.    Restrict to housing unit

12.    Reprimand

13.    Warning

## IV. "Low Moderate" Offense Category

### A. Prohibited Acts

400    Possessing property belonging to another person

401    Possessing unauthorized clothing

402    Malingering; feigning illness

403    Smoking where prohibited

EXHIBIT 18
Page 0510

*404*  Using abusive or obscene language

*405*  Tattooing, body piercing or self-mutilation

*406*  Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)

*407*  Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)

*408*  Conducting a business

*409*  Possessing money or currency, unless specifically authorized

*410*  Failing to follow safety or sanitation regulations

*411*  Unauthorized use of equipment or machinery

*412*  Using equipment or machinery contrary to posted safety standards

*413*  Being unsanitary or untidy; failing to keep self and living area in accordance with posted standards

*\*498*  Interfering with a staff member in the performance of duties (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

*\*499*  Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

### B. Sanctions

1. Loss of privileges, commissary, vending machines, movies, recreation, etc.

2. Change housing

3. Remove from program and/or group activity

4. Loss of job

5. Impound and store detainee's personal property

6. Confiscate contraband

7. Restrict to housing unit

8. Reprimand

9. Warning

EXHIBIT 18
Page 0511

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and

good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or

EXHIBIT 18
Page 0512

who is illiterate.

# III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

# V. Expected Practices

## A. Voluntary Work Program

Detainees shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

## B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure

perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four detainees. The detainees shall be within sight and sound of that staff member at all times.*

## C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*
2. *stacking loose papers;*
3. *keeping the floor free of debris and dividers free of clutter; and*
4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

## D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*
2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*
3. *The shift supervisor or department head shall*

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

*4. Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Detainees with Disabilities

The facility shall allow, where possible, detainees with disabilities to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1. unsatisfactory performance;

2. disruptive behavior, threats to security, etc.;

3. physical inability to perform the essential

**EXHIBIT 18**
**Page 0514**

elements of the job due to a medical condition or lack of strength;

4. prevention of injuries to the detainee; and/or

5. a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1. The detainee shall perform all assigned tasks diligently and conscientiously.

2. The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3. The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4. In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1. The voluntary work program shall operate in compliance with the following codes and regulations:

   a. Occupational Safety and Health Administration (OSHA) regulations;

   b. National Fire Protection Association 101 Life Safety Code; and

   c. International Council Codes (ICC).

   Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

   The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials, including:

   a. safety features and practices demonstrated by the supervisor; and

   b. recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

   A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

**EXHIBIT 18**
**Page 0515**

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1. The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2. First aid shall be administered as necessary.

3. Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4. The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

**EXHIBIT 18**
**Page 0516**

**EXHIBIT 19**

**EXHIBIT 19**

## INS DETENTION STANDARD

### VOLUNTARY WORK PROGRAM

---

**I.  POLICY**

Every facility with a work program will provide detainees the opportunity to work and earn money.  While not legally required to do so, INS affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

**II.  APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1.  Service Processing Centers (SPCs);

2.  Contract Detention Facilities (CDFs); and

3.  State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics.  IGSA facilities may find such procedures useful as guidelines.  IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

**III.  STANDARDS AND PROCEDURES**

**A.  Voluntary Work Program**

Detainees who are physically and mentally able to work will be provided the opportunity to participate in any voluntary work program.

The detainee's classification level will determine the type of work assignment for which he/she is eligible.

*General work assignments at SPCs/CDFs do not require specific skills.  A sample of work assignments and corresponding classification levels follows:*

---

**EXHIBIT 19**
**Page 0517**

| *Work Assignment* | *Level* |
|---|---|
| 1.  Kitchen worker (either shift) | 1-2 (and 3, if screened for violence) |
| 2.  Recreation/Library/Barber | 1-2 (and 3, if screened for violence) |
| 3.  Living area clean-up/janitorial | 1-3 |
| 4.  Area cleaning (inside facility) | 1-3 |
| 5.  Area cleaning (outside facility) | 1 |
| 6.  Evening workers (unit janitorial) | 1-2 |
| 7.  Evening workers (building janitorial) | 1-2 |
| 8.  Processing | 1-2 |
| 9.  Bus detail | 1-3 |
| 10. Maintenance | 1-2 |
| 11. Lawn care | 1-3 |
| 12. Laundry | 1-2 |

**B.** **Voluntary Work Program Objectives**

Through the voluntary work program:

1.    Physically and mentally able detainees are gainfully employed while contributing to the orderly operation of the facility;

2.    Essential operations and services improve through the productivity of detainees; and

3.    Inactivity-induced idleness and disciplinary-code violations will decline.

**C.** **Required Work Assignments**

Work assignments are voluntary.  However, all detainees are responsible for personal housekeeping.

*In SPCs/CDFs, detainees are required to maintain their immediate living areas in a neat and orderly manner.  This involves making their bunk beds daily, stacking loose papers, keeping the floor free of debris and dividers free of clutter, and hanging/draping no articles of clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.*

**D.** **Voluntary Special Details**

Detainees may volunteer for the temporary work details that occasionally arise. The work, which generally last from several hours to several days, can involve digging trenches, removing topsoil, and other labor-intensive work.  Level-3 detainees will not, under any circumstances, work outside the secure outer perimeter.  With immediate supervision, lower categories of level-3 detainees may participate in special details.

**E.     Detainee Selection**

The OIC shall develop site-specific rules for selecting work detail volunteers.

*In SPCs/CDFs, these general procedures apply:*

a.      *Staff will present the detainee's name and A-number to the shift supervisor or the requesting department head.*

b.      *The shift supervisor/department head will review the detainee's detention file and/or A-file for classification purpose, scanning documents that might provide relevant information.*

c.      *Inquiries to staff members about the detainee's attitude and behavior may affect the supervisor's selection.*

d.      *Staff will explain the rules and regulations as well as privileges relating to the detainee worker's status.*

*The primary factors in hiring a detainee as a worker will be his/her classification level and the specific requirements of the job.*

**F.     Discrimination in Hiring Detainee Workers**

Volunteering detainees will not be denied work opportunities based on non-merit factors, such as social group, race, religion, sex, physical or mental handicaps, or national origin.

**G.     Physically and Mentally Challenged Detainees**

INS maintains custody of physically and mentally challenged detainees whose disabilities range from minor to debilitating.  While some of these individuals' medical restrictions will prevent them from working, those with less severe disabilities will have the opportunity to participate in the voluntary work program, in appropriate work projects.

The selecting official must consider the precise limitations of a disabled individual before rejecting certain work assignments. Expediency or convenience will not justify the rejection or pigeonholing of a detainee who, with reasonable accommodation, can perform the essential function of the work involved.  In disputed cases, the official will consult medical personnel to ascertain the detainee's assignability with regard to a given project.

**H.     Hours of Work**

Detainees participating in the volunteer work program are required to work according to a fixed schedule.

---

*In SPCs/CDFs, the normal scheduled workday for a detainee employed full-time is a maximum of 8 hours.  Detainees who wish to participate in the work program will not be permitted to work in excess of 8 hours daily, 40 hours weekly.*

*Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program*

**I.    Work Restrictions**

The OIC may restrict the number of work details permitted a detainee during one day.

*In SPCs/CDFs, a detainee may participate in only one work detail per day.  Also, the detainee is required to sign a voluntary work program agreement before every new assignment. Completed agreements will be filed in the detainee's detention file.  (Sample agreement attached).*

**J.    Facilities That Detain Criminal Aliens**

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

**K.    Compensation**

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

*In SPCs/CDFs, the stipend is $1.00 per day, to be paid daily.*

**L.    Removal of Detainee from Work Detail**

A detainee may be removed from a work detail for cause.  Upon removing a detainee from a work detail, the OIC shall place a written justification in the detainee's detention file.

A non-exhaustive list of reasons for removal follows:

1.    Unsatisfactory performance.

2.    Disruptive behavior, threats to security, etc.

3.    Infraction of a facility rule, regulation or policy, leading to removal from a work details as a sanction imposed by the Institutional Disciplinary Panel.

4.    Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition.  Such detainees may be removed from a work detail to prevent future injuries.

---

**EXHIBIT 19**
**Page 0520**

**M.**   **Detainee Responsibility**

The OIC will establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

*In SPCs/CDFs, the detainee is expected to be ready to report for work at the required time. The detainee may not leave an assignment without permission.*

The detainee will perform all assigned tasks diligently and conscientiously.  Removal from the work detail and/or disciplinary action may result when a detainee evades attendance and performance standards in assigned activities, or encourages others to do so.

The detainee will exercise care in performing assigned work, using safety equipment and other precautions in accordance with the work supervisor's instructions.  In the event of a work-related injury, the detainee shall notify the work supervisor, who will immediately implement injury-response procedures (see section III. O., below).

**N.**   **Detainee Training and Safety**

All detention facilities shall comply with all applicable health and safety regulations and standards.

The OIC shall ensure that all department heads develop and institutes, in conjunction with the facility's training officer, appropriate training for all detainee workers.

*1.*   *In all SPCs/CDFs the Voluntary Work Program shall operate in compliance with the following:*

    *a.*   *Occupational Safety and Health Administration (OSHA) regulations set forth in 29 CFR Parts 1910, 1926, and 1960 (current indexes attached);*

    *b.*   *National Fire Protection Association 101 Life Safety Code (current index attached);*

    *c.*   *American Correctional Association Standards for Adult Local Detention Facilities (see section IV., below);*

    *d.*   *INS Environmental Occupational Safety and Health Program Handbook.*

2.   Upon the detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials.  The supervisor shall demonstrate safety features and practices.  Workers will learn to recognize hazards in the workplace, to understand the protective devices and clothing provided, and to report deficiencies to their supervisors.  INS will not tolerate  "lack of knowledge or skill" as an accident's cause.  Therefore, the detainee shall undertake no assignment before signing a voluntary work program agreement.  Among other things, by signing the agreement the detainee confirms he/she has received and understood training about the assigned job from the supervisor. This agreement will be placed in the detainee's detention file.

3.   Medical staff, working with the Public Health Service, will ensure detainees are medically screened and certified before undertaking a food service assignment.

4.   The facility will provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5.   *Each Regional Safety and Health Officer (RSHO) shall be responsible for providing every SPC/CDF in his/her region with complete and current copies of the documents listed in III.N.1., above, including 29 CFR Parts 1910, 1926 and 1960.  The OIC shall ensure that the facility operates in compliance with all currently applicable standards.*

**0.   <u>Detainee Injury and Reporting Procedures</u>**

The OIC shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of INS.

*In SPCs/CDFs, if a detainee is injured while performing his/her work assignment, the following procedures apply:*

1.   *The work supervisor will immediately notify the facility medical staff.  In the event that the accident occurs in a facility that does not provide 24-hour medical coverage, the supervisor will contact the on-call medical officer for instructions.*

2.   *First aid will be administered when necessary.*

3.   *Medical staff will determine what treatment is necessary and where that treatment will take place.*

4.   *The work supervisor will complete a detainee accident report and submit it to the OIC for review and processing.  A copy of this report will be placed in the detainee's A-file.*

IV.   **AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED:**

American Correctional Association 3rd Edition, Standards for Adult Detention Facilities: 3-ALDF-3E-04, 5A-01, 5A-03, 5A-04, 5A-05, 5A-06, 5A-08, 5A-13.

**Approval of Standard**

Michael D.  Cronin
**Acting Executive Associate Commissioner**
**Office of Programs**

SEP 2 0 2000

**Date**

Michael A.  Pearson
**Executive Associate Commissioner**
**Office of Field Operations**

SEP 2 0 2000

**Date**

Detainee Voluntary Work Program Agreement
Service Processing Center/Contract Detention Facility
*[Insert Facility Name]*

**<u>Detainee Voluntary Work Program Agreement</u>:**

Detainees that participate in the volunteer work program will <u>not</u> be permitted to work in excess of 8 hours daily or 40 hours weekly.

