**EXHIBIT 29**

**EXHIBIT 29**

1                 UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3                CASE NO. 3:17-CV-01112-JLS-NLS

4                JUDGE HON. JANIS L. SAMMARTINO

5               MAGISTRATE HON. NITA L. STORMES

6

7                         CLASS ACTION

8    SLYVESTER OWINO AND JONATHAN GOMEZ, ON BEHALF OF

9    THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

10           PLAINTIFFS

11

12           V.

13

14    CORECIVIC, Inc.

15           DEFENDANT

16    _____

17

18              DEPONENT: TROY G. POLLOCK

19              DATE:    FEBRUARY 26, 2019

20

21

22    REPORTER:

23    KELLEY BOHAN

24    JOB NO. 3225917

25    PAGES 1 - 203

Page 1

EXHIBIT 29
Page 0883

1    worked, is there a difference in terms of how the

2    company handles the detention of these different

3    inmates?

4            MR. STRUCK:  Form, foundation.

5        A.   So the prior places to coming to the detention

6    center have all been inmates, state inmates, convicted

7    felons, so I mean, what -- I guess I need a little bit

8    more what you're asking?

9        Q.   Is there a difference in approach in terms of

10   how you're handling their detention or is it similar to

11   what's done at Stewart?

12           MR. STRUCK:  Form and foundation.

13       A.   My job at each one of these places has been to

14   provide a safe and secure environment and met the basic

15   needs, life safety needs of whether they're inmates or

16   detainees so they're treated the same.

17       Q.   And are the daily experiences of the different

18   detainees or inmates, are they similar or different?

19           MR. STRUCK:  Form.

20       Q.    In your experience?

21           MR. STRUCK:  Form and foundation.

22       A.    It depends on, again, what facilities it is.

23   Some facilities have different programs that they

24   require educational things, vocational things, depending

25   on which facility you have.

Page 57

**EXHIBIT 29**
**Page 0884**

1    than on your scheduled laundry day?

2         A.    I don't know.

3         Q.    Section I 5 here, it talks about some cleaning

4    that's done in the laundry area.  Do you know who does

5    that cleaning?

6         A.    Laundry workers.

7         Q.    And are those detainees?

8         A.    Yes.

9         Q.    And are they paid for that work?

10        A.    Yes.

11        Q.    Do you know how much?

12        A.    No.

13        Q.    Section J sanitation of mattresses and

14   pillows.  Who does the cleaning of that work or of those

15   items?

16        A.    I'm not sure.

17        Q.    Okay.  Do you know if that's paid work?

18        A.    Yes.

19        Q.    Okay.  Let's talk a little bit now about

20   disciplinary policy and procedures at Stewart.  Is

21   discipline an important aspect of the facilities

22   operations?

23        A.    Rules are.

24        Q.    Okay.  Why is that?

25        A.    Well, every institution or every organization

Page 66

EXHIBIT 29
Page 0885

1    has to have rules to go by in order to maintain a safe

2    and secure environment for the detainees and staff and

3    the public.

4         Q.   Is there a concern with respect to the

5    behavior of the detainees?

6         A.   What do you mean by concern?

7              MR. STRUCK:  Object to the form.

8         Q.   Is that a problem that is anticipated?

9              MR. STRUCK:  Form, foundation.

10        A.   I'm still -- I still don't understand.  I

11   mean, by nature, what we're doing, we're a detention

12   facility that nobody wants to be in.  So does that

13   heighten our alertness?  Yes.  Nobody wants to be there.

14        Q.   And because they don't want to be there, that

15   raises a concern, why?

16             MR. STRUCK:  Form and foundation.

17        A.   So if a person does not want to be somewhere,

18   usually they don't always act appropriately.

19        Q.   The inmate -- or the detainees, sorry, at

20   Stewart are not in criminal custody, correct?

21             MR. STRUCK:  Foundation.

22        A.   Currently, no.  Some of them do have criminal

23   backgrounds and have come straight to us from prison

24   after they have done their prison time.

25        Q.   What's the objective for the disciplinary

Page 67

1   measures imposed at Stewart?

2          MR. STRUCK:   Form.

3      A.   What's the objection?

4      Q.   Objective.

5      A.   Objective of having the disciplinary procedure

6   to ensure that the rules are followed.

7      Q.   Any other objective?

8      A.   The safety and security of the facility, the

9   staff, detainees, and the public.

10     Q.   So safety and security is the objective?

11     A.   Yes.

12     Q.   Let's talk a little bit about disciplinary

13  segregation.  I'd like to know how that fits with the

14  objective of maintaining safety and security?

15     A.   If I have a person's whose behavior has

16  jeopardized the safety and security of them self or

17  anybody else at the facility, then it warrants that they

18  be isolated in disciplinary segregation.

19     Q.   Would lesser measures still achieve those

20  objectives?

21     A.   Not always, depends on the circumstances.

22     Q.   Why wouldn't they?

23     A.   If I have a guy that's going around stabbing

24  other people, there is no lesser thing that you can to

25  do him other than isolate them to keep them from

Page 68

1          A.    Detainee tried to escape.

2          Q.    The next page talks about a review of such

3     segregation that required intervals.  When do those

4     reviews take place and what's involved in them?

