STRUCK LOVE BOJANOWSKI & ACEDO, PLC
Daniel P. Struck, AZ Bar #012377
*(admitted pro hac vice)*
Rachel Love, AZ Bar #019881
*(admitted pro hac vice)*
Nicholas D. Acedo, AZ Bar #021644
*(admitted pro hac vice)*
Ashlee B. Hesman, AZ Bar #028874
*(admitted pro hac vice)*
Jacob B. Lee, AZ Bar #030371
*(admitted pro hac vice)*
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Tel.:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com

LAW OFFICE OF ETHAN H. NELSON
Ethan H. Nelson, CA Bar #262448
4 Park Plaza, Suite 1025
Irvine, California 92614
Tel.: (949) 229-0961
Fax: (949) 861-7122
ethannelsonesq@gmail.com

Attorneys for Defendant/Counter-Claimant
CoreCivic, Inc.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>CoreCivic, Inc., a Maryland corporation,<br><br>　　　　　Defendant. | NO. 3:17-cv-01112-JLS-NLS<br><br>**INDEX TO EXHIBITS** |

CoreCivic, Inc., a Maryland corporation,

        Counter-Claimant,

v.

Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated,

        Counter-Defendants.

| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| 1 | "'I Don't Want to Die': Asylum Seekers, Once in Limbo, face Deportation Under Trump", published in the New York Times on April 21, 2019 | 001–008 |
| 2 | October 17, 2018 e-mail from Jacob Lee to Alan Ouellette and Geoffrey Raux | 009–010 |
| 3 | October 15, 2015 Letter from Deborah M. Johnson to Bart VerHulst (CCOG00006335) | 011 |

# EXHIBIT 1

# EXHIBIT 1

Subscribe

Log in

ADVERTISEMENT

# 'I Don't Want to Die': Asylum Seekers, Once in Limbo, Face Deportation Under Trump

**EXHIBIT 1**
**001**



Indra Sihotang, 52, with his wife and their children in their Queens home. Mr. Sihotang, an asylum seeker, was granted a temporary reprieve from deportation by the Obama administration. President Trump revoked that safeguard.   Elias Williams for The New York Times

By **Christina Goldbaum**

April 21, 2019

This is your one article preview.
Log in or create a free account to read more articles each month.

*[What you need to know to start the day: Get New York Today in your inbox.]*

**Indra Sihotang was desperate to stay in New York. Minutes from being deported to Indonesia, the 52-year-old father clung to a chair bolted to the floor at Kennedy International Airport, struggling against four immigration officers trying to tear him away.**

EXHIBIT 1
002

By the end of the confrontation, his face was bloody and bruised. But neither Mr. Sihotang, nor another immigrant in the officers' custody who watched the incident unfold, was allowed onto the plane after the pilot raised security concerns.

"I kept trying to explain to them that the conditions in my country are very bad now," Mr. Sihotang said. "I was telling them, 'I don't want to die there.'"

Mr. Sihotang had lost his fight to receive asylum in the United States a decade ago, a decision he did not appeal after he and thousands like him were granted a temporary reprieve from deportation by the Obama administration. Days after assuming office, President Trump revoked that protection, making Mr. Sihotang and thousands of other asylum seekers suddenly eligible for deportation, though many did not realize it.

ADVERTISEMENT

Even as Mr. Trump has sought in recent days to limit who can apply for asylum, and to expand indefinite detention for asylum seekers, his administration has with little public notice been carrying out a crackdown on people who asked for asylum, did not receive it and remained in the United States.

The policy, which often involves seeking out immigrants who have been in the country for years in a legal gray area, shows how the Trump administration aims to reverse what it believes are the misguided policies of the Obama administration.

Immigration agents have been especially active in New York City. Deportations of immigrants with no criminal convictions, including asylum seekers with years- or decades-old deportation orders, rose to 1,144 in the 2018 federal fiscal year from 313 in 2016, a 266 percent increase, according to a recent report from the city comptroller.

That is the largest percentage increase of any Immigration and Customs Enforcement field office in the country.

The Trump administration said ICE agents are following the law in trying to return asylum seekers who have lost their cases on the merits and have no right to remain in the country.

EXHIBIT 1
003

ADVERTISEMENT

But as these people are caught in a deportation dragnet, they risk being sent to countries where the persecution threats they face are even greater than when they fled to the United States, asylum seekers and lawyers say.

In the final years of the Obama administration, immigration judges were instructed to use prosecutorial discretion to grant some undocumented immigrants, such as asylum seekers who had lost their cases, the ability to stay and work in the United States legally as long as they regularly checked in with ICE.

