EILEEN R. RIDLEY (SBN 151735)
    eridley@foley.com
ALAN R. OUELLETTE (SBN 272745)
    aouellette@foley.com
**FOLEY & LARDNER LLP**
555 California Street, Suite 1700
San Francisco, CA 94104-1520
T: 415.434.4484 // F: 415.434.4507

GEOFFREY M. RAUX (*pro hac vice*)
    graux@foley.com
**FOLEY & LARDNER LLP**
111 Huntington Avenue
Boston, MA 02199-7610
T: 617.342.4000 // F: 617.342.4001

ROBERT L. TEEL  (SBN 127081)
    lawoffice@rlteel.com
**LAW OFFICE OF ROBERT L. TEEL**
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
T: 866.833.5529 // F: 855.609.6911

Attorneys for Plaintiffs SYLVESTER OWINO,
JONATHAN GOMEZ, and the Proposed Class(es)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>CORECIVIC, INC.,<br><br>                              Defendant.<br>_____ | Case No. 3:17-CV-01112-JLS-NLS<br><br>**CLASS ACTION**<br><br>**JOINT STATUS REPORT REGARDING COMPARISON OF ADO-LEVEL AND NON-ADO-LEVEL ESI** |
| CORECIVIC, INC.,<br><br>                              Counter-Claimant,<br><br><br>        vs.<br><br>SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>                              Counter-Defendants. | Judge:  Hon. Janis L. Sammartino<br>Magistrate:  Hon. Nita L. Stormes |

Case No. 17-CV-01112-JLS-NLS

Plaintiffs Sylvester Owino and Jonathan Gomez ("Plaintiffs") and Defendant CoreCivic, Inc. ("CoreCivic") hereby submit this Joint Status Report in response to the Court's Order Regarding Joint Motion for Determination of Discovery Dispute No. 5 [ECF 225] ("Order"), as modified by the Court's subsequent orders regarding the same [ECF 227, 229, 231]. This Joint Status Report provides the parties' respective positions regarding ADO-level[1] custodian data to non-ADO-level[2] custodian data produced by CoreCivic in response to the Court's Order.

# I.    PLAINTIFFS' POSITION

## A.    Relevant History

### 1.    Procedural History

On June 1, 2020, the parties filed Joint Motion for Determination of Discovery Dispute No. 4, wherein Plaintiffs raised, among other things, appropriate custodians and search terms for production of electronically stored information ("ESI") maintained by CoreCivic. [ECF 184 at 7.] At the time of that motion, the parties had *already agreed* to collection of ESI from a number of both ADO-level and non-ADO level custodians in the ESI collection, but disputed the appropriateness of adding certain additional custodians. [ECF 184, Appendix 1.] Following the hearing on this motion, the Court issued an order requiring CoreCivic to run its ESI search on the entirety of the parties' mutually agreed custodian list, as well as three additional custodian positions that had been at dispute. [ECF 192 at 4.]

On February 19, 2021, the parties filed Joint Motion for Determination of

---

[1] As used herein, "ADO-level" has the same meaning as used in ECF 215 and refers to administrative-team-level facility employees designated to be "on call" and approved by the Vice President, Facility Ops to assume the required duties and responsibilities of the Warden/Facility Administrator during non-business hours. They generally include the Warden/Facility Administrator, Assistant Warden/Assistant Facility Administrator, Chief of Security, and Chief of Unit Management.

[2] As used herein, "non-ADO-level" refers to the custodians for which CoreCivic was ordered to produce ESI in the Court's Order Regarding Joint Motion for Determination of Discovery Dispute No. 4 [ECF 192], excluding the ADO-level custodians.

Discovery Dispute No. 5, wherein CoreCivic sought to limit its ESI search to just *four* ADO-level custodian positions, excluding not only the custodians set forth in the Court's order [ECF 192], but also excluding numerous positions that CoreCivic *had agreed to include* during the meet and confer process and filings with the Court.  [ECF 184, Appendix 1.]  CoreCivic's attempt to renege on the parties' mutually agreed custodian list is based on CoreCivic's belief that collecting ESI from all ordered custodians would "impose an undue burden on CoreCivic" and that limiting ESI custodians to just *four* executive and leadership-level job titles (*i.e.*, ADO-level custodians) would somehow capture all relevant ESI across CoreCivic's expansive, multi-billion-dollar operations.

To test CoreCivic's arguments, the Court ordered CoreCivic to (1) collect and produce ESI from ADO-level custodians at Otay Mesa Detention Center and San Diego Correctional Facility by August 31, 2021; and (2) collect and produce ESI from all previously listed custodians (*i.e.*, including non-ADO-level custodians) at the same two facilities by September 30, 2021.  [ECF 225.]  The Court further ordered CoreCivic to provide an "affidavit from a knowledgeable corporate representative regarding the sufficiency of ESI from ADO-level custodians."  [ECF 227.]  Due to CoreCivic's repeated inability to meet these production deadlines, the parties were forced to file multiple unopposed motions extending these deadlines, which were granted by the Court. [ECF 227, 229, 231.]  As relevant here, the Court set a deadline of November 1, 2021 for CoreCivic to produce its ADO-level data, and a deadline of December 1, 2021 for CoreCivic to produce its non-ADO-level data.  [ECF 231.]

### 2.    CoreCivic's Productions

On August 31, 2021, September 14, 2021, September 29, 2021, and November 1, 2021, CoreCivic produced a total of 20,530 documents, which CoreCivic represented was collected "from the San Diego/Otay Mesa ADO Custodians."  [Ouellette Decl. ¶¶ 3-6; Ex. 23.]

CoreCivic failed to produce its non-ADO-level data by December 1, 2021 [Ouellette Decl. ¶ 7], as required by the Court's order.  [ECF 231.]  As a result, Plaintiffs'

4857-6833-4094.4

counsel inquired on December 2, 2021 regarding the status of the "document production yesterday [December 1, 2021], as Ordered by the Court."  [Ouellette Decl., Ex. 22.] CoreCivic's counsel "apologi[zed] for the delay" and stated that the production would be produced in the following week.  [*Id.*]  On December 8, 2021 and December 13, 2021, CoreCivic produced a total of 17,510 documents.  [Ouellette Decl. ¶¶ 8-9.]  Plaintiffs understood these productions to be CoreCivic's non-ADO-level production, as they were produced well past the November 1, 2021 deadline to produce ADO-level data and because, unlike prior productions, CoreCivic did *not* characterize the productions as being collected from "ADO Custodians."  [Ouellette Decl.¶ 31, Ex. 23 (stating only that "a new production volume" was uploaded).]

