| | |
|---|---|
| 1 | STRUCK LOVE BOJANOWSKI & ACEDO, PLC |
|   | Daniel P. Struck, AZ Bar #012377 |
| 2 | *(admitted pro hac vice)* |
|   | Rachel Love, AZ Bar #019881 |
| 3 | *(admitted pro hac vice)* |
|   | Nicholas D. Acedo, AZ Bar #021644 |
| 4 | *(admitted pro hac vice)* |
|   | Ashlee B. Hesman, AZ Bar #028874 |
| 5 | *(admitted pro hac vice)* |
|   | Jacob B. Lee, AZ Bar #030371 |
| 6 | *(admitted pro hac vice)* |
|   | 3100 West Ray Road, Suite 300 |
| 7 | Chandler, Arizona 85226 |
|   | Tel.: (480) 420-1600 |
| 8 | Fax: (480) 420-1695 |
|   | dstruck@strucklove.com |
| 9 | rlove@strucklove.com |
|   | nacedo@strucklove.com |
| 10 | ahesman@strucklove.com |
|   | jlee@strucklove.com |
| 12 | LAW OFFICE OF ETHAN H. NELSON |
|   | Ethan H. Nelson, CA Bar #262448 |
|   | 4 Park Plaza, Suite 1025 |
| 13 | Irvine, California 92614 |
|   | Tel.: (949) 229-0961 |
| 14 | Fax: (949) 861-7122 |
|   | ethannelsonesq@gmail.com |
| 16 | Attorneys for Defendant/Counter-Claimant CoreCivic, Inc. |

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CoreCivic, Inc., a Maryland corporation,<br><br>Defendant. | NO. 3:17-cv-01112-JLS-NLS<br><br>**DECLARATION OF MICHAEL GIARDINA, ACP**<br><br>Magistrate Judge: Honorable Nita L. Stormes |

| | |
|---|---|
| CoreCivic, Inc., a Maryland corporation,<br><br>     Counter-Claimant,<br><br>v.<br><br>Sylvester Owino and Jonathan Gomez, on behalf of themselves, and all others similarly situated,<br><br>     Counter-Defendants. | |

  I, MICHAEL GIARDINA, ACP, make the following Declaration:

  1. I am over the age of 18 years, have personal knowledge of, and am competent to testify to the matters set forth in this Declaration.

  2. I received my B.A. in Economics in 1994. In 1995, I began my career as a paralegal in Washington, D.C. In January 2006, I successfully passed the Certified Legal Assistant Examination offered by the National Association of Legal Assistants and earned the designation of Certified Paralegal (CP). In January 2011, I successfully completed the requirements of the National Association of Legal Assistants and earned the designation of Advanced Certified Paralegal (ACP) in Discovery. In June 2015, I successfully completed the requirement of the National Association of Legal Assistants and earned a second ACP credential in E-Discovery. The National Association of Legal Assistants requires that an individual seeking to maintain a designation as a Certified or Advanced Certified Paralegal must complete 50 hours of continuing legal education, at least five of which must be in ethics, every five years. I have successfully renewed those credentials in 2011, 2016 and 2021.

  3. I am an active member of the Arizona Paralegal Association, the National Association of Legal Assistants, and the International Legal Technology Association.

  4. During my career, I have worked in litigation firms with nationwide practices located in Washington, D.C.; Baltimore, Maryland; and Phoenix, Arizona.

I have twenty-two years' experience as a litigation paralegal supporting attorneys with cases proceeding to trial in both state and federal courts and administrative proceedings in Alaska, Arizona, California, Delaware, the District of Columbia, Kentucky, Hawaii, Georgia, Illinois, Indiana, Maryland, New Mexico, North Carolina, Ohio, Texas, and, Virginia.

5. Since February 2006, I have continuously worked under the supervision of Daniel P. Struck as a paralegal on complex matters for a variety of corporate and governmental clients, including CoreCivic. At all relevant times in this case, I have acted under the supervision and direction of Daniel Struck, Rachel Love, Nicholas Acedo, Ashlee Hesman, and Jacob Lee.