Detainees that participate in the volunteer work program are required to work according to an assigned work schedule and to participate in all work-related training.  Unexcused absence from work or unsatisfactory work performance could result in removal from the voluntary work program.  Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment.  Compensation shall be $1.00 per day.

I,_____, A#_____, have read, understand, and agree
      (Detainee name)
to comply with the above.  I have received and understand relevant safety training regarding my work assignment:

_____
     Work Assignment

_____                   _____
     Detainee Signature                                 Date

**EXHIBIT 19**
**Page 0524**

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

> **Policy:**  In every facility offering a voluntary work program, INS detainees will have the opportunity to work and earn money by participating.  While not legally required, INS affords detainee workers basic Occupational Safety and Health Administration (OSHA) protections.

| VOLUNTARY WORK PROGRAM | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 1.  Does the facility have a voluntary work program?<br>    If yes, do detainees participate? | | | |
| 2.  Does staff maintain a written chart with work assignments and the corresponding classification levels? | | | |
| 3.  Does the Voluntary Work Program:<br>    a. Contribute to detainee morale and the orderly operation of the facility?<br>    b. Improve operations and services?<br>    c. Reduce restlessness and disciplinary code violations? | | | |
| 4.  Does detainee housekeeping meet neatness and cleanliness standards? | | | |
| 5.  Do low level-three detainees have the opportunity to participate in special details?<br>    a. If yes, do they ever work outside the outer perimeter? | | | |
| 6.  Do written procedures govern selection of detainees for the Voluntary Work Program?<br>    a.  Do the same procedures apply for replacement workers as for "new" workers?<br>    b.  Does staff always follow written procedures?<br>    c.  Is merit the sole selection criterion? | | | |
| 7.  Do physically and mentally challenged detainees participate in the program?<br>    a. If yes, how many physically challenged are currently employed?<br>    b. How many mentally challenged? | | | |

**EXHIBIT 19**
**Page 0525**

| VOLUNTARY WORK PROGRAM | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 8. Does the facility comply with work-hour requirements for detainees, not exceeding:<br>a. Eight hours a day?<br>b. Forty hours a week? | | | |
| 9. Do exceptions occur regularly?<br>a. If yes, certain times of the month?<br>b. Certain times of year? | | | |
| 10. Do detainee volunteers work according to<br>a. Fixed schedule? | | | |
| 11. Do volunteers receive the $1/day stipend? | | | |
| 12. Has every participating detainee signed the Voluntary Work Program agreement? | | | |
| 13. If the OIC removes a detainee from a work detail, does staff place the written justification for the action in the detainee's detention file?<br>a. Is this a matter of written procedure? | | | |
| 14. Does staff ensure that detainee volunteers understand their responsibilities as workers before they join the work program?<br>a. In accordance with written procedure? | | | |
| 15. Does the voluntary work program meet:<br>a. OSHA standards?<br>b. NFPA standards?<br>c. ACA standards?<br>d. EOSH standards? | | | |
| 16. Does medical staff screen and formally certify detainee food service volunteers?<br>a. If yes, before the assignment begins?<br>b. Is this a matter of written procedure? | | | |
| 17. Do detainees receive safety equipment/ training sufficient for the assignment? | | | |
| 18. Does the OIC have the latest OSHA standards? NFPA? ACA? EOSH? | | | |
| 19. Is the proper procedure followed when an alien is injured on the job? | | | |

**EXHIBIT 19**
**Page 0526**

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

| VOLUNTARY WORK PROGRAM |
| --- |

**Verification Sources:**

**The following may serve as sources of information for auditors verifying the facility's compliance with this detention standard:**

| SOURCE | TIME | DATE | LOCATION |
| --- | --- | --- | --- |
| A.  Facility's written work program policies and procedures | | | |
| B.  Observing on-the-job volunteers | | | |
| C.  A-files/detention files | | | |
| D.  OSHA standards | | | |
| E.  NFPA standards | | | |
| F.  ACA standards | | | |
| G.  EOSH standards | | | |
| H.  Detainee and staff interviews | | | |

Facilities must complete the attached Plan of Action for bringing operations into compliance.   For each element found out of compliance, the plan of action will specify remedial action and the estimated timetable for compliance.

**Remarks**: *(Record significant facts, observations, other sources used, etc.)*


_____
Auditor's Signature


_____
Date

**EXHIBIT 19**
**Page 0527**

## INS DETENTION STANDARD

### DISCIPLINARY POLICY

**I.      POLICY**

To provide a safe and orderly living environment, facility authorities will impose disciplinary sanctions on any detainee whose behavior is not in compliance with facility rules and procedures.

**II.     APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1.      Service Processing Centers (SPCs);

2.      Contract Detention Facilities (CDFs); and

3.      State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics.  IGSA facilities may find such procedures useful as guidelines.  IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

**III.    STANDARDS AND PROCEDURES**

**A.      Guidelines**

1.      Each facility holding INS detainees in custody will have a detainee disciplinary system. This disciplinary system shall have progressive levels of reviews, appeals, procedures, and documentation procedures.  The disciplinary policy and procedures shall clearly define detainee rights and responsibilities

2.      Disciplinary action may not be capricious or retaliatory.

3.      Staff may not impose or allow imposition of the following sanctions: corporal punishment; deviations from normal food services; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; or deprivation of physical exercise unless such activity creates an unsafe condition.

4.    The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent.

A mentally incompetent individual unable to appreciate the difference between appropriate and inappropriate behavior– between "right" and "wrong"–is not capable of acting in accordance with those norms.  Therefore, he/she is not responsible for his/her "wrongful" actions.

Also, a person who lacks the ability to understand the nature of the disciplinary proceedings against him/her, or to assist in his/her own defense, is considered incompetent.  Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her own defense.  If the detainee's mental status does not improve within a reasonable amount of time, the Incident Report shall "find" the detainee incompetent to assist in his/her own defense.  Under that circumstance, disciplinary proceedings cannot move forward.

5.    The detainee handbook or equivalent, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct, and of the sanctions imposed for violations of the rules.  Among other things, the handbook shall advise detainees of the following:

a.    The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

b.    The right of freedom from discrimination based on race, religion, national origin, sex, handicap, or political beliefs;

c.    The right to pursue a grievance in accordance with written procedures (provided in the handbook);

d.    The right to correspond with persons or organizations, consistent with  safety, security, and the orderly operation of the facility; and

e.    The right to due process, including the prompt resolution of a disciplinary matter (in accordance with the rules, procedures, and sanctions provided. in the handbook).

*In SPCs/CDFs, copies of the rules of conduct and disciplinary sanctions will be posted in English, Spanish, and/or other languages spoken by significant numbers of detainees, as follows:*

a.    *Disciplinary Severity Scale*
b.    *Prohibited Acts*
c.    *Sanctions*

**EXHIBIT 19**
**Page 0529**

B.    **Incident Reports**

Officers who witness a prohibited act or have reason to suspect one has been committed shall prepare and submit an incident report. All incident reports must state the facts clearly, precisely, and concisely, omitting no details that could prove significant. Reports also will identify the officer(s), the detainee(s), and all witness(es) to the incident.

INS approval is required for the incident-report forms used in CDFs and IGSA facilities.

*In SPCs/CDFs, minor transgressions will be settled informally, by mutual consent, whenever possible. If, however, the officer involved thinks an informal resolution inappropriate or unachievable, he/she shall prepare an Incident Report and Notice of Charges, forwarding it to the appropriate supervisor before the end of the assigned shift.*

*The incident report shall cite the relevant rule or standard without quoting it in its entirety. For example, for destruction of government property, the report would cite, briefly, "Code 218-Destroying Government Property."*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report. The reporting officer shall also list all staff, contract officers or detainee witnesses to the incident, and the disposition of any physical evidence (weapons, property, etc.) relating to the incident. The reporting officer will sign the report and include title, date and time the report was signed. The shift supervisor shall review all incident reports before going off duty.*

C.    **Investigations**

IGSAs shall have procedures in place to ensure that all incident reports are investigated within 24 hours of the incident.

The investigating officer shall have supervisory rank, or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, either as witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness, and sign them.

*In SPCs/CDFs, the officer designated to investigate the incident is responsible for completing the necessary interviews, collecting evidence, and submitting written reports.*

**The investigating officer shall:**

1.    *Commence the investigation within 24 hrs. of receipt of the incident report.*

2.    *Advise the detainee of the right to remain silent at every stage of the disciplinary process, and ensure he/she has a complete listing of detainee rights*

3.    *Advise the detainee that, although silence may not be used to support a finding of guilt, silence is rarely interpreted in the detainee's favor.*

4.      Provide the detainee(s) with a copy of the incident report/notice of charges at least 24 hours before the start of disciplinary proceedings.

5.      Advise the detainee of his/her right, if applicable, to an initial hearing before the Unit Disciplinary Committee (UDC) within 24 hours of his/her notification of charges.

6.      Terminate the investigation if the incident is under investigation elsewhere, e.g., on criminal grounds, unless and until the agency with primary jurisdiction concludes its investigation or indicates that it will not pursue the matter.

7.      Record personal observances and other potentially material information.

8.      Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

9.      Forward to the UDC all reports relevant to the disciplinary hearing.  NOTE:  policy expressly prohibits providing a copy of any such report(s) to the detainee at this stage of the disciplinary process.

**Unit Disciplinary Committee (UDC)**

All facilities shall establish an intermediate level of investigation/adjudication is present to adjudicate low or moderate infractions.  They shall also ensure that the detainee is afforded all the rights listed under "Detainee Rights in UDC Proceedings," below.

*In SPCs/CDFs:*

*The UDC administering unit discipline shall comprise from one to three members, at least one of whom is a supervisor.*

*The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident.   Only if virtually every available officer witnessed or was directly involved in the incident shall an exception to this rule occur*

*The UDC will conduct hearings and, to the extent possible, informally resolve cases involving "high moderate" or "low moderate" charges, in accordance with the list of charges and related sanctions (see III., I., below).  Unresolved cases and cases involving serious charges are forwarded  to the Institutional Disciplinary Panel.*

**The UDC shall have authority to:**

1.      Conduct hearing and informally resolve incidents involving High Moderate or Low Moderate charges.

2.      Consider written reports, statements, and physical evidence.

**EXHIBIT 19**
**Page 0531**

3.      *Hear pleadings on the part of the detainee.*

4.      *Make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.*

5.      *Impose minor sanctions "E" through "M" in accordance with the table of prohibited acts and associated sanctions (see section III.I., below).*

**The detainee in UDC proceedings shall have the right to:**

1.      *Remain silent at any stage of the disciplinary process.*

2.      *Due process, including a UDC hearing within 24 hours of the end of the investigation, and:*

    *a.      To attend the entire hearing (excluding committee deliberations); or*

    *b.      To waive the right to appear.*

    *If security considerations prevent the detainee's attendance, the committee must document the security considerations.*

3.      *Present statements and evidence in his/her own behalf.*

4.      *Appeal the committee's determination through the detainee appeal process.*

**The UDC shall:**

1.      *Advise the detainee of above-listed rights before the hearing.*

2.      *Refer to the IDP any incident involving a serious violation, i.e., associated with an A-through-D-range sanction. This includes code violations in the "Greatest" and "High" categories (100s and 200s).*

3.      *Serve the detainee with:*

    *a.      A copy of the UDC decision and sanctions imposed; or*

    *b.      Written notification of charges and hearing before the IDP.*

4.      *If the detainee's case is being referred to the IDP, advise the detainee, in writing, of*