5                MR. STRUCK:  Form.

6          A.    It has to be reviewed by an ADO staff member

7     within 72 hours of initial placement and then a weekly

8     review is done at that review meeting that we have.

9          Q.    Aside from the detainee who tried to escape,

10    do you recall any other instances of someone being

11    placed?

12         A.    Yes.

13         Q.    What were the circumstances of those?

14         A.    MS-13 gang members trying to assault other

15    gang members.

16         Q.    Any other instances?

17         A.    Not that I recall specifically.

18         Q.    Okay.  Looking now at page 7489, in section 3,

19    there's discussion of reviews required for detainees in

20    disciplinary segregation and also for detainees in

21    administrative segregation, the former is more frequent.

22    And I guess my question is:  Why are reviews conducted

23    more often for detainees in disciplinary segregation as

24    opposed to administrative segregation?

25         A.    We review every detainee in restricted housing

                                              Page 86

```
 1    and I believe T shirts, white T shirts.
 2         Q.   Are they allowed to wear baseball caps inside
 3    the facility?
 4         A.   Yes.  I mean, at recreation and going to and
 5    from recreation.
 6         Q.   But not inside their unit?
 7         A.   Right.
 8         Q.   Okay.   Okay.  How often are hygiene items
 9    purchased at the commissary?
10         A.   I have no idea.
11         Q.   Can a detainee be terminated from his job as
12    part of the Voluntary Work Program?
13         A.   Yes.
14         Q.   At any time?
15         A.   Yes.
16         Q.   For any reason?
17         A.   No.  There has to be -- they sign a form that
18    tells them, you know, they have their attendance, they
19    can be fired for not coming to work, for failing to
20    do the job, for physical not being able to do the job,
21    and there's, I think, a couple other reasons they can be
22    fired, but just not because -- for the heck of it they
23    just can't be fired.
24         Q.   It has to be some sort of cause?
25         A.   Right.
```

Page 116

EXHIBIT 29
Page 0889

1        Q.    Okay.

2        A.    Their classification may change.

3        Q.    And can a detainee quit his job as part of the

4    Voluntary Work Program?

5        A.    Yes.

6        Q.    At any time?

7        A.    Uh-huh.

8        Q.    Can he do it for any reason?

9        A.    Yes.

10       Q.    Can a detainee be disciplined at all for

11   quitting the job?

12       A.    No.

13             (EXHIBIT 55 MARKED FOR IDENTIFICATION)

14       Q.    I'm handing you what's been marked as 55.

15   This is policy 19-100 covering the detainee Voluntary

16   Work Program.  Are you familiar with this policy?

17       A.    Yes.

18       Q.    So you stated that certain jobs are not

19   available to high custody detainees.  What are those

20   jobs?

21       A.    So the policy generally states that

22   detainees -- high custody detainees cannot have --

23   generally cannot have jobs

24             outside of the housing unit, the living unit

25   that they're assigned to.  We got a waiver to allow high

                                              Page 117

1          A.    That I don't know.

2          Q.    Posted?

3          A.    I don't know.

4          Q.    Okay.  On subsection H 2 it says the detainee

5     workday will approximate the work date in the community,

6     do you know what that means?

7          A.    I have no idea.

8          Q.    Me either.  H 3 states that un-excused

9     absences from work or unsatisfactory work performance

10    may result in removal from the Voluntary Work Program.

11    Aside from removal, are there any other potential

12    consequences for poor performance?

13         A.    No.

14         Q.    Loss of privileges?

15         A.    For poor performance, no.

16         Q.    No discipline?

17         A.    No.

18         Q.    Section K talks about compensation it's on

19    page 8005 it says detainees will be compensated at least

20    $1 per day.  You testified, I believe, there's a range

21    of about $1 to $4?

22         A.    Yes.

23         Q.    Is there any limit to the ability of the

24    facility to pay more than $4 if it deems it appropriate?

25         A.    That's at the warden's discretion.

Veritext Legal Solutions
866 299-5127

EXHIBIT 29
Page 0891

```
 1              CERTIFICATE OF REPORTER

 2           COMMONWEALTH OF KENTUCKY AT LARGE

 3

 4   I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Title page here of by me after

 7   first being duly sworn to testify the truth, the whole

 8   truth, and nothing but the truth; and that the said

 9   matter was recorded stenographically and mechanically by

10   me and then reduced to type written form under my

11   direction, and constitutes a true record of the

12   transcript as taken, all to the best of my skill and

13   ability. I certify that I am not a relative or employee

14   of either counsel, and that I am in no way interested

15   financially, directly or indirectly, in this action.

16

17

18

19

20

21      _____

22                  KELLEY BOHAN,

23             COURT REPORTER / NOTARY

24      MY COMMISSION EXPIRES ON: 05/19/2020

25            SUBMITTED ON: 03/01/2019
```

Veritext Legal Solutions
866 299-5127

EXHIBIT 29
Page 0892