These enforcement policies were designed to focus ICE's limited resources on deporting unauthorized immigrants who had criminal convictions, recently crossed the border or posed a threat to national security.

Until Mr. Trump came into office, asylum seekers like Mr. Sihotang "had no reason to try to reopen their asylum case because they were permitted to stay and work in this country," Amber Gracia, an immigration lawyer in Texas, said. "When the government suddenly seeks removal, these people are caught off guard."

She questioned why agents were focusing on deporting undocumented immigrants who had not broken the law, rather than focusing on violent criminals in the country illegally.

ICE officials said that as long as there was a standing deportation order for an individual, there would be legal grounds to take that person into custody.

"The U.S. government provides all those in removal proceedings with an opportunity to apply and be considered for relief from removal," an ICE spokeswoman, Rachael Yong Yow, said in a statement. "If an immigration judge finds an individual ineligible for any form of relief, the judge will issue a final order of removal, which ICE carries out in accordance with applicable U.S. law."

EXHIBIT 1
004

ADVERTISEMENT

She said she could not comment on specific cases.

After losing his original asylum case five years ago, Mr. Sihotang lived and worked legally in New York City and watched as the persecution of Christians like him intensified in Indonesia.

When he arrived for his biannual check-in with ICE — a condition of his reprieve — in summer 2017, he said he had thought that it would proceed like every other: He would update his home address, provide his work address and confirm that he had not been arrested or convicted of a crime.

ADVERTISEMENT

**EXHIBIT 1**
**005**



In 2017, Mr. Sihotang clung to a chair at Kennedy International Airport and struggled against immigration officers trying to tear him away.   Elias Williams for The New York Times

But this time, the ICE officer asked him to renew his passport and return to the ICE office. When he returned with the new passport, ICE took him into custody.

Only when ICE drove him to Kennedy Airport four weeks later did Mr. Sihotang realized why the ICE officer had requested that he renew his passport: The plan was to put him on a commercial flight to Indonesia.

"I was shocked," Mr. Sihotang said. "I was thinking about my kids. I told them, 'I've got four kids and my family. How will they survive without me?'"

Months after the confrontation at the boarding gate last year, ICE again tried to deport Mr. Sihotang. But this time, as he sat in a van minutes away from the airport, an ICE officer received a call telling him to stop the

**EXHIBIT 1**
**006**

deportation.

ADVERTISEMENT

A judge had determined Mr. Sihotang faced credible fears of persecution in Indonesia and reopened his asylum case, which remains unresolved.

The asylum seeker who watched Mr. Sihotang's first airport confrontation requested that he be identified only by his nickname, Neo, and that his home country not be named for fear of persecution. He was deported from New York weeks after that encounter, despite last-minute attempts to reopen his asylum case.

"I didn't do anything criminal," Neo said, breaking into tears. "I didn't do anything wrong, then suddenly they just sent me back."

One aspect of Neo's asylum case, he and his lawyer said, was a medical condition he had developed for which he needed daily medication unavailable in his home country. When he boarded his deportation flight to East Asia, he said he had three weeks' worth of the medication left. So, he said, he started to ration it: Take one pill. Skip a day. Take another.

"I was worried I was going to die," he said.

His only hope was his lawyer in the United States, who had filed an appeal to the Board of Immigration Appeals, the highest immigration court in the country.

The board determines whether an asylum seeker's claim has new merits and can issue an order preventing ICE from deporting an immigrant while that decision is made.

Since Mr. Trump came into office, more immigrants are making requests to the board to temporarily prevent a deportation.

ADVERTISEMENT

**EXHIBIT 1**
**007**

But the denial rate for those requests has sharply increased, according to analysis by the Benjamin N. Cardozo School of Law in New York.

Steven Stafford, a spokesman for the Justice Department, said judges on the board "apply the law to the facts of the case before them."

When the board grants these requests, it is often only hours before an immigrant is scheduled to board a deportation flight, lawyers say. Some asylum seekers have even had their cases reopened after they have been deported.

Last spring, Neo was brought back to the United States by ICE after the board agreed to reopen his asylum case.

Still, not everyone is as lucky.

Immigration lawyers pointed to the circumstances of a Bangladeshi man who requested that he be identified only by his given name, Mahbub, because of an unresolved asylum case. He was granted permission to stay in the United States until the board reconsidered his case. He had sought asylum on the grounds that he was being persecuted over his political affiliation.

But the panel's decision, which arrived in his lawyer's inbox at 9 a.m., came four hours too late: At 5 a.m., he had been put on a flight to Bangladesh.