According to the de-duplication function on the electronic discovery platform, RelativityOne, there are only 344 exact duplicates between CoreCivic's ADO-level production and its non-ADO-level production.  [Ouellette Decl. ¶ 10.]

## B.    The Non-ADO-Level Data Contains Key Information for Plaintiffs' Claims.

Based on the non-ADO-level data produced by CoreCivic to date, it is evident that CoreCivic's non-ADO-level custodians will possess evidence that is both critical to Plaintiffs' claims and distinct from the type of information possessed by CoreCivic's ADO-level custodians.  Among other things, the non-ADO-level data produced by CoreCivic provides unique insight into how CoreCivic's policies and procedures regarding detainee labor were actually implemented at the ground level.  These documents will prove essential, as CoreCivic has contested the meaning of its own policies and procedures.  The correspondence of CoreCivic's non-ADO-level employees, however, prove that CoreCivic's policies and procedures were in fact implemented as written, so as to forcibly extract labor from detainees.  Moreover, CoreCivic's non-ADO-level documents include time and payment records for detainees that are absent from CoreCivic's ADO-level data, and which directly undermine CoreCivic's contention that damages are not computable on a class-wide basis.  CoreCivic's effort to renege on its

previously agreed custodians should be rejected as a transparent attempt to deprive Plaintiffs of unique and critical evidence.  For the reasons stated herein, Plaintiffs respectfully request that the Court issue an order requiring CoreCivic to collect and produce documents from all previously agreed custodians.

For example, the non-ADO-level data includes numerous documents and spreadsheets relating to payment for, and scheduling of, detainee labor at CoreCivic. These documents include CoreCivic's "Kitchen Worker Procedures and Incentives," which set forth CoreCivic's policies at the Otay Mesa Detention Center regarding the timing of shifts for kitchen workers, the number of workers expected per shift, the compensation and incentive structure for kitchen workers, and "rules and procedures" to be followed by kitchen workers.[3]  [Declaration of Alan R. Ouellette ("Ouellette Decl.")[4] Ex. 1, CCOG00199520; *see also* Ex. 2, CCOG00202220 (meeting minutes circulated among unit managers stating that "detainees . . . should be working approximately 8 hours a day to be paid").]  The non-ADO-level data also contains detailed schedules setting forth when detainees, as identified by name and alien registration number, were scheduled to work shifts.  [*See, e.g.*, Ex. 3, CCOG00199420; Ex. 4, CCOG00199553).[5]] Similarly, CoreCivic's non-ADO-level data includes numerous spreadsheets detailing

---

[3] This document appears to have been authored by "Acting Warden" R. O. Garcia, Jr. While CoreCivic contends that "Warden" is an ADO-level position, this document was contained in the non-ADO-level data, indicating that there are highly relevant documents not captured by CoreCivic's proposed criteria.

[4] Unless indicated otherwise, all references to Exhibits in Plaintiffs' portion of this Joint Status Report refer to Exhibits attached to the Declaration of Alan R. Ouellette filed concurrently herewith.

[5] The Magistrate Judge's Civil Case Procedures request that the parties submit "only relevant and necessary exhibits" in connection with briefing on joint discovery disputes. Accordingly, Plaintiffs have included as exhibits only a small sampling of detainee labor scheduling documents and spreadsheets.  Numerous similar scheduling documents and spreadsheets were included in CoreCivic's non-ADO-level production, including documents produced at Bates stamps CCOG00199302, CCOG00199428, CCOG00199530, and CCOG00199541.  Plaintiffs are willing to file these documents with the Court upon request.

4857-6833-4094.4

reimbursement made to detainees, as well as the corresponding work that they performed and time in/out records for the same.  [*See, e.g.*, Ex. 5, CCOG00204703.[6]]  These schedules indicate the dates and shifts that detainees were scheduled to work, including when detainees apparently "refused" to work [Ex. 3, CCOG00199420 at 5]; and when detainees were "fired" by CoreCivic [Ex. 4, CCOG00199553 at 5].  These documents directly refute the arguments advanced by CoreCivic throughout this action, including CoreCivic's contentions that "complications from damages calculations in this case also weigh heavily against class certification" and that a jury would be unable to "sort out all these issues that determine liability and damages for each class member's claim."  [ECF 118 at 35:1-21.]  The non-ADO-level data sample reveals that CoreCivic seeks to withhold the very information that would enable Plaintiffs to make such damages calculations.

Further, the non-ADO-level production includes numerous documents that undermine CoreCivic's self-serving interpretation of its sanitation policies, including CoreCivic's contention that not all detainees, but only "volunteers," are required to perform labor for CoreCivic.  To the contrary, the non-ADO-level data contains an email in which CoreCivic employees discuss "[t]hree detainees [who] have been cleaning at night in the corridor and lobby" but "have not gotten paid in three weeks."  [Ex. 6, CCOG00205925.]  In response, a CoreCivic employee stated that the "detainees are already assigned a job in the unit or kitchen," "cannot get paid for two jobs," and that if they "want to work another job, they can ask me to change their job or it is strictly for volunteer purposes."  [*Id.*]  This exchange directly contradicts CoreCivic's argument that the sanitation policy applies only to detainees "who volunteer to participate in the VWP."  [*Id.*]  The email shows that, in actuality, detainees who CoreCivic consider "volunteers" are not even compensated for their work, rebutting the distinction that CoreCivic has

---

[6] Similar documents were produced at CCOG00204709, CCOG00204720, CCOG00204723, CCOG00204745, CCOG00204766, CCOG00204777, CCOG00204782, CCOG00204825, CCOG00204853, and can be filed with the Court upon request.

4857-6833-4094.4

attempted to carve throughout this litigation.

Similarly, the non-ADO-level data includes a memorandum from Shane Cosby, Echo Unit Manager, to Gina Sween, Chief of Unit Management[7] regarding the sanitation duties of detainees.  [Ex. 7 (CCOG00211532).]  In the memorandum, Mr. Cosby states, "we must keep [sanitation] up each and every day and that's to include the evening times and the weekends.  Sanitation isn't just a Monday through Friday from 0730 to 1700 but a **24/7 job**.  Remember keep on the **detainees to clean** and continue to **check behind them as they clean**." [*Id.* at CCOG00211533 (emphasis added).]  This memorandum is evidence that all "detainees" are responsible for "cleaning" under CoreCivic's sanitation policy, not just "volunteers." [*Id.*]  This memorandum also contradicts CoreCivic's argument that its sanitation policy only requires detainees to "maintain[] the common living area" and "does not require detainees to *clean* the common areas of the housing units." [ECF 118 (Opp. to Class Cert. Motion) at 3:19-4:13 (emphasis in original).]  Further, this memorandum contradicts CoreCivic's argument that the sanitation policy applies only to detainees "who volunteer to participate in the VWP." [*Id.*]  In short, the memorandum is evidence that CoreCivic's policies mean exactly what they say:  that all "detainees" (not merely volunteers) are required to "clean" (not merely "maintain") the common areas.  CoreCivic at once denies the plain meaning of its own policies and procedures, while simultaneously seeking to deprive Plaintiffs of the documents necessary to prove that their policies and procedures were *actually implemented as written* by non-ADO-level custodians.