6. In light of my considerable experience, training, certification, and knowledge of CoreCivic's email and ESI systems, I am CoreCivic's designated E-Discovery Liaison in this matter. (*See* Doc. 63.) As such, I am familiar with the parties' various disputes regarding the scope of ESI to be collected and produced, as well as the Court's orders regarding the same and the efforts undertaken by CoreCivic to collect, review, and produce responsive ESI relating to custodians employed at CoreCivic's San Diego Correctional Facility and/or Otay Mesa Detention Center.[1]

7. I submit this Declaration for the Court's consideration regarding efforts to streamline and expedite any future collection, review, and production of ESI in this matter.

8. The initial collection involved 10 persons who at the time of collection served in an Administrative Duty Officer (ADO) position (as Warden, Assistant Warden, Chief of Security, or Chief of Unit Management) at the facility or served

---

[1] The San Diego Correctional Facility was owned by the County of San Diego and leased by CoreCivic, then known as Corrections Corporation of America. At the expiration of the lease, the U.S Immigration and Customs Enforcement (ICE) and U.S. Marshals Service (USMS) detainees in CoreCivic's physical custody, as well as CoreCivic staff, were transferred to a new CoreCivic facility, the Otay Mesa Detention Center.

in an ADO position at the time of their separation from employment with CoreCivic.

9. The second collection included an additional 9 individuals who were identified as having served in an ADO position at the facility at some point during their career. This included individuals who had since moved into other positions and job titles, transferred to other facilities, and one individual who had recently been promoted and transferred from another facility to an ADO position at OMDC.

10. The identified ADO custodians and their positions at the facility were:

- C. Burns (Assistant Warden)
- F. Figueroa (Warden)
- C. Frappiea (Assistant Warden)
- R. Garcia (Assistant Warden)
- R. George (Assistant Warden)
- C. Howard (Assistant Warden)
- C. LaRose (Warden)
- F. Lawrence (Warden)
- D. Morris (Assistant Warden)
- J. Peterson (Chief of Security)
- D. Powell (Assistant Warden)
- J. Roemmich (Assistant Warden)
- V. Sawyer (Chief of Unit Management)
- M. Sedgwick (Assistant Warden)
- R. Shoenfelder (Assistant Warden)
- C. Strausbaugh (Chief of Security/Unit Management)
- T. Topasna (Chief of Security/Unit Management)
- J. Weaver (Assistant Warden and Warden)
- J. Williams (Chief of Security)

SDCF/OMDC did not, during the relevant time period, have anyone with the job title of Complex Chief of Security.

11. To the extent that an individual was promoted from a non-ADO position at a relevant facility to an ADO position (for example, an individual promoting from Unit Manager to Chief of Unit Management), the full ESI during the relevant time period, including prior to promotion, was collected, processed, and reviewed for production.

12. As the court is aware, ESI must be collected individually for each custodian. (Dkt. 215-1 at ¶ 10.) The collection for these 19 ADO custodians consisted of more than 1,733,000 items, with a total file volume of 881 GB.

13. The ADO ESI was de-duplicated based upon email family hash-values, which resulted in a unique total collection of more than 991,000 files, with a total file volume size of 220 GB.

14. Per the Court's direction, the search terms were applied to this collection, which resulted in more than 191,000 documents where at least one search term appeared in the document, with a total volume size of 67 GB.

15. To further manage the volume, e-mail threading was applied to this collection. Threading further reduced the volume, but still left more than 124,000 documents containing one or more search terms, with a total volume size of 52 GB to be reviewed.

16. In light of the ESI Protocol's requirement to review and generally produce complete document families, entire document families, not just the 124,000 threaded documents with hits, were promoted for review.

17. Given the volume of ESI to be reviewed and the relatively short amount of time to review and produce it, a mixed Technology Assisted Review (TAR)/Managed Review process was used. Initial batches of ESI were assigned to members of a managed review team to code for responsiveness, privilege, confidentiality, and redaction. Quality control (QC) was done by supervisors of the

managed review team, with a second-level QC review done by personnel in our office who also provided ongoing guidance regarding responsiveness decisions. Based upon the reviewers' decisions and both levels of QC review, the TAR algorithm was revised multiple times to generate the next set of batches for managed review. This was a continuous active learning process. Following termination of the review based upon the TAR algorithm, an elusion sample was generated, reviewed, and analyzed to validate the decision to terminate the managed review.

18. The managed review team members and individuals conducting the QC reviews were instructed to take a very liberal approach to identifying and coding documents as being responsive for production. I was personally involved in developing the guidance and training given to the managed review team members and provided management and guidance to personnel in our office during the second-level QC process, but I did not directly render any second-level QC decisions during the review of either the ADO or non-ADO ESI due to other commitments on other matters.