    *a.      The right to call witnesses and present evidence before the IDP; and*

    *b.      The right to a staff representative before the IDP.*

---

**EXHIBIT 19**
**Page 0532**

E.   **Staff Representation**

*In SPCs/CDFs, the Officer in Charge (OIC) shall, upon the detainee's request, assign a staff representative to help prepare a defense. This help will be automatically provided for illiterate detainees, detainees with limited English-language skills; detainees without means of collecting and presenting essential evidence and detainees in administrative or disciplinary segregation.*

1.   *A staff representative must be a full-time employee.*

2.   *Because of the potential conflict of interest, the OIC, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers, and anyone else with a stake in the outcome shall not act as staff representative.*

3.   *The detainee may select his/her staff representative, barring anyone identified in #2, above.*

4.   *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee has three choices. He/she may select a different representative; wait for the unavailable staff member to become available (within a reasonable period); or proceed without a staff representative.*

5.   *A staff member declining to serve as a detainee's representative must state the reason on the staff representative form.*

6.   *If several officers decline, the OIC shall assign a staff member to serve as that detainee's staff representative.*

7.   *The staff representative shall be free to speak to witnesses and to present evidence in the detainee's behalf, including any mitigating circumstances.*

8.   *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses. The standard pre-hearing preparation time will suit most cases. However, the IDP may grant a delay if required for an adequate defense.*

9.   *The IDP shall establish the reliability of information provided by a confidential informant before considering it in the disciplinary proceedings.*

10.  *The IDP may withhold the confidential informant's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (pre-established by the IDP).*

11.  *When the detainee cannot effectively present his/her own case, the OIC shall appoint a staff representative, even if not requested by the detainee.*

**EXHIBIT 19**
**Page 0533**

**F.**   **Institutional Disciplinary Panel**

All facilities that house INS detainees shall have a disciplinary panel to adjudicate detainee incident reports.   Only the disciplinary panel can place a detainee in disciplinary segregation.

*In SPCs and CDFs*

*1.     The IDP will consist of three members, including the chairperson.*

*2.     The OIC shall appoint the three members of the panel..*

*Members will be appointed by the OIC.   The panel shall not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Only if virtually every available officer witnessed or was directly involved in the incident shall an exception to this rule occur*

**The IDP shall have authority to:**

*1.     Conduct hearings on all charges and allegations referred by the UDC.*

*2.     Call witnesses to testify.*

*3.     Consider written reports, statements, physical evidence, and oral testimony.*

*4.     Hear pleadings by detainee and staff representative.*

*5.     Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.*

*6.     Impose sanctions as listed and authorized in each category.*

**The IDP shall:**

*1.     Verify that the detainee has been advised of, and afforded, his/her rights, as provided above.*

*2.     Remind the detainee of his/her right to a staff representative, providing one if requested.*

*3.     Advise the detainee of his/her right to waive the hearing and admit having committed the offense.*

**EXHIBIT 19**
**Page 0534**

4.   *Conduct the hearing on the first business day after receiving the UDC's referral, unless the detainee waives the 24-hour notification provision, requesting an immediate hearing.  In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, their unavailability of one or more essential witnesses, etc.) and approved by the OIC.   If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency.*

5.   *Prepare a written record of its proceedings.  This record must show that the detainee was advised of his/her rights.  It must also document the evidence considered by the Panel and subsequent findings; the decision and sanctions imposed, along with a brief explanation.*

6.   *Forward the entire record to the OIC, who may (a) concur; (b) terminate the proceedings; or (c) impose stiffer or lesser sanctions.*

7.   *Serve the detainee with written notification of the decision.*

## G.   Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

*In SPCs/CDFs, circumstances justifying the postponement or continuance of a hearing might include: defense preparation, physical or mental illness, security, escape, disciplinary transfer, removal or pending criminal prosecution.*

*An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.*

## H.   Duration of Punishment

The duration of punishment shall be within established limits. Neither the panel recommending sanctions nor the OIC making the final decision shall impose sanctions arbitrarily, outside these limits.

1.   Punishments range from the withholding of privilege(s) to segregation.  Time in segregation after a hearing will generally not exceed 60 days.

2.   Time served in segregation pending the outcoming of the proceedings may be credited to the number of days to be spent in the segregation unit after the decision is announced.

3.   The disciplinary report and accompanying documents are not placed in the file of a detainee who is found not guilty.  However, the facility may retain the material in its own files for institutional uses (statistical, historical, etc.).

**EXHIBIT 19**
**Page 0535**

**I.**   **Disciplinary Severity Scale and Prohibited Acts**

All facilities shall have graduated scales of offenses and disciplinary consequences, as provided in this section.

*SPCs/CDFs shall adopt, without changing, the offense categories and disciplinary sanctions set forth in this section.*

*Prohibited acts are divided into four categories: "Greatest," "High," "Moderate," and "Low Moderate." The sanctions authorized for each category (see table of sanctions, below) will be imposed only if the detainee is found to have committed a prohibited act.*

    **a.**   ***"Greatest" offenses:*** *The IDP shall impose and execute at least one sanction in the A through E range. Additional sanctions (A through G) may be imposed and either executed or suspended, at the discretion of the panel. The IDP may impose and execute sanctions F and G only in conjunction with sanction A, B, C, D, and/or E.*

    **b.**   ***"High" offenses:*** *The IDP shall impose and execute at least one sanction in the A through M range. Additional sanctions (A through M) may be imposed, and. either executed or suspended, at the discretion of the panel.*

    **c.**   ***"High Moderate" offenses:*** *The IDP shall impose at least one sanction in the A through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

    **d.**   ***"Low Moderate" offenses:*** *The IDP shall impose at least one sanction in the E through M range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the G through M range, but may suspend any or all, once imposed.*

**J.**   **Documents**

All documents relevant to the incident, subsequent investigation, hearing(s), etc., will be completed and distributed in accordance with facility procedures.

*In SPCs/CDFs, documents will be prepared and distributed as follows:*

***Incident Report/Notice of Charges***

*The officer shall prepare a report and submit it to the INS or CDF supervisor immediately after the incident takes place. If the incident is resolved informally, the officer will so note on the original report, which will then be forwarded to the Chief Detention Enforcement Officer or Chief of Security.*

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, will forward the entire record to either the Chief of Detention or the IDP, as appropriate.*

### Investigation Report

*Original‑submitted to the UDC.*
*Detainee does not receive a copy*

### UDC Report of Findings and Action

*Original‑served on the detainee after the committee issues its findings*
*Copy‑to the detainee detention file (guilty finding only)*

### Notice of IDP Hearing

*Original‑served on detainee*
*Copy‑detainee detention file*

### Detainee Rights at IDP Hearing
*Original‑served on detainee*
*Copy‑facility detention file*

### IDP Report

*Original‑detainee detention file*
*Copy‑detainee*

**K.**     **Confidential Information**

When a decision relies on information from a confidential informant, the UDC or IDP shall include in the hearing record the factual basis for finding the information reliable.

**L.**     **Notice to Detainees**

The detainee handbook, or equivalent, shall notify detainees of the following:

    1.    The disciplinary process.
    2.    The prohibited acts and disciplinary severity scale:
    3.    The procedure for appealing disciplinary findings.

# IV. AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED

American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3C-01, 3C-02, 3C-03, 3C-04, 3C-05, 3C-06, 3C-07, 3C-08, 3C-09, 3C-10, 3C-11, 3C-12, 3C-13, 3C-14, 3C-15, 3C-16, 3C-17, 3C-18, 3C-19, 3C-20, 3C-21, 3C-22

**Approval of Standard**

SEP 2 0 2000

_____
Michael D. Cronin
**Acting Executive Associate Commissioner**
**Office of Programs**

Date

SEP 2 0 2000

_____
Michael A. Pearson
**Executive Associate Commissioner**
**Office of Field Operations**

Date

**EXHIBIT 19**
**Page 0538**

Disciplinary Severity Scale and Prohibited Acts

# "GREATEST" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 100 | Killing | A. | Initiate criminal proceedings |
| 101 | Assaulting any person (includes sexual assault) | B. | Disciplinary transfer (recommend) |
| 102 | Escape from escort; escape from a secure facility | C. | Disciplinary segregation (up to 60 days) |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity, e.g., a riot or an escape; otherwise the charge is classified as Code 218 or 321) | D. | Make monetary restitution, if funds are available. |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device, or ammunition. | | |
| 105 | Rioting | | |
| 106 | Inciting others to riot | | |
| 107 | Hostage-taking | | |
| 108 | Assaulting a staff member or any law enforcement officer | | |
| 109 | Threatening a staff member or any law enforcement office with bodily harm. | | |
| *198 | Interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | | |
| *199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable. | | |

**EXHIBIT 19**
**Page 0539**

# "HIGH" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 200 | Escape from unescorted activities, open or secure facility, without violence | A. | Initiate criminal proceedings |
| 201 | Fighting, boxing, wrestling, sparring, and any other form of physical encounter, including horseplay, that causes or could cause injury to another person; except when part of an approved recreational or athletic activity | B. | Disciplinary transfer (recommend) |
| | | C. | Disciplinary segregation (up to 60 days) |
| 202 | Possession or introduction of an unauthorized tool | D. | Make monetary restitution, if funds are available |
| 203 | Loss, misplacement, or damage of any restricted tool | E. | Loss of privileges: commissary, movies, recreation, etc. |
| 204 | Threatening another with bodily harm | F. | Change housing |
| 205 | Extortion, blackmail, protection: demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm, or avoiding a threat being informed against | G. | Remove from program and/ or group activity |
| | | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| 206 | Engaging in sexual acts | J. | Confiscate contraband |
| 207 | Making sexual proposals or threats | K. | Restrict to housing unit |
| 208 | Wearing a disguise or mask | | |
| 209 | Tampering with or blocking any lock device | | |
| 210 | Adulteration of food or drink | | |

EXHIBIT 19
Page 0540

# "HIGH" OFFENSE CATEGORY, cont'd

| CODE | PROHIBITED ACTS | SANCTIONS |
|---|---|---|

**211**  Possession, introduction, or use of narcotics, narcotic paraphernalia, or drugs not prescribed for the individual by the medical staff

**A.**  Initiate criminal proceedings

**B.**  Disciplinary transfer (recommend)

**212**  Possessing an officer's or staff member's clothing

**213**  Engaging in or inciting a group demonstration

**C.**  Disciplinary segregation (up to 60 days)

**D.**  Make monetary restitution, if funds are available

**214**  Encouraging others to participate in a work stoppage or to refuse to work

**215**  Refusing to provide a urine sample or or otherwise cooperate in a drug test

**E.**  Loss of privileges: commissary, movies, recreation, etc.

**216**  Introducing alcohol into the facility

**F.**  Change housing

**217**  Giving or offering an official or staff member a bribe or anything of value

**G.**  Remove from program and/or group activity

**218**  Giving money to, or receiving money from, any person for an illegal or prohibited purpose, such as introducing/conveying contraband

**H.**  Loss of job

**I.**  Impound and store detainee's property

**219**  Destroying, altering, or damaging property (government or another person's) worth more than $100

**J.**  Confiscate contraband

**K.**  Restrict to housing unit

**220**  Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days

**EXHIBIT 19**
**Page 0541**

Disciplinary Severity Scale and Prohibited Acts

# "HIGH" OFFENSE CATEGORY, cont'd

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 221 | Signing, preparing, circulating, or soliciting support for prohibited group petitions | A. | Initiate criminal proceedings |
| 222 | Possessing or introducing an incendiary device, e.g., matches, a lighter, etc. | B. | Disciplinary segregation (recommend) |
| 223 | Any act that could endanger person(s) and/or property | C. | Disciplinary segregation |
| | | D. | Make monetary restitution, if funds are available |
| *298 | Interfering with a staff member in the performance of duties (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | E. | Loss of privileges, e.g., commissary, movies, recreation, etc. |
| | | F. | Change housing |
| | | G. | Remove from program and/or group activity |
| *299 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity). This charge is to be used only when no other charge of highest severity is applicable. | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |

*When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398 or 498) or conduct that disrupts (Code 199, 299, 399 or 499), the Disciplinary Committee should specify in its findings the severity-level of the conduct, citing a comparable offense in that category. For example, "We find the act of to be of high severity, most comparable to Code 213, "engaging in a group demonstration."