When he arrived in the Bangladeshi capital, Dhaka, he said he called his mother who, distraught, told him that he could not come to their home. One of his friends in the opposition party, in which Mahbub was an activist, had been arrested in the months before his return.

ADVERTISEMENT

Fearing he faced the same fate, Mahbub, 36, said that he went into hiding. Months later, he paid a smuggler to help make his way to France, where he sought asylum.

"I'm just happy I stayed alive," Mahbub said.

Follow Christina Goldbaum on Twitter:@cegoldbaum.
A version of this article appears in print on April 22, 2019, Section A, Page 1 of the New York edition with the headline: Asylum Seekers Got Relief. Then ICE Moved In.. Order Reprints | Today's Paper | Subscribe

Read 76 Comments

**EXHIBIT 1**
**008**

**EXHIBIT 2**

**EXHIBIT 2**

| | |
|---|---|
| From: | Jacob Lee |
| To: | AOuellette@foley.com; GRaux@foley.com; WDelValle@foley.com |
| Cc: | Owino Team |
| Subject: | Owino - ESI Meet and Confer |
| Date: | Wednesday, October 17, 2018 5:25:11 PM |
| Attachments: | image001.gif<br>image002.png<br>DEF Proposed ESI Search Terms.pdf |

Alan and Geoff,

Our proposed search terms are attached for your review, as we discussed this morning. The list of custodians included with the search terms is the same list we previously sent you.

We hope to be able to provide you with the date ranges during which ICE detainees were housed at those facilities that have not housed ICE detainees continuously for the past 10 years soon, as well as the job titles and tenures for the FSC custodians we listed.

This will also confirm that we are not doing the site visit at OMDC on Tuesday 10/30 at 1:30 p.m. Pacific. It will further confirm the objections we discussed during the call, namely:

1. We cannot allow Plaintiffs' counsel to bring their own cameras—whether still or video—into the facility, as these pose a risk to the safety and security of the facility. As an alternative, we will have a facility staff member accompanying us on the visit with a camera, who will be able to take any shots requested by Plaintiffs' counsel. You will be able to review the shots on the camera to ensure they capture what you wanted them to capture. Before we produce copies of the photos, however, we will review them to ensure no safety- or security-sensitive information is inadvertently included.
2. We cannot allow the inspection to last longer than 2 hours. Due to the layout of the facility, facility operations must be suspended during the site visit to ensure that no detainees are captured in the photographs. Any such suspension disrupts facility operations, but a suspension longer than 2 hours will unreasonably do so.

Additionally, although we did not discuss it during today's call, we have discussed before that the site visit may not be used to interview staff or detainees. We have previously provided instructions on how to arrange interviews with particular detainees, and Plaintiffs may utilize the procedures under the Federal Rules for depositions for staff members they wish to speak with. The site visit is to allow Plaintiffs' counsel to see the facility, nothing more (indeed, the request seeks only to "inspect" the *facility*). Similarly, although counsel will be permitted to "inspect" (i.e., see) areas such as, for example, those "where detainee records are kept and stored," they will not be permitted to review records during the site visit, or to request a demonstration of the computer-based records systems.

Jacob

Jacob B. Lee

**EXHIBIT 2**
**009**

Attorney

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

3100 West Ray Road | Suite 300 | Chandler AZ 85226

480.420.1641 | jlee@strucklove.com | STRUCKLOVE.COM

**EXHIBIT 2**
**010**

**EXHIBIT 3**

**EXHIBIT 3**



**U.S. Department of Justice**

United States Marshals Service

*Prisoner Operations Division*

*Arlington, VA 22301-1025*

October 15, 2015

Corrections Corporation of America
Attn: Bart E. VerHulst, Vice President, Federal and Local Customer Relations
10 Burton Hills Boulevard
Nashville, Tennessee 37215

Dear Mr. VerHulst:

This letter is in reference to contract number ODT-5-C-0003 for Detention Services (Otay Mesa Detention Center) contract with the United States Marshals Service, Prisoner Operations Division. Inspections of the new facility have been completed and have met the acceptable standards of the transfer. Therefore, this letter serves as your official Notice to Proceed, effective October 15, 2015 for the transfer of detainees in custody of the U.S. Marshal Service (USMS) and U.S. Immigration and Customs Enforcement (ICE) from 446 Alta Road, San Diego, CA to the new address 7488 Cal Zeta Del Fuente, San Diego, CA.

Should you have any technical questions related to this notification, please contact your Contracting Officer Representative (COR). Any contractual questions, please contact me directly.

Sincerely,

Deborah M. Johnson
Contracting Officer

CC: Jaime Schimmel (COR)
    Contract File

EXHIBIT 3
011

CCOG00006335