The non-ADO-level production further shows how detainees were coerced by non-ADO-level custodians, demonstrating how CoreCivic's disciplinary policies were

---

[7] Although CoreCivic contends that the Chief of Unit Management is an ADO-level position, this memorandum was contained exclusively in CoreCivic's non-ADO-level production.  Thus, this memorandum, despite being facially addressed to an ADO-level custodian, was either never sent to the ADO-level custodian, or CoreCivic's document collection process was deficient and omitted a key ADO-level document.  Regardless of which is the case, both support the fact that CoreCivic should be obligated to collect and produce ESI from all previously agreed custodians, not just ADO-level custodians.

actually implemented at the ground level.  One email chain in the non-ADO-level data shows relates the experience of an officer who "had a hard time controlling [sic] the pakastanian [*sic*] workers cause they were making loud noises" and could not speak English.  [Ex. 8, CCOG00205909.]  The officer told the detainees to "shut the [expletive] up," and complained to other officers that the Pakistani detainees "sounded like a bunch of hyenas."  [*Id.*]  After hearing this officer's abuse of detainee workers, another CoreCivic employee responded, "Maybe leave out the F bombs next time."  [*Id.*]

Finally, the non-ADO-level data contains foundational policy and procedure documents that were produced for the first time in CoreCivic's non-ADO-level production—key documents that would have been completely missed but for the non-ADO-level collection.  For example, the non-ADO-level production contains a "Resident Work Agreement" for "Floors" at Otay Mesa Detention Center, which outlines the "Duties" of detainees, including "Sweep[ing]/us[ing] the dust mop on floors after each meal," "Wip[ing] up spills as needed," and "Other tasks as directed by your unit team." [Ex. 9, CCOG00202087.]  Critically, the agreement requires the detainee to "understand that I am being paid to work for eight (8) hours of work each day" and "understand that I will not be paid if my duties are not completed in a satisfactory manner."  [*Id.*]  This document, which explains the duties and conditions of labor at Otay Mesa, is contained nowhere in the CoreCivic's ADO-level production, underscoring the importance of collecting relevant information from all levels of CoreCivic's hierarchy, as previously ordered by the Court.

These documents represent but a small sampling of unique and relevant information contained in the non-ADO-level documents produced by CoreCivic.  [*See, e.g.*, Ex. 10, CCOG00202924 (memorandum among non-ADO-level employees stating that "it is imperative that you [officers] have the detainees working tonight in the units. We have the Vice President coming tomorrow and we have been cleaning today but need to continue on Pm shift."); Ex. 11, CCOG00200389 (email indicating that detainees who "are not getting paid due to not signing [work vouchers] or it being their day off . . .

-7-                    Case No. 17-CV-01112-JLS-NLS

should not get back paid for it"); Ex. 12, CCOG00201751 (email indicating that "new detainees" are required sign "work contracts" and "are also scheduled to clean after every meal"); Ex. 13, CCOG00201776 (memorandum among non-ADO-level employees stating that pod porters "must work 3 times a day to get paid" and that "all porters have been told that they should comply with a staff request for additional duties"); Ex. 14, CCOG00204486 (minutes from town hall meeting among non-ADO-level employees stating, "If you are given a directive follow the directives  this is very important"); Ex. 15, CCOG00199436 (email indicating that "Otay Mesa is now critical due to the detainee workforce being 100% depleted as of this afternoon" due to COVID-19 pandemic); Ex. 16, CCOG00201761 (email indicating that "[p]od porters work 3 times a day.  After breakfast, Lunch, and dinner.  There may also be times when you are requested to clean during off times for facility reasons."); Ex. 17, CCOG00201781 (memorandum requiring that unit officers "[m]aintain accountability of unit cleaning supplies by ensuring residents are exchanging their ID's for items on the cleaning cart").]

CoreCivic suggests below that it is somehow insufficient for Plaintiffs to cite "33 documents . . . out of over 38,000" as evidence of the relevance of the non-ADO-level production.  However, there is obviously no practical way for Plaintiffs to attach the countless relevant documents identified in its review to this Joint Status Report; nor would such an undertaking be consistent with the Court's standing civil case procedures, which directs the parties to "include only relevant and necessary exhibits" in connection with briefing on a discovery dispute.  [Hon. Nita L. Stormes, U.S. Magistrate Judge Civil Case Procedures, ¶ VI.C.3.]

In short, there is no basis for CoreCivic's belated request that the Court alter its prior discovery order and limit the parties' previously agreed ESI custodians to only *four* executive and leadership-level job titles.  CoreCivic has attempted to argue that when an issue arises with respect to a detainee, the non-ADO-level officers "would escalate the issue up the chain of command" such that any writing pertaining to such issue "would most likely make its way at least to the Chief of Unit Management and/or the Chief of

4857-6833-4094.4

Security, if not the Assistant Warden for Operations and possibly the Warden."
[Ouellette Decl., Ex. 22 (Declaration of Jason Ellis)[8]; *see also* ECF 184 at 12 (arguing the same).]  The above-referenced documents expose this argument to be devoid of merit.  CoreCivic's non-ADO-level documents contain not only **relevant** information, but information that is **distinct** from ADO-level communications and can be ascertained only from the non-executive, non-ADO-level employees actually responsible for implementing CoreCivic's policies.  For these reasons, Plaintiffs respectfully request that the Court enter order requiring CoreCivic to collect and produce documents from all previously agreed custodians.

## C.   No Weight Should Be Afforded to CoreCivic's Argument that Certain Documents Cited Above Were Collected from ADO-Level Custodians.

CoreCivic responds the foregoing arguments by contending, below, that 12 of the 33 documents referenced in Plaintiffs' argument were documents produced on December 8, 2021 that were actually collected from ADO-level custodians.  No weight should be afforded to this argument.