19. Ultimately, 11,668 documents from the ADO custodians were determined to be non-privileged and responsive. Because the ESI protocol required the production of complete document families, an additional 9,674 non-responsive, non-privileged family-member documents were also produced, for a total production volume of 21,342 ADO documents.

20. While review was commencing for the ADO custodians, collection and processing for the non-ADO custodians began. The non-ADO custodians and their job titles or functional roles were:

- R. Ayers (Unit Manager)
- R. Blossom (Disciplinary Hearing Officer (DHO) function)
- S. Cosby (Unit Manager, Assistant Chief of Security)
- R. Crouch (Business Manager)

- J. Falvey-Hogue (Unit Manager)
- D. Gillespie (Unit Manager)
- J. Guerrero-Lopez (Quality Assurance Coordinator)
- B. Handsbur (Unit Manager)
- G. Iwuaba (Disciplinary Hearing Officer function)
- L. Mileto (Grievance Coordinator (GC))
- A. Mora, Jr. (Unit Manager)
- K. Perry (Unit Manager)
- R. Rivera (Investigator; also filled DHO function)
- B. Soria (Quality Assurance Manager; also filled GC function)
- M. Torres-Honorato (Unit Manager)
- T. Trick (Unit Manager)

During the relevant time period, SDCF/OMDC did not have any personnel with the titles of Finance Manager, Complex Quality Assurance, Senior QA Manager, Jobs Coordinator, Operations Manager, Program Director, Program Facilitator, Program Manager, or Safety/Grievance Manager.[2]

21.  The non-ADO ESI was de-duplicated, both against itself and against the final threaded collection of ADO ESI, based upon email family hash-values, which resulted a unique total collection of more than 634,000 files, with a total file volume size of 198 GB.

22.  Per the Court's direction, the search terms were applied to this collection, which resulted in more than 115,184 documents where at least one hit, with a total volume size of 48 GB.

23.  To further manage the volume, e-mail threading was applied to this collection. Threading further reduced the volume, but still left more than 82,128 documents, with a total volume size of 37 GB to be reviewed.

---

[2] Ms. Soria has also held the title of Manager, Quality Assurance.

24. The review of the non-ADO ESI proceeded using the same Continuous Active Learning, TAR/managed-review process as the ADO ESI.

25. Ultimately, 9,330 documents among this non-ADO set were determined to be non-privileged and responsive. Because the ESI protocol required the production of complete document families, an additional 7,368 non-privileged, non-responsive family member documents were also produced, for a total production volume of 16,698 non-ADO documents.

26. The following table summarizes and compares the number of SDCF/OMDC ADO and non-ADO documents at each step of the process:

|  | ADO | Non-ADO |
| --- | --- | --- |
| Files Collected | 1,733,634 | 1,539,520 |
| Files after De-Duplication | 991,410 | 634,146 |
| Files after Search Terms | 191,274 | 115,184 |
| Files after Threading | 125,953 | 82,128 |
| Responsive Files | 11,668 | 9,330 |
| Files Produced | 21,342 | 16,698 |
| Non-Responsive Family Members Produced | 9,674 | 7,368 |

27. In order to compare the two productions, I directed that approximately 10% of the produced ESI which was actually coded as responsive either by a managed review team member or the TAR algorithm be prepared for my review by CoreCivic's ESI vendor. Further, I directed that the project manager creating the batches ensure that files from the ADO and non-ADO custodians be included in the sample. I intentionally sought to exclude the 17,042 documents which were non-responsive (and may not even have contained any search terms, but were produced solely in accordance with the ESI protocol's "complete e-mail family" criteria) to increase the reliability of my conclusions.

28. The random sample I reviewed was 2,000 documents, which accounted for nearly 10% of the 20,998 responsive documents produced across the entire set of SDCF/OMDC ADO and non-ADO custodians.

29.     The sample was nearly evenly divided among both categories of custodians, including 1,077 files from the ADO custodians, and 923 from the non-ADO custodians.

30.     The sample did not include any responsive ESI from five ADO custodians who held positions as Assistant Warden or Warden. The sample included responsive ESI from all non-ADO custodians except Mr. Rivera, who did not have any non-duplicative documents promoted for review or production.