EXHIBIT 19
Page 0542

Disciplinary Severity Scale and Prohibited Acts

# "HIGH MODERATE" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 300 | Indecent exposure | A. | Initiate criminal proceedings |
| 301 | Stealing (theft) | B. | Disciplinary transfer (recommend) |
| 302 | Misuse of authorized medication | | |
| 303 | Loss, misplacement, or damage of a less restricted tool | C. | Disciplinary segregation (up to 72 hours) |
| 304 | Lending property or other item of value for profit/increased return | D. | Make monetary restitution |
| | | E. | Loss of privileges, e.g., vending machines, recreation, etc. |
| 305 | Possession of item(s) not authorized for receipt or retention; not issued through regular channels | F. | Change housing |
| 306 | Refusal to clean assigned living area | G. | Remove from program |
| 307 | Refusing to obey a staff member/ officer's order (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105--Rioting;  continuing to fight, Code 201--Fighting; refusing to provide a urine sample, Code 215 | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| 308 | Insolence toward a staff member | L. | Reprimand |
| 309 | Lying or providing false statement to staff | M. | Warning |

**EXHIBIT 19**
**Page 0543**

# "HIGH MODERATE" OFFENSE CATEGORY,

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 310 | Counterfeiting, forging, or other unauthorized reproduction of money or other official document or item, e.g. security document, identification card, etc. (may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction, e.g., counterfeiting release papers to effect escape--Code 102 or 200) | A. | Initiate criminal proceedings |
| | | B. | Disciplinary transfer (recommend) |
| | | C. | Disciplinary segregation (up to 72 hours) |
| 311 | Participating in an unauthorized meeting or gathering | D. | Make monetary restitution |
| 312 | Being in an unauthorized area | E. | Loss of privileges, e.g., vending machines, recreation, etc. |
| 313 | Failure to stand count | F. | Change housing |
| 314 | Interfering with count | G. | Remove from program and/or group activity |
| 315 | Making, possessing, or using intoxicant(s) | H. | Loss of job |
| 316 | Refusing a breathalyzer test or other test of alcohol consumption | I. | Impound and store detainee's personal property |
| 317 | Gambling | J. | Confiscate contraband |
| 318 | Preparing or conducting a gambling pool | K. | Restrict to housing unit |
| 319 | Possession of gambling paraphernalia | L. | Reprimand |
| 320 | Unauthorized contact with public. | M. | Warning |

**EXHIBIT 19**
**Page 0544**

Disciplinary Severity Scale and Prohibited Acts

# HIGH MODERATE" OFFENSE CATEGORY,

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|----------------|---|-----------|
| 321 | Giving money or another item of value to, or accepting money or another item of value from anyone, including another detainee, without staff authorization | A. | Initiate criminal proceedings |
| | | B. | Disciplinary transfer (recommend) |
| 322 | Destroying, altering, or damaging property (government or another person's) person's) worth more than $100 | C. | Disciplinary (up to 72 hours) |
| | | D. | Make monetary restitution |
| *398 | Interfering with a staff member in the performance of duties (offense must be of high moderate severity).  This charge is to be used only when no other charge in this category is applicable. | E. | Loss of privileges; vending machines, recreation, etc. |
| | | F. | Change housing |
| *399 | Conduct that disrupts or interferes with the security or orderly  running (offense must be of high moderate severity). This charge is to be used only when no other charge in this category is applicable. | G. | Remove from program and/or group activity |
| | | H. | Loss of job |
| | | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| | | L. | Reprimand |

NOTE:  Any combination of high moderate and low moderate offenses during a 90-day  period  shall  constitute  a  high offense.

**EXHIBIT 19**
**Page 0545**

Disciplinary Severity Scale and Prohibited Acts

# "LOW MODERATE" OFFENSE CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 400 | Possession of property belonging to another person | D. | Make monetary restitution |
| 401 | Possessing unauthorized clothing | E. | Loss of privileges, e.g., commissary, vending machines, recreation |
| 402 | Malingering, feigning illness | | |
| 403 | Smoking where prohibited | F. | Change housing |
| 404 | Using abusive or obscene language | G. | Remove from program and/or group activity |
| 405 | Tattooing, body piercing, or self-mutilation | H. | Loss of job |
| 406 | Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction) | I. | Impound, store detainee's personal property |
| 407 | Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction) | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| | | L. | Reprimand |
| 408 | Conducting a business | M. | Warning |
| 409 | Possession of money or currency, unless specifically authorized | | |
| 410 | Failure to follow safety or sanitation regulations | | |
| 411 | Unauthorized use of equipment or machinery | | |
| 412 | Using equipment or machinery contrary to posted safety standards | | |

**EXHIBIT 19**
**Page 0546**

Disciplinary Severity Scale and Prohibited Acts

# "LOW MODERATE" OFFENSE CATEGORY, cont'd

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 413 | Being unsanitary or untidy, failing to keep self and living area in accordance with posted standards | D. | Make monetary restitution |
| 498 | Interfering with a staff member in the performance of duties (offense must be of low moderate severity). This charge is to be used only when no other charge in this category is applicable. | E. | Loss of privileges. e.g., commissary, vending machines, recreation |
| | | F. | Change housing |
| | | G. | Remove from program and/or group activity |
| | | H. | Loss of job |
| *499 | Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity). This charge is to be used only when no other charge in this category is applicable. | I. | Impound and store detainee's personal property |
| | | J. | Confiscate contraband |
| | | K. | Restrict to housing unit |
| | | L. | Reprimand |
| | | M. | Warning |

**EXHIBIT 19**
**Page 0547**

**U.S. Department of Justice**
Immigration and Naturalization Service

# Incident of Prohibited Acts
# And Notice of Charges

Detainee Name:_____A-Number_____

Nationality:_____Date & Time of Incident:_____

Incident Location:_____Work Assignment:_____

Classification Level:_____Quarters:_____

**PROHIBITED ACTS:**

1._____Code:_____
2. _____Code:_____
3._____Code:_____
4._____Code:_____

Description of Incident:   _____

_____
_____
_____
_____
_____
_____
_____
_____
_____

Staff Witnesses?      Y      N                    Evidence Attached?   Y      N      NA

Supporting Memoranda            Y      N      NA

_____          _____          _____
Name of Reporting Officer              Date & Time                         Signature

Reviewed for accuracy prior to investigation by :_____     _____
                                                            Supervisor                    Date & Time

Incident Recorded on D.C.S.?            Y      N          Classification Level Change?   Y      N

Level change from _____To_____

Form No I-884 (02/08/00)

**EXHIBIT 19**
**Page 0548**

**U.S. Department of Justice**
Immigration and Naturalization Service

**Detainee Rights**

## Detainee Rights at The Institution Disciplinary Panel Hearing (IDP)

As a detainee charged with a prohibited act(s), you have been referred to the  Institution Disciplinary Panel for disposition. While at the IDP hearing, you have the following rights:

1.      The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the IDP.

2.      The right to have a full time member of staff who is reasonably available to assist you before the IDP.

3.      The right to call witnesses and present documentary evidence in your behalf, provided institutional safety would not be jeopardized.

4.      The right to remain silent.  Your silence may be used to draw an adverse inference against you.  However, your silence alone may not be used to support a finding that you committed a prohibited act.

5.      The right to be present throughout the IDP decision, except during committee deliberations and where institutional safety would be in jeopardy.

6.      The right to be advised of the IDP decision in writing and the facts supporting the panel's decision, except where institutional safety would be jeopardized.

7.      The right to appeal the decision of the IDP by means of the Detainee Grievance Procedure to the Officer in Charge, within 15 days of the notice of the panel's decision and disposition.

**I hereby acknowledge that I have been advised of the rights afforded me at the Institution Disciplinary Panel hearing.**

Signed:_____A-Number_____Date:_____

Notice of Rights given to the detainee by_____
<div align="right">Staff Member &  Date</div>

**Refusal to Sign**

I have personally advised_____of the rights afforded detainees at the Institution Disciplinary Panel hearing.  The detainee refused to sign the acknowledgment.

Staff member and date:_____

**Waiver of 24 hours Notice:**

I have been advised that I have at least a 24 hour notice prior to appearing before the IDP.  At this time, I wish to waive this right and proceed with the IDP hearing

Detainee Signature, Date and Time:_____

Form No.  I-892 (02/08/00)

**EXHIBIT 19**
**Page 0549**

**U.S. Department of Justice**
Immigration and Naturalization Service

# Investigation Report

_____     _____     _____
Name of Detainee                          A-Number                          Date of  Incident

_____     _____     _____     _____
Place of Incident                     Quarters                     Date/Investigation          Code(s)

Name of Investigating Officer :_____has advised _____
                                                                                                Detainee
that he/she has the right to remain silent at stages of the disciplinary process, but, that silence may be used to draw an adverse inference against him/her at any stage of the disciplinary process.  However, silence alone may not be used to support a finding that he/she committed a prohibited act.

Detainee Statement and Attitude During the Interview:_____

_____
_____
_____

Other Facts about the Incident:_____

_____
_____
_____

Investigator's Comments and Conclusions: _____

_____
_____
_____

Date and Time Investigation Began:_____

Date and Time Investigation Ended:_____


_____
Signature of Investigating Officer


_____
 Reviewed for Accuracy by: (SDEO/DOS)

Form I-890 (02/09/00)

EXHIBIT 19
Page 0550

**U.S. Department of Justice**
Immigration and Naturalization Service

**Unit Disciplinary Committee**
**Report of Findings & Actions**

_____          _____          _____
         Name of Detainee                              A-Number                              Date of Incident

Place of Incident:_____          Prohibited Act(s)Code:   _____

Committee Action: Comments to Committee from Detainee Regarding the above Incident: _____
_____
_____
_____
_____

It Is the Finding of the Unite Disciplinary Committee That:
     1.     You Committed the Prohibited Act as Charged: Code(s)   _____
     2.     You Committed the Following Prohibited Act : Codes(s)   _____
     3.     You Did Not Commit a Prohibited Act as Charged:   _____
Committee Findings Are Based on the Following Information:   _____
_____
_____
_____
_____

Committee Action:
[ ]     Waives IDP Hearing and Accepts the UDCs Sanction:   _____
                                                  Name of Detainee

[ ]     Refer to IDP          Date & Time:_____/_____
[ ]     Loss of Privileges      [ ] Loss of Job          [ ] Quarter Changes
[ ]     Restrict to Dorm       [ ] Remove from Program   [ ] Reprimand
[ ]     Warning             [ ] Confiscate Contraband  [ ] Impound Personal Property

Comments:_____
_____
_____
_____

UDC Chairpersons Signature:_____

UDC Member's Signature:_____

UDC Time and Date:_____/_____

Form I-891 (02/08/00)

**EXHIBIT 19**
**Page 0551**

**U.S. Department of Justice**
Immigration and Naturalization Service

**Notice of Institution
Disciplinary Panel Hearing**

_____          _____          _____
   Name of Detainee                          A-Number                              Date

Alleged Disciplinary Code Violation(s): _____

Date of Offense: _____

You are being referred to the Institution Disciplinary panel for the above mentioned charge(s).

The hearing will be held on_____, at_____(time) at the following location_____.