After numerous extensions due to CoreCivic's noncompliance with the Court's discovery deadlines, the Court set a deadline of November 1, 2021 for CoreCivic to complete its ADO-level production.  [ECF 231.]  Consistent with this directive, CoreCivic completed document productions on August 31, 2021, September 14, 2021, September 29, 2021, and November 1, 2021, which CoreCivic specifically represented were collected "from the San Diego/Otay Mesa **ADO Custodians**."  [Ouellette Decl., Ex. 23 (emphasis added).]

The Court's order also set a deadline of December 1, 2021 for CoreCivic to

---

[8] The Court's order dated August 23, 2021 [ECF 227] required CoreCivic to complete "[p]roduction of an affidavit from a knowledgeable corporate representative regarding the sufficiency of ESI from ADO-level custodians at facilities housing 25,000+ detainees during the relevant time period."  The Declaration of Jason Ellis referenced herein was produced in response to the Court's order, although CoreCivic did not file such declaration with the Court.  Mr. Ellis' declaration is attached to Mr. Ouellette's declaration for the Court's reference.

4857-6833-4094.4

complete its non-ADO-level production.  [ECF 231.]  CoreCivic failed to comply with the Court's order and failed to produce its non-ADO-level data by December 1, 2021 [Ouellette Decl. ¶ 7.]  When Plaintiffs' counsel inquired regarding the "document production yesterday [December 1, 2021], as Ordered by the Court," CoreCivic's counsel stated that the production would be produced in the following week.  [*Id.*]  On December 8, 2021 and December 13, 2021, CoreCivic produced a total of 17,510 documents. [Ouellette Decl. ¶¶ 8-9.]  Plaintiffs had good reason to believe that these documents constituted CoreCivic's non-ADO-level production: (1) these documents were produced well after the November 1, 2021 deadline to produce ADO-level documents; (2) they were produced following an inquiry from Plaintiffs' counsel regarding the non-ADO-level document production due on December 1, 2021; and (3) unlike the prior productions, CoreCivic did not describe the productions as being from "ADO Custodians," instead only stating this time that "a new production volume" was uploaded. [Ouellette Decl.¶ 31, Ex. 23.]

Indeed, the first time Plaintiffs' counsel were informed that the December 8, 2021 production contained documents collected from ADO-level custodians was when CoreCivic's counsel circulated its portion of the joint report on **4:21 p.m. on February 16, 2021**—*the deadline for filing this joint report*.  CoreCivic should not be allowed to benefit from its blatant disregard of the Court's discovery orders and lack of transparency in its document productions.  Further, even if the Court were to accept CoreCivic's argument that 12 of the 33 documents cited herein are ADO-level documents, CoreCivic cannot meaningfully dispute that the remaining 21 representative documents contain relevant and unique information regarding the implementation of CoreCivic's policies at issue in this action.

### D.    The Non-ADO-Level Data Contains Relevant Information That Should Have Been Collected in, but Was Not Present in, the ADO-Level Data.

CoreCivic should be required to abide by its previously agreed custodians for the additional reason that CoreCivic's ADO-level production contains gaps—*i.e.*, documents

that should have been contained in the ADO-level production, but were missing and identified only in CoreCivic's non-ADO-level production.

For example, the non-ADO-level data includes an email in which CoreCivic employees discuss how a particular detainee "was not officially employed during the days she was requesting pay for" and that CoreCivic is therefore "unable to pay her since she was a volunteer worker." [Ex. 18, CCOG00199364.] This relevant document undermines CoreCivic's argument that it did not "employ" detainees; and further undermines CoreCivic's argument that only those "who volunteer to participate in the VWP" received payment in exchange for labor. [ECF 118 (Opp. to Class Cert. Motion) at 3:19-4:13 (emphasis in original).] This email contains Christopher LaRose, a Senior Warden (an ADO-level custodian), at all levels of the communication, yet only lower levels of this specific email chain were produced in CoreCivic's ADO-level data—despite the fact that this document should have been contained in the ADO-level data if CoreCivic had completed its collection correctly. The full email chain is contained only in the non-ADO-level data.

Although Plaintiffs have not yet reviewed every single document produced by CoreCivic due to CoreCivic's repeated failure to comply with the Court's production deadlines,[9] Plaintiffs are already aware of other instances in which ADO-level

---

[9] Despite the fact that the Court ordered CoreCivic to produce all ADO-level data by August 31, 2021 and all non-ADO-level data by September 30, 2021, CoreCivic took almost three extra months to complete these tasks, completing production of ADO-level data on November 1, 2021 and non-ADO-level data on December 13, 2021. CoreCivic's inability to comply with Court-set deadlines necessitated Court intervention, including extensions of time and Court-ordered rolling productions.

Further, even when CoreCivic provided rolling productions, its productions were so backloaded as to deprive Plaintiffs of the ability to review documents as they were being produced. For example, with respect to the ADO-level production, CoreCivic's first two productions contained a paltry 736 documents, while the final two productions contained the remaining 19,794. Similarly, with respect to the non-ADO-level production, CoreCivic's first production contained a paltry 660 documents, whereas its final production contained 16,850.

4857-6833-4094.4

communications were omitted from CoreCivic's ADO-level production and contained only in CoreCivic's non-ADO-level production. [*See, e.g.*, Ex. 19, CCOG00199499 (email in which Chief of Unit Management Virginia Sawyer and Warden Fred Figueroa—both ADO-level positions—discuss shortage of kitchen workers and how "Detainee's [*sic*] need to be held accountable" for not working); Ex. 20, CCOG00199307 (email involving Virginia Sawyer discussing work schedules for porters).]

For this separate reason, Plaintiffs respectfully request that the Court order CoreCivic to produce data for all previously ordered custodians.

### E.     No Undue Burden Would Be Imposed By Requiring Collection of Non-ADO-Level Custodian ESI.

CoreCivic also argues below that "Plaintiffs have failed to provide any evidence or argument regarding the burden the complete production would impose on CoreCivic." However, the purpose of this Joint Status Report is not to brief the issue of undue burden, but to "compar[e] the ADO-level ESI to the all-custodians ESI for OMDC and SDCF." [ECF 231.]  As part of this discovery dispute,[10] CoreCivic admits that with use of

---

As a result of CoreCivic's dilatory tactics, Plaintiffs have not yet reviewed every document contained in CoreCivic's ADO-level and non-ADO-level productions—yet, even the review performed to date provides ample evidence of the significance of CoreCivic's non-ADO-level data.

To the extent the Court is inclined to limit any of its previously ordered ESI custodians, Plaintiffs respectfully request that the Court grant the parties an additional 30 days to review produced documents, provide briefing regarding the same, and set a further hearing on this discovery dispute.