31.     To evaluate the files, I developed a three-tier rating of each document. "Relevant" was assigned to documents which were relevant to the core issues pertaining to the claims or defenses in this matter, such as policies and practices at the facility relating to the Voluntary Work Program, aggregate monthly expenses relating to the Voluntary Work Program, ICE oversight of the Voluntary Work Program, etc. "Tangentially Relevant" was assigned to those documents which arguably had some connection, albeit tenuous, to the core claims and defenses in the litigation. "Not Relevant" was assigned to documents which did not have any relationship to the issues in this litigation.

32.     As with the coding instructions given to the managed review team, I evaluated each document based solely upon the four corners of the document and relevant meta-data. Documents were not relevant simply because the header listed the filename of an attachment that could be relevant. Rather, non-email files (PDF, MS Excel, MS Word) were included in the sample and evaluated independently.

33.     "Not Relevant" was used sparingly for those documents which exclusively involved a non-ICE-detainee population; related to policies and practices at other facilities (including documents sent to custodians who had been employed at those other facilities); likely were coded responsive in error and not identified during the QC process; or identified as privileged during my review. A total of 180 "Not Relevant" documents were identified among the sample set, with 109 occurring among the ADO custodians and 70 occurring among the non-ADO

custodians. Based upon my experience working with CoreCivic, I expected this to be the case, since opportunities for advancement to ADO level normally require transfer to a new facility location, whereas non-ADO staff are more likely to seek promotion at their current facility, rather than relocate.

34. During the sample review, I identified 375 documents as "Relevant." Of those "Relevant" documents, 292 (77.85%) were collected from ADO custodians. Of all of the non-ADO custodians included in the sample, only the business manager had more than 15% of his documents identified as "Relevant," including monthly reports, ICE invoices, and incentives provided to participants in the Voluntary Work Program, at a gross facility monthly level. Most non-ADO custodians, including individuals who served as Quality Assurance Manager, Grievance Officer, Disciplinary Hearing Officer, and some Unit Managers, had less than 10% of documents which I identified as "Relevant."

35. The fact that the processing and review was conducted in the sequence directed by the Court, with the ADO custodians first, followed by the non-ADO custodians, inflated the number of "Relevant" documents among the non-ADO custodians and limited the effectiveness of email threading to control data storage and review costs. Generally, email threading strives to exclude earlier communications in an email exchange to keep the complete thread. Threading, however, looks only at exact duplicates of earlier parts of the final exchange. Thus, if one response in the exchange included a new or different attachment, it would be produced as a separate exchange, even though much of the exchange is duplicative. This problem is compounded by the separate productions of ESI from ADO and non-ADO custodians. For example, if an exchange started out among unit staff, but was later forwarded to an ADO custodian, both the original exchange among unit staff and the forwarded exchange that included the ADO custodian were likely coded responsive and produced, as the exchange involving the ADO custodian would have been produced first, with the original exchange produced again later

1  because it was not an exact duplicate of the exchange that was produced with the
2  ADO custodian's ESI and therefore was not filtered out during de-duplication and
3  threading. This situation accounts for many of the "Relevant" documents among the
4  Unit Managers I identified during the sample review.

5        36. Among the "Relevant" documents identified from the Unit Managers,
I found draft Unit Plans relating to the operation of each unit at the facility. Unit Plans are usually prepared annually, and typically: identify the designated population of a housing area; identify available VWP assignments from the Facility's 18-100BB Housing Plan Guidelines and 18-100CC Work/Program Plan Guidelines; detail expected practices and procedures relating to operations in each housing unit; and identify specific unit personnel. These plans are not simply prepared by Unit Managers, but require approval of the Chief of Unit Management and the Warden (or Warden's designee), and duplicate copies were also identified among the ADO custodians' ESI. Further, final approved versions of these are usually maintained at each facility, and should be more readily obtained as hardcopy documents or loose ESI directly from the facilities.

17        37. More than 70% of the files I reviewed in the sample were identified as "Tangentially Relevant." Of those, 676 files were located among the ADO custodians, and 770 were identified among the non-ADO custodians. To differentiate these, I placed them in the following subcategories[3]:

      a. Facility Policies – Copies of the final versions of these policies were previously obtained from the facility and produced prior to the collection of ESI. The copies that appeared in the sample are duplicates of documents more easily and already obtained by other means, or drafts which were never approved for implementation (55 documents – 37 ADO and 18 non-ADO);

---

[3] To the extent a document fell into more than one subcategory, it was classified for each relevant one.