You are entitled to have a full time staff member represent you at the hearing.  Please indicate below if you desire to have a staff member assist you, and if so, his or her name.

I (do)_____ (do not)_____wish to have a staff representative.

If so, the staff representative's name is _____.

You also have the right to call witnesses at the hearing and to present documentary evidence in your behalf; provided, that calling your witnesses will not jeopardize facility security.  Names of witnesses you wish to call should be listed below.  State below what each proposed witness would be able to testify to:

Name:_____Can testify to : _____

_____

Name:_____Can testify to : _____

_____

Name:_____Can testify to : _____

_____

The chairperson of the Institution Disciplinary Panel will call those listed above as witnesses (staff or detainee) who are reasonably available, and who are determined by the chairperson to be necessary for an appreciation of all of the circumstances surround the charge(s).  Repetitive witnesses need not be called.  Unavailable witnesses may be asked to submit written statements.  If additional space is required, use the reverse side of the form.

Form I-893 (02/08/00)

**EXHIBIT 19
Page 0552**

**U.S. Department of Justice**
Immigration and Naturalization Service

**Institution Disciplinary Panel Report**

Name of Detainee:_____ A-Number:_____

Date of Incident:_____Code(s)_____

I.     Notice of Charge(s):

    A.    Advance written notice of charge(s) (copy of Incident Report) was given to the detainee on
        _____at_____.
                date             time

    B.    The IDP hearing was held on _____at_____
                                    date                      time

    C.    The detainee was advised of his/her rights before this IDP by _____
                                                     officer
        on_____and a copy of the advisement of rights form is attached.

II     Staff Representative:

    A.    Detainee waived his/her right to staff representative: _____

    B.    Detainee requested staff representative and _____ appeared.
                                              staff representative

    C.    Requested staff representative declined or could not appear but detainee was advised of option to
        postpone hearing to obtain an alternative staff representative with the result: _____

III.   Presentation of Evidence:

    A.    Detainee has been advised of his/her right to present a statement or to remain silent, to present
        documents, including written statements of unavailable witnesses, and for relevant and material
        witnesses to appear on his/her behalf.

    B.    Summary of detainee's statement: _____
        _____
        _____
        _____
        _____

    C.    Witnesses:

        1.    The following persons were called as witnesses at this hearing and appeared: _____
            _____

        2.    A summary of testimony of each witness is attached

        3.    The following persons requested were not called for the reason(s) given _____
            _____

        4.    Unavailable witnesses were requested to submit written statements and those statements
            received were considered (statements attached)

        5.    Documentary evidence: In addition to the incident report and investigation, the panel
            considered the following documents: _____
            _____
            _____

        6.    Confidential information was considered by the IDP and was not provided to the detainee
            on _____.
                date

**EXHIBIT 19**

IV.    Findings:

_____a.  The Act Was Committed as Charged
_____B.  The Following Act Was Committed:_____
_____C.  No Prohibited Act Was Committed.

V.    Specific Evidence Relied on to Support Findings:

_____

_____

_____

VI.    Sanctions or Action Taken:    Offense Severity:

_____

_____

_____

VII.    Reason for Sanction or Action Taken:

_____

_____

_____

_____        _____        _____
Chairperson                    Member                         Member

VIII.    Review and Concur:

A.        Concur with findings:    _____
B.        Proceedings terminated:_____
C.        Discipline Imposed:_____

Signature_____Date:_____Time:_____
                Officer in Charge

Copy delivered to detainee by:_____ on_____
                                              signature and title                               date

Form I-894 (02/08/00)

**EXHIBIT 19**
**Page 0554**

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

**Policy**:   All facilities housing INS detainees are authorized to impose discipline on detainees whose behavior is not in compliance with facility rules and regulations.

| DISCIPLINARY POLICY | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 1. Does the facility have a disciplinary system? If so, does it have:<br>a. Progressive levels of reviews?<br>b. Appeals?<br>c. Procedures, including documentary procedures? | | | |
| 2. Do the facility rules state that disciplinary action shall not be capricious or retaliatory? | | | |
| 3. Do rules prohibit staff from imposing or permitting the following sanctions:<br>a. corporal punishment<br>b. deviations from normal food service<br>c. clothing deprivation<br>d. bedding deprivation<br>e. denial of personal hygiene items<br>f. loss of correspondence privileges<br>g. deprivation of physical exercise? | | | |
| 4. Are the rules of conduct, sanctions, and procedures for violations defined in writing and communicated to all detainees?<br>a. How? | | | |
| 5. Are the following conspicuously posted in Spanish and English or other languages?<br>a. Rights and Responsibilities?<br>b. Prohibited Acts?<br>c. Disciplinary Severity Scale?<br>d. Sanctions?<br>e. If so, where posted? | | | |
| 6. When minor rule violations or prohibited acts occur, are informal resolutions encouraged? | | | |

**EXHIBIT 19**
**Page 0555**


| DISCIPLINARY POLICY | | | |
|---|---|---|---|
| Components | Yes | No | Remarks |
| 7. If informal resolutions are not appropriate, are incident reports and Notice of Charges promptly forwarded to the INS/CDF supervisor? | | | |
| 8. Are incident reports investigated within 24 hrs of the incident report?<br>a. Does the Unit Disciplinary Committee (UDC) or equivalent convene before investigations have ended? | | | |
| 9. Is an intermediate disciplinary process used to adjudicate minor infractions? | | | |
| 10. Does a disciplinary panel adjudicate infractions? If so does the panel:<br>a. Conduct hearings on all charges and allegations referred by the UDC?<br>b. Consider written reports, statements, physical evidence, and oral testimony?<br>c. Hear pleadings by detainee and staff representative?<br>d. Base its findings on the preponderance of evidence?<br>e. Impose authorized sanctions? | | | |
| 11. Is a staff representative available, if requested for a detainee facing a disciplinary hearing? | | | |
| 12. Does the facility permit hearing postponements or continuances?<br>a. Under specified conditions?<br>b. Which? | | | |
| 13. Does the duration of punishment set by the OIC/recommended by the disciplinary panel ever exceed established sanctions?<br>a. Does the maximum time in segregation after the exceed 60 days? | | | |

**EXHIBIT 19**
**Page 0556**

| DISCIPLINARY POLICY | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 14. Do written procedures govern the handling of confidential-informant information?<br>    a.   Do standards include criteria for recognizing "substantial evidence"? | | | |
| 15. Are forms relevant to the incident, investigation, committee/panel reports, etc., completed and distributed as required? | | | |

**EXHIBIT 19**
**Page 0557**

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

| DISCIPLINARY POLICY |
|:---:|

**Verification Sources:**

**The following may serve as sources of information for auditors verifying the facilities compliance with this detention standard:**

| SOURCE | TIME | DATE | LOCATION |
|---|---|---|---|
| A. Observing posted notices of rights | | | |
| B. Observing disciplinary hearings | | | |
| C. Review of written disciplinary actions | | | |
| D. Facility's written policy and procedures | | | |
| E. Detainee and staff interviews | | | |

Facilities must complete the attached Plan of Action for bringing operations into compliance. For each element found out of compliance, the plan of action will specify remedial action and the estimated timetable for compliance.

**Remarks:** *(Record significant facts, observations, other sources used, etc.)*

_____
Auditors Signature


_____
Date

**EXHIBIT 19**
**Page 0558**

## INS DETENTION STANDARD

### ENVIRONMENTAL HEALTH AND SAFETY

**I.      POLICY**

Each facility will establish a hazardous materials program for the control, handling, storage, and use of flammable, toxic, and caustic materials.  This will protect detainees, staff, and visitors, preventing breaches in safety and security.  Among other things, the facility will include the identification and labeling of hazardous materials in accordance with applicable regulations, standards and codes (Occupational Safety and Health Administration (OSHA), National Fire Protection Association, etc.); will provide warnings of incompatible materials, etc.

**II.     APPLICABILITY**

The standards provided in this Detention Standard will apply to the following facilities housing INS detainees:

1.   Service Processing Centers (SPCs);

2.   Contract Detention Facilities (CDFs); and

3.   State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics.  IGSA facilities may find such procedures useful as guidelines.  IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

**III.    STANDARDS AND PROCEDURES**

Every facility will establish a system for storing, issuing, and maintaining inventories of and accountability for hazardous materials.  Adopting such a system may require changes in facility storage methods, inventory maintenance, and recordkeeping.  The system's effectiveness will depend on staff and detainees following instructions precisely and taking prescribed precautions, including using safety equipment.

**A.      Inventories**

Every area will maintain a running inventory of the hazardous (flammable, toxic, or caustic) substances used and stored in that area.  Inventory records will be maintained separately for

---

*Environmental Health and Safety*                                                          *September 20, 2000*

**EXHIBIT 19**
**Page 0559**

each substance, with entries for each logged on a separate card (or equivalent). That is, the account keeping will not be chronological, but filed alphabetically, by substance (dates, quantities, etc.).

**B.** **Material Safety Data Sheets (MSDSs); Files**

Every area using hazardous substances will maintain a self-contained file of the corresponding Material Safety Data Sheets (MSDSs). The MSDSs provide vital information on individual hazardous substances, including instructions on safe handling, storage, and disposal, prohibited interactions, etc. Staff and detainees will have ready and continuous access to the MSDSs for the substances with which they are working while in the work area.

Because changes in MSDSs occur often and without broad notice, staff must review the latest issuance from the manufacturers of the relevant substances, updating the MSDS files as necessary.

The MSDS file in each area should include a list of all areas where hazardous substances are stored, along with a plant diagram and legend. Staff will provide a copy of this information and all MSDSs contained in the file, forwarding updates upon receipt, to the Maintenance Supervisor or designate.

**C.** **Master Index**

The Maintenance Supervisor or designate will compile a master index of all hazardous substances in the facility, including locations, along with a master file of MSDSs. He/she will maintain this information in the safety office (or equivalent), with a copy to the local fire department. Documentation of the semi-annual reviews will be maintained in the MSDS master file.

The master index will also include a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

**D.** **Personal Responsibility**

Every individual using a hazardous substance in the facility must be familiar with and follow all prescribed precautions, wear personal protective equipment when necessary, and report hazards or spills to the designated authority.

**E.** **General Guidelines**

1. Issuance: Flammable, caustic, and toxic substances (hazardous substances) will be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

2. Amounts: A hazardous substances will be issued in single-day increments, i.e., the amount needed for one day's work.

3.      Supervision: Qualified staff will closely monitor detainees working with hazardous substances.

4.      Accountability:  Inventory records for a hazardous substance must be kept current before, during, and after each use.

F.      **Specific Guidelines for Storage, Use, and Disposal of Flammable and Combustible Liquids**

1.      Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label, in accordance with the Federal Hazardous Substances Labeling Act, to protect both life and property.

2.      Lighting fixtures and electrical equipment installed in flammable-liquid storage rooms must meet National Electrical Code requirements for same in hazardous locations.

3.      Every hazardous-material storage room will:

   a.      Be of fire-resistant construction and properly secured;

   b.      Have self-closing fire doors at each opening;

   c.      Be constructed with either a four-inch sill or a four-inch depressed floor; and

   d.      Have a ventilation system (mechanical or gravity flow) within 12 inches of the floor, which provides at least six air changes per hour.

4.      Every storage cabinet will:

   a.      Be constructed according to code and securely locked at all times;

   b.      Stand clear of open passageways, stairways, and other emergency exit areas;

   c.      Be conspicuously labeled: "Flammable−Keep Fire Away"; and

   d.      Contain either 60 gallons, maximum, of Class I and/or Class II liquids or 120 gallons, maximum, of Class III liquids.

5.      Storage rooms and cabinets cannot be entered except under secure conditions, under the supervision of authorized staff.

6.      A portable container that is not the original shipping containers must be an approved safety can, listed or labeled by a nationally recognized testing laboratory.  Each will bear a legible label that identifies its contents.