[10] CoreCivic argues that this discovery dispute is relevant "solely to the federal TVPA claims."  This assertion is incorrect for multiple reasons.  Since one of CoreCivic's California facilities—California City Correctional Facility—was not included in the productions required by the Court's orders [ECF 225, 227, 229, 231], there remains a California facility (and therefore labor law claims) that would be affected by the outcome of this discovery dispute.

Alternatively, to the extent CoreCivic contends that this discovery dispute relates solely to federal claims, CoreCivic implicitly acquiesces to the collection and production of ESI from all previously agreed custodians for California City Correctional Facility.

Conversely, the fact that many of non-ADO-level documents cited herein relate to detainee pay issues and work hours does not render them irrelevant to the federal TVPA claims.  The amount of time that CoreCivic required detainees to work, and whether

technology-assisted review, CoreCivic reviewed only a "random sample of 2,000" of the 38,000 documents it produced, and reviewed only 923 documents specifically from non-ADO-level custodians.  Extrapolating across all of CoreCivic's facilities nationwide, the number of documents CoreCivic would actually have to review, utilizing technology-assisted review, would be nominal given the size and geographic scope of the class and relevant time periods for Plaintiffs' claims.

Further, while Plaintiffs are willing to meet and confer with CoreCivic regarding the use of technology-assisted review, CoreCivic failed to notify, let alone meet and confer with, Plaintiffs regarding their unilateral use of such methods until CoreCivic circulated its portion of this Joint Status Report on the filing deadline.  [Ouellette Decl. ¶ 35.]  Thus, to the extent CoreCivic argues that the non-ADO-level data does not contain sufficiently relevant documents, Plaintiffs object that they were not consulted regarding what electronic discovery protocol CoreCivic would use in connection with this discovery dispute.  *See Youngevity Int'l, Corp. v. Smith*, No. 16-cv-00704-BTM (JLB), 2019 U.S. Dist. LEXIS 60907, at *39 (S.D. Cal. Apr. 9, 2019) ("Technology-assisted review of ESI does require an 'unprecedented degree of transparency and cooperation among counsel' in the review and production of ESI responsive to discovery requests […] requir[ing] the producing party to provide the requesting party with full disclosure about the technology used, the process, and the methodology, including the documents used to 'train' the computer.").  The governing ESI protocol does not authorize or contemplate the use of technology-assisted review.  [ECF 63.]  Due to CoreCivic's continued lack of transparency in the discovery process, Plaintiffs have been deprived of the ability to ensure that CoreCivic's collection process does not systematically exclude potentially relevant ESI.  CoreCivic should be denied relief from the Court's prior discovery orders on these alternative grounds.

---

detainees were compensated for that work, bear directly on whether CoreCivic extracted labor from detainees by means of coercion or other unlawful means.  [*See, e.g.*, Ex. 2, CCOG00202220 (stating that detainees must work "8 hours a day to be paid").]  Similarly, the amount of work that detainees performed, and the amount of pay they received, necessarily bear on damages available under the TVPA.

-13-                     Case No. 17-CV-01112-JLS-NLS

## II. __DEFENDANT'S POSITION__

By now, the Court is well aware of the reason CoreCivic requested that the Court narrow the list of custodians from whom ESI must be collected should this case proceed to nationwide discovery—i.e., that collection of ESI from all custodian positions would require at least five years at a cost reaching into the millions of dollars. (Dkt. 215.) Recognizing the burden full production would impose on CoreCivic, as well as Plaintiffs' concerns about evidentiary gaps, the Court crafted a procedure to test whether limiting ESI production to ADO-level positions would provide an appropriate balance between these concerns. (Dkt. 225.) Even this limited process, however, proved to be incredibly burdensome and required several extensions of the deadlines.[11]

Plaintiffs have failed to provide any evidence or argument regarding the burden the complete production would impose on CoreCivic.[12] (Id. at 11–16.) Instead, Plaintiffs'

---

[11] Plaintiffs complain that CoreCivic's productions were "backloaded." But that is the nature of the continuous active learning process used to review the voluminous documents—it starts slowly at first as the algorithm learns to recognize potentially relevant documents and then moves more quickly as the algorithm is refined. In any event, the original Order required CoreCivic to complete its productions by September 30, 2021, and for the parties to file their Joint Status Report by October 31, 2021, giving Plaintiffs 30 days to complete their review and briefing. By Plaintiffs' own admission, they have had two months to review ESI since CoreCivic completed its productions on December 13, 2021. The Court should deny their requests for additional time and briefing on these issues.

Plaintiffs further complain that CoreCivic did not meet the November 1 and December 1, 2021 deadlines to complete production of ADO-level and non-ADO-level ESI and argue that CoreCivic should be required to provide ESI for all ADO-level and non-ADO-level ESI on a nationwide basis because of it. Collection of ESI for the ADO-level and non-ADO-level custodians for essentially one facility (as OMDC replaced SDCF), however, resulted in over 3.2 million documents to be reviewed. (Giardina Dec. at ¶ 26.) Even after de-duplicating and threading, CoreCivic still had to review over 208,000 documents. (Id.) Counsel for CoreCivic told Plaintiff's counsel on August 12, 2021 that after application of search terms to the ADO-level ESI, there were 191,274 documents to be reviewed. The only way it would have been possible for CoreCivic to meet the production deadlines was to use TAR/continuous active learning. Nothing in the ESI Protocol required CoreCivic to get Plaintiffs' approval to do so first, nor does it prohibit the use of TAR/continuous active learning. (Dkt. 63.) Plaintiffs have also cited no authority that would support their position that CoreCivic should be required to make a production that will take 5 years and millions of dollars to complete as a sanction for producing tens of thousands of documents a few weeks past the deadline.

[12] At 8:59 a.m. MST on February 16, 2022, Plaintiffs notified CoreCivic that they intended to attach various documents to their portion of this joint filing that had been designated confidential, such that CoreCivic would need to either withdraw the

-14-                                    Case No. 17-CV-01112-JLS-NLS

position has been and is that CoreCivic should have to produce the complete set of ESI because they (Plaintiffs) requested it. But Rule 26(b)(1) requires that discovery be proportional to the needs of the case, considering (among other things) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Plaintiffs have failed to show that the time-consuming and expensive discovery they demand is likely to yield a benefit that outweighs the undisputed burden it will impose.