Declaration of Michael Giardina, ACP      11      17cv01112-JLS-NLS

b. Facility Handbooks – Copies of the final versions of these issues were obtained from the facility and produced prior to the collection of ESI. The copies which appeared in the ESI sample are duplicates of documents more easily and already obtained by other means, or drafts which were never issued to the detainee population (19 documents – 2 ADO and 17 non-ADO);

c. Detainee Job Descriptions, Checklists, and Specifications – Copies of most of these were previously obtained directly from the facility and produced prior to the collection of ESI. (62 documents – 16 ADO and 46 non-ADO);

d. Facility or Unit Clocks – Copies of these documents (which set the operating schedule of the facility or a certain housing unit) were obtained from the facility and produced prior to the collection of ESI, and most of these are duplicates of documents more easily obtained by other means (26 documents – 20 ADO and 6 non-ADO);

e. Town Hall Meeting Minutes – These documents usually include a simple reminder to detainees of the option to participate in the VWP, as well as reminders about the importance of sanitation and hygiene, among other reminders relating to facility operations and procedures. (94 documents – 28 ADO and 66 non-ADO);

f. Rosters of VWP Participants (including scheduled individual days off) – The information regarding the identity of VWP participants is duplicative of the detainee pay records which were previously obtained and produced as structured data identifying each trust account transaction for each detainee who participated in the VWP. Further, as opposed to the structured

data previously produced, which covered the entire time period at issue, these are "static" documents, reflecting at best a snapshot of the roster as it appeared on just a single day. (64 documents – 29 ADO and 35 non-ADO);

g. Documents mentioning Detainee Work Stoppages and potentially related discipline (5 documents – 5 ADO and zero non-ADO);

h. Individual Detainee VWP requests for assignment, schedule changes, performance, payment questions (166 documents – 27 ADO and 139 non-ADO);

i. Documentation relating to medical clearances for individual detainees prior to being placed in certain VWP positions, as well as correspondence relating to removal or suspension of certain detainees due to individual medical concerns (443 documents – 211 ADO and 232 non-ADO);

j. General ICE oversight of facility operations (unrelated to VWP) (251 documents – 225 ADO and 26 non-ADO);

k. Plan of Action Lists and reports relating to ICE and audit deficiencies (15 – 15 ADO and zero non-ADO);

l. General reminders and reports relating to overall facility state of sanitation (177 documents – 24 ADO and 154 non-ADO);

m. Individual Detainee Discipline, unrelated to cleaning or VWP participation (19 documents – 9 ADO, 10 non-ADO); and

n. Duplicative content, usually different non-substantive branches of a Relevant email which appeared in close proximity in the sample (31 documents – 24 ADO and 8 non-ADO).

38. In addition, there were 45 documents (30 ADO and 15 non-ADO) which were identified as "Tangentially Relevant" but not included in the categories

above. These included documents relating to news articles, security and supervision of the facility kitchen, blank audit tools, and occasionally daily shift "pass-on" emails from Unit Management team members regarding the operation and observation of a particular housing unit for the member working the next shift.

39. During the review of 2,000 responsive emails and attachments among both the ADO and non-ADO custodians who were employed at SDCF/OMDC, I did not see a substantial difference between the emails collected, with the sole exception of emails relating to individual daily performance in the VWP, individual detainee requests for VWP assignments, and individual detainee requests relating to payment records. While there was considerably more correspondence among non-ADO personnel regarding individual detainee questions, requests for VWP positions, decisions to quit VWP participation, inquiries regarding status of individual payment of VWP allowances for certain days, requests to be reinstated to the VWP, and the performance of detainees in the VWP, the general substance and nature of those described individual detainee communications did not materially differ from those which were escalated to the ADO level and appeared among the ADO ESI contained in the sample.

40. To the extent that the purpose of discovery of ESI is to identify specific facility practices and procedures relating to cleaning done by detainees beyond their personal living spaces, during my review of the 923 non-ADO documents in the sample, I did not identify *any* relevant substantive emails or attachments with content which either was not duplicative of ESI from an ADO custodian or which could more quickly and readily be obtained from the facility or extracted from available structured data on a facility-wide basis.

///

///

///

Declaration of Michael Giardina, ACP      14      17cv01112-JLS-NLS

1  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 16th day of February, 2022 at Chandler, Arizona.

*[signature]*
Michael Giardina