7.       Excess liquids will remain in original containers, tightly closed, in the storage room or cabinet.

---

8.      The MSDS will govern use of a particular flammable or combustible liquid.

9.      Only authorized staff will dispense flammable and combustible liquids dispensed only by an authorized staff member, using acceptable methods for drawing from or transferring these liquids.

Drawing from or transferring any of these liquids into containers indoors is prohibited unless:

a.      Through a closed piping system;
b.      From a safety can;
c.      By a device drawing through the top; or
d.      By gravity, through an approved self-closing system.

An approved grounding and bonding system must be used when liquids are dispensed from drums.

10.     Without exception, cleaning liquids must have a flash point at or above 100° F (e.g., Stoddard solvents, kerosene).  Cleaning operations must be in an approved parts-cleaner or dip tank fitted with a fusible link lid with a 160° F melting-temperature link.

11.     Staff will follow MSDS directions in disposing of excess flammable or combustible liquids.

12.     Likewise, staff will follow the method provided in the MSDS in case of a chemical spill.

## G.      Toxic and Caustic Substances

1.      All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

2.      Authorized staff only will draw/dispense these substances, in accordance with the. applicable Material Safety Data Sheet(s).

3.      Staff will either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container n the storage area..

4.      MSDS directions will determine the disposal and spill procedures for toxic and caustic materials used in the facility.

## H.      Poisonous Substances

1.      Poisonous substances or chemicals pose a very high (Class I) caustic hazard due to their toxicity, e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda, tannic acid, etc.

---

**EXHIBIT 19**
**Page 0562**

2.   Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems). If ingested, methyl alcohol can cause permanent blindness or death.

3.   Staff must directly supervise the use of any product containing methyl alcohol. Products containing methyl alcohol in a diluted state, such as shoe dye, may be issued to detainees, but only in the smallest workable quantities.

4.   Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

**I.   Other Toxic Substances**

1.   Permanent antifreeze containing ethylene glycol will be stored in a locked area and dispensed only by authorized staff.

2.   Typewriter cleaner containing carbon tetrachloride or tricholorochane will be dispensed in small quantities and used under direct supervision by staff.

3.   Cleaning fluids containing carbon tetrachloride or tetrachloride or tricholoroethylene must be strictly controlled.

4.   Glues of every type may contain hazardous chemicals.  When use of a nontoxic product is not possible, staff must closely supervise all stages of handling. The toxic glues must be stored in a locked location.

5.   The use of dyes and cements for leather requires close supervision.  Nonflammable types will be used whenever possible.

6.   Ethyl alcohol, isopropyl alcohol, and other antiseptic products will be stored and used in the medical department only, under close supervision.  To the extent practicable, such chemicals will be diluted and issued only in small quantities so as to prevent any injuries or lethal accumulation.

7.   Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoracetate), are prohibited.  The Maintenance Supervisor or designate is responsible for purchasing, storing (in a locked area), and dispensing all the pesticides used in the facility.

8.   The Maintenance Supervisor or designate or other staff member responsible for herbicides must hold a current state license as a Certified Private Applicator.  Persons applying herbicides must wear proper clothing and protective gear.

9.   Lyes may be used only in dye solutions and only under the direct supervision of staff.

**EXHIBIT 19**
**Page 0563**

**J.**   **Labeling of Chemicals, Solvents, and Other Hazardous Materials**

The OIC will individually assign the following responsibilities associated with the labeling procedure:

1.   Identifying the hazardous nature of materials adopted for use;

2.   Requiring use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer the material;

3.   Teaching staff the meaning of the classification code and the MSDS, including the safe handling procedures for each material,; and impressing on staff the need to ensure containers are properly labeled; and

4.   Placing correct labels on all smaller containers when only the larger shipping container bears the manufacturer-affixed label;

**K.**   **Controlled Hazardous Materials**

Certain substances require special treatment, including careful planning before use, which goes beyond attention to the warning label.  These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

**Class I: Industrial Solvents.** Includes industrial solvents and chemicals used as paint thinners, degreasers, and cleaning agents that may have toxic properties and low flash points, making them dangerous fire hazards.

**Class II: Restricted Materials.** Beryllium, its alloys and compounds, and silver solder containing cadmium pose a danger to workers, for whom special precautions must be taken.

**Class III: Recognized Carcinogens.**  OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.  Although asbestos appears on the OSHA list, it is exempt from the regulation under the following circumstances:  (i) when no asbestos fibers will be released into the air during handling and use; and (ii) when the asbestos in question consists of firmly bound asbestos fibers contained in a product, e.g., a transit pipe, wallboard, or tile, except when being sawed or otherwise handled in a way that releases fibers into the air.

**Class IV: Suspected Carcinogenic, Teratogenic, and Mutagenic Materials**: Chemical agents, substances, mixtures, and exposures listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act; the Maintenance Supervisor or designate will ensure the facility has and complies with the provisions of the latest edition.

**EXHIBIT 19**
**Page 0564**

**L.**     **FIRE PREVENTION AND CONTROL**

  **1.**     **Fire Safety Codes**

Every facility will comply with standards and regulations issued by the Environmental Protection Agency (EPA) and OSHA, the American Correctional Association's "mandatory" standards, local and national fire safety codes, and the applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations, and renovations, will comply with the latest revision or update of the BOCA National Building Code (issued by Building Officials and Code Administrators International); the Uniform Building Code, or the Standard Building Code, in accordance with 40 USC Title 619 and local law.  If the local government does not mandate adherence to a particular code, the construction must conform to the BOCA National Building Code.

In addition, the construction will comply with the latest edition of the National Fire Protection Association's *NFPA 101, Life Safety Code* and *National Fire Codes*.  If the fire protection and life safety requirements of a building code differ from the *NFPA 101* or the *National Fire Codes*, the requirements of NFPA 101 and the NFCs will take precedence, recognized as equivalent to the specifications of any local building code.

  **2.**     **Inspections**

A qualified departmental staff member will conduct weekly fire and safety Inspections; the maintenance (safety) staff will conduct monthly inspections.  Written reports of the inspections will be forwarded to the OIC for review and, if necessary, corrective action determinations. The Maintenance Supervisor or designate will maintain inspection reports and records of corrective action in the safety office.

  **3.**     **Fire Prevention, Control, and Evacuation Plan**

Every institution will develop a fire prevention, control, and evacuation plan to include, among other thing, the following:

a.        Control of ignition sources;

b.        Control of combustible and flammable fuel load sources;

c.        Provisions for occupant protection from fire and smoke;

d.        Inspection, testing, and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

**EXHIBIT 19**
**Page 0565**

  e.  Monthly fire inspections;

  f.  Installing fire protection equipment throughout the facility, in accordance with *NFPA 10, Standard for Portable Fire Extinguishers*;

  g.  Accessible, current floor plans (buildings and rooms); prominently posted evacuation maps/plans; exit signs and directional arrows for traffic flow; with a copy of each revision filed with the local fire department;

  h.  Conspicuously posted exit diagram conspicuously posted for and in each area.

**4.**  <u>**Fire Drills**</u>

Monthly fire drills will be conducted and documented separately in each department.

  a.  Fire drills in housing units, medical clinics, and other areas occupied or staffed during non-working hours will be timed so that employees on each shift participate in an annual drill.

  b.  Detainees will be evacuated during fire drills, except in areas where security would be jeopardized or in medical areas where patient health could be jeopardized or, in individual cases when evacuation of patients is logistically not feasible. Staff- simulated drills will take place instead in the areas where detainees are not evacuated.

  c.  Emergency-key drills will be included in each fire drill, and timed. Emergency keys will be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors.

**5.**  <u>**Exit Diagram**</u>

In addition to a general area diagram, the following information must be provided on existing signs:

  a.  English and Spanish instructions;

  b.  "You Are Here" markers;

  c.  Emergency equipment locations.

New signs and sign replacements will also identify and explain "Areas of Safe Refuge."

**EXHIBIT 19**
**Page 0566**

**M.**     **Pests and Vermin**

The OIC will contract with licensed pest-control professionals to perform monthly inspections.  During these routine inspections, they will identify and eradicate rodents, insects, and vermin.  The contract will include a preventative spraying program for indigenous insects.

**N.**     **Certification of Facility Water Supply**

A state laboratory will test samples of drinking and wastewater to ensure compliance with applicable standards.

**O.**     **Emergency Electrical Power Generator**

Power generators will be tested at least every two weeks.  Other emergency equipment and systems will undergo quarterly testing, with follow-up repairs or replacement as necessary.

The biweekly test of the emergency electrical generator will last one hour.  During that time, the oil, water, hoses and belts will be inspected for mechanical readiness to perform in an emergency situation.  The emergency generator will also receive quarterly testing and servicing from an external generator-service company.  Among other things, the technicians will check starting battery voltage, generator voltage and amperage output.

**P.**     **Guidelines for Specific Areas of the Facility; Barber Operations**

Sanitation of barber operations is of the utmost concern because of the possible transfer of diseases through direct contact or by towels, combs and clippers.  Towels must not be reused after use on one person.  Instruments such as combs and clippers will not be used successively on detainees without proper cleaning and disinfecting.  The following standards will be adhered to:

1.     The operation will be located in a separate room not used for any other purpose.  The floor will be smooth, nonabsorbent and easily cleaned.  Walls and ceiling will be in good repair and painted a light color.  Artificial lighting of at least 50-foot candles will be provided.  Mechanical ventilation of 5 air changes per hour will be provided if there are no operable windows to provide fresh air.  At least one lavatory will be provided.  Both hot and cold water will be available, and the hot water will be capable of maintaining a constant flow of water between 105 degrees and 120 degrees.

2.     Each barbershop will be provided with all equipment and facilities necessary for maintaining sanitary procedures of hair care.  Each shop will be provided with appropriate cabinets, covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

**EXHIBIT 19**
**Page 0567**

3.    Between detainees, all hair care tools coming in contact with the detainees will be cleaned and effectively disinfected.  Hair care tools come into intimate contact with the detainees' scalp and skin, and when reused without disinfection, provide excellent means for transfer of ringworm or other skin and scalp diseases.  Clippers may be treated for pathogenic organisms and fungi by an approved bactericidal and fungicidal process.  Ultraviolet lights may only be used for maintaining tools after sterilization.

4.    Each barbershop will have detailed hair care sanitation regulations posted in a conspicuous location for the use of all hair care personnel and detainees

   a.    All scissors, combs or other tools (except clippers) will be thoroughly washed with soap and hot water to remove film and debris and effectively disinfected immediately after use on each detainee and before being used for the service of any other detainee.

   b.    After cleaning, the clipper blades will be immersed in the disinfectant solution and agitated for a period of not less than 15 seconds before use on any other detainee.  The solution will be replaced as often as necessary.

   c.    No hair care specialist will use for the service of a detainee any headrest cover, neck strap, towel, or washcloth that has been used for any other detainee, unless the same will have been properly laundered since its last use.

   d.    Clean hair cloths may be reused; however, when a hair cloth is used in servicing a detainee, a neck strip, a freshly laundered towel, or other suitable protection will be placed between the hair cloth and the neck of the detainee.  Soiled or unclean hair clothes may not be used.

   e.    Cotton pads, absorbent cotton and other single or dispensable toilette articles may not be reused, and will be placed in a proper waste receptacle immediately after use.

   f.    The common use of brushes, neck duster, shaving mugs and shaving brushes will be prohibited.

   g.    The making of shaving lather in a wash basin or lavatory for use in serving a detainee is prohibited.

   h.    The use of powder puffs, sponges, lump alum, styptic pencils, and similar items is prohibited.