Plaintiffs have also failed to provide the Court with a true comparison "between the two productions that would show the additional types of documents and information gathered with the different custodian lists." (Dkt. 225 at 3.) Instead, Plaintiffs identified 33 documents (out of over 38,000, or 0.09% of the total documents produced) that they believe show that non-ADO-level ESI will include relevant and responsive documents. In doing so, they misconstrue CoreCivic's position. CoreCivic has never claimed that non-ADO-level ESI will include no relevant and responsive documents. Rather, CoreCivic has consistently maintained that it is unlikely to contain unique documents and information such that the likely benefit to be gained by requiring CoreCivic to produce ESI for all positions outweighs the burden doing so will impose.

With the completion of this production, all responsive ESI hitting on any search term from any possible SDCF/OMDC Custodian has been produced. The focus of this dispute is the collection of non-ADO ESI relating solely to the federal TVPA claims, and specifically, whether CoreCivic should be required to produce non-ADO-level ESI for all facilities at issue, as opposed to just ADO-level ESI at facilities housing 25,000+ detainees during the relevant time period.[13] Yet, most of Plaintiff's arguments about the

---

designation or file a Motion for Leave to File Under Seal. At 9:48 a.m., Plaintiffs sent 9 proposed exhibits for CoreCivic's review. At 1:14 p.m., Plaintiffs sent their portion of the Joint Status Report. CoreCivic sent its portion, including CoreCivic's response to Plaintiffs' arguments, at 5:21 p.m. MST. Plaintiffs sent extensive additions to their portion at 9:11 p.m. MST.
[13] The California City Correctional Center stopped operations on November 28, 2013. The applicable class period for the CA Labor Law Class commences on May 31, 2013 (Dkt. 84 at 1). Given the relatively small number of ICE detainees held at California City during the six months of the relevant time period in which it housed such detainees, CoreCivic has proposed excluding it from the collection of ESI, focusing rather on those facilities with significantly more ICE detainees. To the extent that the Court determines

4857-6833-4094.4

relevance of the non-ADO ESI they highlight relate solely to individual detainee pay issues and hours of work, which are not relevant to the current dispute.

Plaintiffs also misconstrue the origin of many of the documents they rely on. CoreCivic produced the bulk of the ADO-level ESI in four batches on August 31, September 14, September 29, and November 1, 2021. (Lee Dec. at ¶¶ 2–5.) On December 8, 2021, CoreCivic made a fifth production of ESI consisting of both non-ADO-level ESI and some additional ADO-level ESI, despite CoreCivic's best efforts to complete the production of ADO-level ESI by November 1, 2021. (Id. at ¶ 6.) CoreCivic then completed its production of non-ADO-level ESI on December 13, 2021. (Id. at ¶ 7.) Many of the documents Plaintiffs rely on were produced on December 8, 2021; a simple review of the metadata makes it clear that documents CCOG00199520, CCOG00199420, CCOG00199553, CCOG00199302, CCOG00199428, CCOG00199530, CCOG00199541, CCOG00200389, CCOG00199436, CCOG00199364, CCOG00199499, and CCOG00199307 were all collected from ADO-level custodians— something Plaintiffs apparently failed to do. (Id. at ¶¶ 8–15, 17–21.)

Other documents Plaintiffs rely on are irrelevant to this case. The references to detainees refusing to work and/or being fired in documents CCOG00199420 and CCOG00199553 pertain to USMS detainees. (Id. at ¶¶ 10–11.) Document CCOG00211532 pertains to Eloy Detention Center, which is not at issue here. (Id. at ¶ 16.) Other documents, such as reports showing deposits into detainee accounts, are duplicative of structured data produced separately from ESI. (Giardina Dec. at ¶ 38(f).)

Plaintiffs point out that there are only 344 exact duplicates between the two sets of ESI, but again, CoreCivic has never claimed that non-ADO-level ESI would result in the production of exact duplicates. Indeed, CoreCivic runs the collected documents through both de-duplication and threading processes that are intended to eliminate, or at least significantly reduce, true duplicates. (Giardina Dec. at ¶¶ 14–16, 22–24.) What little

_____

that non-ADO ESI is relevant for that claim, the collection period should be limited solely to the applicable 6-month period of the CA Labor Law Class.

4857-6833-4094.4

unique information has resulted from the non-ADO-level ESI pertains primarily to individual detainee issues, and not to system-wide policies or practices. (Id. at ¶¶ 40–41.)

CoreCivic's initial collection involved 19 ADO custodians, including individuals who had since moved into other positions and job titles, transferred to other facilities, and one individual who had recently been promoted and transferred from another facility to an ADO position at OMDC. (Id. at ¶¶ 9–11.) To the extent that an individual was promoted from a non-ADO position at a relevant facility to an ADO position, the full ESI during the relevant time period, including prior to promotion, was collected, processed, and reviewed for production. (Id. at ¶ 12.) As the court is aware, ESI must be collected individually for each custodian. (Dkt. 215-1 at ¶ 10; Giardina Dec. at ¶ 13.) The collection for these 19 ADO custodians consisted of more than 1,733,000 items, with a total file volume of 881 GB. (Id.)

The ADO ESI was de-duplicated based upon email family hash-values, which resulted in a unique total collection of more than 991,000 files, with a total file volume size of 220 GB. (Id. at ¶ 14.) Application of the search terms resulted in more than 191,000 documents, with a total volume size of 67 GB. (Id. at ¶ 15.) E-mail threading further reduced the volume, but still left more than 124,000 documents, with a total volume size of 52 GB. (Id. at ¶ 16.) Entire document families were promoted for review pursuant to the ESI Protocol. (Id. at ¶ 17.)

Given the volume of ESI to be reviewed and the relatively short amount of time to review and produce it, a mixed Technology Assisted Review (TAR)/Managed Review process was used. (Id. at ¶ 18.) Initial batches of ESI were assigned to members of a managed review team to code for responsiveness, privilege, confidentiality, and redaction. (Id.) Quality control (QC) was done by supervisors of the managed review team, with a second-level QC review done by personnel in CoreCivic's counsel's office. (Id.) Based upon the reviewers' decisions and both levels of QC review, the TAR algorithm was revised multiple times to generate the next set of batches for managed review. (Id.) This was a continuous active learning process. (Id.) Following termination

4857-6833-4094.4

of the review based upon the TAR algorithm, an elusion sample was generated, reviewed, and analyzed to validate the decision to terminate the managed review. (Id.)

The individuals involved in review and QC were instructed to take a very liberal approach to identifying and coding documents as being responsive for production. (Id. at ¶ 19.) Ultimately, 11,668 documents from the ADO custodians were determined to be non-privileged and responsive. (Id. at ¶ 20.) An additional 9,674 non-responsive, non-privileged family-member documents were also produced pursuant to the ESI Protocol, for a total production volume of 21,342 ADO documents. (Id.)