   I.    The removal or treatment of blackheads, carbuncles, infected hairs, or any sores or lesions is prohibited.

j.     The pulling of hair from ears, nostrils, eyebrows, and moustaches is prohibited.

k.     No barber or beautician will serve any detainee when the skin of the detainee's face, neck, or scalp is inflamed, scaling, contains pus, or is erupted, unless service of such detainee is performed in accordance with the specific authorization of the Chief Medical Officer.

i.     No person will be served when infested with head lice.

**Q.     Guidelines for Specific Areas of the Facility, Medical Operations**

An established uniform procedure will be provided for the safe handling and disposal of used needles and other potentially sharp objects to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, especially the hepatitis B virus (HBV) and the human immunodeficiency virus (HIV).

A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.  Accidental injuries from sharp objects (sharps) are common in health care programs, mostly from needle sticks caused by attempting to recap hypodermic needles.

Sharps will be defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation.  Items included under this policy are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges, lancets.  The following procedures will be observed when handling and disposing of needles and other hazardous sharp items.

**1.     Inventory**

An inventory will be kept of those items that pose a security risk, such as sharp instruments, syringes, needles, and scissors.  This inventory will be checked weekly by an individual designated by the medical facility Health Service Administrator (HSA) or equivalent.

**2.     Handling**

Without removing the needles or replacing the needle covers, staff will place used (disposable) syringes in a plastic disposal box or container.

**a.     Disposal Containers**

Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health.  An example of an approved brand is "Winfield Sharps Container."  Do not use milk cartons or plastic milk jugs as they have been found to puncture easily.

**EXHIBIT 19**
**Page 0569**

Likewise do not use other plastic containers of similar thickness.

Containers will be of approximately two-gallon capacity in order to be of sufficient size to receive various types of sharps.  Under no circumstances will an item be removed from the container.

**b.**     <u>**Location**</u>

Containers will be located on top of counters or, if on the wall, at least five feet above ground.  Containers will not sit on the floor.

**c.**     <u>**Disposal**</u>

When the disposal box is ½ to 2/3 full, the lid will be closed and locked, tape will be placed over the top of the lid to indicate that it is ready for disposal. The container will be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.  Sharps will be considered as infectious waste and final disposal of the container and contents will be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA will make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations.  Arrangements will be made with local hospitals, if possible, for disposal with the hospitals' own infectious waste.

**3.**     <u>**Accidental Needle Sticks**</u>

Should an individual receive a needle stick or be cut while handling potentially contaminated sharps, the individual will be counseled regarding baseline testing for HBV and HIV and referred to their usual source of health care.  If the injury also involves a person who is a known source of possible infection, that person will also be tested for HBV and HIV.  The incident will be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan will be followed in the event of a needle stick.

**EXHIBIT 19**
**Page 0570**

**R.**     **General Environmental Health Guidelines**

1.     Environmental health conditions will be maintained at a level that meets recognized standards of hygiene. The standards include those from the American Correctional Association, the Occupational Safety and Health Administration, the Environmental Protection Agency, the Food and Drug Administration, the National Fire Protection Association's Life Safety Code, and the National Center for Disease Control and Prevention.

The INS HSD or IGSA equivalent activities are designed to assist in the identification and correction of conditions that could adversely impact the health of detainees, employees, and visitors.  The INS sanitarian consultant is responsible for developing and implementing policies, procedures, and guidelines pertaining to activities of the environmental health program.  These elements are intended to evaluate, and eliminate or control as necessary, both sources and modes of transmission of agents or vectors of communicable disease and of injuries.

The sanitation consultant will conduct special investigations and comprehensive surveys of environmental health conditions.  Advisory, consultative, inspection and training services regarding environmental health conditions will also be provided through the sanitarian consultant.

The medical facility HSA is responsible for implementing a program that will assist in maintaining a high level of environmental sanitation.  In consultation with the sanitarian consultant, they will provide recommendations to the INS OIC concerning environmental health conditions.

**2.**     **Housekeeping**

The key to the prevention and control of nosocomial infections due to contaminated environmental surfaces is environmental cleanliness.  Responsibility for ensuring the cleanliness of the medical facility lies with the HSA or with an individual designated by the HSA or other health care provider utilized.  The HSA or designee will make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, and equipment.

Methods of cleaning; cleaning equipment; cleansers; disinfectants and detergents to be used; plus, the frequency of cleaning and inspections will be established using an acceptable health agency standard as the model.

Proper housekeeping procedures include the cleaning of surfaces touched by detainees or staff with fresh solutions of appropriate disinfectant products, applied with clean cloths, mops, or wipes.  Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk.  Floors, walls, beds, tables, and other surfaces that usually come in contact with intact skin require low-level disinfection.

**EXHIBIT 19**
**Page 0571**

Since these surfaces are rarely associated with the transmission of infections to patients or personnel, extraordinary attempts to disinfect or sterilize these surfaces are not indicated.

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur and in short-stay units when a detainee is discharged. Cleaning of walls, blinds, or curtains is indicated only when visibly soiled. The Chief Nurse is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

**a.   General Cleaning Procedures**

    1.   All horizontal surfaces will be damp-dusted daily with an approved germicidal solution.

    2.   Windows, window frames, and windowsills will be cleaned on a regular schedule, but do not require daily cleaning.

    3.   Furniture and fixtures will be cleaned daily.

    4.   Floors will be mopped daily and when soiled using the double-bucket mopping technique, and with a hospital disinfectant-detergent solution mixed according to the manufacturers directions. A clean mop head will be used each time the floors are mopped.

    5.   Waste containers will be lined with plastic bags and the liner will be changed daily. The container itself will be washed at least weekly, or as needed when it becomes soiled.

    6.   Cubicle curtains will be laundered monthly or during terminal cleaning following treatment of an infectious patient.

**b.   Procedures for Isolation Cleaning**

    1.   An approved germicidal detergent solution will be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

    2.   After cleaning the isolation room, mops and cleaning cloths will be laundered before being reused.

    3.   Dirty water and used disinfecting solutions will be discarded and the buckets and basins disinfected before being refilled. Items used in cleaning an isolation (contaminated) room will never be taken into another area.

4.    Linens will be carefully removed from the bed and double bagged for transport.

5.    All waste materials will be double bagged and disposed of as contaminated waste.

**c.    <u>Procedures for Terminal Cleaning</u>**

1.    Every item in the room must be cleaned with an approved hospital germicidal solution.

2.    When applicable, linen will be stripped from the bed, with care taken not to shake linen.  Linen will be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

3.    When applicable, all reusable receptacles such as drainage bottles, urinals, bedpans, water pitchers will be emptied and rinsed with germicidal solutions.

4.    All equipment that is not to be discarded, such as IV poles, respirators and suction machines, will be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

5.    When applicable, mattresses and pillows covered with durable plastic covers will be thoroughly washed with the approved germicidal solution.

6.    When applicable, beds will be washed thoroughly using a small brush soaked in the germicidal solution to gain access to small holes and crevices, to areas between the springs, and the casters.

7.    All furniture will be washed with a germicidal detergent solution.  Use a small brush if necessary.  Outside and underside as well as legs and casters must also be washed.

8.    Wastebaskets will be thoroughly washed with a germicidal solution after trash has been removed.

9.    Telephones will be thoroughly cleaned with a clean cloth soaked in the germicidal solution.  The earpiece and mouthpiece will be unscrewed, scrubbed, dried and replaced.

10.    Walls and ceilings need not be washed entirely, but areas that are obviously soiled will be washed with germicidal solution.

**d.      Choice of Disinfecting Materials**

Hospital grade disinfectant-detergent formulations registered by the Environmental Protection Agency may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is probably as important as any antimicrobial effect of the cleaning agent used.

Therefore cost, safety, and acceptance by staff can be the criteria for selecting any such registered agent. *The manufacturer's instructions for use will be followed exactly.*

**3.      Blood and Body Fluid Clean-up**

Spills of blood and body fluids will be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV. A suitable cleanup kit will be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources, or kits may be put together by INS HSD staff or leading health care provider.

**a.      Making a Clean-up Kit**

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear" Ziplock" bag.

Gloves, rubber or vinyl, household type, (2 pair)

Clean absorbent rags (4)

Absorbent paper towels (15)

Disposable bag marked "Contaminated" size 23"x10"x39", minimum thickness 1.5 mils.

Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.

Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25 % sodium hypochlorite).

**b.      Selection of Disinfectants**

Quaternary disinfectants are less effective against Hepatitis B, while dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus, and therefore have been recommended for use in environmental decontamination procedures rather than quaternary

**EXHIBIT 19**
**Page 0574**

ammonium compounds. Chlorine in solution inactivates virus quickly and efficiently, but must reach the virus particles to do so. Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles. Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, their use may help in the cleaning and removal of proteinaceous materials from surfaces. A facility may wish to use one of these compounds to help clean the surface, then follow with the use of chlorine solution for final disinfection. Using one disinfectant compound rather than two would keep the procedure as simple as possible. By following the mechanical procedure listed in the article, most blood or fluids would be removed from the surface before application of the disinfectant, so the use of sodium hypochlorite solution will be sufficient.

**c.** **Selection of Gloves**

Household or industrial rubber gloves have been recommended for use rather than surgical rubber gloves. Surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during cleanup procedures.

**d.** **Use of Detainees as Housekeeping Workers**

Detainee workers may be used to assist in cleaning the medical facility. Detainees will be allowed to clean floors, walls, and to remove trash, but will not be allowed to clean medical equipment.

**4.** **Instructions for Use of Clean-Up Kit**

a.    Obtain a Cleanup Kit.
b.    Open the bag.
c.    Remove supplies.
d.    Depending on the type of disinfectant you have included in your kit, take out bottle of "hospital disinfectant", or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25 % sodium hypochlorite (common household bleach) with 10 parts water.
e.    Open the large clear plastic bag and the large bag marked "Contaminated". Place them next to each other.
f.    Put on one pair of gloves.
g.    Use paper towels to absorb as much of the fluid as possible; then place paper towels in the large clear plastic bag.
h.    Pour solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.
I.    Use the rags to clean the area. Place rags in the large clear plastic bag.
j.    Tie off the clear plastic bag and place inside the large plastic bag marked "Contaminated".
k.    Remove gloves carefully and place in the plastic bag marked "Contaminated".

l.    Put on the second pair of gloves and tie the "Contaminated" trash bag closed.
m.    Dispose of the "Contaminated" trash bag properly in a contaminated-waste receptacle.
n.    Dispose of the second pair of gloves in the contaminated-waste receptacle.
o.    Wash your hands.
p.    Prepare a new clean-up kit.

NOTE:  Do not place linen or non-disposable articles in the "Contaminated" trash bag.

**5.**    **Hazardous and Infectious Waste Disposal**

Infectious and hazardous waste generated at a medical facility will be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal some special precautions appear prudent.

**a.**    **Definitions**

Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps (all discarded items derived from patient care in medical facilities which could potentially transmit disease via direct subdermal inoculation or present a risk of injury & skin penetration); laboratory and other chemicals; certain drugs such as neoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste.  Such waste includes bandages, dressings, casts, catheters, and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

**b.**    **Collection and Storage**

Infectious waste must be separated from the general waste stream and clearly labeled as infectious.  Infectious waste will be double-bagged and tied and marked with a label reading "Infectious Waste".   The bags must be impermeable, commercially supplied red bags, sold specifically for biohazardous waste storage. Miscellaneous biomedical waste will be double-bagged and tied, but need not be labeled as infectious.

**EXHIBIT 19**
**Page 0576**

    **c.**   **Treatment and Disposal**

Blood products and designated body fluids will be poured slowly and carefully down the toilet to prevent splash.  Compacting of untreated infectious waste is prohibited.  The waste disposal contractor must meet all state or and local requirements for transportation and disposal.