In the meantime, collection and processing for the non-ADO custodians began. (Id. at ¶ 21.) The non-ADO ESI was de-duplicated, both against itself and against the final threaded collection of ADO ESI, based upon email family hash-values, which resulted in a unique total collection of more than 634,000 files, with a total file volume size of 198 GB. (Id. at ¶ 22.) Application of the search terms resulted in more than 115,184 documents, with a total volume size of 48 GB. (Id. at ¶ 23.) E-mail threading further reduced the volume, but still left more than 82,128 documents, with a total volume size of 37. (Id. at ¶ 24.) The review of the non-ADO ESI proceeded using the same Continuous Active Learning, TAR/managed-review process as the ADO ESI. (Id. at ¶ 25.) Ultimately, 9,330 documents among this non-ADO set were determined to be non-privileged and responsive. (Id. at ¶ 26.) An additional 7,368 non-privileged, non-responsive family member documents were also produced pursuant to the ESI Protocol, for a total production volume of 16,698 non-ADO documents. (Id.)

The following table summarizes and compares the number of SDCF/OMDC ADO and non-ADO documents at each step of the process:

|  | ADO | Non-ADO |
|---|---|---|
| Files Collected | 1,733,634 | 1,539,520 |
| Files after De-Duplication | 991,410 | 634,146 |
| Files after Search Terms | 191,274 | 115,184 |
| Files after Threading | 125,953 | 82,128 |
| Responsive Files | 11,668 | 9,330 |
| Files Produced | 21,342 | 16,698 |
| Non-Responsive Family Members Produced | 9,674 | 7,368 |

(Id. at ¶ 27.)

In order to compare the two productions, CoreCivic directed its ESI vendor to prepare approximately 10% of the produced ESI which was actually coded as responsive either by a managed review team member or the TAR algorithm for review by CoreCivic. (Id. at ¶ 28.) Further, CoreCivic directed that the vendor ensure that files from ADO and non-ADO custodians be included in the sample. (Id.) CoreCivic intentionally sought to exclude the 17,042 documents which were non-responsive (and may not even have contained any search terms, but were produced solely in accordance with the ESI Protocol) to increase the reliability of its conclusions. (Id.)

CoreCivic reviewed a random sample of 2,000 documents. (Id. at ¶ 29.) The sample was nearly evenly divided among both categories of custodians, including 1,077 files from the ADO custodians, and 923 from the non-ADO custodians. (Id. at ¶¶ 30–31.)

To evaluate the files, CoreCivic developed a three-tier rating system. (Id. at ¶ 32.) "Relevant" documents address core issues pertaining to the claims or defenses in this matter, such as policies and practices at the facility relating to the Voluntary Work Program, aggregate monthly expenses relating to the Voluntary Work Program, ICE oversight of the Voluntary Work Program, etc. (Id.) "Tangentially Relevant" documents arguably have some connection, albeit tenuous, to the core claims and defenses in the litigation. (Id.) "Not Relevant" documents do not have any relationship to the issues in this litigation. (Id.)

As with the original coding, CoreCivic evaluated each document based solely upon the four corners of the document and relevant metadata. (Id. at ¶ 33.) Documents were not relevant simply because they contained an attachment that may be relevant. (Id.) Rather, non-email files (PDF, MS Excel, MS Word) were included in the sample and evaluated independently. (Id.) "Not Relevant" was used sparingly for those documents which exclusively involved a non-ICE-detainee population; related to policies and practices at other facilities (including documents sent to custodians who had been employed at those other facilities); likely were coded responsive in error and not

Case No. 17-CV-01112-JLS-NLS

identified during the QC process; or were identified as privileged. (Id. at ¶ 34.) A total of 180 "Not Relevant" documents were identified among the sample set, with 109 among the ADO custodians and 70 among the non-ADO custodians. (Id.) This was expected to be the case, since opportunities for advancement to ADO level normally require transfer to a new facility location, whereas non-ADO staff are more likely to seek promotion at their current facility, rather than relocate. (Id.; *see also* Ellis Dec. at ¶¶ 8–19.)

During the sample review, CoreCivic identified 375 documents as "Relevant." (Id. at ¶ 35.) Of those "Relevant" documents, 292 (77.85%) were collected from ADO custodians. (Id.) Of all the non-ADO custodians included in the sample, only the business manager had more than 15% of his documents identified as "Relevant," including monthly reports, ICE invoices, and incentives provided to participants in the Voluntary Work Program. (Id.) Most non-ADO custodians, including individuals who served as Quality Assurance Manager, Grievance Officer, Disciplinary Hearing Officer, and some Unit Managers, had less than 10% of documents identified as "Relevant." (Id.)

The fact that the processing and review was conducted for ADO custodians first, followed by the non-ADO custodians, inflated the number of "Relevant" documents among the non-ADO custodians and limited the effectiveness of email threading to control data storage and review costs. (Id. at ¶ 36.) Generally, email threading strives to exclude earlier communications in an email exchange to keep the complete thread. (Id.) Threading, however, looks only at exact duplicates of earlier parts of the final exchange. (Id.) Thus, if one response in the exchange included a new or different attachment, it would be produced as a separate exchange, even though much of the exchange is duplicative. (Id.) This problem is compounded by the separate productions of ESI from ADO and non-ADO custodians. (Id.) For example, if an exchange started out among unit staff, but was later forwarded to an ADO custodian, both the original exchange among unit staff and the forwarded exchange that included the ADO custodian were likely coded responsive and produced, as the exchange involving the ADO custodian would have been produced first, with the original exchange produced again later because it was not an

4857-6833-4094.4

exact duplicate of the exchange that was produced with the ADO custodian's ESI and therefore was not filtered out during de-duplication and threading. (Id.) This situation accounts for many of the "Relevant" documents among the Unit Managers CoreCivic identified during the sample review. (Id.)

Among the "Relevant" documents identified from the Unit Managers, CoreCivic found draft Unit Plans relating to the operation of each unit at the facility. (Id. at ¶ 37.) Unit Plans are usually prepared annually, and typically: identify the designated population of a housing area; identify available VWP assignments from the Facility's 18-100BB Housing Plan Guidelines and 18-100CC Work/Program Plan Guidelines; detail expected practices and procedures relating to operations in each housing unit; and identify specific unit personnel. (Id.) These plans are not simply prepared by Unit Managers, but require approval of the Chief of Unit Management and the Warden (or Warden's designee), and duplicate copies were also identified among the ADO custodians' ESI. (Id.) Further, final approved versions of these are usually maintained at each facility, and should be more readily obtained as hardcopy documents or loose ESI directly from the facilities. (Id.)