**S.**   **Universal Precautions**

1.   Staff will routinely take precautions to prevent contact with blood or other body fluids, using these guidelines:

   a.   Gloves will be worn for touching blood and body fluids, mucous membranes, or non-intact skin of all patients, for handling items or surfaces soiled with blood or body fluids, and for performing venipuncture and other vascular access procedures.  Gloves will be changed after contact with each detainee.

   b.   Masks and protective eye wear or face shields will be worn during procedures that are likely to generate droplets of blood or other body fluids, to prevent exposure of mucous membranes of the mouth nose or eyes.

   c.   Gowns or aprons will be worn during procedures that are likely to generate splashes of blood or other body fluids.

   d.   Hands and other skin surfaces will be washed immediately and thoroughly if contaminated with blood or other body fluids.  Hands will be washed immediately after gloves are removed.

   e.   All health-care workers will take precautions to prevent injuries caused by needles, scalpels, and other sharp instruments or devices during procedures; when cleaning used instruments; during disposal of used needles; and when handling sharp instruments after procedures.

   f.   To prevent needle stick injuries, needles will not be recapped, purposely bent or broken by hand, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades, and other sharp items will be placed in puncture-resistant containers for disposal.

   g.   Large-bore reusable needles will be placed in a puncture resistant container for transport to the reprocessing area.

   h.   Although saliva has not been implicated in HIV transmission, to minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices will be available for use in areas in which the need for resuscitation is predictable.

**EXHIBIT 19**
**Page 0577**

I.    Health-care workers who have exudative lesions or weeping dermatitis will refrain from all direct patient care and from handling patient-care equipment until the condition resolves.

j.    Pregnant health-care workers are not known to be at greater risk of contracting HIV infection than health-care workers who are not pregnant; however, if a health care worker develops HIV infection during pregnancy, the infant is at risk of infection from perinatal transmission.  Because of this risk, pregnant health care workers will be especially familiar with and strictly adhere to precautions to minimize the risk of HIV transmission.

k.    Implementation of universal blood and body fluid precautions for all detainees eliminates the need for the use of isolation category of "Blood and Body Fluid Precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens. Isolation precautions will be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected.

**T.**     **Protective Equipment**

1.    Protective eye and face equipment will be required where there is a reasonable probability of injury that can be prevented by such equipment.  These areas of the facility will be conspicuously marked with eye hazard warning signs.

2.    OSHA-approved eyewash stations will be installed in designated areas throughout the facility.  All employees and detainees in those areas will be instructed in their use.

**U.**    **Garbage and Refuse**

1.    Refuse includes all garbage, rubbish, and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

2.    Garbage and refuse will be collected and removed as often as necessary to maintain sanitary conditions and to avoid creating health hazards.

3.    Methods for handling and disposing of refuse affects the local environment, compliance with the requirements of local and federal agencies is essential.

**EXHIBIT 19**
**Page 0578**

IV.     **AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED**

American Correctional Association 3rd Edition, Standards for Adult Detention Facilities:
3-ALDF-3B-01, 3B-02, 3B-05, 3B-10, 3B-11, 3B-12.4D-01, 4D-03, 4D-13

**Approval of Standard**

Michael D.  Cronin
**Acting Executive Associate Commissioner**
**Office of Programs**

SEP 2 0 2000

Date

Michael A.  Pearson
**Executive Associate Commissioner**
**Office of Field Operations**

SEP 2 0 2000

Date

**EXHIBIT 19**
**Page 0579**

# TABLE A
## Common Flammable, Toxic, and Caustic Substances

**Class I Liquids**

Gasoline
Benzine (Petroleum ether)
Acetine
Hexane
Lacquer
Lacquer thinner
Denatured alcohol
Ethyl alcohol
Xylene (Xylol)
Contact cement (flammable)
Toudi (Toluene)
Methyl ethyl ether
Methyl ethyl ketone
Naphtha Y, M, and P

**Class II Liquids**

Diesel fuel
Motor fuel
Kerosene
Cleaning solvents
Mineral spirits
Agitene

**Class III Liquids**

Paint (oil base)
Linseed oil
Mineral oil
Neatsfoot oil
Sunray conditioner
Guardian fluid

**Toxic Substances**

Ammonia
Chlorine
Antifreeze
Duplicating fluid
Methyl alcohol
Defoliants
Herbicides
Pesticides

**Caustic Substances**

Lye
Muriatic acid
Caustic soda
Sulfuric acid
Tannic acid

**EXHIBIT 19**
**Page 0580**

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

**Policy**:  Every facility will control flammable, toxic, and caustic materials through a hazardous materials program. The program will include, among other things, the identification and labeling of hazardous materials in accordance with applicable standards (e.g., National Fire Protection Association [NFPA]); identification of incompatible materials, and safe-handling procedures

| ENVIRONMENTAL HEALTH AND SAFETY | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 1.  Does the facility have a system for storing, issuing, and maintaining inventories of hazardous materials? | | | |
| 2.  Are constant inventories maintained for all flammable, toxic, and caustic substances used/stored in each section of the facility? | | | |
| 3.  Is the manufacturer's Material Safety Data Sheet (MSDS) file up-to-date for every hazardous substance used?<br>a.  Do the files list all storage areas, and include a plant diagram and legend?<br>b.  Are the MSDSs and other information in the files available to personnel managing the facility's safety program? | | | |
| 4.  Do all personnel using flammable, toxic, and/or caustic substances follow the prescribed procedures?  Do they:<br>a.  Wear personal protective equipment?<br>b.  Report hazards and spills to the designated official? | | | |
| 5.  Are the MSDSs readily accessible to staff and detainees in the work areas? | | | |
| 6.  Are hazardous materials always issued under supervision?<br>a.  Who supervises issuance of caustic, flammable, and toxic substances?<br>b.  Are quantities limited?<br>c.  Does staff always supervise detainees using these substances? | | | |

**EXHIBIT 19**
**Page 0581**

| ENVIRONMENTAL HEALTH AND SAFETY | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 7.  Are "flammable" and "combustible" materials (liquid and aerosol) stored and used according to label recommendations? | | | |
| 8.  Do lighting fixtures and electrical equipment installed in storage rooms and other hazardous areas meet National Electrical Code requirements? | | | |
| 9.  Do the storage rooms meet the security and structural requirements specified in the standard?<br>a.  Do storage cabinets meet the physical requirements specified in the standard? | | | |
| 10. Are all toxic and caustic materials stored in their original containers?<br>a.  In a secure area? | | | |
| 11. Are excess flammables, combustibles, and toxic liquids disposed of properly?<br>a.  Are they disposed only in accordance with MSDSs? | | | |
| 12. Does staff directly supervise and account for products with methyl alcohol?<br>a.  Does staff receive a list of products containing diluted methyl alcohol, e.g., shoe dye?<br>b.  Are such products clearly labeled as such?<br>c.  Does "accountability" include issuing such products to detainees in the smallest workable quantities? | | | |
| 13. Does every employee and detainee using flammable, toxic, or caustic materials receive advance training in their use, storage, and disposal? | | | |
| 14. Does the facility comply with the most current edition of applicable codes, standards, and regulations of the National Fire Protection Association and the Occupational Safety and Health Administration (OSHA)? | | | |

**EXHIBIT 19**
**Page 0582**

| ENVIRONMENTAL HEALTH AND SAFETY | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 15. Does a technically qualified officer conduct the fire and safety inspections?<br>  a. Weekly?<br>  b. Monthly?<br>  c. Is every written inspection report forwarded to the OIC? | | | |
| 16. Does the Safety Office maintain files of inspection reports?<br>  a. Do files record corrective actions taken? | | | |
| 17. Does the facility have a fire prevention, control, and evacuation plan?<br>  a. Reviewed and approved by the fire marshal? | | | |
| 18. Does the plan require:<br>  a. Monthly fire inspections?<br>  b. Fire protection equipment strategically located throughout the facility?<br>  c. Public posting of emergency plan with accessible building/room floor plans?<br>  d. Exit signs and directional arrows?<br>  e. An area-specific exit diagram conspicuously posted in the diagrammed area? | | | |
| 19. Are fire drills conducted monthly?<br>  a. Who conducts and documents? | | | |
| 20. Does a sanitation program cover barbering operations? | | | |
| 21. Does the barbershop have the facilities and equipment necessary to meet sanitation requirements? | | | |
| 22. Are the sanitation standards conspicuously posted in the barbershop? | | | |
| 23. Do written procedures regulate the handling and disposal of used needles and other sharp objects? | | | |
| 24. Are all items representing potential safety or security risks inventoried?<br>  a. Does a designated individual check this inventory weekly? | | | |

**EXHIBIT 19**
**Page 0583**

| ENVIRONMENTAL HEALTH AND SAFETY | | | |
|---|:---:|:---:|:---:|
| **Components** | **Yes** | **No** | **Remarks** |
| 25. Has the Health Services Administrator (HSA) implemented a program supporting a high level of environmental sanitation? | | | |
| 26. Does the HSA conduct medical-facility inspections every day?<br>   a.  Does each inspection include noting the condition of floors, walls, windows, horizontal surfaces, and equipment? | | | |
| 27. Do standard cleaning practices include:<br>   a.  Using specified equipment; cleansers; disinfectants and detergents?<br>   b.  An established schedule of cleaning and follow-up inspections? | | | |
| 28. Does the Chief Nurse teach staff and detainees proper "housekeeping" procedures, including the safe-handling of hazardous materials/chemicals? | | | |
| 29. Does the facility follow standard cleaning procedures?<br>   a.  List discrepancies between INS standard and facility procedures.<br>   b.  Have isolation-cleaning procedures been implemented as required? | | | |
| 30. Are spill kits readily available? | | | |
| 31. Does a licensed medical waste contractor dispose of infectious/bio-hazardous waste? | | | |
| 32. Is staff trained to prevent contact with blood and other body fluids?<br>   a.  Are written procedures followed? | | | |
| 33. Do the methods for handling/disposing of refuse meet all regulatory requirements? | | | |
| 34. Does a licensed pest-control professional inspect for rodents, insects, and vermin?<br>   a.  At least monthly?<br>   b.  Does the pest-control program include preventive spraying for indigenous insects? | | | |

**EXHIBIT 19**
**Page 0584**

| ENVIRONMENTAL HEALTH AND SAFETY | | | |
|---|---|---|---|
| Components | Yes | No | Remarks |
| 35. Are drinking water and wastewater routinely tested?<br>   a. According to a fixed schedule?<br>   b. How often?<br>   c. By whom? | | | |
| 36. Are emergency power generators tested at least every two weeks?<br>   a.  Do other emergency systems and equipment receive testing at least quarterly?<br>   b.  Followed-up with timely corrective actions (repairs and replacements)? | | | |

**EXHIBIT 19**
**Page 0585**

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

| ENVIRONMENTAL HEALTH AND SAFETY |
|---|

**Verification Sources:**

**The following may serve as sources of information for auditors verifying the facility's compliance with this detention standard:**

| SOURCE | TIME | DATE | LOCATION |
|---|---|---|---|
| A.  Observe maintenance crews | | | |
| B.  Observe detainee work crews | | | |
| C.  Inspect storage facilities | | | |
| D.  Facility's written policy and procedures | | | |
| E.  Inspect inspection reports | | | |
| F.  Inspect medical facilities | | | |
| G.  Review waste removal contracts | | | |
| H.  Review evacuation routes/maps | | | |
| I.   Detainee and staff interviews | | | |

Facilities must complete the attached Plan of Action for bringing operations into compliance.   For each element found out of compliance, the plan of action will specify remedial action and the estimated timetable for compliance.

**Remarks***: (Record significant facts, observations, other sources used, etc.)*

_____
Auditors Signature

_____
Date

**EXHIBIT 19**
**Page 0586**