More than 70% of the files CoreCivic reviewed in the sample were identified as "Tangentially Relevant." (Id. at ¶ 38.) Of those, 676 files were located among the ADO custodians, and 770 were identified among the non-ADO custodians. (Id.) To differentiate these, CoreCivic placed them in the following subcategories:

a.   Facility Policies – Copies of the final versions of these policies were previously obtained from the facility and produced prior to the collection of ESI. The copies in the sample are duplicates of documents more easily and already obtained by other means, or drafts which were never approved for implementation (55 documents – 37 ADO and 18 non-ADO);

b.   Facility Handbooks – Copies of the final versions of these documents were obtained from the facility and produced prior to the collection of ESI. The copies in the ESI sample are duplicates of documents more easily and

-21-    Case No. 17-CV-01112-JLS-NLS

already obtained by other means, or drafts which were never issued to the detainee population (19 documents – 2 ADO and 17 non-ADO);

c.  Detainee Job Descriptions, Checklists, and Specifications – Copies of most of these were previously obtained directly from the facility and produced prior to the collection of ESI. (62 documents – 16 ADO and 46 non-ADO);

d.  Facility or Unit Clocks – Copies of these documents (which set the operating schedule of the facility or a certain housing unit) were obtained from the facility and produced prior to the collection of ESI, and most of these are duplicates of documents more easily obtained by other means (26 documents – 20 ADO and 6 non-ADO);

e.  Town Hall Meeting Minutes – These documents usually include simple reminders to detainees of the option to participate in the VWP during a meeting, the importance of sanitation and hygiene, and other reminders relating to facility operations and procedures. (94 documents – 28 ADO and 66 non-ADO);

f.  Rosters of VWP Participants (including scheduled individual days off) – The information regarding the identity of VWP participants is duplicative of the detainee pay records which were previously obtained and produced as structured data identifying each trust account transaction for each detainee who participated in the VWP. Further, as opposed to the structured data previously produced, which covered the entire time period at issue, these are "static" documents, reflecting at best a snapshot of the roster as it appeared on just a single day. (64 documents – 29 ADO and 35 non-ADO);

g.  Documents mentioning Detainee Work Stoppages and potentially related discipline (5 documents – 5 ADO and zero non-ADO);

h.  Individual Detainee VWP requests for assignment, schedule changes, performance, payment questions (166 documents – 27 ADO and 139 non-ADO);

i.      Documentation relating to medical clearances for individual detainees prior to being placed in certain VWP positions, as well as correspondence relating to removal or suspension of certain detainees due to individual medical concerns (443 documents – 211 ADO and 232 non-ADO);

j.      General ICE oversight of facility operations (unrelated to VWP) (251 documents – 225 ADO and 26 non-ADO);

k.      Plan of Action Lists and reports relating to ICE and audit deficiencies (15 – 15 ADO and zero non-ADO);

l.      General reminders and reports relating to overall facility state of sanitation (177 documents – 24 ADO and 154 non-ADO);

m.      Individual Detainee Discipline, unrelated to cleaning or VWP participation (19 documents – 9 ADO, 10 non-ADO); and

n.      Duplicative content, usually different non-substantive branches of a Relevant email which appeared in close proximity in the sample (31 documents – 24 ADO and 8 non-ADO).

(Id. at ¶ 38.) In addition, there were 45 documents (30 ADO and 15 non-ADO) which were "Tangentially Relevant" but not included in the categories above. (Id. at ¶ 39.) These included documents relating to news articles, security and supervision of the facility kitchen, blank audit tools, and occasionally daily shift "pass-on" emails from Unit Management team members regarding the operation and observation of a particular housing unit for the member working the next shift. (Id.)

Review of 2,000 responsive emails and attachments did not disclose a substantial difference between the emails collected, with the sole exception of emails relating to individual daily performance in the VWP, individual detainee requests for VWP assignments, and individual detainee requests relating to payment records. (Id. at ¶ 40.) While there was considerably more correspondence among non-ADO personnel regarding individual detainee questions, requests for VWP positions, decisions to quit VWP participation, inquiries regarding status of individual payment of VWP allowances

for certain days, requests to be reinstated to the VWP, and the performance of detainees in the VWP, the general substance and nature of those individual detainee communications did not materially differ from those which were escalated to the ADO level and appeared among the ADO ESI in the sample. (Id.) The purpose of ESI discovery is to identify specific facility practices and procedures relating to cleaning done by detainees beyond their personal living spaces, but during CoreCivic's review of the 923 non-ADO documents in the sample, it did not identify any relevant substantive emails or attachments with content which either was not duplicative of ESI from an ADO custodian or which could more quickly and readily be obtained from the facility or extracted from available structured data on a facility-wide basis. (Id. at ¶ 41.) The Court should limit ESI to ADO-level custodians. If it does not, CoreCivic estimates the complete production will take at least five years and will cost millions of dollars—burdens that Plaintiffs have not shown are outweighed by any benefit that might result. (Dkt. 215.)

DATED:  February 16, 2022

**FOLEY & LARDNER LLP**
Eileen R. Ridley
Geoffrey Raux
Alan R. Ouellette


*/s/ Eileen R. Ridley*
Eileen R. Ridley
Attorneys for Plaintiffs SYLVESTER OWINO, JONATHAN GOMEZ, and the Proposed Class(es)


**LAW OFFICE OF ROBERT L. TEEL**
Robert L. Teel
   lawoffice@rlteel.com
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Telephone:  (866) 833-5529
Facsimile:  (855) 609-6911

Attorneys for Plaintiffs SYLVESTER OWINO,

4857-6833-4094.4

JONATHAN GOMEZ, and the Proposed Class(es)

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**


*/s/ Jacob B. Lee*
Daniel P. Struck
dstruck@strucklove.com
Rachel Love
rlove@strucklove.com
Nicholas D. Acedo
nacedo@strucklove.com
Ashlee B. Hesman
ahesman@strucklove.com
Jacob B. Lee
jlee@strucklove.com

Ethan H. Nelson
LAW OFFICE OF ETHAN H. NELSON
ethannelsonesq@gmail.com

Attorneys for Defendant/Counter-Claimant CoreCivic, Inc.

4857-6833-4094.4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on February 16, 2022, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

*/s/ Eileen R. Ridley*
Eileen R. Ridley

Case No. 17-CV-01112-JLS-NLS

4857-6833-4094.4